**_REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED_**

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Mark D. Selwyn (SBN 244180)
mark.selwyn@wilmerhale.com
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Fax: (650) 858-6100

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Leon B. Greenfield (*pro hac vice to be filed*)
leon.greenfield@wilmerhale.com
Amanda L. Major (*pro hac vice to be filed*)
amanda.major@wilmerhale.com
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 663-6000
Fax: (202) 663-6363

WILMER CUTLER PICKERING
  HALE AND DORR LLP
William F. Lee (*pro hac vice to be filed*)
william.lee@wilmerhale.com
Joseph J. Mueller (*pro hac vice to be filed*)
joseph.mueller@wilmerhale.com
Timothy D. Syrett (*pro hac vice to be filed*)
timothy.syrett@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

*Attorneys for Plaintiffs*
*Intel Corporation, Apple Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTEL CORPORATION, APPLE INC.,<br><br>    Plaintiffs,<br><br> v.<br><br>FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., DSS TECHNOLOGY MANAGEMENT, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC,<br><br>    Defendants. | Case No. 19-7651<br><br><br><br>**COMPLAINT**<br><br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Intel Corporation ("Intel") and Apple Inc. ("Apple"), on personal knowledge as to their own acts, and on information and belief as to all other acts based on their own and their attorneys' investigation, by and through their attorneys, allege as follows:

## INTRODUCTION

1.      Intel and Apple bring this action under Section 1 of the Sherman Act and Sections 4, 7, and 16 of the Clayton Act, 15 U.S.C. §§ 1, 15, 18, and 26; under Cal. Bus. & Prof. Code § 17200 et seq.; and to prevent and restrain Defendants' anticompetitive conduct and other violations of the law.

2.      Rather than promote the progress of science and useful arts, patent assertion entities ("PAEs"), including Defendants, that aggressively pursue meritless litigation have long been recognized to harm and deter innovation.  For example, one study estimated that patent litigation brought by PAEs in the United States resulted in expenditures of $29 billion in 2011 for licensing fees, legal fees, and other costs of responding to PAE litigation.[1]  Another study found, by looking at the impact on stock price, that lawsuits by PAEs from 1990 through 2010 were responsible for the defendants losing half a trillion dollars.[2]  And those losses are not offset by corresponding gains to patent holders that promote innovation.  One study found that the profits received by PAEs from litigation amounted to less than 10% of the lost share value of companies targeted by the PAEs.[3]

3.      Based on such studies, the President's Council of Economic Advisers, the National Economic Council, and the Office of Science & Technology Policy warned in a 2013 report that "Patent Assertion Entities . . . focus on aggressive litigation, using such tactics as: . . . creating shell companies that make it difficult for defendants to know who is suing them; and asserting that

---

[1] James Bessen; Michael J. Meurer, *The Direct Costs from NPE Disputes*, 99 Cornell L. Rev. 387, 389-90 (2014).

[2] James Bessen; Jennifer Ford; Michael J. Meurer, *The Private and Social Costs of Patent Trolls*, 34 Regulation 26, 31 (2011).

[3] Bessen & Meurer, *supra* note 1, at 411.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

their patents cover inventions not imagined at the time they were granted."[4]  Further, the report concluded that PAEs "have had a negative impact on innovation and economic growth."[5]

4.     Recognition of the threat posed by improper patent assertions has led to judicial determinations clarifying the law and legislative changes with the potential to curb meritless litigation.  In 2011, the U.S. Court of Appeal for the Federal Circuit struck down the overreaching presumption offered by Defendant Uniloc USA, Inc. ("Uniloc USA") that, as a rule of thumb, infringement of a single patent warranted twenty-five percent of the product's profit.  The same year, Congress enacted the Leahy Smith America Invents Act, including *inter partes* review procedures through which the Patent Trial and Appeal Board ("PTAB") of the U.S. Patent & Trademark Office ("USPTO") can be asked to review whether issued patents are actually valid. And in 2014, the Supreme Court held in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), that inventions directed to abstract ideas could not be patented unless they contain an "inventive concept" beyond implementation of the abstract idea in computer code.

5.     In 2016, the Council of Economic Advisers returned to the subject of PAEs, observing that research since 2013 continues to show "that a substantial amount of patent litigation in the United States, often with little substantive merit, often arises from certain types of NPEs [non-practicing entities] called 'patent assertion entities.'"[6]  But the Council noted that legislative and judicial actions, such as those described above, are "promising in that all of them should reduce the level of frivolous patent litigation."[7]

6.     In the face of these challenges, PAEs have evolved.  PAEs have increasingly been partnering with investment firms to fuel their litigation.  This trend is part of a larger trend in the growth of third-party investment in litigation generally.  Although the precise scale of investment

---

[4] Executive Office of the President, *Patent Assertion and U.S. Innovation* at 1 (June 2013).

[5] *Id*. at 2.

[6] Council of Economic Advisers Issue Brief, *The Patent Litigation Landscape: Recent Research and Developments* at 2 (March 2016).

[7] *Id*. at 7.

in litigation is unknown, estimates put it in the tens of billions of dollars.[8]  As one example, the largest litigation investor reported having investments of $2.8 billion in 2019.[9]

7.     Having deep-pocketed investment firms standing behind them has made PAEs only more aggressive.  Indeed, to meet the expectations of their new investors for high returns, PAEs must act ever more aggressively.  These new investors are content to incur loss after loss so long as they have the chance to hit a windfall reward that will justify their investment.  Patent assertion thus becomes simply a numbers game disassociated from the merits of the underlying patents, with PAEs and their investors betting that serial assertions with aggressive demands will strike a jackpot eventually making up for many other losses.  Consistent with this strategy, while the overall level of patent litigation may be declining, assertions by non-practicing entities are increasing.[10]

8.     A central player in this emerging investment strategy is Fortress Investment Group LLC ("Fortress").  Fortress is an investment firm that went public in 2007.  Fortress's shares traded at over $35 per share after going public, but one decade later, Fortress was struggling with poor returns and its share price had plummeted to around $5 per share in 2017.  Fortress was acquired that year by SoftBank Group Corp. ("SoftBank") for $3.3 billion.  Fortress contends it is "a leading, highly diversified global investment manager"[11] and claims to have approximately $39.2 billion of assets under management as of March 31, 2019.  One way in which Fortress has tried to turn around its performance and justify SoftBank's investment in it is through increased speculation on patent assertions.

---

[8] Brian Baker, *In low-yield environment, litigation finance booms*, MarketWatch (Aug, 21, 2018) (reporting an estimate of $50 to $100 billion invested in litigation finance); L.M. Sixel, *Private equity's latest investment?  Lawsuits*, Houston Chronicle (May 18, 2018) (reporting an estimate of $30 billion invested in lawsuits).

[9] Burford Capital, *Investor Presentation – 1H 2019 Results* at 5 (July 25, 2019).

[10] Unified Patents, *Q3 2019 Patent Dispute Report* (Sept. 30, 2019) ("District court patent litigation is down 5.5% compared to the same period for 2018 (down 43% compared to the peak in 2015).  However, NPEs in Q1-Q3 2019 filed 1,424 new district court cases, slightly more than the number of new NPE cases in 2018."); Unified Patents, *Q2 2019 Patent Dispute Report* (July 1, 2019) ("District court patent litigation is down 5.5% compared to the same period for 2018 ("NPEs filed over 550 new district court cases in Q2 2019, the most NPE cases in a single quarter since 2016").

[11] Fortress, https://www.fortress.com/about (last visited Nov. 15, 2019).

---

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

9.      Intel and Apple bring this complaint to end a campaign of anticompetitive patent aggregation by Fortress and a web of PAEs that Fortress owns or controls.  Fortress has used its stable of PAEs to aggregate a massive portfolio of patents that purportedly read on high-tech consumer and enterprise electronic devices and components or software therein and processes used to manufacture them.  By employing a network of PAEs that it either owns or controls, Fortress has created a web of entities that obscures Fortress's puppeteering role in this scheme.  Rather than enhancing efficiency, Fortress uses aggregation to undermine it by creating a structure in which Fortress and its PAEs benefit by asserting weak patents—i.e., those that never would have been asserted by their former owners—in order to stretch the resources of their targets and increase the possibility that those weak patents will improperly be found valid and infringed or the prospect that a target (like Intel or Apple) will agree to a license to resolve the threat posed by Fortress and its PAEs.  Thus, rather than promoting the procompetitive benefits of the patent system by increasing innovation and output, Fortress's scheme has the opposite effect.  Fortress and its PAEs acquire and seek to monetize meritless patents that never would have been asserted by their original owners, imposing a tax on the electronics industry that increases prices, decreases output, and ultimately harms consumers.  To the extent that Fortress and the other Defendants have patents that would actually be of value to potential licensees, the transfer of those patents to Fortress's control limits access to them because those patents are now held by entities that have no incentive to license patents in a way that captures royalties that are commensurate with their actual value.  Instead, those entities have incentives to obtain excessive monopoly rents by exploiting patent portfolios that aggregate any valuable patents with many meritless patents.

10.      Through its anticompetitive aggregation scheme, Fortress has engaged in anticompetitive conduct by creating a portfolio of patents that purportedly read on electronic devices and components or software therein and processes used to manufacture them that allows it to charge far more than the value of the inventive contributions (if any) of the patents and of competitive prices for licenses.  Fortress and its PAEs seek to use that ill-gotten power to extract and extort exorbitant revenues unfairly and anticompetitively from Intel, Apple, and other

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

suppliers of electronic devices or components or software for such devices and ultimately from consumers of those products.  Fortress's aggregation is thus intended for an anticompetitive purpose—to invest in patents at costs lower than the holdup value of the patents to ensnare as many potential licensees as possible and to allow it and the other Defendants to assert as many possible claims of infringement to tax the commercial use of existing technology at rates beyond the actual value (if any) of the aggregated patents.

11.     In furtherance of the anticompetitive scheme, Fortress and the other Defendants have deployed patents in waves of lawsuits against their targets without regard for the merits of the claims.  Rather than licensing and litigating based on the merits of the patents, Fortress and its PAEs operate based on volume and repetition, targeting the resolve of the targets instead of establishing the merits and value of the patents.  Given the size of the portfolio, Fortress and its PAEs can deploy patent after patent in case after case against their targets with the threat of ever more patent assertions and ever more litigation.  Faced with this threat, many victims have agreed to settle, rather than to challenge Fortress and its PAEs, for amounts that reflect not the merits of the underlying patents but the effectiveness of the Fortress model.  Thus, Fortress and the other Defendants foreclose the possibility—which existed before aggregation—that litigation can be an economic alternative to licensing patents.

12.     Intel and Apple bring this action to remedy the harms that they have already suffered from Defendants' violations of federal antitrust and state unfair competition laws and to prevent further harm to themselves, the broader electronics industry, and U.S. consumers.

## PARTIES

13.     Plaintiff Intel develops, manufactures, and sells integrated digital technology products.  Intel is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business within this District at 2200 Mission College Boulevard, Santa Clara, California.

14.     Plaintiff Apple designs and sells innovative, iconic consumer electronics such as the iPhone, iPad, and MacBook.  Apple is a corporation organized and existing under the laws of

the State of California with its principal place of business within this District at One Apple Park Way, Cupertino, California.

15.     Defendant Fortress claims to be a Delaware limited liability company.  Fortress does business and maintains an office within this District at One Market Plaza, Spear Tower, 42nd Floor, San Francisco, California.

16.     Defendant Fortress Credit Co. LLC ("Fortress Credit") claims to be a Delaware limited liability company with its principal place of business at 1345 Avenue of Americas, 46th Floor, New York, New York.  Fortress Credit is registered with the California Secretary of State to do business in California and also maintains an office within this District at One Market Plaza, Spear Tower, 42nd Floor, San Francisco, California.  Fortress Credit is an affiliate of Fortress.

17.     Defendant Uniloc 2017 LLC ("Uniloc 2017") claims to be a Delaware limited liability company with addresses at 1209 Orange Street, Wilmington, Delaware; 620 Newport Center Drive, Newport Beach, California; and 102 N. College Avenue, Suite 303, Tyler, Texas.

18.     Defendant Uniloc USA claims to be a Texas corporation with a principal place of business at Legacy Town Center I, Suite 380, 7160 Dallas Parkway, Plano, Texas.  Uniloc USA is registered with the California Secretary of State to do business in California and also maintains an office in Newport Beach, California, where it conducts strategy meetings.

19.     Defendant Uniloc Luxembourg, S.à.r.l. ("Uniloc Luxembourg") claims to be a Luxembourg company having a principal place of business at 15, Rue Edward Steichen, 4th Floor, L-2540, Luxembourg.  Uniloc Luxembourg's CEO Craig Etchegoyen maintains a residence in Newport Beach, California, where he spends about 20 percent of his time and which he uses to conduct Uniloc Luxembourg business.  Uniloc Luxembourg's chief financial officer, Drake Turner, resides and works in Southern California.  Mr. Turner's responsibilities include preparing Uniloc Luxembourg's financial documents and negotiating terms with companies, including Fortress, that have security interests in Uniloc Luxembourg's patents.  Uniloc Luxembourg conducts business at Uniloc USA's office in Newport, California.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

20.     Defendant VLSI Technology LLC ("VLSI") claims to be a Delaware limited liability company with a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware.

21.     Defendant INVT SPE LLC ("INVT") claims to be a corporation existing under the laws of the State of Delaware with its principal place of business within this District at One Market Plaza, Spear Tower, 42nd Floor, San Francisco, California.

22.     Defendant Inventergy Global, Inc. ("Inventergy") claims to be a Delaware corporation with its principal place of business within this District at 19925 Stevens Creek Boulevard, Cupertino, California.

23.     Defendant DSS Technology Management, Inc. ("DSS") claims to be a Delaware corporation with a principal place of business at 1650 Tyson's Boulevard, Suite 1580, Tyson's Corner, Virginia.

24.     Defendant IXI IP, LLC ("IXI IP") claims to be a New York limited liability company with its principal place of business located at 825 Third Avenue, 2nd Floor, New York, New York.

25.     Defendant Seven Networks, LLC ("Seven Networks") claims to be a Delaware limited liability company with its principal place of business at 2660 East End Boulevard South, Marshall, Texas.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the federal claims alleged under 28 U.S.C. §§ 1331 and 1337(a).  This Court has jurisdiction over the unfair competition claims arising under state law pursuant to 28 U.S.C. § 1367(a).  The Court may grant declaratory relief in this action pursuant to at least 28 U.S.C. §§ 2201 and 2202 and 15 U.S.C. § 26.

27.     Venue is proper in this District pursuant to, at least, 15 U.S.C. § 22 and/or 28 U.S.C. § 1391(b) and (c) because, during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and/or because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.  In particular,

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Intel and Apple have addressed Defendants' anticompetitive conduct described herein from their headquarters in this District, including addressing licensing demands and coordinating the defense of Defendants' litigation, much of which has occurred in this District.  Further, Eran Zur, a Managing Director in Fortress's San Francisco office, runs Fortress's Intellectual Property Group, which has directed and controlled the anticompetitive conduct described herein.

28.     This Court has personal jurisdiction over each Defendant based on its national contacts with the United States as a whole pursuant to 15 U.S.C. § 22, as well as Defendants' relevant contacts with this judicial district.  Defendants have conducted and continue to conduct business in this District and/or have engaged in continuous and systematic activities in this District, including licensing activities, demands, negotiations, and litigation directly or through their agents. Defendants have minimum contacts with this forum such that the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice.

## INTRADISTRICT ASSIGNMENT

29.     The appropriate intradistrict assignment is in the San Jose Division.  Under Civil Local Rule 3-2(c), a civil action shall be assigned to the division "serving the county in which the action arises."  An action "arises in the county in which a substantial part or the events or omissions which give rise to the complaint occurred."  Civ. L.R. 3-2(c).  Here, a substantial part of those events or omissions occurred in Santa Clara County, where Intel and Apple are headquartered and where a substantial portion of the events set forth in this Complaint have a locus.  As described above, Intel and Apple have addressed Defendants' litigation and licensing demands from their headquarters in Santa Clara County.  Civil actions arising in Santa Clara County "shall be assigned to the San Jose Division."  *Id*. at 3-2(e).

## I.     FORTRESS'S ANTICOMPETITIVE PATENT AGGREGATION SCHEME

30.     Fortress describes its investing approach as "making control-oriented investments in cash flow generating assets."[12]  When it comes to patent investments, Fortress has taken its

---

[12]  Fortress, https://www.fortress.com/businesses/private-equity (last visited Nov. 15, 2019).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

"control-oriented" approach to an extreme.  Fortress's model is to condition its investments in PAEs on terms so severe that the PAEs have no choice but to make aggressive and reckless patent assertions to attempt to generate the revenue required to meet their obligations to Fortress.  When they fail to do so—as is often the case—Fortress steps in and assumes even more control and/or ownership of the patents, allowing it to ratchet up the aggressiveness of the assertions.  In other instances, such as with VLSI, Fortress has skipped this intermediary step of finding a partner to do its bidding and acquired patents through a subsidiary outright from the start.  The result is that Fortress has either acquired or controls a portfolio of well over a thousand U.S. patents for high-tech consumer and enterprise electronic devices and components or software therein and processes used to manufacture them to deploy against its targets.

31.    Fortress has targeted suppliers of high-tech consumer and enterprise electronic devices or components or software for such devices because they provide attractive targets for repeated and meritless assertions.  An article co-authored by Eran Zur, Managing Director of the Intellectual Property Finance Group at Fortress, observes that courts can grant "oversized awards" in the technology sector that "stem from the sheer complexity of interoperable components and systems sold as part of functional units, if not integrated devices."[13]  Further, the article notes that "because technology invention tends to be incremental, to the extent an individual patent owner can be awarded damages on the price of the *entire end product* as opposed to their specific patent claim, a litigation incentive arises."[14]  That litigation incentive is coupled with what the article notes are "the substantial legal costs to defend a patent infringement suit," creating a situation in which "speculative behavior drives an ever-inflating price ceiling (given the possibility of oversized damages) [and] a price floor becomes set by the extreme expense of litigation defense, marked at just under nuisance value."[15]

---

[13]  Eran Zur, *Why Investment-friendly Patents Spell Trouble for Trolls*, (Sept. 24, 2015), https://knowledge.wharton.upenn.edu/article/why-investment-friendly-patents-spell-trouble-for-trolls/ (last visited Nov. 15, 2019)

[14] *Id*. (emphasis supplied).

[15] *Id*.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

32.     Further, aggregating a massive portfolio of electronics patents allows Fortress and its PAEs to amass a range of patents that are both substitutes for and complements to one another. When a company wants to build an electronic device, such as a smartphone, there are many ways to do so.  Each alternative requires multiple technologies.  However, the alternatives do not require the same combination of technologies.  For example, Alternative 1 might require technologies A, B and C, while Alternative 2 might require technologies D, E and F.  The technologies used for Alternative 1 (A, B and C) are complements:  they are each needed to create the device using Alternative 1.  Similarly, the technologies used for Alternative 2 (D, E, and F) are complements. The technologies comprising Alternative 1 are also a substitute for the technologies comprising Alternative 2, because the bundle of technologies used in Alternative 1 can be used as a substitute for the bundle of technologies used in Alternative 2.

33.     There are many possible permutations of complement and substitute technologies for electronics patents.  For instance, Alternative 3 might require technologies A, C, and D.  In that scenario, the technologies bundled in Alternative 3 are a substitute for the technologies bundled in Alternatives 1 and 2 respectively; A, C, and D are complements in the production of Alternative 3; and technology D is a substitute for technology B.  Technologies can thus be both substitutes and complements.  If Alternative 4 used technologies A, B, and D, then B and D are complements for Alternative 4, but D and B are also substitutes that if switched would change Alternative 1 to Alternative 3.  Holding a broad array of patents that can act as both substitutes and complements in different circumstances allows Fortress and its PAEs flexibility to stifle competition in a variety of ways and against a variety of electronic device suppliers.

34.     Some of the technologies that can be used to make an electronic device might be patented.  But even with the most diligent approach to assessing the patent landscape for a product, it can be challenging to determine whether the technologies included in the device are patented, including because the scope of patent claims may be uncertain prior to litigation, as well as the validity and enforceability of such claims.

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

35.     When this array of patents is held by multiple owners, each patent owner would only assert a patent if the expected value of doing so was net positive.  "Weak" patents that have questionable validity, infringement, enforceability, and/or are easily designed around, and therefore have little or no meaningful value, are either not asserted, or are asserted to demand a license at an amount that is commensurate with the value of the patent's merits.

36.     Faced with a patent asserted against its device, the supplier can typically either take a license to the patent or refuse to license and litigate the infringement claim.  Regardless of which course is taken, the feasibility of designing around the asserted patent will affect the outcome because the supplier will not pay the patent owner a royalty greater than the cost to design around the patent.

37.     When patents are aggregated as Fortress has done, the dynamics for determining whether to assert a patent change and the options available to the target of the assertion also change—both of which have harmful impacts on competition.

38.     First, the scope of Fortress's aggregation and its focus on electronics patents ensures that it can effectively exercise hold-up power by eliminating substitutes.  Fortress has inevitably acquired substitute patents that, before aggregation, competed with each other.  When the patents were held by their original owners, there was competition and a prospective licensee could choose between competing options (or forego those options and design its product in a different way).  But now, under the control of Fortress, the prospect of competition disappears and so does the feasibility of redesigning products.  Fortress and its PAEs can thus threaten a target with the serial risk that the next best alternative design to an asserted patent is also subject to a patent claim by one of Fortress's PAEs.

39.     Second, aggregation elevates the value of asserting weak patents by Fortress-backed PAEs, untethered to the value of the patents themselves.  Before aggregation, there would be no incentive to assert such patents because there would be no expectation of a positive return from asserting a weak patent because the patent could be expected to be proven invalid, not infringed, or unenforceable in litigation, or would be easily designed around.  But, after

aggregation, assertion of weak patents as part of a wave of assertions against a target generates economic value even if many of those assertions are defeated in litigation. By increasing the volume of assertions a target faces, Fortress and its PAEs cause targets to deploy licensing and litigation resources less efficiently and thereby increase the value of litigation to Fortress and its PAEs. In particular, Fortress and its PAEs increase the likelihood that a weak patent will slip through litigation and be found infringed, valid, and enforceable when it should not be. Further, this strategy creates incentives for targets to settle with Fortress-backed PAEs for amounts that exceed the value (if any) of their patents to put an end to this risk. In this manner, Fortress's patent aggregation enables the use of weak patents to force targets to pay undeserved and inflated royalties.

40.     Patent aggregators often claim they are more efficient at enforcing patents than other licensors and that their greater efficiency results in higher payments to inventors and therefore in more innovation. But there is no efficiency associated with patent aggregation in the Fortress assertion model described above. To the contrary, patent licensing becomes less efficient with this type of abusive patent aggregation because the targets waste resources to defend against meritless assertions.

41.     Aggregating patents in the way that Fortress has done harms competition. First, by aggregating patents covering technologies that are actual or potential alternatives for one another, Fortress injures competition in the same way as any merger or combination of competitors. Before aggregation, when multiple parties held such patents, those parties competed with one another to license the patents, and licensees benefited from that competition through more favorable licensing terms. Multiple holders of substitute patents were forced to compete with each other to offer better terms to secure licensees. Once the patents were aggregated and controlled by Fortress, however, that competition was eliminated.

42.     Second, Fortress introduces a new cost to suppliers of electronic devices and the components and software for those devices that dampens incentives for product suppliers to invest in research and development to drive innovation, thereby further undermining competition and

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

harming end consumers.  Exposing the targeted suppliers to another cost benefits their competitors by making the targeted suppliers' products more expensive and/or less innovative.  Those competitors might have previously owned some of the patents aggregated by Fortress but were unable to impose such high costs on suppliers using technologies claimed by the patents when the patents were not aggregated into a massive portfolio.  Fortress's aggregation thus undermines competition in the sales of electronic devices and components and software for those devices.

43.  Third, the higher royalty payments that Fortress and its PAEs generate reward the creation of patents that are not actually inventive or are not actually used.  Thus, the higher royalties that patent aggregation generates do not lead to welfare-enhancing additional innovation.

44.  Fourth, Fortress's hold-up power is amplified by the uncertainty it creates through the size of the portfolio it controls and obfuscation regarding the scope of that portfolio.  After aggregation, potential licensees lose the ability to decipher the extent to which Fortress controls patents that they may actually have wanted to license ex ante or that would be substitutes to asserted patents.  By way of example, Fortress employees are listed as managing members or directors of companies that otherwise have no publicly known ties to Fortress.  Mysterious patterns emerge such as entities with names connoting an unspecified relationship with Fortress, by a prefix "CF."  District court judges have gone so far as having to compel Defendants to reveal the ownership history of the asserted patents and the degree to which Fortress held rights in, and control over, those patents.  The effect is that the hold-up power of asserted patents is imbued on other patents Fortress controls.  Thus, rather than fostering pro-competitive patent licensing, Fortress's aggregation scheme reduces potential licensees' ability to obtain licenses to any patents they might be interested in licensing while simultaneously elevating the value of weak patents.

45.  Fortress's use of a web of separate PAEs to disperse and enforce the portfolio also ensures that there is no single entity that can offer a comprehensive license to the Fortress portfolio and thereby increases the number of transactions necessary for licensees to attempt to secure patent peace or the number of litigations that Defendants can bring.  Defendants benefit from increasing the number of transactions because the more transactions, the more opportunities that they have to

extract anticompetitive royalties that are not reflective of the value of the patents being licensed. The same goes for litigation—the more cases that Defendants bring, the more opportunities they create for mistaken findings of infringement or coercive settlements.

46.     Distributing the patents across a network of PAEs, rather than having Fortress directly own and assert them, is also intended to limit the exposure of Fortress and the broader portfolio to potential blowback from aggressive assertions.  For example, to the extent that one of Fortress's PAEs is subject to an award of significant sanctions or attorneys' fees, Fortress could decide either to cut its losses or that it is worth continuing to fund the PAE to pursue further assertions.

47.     Moreover, PAEs can benefit in litigation from having had no role in prosecuting patents that they obtained from operating companies.  The result is that it can be difficult for a defendant to obtain evidence and to mount a complete defense to a PAE's assertion—thereby increasing the likelihood of a mistaken verdict of infringement or failure to find unenforceability.

48.     There is nothing inherently illegal with owning many patents or obtaining those patents through acquisition.  But Fortress's patent aggregation scheme is unlike the development of patent portfolios by operating companies that use patents to safeguard their ability to offer their own products and services free from infringement by others.  And it is different, too, from a company acquiring patents for the purpose of licensing based on the intrinsic value of those patents.  Both of those scenarios have the potential to increase output and lower prices by putting patents to efficient use.  But Fortress's aggregation is intended for an anticompetitive purpose— to invest in patents at costs lower than the holdup value of the patents to ensnare as many potential licensees and to allow it and the other Defendants to assert as many possible claims of infringement to tax the commercial use of existing technology at rates beyond the actual value (if any) of the aggregated patents.  And Fortress's aggregation scheme has had its intended anticompetitive effects, capturing hold-up values that exceed the values at which Fortress or the other Defendants acquired the patents, leading to reduced output.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

49.     Nor are the transfers of patents at issue here typical sales that place patents in the hands of new owners that intend to practice them to develop their businesses or to license them based on their technical merit to generate revenue.  Instead, Defendants' transfers are made with the purpose and effect of stifling competition by allowing Fortress and those using Fortress-backed patents to extort supracompetitive royalties unrelated to the value (if any) of the Fortress-backed patents.

50.     Transferring patents from operating companies to Fortress and its PAEs reduces or eliminates competitive constraints that would otherwise have restricted the ability of the former owners to impose onerous licensing terms when they asserted the patents.  Product companies generally sell a range of products in competition with other companies, and their ability to sell any of them is constrained by the competition faced by all the products.  A product company knows that if it acts too aggressively or rapaciously toward the customers of some of its products, those customers and others will be more likely to buy other types of products offered by the company from other companies that have not been so aggressive.  In that way, competition in the sale of one product constrains the prices of other products, and the product companies selling such products will have a strong competitive incentive to maintain a positive industry reputation and good customer relationships over the full range of their products.  For example, infringement actions by component or software suppliers against customers or potential customers will limit prospects for future sales.  Suits by electronic device suppliers against suppliers or potential suppliers of components or software could jeopardize their ability to source essential components or software for their devices.  Reputational and relational harm from filing repeated, baseless infringement suits will limit product companies' ability to participate effectively in collaborative industry initiatives, such as standard setting or other industry endeavors.  Because transfers of patents from product companies to Fortress and its PAEs lessen or eliminate these and other constraints and place the patents with a party with different incentives, those transfers result in inflated royalties or other less favorable licensing terms.  Transfers to Fortress and its PAEs—companies that produce no products and thus face no risk of patent countersuits from their targets—place patents

in the hands of entities that face no such competitive constraints and that are thus free to maximize their profits through aggressive litigation campaigns.  Moreover, Fortress's use of obfuscation and a web of PAEs heighten the anticompetitive effects of such transfers.  That Fortress and its PAEs have repeatedly entered patent transfer agreements with no efficiency rationale and those agreements have resulted in inflated royalties is direct proof of the anticompetitive effects of those transfers.

## A.   Fortress and the Uniloc Defendants

51.   On December 30, 2014, Fortress Credit entered into a Revenue Sharing and Note and Warrant Purchase Agreement ("Uniloc-Fortress Revenue Sharing Agreement") with Uniloc Luxembourg and Uniloc USA.  Under the Uniloc-Fortress Revenue Sharing Agreement, Fortress provided a loan to Uniloc USA in exchange for a share of future licensing revenue from its patent portfolio.  If Uniloc USA failed to timely make a required payment to Fortress or any other "Event of Default" occurred, Fortress had the right to accelerate the full payments owed by Uniloc USA.

52.   Fortress also entered into a Patent License Agreement with Uniloc Luxembourg and Uniloc USA on December 30, 2014.  The License granted Fortress "a non-exclusive, transferrable, sub-licensable, divisible, irrevocable, fully paid-up, royalty-free, and worldwide license to the Licensed Patents, including, but not limited to, the rights to make, have made, market, use, sell, offer for sale, import, export and distribute the inventions disclosed in the Licensed Patents and otherwise exploit the Licensed Patents in any lawful manner in ***Licensee's sole and absolute discretion*** solely for the benefit of the Secured Parties ('Patent License'), provided that Licensee shall only use the Patent License following an Event of Default."[16]

53.   Fortress later took steps to control even more directly the assertion of the Uniloc Luxembourg and Uniloc USA patents.  On February 23, 2018, Fortress formed Uniloc 2017 in order for Fortress to direct and control the assertion of Uniloc patents.  James K. Noble, who was previously Fortress's Secretary, signed the certificate of formation for Uniloc 2017.

---

[16] *Uniloc USA, Inc. et al. v. Apple Inc.*, No. 3:18-CV-00360 (N.D. Cal.) (WHA), Dkt. 167-4 (emphasis added).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

54.     On May 3, 2018, Uniloc Luxembourg assigned nearly 600 patents to Uniloc 2017 pursuant to a March 28, 2018 Asset Purchase Agreement.  Constantine Dakolias signed the agreement as President of Uniloc 2017.  Mr. Dakolias is also Co-Chief Investment Officer, Credit Funds at Fortress.

55.     As one court observed about the various transfers of patents and agreements between the Uniloc entities:  "The Court suspects that Uniloc's manipulations in allocating rights to the patents-in-suit to various Uniloc (possibly) shell entities is perhaps designed to insulate Uniloc Luxembourg from any award of sanctions in the event Uniloc loses this litigation (or some substantial part thereof)."[17]

56.     The patents that Uniloc Luxembourg assigned to Uniloc 2017 included patents claimed to be standard-essential patents ("SEPs") for cellular standards that originated with Koninklijke Philips Electronics N.V. ("Philips").  Philips had provided a commitment to the European Telecommunications Standards Institute ("ETSI") to license any of its essential patents on fair, reasonable, and non-discriminatory ("FRAND") terms and conditions.  The patents were subsequently transferred to the PAE Pendragon Wireless in 2012 and then to Uniloc Luxembourg in 2018 before ultimately being transferred to Uniloc 2017 in 2018.

### B.     Fortress and VLSI

57.     Fortress strategized for six months before undertaking the creation of VLSI and causing the transfer of patents to VLSI.[18]   Among the options Fortress considered was a "Privateering Option" in which the patents would be transferred to a new entity from their prior owner to carry out enforcement.  Another option was the "Corporate Carve Out" in which Fortress would purchase a division of the former owner along with some of its patents.  Ultimately, Fortress settled on the Privateering Option, to be accomplished through the creation of VLSI to obtain

---

[17] *Uniloc 2017 LLC v. Google LLC*, No. 2:18-cv-00553 (E.D. Tex. Jul. 1, 2019), Dkt. 28 Exhibit V.

[18] *VSLI Technology LLC v. Intel Corporation et al*, No.  5:18-mc-80193 (N.D. Cal. Jan. 1, 2019) (NC), Dkt 31.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

patents from the former owner and then assert them in litigation.  The terms of the arrangement were spelled out in a Patent Purchase and Cooperation Agreement.

58.     Fortress formed VLSI on June 27, 2016.  VLSI's formation document is signed by Marc K. Furstein, Fortress's Managing Director, President of the Credit Funds & Chief Operating Officer of Credit Funds.  Two days after VLSI's formation, Justin Klein (then Chief Financial Officer of Fortress's credit arm) formed CF VLSI Holdings LLC ("VLSI Holdings").  VLSI is a subsidiary of VLSI Holdings.  That VLSI ultimately operates at the behest of Fortress is further evidenced by the signature of Eran Zur, Managing Director of Fortress's Intellectual Property Group and an "authorized signatory" for VLSI, on several documents assigning patents to VLSI.

59.     VLSI holds nearly 200 patents and began receiving them with an August 16, 2016 assignment.  Mr. Zur signed a certain number of the patent assignment agreements on behalf of VLSI.

60.     Neither VLSI nor VLSI Holdings manufactures or sells any products.  VLSI appears to have a single employee—its Chief Executive Officer, Michael Stolarski.  Mr. Stolarski is an attorney who worked at several law firms before becoming the CEO of VLSI.

**C.     Fortress and INVT**

61.     In May 2013, Inventergy acquired over 180 patents from Huawei Technologies Co. ("Huawei") claimed to relate to IP Multimedia Subsystem (IMS) and Voice over IP (VoIP). Inventergy acquired the Huawei patents subject to certain ongoing payment obligations to Huawei, including to make a one-time payment when a certain revenue threshold was obtained by licensing the patents and also to share a certain percentage of the quarterly net revenue earned by licensing the patents.

62.     In October 2013, Inventergy acquired nearly 500 patents from Panasonic Corporation ("Panasonic") claimed to relate to 3G and 4G mobile telecommunications.  Inventergy acquired the Panasonic patents subject to an obligation to share a certain percentage of the quarterly net revenue earned on the patents with Panasonic, including to make certain guaranteed payments.  Inventergy agreed that if it failed to make the guaranteed payments by a specified date,

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Panasonic could charge it late fees and Panasonic may have the right to collect interest and in certain circumstances to terminate the agreement under which the patents were transferred to Inventergy.  As described further below, a number of the Panasonic patents are claimed to be essential to cellular standards and subject to commitments to license them on FRAND terms and conditions.

63.    In May 2014, Inventergy acquired approximately 80 patents claimed to be related to IMS and VoIP from Nokia Corporation ("Nokia").  As consideration, Inventergy agreed to make cash payments to Nokia on or before October 1, 2014, June 1, 2015, and June 1, 2016.

64.    On October 1, 2014, affiliates of Fortress, DBD Credit Funding, LLC and CF DB EZ LLC, entered a Revenue Sharing and Note Purchase Agreement with Inventergy.  Through the arrangement, Fortress provided $11 million in financing to Inventergy, consisting of $10 million in debt financing and $1 million in sale of stock.  As Inventergy informed its shareholders, the Fortress funds were "applied towards the repayment of existing debt obligations and improvement of our capital structure."

65.    In exchange for Fortress's investment, Inventergy agreed to apply revenues generated from patent monetization to repayment of the investment and, further, to provide Fortress with an additional portion of Inventergy's licensing revenues.  If Inventergy failed to make the required payments, it could default under the agreement.  As Inventergy subsequently warned its shareholders:  "In the case of a default, Fortress could accelerate our obligations under the Fortress Agreement and exercise their right to foreclose on their security interests, which could force us to cease operations."

66.    Fortress's backing emboldened Inventergy to aggressively pursue licensing targets. As Sonus Networks alleged in a case against Inventergy, Inventergy's CEO Joe Byers told Sonus in January 2015 that "Fortress[,] does not settle" in litigation and that if Sonus Networks declined to take a license, it would face "an IP bloodbath."

67.    On December 22, 2016, Inventergy entered a Restructuring Agreement to amend the Revenue Sharing and Note Purchase Agreement.  As Inventergy explained the consequences

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

of the Restructuring Agreement, "Fortress will have the sole discretion to make any and all decisions relating to [Inventergy's] patents and patent monetization activities (excluding future acquired patents related to Inventergy Innovations, LLC, a subsidiary of Parent, and related monetization activities) (such patents that are subject to the Restructuring Agreement, the 'Patents'), including the right to license, sell or sue unauthorized users of the Patents."

68.    Further, the Restructuring Agreement modified the revenue sharing arrangement to provide that after making certain required payments, including to Nokia, Huawei, and Panasonic, Fortress would receive proceeds "until Fortress has received (x) reimbursement of any amounts advanced by Fortress pursuant to the Restructuring Agreement plus 20% annual interest on such advances plus (y) $30.5 million less any amounts paid to Fortress for the Note Obligations under the Revenue Sharing and Note Purchase Agreement after December 22, 2016" and "after all of the foregoing payment obligations are satisfied, 70% to Fortress and 30% to the Company." Inventergy announced the Restructuring Agreement as an arrangement "under which Fortress may fund, at its discretion, an enhanced enforcement program to further monetize Inventergy's 740 telecommunications patent assets that the Company previously acquired from Panasonic, Nokia and Huawei."

69.    As a result of the Restructuring Agreement, Inventergy and a Fortress affiliate, CF INVT Holdings LLC, on April 27, 2017 formed INVT.  Mr. Dakolias, Co-Chief Investment Officer, Credit Funds at Fortress, is the President of CF INVT Holdings LLC, and signed INVT's Limited Liability Company agreement on behalf of INVT and CF INVT Holdings LLC.  Michele Moreland, a Director at Fortress, serves as the Licensing Officer of INVT SPE LLC.

**D.    Fortress and DSS**

70.    On February 13, 2014, Fortress Credit entered into an Investment Agreement with DSS and other undisclosed investors ("DSS-Fortress Investment Agreement").  Under the DSS-Fortress Investment Agreement, Fortress and the investors granted a loan to DSS in exchange for it placing a lien in favor of the investors on ten semiconductor patents and assigned to the investors

certain funds recoverable from successful patent litigation involving these patents, including settlement payments, license fees and royalties on the patents.

71.     On December 2, 2016, following DSS's default on its payment obligations under the DSS-Fortress Investment Agreement, the parties amended that agreement—including to extend the period for DSS to meet its payment obligations, to add the requirement that DSS repay certain expenses, and to require that DSS share proceeds from monetization efforts associated with certain additional patents.  DSS also granted Fortress and the investors a security interest in certain of DSS's unencumbered semiconductor patents to further collateralize the amounts owed under the DSS-Fortress Investment Agreement.  In February 2018, DSS failed to meet its payment obligations under the amended agreement.

72.     On June 26, 2018, DSS entered into an agreement with Fortress Credit, pursuant to which DSS transferred to Fortress Credit all the remaining economic rights to certain of DSS's semiconductor related patents.

**E.     Fortress and IXI IP**

73.     On April 2, 2014, IXI IP was formed in New York.  IXI IP is a patent assertion entity that received patents from IXI Mobile (R&D) Ltd. ("IXI R&D") on June 5, 2014, less than two weeks before filing its first suit against Apple.  The same day IXI IP received the transfer, it licensed the patents back to IXI R&D.

74.     On June 5, 2014, IXI IP assigned a security interest in each of the patents it received from IXI R&D to Fortress Credit.  Three months later, on September 11, 2014, Fortress Credit Co. DBD LLC assigned its interest to FCO V CLO Transferor LLC, another Fortress subsidiary.

**F.     Fortress and Seven Networks**

75.     Seven Networks was originally incorporated in Delaware in 2000 as a mobile messaging company under the name Seven Networks Inc.  Seven Networks Inc. subsequently registered to conduct business in Texas in 2005.

76.     Fortress was formerly an investor in Seven Networks Inc.  Fortress gained control of Seven Networks in 2015, after Seven Networks unsuccessfully attempted to monetize its patent

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

portfolio by offering its patents as well as its entire company for evaluation and sale to a number of entities, including Apple.  In July 2015, Fortress converted Seven Networks Inc. to a limited liability company.  Seven Network Inc.'s patents passed to Seven Networks at the time of the July 2015 corporate conversion.

77.     Seven Network's parent is CF SVN LLC, a Delaware company formed on July 2, 2015, and a Fortress subsidiary.

### G.     Fortress and KIP CR P1

78.     Crossroads Systems, Inc. ("Crossroads") is a publicly-traded company that used to be in the business of licensing intellectual property.

79.     In July 2013, Crossroads received a loan of up to $10 million from Fortress Credit that was later assigned to another Fortress affiliate, CF DB EZ LLC.  As part of the loan agreement, Crossroads assigned 109 granted or pending patents to a partnership, KIP CR P1 LP ("KIP CR P1"), formed by Crossroads and Fortress.  The transferred patents were all of Crossroads' patents with the exception of one patent family (for U.S. Patent No. 5,941,972 ("'972 patent")).  As with Fortress's other loan deals, Crossroads risked losing its interests in the transferred patents in an "Event of Default," including missing a payment to Fortress.

80.     Crossroads was ultimately able to repay the loan to Fortress in October 2015 only when it made a deal to share revenue from the monetization of the '972 patent family with another company.  But this arrangement was not enough for Crossroads to stay solvent.  In August 2017, Crossroads announced that it had filed for Chapter 11 bankruptcy in order to restructure its business and attract new investment.

81.     In the end, Fortress wound up acquiring all of Crossroads' patents.  As part of its restructuring, Crossroads announced in November 2017 that it had sold its patent portfolio as well as related partnership interests to an "affiliate of Fortress Investment Group" to take over patent monetization efforts.[19]  That Fortress affiliate was KIP CR P1.  Fortress and Crossroads agreed to

---

[19] Crossroads Systems press release, *Crossroads Systems Sells Patent Portfolio to Affiliate of Fortress Investment Group*, Nov. 7, 2017.

"share the proceeds from such efforts equally (after deducting expenses and a $1.5 Million monetization hurdle)."[20]

## II.    LICENSING AND LITIGATION CAMPAIGNS

82.    Consistent with Fortress's intent, the PAEs it has created or in which it has invested have engaged in prolific patent assertions and litigation campaigns.   The practice of serial litigations that Fortress's PAEs have pursued demonstrate that they have used litigation to impose a crushing burden on their targets rather than with regard to the merits of their patents or to vindicate their patent rights.

### A.    The Uniloc Defendants

83.    To date, the Uniloc Defendants have targeted Apple in 25 patent cases in the United States:

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 2:16-cv-00638 (E.D. Tex.)

- *Uniloc USA, Inc. et al. v. Apple Inc.*, No. 2:17-cv-00258 (E.D. Tex.), subsequently transferred as 3:18-cv-00357 (N.D. Cal.) (LHK)

- *Uniloc USA, Inc. et al. v. Apple Inc.*, No. 2:17-cv-00454 (E.D. Tex.), subsequently transferred as 3:18-cv-00358 (N.D. Cal.) (WHA) and 18-2094 (Fed. Cir.)

- *Uniloc USA, Inc. et al. v. Apple Inc.*, No. 2:17-cv-00455 (E.D. Tex.), subsequently transferred as 3:18-cv-00359 (N.D. Cal.) (WHA)

- *Uniloc USA, Inc. et al. v. Apple Inc.*, No. 2:17-cv-00457 (E.D. Tex.), subsequently transferred as 3:18-cv-00360 (N.D. Cal.) (WHA)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 2:17-cv-00469 (E.D. Tex.), subsequently transferred as 4:18-cv-00361 (N.D. Cal.) (PJH)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 2:17-cv-00470 (E.D. Tex.), subsequently transferred as 4:18-cv-00362 (N.D. Cal.) (PJH)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 2:17-cv-00522 (E.D. Tex.), subsequently transferred as 4:18-cv-00364 (N.D. Cal.) (PJH)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 2:17-cv-00534 (E.D. Tex.), subsequently transferred as 3:18-cv-00363 (N.D. Cal.) (WHA)

---

[20] *Id.*

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 2:17-cv-00535 (E.D. Tex.), subsequently transferred as 3:18-cv-00572 (N.D. Cal.) (WHA)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 2:17-cv-00571 (E.D. Tex.), subsequently transferred as 3:18-cv-00365 (N.D. Cal.) (WHA)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 2:17-cv-00708 (E.D. Tex.)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 1:18-cv-00158 (W.D. Tex.), subsequently transferred as 4:19-cv-01691 (N.D. Cal.) (JST)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 1:18-cv-00159 (W.D. Tex.), subsequently transferred as 5:19-cv-01692 (N.D. Cal.) (EJD)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 1:18-cv-00161 (W.D. Tex.), subsequently transferred as 4:19-cv-01693 (N.D. Cal.) (JST)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 1:18-cv-00163 (W.D. Tex.), subsequently transferred as 4:19-cv-01694 (N.D. Cal.) (JST)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 1:18-cv-00164 (W.D. Tex.), subsequently transferred as 5:19-cv-1695 (N.D. Cal.) (LHK)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 1:18-cv-00166 (W.D. Tex.), subsequently transferred as 4:19-cv-01696 (N.D. Cal.) (YGR)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 1:18-cv-00293 (W.D. Tex.), subsequently transferred as 3:19-cv-01697 (N.D. Cal.) (VC)

- *Uniloc USA, Inc. et al v. Apple Inc.*, No. 1:18-cv-00296 (W.D. Tex.), subsequently dismissed without prejudice

- *Uniloc 2017 LLC et al v. Apple Inc.*, No. 1:18-cv-00838 (W.D. Tex.), subsequently refiled as 1:18-cv-00990, and subsequently transferred as 3:19-cv-01904 (N.D. Cal.) (WHO)

- *Uniloc 2017 LLC et al v. Apple Inc.*, No. 1:18-cv-00851 (W.D. Tex.), subsequently refiled as -18-cv-00989 (W.D. Tex.), and subsequently transferred as 3:19-cv-01905 (N.D. Cal.) (JD)

- *Uniloc 2017 LLC et al v. Apple Inc.*, No. 1:18-cv-00890 (W.D. Tex.), subsequently refiled as 1-18-cv-00992 (W.D. Tex.), and subsequently transferred as 4:19-cv-01949 (N.D. Cal.) (JSW)

- *Uniloc 2017 LLC et al v. Apple Inc.*, No. 1:18-cv-00907 (W.D. Tex.), subsequently refiled as 1-18-cv-00991 (W.D. Tex.), and subsequently transferred as 5:19-cv-01929 (N.D. Cal.) (EJD)

- *Uniloc 2017 LLC v. Apple Inc.*, No. 6:19-cv-00532 (W.D. Tex.)

84. The Uniloc Defendants have often filed these cases against Apple in waves, with the apparent aim of heightening the threat to Apple to increase leverage and extract a settlement.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

For example, in June 2016, Uniloc USA and Uniloc Luxembourg sued Apple on four patents; between April and October 2017, Uniloc USA and Uniloc Luxembourg sued Apple on another 16 patents; in February 2018, Uniloc USA and Uniloc Luxembourg sued Apple on another seven patents; in April 2018, Uniloc USA and Uniloc Luxembourg sued Apple on another two patents; and in October 2018, Uniloc 2017 and Uniloc Licensing USA LLC ("Uniloc Licensing USA") sued Apple on another four patents.

85.     Although Apple has been a favored target of the Uniloc Defendants, it has not been the only one.  Since its creation in February 2017, Uniloc 2017 has been a plaintiff in more than 130 patent infringement suits.  Its targets have included the following companies that supply high-tech consumer and enterprise electronic devices or components or software for such devices:

- Barnes & Noble, Inc.
- BlackBerry Corporation
- Cardo Systems, Inc.
- Cisco Systems, Inc.
- Google LLC ("Google")
- Hike Ltd.
- Huawei Devices USA
- LG Electronics USA, Inc.
- Samsung Electronics America, Inc.
- Terrano, LLC
- ZTE (USA), Inc.
- Netflix, Inc.
- Hulu

86.     By targeting a broad number of suppliers of a particular electronics product—e.g., smartphones—the Uniloc Defendants (as well as the other Defendants) increase the chances that the costs imposed on those suppliers will be internalized and passed along to consumers.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

87.     As with Apple, the Uniloc Defendants have targeted many of these companies in repeated lawsuits.  Google, for example, has been a frequent target.  On October 1, 2018, Uniloc 2017 and Uniloc Licensing USA filed four separate complaints against Google.  Between October 31, 2018 and November 1, 2018, Uniloc 2017, Uniloc Licensing, and Uniloc USA filed another 10 separate complaints against Google.  Later in November, the Uniloc entities dismissed those 14 complaints without prejudice and a different set of Uniloc entities—Uniloc 2017 and Uniloc USA—filed 14 new complaints against Google on the same 14 patents asserted in the prior complaints.  In December 2018, Uniloc 2017 filed an additional seven complaints against Google, one of which it later dismissed.  That amounts to a total of 35 lawsuits against Google by Uniloc entities over three months.

88.     The three years so far of the Uniloc Defendants suing Apple has demonstrated Fortress's scheme to assert endless, meritless litigation.  The four patents in the first Uniloc case against Apple have all been found unpatentable by the USPTO.  The second Uniloc case against Apple revealed how little pre-suit diligence is taken before suing, when after suing, Uniloc Luxembourg voluntarily dismissed one of the three asserted patents and admitted that the "Patent is probably commercially worthless."[21]  It is no surprise that one judge described Uniloc USA's infringement theories in a case as "bogus and conclusory."[22]  The examples below demonstrate the flaws in the Uniloc Defendants' patents, including patents that have been found invalid in multiple ways by multiple adjudicators.

89.     In one example of a Uniloc Defendant asserting invalid patents, Uniloc USA sued eight companies, including Apple, on a patent that two courts have found invalid and on which the PTAB has initiated an *inter partes* review.  Uniloc USA asserted U.S. Patent No. 6,993,049 (the "'049 patent"), titled "Communication System," in the following cases:

---

[21] Patent Owner Preliminary Response to Petition, *Unified Patents Inc. v. Uniloc Luxembourg, S.A.*, IPR2017-01850 (PTAB Nov. 30, 2017).

[22] Transcript of Proceedings, *Uniloc USA, Inc. v. Apple Inc.*, No. 18-cv-359 (N.D. Cal. June 28, 2018) (WHA).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

- *Uniloc USA, Inc. v. Apple Inc.*, No. 1:18-cv-00164 (W.D. Tex.), subsequently transferred as 5:19-cv-1695 (N.D. Cal.) (LHK)

- *Uniloc USA, Inc. v. Samsung Electronics America, Inc.*, No. 2:18-cv-00040 (E.D. Tex.)

- *Uniloc USA, Inc. v. Logitech, Inc.*, No. 5:18-cv-01304 (N.D. Cal.) (LHK)

- *Uniloc USA, Inc. v. LG Electronics USA, Inc.*, No. 3:18-cv-00559 (N.D. Tex.), subsequently transferred as 3:18-cv-06738 (N.D. Cal.) (LHK)

- *Uniloc USA, Inc. v. Huawei Device USA, Inc.*, No. 2:18-cv-00074 (E.D. Tex.)

- *Uniloc USA, Inc. v. ZTE (USA), Inc.*, No. 2:18-cv-00307 (E.D. Tex.), subsequently transferred as 3:18-cv-02839 (N.D. Tex.)

- *Uniloc USA, Inc. v. Blackberry Corp.*, No. 3:18-cv-01885 (N.D. Tex.)

- *Uniloc USA, Inc. v. Microsoft Corp.*, No. 8:18-cv-01279 (C.D. Cal.)

90.     The '049 patent purports to cover an improvement of Bluetooth technology.  On April 19, 2019, a court in the Northern District of California held the '049 patent invalid as failing to recite patent-eligible subject matter under 35 U.S.C. § 101.  Specifically, the court concluded that the '049 patent is "directed to the abstract idea of additional polling in a wireless communication system" and that "there is no inventive concept sufficient to save the claim."[23]

91.     On April 5, 2019, a court in the Eastern District of Texas held that there were multiple bases to conclude that asserted claims 1 and 8 of the '049 patent are indefinite.[24]  On July 2, 2019, Uniloc USA, Uniloc Luxembourg, and Uniloc 2017 jointly filed with defendants Huawei Device USA, Inc. and Huawei Device Co. Ltd a Joint Motion to Dismiss with Prejudice, in which dismissal of the Uniloc Defendants' claims was sought to be "conditioned on the Court's vacating the Claim Construction Memorandum Opinion and Order . . . entered April 5, 2019."[25]  By seeking to dismiss without prejudice, the Uniloc Defendants attempted to avoid having final judgment entered finding the '049 patent invalid, allowing the Uniloc Defendants to continue to pursue

---

[23] Amended Order Granting Motion to Dismiss at 17, 32, *Uniloc USA Inc. v. LG Elecs. USA Inc.*, No. 5:18-cv-06738 (N.D. Cal. Apr. 9, 2019) (LHK), Dkt 109.

[24] Claim Construction Memorandum and Order, *Uniloc USA, Inc. v. Samsung Elecs. America, Inc.*, Nos. 2:18-cv-00040, 2:18-cv-00074 (E.D. Tex. Apr. 5, 2019).

[25] Joint Motion to Dismiss, *Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al*, No. 2:18-cv-00074 (E.D. Tex. Jul. 2. 2019), Dkt 58.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

baseless claims using that patent.  The court denied the Uniloc Defendants' ploy, ordering on July 9, 2019 that the parties were to file a "new motion to dismiss that is not conditioned upon the Court vacating the Claim Construction Memorandum Opinion and Order."[26]

92.    Finally, on July 22, 2019, the PTAB instituted an *inter partes* review of the '049 patent, concluding that Apple's "Petition establishes a reasonable likelihood that [Apple] would prevail in showing claims 11 and 12 [of the '049 patent] are unpatentable" as obvious in light of multiple prior art references.[27]

93.    The Uniloc Defendants have also asserted claims without regard to the merits of their infringement allegations.  For example, in *Uniloc USA, Inc. v. Apple Inc.*, No. 2:17-cv-00470 (E.D. Tex.), subsequently transferred as 4:18-cv-00362 (N.D. Cal.) (PJH), Uniloc USA and Uniloc Luxembourg asserted that Apple's iPhones, iPads, and Watches infringe U.S. Patent No. 7,690,556 (the "'556 patent").  The '556 patent claims a "step counter system," which comprises "an accelerometer to detect motion of a user, a step calculation logic to utilize the motion detected by the accelerometer to detect and count steps, and an incline logic to calculate an incline of a surface on which the user moved."  The complaint accused Apple's products "that incorporate hardware (such as an accelerometer, inclinometer, altimeter and/or barometer) and software (such as the Health app in iOS 8.0.x, iOS 9.0.x, iOS 10.0.x and watchOS versions) that are capable of calculating the number of steps taken (e.g., 'Steps') and distance covered (e.g., 'Walking + Running Distance') by a user as well as the user's change in elevation (e.g., 'Flights Climbed')."  But Apple's products do not use an accelerometer to determine elevation change or incline.  Indeed, an analysis of the '556 patent commissioned by its former owner, Fullpower Technologies, Inc. (Fullpower), observed that accelerometers in current fitness trackers, including those in Apple products, "do not monitor how much the foot is going up and how much is coming down," as required by the claims.  Instead, as the Fullpower analysis noted, the incline measurements in the

---

[26] Order Denying Motion to Dismiss, *Uniloc USA, Inc. et al v. Huawei Device USA, Inc. et al*, No. 2:18-cv-00074 (E.D. Tex. Jul. 9, 2019), Dkt 59.

[27] *Apple Inc. v. Uniloc 2017 LLC*, Case No. IPR2019-00251 (PTAB July 22, 2019).

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

tracking devices "com[e] from the barometer/altimeter instead of the accelerometer."[28]  Apple obtained this analysis through third-party discovery from Fullpower.  Uniloc USA and Uniloc Luxembourg refused to reveal to Apple whether it knew of the analysis performed for Fullpower before filing suit.  Uniloc USA and Uniloc Luxembourg either ignored this information or was willfully blind to it before bringing a meritless case against Apple.

94.     Beyond the '556 patent being not infringed, nearly every claim was found invalid as indefinite in Uniloc USA, Uniloc Luxembourg's case against Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. ("Samsung").[29]  The Uniloc Defendants litigated the case against Samsung all the way until the days leading up trial, when it voluntarily dismissed the case.

95.     Notwithstanding the weakness of its claim on the '556 patent, Uniloc USA and Uniloc Luxembourg have disclosed that they believes they are entitled to damages of between $1.41 and $2.75 per Apple product, for total damages in the range of $375 to $732 million.  The apparent precision of the per-unit damages request is a facade; Uniloc USA and Uniloc Luxembourg simply adopted the amounts that Apple sought from Samsung in litigation for Apple's patents.  Uniloc USA and Uniloc Luxembourg have adopted this approach to damages in multiple cases against Apple in complete disregard for the technology claimed in the asserted patents.  Based on this approach, Uniloc USA and Uniloc Luxembourg have suggested that they are entitled to between $2.6 and $5.1 billion in damages from just four of its 25 cases against Apple:

| Case | Patent | Per Unit Damages | Damages |
| --- | --- | --- | --- |
| *Uniloc USA, Inc. v. Apple Inc.*, No. 5:18-cv-00357 (N.D. Cal.) (LHK) | 8,239,852:  "Remote update of computers based on physical device recognition" | $1.41 - $2.75 | $756,709,869 - $1,475,852,582 |

---

[28] *Uniloc USA, Inc. v. Apple Inc.*, 4:18-cv-00362 (N.D. Cal.) (PJH), Dkt. 120-2.

[29] Claim Construction Memorandum & Order, *Uniloc USA, Inc., v. Samsung Elecs. America, Inc.*, No. 2:17-cv-651 (E.D. Tex. Oct. 24, 2018), Dkt. 77.  The complaint was originally filed by Uniloc USA and Uniloc Luxembourg and Uniloc 2017 later joined.

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

| Case | Patent | Per Unit Damages | Damages |
|---|---|---|---|
| | 9,414,199:  "Predictive delivery of information based on device history" | $1.41 - $2.75 | $186,200,370 - $363,156,750 |
| *Uniloc USA, Inc. v. Apple Inc.*, No. 4:18-cv-00361 (N.D. Cal.) (PJH) | 8,872,646:  "Method and system for waking up a device due to motion" | $1.41 - $2.75 | $166,933,405 - $325,579,336 |
| *Uniloc USA, Inc. v. Apple Inc.*, No. 4:18-cv-00362 (N.D. Cal.) (PJH) | 7,690,556:  "Step counter accounting for incline" | $1.41 - $2.75 | $375,273,911 - $731,917,202 |
| *Uniloc USA, Inc. v. Apple Inc.*, No. 4:18-cv-00364 (N.D. Cal.) (PJH) | 7,653,508:  "Human activity monitoring device" | $1.41 - $2.75 | $375,273,911 - $731,917,202 |
| | 7,881,902:  "Human activity monitoring device" | $1.41 - $2.75 | $375,273,911 - $731,917,202 |
| | 8,712,723:  "Human activity monitoring device" | $1.41 - $2.75 | $375,273,911 - $731,917,202 |
| **Total** | | | **$2,610,939,288 - $5,092,257,476** |

96.     As the number of times that the Uniloc Defendants' cases against Apple have been transferred out of Texas—shown in the list above in paragraph 82—makes clear, the Uniloc Defendants have time and again sought to impose the additional burden on Apple of litigating in an inconvenient forum.  Uniloc Defendants have gone so far as to misrepresent facts about its connections to Texas and lack of connections to California in an effort to fend off Apple's requests to have cases transferred to this District.  In *Uniloc USA, Inc. v. Apple Inc.*, No. 2:17-cv-00258 (E.D. Tex.), the court detailed a series of deceptive statements made by Uniloc USA and Uniloc Luxembourg, concluding that such "contradictory representations [are] troubling, particularly

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

because they are not isolated exceptions."  For example, Uniloc USA and Luxembourg made repeated misrepresentations about their lack of connection to California[30]:

> Mr. Burdick, Uniloc's only party witness residing within the Eastern District of Texas, does not spend the majority of his time in the Plano office.  (Dkt. No. 60-2, Ex. B at 2.)  Mr. Burdick spends equally as much time in Plano, as he does in Boise, Idaho and in southern California.  (*Id.*)  In addition, Mr. Etchegoyen [the CEO of Uniloc Luxembourg] spends about twenty percent of his time in either Newport Beach or Irvine, California and owns a residence in Newport Beach, which he uses when he "is doing business in Orange County."  (*Id.*; Dkt. No. 60-1, Ex. A at 160:15–16.)  Both Mr. Burdick and Mr. Etchegoyen have held around one hundred "top-level strategy meetings" in southern California, for Uniloc business purposes.  (Dkt. No. 60-1, Ex. A at 54:2–55:11.) Mr. Etchegoyen separately travels to southern California every month to meet with Mr. Turner, Uniloc Luxembourg S.A.'s CFO.  (Dkt. No. 60-1, Ex. A at 47:18–25.)  All of these facts fly in the face of Uniloc's prior representations:  that Uniloc had only one full-time employee, Tanya Kiatkulpiboone, working at its office in Irvine, California as of April 2017 (Dkt. No. 30-7, Burdick Decl. ¶ 10); that Mr. Etchegoyen has lived in Hawaii since well before the filing date of the Complaint and does not maintain a residence in California (Dkt. No. 30 at 12); and that Mr. Burdick does not work in California (Dkt. No. 43 at 2 n.3 [(]"Apple also repeats its erroneous assertion that Uniloc's IP counsel lives and works in California."); and that Apple "attempts to exaggerate Uniloc's ties to California" (Dkt. No. 30 at 1–2).

97.   As non-practicing entities, the Uniloc Defendants cannot credibly seek injunctions in U.S. litigation under the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), but they do not face the same limitations in Europe where injunctions may be automatically granted if infringement is found.  Accordingly, Uniloc Luxembourg has sought to enjoin Apple in litigation in Germany as leverage to coerce Apple to accept unreasonable licensing terms—including for its U.S. patents—or face the risk of having its business shut down.  In Uniloc Luxembourg's first case to proceed to trial against Apple, in Germany, it was Fortress employees who attended and consulted during the trial with outside counsel for Uniloc Luxembourg.  As with the rest of its cases against Apple to date, the court found the allegation meritless, here based on

---

[30] Memorandum Order and Opinion at 16-17, *Uniloc USA, Inc. v. Apple Inc.*, No. 2:17-cv-00258 (E.D. Tex. Dec. 22, 2017).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

Apple not infringing the patent, and dismissed the case (a decision that Uniloc Luxembourg has appealed).

### B.   VLSI

98.     On October 2, 2017, VLSI filed a suit against Intel in the Northern District of California, asserting eight patents against virtually every one of Intel's microprocessors ever sold since 2011 (the "California Action").[31]  Despite VLSI's aggressive litigation strategy in that case, it suffered numerous setbacks, including losing various discovery- and damages-related disputes. After the PTAB instituted *inter partes* review proceedings to evaluate the patentability of the claims in six of the asserted patents, the parties stipulated to a stay of the Northern District of California case in March 2019.

99.     Apparently unhappy with the setbacks it was encountering in the Northern District of California, VLSI also set its sights on Delaware.  On June 28, 2018, VLSI filed suit in the District of Delaware asserting five different patents against many of the same products accused in the California Action (the "Delaware I Action").[32]  In the past year, the Delaware I Action has imposed substantial burdens on Intel:  the parties have engaged in extensive discovery, with Intel having produced over a million pages of documents related to the accused products and 2.5 TB of source code, and thousands of pages of noninfringement and invalidity contentions.

100.     On March 1, 2019—***the same day*** that VLSI agreed to stay the California Action—VLSI filed yet another suit in the District of Delaware, asserting six new patents against many of the same products at issue in the previous cases (the "Delaware II Action").[33]

101.     Evidently concerned that the Delaware I Action and the Delaware II Action might be consolidated, VLSI again abandoned its litigation in hopes of obtaining a favorable outcome elsewhere.  On April 11, 2019, just hours after Intel filed its reply brief in support of its motion to consolidate—and without any warning—VLSI voluntarily dismissed the Delaware II Action and,

---

[31] *VLSI Tech. LLC v. Intel Corp.*, No. 5:17-cv-05671 (N.D. Cal.) (BLF).

[32] *VLSI Tech. LLC v. Intel Corp.*, No. 1:18-cv-00966 (D. Del.).

[33] *VLSI Tech. LLC v. Intel Corp.*, No. 1:19-cv-00426 (D. Del.).

***that same day***, filed three suits in the Western District of Texas (the "Texas Actions"),[34] asserting the same six patents at issue in the Delaware II Action, as well as two additional patents.

102.    VLSI claims up to $7.1 billion in connection with eight patents in the California Action and multiple billions of dollars in damages in the Delaware I Action.  These inflated numbers are a product of transferring the patents to VLSI and employing them in Fortress's unlawful aggregation scheme, including the fact that VLSI does not invent, produce, or sell any products.  For example, before VLSI acquired certain of the patents asserted against Intel in the Delaware I Action, ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████

103.    VLSI, at Fortress's direction, can and does take advantage of the fact that it produces nothing at all and therefore has no desire or need for dispute resolution.  Because VLSI's litigation costs and risks are trivial in comparison with those of the product companies it sues, it can afford to bring these types of serial suits based on weak or low-value patents under the theory that even a modest settlement for supracompetitive royalties will be profitable.

104.    As a non-practicing entity, VLSI cannot credibly seek injunctions in U.S. litigation under the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).  Faced with this problem, VLSI is seeking to enjoin Intel in multiple litigations in China, as leverage to coerce Intel to accept unreasonable licensing terms—including for its U.S. patents— or face the risk of having its business shut down.

**C.    INVT**

105.    ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████    Following that offer, Apple and Inventergy engaged in licensing negotiations.

---

[34] *VLSI Tech. LLC v. Intel Corp.*, No. 6:19-cv-00254 (W.D. Tex.); *VLSI Tech. LLC v. Intel Corp.*, No. 6:19-cv-00255 (W.D. Tex.); *VLSI Tech. LLC v. Intel Corp.*, No. 6:19-cv-00256 (W.D. Tex.).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

106.    INVT sued Apple and HTC in May 2017 in the District of New Jersey.  INVT has asserted eight SEPs that it claims are essential to cellular standards and are subject to FRAND commitments.  On August 29, 2017, INVT filed suit against ZTE Corporation ("ZTE"), in which it has asserted the same eight patents.

107.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Apple nonetheless informed INVT in July 2018 that it remained willing to negotiate and asked INVT to identify the specific patents it was seeking to license.

108.    Before responding to Apple's request and apparently dissatisfied with the pressure it could exert through district court litigation alone, on September 14, 2018, INVT asserted five of the patents from the District of New Jersey action against Apple, HTC, and ZTE in the International Trade Commission seeking an order excluding the accused products from importation into the United States.

109.    The International Trade Commission delegated to the Administrative Law Judge overseeing the litigation the responsibility to assess the implications for the public interest of INVT seeking an exclusion order on FRAND-committed patents.  An evidentiary hearing in the case was held in September 2019.  The Commission's target date for issuing a decision on whether to exclude the defendants' accused products from importation is June 15, 2020.

**D.    DSS**

110.    Backed by Fortress funds, DSS sued Intel on February 16, 2015, in the Eastern District of Texas, asserting two patents.  DSS also named Dell Inc., GameStop Corp., Conn's Inc., Conn Appliances, Inc., NEC Corporation of America, Wal-Mart Stores Inc., Wal-Mart Stores Texas, LLC, and AT&T, Inc. as defendants in the suit.

111.    Intel then petitioned the PTAB to assess in *inter partes* review proceedings whether the claims of the asserted patents were patentable.  The PTAB instituted the proceedings, and Intel and DSS agreed to stay the litigation pending the outcome of those *inter partes* reviews.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

112.    In final written decisions issued on June 1, 2017, the PTAB held that all challenged claims (which included the claims DSS had asserted against Intel) were unpatentable.  DSS and Intel jointly requested that the litigation stay continue pending appeal.

113.    In January 2019, Intel and DSS entered into a settlement, and the district court litigation was dismissed.

### E.    IXI IP

114.    IXI R&D and IXI IP (collectively, "IXI") brought suit, in the Southern District of New York, against Samsung and BlackBerry Limited and BlackBerry Corporation ("BlackBerry") on June 17, 2014 and June 18, 2014 respectively, on the same set of four patents in each case.  IXI voluntarily dismissed without prejudice their complaint against BlackBerry on February 5, 2019.

115.    IXI also sued Apple on the same patents on October 2, 2014 in the Southern District of New York.  On May 11, 2015, IXI and Apple jointly stipulated to dismiss with prejudice one of the patent claims at issue in the case.

116.    On December 21, 2016, the PTAB found unpatentable every asserted claim of one of the remaining patents-in-suit in *inter partes* review proceedings.[35]  While the PTAB's decision was on appeal, IXI filed an *ex parte* reexamination of the patent.  The patent issued from reexamination with one amended claim and 68 new claims.  U.S. Patent No. 7,039,033 (requested Mar. 24, 2017) (issued Feb. 1, 2018).  IXI obtained the reexamined claims by adding trivial additional limitations—like a "speaker," a "microphone," and a "touchscreen"—that make the new claims no more novel than the canceled claims.

117.    Similarly, on December 21, 2016, the PTAB found unpatentable all but one of the asserted claims of another asserted patent, U.S. Patent No. 7,295,532 (the "'532 patent").[36]  The USPTO thereafter instituted a reexamination of the '532 patent challenging, among other claims, the sole originally-asserted claim that was not instituted as part of the *inter partes* review.  In the subsequent *ex parte* reexamination proceedings, all challenged claims, including the lone

---

[35] *See* IPR2015-01444, Paper 27 (PTAB Dec. 21, 2016).
[36] *See* IPR2015-01443, Paper 27 (PTAB Dec. 21, 2016).

1    remaining originally-asserted claim, currently stand rejected.[37]  In response, IXI is seeking to add

2    numerous new claims and argues for patentability of the challenged claims.

3        118.    IXI subsequently moved to amend its infringement contentions in the litigation

4    against Apple to assert certain unspecified newly-issued claims of the '033 patent and additional

5    unspecified claims that have not yet even been allowed by the USPTO of the '532 patent.[38]   IXI

6    thereby seeks to restart the litigation that it comprehensively lost five years after the complaint was

7    filed.  Apple opposed IXI's motion, arguing that IXI's attempt to insert reexamined claims into

8    the litigation should be barred by res judicata.[39]  The court denied IXI's motion to amend its

9    infringement contentions, but it did not decide whether res judicata bars IXI from asserting its

10   reexamined claims against Apple.  Apple and Samsung subsequently filed complaints seeking a

11   declaratory judgment that res judicata bars IXI from asserting the reexamined claims and, in the

12   alternative, that the reexamined claims are not infringed and are invalid.

13       119.    Apple also filed *inter partes* review petitions on the reexamined claims of the '033

14   patent in 2018, but the PTAB denied institution because—even though the new claims did not

15   exist during the year after the complaint was filed—the PTAB concluded that the petitions were

16   time-barred.[40]  IXI thus attempts to immunize its patent from *inter partes* review challenge.

17       **F.    Seven Networks**

18       120.    In May 2017, Seven Networks sued ZTE and Samsung in the Eastern District of

19   Texas on the same set of seven patents in both cases and also asserted those patents plus three

20   others against Google.  Seven Networks voluntarily dismissed its case against ZTE a month later

21   before refiling the same patents.  In November 2018, Seven Networks asserted another group of

22   six patents against Samsung and Google.

23

24

_____

25   [37] Office Action (mailed Sept. 25, 2018).

26   [38] *IXI Mobile (R&D) Ltd. v. Apple Inc.*, Case No. 4:15-cv-3755 (N.D. Cal. Mar. 7, 2019) (HSG), Dkt. 157.

27   [39] *Id.*, Dkt. 164.

28   [40] *Apple Inc., v. IXI IP, LLC*, IPR2019-00124, Paper 13 (PTAB Jun. 3, 2019).

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

121.     Seven Networks eventually obtained settlements with ZTE, Samsung, and Google.[41]

122.     Seven Networks sued Apple on April 10, 2019 in the Eastern District of Texas, asserting sixteen patents against Apple related to a wide range of Apple products and services.  Per the complaint, Seven Networks is listed as the "assignee of all rights, title, and interest in" for each of the sixteen patents-in-suit.

### G.     KIP CR P1

123.     Since receiving a loan from Fortress Credit in 2013, Crossroads has asserted eight separate patent actions in the Western District of Texas against Dot Hill Systems Corp.; Oracle Corporation; Huawei Technologies Co., Ltd.; Huawei Enterprise USA, Inc.; Huawei Technologies USA, Inc.; Cisco Systems, Inc.; NetApp, Inc.; and Quantum Corporation claiming infringement of some combination of U.S. Patent Nos. 6,425,035 (the "'035 patent"), 7,051,147 (the "'147 patent"), 7,934,041 (the "'041 patent"), and 7,987,311 (the "'311 patent").   Specifically, Crossroads alleged in each of the eight actions that the '035 patent was infringed, and in seven of the actions that the '041 patent was infringed.

124.     In final written decisions dated January 29, 2016 and March 17, 2016, the PTAB found in *inter partes* review proceedings all asserted claims of the asserted '035 and '041 patents were invalid.  The U.S. Court of Appeals for the Federal Circuit affirmed that decision on June 6, 2017.

125.     Fortress and KIP CR P1 agreed to step into the place of Crossroads in these litigations notwithstanding the PTAB and Federal Circuit findings.  Fortress's subsequent writs of certiorari to the Supreme Court challenging the constitutionality of the PTAB's *inter partes* review process were denied on April 30, 2018.  Each of these actions was ultimately dismissed.

---

[41] *Seven Networks, LLC v. ZTE (USA) Inc.*, No. 3:17-cv-1495 (N.D. Tex. Aug. 14, 2019), Dkt. 318; *Seven Networks, LLC v. Samsung Elecs. Co., Ltd.*, No. 2:17-cv-441 (E.D. Tex. Dec. 28, 2018), Dkt. 67; *Seven Networks, LLC v. Google LLC*, No. 2:17-cv-442 (E.D. Tex. Jan. 20, 2019), Dkt. 608.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

## III.    SEP TRANSFER SCHEMES

126.    As described above, INVT and Uniloc 2017 hold what they claim are SEPs for cellular standards and that are subject to commitments to license on FRAND terms.

### A.    Cellular Standards and the Risks of Standard Setting

127.    Standards, such as LTE, are created and publicly distributed by standard setting organizations ("SSOs").  Industry standards provide potential benefits by allowing devices made by different companies to communicate with each other because these devices support the same standard.  But standards also present risks of harm to competition and consumers when patent holders claim to have patents essential to the standards—*i.e.*, the standard cannot be practiced without using the patent—and exploit those patents to demand excessive royalties or hold up companies that use the standard.  Before a standard is set, the SSO can choose different ways of implementing particular functionality within the standard.  But once the standard is set and technology to perform a particular functionality is incorporated in the standard, users of the standard become "locked in" to using that technology through their investment in products and services that support the standard.  This "lock-in" effect creates a risk that patent holders claiming to have essential patents will attempt to exploit their patents by demanding excessive royalties or seeking to enjoin the use of their patents.  In particular, SEP holders may seek royalties that do not reflect the incremental value of their patents (which may cover only a fraction of the matter addressed in a given standard) but instead are based on the user's investments in supporting the standard.

128.    The risk of exploitative SEP licensing conduct is exacerbated by the fact that SSOs typically make no evaluation of whether a claimed-essential patent is actually essential.

129.    In response to this risk of exploitative behavior, SSOs have adopted licensing commitments that govern patents claimed to be essential to a standard.  Many SSOs impose a requirement that patent holders claiming to have essential patents timely disclose those patents to the SSO and commit to license them on FRAND terms and conditions.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

130.   FRAND royalties for SEPs should reflect the ex ante value of the technology covered by the SEP before standardization, when alternative means of performing the functions purportedly covered by the patented technology were available.  That is, FRAND royalties should be apportioned so that they do not reflect any value attributable to adoption in the standard of the feature covered by the SEP or unpatented features within the standard.

**B.   ETSI and Its Intellectual Property Rights Policy**

131.   ETSI is an independent, non-profit SSO that produces globally-accepted standards for the telecommunications industry.  ETSI has more than 800 members from over 60 countries across five continents.  ETSI created or helped to create many telecommunication standards, including the 2G (e.g., GSM), 3G (e.g., WCDMA/UMTS), and 4G (LTE) cellular communication standards.

132.   Along with six other regional SSOs, ETSI is an Organizational Partner in the Third Generation Partnership Project ("3GPP").  3GPP produces technical specifications that are adopted as standards by Organizational Partners, such as ETSI.  3GPP was created to oversee work on global 3G cellular specifications and has subsequently worked on creating 4G specifications.  The 3GPP Organizational Partners agreed that members of a particular Organizational Partner would be bound by the intellectual property rights ("IPR") policy of that Organizational Partner when participating at 3GPP.

133.   ETSI has adopted an IPR Policy, incorporated as Annex 6 of the ETSI Rules of Procedure.  The ETSI IPR Policy is governed by the laws of France and provides that "[a]ny right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature."

134.   Among other requirements, the ETSI IPR Policy obligates members to disclose to ETSI and its members patents and patent applications that a member believes are or may become essential to an ETSI standard.  Once such a disclosure is made, the member is requested to submit

an irrevocable undertaking confirming its willingness to license the IPRs it has disclosed on FRAND terms and conditions.

135.    Specifically, Clause 4.1 of the ETSI IPR Policy provides as follows regarding the disclosure obligation at ETSI:

> Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion.  In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

136.    In its second sentence, Clause 4.1 imposes a "particular" requirement on members submitting a technical proposal to disclose the existence of any potentially essential IPR when a proposal is made and no later than when the standard has been adopted.

137.    The disclosure requirement under Clause 4.1 of the ETSI IPR Policy is intended to ensure that when ETSI members (or participants at 3GPP) are deciding on the content of a particular standard specification, they understand that there is IPR that may potentially be implicated if certain technology is standardized.  This knowledge allows members to make choices regarding technologies to standardize with a more informed understanding of the consequences of their choices.  ETSI and its members rely on the safeguards of the disclosure and FRAND licensing obligation to ensure the viability and commercial potential of the standards adopted by ETSI.

138.    The ETSI IPR Policy further requests that SEP owners submit an irrevocable written undertaking that they are prepared to grant irrevocable licenses on "fair, reasonable, and non-discriminatory" or FRAND terms and conditions.  Clause 6.1 states:

> When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ("FRAND") terms and conditions under such IPR to at least the following extent:

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

● MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

● sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

● repair, use, or operate EQUIPMENT; and

● use METHODS.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

139.    ETSI's IPR Policy was designed to benefit all ETSI members, as well as all other parties (including manufacturers and consumers) that supply products that support an ETSI standard.  In particular, the Policy describes in Clause 3.1 that it has the objective to "reduce the risk" to those implementing the standards or other technical specifications "that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."

140.    Through disclosure of potentially essential IPRs and obtaining FRAND commitments for them, ETSI can include technology in its standards that may be covered by IPRs with confidence that hold-up tactics by owners of declared SEPs will not undermine the subsequent widespread adoption of the standards.  If ETSI becomes aware of a potentially essential IPR for which a FRAND undertaking is not made, the IPR Policy requires that ETSI avoid standardizing the technology claimed by that IPR.  In particular, Section 8.1.1 of the ETSI IPR Policy provides that ETSI must take steps to ensure that a "viable alternative technology" is available where IPR cannot be licensed on FRAND terms and conditions:

Where prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION an IPR owner informs ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION in accordance with Clause 6.1 above, the General Assembly shall review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION which:
- is not blocked by that IPR; and

- satisfies ETSI's requirements

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

141.    Apple is an ETSI member through the participation of its European subsidiaries. The ETSI IPR Policy defines a "MEMBER" as including the member's "affiliates," which includes those entities owned or controlled by a member.

### C.   Holders of Declared SEPs Have Monopoly Power In Input Technology Markets For Standardized Functionalities

142.    Each cellular standard developed by ETSI or 3GPP consists of many different technologies that perform a variety of functions.  The technologies that perform each of these functions are essential inputs into the manufacture and supply of products and services that support the standards.

143.    In the process of developing cellular specifications and standards, ETSI and 3GPP participants choose particular technology to provide each individual function encompassed by the standards.  ETSI and 3GPP participants evaluate whether to standardize particular proposed functions and, if so, which viable, alternative competing technologies to select to perform those functions.

144.    Once a standard, like LTE, is adopted, the viability of using alternative technologies that are not standardized to perform functions included in the standard is constrained or eliminated. That is, standardization constrains or eliminates as substitutes all the technologies that would have been capable of performing the functionality in the standard but that were not chosen to perform that function.  Parties supplying products that support the standard, such as Apple, become "locked-in" to the standardized technology.

145.    If a technology selected for inclusion in the standard is protected by patents, the patent owner controls the supply of that particular input technology for the standard.  This is true for each function comprising the standard for which patented technology was selected.

146.    The functionality for cellular standards associated with each input technology comprises its own relevant market for antitrust purposes (individually, an "Input Technology Market," and collectively, the relevant "Input Technology Markets").  Fortress, INVT, and Uniloc 2017 hold monopoly power in the various Input Technology Markets for the various functions

claimed to be covered by their declared SEPs.  That is because, post-standardization, formerly viable alternative technologies are no longer viable because of the lock-in effect of standards discussed above.

147.    Cellular standards are employed throughout the world and alternative technologies competing to be incorporated into the cellular standards were offered by suppliers from around the world.  Accordingly, the geographic scope of each of the relevant Input Technologies Markets described above is worldwide.

148.    SEP holders have the power to raise prices and exclude competition with respect to each of the technologies covered by their patents and incorporated in the relevant standard.  An Input Technology Market has high barriers to entry because the standardization process eliminates the viability of alternative technologies as substitutes to perform the standardized functionality in the Input Technology Market.

149.    Simply by asserting that they have large portfolios of essential patents, INVT and Uniloc 2017 can obtain royalties or other licensing terms for the patents above what they could have obtained before ETSI or 3GPP standardized the technology that INVT and Uniloc 2017 claims is covered by their patents.  INVT and Uniloc 2017 have such hold-up power because without a license, a party supplying products that support the relevant cellular standards risks being unable to market those products and having its entire business put in peril.

**D.    Fortress, INVT, and the Uniloc Defendants' Anticompetitive SEP Transfer Schemes**

150.    INVT acquired SEPs from Panasonic subject to obligations for INVT to share with Panasonic the royalties it obtains from licensees.  Uniloc Luxembourg received SEPs that originated with Philips, to which Uniloc Luxembourg granted Uniloc USA rights to be an exclusive licensee, and which it later transferred to Uniloc 2017.

151.    Transferring SEPs from an operating company that supplies its own products and participates in SSOs to a PAE allows the PAE to escape the protections for licensees to which licensors agree through making a FRAND commitment.  When an operating company demands

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

royalties for patents it has declared essential to industry standards, it faces bounds on the reach of its demands because it remains an operating company and an SSO participant.  As an operating company that sells its own products or services, it remains subject to assertion of patents against it by potential licensees.  Thus, for example, an operating company would face constraints in demanding non-FRAND royalties or otherwise failing to adhere to a FRAND commitment because it could be subject to reciprocal demands or conduct from other SEP holders.

152.     And, as SSO participants, operating companies have reputational interests at stake that may be injured though directly breaching their FRAND commitments.  Such conduct will make SSOs and their members less likely to standardize the operating company's technology in future standards.  By transferring SEPs to PAEs, operating companies avoid these constraints and enlist PAEs that are not subject to the same constraints to exploit the monopoly power associated with their claimed SEPs.

153.     Patent transfer schemes like INVT's and the Uniloc Defendants' frustrate the purposes of the FRAND commitment in another way.  By transferring portions of the SEP portfolios of operating companies to PAEs for the purpose and with the effect of driving up transaction costs and evading FRAND commitments, the scheme not only introduces inefficiencies but also makes it impossible for Apple and other device suppliers to license all of an operating company's declared SEPs in a single license.  Apple had previously paid Panasonic for a license to certain of its W-CDMA SEPs through the W-CDMA patent pool administered by Sipro Lab Telecom.  In addition, Apple entered a license agreement with Philips in 2012 that granted Apple a license to certain Philips patents.  But Philips had already transferred one of those patents at the time of the license (without retaining a right to license Apple) and, after further transfers, it ultimately ended up with Uniloc 2017.  In litigation against Apple, Uniloc 2017 claims that Apple's cellular devices infringe the transferred patent because they support 3G and LTE standards, thus relying on the purported essentiality of the transferred patent.  In litigation between Apple and Philips about the scope of their license, however, Philips claims that the transferred patent is not

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

commercially or technically essential and, therefore, does not fall within the scope of the 2012 license agreement.

154. The transfer of SEPs from operating companies to PAEs to engage in abusive licensing undermines standard-setting's procompetitive purposes of facilitating wide adoption of industry standards on economically reasonable terms, and, instead, transforms standard-setting into a mechanism for holding up and extracting exorbitant royalties from product suppliers, bringing immediate harm to product suppliers and end consumers through higher prices and reduced innovation and quality. Over the long run, abusive patent transfer schemes, like INVT and the Uniloc Defendants have employed here, chill standard-setting activities and the procompetitive benefits they bring.

155. There is no procompetitive justification for the anticompetitive transfer of SEPs to INVT and the Uniloc Defendants. To the extent INVT and the Uniloc Defendants assert that any procompetitive justifications exist, such purported justifications are outweighed by the anticompetitive effects in the markets alleged herein or could have been obtained in a substantially less restrictive way.

## IV. FORTRESS AND THE OTHER DEFENDANTS HAVE HARMED COMPETITION IN A MARKET FOR PATENTS FOR HIGH-TECH CONSUMER AND ENTERPRISE ELECTRONIC DEVICES AND COMPONENTS OR SOFTWARE THEREIN AND PROCESSES USED TO MANUFACTURE THEM

156. Fortress and the other Defendants, through their anticompetitive conduct, have harmed competition in an antitrust market for patents for high-tech consumer and enterprise electronic devices and components or software therein and processes used to manufacture them, the "Electronics Patents Market."

157. The Electronics Patents Market constitutes a relevant patent licensing market where Fortress (either directly through its PAE subsidiaries or by acting in concert with the PAEs in which it invests) and other holders of patents claimed to read on electronic devices demand that suppliers of electronic products license their patents.

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

158. The geographic scope of the Electronics Patents Market is the United States, as patents are national in scope.

159. Fortress has market power in the Electronics Patents Market based on the number of patents that Fortress and its PAEs have aggregated, the means by which Fortress and Defendants hold and assert those patents, and the other anticompetitive conduct described above and below.

160. The supracompetitive licensing returns Fortress's PAEs have obtained are direct evidence of its market power. For example, the Uniloc Defendants have been able to coerce several parties (including Amazon.com, Inc. and Huawei Device Co. Ltd.) to license its patents, even though its patents have repeatedly been shown to lack merit. Fortress has been able to acquire patents at costs below their hold-up value and then, through the benefit of its anticompetitive scheme, extract higher payments from licensees that reflect hold-up value rather than the actual value of the patents based on their technical and commercial merits.

161. Defendants' demands also show that Fortress has the power to control prices in the Electronics Patents Market. As detailed above, Fortress-backed entities have sought billions of dollars from Intel and Apple.

162. By creating a massive portfolio, Fortress decreases the importance of any particular patent held by its PAEs because, given the size of the portfolio, it becomes exceedingly difficult for any potential licensee to meaningfully analyze the patents in the portfolio in a systematic fashion. Thus, the size of the aggregated portfolio imposes substantial costs for suppliers of electronic devices to design or work around no matter the merits of the constituent patents. Further, as described above, Fortress's PAEs assert their patents to read broadly on the accused products in ways that are facially invalid, but that Fortress's PAEs also claim make it infeasible to design around. Moreover, the features of products accused of infringement by Fortress's PAEs may be difficult or impossible to modify because of the extremely high switching costs involved given the investments that have already been made in product design and production. For example, a report for the Uniloc Luxembourg board of directors indicates that litigation "campaigns are launched when the relevant technology reaches a well-monetized status." Even if Apple, Intel, and other

targets of Fortress-backed assertions have had success in invalidating or proving non-infringement of certain Fortress-backed patents, Fortress and its PAEs just turn to the next patent in the portfolio to assert. Fortress and its PAEs exploit that dynamic to shield from scrutiny their patents and to extract royalties based on the size of the portfolio (including by distributing it among multiple PAEs to assert) rather than its quality. Further, the asserted SEPs held by INVT and Uniloc 2017, by definition, claim to cover essential technology that it would generally not be feasible to design around if they are actually essential.

163. Thus, the power of Fortress's patent portfolio is not based on the value or lawful scope of its constituent patents, but on the size of the portfolio itself, which imposes hurdles to design around regardless of the merits of the patents within it, and its distribution among aggressive PAEs. That size allows Defendants to threaten serial litigation and impose uncertainty on their victims regardless of the merits of the asserted patents, which become secondary to the sheer size of the portfolio. Accordingly, the targets of Defendants' assertions have no choice but to buy licenses from Defendants or to face endless, meritless litigation. Before aggregation, the holders of meritless patents lacked the same incentives to assert them as do Fortress and its PAEs. But, to the extent that they had asserted them, litigation would have been a viable possibility for the targets to address those assertions. In their aggregation and serial assertion strategy, however, Defendants are not dissuaded by repeated litigation failures from asserting ever more patents.

164. Fortress's aggregation of patents also decreases access to any patents that Fortress controls for which a licensee might actually want a license to use the technology in the patent. Before aggregation, those patents could have been the subject of licensing discussions focusing on the merits of the patents and that would have promoted use of the technology. But by aggregating potentially valuable patents in a huge portfolio with meritless patents in an anticompetitive scheme, Fortress and the other Defendants obscure those patents from the market and reduce the availability of information. Thus, rather than increasing efficiency and enhancing output, the scheme has the opposite effect—the value of meritless patents is enhanced and the value of any

patents in which there might have been interest in practicing is decreased, thereby reducing innovation and output.

165.   There is no procompetitive justification for the anticompetitive aggregation of patents by Fortress and its PAEs.  To the extent Defendants assert that any procompetitive justifications exist, such purported justifications are outweighed by the anticompetitive effects in the markets alleged herein or could be obtained through less restrictive means.  For example, the operating companies that transferred patents to Fortress's PAEs would have been capable of licensing their own patents.  As an example, Nokia, which transferred patents to Inventergy, reported in its 2018 annual report that "Our Patent Business continues to grow its successful patent licensing and monetization activities" and that Nokia was a party to more than 100 patent licenses.

## V.   THE ANTICOMPETITIVE EFFECTS OF DEFENDANTS' SCHEME

166.   As set forth above, Fortress possesses market power in the Electronics Patents Market.  Further, Fortress, INVT, and Uniloc 2017 possess monopoly power for their SEPs in the Input Technology Markets that perform each of those standardized functions.

167.   Putting aside market definition, direct evidence demonstrates the adverse effects on competition of the anticompetitive conduct of Fortress and the other Defendants through aggregation (as described above and below).  In particular, through their aggregation scheme, Fortress and the other Defendants seek and/or obtain far more for their patents than the costs at which they acquired those patents or the rates at which they would have been licensed before aggregation.

168.   Fortress and its PAEs' anticompetitive scheme—including patent aggregation, ownership by an array of aggressive PAEs, baseless litigation, and efforts to evade FRAND commitments—has led to anticompetitive effects, reduced output, the creation and enhancement of market power in the Electronics Patents Market and creation and enhancement of monopoly power in the Input Technology Markets.  Fortress and the other Defendants' conduct has harmed and continues to harm competition in interstate commerce.

169.   In particular, Defendants' illegal scheme has resulted in inflated licensing royalties—i.e., higher prices—and imposed burdens, costs, and uncertainties for Intel, Apple, and other purchasers in the Electronics Patents Market and each of the Input Technology Markets.  The purchasers in those markets include electronic device suppliers (e.g., of smartphones, tablets, and computers, such as those offered by Apple) and providers of components for such devices (e.g., processors and chipsets, such as those offered by Intel) that are potential and actual licensees.  In addition, as a result of the illegal conduct of Fortress and the other Defendants, U.S. and other end consumers have been harmed and face a continuing threat of increased prices and reduced innovation and quality for electronic devices.

170.   Defendants' illegal conduct causes obvious harm to licensees such as Intel and Apple—i.e., customers in the Electronics Patents Market and/or in the Input Technology Markets—when they are compelled to pay inflated royalties.  Licensing customers are also harmed, even when they do not acquiesce to an inflated royalty, by being forced to incur substantial expenses, uncertainty, and burdens in resisting the patent litigations and threats that the aggregation and transfer schemes of Defendants have enabled.  For example, Intel and Apple have spent millions of dollars to date on outside resources (including counsel, experts, and vendors) to defend against Fortress-backed demands and assertions.  Intel and Apple have also each been harmed by the enormous amounts of time their employees have been forced to spend on these matters, including negotiating with Defendants as well as collecting information and documents and preparing for depositions, rather than doing their jobs.  As an example, in litigation brought by Uniloc USA and Uniloc Luxembourg, those Defendants have already deposed eight Apple engineers, two human resource witnesses, and one Apple licensing witness.  Similarly, in Intel's litigation against VLSI in Delaware, Intel's disclosures identify twenty-five Intel employees with knowledge relevant to the litigation, including engineers and employees in the marketing and finance departments.  An employee identified in such disclosures is typically deposed, necessitating at least two full days dedicated to the litigation between preparation and sitting for the deposition, in addition to other time dedicated to identifying relevant documents or providing

information to counsel on the facts of the case.  Defendants have employed the strategies set forth herein to impose these costs on licensees and to use their leverage to extract unreasonable and unjustified royalties.  Intel and Apple continue to experience the unlawful effects of Defendants' unlawful conduct so long as they are subject to litigation by Fortress-backed patents.

171.   For declared SEPs specifically, Fortress, INVT, and the Uniloc Defendants' FRAND evasion has led to precisely the sort of anticompetitive effects that ETSI's IPR Policy was designed to avoid, leading to inflated prices in Input Technology Markets associated with their declared SEPs, as well as higher prices and reduced innovation and quality for downstream purchasers.  The transfer of those SEPs to PAEs in exchange for a share of licensing revenue has imposed exorbitant non-FRAND royalties (or heavy costs in trying to avoid such royalties) on Apple and other suppliers of products that support cellular standards.  This has led to inflated prices in Input Technology Markets associated with INVT and the Uniloc Defendants' declared SEPs, as well as higher prices and reduced innovation and quality for consumers of cellular products.  Moreover, the illicit SEP transfer scheme has chilled, and, if not enjoined, will continue to chill procompetitive standard-setting, to the detriment of industry and American and other consumers alike.

## FIRST COUNT

### Agreements to Restrain Competition in Patent Licensing

### (Section 1 of the Sherman Act)

### (Claim Against Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Inventergy, DSS, and IXI IP )

172.   Intel and Apple repeat and reallege the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

173.   As alleged above, Fortress and Fortress Credit reached agreements with various parties, including Uniloc USA, Uniloc Luxembourg, Inventergy, DSS, and IXI IP (collectively the "Agreeing Parties"), to aggregate patents under Fortress's control and to assert patents to increase the total royalties obtained from licensing the Fortress-backed patents.  Fortress and each of the

Agreeing Parties intended that through their agreements they would extract royalties from their targets—like Intel and Apple—beyond the royalties that could have been obtained but for aggregation by Fortress.

174.   The agreements between Fortress and the Agreeing Parties to aggregate patents substantially raised or threaten to raise prices and have resulted or threaten to result in other anticompetitive effects, including in the Electronics Patents Market, and for downstream products sold to consumers.  The agreements have substantially affected interstate commerce.

175.   The agreements to aggregate and assert patents generated no efficiencies, and in fact were designed to create inefficiencies in the licensing that Fortress could exploit to harm Intel, Apple, and other potential licensees, as well as finished product consumers.  Any conceivable efficiencies the agreements may have created were substantially outweighed by their anticompetitive effects or could have been obtained through substantially less restrictive means.

176.   As a direct, proximate, and foreseeable result of Fortress and the Agreeing Parties' unlawful agreements, Intel and Apple have suffered or will suffer harm to their businesses and property, and, absent an injunction, Intel and Apple will continue to suffer from these effects.  Intel and Apple's past and continuing harm includes litigation costs, the risk of supracompetitive licensing rates, business uncertainty, and business resources lost in dealing with the consequences of the Agreeing Parties' unlawful agreements.

**SECOND COUNT**

**Unlawful Asset Acquisitions**

**(Section 7 of the Clayton Act)**

**(Claim Against Fortress, Fortress Credit, Uniloc 2017, VLSI, INVT, IXI IP, and Seven Networks)**

177.   Intel and Apple repeat and reallege the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

178.   Fortress, Fortress Credit, Uniloc 2017, VLSI, INVT, IXI IP, and Seven Networks (the "Acquiring Parties") have acquired numerous patents (or interests in patents), which are assets

under Section 7 of the Clayton Act.  Those anticompetitive acquisitions include at least those described in Section I above.  The effects of the acquisitions have been to lessen competition substantially, and to tend to create market power, including in the Electronics Patents Market. Among other harms, the transfers have significantly enhanced the Acquiring Parties' ability and incentives to harm competition, including by evading constraints on assertion and creating incentives to assert patents aggressively and thus increasing the cost and likelihood of litigation.

179.    As a direct, proximate, and foreseeable result of the Acquiring Parties' unfair and wrongful conduct, as alleged above, there is a significant threat of inflated royalties to consumers of licenses to Fortress-backed patents.

180.    As a direct, proximate, and foreseeable result of the Acquiring Parties' unfair and wrongful conduct, as alleged above, there is a significant threat of harm to consumers, including through the inevitable passing on to consumers of the inflated royalties demanded for Fortress-backed patents.  The anticompetitive acquisitions have thus harmed consumers for electronics products.

181.    As a direct, proximate, and foreseeable result of the unlawful patent acquisitions, Intel and Apple have suffered or will suffer harm to their businesses and property, and, absent an injunction and rescission of these transactions, Intel and Apple will continue to suffer from these effects.  Intel and Apple's past and continuing harm include the risk of supracompetitive licensing rates, business uncertainty, litigation costs, and business resources lost in dealing with the consequences of the Acquiring Parties' unlawfully-acquired patents.

## THIRD COUNT

### Unfair Competition

### (Cal. Bus. & Prof. Code § 17200)

### (Claim Against All Defendants)

182.    Intel and Apple repeat and reallege the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

183. Defendants have engaged in unfair competition in violation of Cal. Bus. Prof. Code § 17200, et seq. As set forth above, Defendants have engaged in illegal conduct by violating the Sherman and Clayton Acts. That conduct is also unfair in that it violates the spirit and policy of the antitrust laws.

184. As a direct result of Defendants' wrongful conduct, competition has been injured, and, absent an injunction and rescission of these transactions, will continue to be injured, including in the Electronics Patents Market as alleged above. Moreover, this conduct threatens injury to downstream competition for price, innovation, and quality in sales of cellular devices, thereby injuring consumers in California and elsewhere. These threatened injuries include the passing on to consumers of improperly inflated royalties, and decreases in innovation and quality competition.

185. As a direct result of Defendants' illegal conduct, Intel and Apple have suffered economic harm in the form of litigation costs and diversion of resources away from innovation to respond to these entities' serial nuisance suits.

## FOURTH COUNT – BY APPLE ONLY

### Unfair Competition

### (Cal. Bus. & Prof. Code § 17200)

### (Claim Against Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Uniloc 2017, INVT, Inventergy Only)

186. Apple repeats and realleges the allegations of the preceding and subsequent paragraphs as if fully set forth herein.

187. Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Uniloc 2017, INVT, and Inventergy have engaged in unfair competition in violation of Cal. Bus. Prof. Code § 17200, et seq. As described below, their conduct violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. That conduct is also unfair in that it violates the spirit and policy of the antitrust laws.

188. Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Uniloc 2017, INVT, and Inventergy's unfair business practices include their efforts to evade FRAND commitments

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED*

through the transfer of SEPs to INVT and Uniloc 2017.  The acquiring parties would then demand non-FRAND royalties in violation of those FRAND commitments.[42]

189.   The United States Federal Trade Commission ("FTC") enforces Section 5 of the Federal Trade Commission Act, which is similar to Cal. Bus. & Prof. Code § 17200.  Section 5 of the FTC Act is used as a model in interpreting Cal. Bus. & Prof. Code § 17200.

190.   The FTC has brought an action under Section 5 where, like here, an acquiring firm refused to abide by licensing commitments that its predecessor made in connection with industry standard-setting activities.[43]

191.   As a direct result of Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Uniloc 2017, INVT, and Inventergy's wrongful conduct, competition has been injured and, absent an injunction, will continue to be injured, in the Input Technology Markets as alleged above. Moreover, this conduct threatens injury to downstream competition for price, innovation, and quality in sales of cellular devices, thereby injuring consumers in California and elsewhere.  These threatened injuries include the passing on to consumers of improperly inflated royalties, and decreases in innovation and quality competition for cellular devices that comply with relevant standards by raising costs for innovators to bring products to market via exorbitant, non-FRAND licensing terms.  As a direct result of Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Uniloc 2017, INVT, and Inventergy's illegal conduct, Apple has suffered economic harm in the form of litigation costs and diversion of resources away from innovation to respond to these entities' serial nuisance suits.

## PRAYER FOR RELIEF

Intel and Apple respectfully request the following relief:

---

[42] Apple brings this Count only as to conduct relating to patents that INVT and Uniloc 2017 have not yet asserted against Apple.

[43] *See* Decision and Order, *In the Matter of Negotiated Data Solutions LLC*, File No. 051-0094 (Jan. 23, 2008), available at https://www.ftc.gov/sites/default/files/documents/cases/2008/01/080122do.pdf.

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED***

a) That Defendants' unlawful conduct be declared a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 7 of the Clayton Act, 15 U.S.C. § 18; and Cal. Bus. Prov. Code § 17200, et seq.;

b) That Intel and Apple recover damages against Defendants in an amount to be determined and multiplied to the extent provided by law, including under Section 4 of the Clayton Act;

c) That all contracts or agreements Defendants entered into in violation of the Sherman Act, Clayton Act, or Cal. Bus. Prov. Code § 17200, et seq. be declared void and the patents covered by those transfer agreements be transferred back to the transferors;

d) That all patents transferred to Defendants in violation of the Sherman Act, Clayton Act, or Cal. Bus. Prov. Code § 17200, et seq. be declared unenforceable;

e) Award to Intel and Apple their costs and expenses associated with this case, together with interest; and

f) Grant such other and further relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Intel and Apple demand a jury trial on all issues and claims so triable.

DATED:  November 20, 2019                Respectfully submitted,


By:  /s/ *Mark D. Selwyn*

Mark D. Selwyn (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

William F. Lee (*pro hac vice to be filed*)
william.lee@wilmerhale.com
Joseph J. Mueller (*pro hac vice to be filed*)
joseph.mueller@wilmerhale.com
Timothy Syrett (*pro hac vice to be filed*)
timothy.syrett@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

**_REDACTED VERSION OF DOCUMENT SOUGHT TO BE CONDITIONALLY SEALED_**

Leon B. Greenfield (*pro hac vice to be filed*)
leon.greenfield@wilmerhale.com
Amanda L. Major (*pro hac vice to be filed*)
amanda.major@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiffs*
INTEL CORPORATION, APPLE INC.