1  IRELL & MANELLA LLP
   Morgan Chu (SBN 70446)
2  Benjamin W. Hattenbach (SBN 186455)
   A. Matthew Ashley (SBN 198235)
3  Michael D. Harbour (SBN 298185)
   Olivia Weber (SBN 319918)
4  1800 Avenue of the Stars, Suite 900
   Los Angeles, California 90067-4276
5  Telephone:   (310) 277-1010
   Facsimile:   (310) 203-7199
6  Email: mchu@irell.com
   Email: bhattenbach@irell.com
7  Email: mashley@irell.com
   Email: oweber@irell.com
8  Email: mharbour@irell.com
   *Counsel for Defendants*
9  FORTRESS INVESTMENT GROUP LLC,
   FORTRESS CREDIT CO. LLC,
10 VLSI TECHNOLOGY LLC

11 PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
12 Martin Flumenbaum (*pro hac vice* pending)
   1285 Avenue of the Americas
13 New York, NY 10019-6064
   Telephone:   (212) 373-3191
14 Facsimile:   (212) 492-0191
   Email:  mflumenbaum@paulweiss.com
15 *Counsel for Defendants*
   FORTRESS INVESTMENT GROUP LLC,
16 FORTRESS CREDIT CO. LLC

17 Additional counsel listed on signature page

18              **UNITED STATES DISTRICT COURT**

19              **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 20  INTEL CORPORATION and APPLE INC., | Case No. 3:19-cv-07651-EMC |
| 21              Plaintiffs, | |
| 22         v. | **DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' COMPLAINT** |
| 23  FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC | |
| 24  2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI | Hon. Edward M. Chen |
| 25  TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., DSS | Date:    April 23, 2020 |
| 26  TECHNOLOGY MANAGEMENT, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC, | Time:    1:30 p.m.  Dept.:    Courtroom 5 |
| 27 | |
| 28              Defendants. | |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE THAT**, at 1:30 p.m. on April 23, 2020, in Courtroom 5, 17th floor of 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Judge Edward M. Chen, Defendants Fortress Investment Group LLC ("Fortress"), Fortress Credit Co. LLC ("Fortress Credit"), Uniloc 2017 LLC ("Uniloc 2017"), Uniloc USA, Inc. ("Uniloc USA"), Uniloc Luxembourg S.a.r.l. ("Uniloc Luxembourg"), VLSI Technology LLC ("VLSI"), INVT SPE LLC ("INVT"), Inventergy Global, Inc. ("Inventergy"), DSS Technology Management, Inc. ("DSS"), IXI IP LLC ("IXI"), and Seven Networks, LLC ("Seven Networks" and collectively "Defendants") will appear and move to dismiss and to strike the Complaint of Plaintiffs Apple Inc. ("Apple") and Intel Corporation ("Intel" and collectively "Plaintiffs"). Specifically, Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and move to strike Plaintiffs' state law claims pursuant to California Code of Civil Procedure § 425.16. This motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the Declaration of Michael D. Harbour, Defendants' Request for Judicial Notice, and any other filing, evidence, or argument presented in this matter.

Defendants will be entitled to an award of attorneys' fees and costs if they prevail on their motion to strike. *See* Cal. Code Civ. Proc. § 425.16(c)(1). Should Defendants prevail, they request that the amount of the award be reserved for later briefing following the April 23 hearing.

## STATEMENT OF ISSUES TO BE DECIDED

1.  Whether Plaintiffs have pleaded a viable antitrust market or market power;

2.  Whether Plaintiffs have pleaded a cognizable antitrust injury;

3.  Whether the *Noerr-Pennington* doctrine bars Plaintiffs' claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, and California Business & Professions Code § 17200;

4.  Whether Plaintiffs have pleaded a viable Sherman Act Section 1 claim;

5.  Whether Plaintiffs have pleaded a viable Clayton Act Section 7 claim, 15 U.S.C. § 18;

6.  Whether Plaintiffs' California state law claims should be stricken under California's Anti-SLAPP statute or alternatively dismissed under Rule 12(b)(6); and

7.  Whether some of Plaintiffs' claims are barred by the relevant statute of limitations periods.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .......................................................................................................... 1

II.  THE COMPLAINT ....................................................................................................... 4

    A.  The Alleged "Scheme" .................................................................................... 4

    B.  Plaintiffs' Proposed Market And Fortress's Alleged "Market Power" .................. 6

    C.  Plaintiffs' Alleged Injury ................................................................................ 9

III.  PLAINTIFFS FAIL TO PLEAD A RELEVANT MARKET OR MARKET POWER ... 10

    A.  The "Electronics Patents Market" Is Facially Unsustainable ............................. 10

    B.  Plaintiffs' Allegations Of Market Power Are Legally Deficient ......................... 14

    C.  Apple's "Input Technology Markets" Are Also Facially
    Unsustainable ................................................................................................ 16

IV.  PLAINTIFFS FAIL TO PLEAD AN ANTITRUST INJURY ....................................... 18

    A.  Plaintiffs' Purported Exposure To "Supracompetitive" License
    Rates Is Not Antitrust Injury ........................................................................... 19

    B.  Plaintiffs' Payment Of Litigation Costs Is Not An Antitrust Injury .................... 23

V.  THE *NOERR-PENNINGTON* DOCTRINE BARS PLAINTIFFS' SHERMAN ACT
AND 17200 CLAIMS ................................................................................................... 24

    A.  Plaintiffs Do Not Allege That Defendants Compete With Plaintiffs
    Or Are Using The Litigation Process To Achieve An
    Anticompetitive Goal ...................................................................................... 26

    B.  Plaintiffs Do Not Adequately Allege That Defendants' Lawsuits Are
    Objectively Baseless ....................................................................................... 28

VI.  PLAINTIFFS FAIL TO ALLEGE AN UNLAWFUL AGREEMENT ........................... 30

VII.  PLAINTIFFS FAIL TO STATE A CLAYTON ACT SECTION 7 CLAIM .................. 34

    A.  Plaintiffs' Alleged Injury Is Not The Result Of Alleged Patent
    Acquisitions ................................................................................................... 35

    B.  Plaintiffs' Section 7 Claim Is Time-Barred ...................................................... 38

VIII.  PLAINTIFFS' SECTION 17200 CLAIMS SHOULD BE STRICKEN UNDER
CALIFORNIA'S ANTI-SLAPP STATUTE OR ALTERNATIVELY DISMISSED ...... 39

    A.  Plaintiffs' Section 17200 Claims Arise From Protected Activity ....................... 40

    B.  Plaintiffs' Section 17200 Claims Fail As A Matter Of Law ............................... 40

        1.  Plaintiffs' 17200 Claims Are Barred By The Litigation
        Privilege ............................................................................................. 41

**Page**

2. Plaintiffs Are Not Entitled To Any Remedy Available Under The UCL .......... 42

3. Plaintiffs' Section 17200 Claims Fail To State A Claim .......... 43

C. Alternatively, Plaintiffs' Section 17200 Claims Should Be Dismissed .......... 45

IX. CONCLUSION .......... 45

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*49er Chevrolet, Inc. v. Gen. Motors Corp.*,
   803 F.2d 1463 (9th Cir. 1986)................................................................................31
5

6

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
   41 Cal. 4th 1232 (2007)..........................................................................................41

7

*Adobe Sys. Inc. v. Coffee Cup Partners, Inc.*,
   No. C 11-2243 CW, 2012 WL 3877783 (N.D. Cal. Sept. 6, 2012) .........................20, 23, 26, 28
8

9

*Analogix Semiconductor, Inc. v. Silicon Image, Inc.*,
   No. C 08-2917 JF (PVT), 2008, WL 8096149 (N.D. Cal. Oct. 28, 2008) ................................12
10

11

*Apple Inc. and ZTE (USA) Inc. v. INVT SPE LLC*,
   No. IPR2018-01474 (Mar. 5, 2019) .........................................................................6
12

13

*Apple Inc. and ZTE (USA) Inc. v. INVT SPE LLC*,
   No. IPR2018-01478 (P.T.A.B. Feb. 19, 2019) .............................................................6

14

*Apple Inc. v. Samsung Elecs. Co.*,
   No. 11-CV-01846-LHK, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ...............................45
15

16

*Apple Inc. v. Samsung Elecs. Co.*,
   No. 11-CV-01846-LHK, 2012 WL 1672493 (N.D. Cal. May 14, 2012)................................17

17

*Apple Inc. v. Uniloc 2017 LLC*,
   No. IPR2017-01993 (P.T.A.B. Mar. 6, 2019) ..............................................................6
18

19

*Apple Inc. v. Uniloc Luxembourg S.A.*,
   No. IPR2017-02202 (P.T.A.B. May 1, 2018) ..............................................................6
20

21

*Arthur J. Gallagher & Co. v. Lang*,
   No. C 14-0909 CW, 2014 WL 6816644 (N.D. Cal. Dec. 3, 2014).....................................41

22

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ..............................................................................................21
23

24

*Aventis Pharma S.A. v. Amphastar Pharm., Inc.*,
   No. 5:03-00887-MRP PLA, 2009 WL 8727693 (C.D. Cal. Feb. 17, 2009) ..........................23
25

26

*BE & K Const. Co. v. NLRB*,
   536 U.S. 516 (2002) ..............................................................................................24

27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................16, 22
28

**Page**

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012)................................................................................................21

*Brullotte v. Thys Co.*,
    379 U.S. 29 (1964) ..................................................................................................................22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ..........................................................................................................18, 21

*Brunswick Corp. v. Riegel Textile Corp.*,
    752 F.2d 261 (7th Cir. 1984)..................................................................................................34

*Carefusion Corp. v. Medtronic, Inc.*,
    No. 10-CV-01111-LHK, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ..................................33

*Catch Curve, Inc. v. Venali, Inc.*,
    No. 05-CV-04820-DDP-AJWX, 2008 WL 11334024 (C.D. Cal. Nov. 3, 2008) .....................25

*Certain LTE- and 3G-Compliant Cellular Communications Devices*,
    Inv. No. 337-TA-1138 (Sept. 13, 2019), Order No. 52 ............................................................6

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
    No. 05-3465-PJH, 2006 WL 13058 (N.D. Cal. Jan. 3, 2006) ..................................................19

*Chipman v. Nelson*,
    2013 WL 1007285, at *8 (E.D. Cal. Mar. 13, 2013), *adopted by*, 2013 WL
    1284330 (E.D. Cal. Mar. 28, 2013)........................................................................................45

*ChriMar Sys. v. Cisco Sys.*,
    72 F. Supp. 3d 1012 (N.D. Cal. 2014) ...................................................................................17

*Church & Dwight Co. v. Mayer Labs., Inc.*,
    No. 10-CV-4429 EMC, 2011 WL 1225912 (N.D. Cal. Apr. 1, 2011)......................................18

*City of Columbia v. Omni Outdoor Advert Inc.*,
    499 U.S. 365 (1991) ..............................................................................................................27

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*,
    944 F.2d 1525 (9th Cir. 1991) ................................................................................................25

*Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*,
    217 F.3d 1187 (9th Cir. 2000)................................................................................................33

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*,
    No. CV 15-9814 DSF, 2016 WL 3457177 (C.D. Cal. May 11, 2016) .....................................38

*Dang v. San Francisco Forty-Niners*,
    964 F. Supp. 2d 1097 (N.D. Cal. 2013) .................................................................................19

**Page**

*Darba Enterprises, Inc. v. Amica Mut. Ins. Co.*,
No. 2:12-cv-00043-LRH-GWF 2012 WL 3096709 (D. Nev. July 30, 2012) ..........................29

*Delano Farms Co. v. California Table Grape Comm'n*,
655 F.3d 1337 (Fed. Cir. 2011) ..................................................................................................12

*Digital Sun v. The Toro Co.*,
No. 10-CV-4567-LHK, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) ...................................16

*Dole Valve Co. v. Perfection Bar Equip., Inc.*,
311 F. Supp. 459 (N.D. Ill. 1970) ..............................................................................................37

*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*,
47 Cal. App. 4th 777 (1996).......................................................................................................41

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*,
114 F.3d 1547 (Fed. Cir. 1997), *abrogated on other grounds*, *Cybor Corp. v.
FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998).....................................................................36

*Elecs. For Imaging, Inc. v. Coyle*,
No. 01-CV-4853MJJ, 2005 WL 1661958 (N.D. Cal. July 14, 2005) .....................................26

*Entrepreneur Media, Inc. v. Dermer*,
No. SACV 18-1562 JVS, 2019 WL 4187466 (C.D. Cal. July 22, 2019)..................................26

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*,
629 F.3d 1278 (Fed. Cir. 2010) ..................................................................................................27

*Feldman v. 1100 Park Lane Assocs.*,
160 Cal. App. 4th 1467 (2008)...................................................................................................40

*Fitbit, Inc. v. Laguna 2, LLC*,
No. 17-CV-00079-EMC, 2018 WL 306724 (N.D. Cal. Jan. 5, 2018) ...............................26, 29

*Formula One Licensing v. Purple Interactive*,
No. 00-CV-2222-MMC, 2001 WL 34792530 (N.D. Cal. Feb. 6, 2001) ..................................29

*Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd. of
Culinary Workers*,
542 F.2d 1076 (9th Cir. 1976)....................................................................................................27

*Gen-Probe, Inc. v. Amoco Corp.*,
926 F. Supp. 948 (S.D. Cal. 1996) .......................................................................................25, 28

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,
362 F.3d 1367 (Fed. Cir. 2004) ..................................................................................................25

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*,
No. 15-634, 2017 WL 750700 (D. Del. Feb. 27, 2017), *adopted by*, 2017 WL
1055958 (D. Del. Mar. 20, 2017)..................................................................................18, 44, 45

**Page**

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
433 F. App'x 598 (9th Cir. 2011).................................................................................................11, 13

*Grand River Enters. v. King*,
783 F. Supp. 2d 516 (S.D.N.Y. 2011) .......................................................................................20

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*,
742 F.3d 414 (9th Cir. 2014)....................................................................................................40

*Handgards, Inc. v. Ethicon, Inc.*,
601 F.2d 986 (9th Cir. 1979)....................................................................................................24

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg.*,
No. C-92-3330-DLJ, 1995 WL 552168 (N.D. Cal. Aug. 30, 1995) .........................................29

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018)..................................................................................................10

*In re High-Tech Employee Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................................................................................43

*Iglesia Ni Cristo v. Cayabyab*,
No. 18-CV-00561-BLF, 2018 WL 4674603 (N.D. Cal. Sept. 26, 2018)...................................40

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*,
863 F.3d 1178 (9th Cir. 2017)..................................................................................................25

*Int'l Television Prods. Ltd. v. Twentieth Century-Fox Television*,
622 F. Supp. 1532 (S.D.N.Y. 1985) .........................................................................................13

*Intel Corporation v. VLSI Technology LLC*,
No. IPR2018-01038 (P.T.A.B. Dec. 4, 2018) .............................................................................6

*Intel Corporation v. VLSI Technology LLC*,
No. IPR2018-01296 (P.T.A.B. Apr. 11, 2019) ............................................................................6

*Intel Corporation v. VLSI Technology LLC*,
No. IPR2019-00034 (P.T.A.B. Apr. 11, 2019) ............................................................................6

*Intel Corporation v. VLSI Technology LLC*,
No. IPR2019-01196 (P.T.A.B. Jan. 7, 2020) ..............................................................................6

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
280 F. Supp. 3d 691 (D. Md. 2017) ..........................................................................................27

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
No. 1:13-CV-00740-AJT, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) ......................... *passim*

*Intellectual Ventures I LLC v. Capital One Financial Corp. et al*,
No. 18-1367, Dkt. 41 (May 11, 2018).......................................................................................27

**Page**

*JM Comput. Servs., Inc. v. Schlumberger Techs., Inc.*,
   No. C 95-20349 JW, 1996 WL 241607 (N.D. Cal. May 3, 1996) .............................................11

*Kane v. DeLong*,
   No. C-12-5437 EMC, 2013 WL 1149801 (N.D. Cal. Mar. 19, 2013) ................................41, 42

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008)......................................................................................30, 31

*Kewanee Oil Co. v. Bicron Corp.*,
   416 U.S. 470 (1974) .......................................................................................................43

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
   No. C07-01057 MJJ, 2007 WL 2318906 (N.D. Cal. Aug. 13, 2007) ....................................19

*Lenovo (United States) Inc. v. IPCom GmbH & Co.*,
   No. 5:19-cv-01389 (N.D. Cal. Oct. 25, 2019).................................................................45

*Manley v. Experian Info. Sols., Inc.*,
   No. 16-CV-03355-LHK, 2017 WL 151540 (N.D. Cal. Jan. 16, 2017).............................15, 42

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
   No. 18-CV-02054-MMC, 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019) ....................11, 13, 14

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004).........................................................................................38

*Minichino v. First California Realty*,
   No. C-11-5185 EMC, 2012 WL 4364611 (N.D. Cal. Sept. 24, 2012).....................................40

*Mitchell v. Reg'l Serv. Corp.*,
   No. C 13-04212 JSW, 2014 WL 12607809 (N.D. Cal. Apr. 23, 2014) ...................................43

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) .......................................................................................................30

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015)......................................................................................30, 31

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015)..........................................................................................31

*In the Matter of Negotiated Data Solutions LLC*,
   File No. 051-0094 ....................................................................................................44, 45

*Nelson v. Pearson Ford Co.*,
   186 Cal. App. 4th 983 (2010), *reversed in part on other grounds by Raceway*
   *Ford Cases*, 2 Cal.5th 161 (2016) ...................................................................................43

Page

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008).............................................................................10, 11

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998)................................................................................25

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
    No. 17-CV-05005-LB, 2017 WL 6059299 (N.D. Cal. Dec. 7, 2017).......................33

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014).................................................................................38

*Oregon Nat. Res. Council v. Mohla*,
    944 F.2d 531 (9th Cir. 1991)...................................................................................28

*Orion Elec. Co. v. Funai Elec. Co.*,
    2002 WL 377541 (S.D.N.Y. Mar. 11, 2002) ......................................................18, 44

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003).................................................................................14

*Person v. Google, Inc.*,
    No. C 06–7297 JF RS, 2007 WL 832941 (N.D. Cal. Mar. 16, 2007).......................13

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    890 F.3d 828 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018) .................41

*Plascencia v. Lending 1st Mortg.*,
    583 F. Supp. 2d 1090 (N.D. Cal. 2008) .................................................................38

*Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*,
    No. 11-CV-2652-GPC-RBB, 2013 WL 3873074 (S.D. Cal. July 25, 2013),
    *aff'd*, 642 F. App'x 665 (9th Cir. 2016) ............................................................19, 20

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ............................................................................... *passim*

*PSKS, Inc. v. Leegin Creative Prods., Inc.*,
    615 F.3d 412 (5th Cir. 2010).............................................................................13, 14

*Ramachandran v. City of Los Altos*,
    359 F. Supp. 3d 801 (N.D. Cal. 2019) .................................................................39, 40

*Realco Servs., Inc. v. Holt*,
    479 F. Supp. 880 (E.D. Pa. 1979) ...........................................................................27

*Rebel Oil Co., v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)...................................................................................23

Page

*Reudy v. Clear Channel Outdoors, Inc.*,
  No. C-02-54380 SC, 2007 WL 9734455 (N.D. Cal. Apr. 3, 2007), *adopted by*,
  2007 WL 9735532 (N.D. Cal. Apr. 9, 2007) ...............................................................11

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
  532 F.3d 963 (9th Cir. 2008)..............................................................................15, 16

*Rothman v. Jackson*,
  49 Cal. App. 4th 1134 (1996) .....................................................................................42

*Rusheen v. Cohen*,
  37 Cal. 4th 1048 (2006) ..............................................................................................41

*Rutman Wine Co. v. E. & J. Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987).......................................................................................34

*Saint Alphonsus Med. Center-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015).......................................................................................35

*Schauer v. Mandarin Gems of Cal., Inc.*,
  125 Cal. App. 4th 949 (2005).....................................................................................43

*Schlafly v. Public Key Partners*,
  No. 94-20512 SW, 1997 WL 564073 (N.D. Cal. Aug. 29, 1997)...............................37

*SCM Corp. v. Xerox Corp.*,
  645 F.2d 1195 (2d Cir. 1981) ......................................................................................34

*Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*,
  No. 09-cv-102H (WMC), 2010 WL 6675046 (S.D. Cal. Apr. 20, 2010) ...................12

*Seven Networks, LLC v. Google, LLC*,
  No. 17-CV-00442-JRG (E.D. Tex. Jan. 18, 2019) Dkt. 607 .........................................6

*Sheahan v. State Farm Gen. Ins. Co.*,
  394 F. Supp. 3d 997 (N.D. Cal. 2019) ...........................................................11, 14, 19, 24

*Sidibie v. Sutter Health*,
  No. C 12–04854 LB, 2013 WL 2422752 (N.D. Cal. June 3, 2013)...........................13

*Silberg v. Anderson*,
  50 Cal. 3d 205 (1990)..................................................................................................42

*Sosa v. DirectTV, Inc.*
  437 F.3d 923 (9th Cir. 2006).......................................................................................25

*Soukup v. Law Offices of Herbert Hafif*,
  39 Cal. 4th 260 (2006).................................................................................................40

Page

*Stearns v. Select Comfort Retail Corp.*,
   No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009) .............................................21, 24

*Sumotext Corp. v. Zoove, Inc.*,
   No. 16-CV-01370-BLF, 2017 WL 2774382 (N.D. Cal. June 26, 2017).................................33

*Surface Supplied, Inc. v. Kirby Morgan Dive Sys., Inc.*,
   No. C-13-0575 MMC, 2013 WL 5496961 (N.D. Cal. Oct. 3, 2013)........................................15

*Synopsys, Inc. v. ATopTech, Inc.*,
   No. C 13-2965 MMC, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ......................................22

*In re Tamoxifen Citrate Antitrust Litig.*,
   277 F. Supp. 2d 121 (E.D.N.Y. 2003) *aff'd*, 466 F.3d 187 (2d Cir. 2006) ..............................37

*Tanaka v. Univ. of S. California*,
   252 F.3d 1059 (9th Cir. 2001)..........................................................................................22, 30

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
   No. SACV 14-0341 JVS (DFMx) 2016 WL 7049263 (C.D. Cal. Aug. 9, 2016) ....................42

*The Jeanery, Inc. v. James Jeans, Inc.*,
   849 F.2d 1148 (9th Cir. 1988).........................................................................................30

*Top Rank, Inc. v. Haymon*,
   No. CV 15-4961-JFW, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) .....................................15

*Toscano v. PGA Tour, Inc.*,
   70 F. Supp. 2d 1109 (E.D. Cal. 1999), *aff'd*, 258 F.3d 978 (9th Cir. 2001) .............................31

*Townshend v. Rockwell Int'l Corp.*,
   No. C99-0400SBA, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000) ...........................................22

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
   762 F.3d 1338 (Fed. Cir. 2014).........................................................................................28

*United States v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974) ....................................................................................................10, 20

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
   143 F. Supp. 3d 982 (N.D. Cal. 2015) ................................................................................40

*Universal Grading Serv. v. eBay, Inc.*,
   No. C-09-2755 RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) *aff'd sub nom.*,
   563 F. App'x 571 (9th Cir. 2014)................................................................................13, 17

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ..........................................................................................................23

Page

*Version2 Tech., Inc. v. Neilmed Pharm., Inc.*,
    No. 16-CV-04720-LB, 2016 WL 6611015 (N.D. Cal. Nov. 9, 2016) ......................................26

*Visto Corp. v. Sproqit Techs., Inc.*,
    360 F. Supp. 2d 1064 (N.D. Cal. 2005) ...................................................................................41

*Vizio, Inc. v. Funai Elec. Co.*,
    2010 WL 7762624 (C.D. Cal. Feb. 3, 2010).............................................................................44

*VLSI Technology LLC v. Intel Corporation*,
    Case No. 5:17-cv-05671-BLF, Dkt. 269 (N.D. Cal. Nov. 12, 2019) .....................................28

*VLSI Technology LLC v. Intel Corporation*,
    No. 19-CV-00977-ADA (W.D. Tex. Jan. 3, 2020), Dkt. 101 ...................................................6

*Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965) .................................................................................................................14

*Wang v. Heck*,
    203 Cal. App. 4th 677 (2012) ..................................................................................................41

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017) ....................................................................................................24

*Wilson v. Cable News Network, Inc.*,
    7 Cal. 5th 871 (2019)...............................................................................................................40

*WIXT Television, Inc. v. Meredith Corp.*,
    506 F. Supp. 1003 (N.D.N.Y. 1980) ........................................................................................20

*Zhang v. Superior Court*,
    57 Cal. 4th 364 (2013).............................................................................................................43

**Statutes**

15 U.S.C. § 15b ............................................................................................................................38

15 U.S.C. § 18 ..............................................................................................................................35

35 U.S.C. § 261 ..............................................................................................................................8

Cal. Bus. & Prof. Code § 17200.............................................................................................. *passim*

Cal. Bus. & Prof. Code § 17204..................................................................................................42

Cal. Civ. Code § 47 ......................................................................................................................41

Cal. Civ. Code § 47(b) ...............................................................................................................4, 41

Cal. Civ. Proc. Code § 425.16......................................................................................................4

**Page**

Cal. Civ. Proc. Code § 425.16(b)(1) ........................................................39

U.C.C. § 9-101 *et seq.* ...............................................................................8

**Rules**

Fed. R. Civ. P. 12(b)(6) ..................................................10, 29, 41, 45

Fed. R. Civ. P. 9(b).................................................................................45

**Other Authorities**

5 Annotated Patent Digest § 34:54.50 ...................................................37

Assistant Attorney General Makan Delrahim, Remarks at American Bar Assoc.
   2019 Antitrust Fall Forum (Nov. 18, 2019) (available at
   https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-
   delivers-remarks-abas-2019-antitrust-fall-forum)...........................................23

Makan Delrahim, Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Justice,
   Address at IAM's Patent Licensing Conference (Sep. 18, 2018) .............................45

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 1202(f)(4) (3rd ed. 2016
   update)........................................................................................36

U.S. Const. amend. I ...........................................................................24, 42

U.S. Const. art. I, § 8, cl. 8 ....................................................................34

U.S. Dep't of Justice and Federal Trade Comm'n, Antitrust Guidelines for the
   Licensing of Intellectual Property § 3.2.2 .......................................................12

1  **I.      INTRODUCTION**

2          Apple and Intel—two of the largest, most powerful companies in the world—assert

3  unprecedented "antitrust" claims against companies a tiny fraction of their size in an attempt to

4  intimidate those companies from enforcing their Constitutionally-protected patent enforcement

5  rights.  The Complaint describes in conclusory terms a purported "scheme" by Defendants to

6  aggregate "weak" patents and to bring "meritless" patent infringement suits.  But Defendants'

7  exercise of their patent rights—rights critical to promoting innovation—is not anticompetitive.

8  The Complaint has nothing to do with protecting <u>competition</u> at all.  Instead, Plaintiffs' real

9  complaint is that loans or equity investments from Fortress-managed investment funds have

10 allowed patent owners to sue Plaintiffs for infringement, when the original inventors and owners

11 might not have been able to withstand Plaintiffs' high-priced defenses and refusals to pay for the

12 technology they are using.  This is not a proper basis for a federal antitrust action.  It is ironic that

13 Apple and Intel, who have been accused for many years of violating the antitrust laws, charging

14 supracompetitive prices, and using their patents to block competitors, have brought these claims.

15         Defendant Fortress is a leading global investment management firm.  Fortress offers a

16 range of alternative investment strategies including credit, real estate, and private equity for

17 institutional and private investors around the world.  In particular, Fortress's credit business is

18 focused on investing, primarily in undervalued assets and distressed and illiquid credit

19 investments, including intellectual property.  Some of Fortress's IP-related business strategies

20 involve providing loans to operating companies where the IP serves as the main collateral for such

21 loans, and private equity investments that enable inventors, research institutes, universities, and

22 companies to realize the value of their intellectual property.  Without Fortress's loans and

23 investments, these individuals and organizations would often lack sufficient resources to enforce

24 their Constitutionally-enshrined patent rights when companies like Plaintiffs refuse to pay a fair

25 price to use their patented technology.  This is a lawful and publicly-beneficial business practice—

26 not competition-harming conduct that is the true purview of antitrust law.  Plaintiffs attempt to

27 spin these commercially common and unremarkable loans and investment agreements into some

28 nefarious conspiracy hatched by Fortress to enlist other companies in a scheme to pursue

"aggressive" patent litigation against Plaintiffs.  But Plaintiffs fail to allege any facts showing that there was any such conspiracy among Defendants—as opposed to distinct and routine financing agreements—let alone a conspiracy to unreasonably restrain trade.  Plaintiffs also fail to explain how "aggressively" enforcing one's patent rights is unlawful.  Indeed, few companies are as aggressive as Apple and Intel in threatening their patent rights against competitors.

The gravamen of the Complaint is that Fortress "aggregated" purportedly "weak" patents and that certain Defendants then sued Plaintiffs for infringement in litigations that Plaintiffs baldly characterize as "meritless"—notwithstanding that most of those cases remain pending.  Moreover, the Complaint cherry picks a handful of supposedly adverse rulings while ignoring that Defendants have prevailed in *inter partes* review proceedings, obtained favorable *Markman* and summary judgment rulings, and survived various other challenges brought by Plaintiffs.  Plaintiffs nonetheless ask that the Court accept Plaintiffs' conclusory assertions that all of these suits lack merit, declare all of Defendants' patents unenforceable, and rescind all of Defendants' agreements related to the patents, including agreements with companies that are not even parties to this suit.

The Complaint fails as a matter of law for a number of independent reasons.  First, Plaintiffs fail to plead a viable antitrust market, which is a necessary element of each of their claims.  Plaintiffs' primary proposed market is the market for "patents for high-tech consumer and enterprise electronic devices and components or software therein and processes used to manufacture them, the 'Electronics Patents Market.'"  Cmplt. ¶ 156.  This supposed market is both vague and overbroad.  What little that can be gleaned from Plaintiffs' generalized description of the "Electronics Patents Market" demonstrates that it is massive.  Plaintiffs' alleged "market" apparently includes all patents covering everything from microprocessors to wireless routers, smartphone apps to enterprise software, semiconductors to televisions, and internet streaming services to electronic door bells, just to name a few.  The vast range of different technologies incorporated into these broad categories of products are not substitutes for each other and therefore as a matter of law cannot comprise a proper antitrust market.  Nor does the Complaint contain any plausible factual allegations that Defendants somehow have obtained market power over such a large and disparate market.  The supposed "Input Technology Markets" underlying Apple's unfair

competition claim are likewise infirm; Apple's pleadings fail to establish that they are viable

antitrust markets or that Defendants possess market power in such markets.

Second, Plaintiffs fail to plead cognizable antitrust injury, which is a necessary element of

each antitrust claim.  Although the Complaint repeatedly and nebulously refers to

"supracompetitive" license rates, neither Apple nor Intel alleges that it has ever paid a

supracompetitive rate to license any of Defendants' patents.  Indeed, neither Apple nor Intel

alleges that it has ever entered into even one license agreement with any Defendant.

Consequently, Plaintiffs' purported injury is nothing more than the fees that they paid their

attorneys in several patent infringement lawsuits.  But the Complaint contains no allegations to

support that the patent litigation costs paid by Plaintiffs—who, according to Plaintiffs, are

Defendants' <u>customers</u>, not competitors—flowed from any competition reducing aspect or effect

of Defendants' behavior, as is required to plead antitrust injury.

Third, Defendants' patent infringement lawsuits and related licensing activities are

constitutionally-protected petitioning activity that is not actionable under the Supreme Court's

*Noerr-Pennington* doctrine.  To avoid application of the *Noerr-Pennington* doctrine, Plaintiffs

bear the burden of pleading facts showing both that:  (i) Defendants invoked the litigation <u>process</u>

without regard to the <u>outcome</u> simply in order to harm a competitor; and (ii) the lawsuits filed by

Defendants are objectively baseless.  Plaintiffs' own allegations preclude application of the first

prong, confirming that the alleged intent behind the infringement lawsuits was to obtain

"windfall" damages from a <u>customer</u>—not to use mere process to interfere with a <u>competitor</u>.  And

Plaintiffs say nothing in their Complaint about the majority of the patent infringement actions filed

by Defendants, much less plead the facts necessary to establish a lack of any objective basis.

In addition to these broad failings, each of Plaintiffs' claim-specific allegations is deficient.

Plaintiffs' Sherman Act Section 1 claim fails because the Complaint lacks allegations to support

the central element of a Section 1 claim:  an agreement to unlawfully restrain trade.  The garden-

variety loans and investment agreements on which the Complaint relies are insufficient to support

a claim that any Defendant engaged in any unlawful concerted action.

Plaintiffs' claim under Clayton Act Section 7, which prohibits certain anticompetitive asset

1    acquisitions, fails because Plaintiffs plead no facts to show that the company and/or patent

2    acquisitions themselves posed any threat to competition.  Rather, Plaintiffs impermissibly premise

3    their Section 7 claim on Defendants' post-acquisition enforcement of their patents.  Moreover, the

4    Section 7 claim is time-barred, at minimum for several Defendants, because many of the alleged

5    acquisitions occurred outside the four-year statute of limitations period.

6          Finally, the Court should strike Plaintiffs' state law unfair competition claims pursuant to

7    California Code of Civil Procedure section 425.16 (the "anti-SLAPP" statute) or, in the

8    alternative, dismiss them for the same reasons that Plaintiffs' federal claims fail.  California's anti-

9    SLAPP statute provides for a special motion to strike where a cause of action arises out of

10   petitioning activity.  Here, Plaintiffs base their state law claims on Defendants' patent

11   infringement lawsuits and related licensing activities.  Because these claims target petitioning

12   activity, Plaintiffs bear the burden of showing that they have stated a viable claim.  They have not

13   met that burden for all of the same reasons that their Sherman and Clayton Act claims fail.  The

14   state law claims also fail under California's statutory litigation privilege, California Civil Code

15   § 47(b).  Consequently, this Court should strike, or in the alternative dismiss, the state law claims.

16   **II.    THE COMPLAINT**

17         The Complaint portrays Fortress as a monopolist that secretly "controls" a "web" of patent

18   assertion entities ("PAEs") as part of a "scheme" to aggregate "weak" patents and bring

19   "meritless" patent suits.  Cmplt. ¶ 9.  But this portrayal is not supported by the Complaint's factual

20   allegations.  It is not even clear from the Complaint which PAEs are purportedly under Fortress's

21   "control" or are part of the alleged conspiracy, what patents are at issue, or the confines and limits

22   of the market over which Fortress purportedly has power.

23         **A.    The Alleged "Scheme"**

24         According to the Complaint, Fortress's "scheme" to aggregate patents began in February

25   2014, when Fortress "granted a loan" to Defendant DSS "in exchange for it placing a lien in favor

26   of the investors on ten [unidentified] semiconductor patents[.]"  Cmplt. ¶ 70.  The Complaint

27   alleges that, over the next several years, Fortress made loans to, or investments in, other

28   companies, including IXI, Inventergy, Uniloc, Seven Networks, and Crossroads Systems, Inc.  *Id.*

¶¶ 51, 64, 67, 74, 76, 79.  According to Plaintiffs, the purpose of these transactions was to "obscure" Fortress's role in aggregating allegedly "weak" patents so that Defendants could then bring "meritless" infringement suits in the hope that the aggregation would "increase the possibility that those weak patents [would] improperly be found valid and infringed or the prospect that a target (like Intel or Apple) will agree to a license[.]" *Id.* ¶ 9.

The Complaint, however, does not contain factual allegations to support that Fortress-facilitated loans and investments were part of any anticompetitive scheme.  The range of transactions that Plaintiffs identify includes loans that Fortress allegedly made in exchange for patent licensing revenue, *id.* ¶¶ 51, 65, 70; patent portfolio acquisitions, *id.* ¶ 81; and the formation of entities to "direct" enforcement of patent rights, *id.* ¶ 53.  But Plaintiffs do not allege any facts that would render these transactions anything other than standard commercial arrangements.  The Complaint nowhere identifies any agreement—written, oral, or tacit—between any of the Defendants (much less <u>all</u> of the Defendants) to bring meritless infringement claims.  Indeed, the Complaint does not allege any sort of overarching agreement of any kind:  every allegedly improper transaction is only between Fortress or Fortress Credit and a single other Defendant. There are no alleged agreements among any of the other Defendants.

Plaintiffs have also pleaded only minimal facts about the purportedly "meritless" or "weak" patent infringement suits through which Defendants allegedly carried out their purported anticompetitive scheme.  *See, e.g.*, *id.* ¶¶ 9, 11, 31, 83–84, 88–93, 97–101, 103, 106–112, 115–118, 122–124.  For three-quarters of the lawsuits, Plaintiffs make no allegations at all regarding their merit.  Plaintiffs nowhere identify any Rule 11 or other sanctions in any of the purportedly "meritless" cases.  Indeed, Plaintiffs do not point to any district court findings of non-infringement, much less plead facts sufficient to show that even one, let alone all or a majority of, Defendants' suits were objectively baseless or brought for an improper purpose.  Moreover, Plaintiffs fail to mention the numerous rulings in those cases that have gone in Defendants' favor.  To take just one example, the Complaint identifies a handful of claims that have been invalidated through the *inter partes* review process, *see, e.g., id.* ¶¶ 112, 116, 124, but ignores the many patents that have

1    survived such challenges from Plaintiffs.[1]  Similarly, the district court in VLSI's infringement

2    litigation against Intel that is set for trial in October 2020 substantially adopted VLSI's claim

3    constructions for disputed terms of four out of five patents.[2]

4         **B.    Plaintiffs' Proposed Market And Fortress's Alleged "Market Power"**

5              Plaintiffs claim that Defendants' purported "scheme" has enabled Fortress to acquire

6    "market power" in the "Electronics Patents Market."  Plaintiffs offer a one-sentence description of

7    this purported market:  the "market for patents for high-tech consumer and enterprise electronic

8    devices and components or software therein and processes used to manufacture them[.]"  *Id.*

9    ¶ 156.  But the Complaint nowhere alleges or describes:  (i) which patents and technologies are

10   included in the supposed market; (ii) what the term "high-tech" encompasses; or (iii) which

11   "devices," "components," "software" or "processes" are associated with these unidentified patents

12   and technologies.  While undefined, the Electronics Patents Market is, according to Plaintiffs,

13   broad enough to include such diverse "customers" (*id.* ¶ 170) as Google, Samsung, Amazon,

14   Cisco Systems, Oracle, Netflix, Hulu, Blackberry, and Barnes & Noble.  *See id.* ¶¶ 85, 123, 160.

15              Plaintiffs also assert that Fortress has "the power to control prices" in the vague and

16   gargantuan "Electronics Patents Market."  *Id.* ¶ 161.  The Complaint alleges that this supposed

17   market power arises from (i) the size of Fortress's patent portfolio, (ii) Fortress's alleged

18   acquisition of unidentified "substitute" and "complement" patents, (iii) Fortress's alleged

19

20

21         [1] *See, e.g., Intel Corporation v. VLSI Technology LLC.,* No. IPR2018-01038 (P.T.A.B. Dec. 4, 2018); *Intel Corporation v. VLSI Technology LLC.,* No. IPR2018-01296 (P.T.A.B.

22   Apr. 11, 2019); *Intel Corporation v. VLSI Technology LLC.,* No. IPR2019-00034 (P.T.A.B. Apr. 11, 2019); *Intel Corporation v. VLSI Technology LLC.,* No. IPR2019-01196 (P.T.A.B. Jan. 7,

23   2020); *Apple Inc. and ZTE (USA) Inc. v. INVT SPE LLC,* No. IPR2018-01478 (P.T.A.B. Feb. 19, 2019); *Apple Inc. and ZTE (USA) Inc. v. INVT SPE LLC,* No. IPR2018-01474 (Mar. 5, 2019);

24   *Apple Inc. v. Uniloc 2017 LLC,* No. IPR2017-01993 (P.T.A.B. Mar. 6, 2019); *Apple Inc. v. Uniloc Luxembourg S.A.,* No. IPR2017-02202 (P.T.A.B. May 1, 2018).

25         [2] *See VLSI Technology LLC v. Intel Corporation,* No. 19-CV-00977-ADA (W.D. Tex.

26   Jan. 3, 2020), Dkt. 101 (substantially adopting VLSI's claim constructions for disputed terms of four out of five patents); *see also Certain LTE- and 3G-Compliant Cellular Communications*

27   *Devices,* Inv. No. 337-TA-1138 (Sept. 13, 2019), Order No. 52 (denying summary determination of non-infringement) (public version); *Seven Networks, LLC v. Google, LLC,* No. 17-CV-00442-

28   JRG (E.D. Tex. Jan. 18, 2019) Dkt. 607 (denying summary judgment of non-infringement and invalidity).

acquisition of "standard essential patents" (SEPs), and (iv) something the Complaint calls "obfuscation." *Id.* ¶¶ 32, 38, 41, 44, 159, 162, 188.

Portfolio Size:  Plaintiffs allege that the size of Fortress's alleged patent portfolio is "well over a thousand" patents—a number they arrived at by attributing to Fortress ownership of all patents held by any entity that Fortress-managed funds have either loaned money to or invested in. *Id.* ¶ 30.  But the Complaint never states how that number compares to the total number of patents in the "Electronics Patents Market," or even the total number of patents owned by just Intel and Apple.[3]  Moreover, while claiming that Defendants have market power over virtually the entire "electronics" industry, the Complaint simultaneously alleges that Defendants' patents are universally "weak" and their infringement assertions are "meritless." *See, e.g., id.* ¶¶ 2, 9, 31, 35, 39, 40, 88, 103, 163.  The Complaint never alleges any plausible factual basis for how market power can emanate from owning "weak" patents, whether they number one or a thousand.

Acquisition of Substitutes and Complements:  The Complaint describes in broad, theoretical terms how an entity might acquire "substitute" and "complement" patents such that no manufacturer could produce its product without infringing that entity's patents:

> When a company wants to build an electronic device, such as a smartphone, there are many ways to do so.  Each alternative requires multiple technologies.  However, the alternatives do not require the same combination of technologies.  For example, Alternative 1 might require technologies A, B and C, while Alternative 2 might require technologies D, E and F. . . .the bundle of technologies used in Alternative 1 can be used as a substitute for the bundle of technologies used in Alternative 2. . . .  Holding a broad array of patents that can act as both substitutes and complements in different circumstances allows Fortress and its PAEs flexibility to stifle competition in a variety of ways and against a variety of electronic device suppliers.

Cmplt. ¶¶ 32-33.  Plaintiffs assert that "Fortress has <u>inevitably</u> acquired substitute patents" (*id.* ¶ 38) (emphasis added), but do not plead any facts to support that conclusion.  The Complaint does not identify any patents that Defendants have acquired that are substitutes for, or complements of, another patent Defendants already owned; any technology bundles that Defendants have

---

[3] Searches of the United States Patent and Trademark Office's public database suggest that Intel and Apple currently own well over 35,000 and 20,000 patents respectively, Defendants' Request for Judicial Notice ("RJN") 5, numbers that dwarf the "over [1000]" patents allegedly owned or controlled by Fortress.  Cmplt. ¶ 30.

eliminated from the Electronics Patents Market; nor any "electronic devices" that manufacturers like Apple and Intel cannot produce due to Defendants' acquisition of any substitute and/or complementary patents.  Moreover, Plaintiffs again never square these allegations with the central theory of the Complaint, namely, that Defendants' patents are supposedly "weak" and their infringement claims are "meritless."

Acquisition of SEPs:  With regard to SEPs, the Complaint again includes a lengthy discussion of how a company could theoretically harm competition by acquiring SEPs that read on standardized technology and then charging royalties that exceed fair, reasonable, and non-discriminatory (or "FRAND") terms.  *Id.* ¶¶ 126-155.  According to Plaintiffs, companies that use these industry standards cannot avoid infringing such SEPs, so the SEPs cannot be designed around.  *Id.*  However, the Complaint never identifies a single SEP that Plaintiffs contend Defendants own, what standard the SEP supposedly reads on, what other technology alternatives were available when the standard was adopted, or what products Plaintiffs cannot make without employing the industry standard.  Instead, the Complaint alleges that one or more Defendants has "claimed" to own an unidentified SEP, *id.* ¶¶ 149, 152-53, 162, and then alleges in conclusory fashion that these Defendants have "demand[ed] non-FRAND royalties," *id.* ¶ 188.  Plaintiffs, however, never identify any instance in which any of the Defendants have charged an inflated rate for a FRAND encumbered patent (nor can they).

"Obfuscation:"  Finally, the Complaint claims that Fortress achieves its supposed market power over the entire Electronics Patents Market via "obfuscation regarding the scope of [Fortress's patent] portfolio."  *Id.* ¶ 44.  But the Complaint contains no plausible factual allegations of "obfuscation."  For instance, there are no allegations of any misrepresentations made by any Defendant, or any failures to report or disclose something that there was a duty to report or disclose.  Nor do Plaintiffs ever allege that they were unaware of Fortress's interests underlying the loans and investments that the Complaint attacks.[4]  Moreover, Plaintiffs' claim of

---

[4]  Indeed, far from being obfuscated, Fortress's security interests underlying the loans identified in the Complaint are a matter of public record.  *See* 35 U.S.C. § 261; U.C.C. § 9-101 *et seq.*; *see also* RJN 5.

"obfuscation," is flatly inconsistent with their claim that Fortress's alleged control over patents <u>increases</u> Defendants' licensing returns—*i.e.*, that Fortress's purported aggregation "creates incentives for targets to settle with Fortress-backed PAEs for amounts that exceed the value (if any) of their patents to put an end to [litigation] risk." *Id.* ¶ 39.  The Complaint never explains how supposed "obfuscation" would allow Fortress to control prices or eliminate competition.

### C.   Plaintiffs' Alleged Injury

Plaintiffs repeatedly assert that Defendants' conduct has led to "supracompetitive" royalties. *See, e.g.,* Cmplt. ¶¶ 49, 160.  But Plaintiffs never contend that <u>they</u> have paid <u>any</u> royalties to Defendants (let alone supracompetitive royalties).  Moreover, even when Plaintiffs allude to someone else supposedly agreeing to pay "supracompetitive" licensing returns, namely Amazon.com and Huawei (*id.* ¶ 160), Plaintiffs plead no facts at all about those licenses, including when they were entered into, what the "returns" were, how they compared to returns for similar patents, and why Plaintiffs are complaining about these royalties rather than Amazon or Huawei.[5]

Plaintiffs also assert that as a result of Defendants' alleged conduct "end consumers have been harmed and face a continuing threat of increased prices and reduced innovation and quality for electronic devices." *Id.* ¶ 169; *see also* ¶¶ 42, 154, 184.  But these are just empty catchphrases.  The Complaint does not identify a single product made by Plaintiffs or others that has increased in price because of Defendants' alleged conduct.  Nor does the Complaint allege that either Plaintiffs or anyone else have decreased their research and development budgets or been hampered in bringing new products to market due to Defendants' alleged conduct.

The only tangible harm that Plaintiffs claim to have suffered themselves is their payment of litigation expenses.  But Plaintiffs have not pleaded any facts connecting that "injury" to any harm to competition.  Plaintiffs claim that they are Defendants' customers, not their competitors, and the Complaint contains no factual allegation that Defendants have used litigation to somehow increase their competitors' costs.

---

[5] Elsewhere the Complaint alleges that another Huawei entity, Huawei Technologies Co., was actually a part of the allegedly unlawful aggregation process.  *See* Cmplt. ¶ 61.

1    **III.    PLAINTIFFS FAIL TO PLEAD A RELEVANT MARKET OR MARKET POWER**

2    Plaintiffs' claims should be dismissed because Plaintiffs have not sufficiently alleged either

3    a properly-defined relevant product market or facts plausibly showing that Fortress has market

4    power in any such market.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-24 (9th Cir. 2018)

5    (affirming dismissal of Sherman Act Section 1 and California Business and Professional Code

6    Section 17200 claims for failure to plead a relevant market); *United States v. Marine*

7    *Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (Section 7 requires a plaintiff to identify a

8    properly-defined product market in which the alleged conduct reduced competition).  Although the

9    Complaint asserts two separate "markets" in which competition allegedly has been harmed—one

10    for Plaintiffs' Section 1 and Section 7 claims, and another for Apple's Section 17200 claim—

11    Plaintiffs have not sufficiently defined the bounds of these markets nor pleaded any facts showing

12    that Defendants possess market power within them.

13    **A.    The "Electronics Patents Market" Is Facially Unsustainable**

14    Plaintiffs' alleged "Electronics Patents Market," which they describe as the "market for

15    patents for high-tech consumer and enterprise electronic devices and components or software

16    therein and processes used to manufacture them," Cmplt. ¶ 156, has two glaring deficiencies that

17    require dismissal:  (1) the market is vague because it is entirely unclear what products might fall

18    within the alleged market, and (2) the market is overly broad because whatever its boundaries may

19    be, the alleged market captures products that are not substitutes.  *Id.*  Each of these pleading

20    failures warrants dismissal.  *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th

21    Cir. 2008) ("[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant

22    market' definition is facially unsustainable.").

23    The Alleged "Electronics Patents" Market is Impermissibly Vague:  The Complaint

24    provides no indication whatsoever as to which patents or processes are encompassed in the alleged

25    "Electronics Patents Market," rendering it so vague and hopelessly overbroad as to be "facially

26    unsustainable." *Hicks*, 897 F.3d at 1120, 1123.  At its core, Plaintiffs' one-sentence description of

27    the market is nothing more than a collection of generic words and concepts—such as "devices"

28    and "components," "software" and "processes"—that are so broad that the description lacks any

1   definite meaning.  *See JM Comput. Servs., Inc. v. Schlumberger Techs., Inc.*, No. C 95-20349 JW,

2   1996 WL 241607, at *5 (N.D. Cal. May 3, 1996) (dismissing antitrust claims where plaintiff

3   "allege[d] the relevant market in terms so vague that they are meaningless").  Plaintiffs' use of the

4   modifiers "high-tech consumer" and "enterprise electronic" only makes their proposed market

5   definition even more amorphous.  Plaintiffs make no attempt to explain what constitutes a "high-

6   tech consumer" or "enterprise electronic" device, component, software or process.

7        In short, Plaintiffs have proposed a market definition so vague and imprecise that it would

8   include patents covering thousands upon thousands of products and devices in the home or

9   office—many with disparate uses and applications.  These products and devices include basic

10  computer hardware components (*e.g.*, microprocessors and semiconductors), widely diverse

11  consumer goods (*e.g.*, smartphones, clock radios, televisions, and microwave ovens), large

12  enterprise software (*e.g.*, IT services and large commercial databases), and internet-based services

13  (*e.g.*, online shopping and video streaming), in addition to the processes used to manufacture these

14  wide-ranging devices, components, and software.  These are just a few examples.  This district has

15  not previously hesitated to reject such vague market definitions and should do the same here.  *See*

16  *Sheahan v. State Farm Gen. Ins. Co*., 394 F. Supp. 3d 997, 1010 (N.D. Cal. 2019) (dismissing

17  Section 1 claim for failure to "clearly allege[] what the relevant market is"); *Med Vets Inc. v. VIP*

18  *Petcare Holdings, Inc*., No. 18-CV-02054-MMC, 2019 WL 1767335, at *4 (N.D. Cal. Apr. 22,

19  2019) (dismissing Section 7 claim because "one cannot determine what types of products are

20  encompassed by the term 'wellness'" or "medication"); *Reudy v. Clear Channel Outdoors, Inc.*,

21  No. C-02-54380 SC, 2007 WL 9734455, at *20 (N.D. Cal. Apr. 3, 2007) (dismissing antitrust

22  claims because market allegations were "vague and conclusory") *adopted by*, 2007 WL 9735532

23  (N.D. Cal. Apr. 9, 2007).

24        Moreover, by defining the purported "Electronics Patents Market" in such broad and vague

25  terms, Plaintiffs have made it impossible for them to plausibly allege (as they must) a product

26  market consisting of the product at issue and its interchangeable "economic substitutes."  *See*

27  *Newcal Indus*., 513 F.3d at 1045; *see also Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc*., 433

28  F. App'x 598, 599 (9th Cir. 2011) (affirming dismissal where complaint failed to allege "facts

indicating that all pharmaceutical products are interchangeable for the same purpose.").  It is impossible, based on Plaintiffs' vague description, to tell "what's in and what's out"—*i.e.*, to determine which Defendant or competitor patents or processes might (or might not) be captured within the purported market.  Without these allegations, the Court cannot determine that Plaintiffs have adequately alleged "cross-elasticity of demand" among the patents and processes that comprise the alleged market.  *See Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1351 (Fed. Cir. 2011) ("Without a definition of the relevant market, the anticompetitive effects of [the alleged conduct] are impossible to measure"); *Analogix Semiconductor, Inc. v. Silicon Image, Inc*., No. C 08-2917 JF (PVT), 2008, WL 8096149, at *5-6 (N.D. Cal. Oct. 28, 2008) (market definition was "legally inadequate" because it omitted allegations about other competing technology solutions); *see also* U.S. Dep't of Justice and Federal Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property § 3.2.2 (in the context of a "Technology Market," the relevant market must be defined in terms of the "intellectual property that is licensed . . . and its close substitutes—that is, the technologies or goods that are close enough substitutes to significantly constrain the exercise of market power").

The Alleged "Electronics Patents" Market is Also Overly Broad:  While Plaintiffs' vague market definition makes it impossible to identify the boundaries of the alleged "Electronics Patents Market," and that defect alone would justify dismissal, the alleged market suffers from another fatal defect:  it is overly broad.  Indeed, the Electronics Patents Market is so implausibly vast that it provides no meaningful boundaries at all given the wide variety of technologies, products, and customers it allegedly encompasses.  This alleged market also explicitly includes patents that are not economic substitutes, thus making it nonviable as a matter of law.  *Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*, No. 09-cv-102H (WMC), 2010 WL 6675046, at *3 (S.D. Cal. Apr. 20, 2010) (purported market improperly included "a variety of other products that are not economic substitutes for the products at issue in th[e] case").

This defect manifests itself in multiple ways.  For example, Plaintiffs' proposed market definition includes patents for both "consumer" and "enterprise" electronic devices and components, Cmplt. ¶ 156, but Plaintiffs nowhere allege how the patented technology incorporated

1    into the range of home electronic products that consumers use (*e.g.*, clock radios and kitchen

2    microwaves) would be economically interchangeable with the technology embedded in products

3    used by large-scale commercial enterprises (*e.g.*, photocopiers and cash registers).  Plaintiffs also

4    do not allege how patents that read on physical "electronic <u>devices</u>" (*i.e.*, hardware) could be

5    substitutes for patents that read on the "<u>software</u>" that runs on such devices.  Plaintiffs likewise fail

6    to allege how patents for "electronic devices" are somehow interchangeable with patents for the

7    "processes used to manufacture them."

8          At bottom, Plaintiffs' market definition is so overly broad that it is "not apparent" from the

9    "face of the complaint" that the proposed "Electronics Patents Market" is "a plausible market."

10   *See Sidibe v. Sutter Health*, No. C 12–04854 LB, 2013 WL 2422752 at *15 (N.D. Cal. June 3,

11   2013).  Courts have dismissed complaints predicated on markets that are far more narrowly

12   defined and less facially contradictory.  *See Golden Gate Pharmacy,* 433 F. App'x at 599

13   ("pharmaceutical industry,"); *Med Vets Inc.*, 2019 WL 1767335, at *4 ("the wholesale distribution

14   to non-veterinary retailers of unmeasured veterinary wellness and medication products");

15   *Universal Grading Serv. v. eBay, Inc*., No. C-09-2755 RMW, 2012 WL 70644, at *7 (N.D. Cal.

16   Jan. 9, 2012) ("any market which significantly depends on participation within online auctions,

17   including the markets for coin grading and the market for certified coins") *aff'd sub nom.*, 563 F.

18   App'x 571 (9th Cir. 2014); *Person v. Google, Inc.*, No. C 06–7297 JF RS, 2007 WL 832941, at *4

19   (N.D. Cal. Mar. 16, 2007) ("keyword-targeted Internet advertising"); *PSKS, Inc. v. Leegin*

20   *Creative Prods., Inc.,* 615 F.3d 412, 418 (5th Cir. 2010) ("women's accessories"); *Int'l Television*

21   *Prods. Ltd. v. Twentieth Century-Fox Television*, 622 F. Supp. 1532, 1539 (S.D.N.Y. 1985) ("the

22   development, production, and distribution of television shows and series").

23         The overbreadth of Plaintiffs' market is underscored by the wide range of "consumers" that

24   allegedly participate in it.  These consumers operate in vastly different industries and create or sell

25   completely different products.  In addition to Intel, which manufactures "integrated digital"

26   products such as "processors and chipsets," Cmplt. ¶¶ 13, 169, and Apple, which manufactures

27   very different types of products (*i.e.*, "consumer electronics" such as "smartphones, tablets, and

28   computers," *id.* ¶¶ 14, 169), these alleged consumers include Google (internet-based services and

1  advertising), Netflix and Hulu (streaming services), Oracle (commercial databases), Cisco Systems

2  (IT products), Amazon (e-commerce), and Barnes & Noble (e-books), just to name a few. *Id.*

3  ¶¶ 85, 123, 160.  Similarly, according to Plaintiffs, the purported anticompetitive scheme at issue

4  in the Complaint implicates patents that potentially read on a broad and diverse spectrum of

5  technology ranging from "semiconductor[s]," to "cellular devices," to "3G and 4G mobile

6  telecommunications," to "microprocessors," "IP multimedia subsystem[s]," and "voice over IP."

7  *Id.* ¶¶ 61, 62, 70, 98, 153.  In all, Plaintiffs' proposed market definition likely encompasses tens of

8  thousands of products along with hundreds of thousands (if not millions) of patents.

9      In sum, Plaintiffs' vague and overly broad allegations regarding the purported Electronics

10  Patents Market preclude any understanding of its boundaries—except that those bounds are so

11  wide as to capture all sorts of technologies that are not economic substitutes.  This renders it

12  impossible for this Court to undertake even the simplest market structure analysis, and thus makes

13  it impossible to determine whether Defendants' challenged conduct could have possibly affected

14  competition.  *See, e.g.*, *Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172,

15  177 (1965) ("Without a definition of [the] market there is no way to measure [the defendant's]

16  ability to lessen or destroy competition.").

17      **B.    Plaintiffs' Allegations Of Market Power Are Legally Deficient**

18      Plaintiffs' antitrust claims are also facially deficient for an independent reason:  Plaintiffs

19  cannot plausibly allege that Defendants have "market power" within the purported—and evidently

20  massive—Electronics Patents Market.  *See, e.g., Sheahan*, 394 F. Supp. 3d at 1010 (dismissing

21  Section 1 claim for failure to "clearly allege[] market power"); *Med Vets Inc*., 2019 WL 1767335,

22  at *5–7 (dismissing Section 7 claim on same basis).  "Market power" is the "power to control

23  prices or exclude competition."  *Paladin Assocs., Inc. v. Montana Power Co*., 328 F.3d 1145, 1158

24  (9th Cir. 2003).  As noted, customers in the alleged market include many of the largest and most

25  powerful companies in the world, and the market apparently includes patents for a huge range of

26  products used in a wide array of industries.  It is "impossible to imagine that [Defendants] could

27  have power over such a market."  *See PSKS, Inc.*, 615 F.3d at 418 (defendant could not have

28  market power over a market as broad as "women's accessories").

1    Plaintiffs' bare assertion that Fortress has market power in the Electronics Patents Market

2    because "Fortress's PAEs" purportedly earned "supracompetitive licensing returns" on supposedly

3    "meritless" patents, Cmplt. ¶¶ 159-160, 164, 167, is "unaccompanied by supporting facts," *Rick-*

4    *Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 973 (9th Cir. 2008).  Aside from a

5    few isolated and conclusory anecdotes, Plaintiffs do not allege any facts that Defendants'

6    presumptively valid patents lack merit, *see infra* 28-29, or that Defendants' licensing returns on

7    any of those patents were in fact "supracompetitive."  Plaintiffs' allegations of market power are

8    thus legally insufficient.  *See Rick-Mik Enterprises, Inc.*, 532 F.3d at 973 (Plaintiff's "conclusory

9    allegation that [defendant's] intellectual property rights nonetheless do confer market power . . . is

10   insufficient.") (affirming dismissal); *Top Rank, Inc. v. Haymon*, No. CV 15-4961-JFW (MRWx),

11   2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015) ("conclusory" assertion that defendant had

12   "ability to elicit 'exclusionary' terms from broadcasters and to make 'exclusionary demands' of

13   venues" was not sufficient to plead market power); *Surface Supplied, Inc. v. Kirby Morgan Dive*

14   *Sys., Inc.*, No. C-13-0575 MMC, 2013 WL 5496961, at *6 (N.D. Cal. Oct. 3, 2013) (the "bare

15   assertion" of monopoly power "absent supporting factual allegations is, in essence, a legal

16   conclusion, which the Court is not bound to accept as true") (internal quotation marks omitted);

17   *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13-CV-00740-AJT, 2013 WL

18   6682981, at *6 (E.D. Va. Dec. 18, 2013) (complaint included "nothing other than conclusory

19   allegations that [defendant] has demanded and received 'supracompetitive prices'" where plaintiffs

20   did not allege "specific license fees" that defendant demanded, and did not "allege[ ] specifically"

21   that the defendant "charges or demands license fees higher than other patent holders").

22        Ultimately, the absence of any allegations of fact to support the existence of market power

23   is not surprising, given that the gravamen of the Complaint is that Defendants have "weak"

24   patents.  Cmplt. ¶¶ 9, 35, 39, 44.  Even assuming the truth of those conclusory allegations,

25   Defendants' "weak" patents—whether individually or combined into a portfolio of "weak"

26   patents—would possess no market power at all.  *See Manley v. Experian Info. Sols., Inc.*, No. 16-

27   CV-03355-LHK, 2017 WL 151540, at *5 (N.D. Cal. Jan. 16, 2017*)* (inconsistent factual

28

1   allegations are implausible).[6]  Put another way, if Plaintiffs are able to plead, subject to the

2   requirements of Rule 11, that Defendants' patents are "weak," then Plaintiffs (and other market

3   participants) can use that very same analysis to value Defendants' patents for purposes of licensing

4   and litigation.  Defendants would therefore be unable to use their purportedly "weak" patents to

5   control prices or exclude competition in the alleged market.

6         Finally, the Complaint fails to allege the share (or "percentage") of patents that Defendants

7   allegedly control relative to other competitors in the alleged market.  *See Rick-Mik Enterprises*,

8   532 F.3d at 973; *Digital Sun v. The Toro Co.*, No. 10-CV-4567-LHK, 2011 WL 1044502, at *3

9   (N.D. Cal. Mar. 22, 2011) (dismissing complaint that lacked, *inter alia*, "any allegations regarding

10  [defendant's] share of the relevant market.").  Although Plaintiffs allege that "Fortress has either

11  acquired or controls a portfolio of well over a thousand U.S. patents," Cmplt. ¶ 30, that number is

12  meaningless absent allegations as to how it compares to the total number of patents that make up

13  the Electronics Patents Market—much less how it compares to the size of Plaintiffs' own massive

14  patent portfolios.[7]  Without pleading such facts, the allegation that Fortress "acquired or controls a

15  portfolio of well over a thousand U.S. patents" (indeed, supposedly "weak" ones) is meaningless,

16  lacks context, and says nothing about the existence of market power.

17        **C.    Apple's "Input Technology Markets" Are Also Facially Unsustainable**

18        Apple's proposed Input Technology Markets—which are relevant only to Apple's UCL

---

20  [6] Although Plaintiffs also assert that Defendants' "weak" patents somehow become
    "strong" because of alleged "obfuscation regarding the size of the portfolio," Cmplt. ¶ 44,
21  Plaintiffs plead no facts that establish such "obfuscation."  Nor could they:  for example, USPTO
    records show that on June 4, 2014, IXI IP conveyed a "security interest" in certain patents to
22  Fortress Credit, and on February 13, 2014, DSS conveyed a "security agreement" in certain
    patents to Fortress Credit.  RJN 5.  These are just some examples of why Plaintiffs' bald assertion
23  of obfuscation is entitled to no deference on a motion to dismiss.  *See Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the grounds of his entitle[ment] to
24  relief requires more than labels and conclusions") (internal quotation marks omitted).
        [7] For example, the Complaint alleges that Fortress obtained an interest in just "ten
25  semiconductor" patents from DSS, Cmplt. ¶ 70 (emphasis added), but the PTO has issued over
    300,000 patents in the classification of "semiconductor devices" since 2000 alone, RJN 5.  And
26  this is just one of potentially dozens of PTO classifications that could be encompassed by
    Plaintiffs' amorphous "Electronics Patents Market."  To take just one other example, the PTO has
27  issued more than 500,000 patents since 2000 in the field of "Electric Digital Data Processing,"
    RJN 5.  Thus, the "over [1000]" (Cmplt. ¶ 30) patents allegedly owned or controlled by Fortress
28  undoubtedly make up a miniscule portion of the total number of "Electronics Patents" issued by
    the PTO, however Plaintiffs seek to characterize that "market."

DEFENDANTS' JOINT NOTICE OF MOTION & MOTION
TO DISMISS AND TO STRIKE PLAINTIFFS' COMPLAINT
Case No. 3:19-cv-07651-EMC

claim (Count 4), Cmplt. ¶ 191—are also fatally defective.  These markets purportedly consist of the "technology selected for inclusion in [a] standard" set by a standard setting organization (SSO) for purposes of ensuring cross compatibility between different products.  Cmplt. ¶¶ 145-46.  According to Plaintiffs, if such standardized technology is "protected by patents" (known as Standard Essential Patents or SEPs), "the patent owner controls the supply of that particular input technology for the standard."  *Id.* ¶ 145.  In other words, in Plaintiffs' view, the "functionality" covered by each SEP is automatically a market unto itself.  *Id.* ¶ 146.

However, to adequately plead a market based on SEPs, a plaintiff must:  (1) identify the SEP at issue; (2) allege that there were alternative technologies under consideration by the SSO prior to adoption of the technology claimed by the SEP; and (3) allege that the SSO would have adopted one of these alternatives absent a defendant's alleged failure to disclose relevant intellectual property or false promise to license such technology on FRAND terms.  *See, e.g.,* *ChriMar Sys. v. Cisco Sys.*, 72 F. Supp. 3d 1012, 1019 (N.D. Cal. 2014) (requiring plaintiff to allege "that the SSO would have adopted an alternative standard had it known of the patent holder's intellectual property rights.") (internal quotation marks omitted); *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 1672493, at *6 (N.D. Cal. May 14, 2012) (plaintiff must allege "alternative technologies were excluded through the standardization process" based on a false promise).  Here, Apple fails on all three counts.

While Apple includes general allegations regarding the standard setting process, Apple does not identify the SEPs at issue, nor does Apple identify any alternatives the relevant SSOs were considering at the time the inventions claimed in the SEPs were adopted into the standards.  Cmplt. ¶¶ 142-146.  Indeed, Apple does not include any allegation that the relevant SSOs would have adopted an alternative standard absent the (un)alleged illicit conduct or that they were even considering alternative standards.  Apple's failures merit dismissal of its Section 17200 claim.

Further, the market definition proposed by Apple is impermissibly vague and overbroad given that a single device or product alone can encompass scores of standardized technologies.  In the absence of any specific allegations as to which patents (or "functionalities") are even at issue, it is impossible to identify which technology "markets" are allegedly restrained.  *See Universal*

1    *Grading Serv.*, 2012 WL 70644, at *7.  The most that Plaintiffs offer is that the "functionalit[ies]"

2    relate to "cellular standards" associated with various "input technolog[ies]," Cmplt. ¶ 146, but this

3    vague reference is wholly insufficient to plead a product market.  *See Godo Kaisha IP Bridge 1 v.*

4    *TCL Commc'n Tech. Holdings Ltd.*, No. 15-634, 2017 WL 750700, at *7 (D. Del. Feb. 27, 2017)

5    (rejecting similar proposed "Relevant Technology Market" for failure to "expressly define" global

6    telecommunications standards as the relevant market), *adopted by*, 2017 WL 1055958 (D. Del.

7    Mar. 20, 2017).[8]

8           Apple also has not adequately alleged that Fortress, INVT, and Uniloc 2017—the only

9    Defendants accused of having power over the vague and amorphous Input Technology Market—

10   have market power.  Crucially, <u>Apple never alleges that these Defendants own or control any</u>

11   <u>patents that are actually SEPs</u> (likely because, by doing so, Apple would be conceding

12   infringement in INVT's underlying patent litigations).  Instead, Apple speaks generally about the

13   impact of the "transfer of SEPs from operating companies to PAEs," Cmplt. ¶ 154, and alleges that

14   certain Defendants have "<u>claimed</u>" to own SEPs that read on adopted standards, *id* ¶¶ 146, 152-53,

15   162.  These allegations are wholly inadequate.  There is nothing anticompetitive about the transfer

16   of patents.  *See infra* 33-34.  Moreover, Defendants' "<u>claims</u> about the scope of [their] patents . . .

17   are not legally relevant."  *Orion Elec. Co. v. Funai Elec. Co.*, 2002 WL 377541, at *6 (S.D.N.Y.

18   Mar. 11, 2002) (emphasis added).  These "assertions do not have any legal effect and cannot block

19   anyone from entering the relevant markets.  It is only the legal force of the Asserted Patents

20   themselves that can exclude competitors."  *Id.*  In other words, "any claim of market power must

21   depend upon the patents themselves, not upon the statements of the patentee."  *Id.*

22   **IV.    PLAINTIFFS FAIL TO PLEAD AN ANTITRUST INJURY**

23          All of Plaintiffs' federal antitrust and state law claims should be dismissed for a second

24   reason:  Plaintiffs have not alleged facts showing a cognizable antitrust injury.  *Brunswick Corp. v.*

25   *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (Clayton Act Section 7); *Church & Dwight*

26   *Co. v. Mayer Labs., Inc.*, No. 10-CV-4429 EMC, 2011 WL 1225912, at *7 (N.D. Cal. Apr. 1,

27   

28          [8] There are numerous cellular standards relating to different generations of cellular
     technology (*e.g.*, 2G, 3G, 4G, etc.), and thousands of functionalities within these standards.

1   2011) (Sherman Act Section 1); *Dang v. San Francisco Forty-Niners*, 964 F. Supp. 2d 1097, 1111

2   (N.D. Cal. 2013) (Cal. Bus. & Prof. Code § 17200).  Plaintiffs' alleged injuries—exposure to

3   inflated licensing fees and payment of patent litigation costs—did not flow from any alleged harm

4   to competition.  Rather, they allegedly flow from Defendants' infringement actions against

5   Plaintiffs, but Plaintiffs never explain how these suits against Plaintiffs have harmed Defendants'

6   competitors in any way or decreased competition in the "Electronics Patents Market."  Plaintiffs

7   thus have not alleged an "injury of the type the antitrust laws were intended to prevent and that

8   flows from that which makes the defendants' acts unlawful."  *Sheahan*, 394 F. Supp. 3d at 1011

9   (granting motion to dismiss antitrust claims) (quoting *Chip-Mender, Inc. v. Sherwin-Williams Co.*,

10  No. 05-3465-PJH, 2006 WL 13058, at *5 (N.D. Cal. Jan. 3, 2006)); *Korea Kumho Petrochemical*

11  *v. Flexsys Am. LP*, No. C07-01057 MJJ, 2007 WL 2318906, at *2, n.1 (N.D. Cal. Aug. 13, 2007)

12  ("[G]iven that a plaintiff's ability to establish antitrust injury depends less on the plaintiffs' proof

13  than on its underlying theory of injury," it should be assessed at the "pleading stage.").

14          **A.     Plaintiffs' Purported Exposure To "Supracompetitive" License Rates Is Not
                      Antitrust Injury**
15

16          Plaintiffs' allegation that Defendants have charged inflated licensing fees for their patents

17  does not constitute cognizable antitrust harm as a matter of law.

18          <u>First</u>, and as a threshold matter, the Complaint does not actually plead any facts to support

19  that Defendants charged inflated or "supracompetitive" licensing rates, much less that <u>Plaintiffs</u>

20  ever paid any such rates.  Although Plaintiffs conclusorily allege in several places that Defendants

21  received "supracompetitive licensing returns," *e.g.*, Cmplt. ¶¶ 160, 176, the Complaint nowhere

22  identifies the patents for which Defendants received these purported returns, when Defendants

23  received those returns, or what rendered those returns "supracompetitive."  Without any such

24  supporting details, Plaintiffs' allegations are nothing more than legal conclusions that are deficient

25  as a matter of law.  *See Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, No. 11-CV-

26  2652-GPC-RBB, 2013 WL 3873074, at *13 (S.D. Cal. July 25, 2013) (dismissing antitrust claims

27  where "plaintiff fail[ed] to plead supportive facts beyond conclusory statements that, as a result of

28  Defendants['] actions . . . consumers actually faced higher prices[.]"), *aff'd*, 642 F. App'x 665 (9th

1   Cir. 2016); *Adobe Sys. Inc. v. Coffee Cup Partners, Inc.*, No. C 11-2243 CW, 2012 WL 3877783,

2   at *10 (N.D. Cal. Sept. 6, 2012) (dismissing Sherman Act counterclaim) (allegation that a "lawsuit

3   asserting [certain] patents will result in 'reduced competition and increased prices,' with no

4   elaboration or additional factual allegations" is nothing more than a "sweeping legal conclusion").

5          Nor does the Complaint identify <u>even one patent</u> that Plaintiffs Apple or Intel licensed from

6   Defendants, let alone that either Plaintiff actually ever paid a "supracompetitive" rate for any such

7   license.  Thus, even if the purported licensing fees could constitute an antitrust injury (and, as

8   below, they cannot), Plaintiffs, which never paid those fees, would not have standing to pursue

9   damages for that harm.  Indeed, the "harm" that Apple and Intel claim is not the <u>payment</u> of

10  supracompetitive licensing rates, but rather "the <u>risk</u> of supracompetitive licensing rates."  Cmplt.

11  ¶¶ 176, 181 (emphasis added).  But the <u>risk</u> of such harm is not sufficient to plead an antitrust

12  injury.  *See Prime Healthcare Servs., Inc.*, 2013 WL 3873074, at *13 (dismissing Section 1 claim

13  where plaintiff pleaded only "potential harm[s]" to itself).  And in any event, Plaintiffs' allegations

14  regarding this purported "risk" are insufficient:  Plaintiffs have not identified any patents that they

15  may seek to license from Defendants, nor the basis for any "risk" that they would have to pay

16  "supracompetitive" rates for those licenses.  *See Marine Bancorporation*, 418 U.S. at 622

17  ("[Section] 7 deals in 'probabilities' not 'ephemeral possibilities.'").

18         Further, while Plaintiffs claim—again, without alleging any necessary factual support—

19  that <u>non-parties</u> Amazon.com, Inc. and Huawei Device Co. Ltd. paid "supracompetitive" fees,

20  Cmplt. ¶ 160, those allegations have no bearing on whether <u>Plaintiffs</u> suffered an antitrust injury.

21  *See Grand River Enters. v. King*, 783 F. Supp. 2d 516, 530 (S.D.N.Y. 2011) (granting motion to

22  dismiss) (cigarette manufacturer lacked standing and suffered no antitrust injury from tobacco

23  Master Settlement Agreement which raised rival's costs); *WIXT Television, Inc. v. Meredith Corp.*,

24  506 F. Supp. 1003, 1034 (N.D.N.Y. 1980) (a plaintiff "does not have standing" to "assert the

25  claims" of "other competitors.")

26         <u>Second</u>, even if Plaintiffs had adequately alleged that they paid inflated fees to license

27  Defendants' patents, those allegations would not be sufficient to plead an antitrust injury.  Their

28  purported injury still would not "stem[ ] from a <u>competition-reducing</u> aspect or effect of the

1   defendant[s'] behavior."  *See Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 343 (1990)

2   (emphasis added).  Any inflated charges, in other words, would not be "by reason of anything

3   forbidden in the antitrust laws."  *Brunswick*, 429 U.S. at 488.

4          Crucially in this regard, Plaintiffs allege that they are "customers"—<u>not competitors</u>—of

5   Defendants.  Cmplt. ¶ 170.[9]  Indeed, at least according to the Complaint, Plaintiffs and Defendants

6   compete in entirely different sectors.  Plaintiffs allege that they are operating or product

7   companies, which derive their revenue from selling directly to end users, whereas Plaintiffs allege

8   that Defendants primarily derive their revenue from licensing their patents to operating companies

9   like Plaintiffs.  *Id.* ¶ 50.  But "[n]ot every harm to a consumer constitutes an antitrust injury."

10  *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *13 (N.D. Cal.

11  June 5, 2009).  Rather, to plead an antitrust injury, Plaintiffs needed to plead injury to "competition

12  (rather than consumers)."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1203 (9th Cir. 2012).

13         Plaintiffs' theory is that Defendants' purported license fees derive from Defendants'

14  "alleged ability, with [their] economic resources and patent portfolio, to credibly threaten serial

15  litigation, not for the purpose of enforcing [their] patents, but rather to bludgeon [Plaintiffs] into a

16  licensing agreement that could not otherwise be obtained or justified based on the merits of its

17  patents, were they to be dispersed individually among many holders."  *Intellectual Ventures I*,

18  2013 WL 6682981, at *7; *see e.g.*, Cmplt. ¶¶ 39, 160 ("For example, the Uniloc Defendants have

19  been able to coerce several parties (including Amazon.com and Huawei Device Co. Ltd.) to license

20  its patents, even though its patents have repeatedly been shown to lack merit.").

21         This purported harm has nothing to do with competition.  Plaintiffs do not allege that

22  Defendants' conduct reduced the number of relevant competitors, restricted, excluded, or

23  otherwise hindered any competitor in any of the Complaint's ill-defined "markets," *supra* Section

24  III, or otherwise affected the competitive process in those purported "markets."  Instead, Plaintiffs

25  assert only that certain customers might be exposed to higher rates because of the way that

26  Defendants manage their patent portfolios.  But the "uncertainties" and "risks" that purportedly

27  _____

28         [9] *See also* RJN 3-4 (citing and quoting repeated statements by Intel and Apple in motions
     to stay that Plaintiffs do not compete with Defendants).

1    motivate the licensees to pay those purportedly inflated rates are present regardless of whether

2    Defendants had market power or not.  *See Synopsys, Inc. v. ATopTech, Inc.*, No. C 13-2965 MMC,

3    2015 WL 4719048, at *5 (N.D. Cal. Aug. 7, 2015) (granting motion to dismiss where alleged

4    injury did not result from the defendant's market power).  Plaintiffs vaguely claim that "Fortress

5    has inevitably acquired substitute patents" and that "eliminating substitutes" allows Fortress to

6    "effectively exercise hold-up power."  Cmplt. ¶ 38.  As detailed herein, Plaintiffs nowhere allege

7    any patents for which this is true, what "substitutes" Defendants supposedly acquired or from

8    whom Fortress acquired them, much less how any such acquisitions impacted competition.  *See*

9    *supra* 7-8*; infra* 35-37.  As such, this "allegation" is nothing more than a legal conclusion, which

10   is not entitled to any weight on a motion to dismiss.  *See Twombly*, 550 U.S. at 555.

11          Underscoring this point is Plaintiffs' concession that "[t]here is nothing inherently illegal

12   with owning many patents or obtaining those patents through acquisition," Cmplt. ¶ 48, and

13   Plaintiffs' failure to proffer any "fact-based explanation concerning why [Defendants'] acquisition

14   of presumed valid patents becomes unlawful or at what point [Defendants'] enforcement of

15   multiple patents" became anticompetitive, *Intellectual Ventures I*, 2013 WL 6682981, at *7.  Were

16   Plaintiffs actually seeking to recover for an injury resulting from a reduction in competition,

17   Plaintiffs would be able to identify when or why Defendants' lawful patent acquisition somehow

18   began to cause competitive harm.  That they cannot do so highlights their core pleading failure.

19   *See Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1064 (9th Cir. 2001) ("failure to allege injury

20   to competition," is "a proper ground for dismissal") (internal quotation marks omitted).

21          In short, even if Plaintiffs <u>had</u> chosen to pay an inflated price to license Defendants' patents

22   to avoid claims of infringement, that is not an injury for which the antitrust laws offer redress.  A

23   patent "empowers the owner to exact royalties as high as he can negotiate."  *Brullotte v. Thys Co.*,

24   379 U.S. 29, 33 (1964).  As a result, "[a] patent owner's pursuit of optimum royalty income is not

25   an act in restraint of trade which violates the antitrust laws."  *Townshend v. Rockwell Int'l Corp.*,

26   No. C99-0400SBA, 2000 WL 433505, at *8 (N.D. Cal. Mar. 28, 2000) (granting motion to

27   dismiss).  Indeed, the patent owner's ability to charge an optimum royalty under the patent regime

28   has long been recognized as a central feature of the patent regime that—contrary to Plaintiffs'

theory—actually induces others to innovate and thus promotes the process of dynamic competition that the antitrust laws are designed to protect and promote.  *See* Assistant Attorney General Makan Delrahim, Remarks at American Bar Assoc. 2019 Antitrust Fall Forum (Nov. 18, 2019) (available at https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-abas-2019-antitrust-fall-forum) ("[T]he Antitrust Division has cautioned against the application of antitrust law to patent disputes where a patent holder is merely attempting to monetize his or her investment in research and development, consistent with the statutory construct under the patent laws . . . [this] conduct can reduce incentives for the next generation of innovation, depriving consumers of the benefits the U.S. patent system creates."); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of [the] antitrust law[s], since it may lessen the incentive . . . to invest in those economically beneficial facilities.").  Accordingly, the mere allegation that Plaintiffs have been (or may be) required to pay high prices to license Defendants' patents does not establish antitrust injury.  *Rebel Oil Co., v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury.").

## B. Plaintiffs' Payment Of Litigation Costs Is Not An Antitrust Injury

Plaintiffs do not allege that they compete with Defendants, and thus Plaintiffs' payment of the costs of defending Defendants' patent suits, Cmplt. ¶¶ 163, 168, 176, 181,[10] is not a cognizable antitrust injury.  In addition, and for all of the reasons discussed in this section and below, *see infra* 24-29, Plaintiffs' effort to recover litigation costs is barred by the *Noerr-Pennington* doctrine.

"Patent defense expenses alone may constitute antitrust injury if the defendant is an actual competitor or ready to be a competitor."  *Aventis Pharma S.A. v. Amphastar Pharm., Inc*., No.

---

[10] Although Plaintiffs vaguely refer to business uncertainty, reduced output, and lost business resources, they tie those allegations directly to the litigation and threat of litigation they face.  S*ee* Cmplt. ¶¶ 168-70, 176, 181.  Moreover, these vague references are conclusory and thus entitled to no weight on a motion to dismiss.  *See Adobe Sys. Inc.*, 2012 WL 3877783, at *10.

1   5:03-00887-MRP PLA, 2009 WL 8727693, at *16 (C.D. Cal. Feb. 17, 2009) (citing *Handgards,*

2   *Inc. v. Ethicon, Inc*., 601 F.2d 986, 988-89 (9th Cir. 1979)) (granting dismissal) (emphasis added).

3   For example, courts have held that litigation costs may constitute antitrust injury where a party

4   attempts to use vexatious patent litigation against <u>competitors</u> that manufacture the same products

5   in order to raise their rivals' costs and thereby "litigate the competition out of business,"

6   *Handgards*, 601 F.2d at 990, or where a pharmaceutical company initiates a baseless infringement

7   action against a <u>competing</u> (generic) drug manufacturer to prevent it from obtaining FDA approval

8   for its generic drug, *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132,

9   151 (3d Cir. 2017) (no antitrust injury as a matter of law where alleged sham lawsuit did not

10  "delay[] generic competition").  In such cases, the litigation costs "flow[]" directly from

11  exclusionary conduct that is designed to limit competition.  *Sheahan*, 394 F. Supp. 3d at 1011.

12          As noted above, there is no allegation here that Plaintiffs are competitors of Defendants.

13  And Plaintiffs do not allege that Defendants have somehow used vexatious litigation to drive other

14  competing licensing companies out of the Electronics Patents Market.  Consequently, even if

15  Plaintiffs' litigation costs were from "meritless" cases (and, as demonstrated below, Plaintiffs have

16  not properly alleged facts that this is the case), they would simply be costs incurred by Plaintiffs in

17  the course of business, not harm <u>to competition</u> in the Electronics Patents Market.  *See Stearns*,

18  2009 WL 1635931, at *13 ("Not every harm to a consumer constitutes an antitrust injury.").

19  **V.      THE *NOERR-PENNINGTON* DOCTRINE BARS PLAINTIFFS' SHERMAN ACT
        AND 17200 CLAIMS**

20

21          Plaintiffs' claims under Section 1 of the Sherman Act and Section 17200 of the California

22  Business and Professions Code should be dismissed for another independent reason:  Defendants'

23  patent enforcement efforts are protected petitioning activity under the *Noerr-Pennington* doctrine

24  and thus cannot give rise to "antitrust liability."  *Prof'l Real Estate Inv'rs, Inc. v. Columbia*

25  *Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) ("*PRE*").  The *Noerr-Pennington* doctrine recognizes

26  that the First Amendment protects citizens' right to "use . . . <u>courts</u> to advocate their causes and

27  points of view respecting resolution of their business and economic interests[.]"  *BE & K Const.*

28  *Co. v. NLRB*, 536 U.S. 516, 525 (2002); *Handgards,* 601 F.2d at 993 ("Patentees must be

permitted to test the validity of their patents in court through actions against alleged infringers.").

The doctrine's protections extend not only to litigation itself, but also to pre-litigation

communications demanding the settlement of legal claims.  *Sosa v. DirectTV, Inc.* 437 F.3d 923,

942 (9th Cir. 2006); *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1377

(Fed. Cir. 2004).

      Defendants' patent enforcement efforts plainly fall within *Noerr-Pennington*'s scope, and

Plaintiffs do not adequately plead that any exception to the doctrine applies.  Although Courts

recognize an exception to *Noerr-Pennington* immunity for "sham litigation," the Supreme Court

has expressly held that two conditions must be met to trigger that exception:

> (1) Plaintiffs must adequately allege that the challenged litigations constitute an "attempt to interfere <u>directly</u> with the business relationships of a competitor through the use of governmental <u>process</u>—as opposed to the <u>outcome</u> of that process—as an anticompetitive weapon," <u>and</u>

> (2) Plaintiffs must adequately allege that the litigations are "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."

*PRE*, 508 U.S. at 60–61 (emphasis in original) (citations omitted).[11]  Moreover, "[b]ecause the

sham exception to the *Noerr–Pennington* rule may have a chilling effect on those who seek

redress in the courts, [courts] have held that the exception should be applied with caution."

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*, 944 F.2d 1525, 1531 (9th Cir.

1991).  The sham litigation exception is thus subject to a "heightened pleading requirement."

---

[11] Plaintiffs' allegations that Defendants have filed a series of "endless, meritless" suits (Cmplt. ¶¶ 88, 163) do not affect this analysis.  Under the Ninth Circuit's "series" or "pattern" formulation of the sham pleading exception (and assuming, *arguendo*, that the Ninth Circuit's formulation applies notwithstanding that the conduct being attacked is patent infringement litigation, *see Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998)), Plaintiffs must adequately "allege[] enough sham suits to establish a pattern of baseless or repetitive claims" that reflect "an attempt to interfere <u>directly</u> with the business relationship of a competitor," *i.e.*, an attempt to "injur[e] a market rival."  *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1187 (9th Cir. 2017) (internal quotation marks omitted); *see Catch Curve, Inc. v. Venali, Inc.*, No. 05-CV-04820-DDP-AJWX, 2008 WL 11334024, at *7 (C.D. Cal. Nov. 3, 2008) (concluding that both *PRE* and the "series" tests require objective baselessness and motivation to use the governmental process rather than the outcome of that process to injure a competitor); *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 959 (S.D. Cal. 1996) ("under either the *PRE* or the ['series'] test, [plaintiff's] claims against [defendant] must demonstrate objective baselessness.").

*Fitbit, Inc. v. Laguna 2, LLC*, No. 17-CV-00079-EMC, 2018 WL 306724, at \*10 (N.D. Cal. Jan. 5, 2018).  Courts "routinely dismiss[] claims that are barred by the *Noerr-Pennington* doctrine" at the pleading stage.  *Entrepreneur Media, Inc. v. Dermer*, No. SACV 18-1562 JVS, 2019 WL 4187466, at \*4 (C.D. Cal. July 22, 2019) (collecting cases).[12]  Because Plaintiffs do not satisfy either prong of the "sham" litigation test, Defendants' alleged patent enforcement conduct is immune from antitrust liability.

### A.   Plaintiffs Do Not Allege That Defendants Compete With Plaintiffs Or Are Using The Litigation Process To Achieve An Anticompetitive Goal

The Supreme Court has declared that the sham litigation exception applies when a defendant's purported sham litigation constitutes an "attempt to interfere directly with the business relationships of a <u>competitor</u> through the <u>use</u> of governmental <u>process</u>—as opposed to the <u>outcome</u> of that process—as an anticompetitive weapon."  *PRE*, 508 U.S. at 60-61 (emphasis added). Plaintiffs' own allegations establish (i) that Plaintiffs and Defendants are not competitors (*see supra* 21), and (ii) that Defendants filed patent infringement lawsuits in an effort to obtain judicial findings that their patents are "valid and infringed" and to persuade the subjects of those lawsuits to purchase licenses.  As a result, the sham litigation exception to *Noerr-Pennington* cannot—and does not—apply.

<u>Plaintiffs and Defendants are not competitors</u>:  As noted above, Plaintiffs' own allegations carefully distinguish between "[p]roduct companies," like themselves, which "generally sell a range of products in competition with other companies," and "PAEs . . . that produce no products[.]"  Cmplt. ¶ 50.  Although Plaintiffs do so in an effort to cast aspersions on Defendants' patent enforcement efforts, they unambiguously (and perhaps unwittingly) confirm that Plaintiffs—as licensees or potential licensees—are "customers" of Defendants, *id.* ¶ 170, and are not <u>competitors</u> of Defendants.  Significantly, the two courts that have analyzed the applicability of

---

[12] *See also, e.g., Fitbit, Inc.*, 2018 WL 306724, \*10 (dismissing antitrust counterclaims in part on *Noerr-Pennington* grounds); *Version2 Tech., Inc. v. Neilmed Pharm., Inc.*, No. 16-CV-04720-LB, 2016 WL 6611015, at \*5 (N.D. Cal. Nov. 9, 2016) (same); *Adobe Sys. Inc.*, 2012 WL 3877783, at \*8 (same); *Elecs. For Imaging, Inc. v. Coyle*, No. 01-CV-4853MJJ, 2005 WL 1661958, at \*6 (N.D. Cal. July 14, 2005) (same).

1   the sham litigation exception in cases filed by PAEs against operating companies have found the

2   exception inapplicable on this basis.  *Intellectual Ventures I*, 2013 WL 6682981, at *7 (dismissing

3   antitrust complaint brought by bank against PAE) ("[defendant] and [plaintiff] do not compete in

4   any relevant market, so it cannot be said that [defendant's] object is to use this or any other

5   litigation to interfere with the business relationships of a competitor."); *Intellectual Ventures I LLC*

6   *v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691, 715 (D. Md. 2017) ("it is questionable whether

7   Capital One, a bank, could qualify as a competitor of IV, a patent assertion entity."); *see also*

8   *Realco Servs., Inc. v. Holt*, 479 F. Supp. 880, 884 (E.D. Pa. 1979) (granting motion to dismiss

9   where sham exception counterclaim "[did] not allege that the parties [were] competitors").  This

10  Court should reach the same conclusion here.[13]

11        Defendants do not seek to use governmental process as an anticompetitive weapon:

12  Plaintiffs also fail to adequately allege that Defendants used the litigation "process—as opposed to

13  the outcome of that process—as an anticompetitive weapon."  *PRE*, 508 U.S. at 60–61.  The sham

14  exception is meant to capture instances in which a petitioner is "not seeking official action by a

15  governmental body" and as a result, its "activities complained of are 'nothing more' than an

16  attempt to interfere with the business relationships of a competitor."  *See Franchise Realty*

17  *Interstate Corp. v. San Francisco Local Joint Exec. Bd. of Culinary Workers,* 542 F.2d 1076, 1081

18  (9th Cir. 1976) (emphasis added).[14]  But Plaintiffs explicitly allege that Defendants in fact are

19  seeking official action—*i.e.*, that they sued to obtain "windfall" or "jackpot" damages, to secure

20

21

22   [13] The Department of Justice and Federal Trade Commission have suggested there may be circumstances in which the "subjective" prong of the sham-litigation exception could potentially be satisfied in a suit against a non-competitor.  *See* Brief for the United States of America and the Federal Trade Commission as Amici Curiae In Support of Neither Party, *Intellectual Ventures I*

23   *LLC v. Capital One Financial Corp. et al*, No. 18-1367, Dkt. 41 at 11 n.4 (May 11, 2018).  Such circumstances might arise if, for example, sham litigation is brought against a potential new

24   entrant in order to forestall its entry into a market, but those circumstances are not present here, where Defendants sued a customer at a different level of the distribution chain in order to obtain

25   judicial relief, not to "impose anticompetitive harm from the judicial process," *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1291 (Fed. Cir. 2010).

26

27   [14] For example, a party uses process as an anticompetitive weapon when it files "frivolous objections to the license application of a competitor, with no expectation of achieving denial of the

28   license but simply in order to impose expense and delay."  *City of Columbia v. Omni Outdoor Advert Inc.*, 499 U.S. 365, 380 (1991).

DEFENDANTS' JOINT NOTICE OF MOTION & MOTION
TO DISMISS AND TO STRIKE PLAINTIFFS' COMPLAINT
Case No. 3:19-cv-07651-EMC

1   judicial findings that their patents are "valid and infringed," and to persuade targets to "agree to a

2   license." *See* Cmplt. ¶¶ 7, 9.[15]  Such petitioning activity—aimed at achieving a favorable result as

3   an outcome of the judicial process—is precisely what the *Noerr-Pennington* doctrine is meant to

4   protect.  *See Adobe Sys. Inc.*, 2012 WL 3877783, at *9 (concluding that the plaintiff failed to plead

5   the sham exception where there was no allegation that the defendant brought the lawsuit with the

6   intent to injure plaintiff's business); *Gen-Probe*, 926 F. Supp. at 959 (concluding that allegations

7   provided no reason to believe that defendants desired "anything other than the relief sought in the

8   lawsuits themselves" and noting that "simply alleging that a lawsuit is brought for the purpose of

9   inducing settlement negotiations is insufficient: this could be said of any lawsuit"); *see also*

10  *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 535 (9th Cir. 1991) (affirming dismissal on

11  *Noerr-Pennington* grounds when the litigant "was not merely exploiting the governmental <u>process</u>;

12  it was genuinely seeking judicial <u>relief</u>") (emphasis added).

13   **B.   Plaintiffs Do Not Adequately Allege That Defendants' Lawsuits Are Objectively
           Baseless**

14

15         Finally, Plaintiffs do not adequately allege facts demonstrating that Defendants' lawsuits—

16  the vast majority of which <u>are currently pending</u>—are "objectively baseless in the sense that no

17  reasonable litigant could realistically expect success on the merits."  *PRE*, 508 U.S. at 60-61.

18  "Given the presumption of patent validity and the burden on the patent challenger to prove

19  invalidity by clear and convincing evidence, it will be a rare case in which a patentee's assertion of

20  its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the

21  patentee has engaged in sham litigation."  *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d

22  1338, 1345 (Fed. Cir. 2014).

23         And this is not that "rare" case.  Plaintiffs have not pleaded <u>any</u> facts that would give rise to

24  a proper inference that <u>no reasonable litigant</u> could think that Defendants' infringement suits have

25  merit, much less the facts necessary to satisfy the applicable heightened pleading requirement.

26

27  ────────────────

    **[15]** *See also* RJN 4 (quoting Intel's Opposition to Motion to Consider Whether Cases are
    Related, *VLSI Technology LLC v. Intel Corporation*, Case No. 5:17-cv-05671-BLF, Dkt. 269 at
28  3:1-2 (N.D. Cal. Nov. 12, 2019) (describing alleged "Fortress-led strategy to engage in aggressive
    serial assertions with <u>the objective of eventually obtaining a windfall</u>") (emphasis added).

1   *Fitbit, Inc.*, 2018 WL 306724, at \*10.  More often than not, the lone "factual" support that

2   Plaintiffs offer is their facially insufficient and wholly conclusory *ipse dixit* that Defendants' suits

3   are "baseless" and predicated on "weak" patents—a conclusory assertion contradicted by

4   Plaintiffs' admission elsewhere that Defendants own "potentially valuable patents" (Cmplt. ¶ 164).

5   *Id.* ¶¶ 9, 35, 39, 50, 91, 103, 168; *see, e.g., Formula One Licensing v. Purple Interactive*, No. 00-

6   CV-2222-MMC, 2001 WL 34792530, at \*2 (N.D. Cal. Feb. 6, 2001) (dismissing claims where the

7   sham pleadings alleged only a "meritless trademark infringement action . . . alleging the

8   infringement of unenforceable, generic marks"); *Hewlett-Packard Co. v. Repeat-O-Type Stencil*

9   *Mfg.*, No. C-92-3330-DLJ, 1995 WL 552168, at \*5 (N.D. Cal. Aug. 30, 1995) ("defendant's

10   proposed antitrust counterclaim is merely conclusory and fails to contain the requisite specificity to

11   avoid dismissal under Rule 12(b)(6).").

12        Further underscoring the inadequacy of Plaintiffs' allegations is the fact that for most

13   infringement actions that they deem "meritless," the Complaint fails even to identify the patents

14   that are at issue, let alone explain how they are "weak" or allege why Defendants' positions are

15   objectively unreasonable.  Nor can Plaintiffs attempt to rely on cherry-picked judicial

16   determinations unrelated to the merits of Defendants' infringement claims—such as some

17   Defendants' voluntary dismissals of some cases (Cmplt. ¶¶ 88, 94, 101, 114, 120), or the loss of a

18   discovery motion, *id.* ¶ 98—to salvage their pleading.  Setting aside the fact that Plaintiffs also

19   purposefully ignore numerous rulings that have gone in Defendants' favor (including favorable

20   *inter partes* review determinations, summary judgment rulings, and claim construction orders, *see*

21   *supra* 6), none of the few rulings that Plaintiffs point to demonstrate that Defendants' infringement

22   suits are "meritless."  The Complaint fails to identify a single finding of non-infringement on any

23   of the relevant patents, much less all of them.  Indeed, the vast majority of the infringement actions

24   on which Plaintiffs rely are still pending, rendering Plaintiffs' claims of baselessness entirely

25   premature.  *Darba Enterprises, Inc. v. Amica Mut. Ins. Co.*, No. 2:12-cv-00043-LRH-GWF 2012

26   WL 3096709, at \*3 (D. Nev. July 30, 2012) ("[B]ecause the Rhode Island litigation is ongoing and

27   has not been dismissed, . . . [plaintiff] cannot plausibly allege that it is objectively baseless for

28   purposes of establishing that [defendant] has engaged in 'sham' litigation.").

DEFENDANTS' JOINT NOTICE OF MOTION & MOTION
TO DISMISS AND TO STRIKE PLAINTIFFS' COMPLAINT
Case No. 3:19-cv-07651-EMC

10794413

1    In summary, because Plaintiffs have not met their burden of pleading facts showing the

2    sham exception is met, Defendants' patent enforcement efforts are immune from antitrust liability

3    under the *Noerr-Pennington* doctrine.

4    **VI.    PLAINTIFFS FAIL TO ALLEGE AN UNLAWFUL AGREEMENT**

5          Plaintiffs' Sherman Act Section 1 claim fails for a fourth reason:  Plaintiffs have not

6    sufficiently alleged that Defendants entered a contract, combination, or conspiracy that was

7    intended to, and did, unreasonably restrain trade.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042,

8    1046–47 (9th Cir. 2008); *Tanaka*, 252 F.3d at 1062 (agreement must have "unreasonably

9    restrained trade under either a *per se* rule of illegality or a rule of reason analysis").

10         The Complaint is devoid of any factual allegations that would support a claim that

11   Defendants engaged in any unlawful "concerted action."[16]  *See The Jeanery, Inc. v. James Jeans,

12   Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752,

13   764 (1984).  Indeed, Plaintiffs nowhere allege that all seven Section 1 Defendants ever had a

14   "meeting of the minds," much less that they ever agreed to achieve any unlawful objective.  Nor

15   does the Complaint allege any agreement or meeting of the minds between any two Defendants to

16   unreasonably restrain trade.  While the Complaint rests on an alleged scheme to pursue purportedly

17   "meritless" or "weak" patents, *e.g.,* Cmplt. ¶¶ 9, 39, 88, 163–64, it does not contain any factual

18   allegations that support the actual existence of any such agreement among Defendants to pursue

19   that course of action.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194

20   n.6 (9th Cir. 2015) (affirming dismissal and noting that "plaintiffs must plead evidentiary facts:

21   who did what, to whom (or with whom), where, and when.") (internal quotation marks omitted).

22         In the absence of any factual allegations to support such an agreement, Plaintiffs instead

23   point to various garden-variety commercial transactions between certain Section 1 Defendants and

24   either Fortress Credit or Fortress Investment Group.[17]  But Plaintiffs cannot meet their burden of

25

26   _____

     [16] Plaintiffs assert their Sherman Act Section 1 claim against Fortress, Fortress Credit,
27   Uniloc USA, Uniloc Luxembourg, Inventergy, DSS, and IXI IP (the "Section 1 Defendants").

     [17] *See* Cmplt. ¶¶ 51-52 (Uniloc USA and Uniloc Luxembourg: revenue sharing and note
28   and warrant purchase agreement, patent license agreement); *id*. ¶¶ 64, 67 (Inventergy: revenue
     sharing and note purchase agreement; restructuring agreement); *id*. ¶¶ 70-72 (DSS: investment

alleging an unlawful agreement to restrain trade through allegations about ordinary loan and sale

transactions that show nothing more than that Fortress and other Defendants had reached

commercial arrangements.  *See, e.g., 49er Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463,

1467 (9th Cir. 1986) (declining to infer concerted action from "[o]rdinary sales contracts" because

"antitrust laws are not offended by agreements as such, but only by those with an anticompetitive

content"); *see also Toscano v. PGA Tour, Inc.*, 70 F. Supp. 2d 1109, 1115–16 (E.D. Cal. 1999),

*aff'd*, 258 F.3d 978 (9th Cir. 2001) (requiring plaintiff to provide additional evidence of conspiracy

beyond allegations of written contracts).  Allegations like these, which "could just as easily

suggest rational, legal business behavior by the defendants as they could suggest an illegal

conspiracy are insufficient to plead a § 1 violation." *In re Musical Instruments*, 798 F.3d at 1194.

For example, while Plaintiffs emphasize that Fortress purportedly made loans on "severe"

terms to certain Defendant companies and later foreclosed on them when the loans were not

repaid, *e.g.*, Cmplt. ¶¶ 30, 70–72, that is fully consistent with standard financing arrangements:

lenders routinely seek to maximize returns and then foreclose on securitizing collateral in the event

of default.  *See Kendall*, 518 F.3d at 1049 ("[T]he banks charge the merchant a higher price than

their cost of business to make a profit.  This behavior suggests a rational business decision, not a

conspiracy."); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124,

1130 (9th Cir. 2015) ("We cannot, however, infer an anticompetitive agreement when factual

allegations 'just as easily suggest rational, legal business behavior.'") (quoting *Kendall*) (affirming

dismissal).  Plaintiffs' theory of liability is equivalent to a rule that a bank's lending to multiple

borrowers pursuant to a single investment strategy is sufficient in and of itself to establish that the

lender and its borrowers have engaged in a combination or conspiracy in violation of Section 1.

Here, there is no allegation that the "PAE" Defendants have reached any agreement with one

another, or are even aware of Fortress's loans or investments with other Defendants.

The inadequacy of Plaintiffs' reliance on these run-of-the-mill commercial agreements is

only underscored by the Complaint's citation to various such agreements without ever identifying

---

agreement issuing a loan; amendment to investment agreement; agreement to transfer economic
rights to patents); *id.* ¶ 74 (IXI IP: assignment of security interests in patents).

which one(s) purportedly constitute the agreement(s) to unreasonably restrain trade (*i.e.*, to bring "meritless" claims over "weak" patents).  For example:

- The Complaint alleges that Fortress Credit and DSS entered into a 2014 Investment Agreement that "granted a loan to DSS in exchange for it placing a lien in favor of the investors on ten semiconductor patents and assigned to the investors certain funds recoverable from successful patent litigation involving these patents[.]"  Cmplt. ¶ 70.

- In the next paragraph, the Complaint alleges that in 2016, "following DSS's default" on the loan, "DSS also granted Fortress and the investors a security interest in certain of DSS's unencumbered semiconductor patents to further collateralize the amounts owed[.]"  *Id.* ¶ 71.

- The Complaint then alleges that, in 2018, after DSS failed to meet its payment obligations under the amended agreement, "DSS transferred to Fortress Credit all the remaining economic rights to certain of DSS's semiconductor related patents."  *Id.* ¶ 72.

But the Complaint never alleges—much less provides any factual allegations—that any of this constitutes an agreement that was intended to harm or unreasonably restrain (and that in fact harmed or unreasonably restrained) trade.  It simply recounts a 2014 loan and security interest, a 2016 loan collateralization, and a 2018 loan foreclosure.  The Complaint also never explains why DSS would have conspired to set itself up to fail just so that Fortress could foreclose on collateral and gain control of DSS's patents several years after the original agreement was signed.

Likewise, with respect to the Uniloc entities, the Complaint merely identifies two agreements from December 30, 2014 between Fortress, Uniloc Luxembourg, and Uniloc USA: a Revenue Sharing and Note and Warrant Purchase Agreement and a Patent License Agreement.  *Id.* ¶¶ 51-52.  Pursuant to the Revenue Sharing Agreement, Fortress allegedly "provided a loan" in exchange for "licensing revenue" and "had the right to accelerate" the full payments owed upon default.  *Id.* ¶ 51  Pursuant to the Patent License Agreement, Fortress allegedly gained the ability to "exploit the Licensed Patents in any lawful manner" in the event of a default.  *Id.* ¶ 52.  These descriptions of ordinary business transactions are entirely inadequate to demonstrate any agreement between Fortress, Uniloc Luxembourg, and Uniloc USA to unreasonably restrain trade.  And the same pleading inadequacies exist throughout the Complaint:  Plaintiffs repeatedly cite dates and parties to various written contracts without ever (i) identifying how those contracts constitute unlawful agreements to unreasonably restrain trade; or (ii) providing a factual basis for such an assertion.  *See, e.g., id.* ¶¶ 51–56, 61–74, 173–76.

1    Instead, Plaintiffs baldly assert that Defendants "intended that through their agreements

2    they would extract royalties from their targets—like Intel and Apple—beyond the royalties that

3    could have been obtained but for aggregation by Fortress." *Id.* ¶ 173.  Not only is this allegation

4    conclusory, but it "improperly groups the defendants together and does not plead facts from which

5    a conspiracy between the defendants can be inferred." *NorthBay Healthcare Grp., Inc. v. Kaiser*

6    *Found. Health Plan, Inc*., No. 17-CV-05005-LB, 2017 WL 6059299, at *8 (N.D. Cal. Dec. 7,

7    2017) (dismissing antitrust claims).  For example, DSS's alleged participation in Defendants' so-

8    called "scheme" amounts to a single infringement suit that it filed against Intel.  Cmplt. ¶ 110.

9    There is no allegation that DSS filed "waves of lawsuits," *id.* ¶ 11, nor is there any allegation that

10   it ever filed any suits against Apple at all.  Likewise, there are no allegations that Uniloc USA,

11   Uniloc Luxembourg, Inventergy, or IXI IP have ever brought a single lawsuit against Intel or that

12   they somehow conspired with others to do so.  Plaintiffs' assertion that these Defendants were all

13   part of some "scheme" to harm Intel and Apple thus makes no sense, nor does it give each

14   Defendant notice of what its supposed role in this alleged "scheme" is.  *See Sumotext Corp. v.*

15   *Zoove, Inc*., No. 16-CV-01370-BLF, 2017 WL 2774382, at *10 (N.D. Cal. June 26, 2017)

16   ("Allegations which lump multiple defendants together are insufficient to put any one defendant on

17   notice of the conduct upon which the claims against it are based.") (dismissing antitrust claims).

18       Finally, even setting the above defects aside, the purported motive that Plaintiffs ascribe to

19   Defendants is not anticompetitive.  Plaintiffs claim that the purpose of Defendants' alleged

20   "scheme" was "to increase the total royalties obtained from licensing the Fortress-backed patents."

21   Cmplt. ¶ 173.  But there is nothing inherently unlawful—much less anticompetitive—in buying or

22   selling (*i.e.*, "aggregating") patents, as the Complaint itself expressly concedes.  *Id.* ¶ 48 ("There is

23   nothing inherently illegal with owning many patents or obtaining those patents through

24   acquisition.").  Indeed, the transfer of a patent "has no antitrust significance," as it just transfers a

25   lawful monopoly from one person to another.  *Carefusion Corp. v. Medtronic, Inc.*, No. 10-CV-

26   01111-LHK, 2010 WL 4509821, at *7 (N.D. Cal. Nov. 1, 2010); *see also Columbia River People's*

27   *Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190 (9th Cir. 2000) (The transfer "of a

28   valid patent 'creates no monopoly power; it merely shifts a lawful monopoly into different

1    hands.'") (quoting *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 266 (7th Cir. 1984)).

2           Nor is there anything inherently unlawful with Defendants' licensing their patents or filing

3    infringement cases over patents.  *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981)

4    ("[W]here a patent has been lawfully acquired, subsequent conduct permissible under the patent

5    laws cannot trigger any liability under the antitrust laws.").  And Defendants' purported effort to

6    recover more in royalties than the price they paid for the patents, *e.g.*, Cmplt. ¶ 48, is hardly

7    "anticompetitive"—it reflects nothing more than the market for patent rights envisioned in the

8    Constitution itself.  U.S. Const. art. I, § 8, cl. 8.

9           No matter the antitrust buzzwords—such as "hold-up values" and "reduced output"—that

10   Plaintiffs sprinkle throughout the Complaint, they have failed to allege any agreements <u>in restraint</u>

11   <u>of trade</u>, as is required to state a claim under Section 1.  *Rutman Wine Co. v. E. & J. Gallo Winery*,

12   829 F.2d 729, 736 (9th Cir. 1987) ("if the facts do not at least outline or adumbrate a violation of

13   the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of

14   antitrust.") (internal quotation marks omitted).  For example, Plaintiffs' allegation that "Fortress's

15   model is to condition its investments in PAEs on terms so severe that the PAEs have no choice but

16   to make aggressive and reckless patent assertions" (Cmplt. ¶ 30) does not allege a conspiracy or

17   agreement <u>to unreasonably restrain trade</u>.  It is also wholly conclusory and devoid of the required

18   evidentiary facts.  Plaintiffs never identify the terms that are "so severe" that PAEs "have no

19   choice but to make aggressive and reckless patent assertions."  Nor do Plaintiffs explain how

20   purportedly being "aggressive" is even unlawful, anticompetitive behavior.  Indeed, one could

21   scarcely identify two companies that have been more "aggressive" in the marketplace and in the

22   use of their patents than Intel and Apple.  Plaintiffs' conclusory assertion that Defendants intended

23   to "extract royalties from their targets—like Intel and Apple—beyond the royalties that could have

24   been obtained but for aggregation by Fortress" is similarly problematic.  *Id.* ¶ 173.  Dressing up the

25   Complaint with allegations of "extracting" higher royalties as a consequence of "aggregating"

26   patents is insufficient to establish a violation of Section 1.

27   **VII.    PLAINTIFFS FAIL TO STATE A CLAYTON ACT SECTION 7 CLAIM**

28          In addition to the deficiencies identified above, *supra* Sections III-VI, Plaintiffs' Clayton

1    Act Section 7 claim is subject to dismissal for two separate reasons.  First, Plaintiffs have failed to

2    allege that their injury resulted from Defendants' patent <u>acquisitions</u>—as is required to state a

3    claim under Section 7.  Second, a number of the transactions that Plaintiffs challenge took place

4    outside of the statute of limitations period, and accordingly the claim is time-barred.

5         **A.    Plaintiffs' Alleged Injury Is Not The Result Of Alleged Patent Acquisitions**

6         When stripped of its conclusory rhetoric, the Complaint "do[es] not allege that

7    [Defendants'] acquisitions, standing alone, have lessened competition."  *Intellectual Ventures I*

8    *LLC.*, 2013 WL 6682981, at *9.  As a result, Plaintiffs have not sufficiently pleaded that the effect

9    of Defendants alleged patent acquisitions "may be substantially to lessen competition, or to tend to

10   create a monopoly," 15 U.S.C. § 18, as is required to state a Section 7 claim.  The point of a

11   Section 7 exercise is to determine whether or not <u>acquisitions</u> give a merged firm the incentive and

12   ability to raise prices or reduce output—*i.e.*, whether <u>acquisitions</u> change the competitive

13   landscape in such a way as to allow the merged firm to harm consumers.  *See Saint Alphonsus*

14   *Med. Center-Nampa Inc. v. St. Luke's Health Sys., Ltd.,* 778 F.3d 775, 787-88 (9th Cir. 2015).  But

15   Plaintiffs have failed to allege that Defendants' patent acquisitions would have this anticompetitive

16   effect.  They rather concede that there "is nothing inherently illegal with owning many patents or

17   obtaining those patents through acquisition," Cmplt. ¶ 48, without ever pleading any facts to

18   support that <u>Defendants'</u> acquisitions are any exception.

19        Plaintiffs' pleading failures stem from the fact that they are not really challenging

20   Defendants' patent acquisitions, but rather Defendants' enforcement of the patents that they

21   acquired.  As described above, the gravamen of Plaintiffs' theory is that Defendants have forced

22   them "to incur substantial expenses, uncertainty, and burdens in resisting" Defendants' allegedly

23   meritless infringement suits.  *Id.* ¶ 170; *see also id.* ¶ 40; *compare Intellectual Ventures I*, 2013

24   WL 6682981, at * 9 ("[T]he alleged anticompetitive effects" on which Plaintiffs base their claims

25   "arise from [Defendants'] litigation threats, based on the patents [they have] accumulated, and the

26   settlements that result from those litigation threats").  And it is particularly telling that Plaintiffs

27   themselves consistently downplay the impact of the actual patent acquisitions, emphasizing

28   throughout the Complaint that Defendants' patents are "weak" and their infringement suits are

1   "meritless."  *See, e.g.,* Cmplt. ¶¶ 2, 9, 31, 35, 39, 40, 44, 88, 103, 163, 164.  Plaintiffs' reliance on

2   Defendants' post-acquisition infringement litigation as the ultimate source of their purported harm

3   thus dooms their Section 7 claim and warrants its dismissal.

4           Plaintiffs cannot save their Section 7 claim by arguing that the alleged patent acquisitions

5   were the but-for cause of their purported injuries, even if those acquisitions were (as Plaintiffs

6   allege) part of a scheme that ultimately included threatening and bringing infringement litigation.

7   The mere acquisition of patents, even if undertaken pursuant to such an enforcement "scheme,"

8   cannot threaten "substantially to lessen competition, or tend to create a monopoly," unless the

9   acquisition <u>itself</u> combines patents for substitute technology in a way that creates or enhances

10  market power or otherwise enables the owner of the assembled portfolio to increase prices <u>by</u>

11  <u>virtue of</u> its control of substitute technologies.  *See* Phillip E. Areeda & Herbert Hovenkamp*,*

12  *Antitrust Law,* ¶ 1202(f)(4) (3rd ed. 2016 update) ("§ 7's concern with <u>asset acquisitions that may</u>

13  <u>substantially lessen competition</u>" could arise "if some of the acquired patents operated as

14  substitutes rather than as complements, <u>and</u> if the patentee had acquired enough of these so as to

15  limit unreasonably the technology choices in the market") (emphases added); *see also Intellectual*

16  *Ventures I*, 2013 WL 6682981, at *9 (plaintiffs failed to plead a Section 7 claim because, *inter*

17  *alia*, they did not allege that defendants had acquired all substitutes or competing patents);

18  *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1557 (Fed. Cir. 1997),

19  *abrogated on other grounds*, *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998).

20          Nor are Plaintiffs' vague and wholly conclusory allegations that Defendants "inevitably"

21  acquired all of the <u>unidentified</u> substitutes for <u>unidentified</u> patents sufficient to plead that

22  Defendants' patent acquisitions themselves have the tendency to substantially lessen competition

23  in violation of the Clayton Act.  Tellingly, the Complaint contains only a small handful of vague

24  allegations regarding potential substitutes, and it fails to plead facts that demonstrate that any

25  patents owned or controlled by Defendants are in fact substitutes in the relevant antitrust sense.

26  Paragraphs 32 and 33 of the Complaint are nothing more than hypothetical examples regarding

27  potential substitutes, and Paragraphs 38, 41, and 44 do not identify even a single patent that is a

28  substitute for another patent, much less "a range of patents that are . . . substitutes for . . . one

1  another." Cmplt. ¶ 32.  Moreover, the Complaint fails to identify which of the numerous

2  transactions included in the Complaint are objectionable or why.  For example, the only allegation

3  in the Complaint relating to patents acquired by INVT consists of the conclusory assertion that

4  "INVT acquired SEPs from Panasonic," *id.* ¶ 150,[18] but the Complaint never states what these

5  patents were, when this transaction occurred, or how it lessened competition.  Similarly, the

6  Complaint does not contain any allegations concerning Seven Networks' acquisition of patents,

7  nor does it identify how many patents Seven Networks owns or what these patents cover.

8  Plaintiffs' conclusory allegations of aggregation are inadequate to state a Section 7 claim.  *See*

9  *Schlafly v. Public Key Partners*, No. 94-20512 SW, 1997 WL 564073, at *3-4 (N.D. Cal. Aug. 29,

10  1997) (plaintiffs' conclusory assertions that defendants illegally pooled their patents were

11  insufficient as a matter of law to demonstrate anticompetitive effects).

12        Because Plaintiffs cannot (and do not) assert plausible allegations about the competitive

13  effects of the challenged patent acquisitions themselves, it is apparent that their purported

14  injuries—incurring expenses and "uncertainty"—"do not arise from the <u>acquisition</u> of the patents,

15  but from <u>conduct that post-dates the acquisition</u>."  *Intellectual Ventures I*, 2013 WL 6682981, at *9

16  (emphases added).  Alleging an injury based not on the effects of an acquisition itself, but rather on

17  post-acquisition conduct, is not sufficient to state a Section 7 claim.  *Id.*; *Dole Valve Co. v.*

18  *Perfection Bar Equip., Inc.*, 311 F. Supp. 459, 462–63 (N.D. Ill. 1970) (no Section 7 claim where

19  "the injury [was] caused by prosecution of the infringement suit, not by the merger prohibited by

20  the Clayton Act."); 5 Annotated Patent Digest § 34:54.50 ("[A] patent assertion entity's acquisition

21  of patents, generally does not lead to antitrust liability, because the complained of conduct is the

22  subsequent enforcement of the acquired patents, not their initial acquisition."); *see also In re*

23  *Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 136 (E.D.N.Y. 2003) *aff'd,* 466 F.3d 187

24  (2d Cir. 2006) ("Nor can a defendant in a patent infringement suit claim antitrust injury based on

25  the costs of defending against the infringement or related costs caused by losing the infringement

26  suit.").  Plaintiffs' Section 7 claim should therefore be dismissed.

27  _____

28       **18**  And the Complaint does not contain a single allegation that INVT filed a lawsuit against
Intel.

**B.    Plaintiffs' Section 7 Claim Is Time-Barred**

Plaintiffs' Section 7 claim is also barred because it challenges a number of transactions that were consummated more than four years before Plaintiffs filed suit.  The statute of limitations for a Clayton Act Section 7 claim is four years, 15 U.S.C. § 15b, and the limitations period begins to run from the time of the allegedly anticompetitive acquisition.  *See, e.g., Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, No. CV 15-9814 DSF (AGRx), 2016 WL 3457177, at *1 (C.D. Cal. May 11, 2016) (A "merger must be challenged within the limitations period.").  Moreover, multiple courts have held that the statute of limitations for claims under Section 7 cannot be extended by allegations of a "continuing violation."[19]  *See, e.g., Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004) ("Once a merger is completed, there is no continuing violation possible under § 7 that would justify extending the statute of limitations beyond four years."); *see also Complete Entm't*, 2016 WL 3457177, at *1 ("[I]t cannot be the case that if a merger leads to monopoly power then anything anticompetitive that the newfound monopolist does is a 'continuing violation' that began with the merger, allowing the merger to be challenged indefinitely.").  Because Plaintiffs' Section 7 claim implicates acquisitions that occurred more than four years prior to the initiation of the present suit, this claim is time-barred.[20]

Here, Plaintiffs filed suit on November 20, 2019.  Thus, the four-year statute of limitations bars Plaintiffs from challenging any transactions that were consummated prior to November 20, 2015.  These include at least the following alleged transactions:

- On February 13, 2014, Fortress invested in DSS and gained an interest in "ten semiconductor patents."  Cmplt. ¶ 70;

- On June 5, 2014, Fortress Credit gained an interest in IXI's patents.  *Id.* ¶ 74;

- On October 1, 2014, Fortress invested in Inventergy and gained an interest in "Inventergy's licensing revenues."  *Id.* ¶¶ 64-65;

---

[19] Even if the "continuing violation" doctrine applied, Plaintiffs do not allege a continuing violation of the sort that would trigger the doctrine's application here.

[20] To the extent Plaintiffs seek injunctive relief for their Section 7 claim, this claim is also barred by the doctrine of laches.  *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014).  Similarly, to the extent that Plaintiffs' state law claims are predicated on the Section 7 claim, these claims are time-barred as well.  *See, e.g. Plascencia v. Lending 1st Mortg.*, 583 F. Supp. 2d 1090, 1099 (N.D. Cal. 2008) ("California law provides a four-year limitations period for UCL claims.").

1    • On December 30, 2014, Fortress entered into a licensing and revenue sharing
2        agreement with Uniloc. *Id.* ¶¶ 51-52;

3    • By July 2015, Fortress had allegedly gained control over Seven Networks. *Id.* ¶ 76.[21]

4  Because the above "acquisitions" occurred outside the four-year limitations period, Plaintiffs'

5  Section 7 claim predicated on such "acquisitions" is time-barred as a matter of law.

6        Plaintiffs may argue that only the post-November 20, 2015 acquisitions constituted the

7  Section 7 violations.  However, that would contradict Plaintiffs' attempt to include entities like

8  Seven Networks in their Section 7 claim, when Fortress's alleged acquisition of Seven Networks

9  occurred in July 2015.  *Id.* ¶ 76.  And at the very least, the pre-November 20, 2015 acquisitions

10 would be time-barred.

11 **VIII.   PLAINTIFFS' SECTION 17200 CLAIMS SHOULD BE STRICKEN UNDER
            CALIFORNIA'S ANTI-SLAPP STATUTE OR ALTERNATIVELY DISMISSED**

12

13        Plaintiffs' California Business and Professions Code Section 17200 unfair competition

14 claims, Cmplt. ¶¶ 182-91, should be stricken pursuant to California's anti-SLAPP statute, or, in the

15 alternative, dismissed.  The analysis of an anti-SLAPP motion proceeds in two steps:

16        At step one, the court decides whether the defendant has made a threshold showing
          that the challenged cause of action is one arising from the protected activity . . . .
17        At step two, the burden shifts to the plaintiff to demonstrate that each challenged
          claim based on protected activity is legally sufficient and factually substantiated.
18

19 *Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 810 (N.D. Cal. 2019) (internal quotation

20 marks and citations omitted) ("A defendant in federal court may bring an anti-SLAPP motion with

21 respect to California state law claims[.]").

22        Plaintiffs' Section 17200 claims are premised on Defendants' patent enforcement efforts.

23 Those claims thus "arise from" acts done "in furtherance of the [defendants'] right of petition or

24 free speech."  Cal. Civ. Proc. Code § 425.16(b)(1); *see Ramachandran*, 359 F. Supp. 3d at 810.

25 Because Plaintiffs fail to "demonstrate" that these claims are "legally sufficient," they should be

26 stricken or dismissed.  *Ramachandran*, 359 F. Supp. 3d at 810 (internal quotation marks omitted).

27 _____

28        [21] Inventergy, Uniloc USA, and Uniloc Luxembourg are not named as Defendants in
   Plaintiffs' Clayton Act Section 7 claim.

1   **A.   Plaintiffs' Section 17200 Claims Arise From Protected Activity**

2        Defendants have met their initial burden of making "a prima facie case that [the] activity

3   underlying [the] plaintiff[s'] claims is statutorily protected." *Wilson v. Cable News Network, Inc.,*

4   7 Cal. 5th 871, 888 (2019); *see also Greater Los Angeles Agency on Deafness, Inc. v. Cable News*

5   *Network, Inc.*, 742 F.3d 414, 422 (9th Cir. 2014) ("California courts . . . have held that a court

6   must generally presume the validity of the claimed constitutional right in the first step of the anti-

7   SLAPP analysis.").  "The filing of lawsuits" unequivocally qualifies as protected activity under the

8   anti-SLAPP statute.  *Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 291 (2006); *see also*

9   *United Tactical Sys., LLC v. Real Action Paintball, Inc.,* 143 F. Supp. 3d 982, 998 (N.D. Cal.

10  2015) (protected activity "includes communicative conduct such as the filing, funding, and

11  prosecution of a civil action") (internal quotation marks omitted).  And, as described herein,

12  Plaintiffs' claims unequivocally arise out of Defendants' infringement suits against Plaintiffs.

13  Plaintiffs' Section 17200 claims are premised on the same core allegations as are their federal

14  claims—*i.e.*, that Defendants engaged in anticompetitive conduct by filing purported "serial

15  nuisance suits."  Cmplt. ¶¶ 185, 191.  Indeed, the only injuries that Plaintiffs' allege with respect to

16  their Section 17200 claims are "litigation costs and diversion of resources away from innovation"

17  as a result of having "to respond to these [ ] serial nuisance suits."  *Id.* ¶¶ 185, 191.  These claims

18  thus necessarily stem from protected activity.  *See Minichino v. First California Realty*, No. C-11-

19  5185 EMC, 2012 WL 4364611, at *2 (N.D. Cal. Sept. 24, 2012) (step one satisfied where

20  "complaint stem[med] from the alleged harm caused by Defendant's lawsuit.").

21   **B.   Plaintiffs' Section 17200 Claims Fail As A Matter Of Law**

22        Plaintiffs have failed to carry their burden of demonstrating that their Section 17200 claims

23  arising from protected activity are legally sufficient.  *Ramachandran*, 359 F. Supp. 3d at 810;

24  *Iglesia Ni Cristo v. Cayabyab*, No. 18-CV-00561-BLF, 2018 WL 4674603, at *5 (N.D. Cal.

25  Sept. 26, 2018) (granting anti-SLAPP motion where plaintiff "ha[d] not met its burden at step

26  two").  First, Plaintiffs' Section 17200 claims are barred by California's litigation privilege.  *See,*

27  *e.g., Feldman v. 1100 Park Lane Assocs.*, 160 Cal. App. 4th 1467, 1491 (2008) (plaintiff "failed to

28  establish a probability of success on the merits" at step two because defendants actions "were

1   shielded by the litigation privilege."). <u>Second</u>, even if the litigation privilege does not apply,

2   Plaintiffs' Section 17200 allegations fail to state a claim.[22]

3        **1.    Plaintiffs' 17200 Claims Are Barred By The Litigation Privilege**

4        California's statutory litigation privilege—which provides that a "publication or broadcast"

5   made as part of a "judicial proceeding" cannot give rise to liability, *Rusheen v. Cohen*, 37 Cal. 4th

6   1048, 1057 (2006); California Civil Code Section 47b—bars Plaintiffs' Section 17200 claims.

7        The Section 17200 claims are based on Defendants' filing of infringement actions and pre-

8   litigation licensing demands.  But "[n]o communication . . . is more clearly protected by the

9   litigation privilege than the filing of a legal action."  *Kane v. DeLong*, No. C-12-5437 EMC, 2013

10   WL 1149801, at *11 (N.D. Cal. Mar. 19, 2013) (dismissing UCL claims) (quoting *Action*

11   *Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1249 (2007)); *see also Arthur J.*

12   *Gallagher & Co. v. Lang*, No. C 14-0909 CW, 2014 WL 6816644, at *2, n.2 (N.D. Cal. Dec. 3,

13   2014) ("[T]he litigation privilege certainly bars a cause of action based on the filing of a lawsuit.").

14   As such, this court has held that "the litigation privilege serves to prohibit [a] UCL action to the

15   extent it is based on Plaintiffs' filing their infringement action, even if such an action is unethical

16   or even illegal."  *Kane*, 2013 WL 1149801, at *12; *see also Visto Corp. v. Sproqit Techs., Inc.*, 360

17   F. Supp. 2d 1064, 1072 (N.D. Cal. 2005) (claim barred where "the merits of the underlying

18   infringement suit are inextricably intertwined with the tort counterclaim").  This statutory bar

19   plainly applies here to Plaintiffs' Section 17200 claims.  *See Wang v. Heck,* 203 Cal. App. 4th 677,

20   686 (2012) ("Any doubt about whether the privilege applies is resolved in favor of applying it.")

21   (internal quotation marks omitted); *see also Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47

22   Cal. App. 4th 777, 783 (1996) ("communications preliminary to the institution of an official

23   proceeding come within the privilege of Civil Code section 47").

24        California's statutory litigation privilege provides protections even broader than those

25   provided by the *Noerr-Pennington* doctrine.  *See Kane*, 2013 WL 1149801, at *12 n.5.  Thus, even

26

---

27      [22] Defendants' motion to strike is based solely on the legal insufficiency of Plaintiffs' Section 17200 claims.  Consequently, the Rule 12(b)(6) motion to dismiss standard applies.

28   *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018).

1   if Plaintiffs had pleaded facts to support that the sham litigation exception to the *Noerr-Pennington*

2   doctrine applies—and for the reasons above, *supra* Section V, they have not—this would not avoid

3   dismissal under the statutory litigation privilege.  *See Rothman v. Jackson*, 49 Cal. App. 4th 1134,

4   1149 (1996) (unlike the First Amendment, the litigation privilege provides a "mantle of an

5   <u>absolute</u> immunity.") (emphasis added); *Kane*, 2013 WL 1149801, at *12 ("[C]ommunications

6   made in connection with litigation do not necessarily fall outside the [litigation] privilege simply

7   because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal[.]").  The

8   "<u>only</u> exception" to the litigation privilege is a claim for malicious prosecution, which can only be

9   brought <u>after</u> the plaintiff has obtained a "favorable termination" on the merits in the underlying

10  litigation.  *See Silberg v. Anderson*, 50 Cal. 3d 205, 216 (1990) (reversing denial of demurrer)

11  (emphasis added).  Plaintiffs' allegations do not support application of that narrow exception.

12      Nor do Plaintiffs successfully plead around the litigation privilege.  In a footnote, the

13  Complaint asserts that "Apple brings [Count 4] only as to conduct relating to patents that INVT

14  and Uniloc 2017 have not yet asserted against Apple."  Cmplt. ¶ 188, n.42.  But that assertion

15  conflicts with Apple's subsequent assertion, made three paragraphs later, that it is seeking to

16  recover for harm purportedly resulting from its defense against "serial nuisance suits."  *Id.* ¶ 191;

17  *Manley*, 2017 WL 151540, at *5 (self-contradictory allegations are implausible).  In any event,

18  Apple cannot assert a Section 17200 claim based on "not yet asserted patents" because there can

19  be no UCL injury from a "not yet asserted patent."  *TCL Commc'ns Tech. Holdings, Ltd. v.*

20  *Telefonaktiebolaget LM Ericsson*, No. SACV 14-0341 JVS (DFMx) 2016 WL 7049263, at *4

21  (C.D. Cal. Aug. 9, 2016) (dismissing UCL claim where plaintiff "only points to hypothetical injury

22  that [it] might have incurred if it had entered into a non-FRAND license."); *see also* Cal. Bus. &

23  Prof. Code § 17204 (providing relief only for those who have "lost money or property").

24          **2.    Plaintiffs Are Not Entitled To Any Remedy Available Under The UCL**

25      The UCL claims also fail as a matter of law because none of the relief that Plaintiffs seek is

26  available under the UCL.

27      <u>First</u>, Plaintiffs seek damages in the form of litigation-related expenses.  Cmplt. ¶¶ 185,

28  191, Prayer at (b).  UCL remedies, however, are "narrow in scope" and "generally limited to

1   injunctive relief and restitution." *Zhang v. Superior Court*, 57 Cal. 4th 364, 371 (2013).  But

2   Plaintiffs do not seek to "restore" any money they paid to Defendants (such as patent licensing

3   fees).  *Id.*  Instead they seek compensation for money spent defending against Defendants'

4   infringement suits.  Such "compensatory" damages are not recoverable under the UCL.  *Id.* at 376.

5           <u>Second</u>, Plaintiffs seek to "void" Defendants' patent transfer agreements.  Cmplt. Prayer at

6   (c).  However, rescission is also not an available remedy under the UCL.  *Nelson v. Pearson Ford*

7   *Co.*, 186 Cal. App. 4th 983, 1018 (2010) ("We have found no authority supporting the remedy of

8   rescission in a UCL action."), *reversed in part on other grounds by Raceway Ford Cases*, 2

9   Cal.5th 161 (2016).  And even if it were, it is well established that a plaintiff cannot seek to

10  "rescind" a "contract to which she was not a party."  *Schauer v. Mandarin Gems of Cal., Inc.*, 125

11  Cal. App. 4th 949, 960 (2005).  There is no allegation that Plaintiffs were party to any of

12  <u>Defendants'</u> patent transfer agreements.

13          <u>Finally</u>, Plaintiffs seek to have Defendants' patents declared unenforceable.  Cmplt. Prayer

14  at (d).  However, Section 17200's <u>narrow</u> remedial scope does not empower courts to grant such

15  extraordinary relief, nor could it given that a state law cannot render a federal patent

16  unenforceable.  *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 480 (1974) (holding that

17  where patent law and state law clash, the "state law must fall").  Accordingly, none of the relief

18  that Plaintiffs seek is available under the UCL, and these claims should be dismissed.  *See In re*

19  *High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1125 (N.D. Cal. 2012).

20          **3.    Plaintiffs' Section 17200 Claims Fail To State A Claim**

21          Even if Plaintiffs' Section 17200 claims did not suffer from the fatal defects outlined

22  above, Plaintiffs have failed to demonstrate the legal sufficiency of those claims.

23          Plaintiffs' first Section 17200 claim (Count 3) mirrors their federal antitrust claims.  This

24  count is explicitly premised on the theory that Defendants' conduct is "illegal" under the "Sherman

25  and Clayton Acts" and violates the "spirit and policy of the antitrust laws."  Cmplt. ¶ 183.  That

26  theory fails for all of the reasons demonstrated in Sections III–VII above.  *Mitchell v. Reg'l Serv.*

27  *Corp.,* No. C 13-04212 JSW, 2014 WL 12607809, at *5 (N.D. Cal. Apr. 23, 2014) ("If the

28  underlying claim that the UCL claim is predicated upon fails then the UCL claim fails as well.").

1     The Complaint's second Section 17200 claim (Count 4) is brought by only Apple against

2     seven of the Defendants.[23]  Cmplt. ¶¶ 186-91.  This claim rests on the allegations that defendants

3     Fortress, INVT, and Uniloc 2017 have "claim[ed]" in various litigations to have certain patents (or

4     SEPs) that read on standards set by standard-setting organizations (or SSOs).  *Id.* ¶¶ 149, 152-53,

5     162.  Apple alleges in conclusory fashion that the Count 4 Defendants have somehow evaded

6     requirements set by SSOs to license these patents on "Fair, Reasonable, and Non-Discriminatory"

7     terms.  *Id.* ¶ 188.  This Count fails as a matter of law for several independent reasons.

8         <u>First</u>, Apple pleads no facts to support its conclusory assertion that the Count 4 Defendants

9     have not abided by FRAND commitments.  Apple has not identified any instance in which any

10    Count 4 Defendant has refused to license a SEP on anything but FRAND terms or sought to obtain

11    royalties in excess of the FRAND rate.  In addition, Apple never alleges that the Count 4

12    Defendants actually possess any SEPs at all—let alone SEPs that read on an Apple product or that

13    Apple cannot design around.  Instead, as noted above, *see supra* 18, Apple alleges only that some

14    Defendants have <u>claimed</u> in litigation to possess such SEPs.  Cmplt. ¶¶ 149, 152-53, 162.  Again,

15    Defendants' "<u>claims</u> about the scope of [their] patents . . . are not legally relevant" for purposes of

16    antitrust law.  *Orion Elec. Co.*, 2002 WL 377541, at *6.

17        <u>Second</u>, even assuming that Apple's conclusory allegations were true, Courts have rejected

18    the proposition that a party's refusal to abide by FRAND commitments violates antitrust laws

19    where the party is not a member of the SSO that set these licensing requirements, on the basis that

20    actions taken after a standard is finalized are not subject to antitrust liability.  *See, e.g., Godo*

21    *Kaisha*, 2017 WL 750700 at *6, *adopted by*, 2017 WL 1055958 (D. Del. Mar. 20, 2017)

22    (dismissing antitrust claim where "[defendant] did not reach the agreement with [the SSO]");

23    *Vizio, Inc. v. Funai Elec. Co.*, 2010 WL 7762624, at *6 (C.D. Cal. Feb. 3, 2010) (dismissing

24    antitrust claims because "the [SSO] Policy requires only that <u>participants</u> provide a written

25    agreement to license on FRAND terms") (emphasis added).[24]  Apple does not allege that any of the

26    ——————————————

27    **[23]** These defendants include Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Uniloc 2017, INVT, and Inventergy (the "Count 4 Defendants").

28    **[24]** Apple's sole legal support for its theory is a FTC consent decree that contains no legal reasoning.  Cmplt. ¶ 190 (citing Decision and Order, *In the Matter of Negotiated Data Solutions*

1   Count 4 Defendants are members of any SSO.  Thus, Count 4 fails as a matter of law.

2       <u>Third</u>, although some courts have suggested that a SSO member might commit an antitrust

3   violation in certain limited circumstances—*i.e.*, where a member makes "an intentionally false

4   promise to license essential proprietary technology on FRAND terms" and the SSO subsequently

5   relies on that promise when setting the standard—the Complaint here does not alleges these

6   circumstances.[25]  *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2011 WL

7   4948567, at *4 (N.D. Cal. Oct. 18, 2011).  Also, because such claims sound in fraud, they must be

8   pleaded with particularity under Rule 9(b).  *Id.* (citing Fed. R. Civ. P. 9(b)).  Apple has not met this

9   exacting standard.  Indeed, Apple has not alleged <u>any</u> facts at all that a SSO member induced a

10  SSO to adopt a standard by falsely promising to license specific patents on FRAND terms, and

11  then transferred these patents to a Count 4 Defendant in order to circumvent this obligation.

12      <u>Fourth</u>, as noted above, *supra* Section III, Apple has not properly defined the alleged "Input

13  Technology Markets" or adequately alleged that Defendants have market power in those markets.

14      **C.    Alternatively, Plaintiffs' Section 17200 Claims Should Be Dismissed**

15      For all of the above reasons, even if this Court declines to strike Plaintiffs' Section 17200

16  claims, the Court should dismiss them pursuant to Rule 12(b)(6).  Moreover, because the litigation

17  privilege is absolute, Plaintiffs' Section 17200 claims "must be dismissed without leave to amend."

18  *Chipman v. Nelson*, 2013 WL 1007285, at *8 (E.D. Cal. Mar. 13, 2013), *adopted by*, 2013 WL

19  1284330 (E.D. Cal. Mar. 28, 2013).

20  **IX.    CONCLUSION**

21      The Court should dismiss the Complaint in its entirety and strike Counts 3 and 4.

22

23  *LLC*, File No. 051-0094).  This court is not required to follow FTC precedent, *Godo Kaisha*, 2017

24  WL 750700 at *7 ("The court is not bound by the FTC's analysis . . . ."), nor should it given that
    the order (1) is merely a consent decree, (2) contains no analysis, and (3) is contrary to court

25  decisions.  Moreover, *Negotiated Data* is distinguishable because Plaintiffs have not sufficiently
    alleged that any Defendant has refused to abide by any applicable FRAND requirements.

26      **25** The Department of Justice has indicated that these circumstances alone do not support an
    antitrust violation, even if they might support a claim against the SSO member under contract law.

27  *See Lenovo (United States) Inc. v. IPCom GmbH & Co.*, No. 5:19-cv-01389 (N.D. Cal. Oct. 25,

28  2019), Dkt. 46; *see also* Makan Delrahim, Assistant Att'y Gen., Antitrust Div., U.S. Dep't of
    Justice, Address at IAM's Patent Licensing Conference (Sep. 18, 2018).

1 | Dated:  February 4, 2020

Respectfully submitted,

2

IRELL & MANELLA LLP

3

4

By: */s/ A. Matthew Ashley*

5

A. Matthew Ashley
*Counsel for Defendants*
FORTRESS INVESTMENT GROUP LLC,
FORTRESS CREDIT CO. LLC,
VLSI TECHNOLOGY LLC

6

7

8

*/s/ Christopher A. Seidl*

9

Christopher A. Seidl (*pro hac vice*)
CSeidl@RobinsKaplan.com
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  612 349 8468
Facsimile:  612 339-4181
*Counsel for Defendants*
INVT SPE LLC
INVENTERGY GLOBAL, INC.

10

11

12

13

14

*/s/ Nathaniel Lipanovich*

15

Nathaniel Lipanovich (Bar No. 292283)
nlipanovich@thoits.com
THOITS LAW
400 Main Street, Suite 250
Los Altos, CA 94022
Telephone: 650 327-4200
Facsimile:  650-325-5572
*Counsel for Defendant*
DSS TECHNOLOGY MANAGEMENT,
INC.

16

17

18

19

20

21

*/s/ Jason D. Cassady*

22

Jason D. Cassady (*pro hac vice pending*)
jcassady@caldwellcc.com
CALDWELL CASSADY & CURRY
2121 N. Pearl Street, Suite 1200
Dallas, TX 75201
Telephone: 214 888-4841
Facsimile:  214-888-4849
*Counsel for Defendant*
IXI IP, LLC

23

24

25

26

27

28

*/s/ James J. Foster*
James J. Foster
jfoster@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
Telephone:  617 456-8022
Facsimile:  617 456-8100
*Counsel for Defendant*
UNILOC 2017 LLC


*/s/ Daniel. R. Shulman*
Daniel R. Shulman (*pro hac vice*)
daniel.shulman@lathropgpm.com
LATHROP GPM LLP
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612 632-3335
Facsimile: 612 632-4000
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC


*/s/ Samuel F.* Baxter
Samuel F. Baxter (*pro hac vice*)
sbaxter@mckoolsmith.com
MCKOOL SMITH
104 East Houston, Suite 100
Marshall, TX 75670
Telephone:  903 923-9001
Facsimile:  903 923-9099
*Counsel for Defendant*
SEVEN NETWORKS, LLC

1

**ECF ATTESTATION**

2          I, Olivia Lauren Weber, am the ECF user whose ID and password are being used to file

3   DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DISMISS AND TO

4   STRIKE PLAINTIFFS' COMPLAINT.  I hereby attest that I received authorization to insert the

5   signatures indicated by a conformed signature (/s/) within this e-filed document.

6

7

8                                        By: */s/   Olivia Lauren Weber*
                                              Olivia Lauren Weber
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28