**Brian Scarpelli** (*pro hac vice to be filed*)
**bscarpelli@actonline.org**
**ACT | THE APP ASSOCIATION**
**1401 K Street NW**
**Washington, DC 20005**
**Telephone: + 1 202 331-2130**
**Facsimile: +1 202 331-2130**

**Alexandra McLeod, SBR 325930**
**amcleod@actonline.org**
**ACT | THE APP ASSOCIATION**
**1401 K Street NW**
**Washington, DC 20005**
**Telephone: + 1 202 331-2130**
**Facsimile: +1 202 331-2130**

**Attorneys for *Amicus Curiae* ACT | The App Association**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| INTEL CORPORATION, APPLE INC., | ) Case No. 3:19-cv-07651-EMC |
| Plaintiffs, | ) |
| | ) **NOTICE OF MOTION AND MOTION OF** |
| v. | ) **ACT \| THE APP ASSOCIATION FOR** |
| | ) **LEAVE TO FILE AN AMICUS CURIAE** |
| FORTRESS INVESTMENT GROUP | ) **BRIEF IN SUPPORT OF INTEL AND** |
| LLC, FORTRESS CREDIT UNION CO. | ) **APPLE RESPECTING DEFENDANTS'** |
| LLC, UNILOC 2017 LLC, UNILOC USA, | ) **MOTION TO DISMISS** |
| INC., UNILOC LUXEMBOURG | ) |
| S.A.R.L., VLSI TECHNOLOGY LLC, | ) |
| INVT SPE LLC, INVENTERGY | ) |
| GLOBAL INC., DSS TECHNOLOGY | ) |
| MANAGEMENT, INC., IXI IP, LLC, and | ) Date: April 23, 2020 |
| SEVEN NETWORKS, LLC, | ) Time: 1:30 p.m. |
| | ) Place: Courtroom 5 |
| Defendants. | ) Judge: The Hon. Edward M. Chen |
| | ) |
| | ) |
| | ) |
| | ) |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT ACT | The App Association ("ACT") respectfully requests leave to participate in this action as *amicus curiae* in support of the Intel Corporation ("Intel") and Apple Inc. ("Apple") respecting Fortress Investment Group LLC, Fortress Credit Co. LLC, Uniloc 2017 LLC, Uniloc USA, Inc., Uniloc Luxembourg S.A.R.L., VSLI Technology LLC, INVT SPE LLC, Inventergy Global, Inc., DSS Technology Management, Inc., IXI IP LLC, and Seven Networks LLC ("Fortress IP")'s Motion to Dismiss Intel and Apple's Complaint for a Demanded Jury Trial (February 4, 2020) [ECF Docket Entry 111]. *Amicus* requests leave to help explain how the Court's resolution of the issues raised may impact small business innovators during critical stages of developing new technologies for the the Internet of Things (IoT).

## I.  STANDARD FOR LEAVE TO FILE BRIEF OF *AMICUS CURIAE*

"[A] district court has broad discretion to appoint *amici curiae*." *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982). "'There are no strict prerequisites that must be established prior to qualifying for *amicus* status although an individual or organization seeking to participate as *amicus curiae* must make a showing that his participation is useful to or otherwise desirable to the court.'" *Infineon Techs. N. Am. Corp. v. Mosaid Techs., Inc.*, No. C 02-5772 JF(RS), 2006 WL 3050849, at *3 (N.D. Cal. Oct. 23, 2006) (citations omitted). "An *amicus* brief should normally be allowed" when, among other considerations, "the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Cmty. Ass'n for Restoration of the Env't (CARE) v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999) (citation omitted). "District courts frequently welcome *amicus* briefs from non-parties concerning legal issues that have potential ramifications beyond the

parties directly involved[.]" Sonoma *Falls Developers, LLC v. Nevada Gold & Casinos, Inc.*, 272 F. Supp. 2d 919, 925 (N.D. Cal. 2003).

## II.    STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*

ACT | The App Association (formerly known as the Association for Competitive Technology) is an international grassroots advocacy and education organization representing more than 5,000 small and mid-size app developers and information technology firms.  It is the only organization focused on the needs of small business innovators from around the world.  ACT advocates for an environment that inspires and rewards innovation while providing resources to help its members leverage their intellectual assets to raise capital, create jobs, and continue innovating.  To this end, ACT has been closely monitoring recent developments in this case because of the significant implications for the interests of its members.  In light of the critical role that technological innovation plays in enhancing competition and improving the welfare of consumers, ACT has a special interest in ensuring that federal law is properly applied to dynamic industries and innovative technologies.

ACT has participated as *amicus curiae* in a number of cases involving technological innovation.  *See*, *e.g.*, *FTC v. Qualcomm*, No. 19-16122 (9th Cir.); *Apple, Inc. v. Pepper*, 139 S. Ct. 1514 (2019); *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1549 (2017); *Samsung Electronics Co. v. Apple*, No. 15-777 136 S. Ct. 1453 (2016) ; *United States v. Apple, Inc.*, 136 S. Ct. 1376 (2016) (cert. denied); *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per

curiam).

### III. *AMICUS CURIAE*'S EXPERTISE WILL BENEFIT THE COURT

Based on its strong interest in fostering innovation and protecting the interests of app developers and information technology firms, ACT believes that its perspective will aid this Court in evaluating the motion filed by Fortress IP. Intel and Apple's Complaint pleads causes of action arising from Fortress IP's unique patent aggregation scheme that creates an unfair licensing negotiation ecosystem by packaging strong and weak patents together to charge unreasonable licensing rates. If true, the detrimental effects of these actions will be especially felt by small businesses lacking adequate resources to defend themselves. ACT has substantial knowledge and a unique perspective about these implications and submits that its participation as an *amicus* would assist the Court in assessing the "potential ramifications beyond the parties directly involved." *Sonoma Falls Developers*, 272 F. Supp. 2d at 925. Specifically, ACT is well positioned to highlight the predicted substantial impact like that alleged in the Complaint by Fortress IP would have on small business software developers and technology firms across an array of critical industries.

### IV. CONCLUSION

Accordingly, ACT respectfully requests that the Court grant this Motion for Leave to Participate as *amicus curiae*, and to file the accompanying Brief in Opposition of Fortress IP's Motion to Dismiss the Intel Corporation and Apple, Inc.'s Complaint for a Jury Trial.

ACT brings this motion after conferring with Counsel for both Intel and Apple who each indicated that they do not oppose the filing of the instant motion and brief. Additionally, ACT also contacted Counsel for all named Defendants in this case. However, at the time of filing this motion, no Defendant indicated that they would consent to the instant filing. Notwithstanding, ACT has not received

notice from any Defendant that they intend to oppose ACT's request to submit an *amicus curiae*.

Respectfully submitted

Dated: March 18, 2020

ACT | The App Association
Brian Scarpelli and Alexandra McLeod

By: *Brian Scarpelli and Alexandra McLeod*

Brian Scarpelli and Alexandra McLeod
Attorneys for *Amicus Curiae*
ACT | The App Association

**Brian Scarpelli** (*pro hac vice motion to be filed*)
**bscarpelli@actonline.org**
**ACT | THE APP ASSOCIATION**
**1401 K Street NW**
**Washington, DC 20005**
**Telephone: + 1 202 331-2130**
**Facsimile: +1 202 331-2130**

**Alexandra McLeod, SBR 325930**
**amcleod@actonline.org**
**ACT | THE APP ASSOCIATION**
**1401 K Street NW**
**Washington, DC 20005**
**Telephone: + 1 202 331-2130**
**Facsimile: +1 202 331-2130**

**Attorneys for *Amicus Curiae* ACT | The App Association**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| INTEL CORPORATION, APPLE INC., | ) Case No. 3:19-cv-07651-EMC |
| Plaintiffs, | ) |
| | ) **BRIEF OF *AMICUS CURIAE* ACT \| The** |
| v. | ) **APP ASSOCIATION IN SUPPORT OF** |
| | ) **THE INTEL AND APPLE RESPECTING** |
| FORTRESS INVESTMENT GROUP | ) **DEFENDANT'S MOTION TO DISMISS** |
| LLC, FORTRESS CREDIT UNION CO. | ) |
| LLC, UNILOC 2017 LLC, UNILOC USA, | ) |
| INC., UNILOC LUXEMBOURG | ) |
| S.A.R.L., VLSI TECHNOLOGY LLC, | ) |
| INVT SPE LLC, INVENTERGY | ) Date: April 23, 2020 |
| GLOBAL INC., DSS TECHNOLOGY | ) Time: 1:30 p.m. |
| MANAGEMENT, INC., IXI IP, LLC, and | ) Place: Courtroom 5 |
| SEVEN NETWORKS, LLC, | ) Judge: Hon. Edward M. Chen |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

                                                                                    **Page**

I.    **STATEMENT OF INTEREST** ................................................................... 1

II.   **PRELIMINARY STATEMENT** ............................................................... 2

III.  **ARGUMENT** ............................................................................................ 2

   A. U.S. Small Business Technology Firms Rely on a Fair and Consistent Patent
      Framework to Invest and Innovate ................................................................ 2

   B. Abuse of the Court System Threatens Small Businesses, Such as the Tactics Raised in
      the Complaint, Undermines Confidence on the U.S. Patent System, and Discourages
      Innovation ..................................................................................................... 4

   C. Abusive Tactics with Respect to Standard-Essential Patents (SEP) Raised in the
      Complaint are Uniquely Damaging to the Innovation Ecosystem ................................ 7

IV.   **CONCLUSION** ...................................................................................... 11

**Cases**

*Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548 et al. (Fed. Cir. Dec. 14, 2012)............................. 10

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 29 (3d Cir. 2007) ............................................ 9, 11

*Lotes Co. LTD. v. Hon Hai Precision Indus. Co. LTD.*, No. 12-cv-7465, 2013 WL
    2099227, at *5 (S.D.N.Y. May 14, 2013) ..................................................................... 11

*Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015)...................................... 9, 10

*Oil States Energy Servs. v. Greene's Energy Grp*, 138 S. Ct. 1365 (2018)..................................... 8

*TC Heartland v. Kraft Foods Brand*, 137 S. Ct. 1514 (2017) ............................................... 7

**Other Authorities**

App Annie, *State of the App Economy 2020* (Jan. 2020), *available at*
    https://www.appannie.com/en/go/state-of-mobile-2019.................................................... 3

Christine Godt, Scientific Competition: The Role of Patents in Scientific
    Competition: A Closer Look at the Phenomenon of Royalty Stacking 151-172
    (Max Albert et al. eds., 2008). ................................................................................... 5

Commissioner Terrell McSweeny, *Holding the Line on Patent Hold up: Why
    Antitrust Enforcement Matters*, Mar. 21, 2018. .......................................................... 5

Department of Commerce Internet Policy Task Force and Digital Leadership Team
    (Jan. 2017), *available at*
    https://www.ntia.doc.gov/files/ntia/publications/iot_green_paper_01122017.pd
    f ........................................................................................................................... 1

ETSI, *ETSI Guidelines for Antitrust Compliance*, §§ A-B, *available at
    http://www.etsi.org/images/files/IPR/etsi%20guidelines%20for%20antitrust%2
    0compliance.pd* ...................................................................................................... 8

ETSI, *Guidelines for Antitrust Compliance*, § B ............................................................... 9

ETSI, *Intellectual Property Rights Policy*, ¶ 3.1............................................................... 8

*Innovation in Small Businesses' Drivers of Change and Value Use*, SMALL
    BUSINESS ADMINISTRATION, *available at*
    https://www.sba.gov/sites/default/files/rs342tot_0.pdf............................................... 3

Kristin Garr, *IP Protection For Startups: The Role of Legislation Stopping Patent
    Trolls and Encouraging Innovation*, B.C. INTELL. PROP. & TECH. F. 1(2018) ...................... 4

Mark Lemley & Carl Shapiro, *Patent Hold Up and Royalty Stacking*, 85 Tex. L. Rev. 1991 (2007).................................................................................................... 5

Minda Zetlin, *Patent Trolls Target Small Businesses With Lawsuit Threats. Here's How One Startup Fought Back*, INC., (Feb. 2018), *available at* https://www.inc.com/minda-zetlin/patent-trolls-target-small-businesses-with-lawsuit-threats-heres-how-one-startup-fought-back.html. ........................................ 4

*Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the H. Subcomm. on Antitrust, Commercial, and Administrative Law*, 116th Cong. 2 (2019) (statement of Morgan Reed, President, ACT | The App Association) *available at* https://actonline.org/wp-content/uploads/Online-Platforms-and-Market-Power-Part-2-Innovation-and-Entrepreneurship-1.pdf.................................................................................... 1

Statement of the Federal Trade Commission, *In the Matter of Robert Bosch GmbH*, FTC File Number 121-0081. ...................................................................... 9

## I.    STATEMENT OF INTEREST

*Amicus curiae* ACT | The App Association (ACT or the "App Association") respectfully submits its perspective regarding the important issues presented in this action, and encourages a full adjudication on the facts and merits of Intel Corporation's ("Intel") and Apple Inc.'s ("Apple") claims against Fortress Investment Group LLC, Fortress Credit Co. LLC, Uniloc 2017 LLC, Uniloc USA, Inc., Uniloc Luxembourg S.A.R.L., VSLI Technology LLC, INVT SPE LLC, Inventergy Global, Inc., DSS Technology Management, Inc., IXI IP LLC, and Seven Networks LLC ("Fortress IP").

The App Association is an international not-for-profit grassroots advocacy and education organization representing more than 5,000 small business software application developers and technology firms that create the technology innovations used on consumer mobile devices and in enterprise systems around the globe.  Today, the ecosystem the App Association represents is valued at approximately $1.7 trillion and is responsible for 5.9 million American jobs.[1]  Our members lead in developing innovative applications and products across consumer and enterprise use cases, driving the adoption of the internet of things ("IoT").[2]

The App Association has a keen interest in the U.S. patent system functioning predictably and fairly while continuously rewarding innovation. Our members include companies that own patents as well as those that license patents, all of which are directly impacted by the courts' approaches to patent rights and litigation. systematic and systemic patent system abuse is a primary concern for the App Association's thousands of member companies that innovate across

---

[1] *Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the H. Subcomm. on Antitrust, Commercial, and Administrative Law*, 116th Cong. 2 (2019) (statement of Morgan Reed, President, ACT | The App Association) *available at* https://actonline.org/wp-content/uploads/Online-Platforms-and-Market-Power-Part-2-Innovation-and-Entrepreneurship-1.pdf.

[2] *See* Department of Commerce Internet Policy Task Force and Digital Leadership Team (Jan. 2017), *available at* https://www.ntia.doc.gov/files/ntia/publications/iot_green_paper_01122017.pdf  (The IoT will involve everyday products using the internet to communicate real-time analysis of data collected through sensors. IoT is expected to enable improved efficiencies in processes, products, and services across every sector, both consumer and enterprise. In key segments of the U.S. economy, from agriculture to retail to healthcare and beyond, the rise of IoT is demonstrating efficiencies unheard of even a few years ago).

electronic consumer and enterprise verticals. Further information about the Association and its activities is available on our website at http://actonline.org.

## II.    PRELIMINARY STATEMENT

The App Association's members rely on a strong, fair, and predictable legal framework to protect and enforce intellectual property rights. Our members develop and utilize a variety of patented technologies to bring next-generation internet of things (IoT) technologies to consumer and enterprise verticals. Driven by the small business community the App Association represents, new IoT innovations will generate advancements in countless sectors of the economy including financial, agricultural, consumer entertainment, healthcare (and others), creating millions of American jobs. Realizing the potential of the IoT, however, requires a fair and predictable legal environment, particularly with respect to intellectual property. The App Association's members are directly impacted by new and novel forms of abuse with respect to patents, as well as by tactics that jeopardize confidence in the U.S. patent system.

Below, we address the important role our members play in the growing IoT world and how a fair and predictable patent system is crucial to our members growth and job creation. We then discuss how our members are impacted by the new patent licensing tactics at issue in this case, which are described by the Complaint. Further, we describe our members reliance on open technical standards to innovate; how access to essential patents in these standards is critical to ingenuity; and how these essential patents are ensured by standard-essential patent (SEP) holders use the voluntary fair, reasonable, and non-discriminatory (FRAND) licensing commitment.

We conclude by urging this Court to deny the Motion to Dismiss because we firmly believe it is important that the Complaint be fully considered and adjudicated.


## III.    ARGUMENT

A.      <u>U.S. Small Business Technology Firms Rely on a Fair and Consistent Patent Framework to Invest and Innovate</u>

The small business software and hardware technology industry is a driving force behind

the growth of the IoT revolution.  The IoT is an all-encompassing concept capturing how everyday consumer and enterprise products begin to use the internet to communicate data collected through sensors, and act on the data in a timely way.  The IoT is predicted to improve efficiencies in processes, products, and services across every sector of the economy. For example, the IoT will soon play a major role in how we irrigate our crops, provide medical treatment, and purchase everyday items.

Additionally, the app economy's success – and the growth of IoT – relies on continuous innovation and investment in connected devices, which in turn requires a strong and consistent legal framework for intellectual property rights.  Patents allow small business developers to protect their investments; attract venture capital; create and maintain a competitive marketplace; and level the playing field with larger and more established companies/competitors.  Small businesses produce sixteen times more patents per employee than large patenting firms.[3] Furthermore, approximately sixteen percent of the App Association's members have experience with protecting their patent or use of a non-patent through patent infringement litigation.[4]  As a result, small businesses can obtain their competitive edge in the large electronic hardware and software market through their patented technologies.

The limits are undefined and endless when it comes to how IoT devices will change all Americans' lives, with a predicted 25.2 billion connected devices deployed by 2025, almost every sector of the U.S. economy will be impacted ranging from finance and health to gaming and the global digital ecosystem.[5]

The App Association's members ability to take part in the booming cross-sectoral IoT ecosystem, creating millions of further American jobs in the process, heavily depends on the ability to rely on and plan according to legal and business norms and policymaking that

---

[3] *Innovation in Small Businesses' Drivers of Change and Value Use*, SMALL BUSINESS ADMINISTRATION, *available at* https://www.sba.gov/sites/default/files/rs342tot_0.pdf.

[4] *The Results are in: Intellectual Property is Still in Style, Holds Value for App Developers*, ACT | THE APP ASSOCIATION ONLINE BLOG, (March 27th, 2018), *available at* https://actonline.org/2018/03/27/the-results-are-in-intellectual-property-is-still-in-style-holds-value-for-app-developers/.

[5] *See* App Annie, *State of the App Economy 2020* (Jan. 2020), *available at* https://www.appannie.com/en/go/state-of-mobile-2019.

appropriately balances creating a pro-innovation environment with the public interest. A core ignitor of the growth and ingenuity for small businesses in emerging IoT sectors is, and must continue to be a fair, reliable, and predictable intellectual property rights system, particularly with respect to patents. According to a recent focus group survey, more than half of our members have dealt with some type of patent infringement claim. Attempts to abuse the patent system, however unique they may be, must be adjudicated and addressed by the courts to ensure that the patent system can still be relied upon.

B.    Abuse of the Court System Threatens Small Businesses, Such as the Tactics Raised in the Complaint, Undermines Confidence on the U.S. Patent System, and Discourages Innovation

Patent system abuse undermines the confidence of the entire intellectual property system and negatively impacts both large and small companies, syphoning off resources that would otherwise be committed to research and development.[6] Small companies that the App Association represents, in particular, often do not have the resources or time to engage in lengthy and expensive litigation, and abusers of the patent system know this, banking on a quick settlement with little or no protest.[7] Startups and small businesses needlessly pulled into patent litigation often having two choices (1) fold their entire business due to cost of litigation; or (2) pay exorbitant royalty rates for use of (often questionable) patents in order to keep their doors open.

Further, a healthy patent system must avoid high licensing fees and royalty stacking. Traditionally, devices have been developed to provide a single solution (*e.g.*, a dedicated device to measure blood glucose levels). More recently, however, a multi-functional technology product can easily have hundreds, and sometimes thousands, of pieces of patented technologies contained in it (such as a smartphone), requiring many licenses to be negotiated before production, sale, and

---

[6] *See* Kristin Garr, *IP Protection For Startups: The Role of Legislation Stopping Patent Trolls and Encouraging Innovation*, B.C. INTELL. PROP. & TECH. F. 1, 3-4 (2018) (noting the financial challenges small startups endure when faced with bad faith patent infringement claims).

[7] *E.g.*, Minda Zetlin, *Patent Trolls Target Small Businesses With Lawsuit Threats. Here's How One Startup Fought Back*, INC., (Feb. 2018), *available at* https://www.inc.com/minda-zetlin/patent-trolls-target-small-businesses-with-lawsuit-threats-heres-how-one-startup-fought-back.html.

use. Cutting-edge healthcare devices that utilize internet connectivity and sensors (the capabilities of a smartphone) to enable real-time analytics for improved treatment decisions, for example, will include numerous patented technologies to enable the medical functionality (*e.g.*, blood glucose reading technology), along with a high number of patented technologies that enable internet connectivity (antennae, processing, etc.). Developers of these new multi-function devices face the very real possibility of the demands for licenses to so many patented technologies "stacking" up to exceed the cost of developing and getting a product to market. In this way, royalty stacking can tax innovation and prevent technological progress.

Royalty stacking and its negative effects are well-documented and widely acknowledged. Royalty stacking effectively consumes a commercial product developer's profit margins, significantly diminishing the incentives to research and develop.[8] Royalty stacking can also constrain technology transfers from universities and research institutes to industry.[9] Further, royalty stacking exacerbates patent hold-up, when the bargaining position of a patent-holder increases considerably after a patent is included in a technical standard, enabling the patent holder to act unreasonably in leveraging its position.[10]

The case before this Court presents a damaging multi-pronged approach to patent assertion involving many parties. The Complaint filed in this case discusses how Fortress IP and its affiliated assertion entities have aggregated a high number of patents and have systematically used threats of litigation to seek royalties for those patents that exceed the value of the patents under its "Privateering Option" approach, even for, in some cases, invalidated patents. We are particularly troubled by the dynamic of excessive royalties being sought on patents through hold up tactics and abuse of hold up power due to the expectations of investors, representing a

---

[8] *E.g.*, Mark Lemley & Carl Shapiro, *Patent Hold Up and Royalty Stacking*, 85 Tex. L. Rev. 1991, 1993 (2007) (Lemley & Shapiro).

[9] Christine Godt, Scientific Competition: The Role of Patents in Scientific Competition: A Closer Look at the Phenomenon of Royalty Stacking 151-172 (Max Albert et al. eds., 2008).

[10] Commissioner Terrell McSweeny, *Holding the Line on Patent Hold up: Why Antitrust Enforcement Matters*, Mar. 21, 2018.

predatory approach to patent portfolio management unlike any encountered before. Therefore, this Court must let this case move to the discovery phase to assess the Defendants' atypical "business model" and its impact on the electronic patent industry at large. Small businesses are often overlooked in cases, such as the current dispute, but the Defendants' tactics at issue in this case would have even greater devastating effects on small businesses than patent hold up abuse cases when it comes to licensing and litigation.

For example, in healthcare, a miniaturized and embedded connected medical device must be able to automatically communicate bi-directionally in real-time. This capability enables a healthcare practitioner to monitor a patient's biometric data as well as for the patient to be able to communicate with a caregiver in the event of a medical emergency. Other uses, such as sensors deployed to alert security of an unauthorized presence, may only require the ability to send data to security professionals with minimal (or even no) capability to receive communications. Cutting-edge healthcare devices that utilize internet connectivity and sensors to enable real-time analytics for improved treatment decisions, for example, will include numerous patented technologies to enable the medical functionality (e.g., blood glucose reading technology), along with a high number of patented technologies that enable internet connectivity (antennae, processing, etc.). Developers of these new multi-function devices face the very real possibility that abusive behavior per the scheme detailed in the Complaint would prevent such products from ever reaching the market and saving countless lives. Essential small businesses –such as the one described above—will have only a limited chance, if at all, to defend their good faith efforts of innovation against an aggressive and elaborate patent aggregation scheme that makes baseless patent infringement assertions. Instead innovation will be swallowed up by overvalued royalty rates and anticompetitive pricing.

Both the law and public policy interests demand that courts act to avoid anticompetitive and abusive behavior that undermines the U.S. patent system. In recent years, the Supreme Court has demonstrated its commitment to creating a more reliable patent litigation system. For

example, in *TC Heartland v. Kraft Foods Brand*("TC Heartland"),[11] the Supreme Court ruled that good-faith innovators can avoid surprise patent suits in unknown jurisdictions where they have little contacts. Furthermore, in *Oil States Energy Servs. v. Greene's Energy Grp*,[12] the Supreme Court affirmed the constitutionality of the United States Patent and Trademark Office's use of the *inter partes* review process. These decisions, among others, demonstrate the U.S. legal system's commitment to ensuring the U.S. patent system's fairness and reliability. As discussed below, the App Association opposes the Defendants' motion to dismiss and requests that this case be adjudicated on the merits.

C.     Abusive Tactics with Respect to Standard-Essential Patents (SEP) Raised in the Complaint are Uniquely Damaging to the Innovation Ecosystem

A particular area of concern for small business innovators in this case is patent abuse with respect to standard-essential patents. Members of the Association rely on, utilize, and innovate from standardized technologies, including technologies for wireless communication. The convergence of computing and communication technologies, driven by the app economy, will continue as a diverse array of industries come together to build the IoT. As discussed above, the IoT is an encompassing technological approach where everyday products use the internet to collect, utilize, and communicate data that was captured through standardized sensors. The IoT's seamless interconnectivity will utilize known and yet-to-be-developed industry standards, such as 5G, WiFi, LTE, Bluetooth, and countless others. As such, reasonable licensing for SEPs is a "must have" for many small companies, such as our members, their customers and suppliers, who want to have a legitimate chance to compete in the IoT's tech-driven areas.

The App Association members use technical standards, and specifically the interoperability they provide, to support a wide variety of innovation and—absent abuses—to create and promote competition. Standardization is particularly critical in today's highly digitized markets. Developed industries, such as medical, automotive, health, manufacturing and finance,

---

[11] 137 S. Ct. 1514, 1520 (2017).

[12] 138 S. Ct. 1365, 1373 (2018).

are each evolving to implement wireless technologies as the IoT takes shape. Simultaneously, new, highly connected industries and markets implementing wireless standards are just now being created. In each of these markets, "downstream" innovative technologies utilize these "upstream" standardized communication technologies to develop a panoply of unique and diverse products, many of which include our Association's members.

The benefits of these standards only accrue when technical standards setting processes are operating as intended. When the system is gamed, standardization processes carry significant competitive risks.[13] Standard setting can involve close technical collaboration between horizontal and vertical market participants.[14] From a competition law standpoint, technologies selected for inclusion in a standard might be viewed as "winners" that are collaboratively "whitelisted" by industry participants. Conversely, technologies that are not selected might be viewed as "losers" that are collaboratively "blacklisted."[15]

Accordingly, thorny competition law issues are presented where the patented technologies of certain companies are utilized rather than those of other companies. The companies whose technologies are utilized will have unchecked and significant market power to demand excessive royalties, exclude competitors, or otherwise take advantage of an industry's collaborative *agreement* to make products in a certain way (*i.e.*, in accordance with the standard) rather than another.[16]

---

[13] *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1030-31 (9th Cir. 2015) (standardization "creates an opportunity for companies to engage in anti-competitive behavior").

[14] *See, e.g.*, ETSI, *ETSI Guidelines for Antitrust Compliance*, §§ A-B (ETSI is "a forum in which competitors interact with each other. Therefore, the market-related rules apply to the decisions which are adopted by the Institute as a standardization body as well as with regard to the activities of Members within ETSI"; accordingly, "[t]he imposition of discriminatory and unfair conditions by the dominant company, to any categories of users, or any other company having contractual relationships with the dominant company, is abusive"), *available at http://www.etsi.org/images/files/IPR/etsi%20guidelines%20for%20antitrust%20compliance.pdf*

[15] *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) ("standard[ization], by definition, eliminates alternative technologies").

[16] *See, e.g.*, *Microsoft*, 795 F.3d at 1030-31 (addressing "hold up" power of patents incorporated into standards); FTC, Brief of Amicus Curie in Support of Neither Party 3-4, *Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548 et al. (Fed. Cir. Dec. 14, 2012) ("[t]he problem of patent hold-up can be particularly acute in the standard-setting context, where an entire industry may be locked into a standard that cannot be avoided without infringing or obtaining a license for numerous (sometimes thousands) of standard-essential patents.")

To address these competition law issues, many standard-setting organizations (SSOs) have adopted patent policies that require members to license the patents necessary for the implementation of the standard on terms that are fair, reasonable, and non-discriminatory ("FRAND"). The FRAND promise—when kept—serves to minimize the competition law issues associated with standardization by providing that patent licenses will remain available to all market participants on terms that are reasonable and that promote a "level playing field" for competition.[17] Although no company has an obligation to commit its patents to a standard, where a company chooses to do so the FRAND promise acts as a crucial constraint on the abuse of market power associated with SEPs. As the Ninth Circuit has explained, the voluntary FRAND commitment "must be construed in the public interest because it is crafted for the public interest",[18] as it is designed to protect against the competitive abuses and consumer harm that standardization can otherwise enable.

The public interest function of FRAND breaks down where a company violates its obligation to license on FRAND terms. While breach of FRAND may surely give rise to contractual or similar claims by particular parties, it may also involve significant competition law problems and violations. As the Federal Trade Commission ("FTC") has noted in addressing a prior matter to enforce competition law interests in connection with SEPs:

> While not every breach of a FRAND licensing obligation will give rise to [competition law] concerns, when such a breach tends to undermine the standard-setting process and risks harming American consumers, the public interest demands action rather than inaction from the Commission.[19]

Simply put, the practice of SEP "hold up" is a competition law problem.[20] These anti-

---

[17] ETSI, *Intellectual Property Rights Policy*, ¶ 3.1 ("[T]he ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and "others applying ETSI STANDARDS . . . , that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD . . . being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs."); ETSI, *Guidelines for Antitrust Compliance*, § B (noting that the competition interests addressed by the ETSI Policies are "aimed at allowing firms to compete on a level playing field.").

[18] *Microsoft v. Motorola*, 795 F. 3d 1024, 1052 (9th Cir. 2015).

[19] Statement of the Federal Trade Commission, *In the Matter of Robert Bosch GmbH*, FTC File Number 121-0081.

[20] *See, e.g.*, *Broadcom*, 501 F.3d at 314 (FRAND commitments serve as "important safeguards against monopoly power"; "the patent holder's subsequent breach of that [FRAND] promise, is actionable anticompetitive conduct.");

competition concerns have serious implications for innovation and developing industries.

Although some large corporations may be able to absorb the cost of FRAND abuses or to seek redress through litigation to prevent them, small business innovators who need reasonable access to SEPs in order to protect and defend their interests easily may find themselves financially barred from similar protections.  As a result, small business innovators faced with FRAND abuse may be forced to: (1)abandon their business plans involving standards altogether; (2) accept excessive royalty demands made by the SEP holders, and thus transfer the value of their own innovations to entrenched, upstream SEP holders; or (3) change their product's design to avoid the standard (an impossible task for markets requiring interoperability).  None of these outcomes are in the public interest.

The net effect of SEP unchecked abuses would be the exclusion of the tens of thousands of American small businesses, not only from established markets, but also within the emerging vertical markets for IoT technologies.  Therefore, as abusive behavior with respect to SEPs is alleged, the App Association urges the court to consider the serious implications of this case for the future of industry, including small businesses innovating in the IoT. Thorough fact-finding on the Complainants' allegations provide just the opportunity for such consideration.

---

*Lotes Co. LTD. v. Hon Hai Precision Indus. Co. LTD.*, No. 12-cv-7465, 2013 WL 2099227, at *5 (S.D.N.Y. May 14, 2013) ("conduct that undermines the procompetitive benefits of private standard setting may … be deemed anticompetitive under antitrust law.").

## IV. CONCLUSION

Because the Plaintiffs' Complaint raises novel issues supported by a complete and viable factual allegation about abuse of the patent system is a competition law problem impacting companies throughout the consumer and enterprise industries, particularly for small businesses such as the App Association's members, we oppose the Defendants' motion to dismiss.

Respectfully submitted

Dated: March 18, 2020

ACT | The App Association
Brian Scarpelli (*pro hac vice to be filed*)
Alexandra McLeod

By:  *Brian Scarpelli and Alexandra McLeod*

Brian Scarpelli and Alexandra McLeod
Attorneys for *Amicus Curiae*
ACT | The App Association