WILMER CUTLER PICKERING
  HALE AND DORR LLP
Mark D. Selwyn (SBN 244180)
mark.selwyn@wilmerhale.com
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Fax: (650) 858-6100

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Leon B. Greenfield (admitted *pro hac vice*)
leon.greenfield@wilmerhale.com
Amanda L. Major (admitted *pro hac vice*)
amanda.major@wilmerhale.com
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 663-6000
Fax: (202) 663-6363

WILMER CUTLER PICKERING
  HALE AND DORR LLP
William F. Lee (admitted *pro hac vice*)
william.lee@wilmerhale.com
Joseph J. Mueller (admitted *pro hac vice*)
joseph.mueller@wilmerhale.com
Timothy D. Syrett (admitted *pro hac vice*)
timothy.syrett@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

*Attorneys for Plaintiffs*
*Intel Corporation, Apple Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

INTEL CORPORATION, APPLE INC.,

               Plaintiffs,

    v.

FORTRESS INVESTMENT GROUP LLC,
FORTRESS CREDIT CO. LLC, UNILOC 2017
LLC, UNILOC USA, INC., UNILOC
LUXEMBOURG S.A.R.L., VLSI
TECHNOLOGY LLC, INVT SPE LLC,
INVENTERGY GLOBAL, INC., DSS
TECHNOLOGY MANAGEMENT, INC., IXI
IP, LLC, and SEVEN NETWORKS, LLC,

               Defendants.

Case No. 3:19-cv-07651-EMC

**PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' JOINT
MOTION TO DISMISS AND TO STRIKE
PLAINTIFFS' COMPLAINT**

**TABLE OF CONTENTS**

I.     Introduction.................................................................................................. 1

II.    Statement of Issues To Be Decided ............................................................ 2

III.   Statement of Facts....................................................................................... 4

       A.   To Boost Declining Returns on Investment, Fortress Invested in PAEs to
            Aggregate Electronics Patents ................................................................. 4

       B.   Fortress Controls a Massive Electronics Patent Portfolio Held Across Defendant
            PAEs......................................................................................................... 6

       C.   Fortress and Defendant PAEs Engage in Serial Patent Assertions to Monetize
            Their Aggregation Scheme ...................................................................... 9

       D.   Fortress, INVT, Inventergy, and the Uniloc Defendants Executed Patent Transfer
            Schemes to Evade FRAND Commitments .............................................. 12

IV.    Argument .................................................................................................... 14

       A.   Standard of Review.................................................................................. 14

       B.   Defendants Have Market Power in the Electronics Patents Market and Input
            Technology Markets ................................................................................ 15

            1.   Defendants Have Market Power in the Electronics Patents Market ........ 15

            2.   Fortress, INVT, and Uniloc 2017 Have Market Power in the Input
                 Technology Markets ........................................................................ 21

       C.   Defendants' Patent Aggregation and Efforts to Evade FRAND Commitments
            Have Resulted in Antitrust Injury to Plaintiffs ...................................... 25

       D.   The *Noerr-Pennington* Doctrine Does Not Bar Plaintiffs' Claims..................... 29

            1.   *Noerr-Pennington* Does Not Apply to Plaintiffs' Claims......................... 29

            2.   Plaintiffs Need Not Be Competitors with Defendants to Escape
                 Application of the *Noerr-Pennington* Doctrine ........................................ 31

       E.   Defendants' Unlawful Agreements Violate Section 1 of the Sherman Act.......... 31

       F.   Defendants' Patent Acquisitions Violate Section 7 of the Clayton Act ............... 35

            1.   Defendants' Conduct Has Harmed Competition ..................................... 35

            2.   Plaintiffs' Section 7 Claim Is Not Time-Barred ...................................... 36

G.   Defendants' Actions Violate California's Unfair Competition Law ................... 38

1.   Plaintiffs' Claims Are Not Barred by the Anti-SLAPP Statute................ 38

2.   Plaintiffs' Claims Are Not Barred by the Litigation Privilege ................. 40

3.   Plaintiffs Seek Injunctive Relief Regarding Their UCL Claim ............... 40

4.   Apple Adequately Pled Its Unfair Competition Law Claim.................... 41

V.   Conclusion ............................................................................................................. 41

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*In re Aggrenox Antitrust Litig.,*
   94 F. Supp. 3d 224 (D. Conn. 2015)................................................................................18, 19

5

6

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
   190 F.3d 1051 (9th Cir. 1999) ....................................................................................................27

7

8

*Am. Ad Mgmt., Inc. v. GTE Corp.,*
   92 F.3d 781 (9th Cir. 1996) ........................................................................................................25

9

*Am. Needle, Inc. v. Nat'l Football League,*
   560 U.S. 183 (2010)......................................................................................................................20

10

11

*Anderson News, L.L.C. v. Am. Media, Inc.,*
   680 F.3d 162 (2d Cir. 2012).......................................................................................................31

12

*Apple Inc. v. Motorola Mobility, Inc.,*
   No. 11-CV-178 (BBC), 2011 WL 7324582 (W.D. Wis. June 7, 2011) .....................24, 25, 28

13

14

*Apple Inc. v. Samsung Elecs. Co.,*
   No. 11-CV-01846 (LHK), 2012 WL 1672493 (N.D. Cal. May 14, 2012).......................23, 24

15

16

*Apple, Inc. v. Samsung Elecs.,*
   No. 11-CV-01846 (LHK), 2012 WL 2571719 (N.D. Cal. June 30, 2012).......................26, 28

17

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)......................................................................................................................14

18

19

*Aventis Pharma S.A. v. Amphastar Pharm., Inc.,*
   No. 03-00887-MRP PLA, 2009 WL 8727693 (C.D. Cal. Feb. 17, 2009)..............................27

20

21

*Barnes & Noble, Inc. v. LSI Corp.,*
   849 F. Supp. 2d 925 (N.D. Cal. 2012) .....................................................................................22

22

*Barry v. State Bar of Calif.,*
   386 P.3d 788 (Cal. 2017).............................................................................................................39

23

24

*Bhan v. NME Hosps., Inc.,*
   929 F.2d 1404 (9th Cir. 1991) ...................................................................................................16

25

26

*Broadcom Corp. v. Qualcomm Inc.,*
   501 F.3d 297 (3d Cir. 2007)..................................................................................................24, 25

27

28

*Carefusion Corp. v. Medtronic, Inc.*,
   No. 10-CV-01111-LHK, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010)................................32

*In re Cathode Ray Tube Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..................................................15, 18, 25

*ChriMar Sys. v. Cisco Sys.*,
   72 F. Supp. 3d 1012 (N.D. Cal. 2014) ..................................................................23

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) ..............................................................................29

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
   611 F.3d 495 (9th Cir. 2010) ......................................................25, 28, 30, 31

*Concha v. London*,
   62 F.3d 1493 (9th Cir. 1995) ................................................................................24

*Dang v. S.F. Forty Niners*,
   964 F. Supp. 2d 1097 (N.D. Cal. 2013) ...............................................................14

*United States v. E.I. du Pont de Nemours & Co.*,
   353 U.S. 586 (1957)...............................................................................................36

*Funai Elec. Co. v. LSI Corp.*,
   No. 16-CV-01210, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017)..................*passim*

*Hahn v. Or. Physicians' Serv.*,
   868 F.2d 1022 (9th Cir. 1988) ..............................................................................20

*Handgards, Inc. v. Ethicon, Inc.*,
   601 F.2d 986 (9th Cir. 1979) ................................................................................27

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
   527 F. Supp. 2d 1084 (N.D. Cal. 2007) .........................................................*passim*

*F.T.C. v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)........................................................................................16, 19

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   937 F.3d 1359 (Fed. Cir. 2019).............................................................................30

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   99 F. Supp. 3d 610 (D. Md. 2015).............................................................21, 27, 36

*Kane v. DeLong*,
   No. C-12-5437 EMC, 2013 WL 1149801 (N.D. Cal. Mar. 19, 2013).....................40

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ..........................................................................34

*In re Loestrin 24 Fe Antitrust Litig.*,
   261 F. Supp. 3d 307 (D.R.I. 2017).....................................................................18

*McWane, Inc. v. F.T.C.*,
   783 F.3d 814 (11th Cir. 2015) ...........................................................................33

*Meredith Corp. v. SESAC LLC*,
   No. 09-CIV-9177 (NRB), 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011)................................21

*Microsoft Mobile Inc. v. InterDigital, Inc.*,
   No. 15-723 (RGA), 2016 WL 1464545 (D. Del. Apr. 13, 2016) ..........................24, 25, 27, 29

*Mindys Cosmetics, Inc. v. Dakar*,
   611 F.3d 590 (9th Cir. 2010) ..............................................................................39

*In re Musical Instruments & Equipment Antitrust Litigation*,
   798 F.3d 1186 (9th Cir. 2015) ...........................................................................34

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015) ...........................................................................35

*In re Niaspan Antitrust Litig.*,
   42 F. Supp. 3d 735 (E.D. Pa. 2014)..............................................................15, 28

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) ...........................................................................38

*Oltz v. St. Peter's Cmty. Hosp.*,
   861 F.2d 1440 (9th Cir. 1988) ...........................................................................16

*Oracle Am., Inc. v. Micron Tech., Inc.*,
   No. 10-4340-PJH, 2011 WL 999583 (N.D. Cal. Mar. 21, 2011) .............................15

*Otsuka Pharmaceutical Co. v. Apotex Corp.*,
   143 F. Supp. 3d 188 (D.N.J. 2015)......................................................................28

*In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*,
   No. 3:18-CV-00825-JHM, 2019 WL 5386484 (W.D. Ky. Oct. 21, 2019).............................16

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .................................................................16, 17, 20

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
   532 F.3d 963 (9th Cir. 2008) ..............................................................................19

*SCM Corp. v. Xerox Corp.*,
    645 F.2d 1195 (2d Cir. 1981)..................................................................................33

*Sheahan v. State Farm Gen. Ins. Co.*,
    394 F. Supp. 3d 997 (N.D. Cal. 2019) ......................................................................27

*United States v. Singer Mfg. Co.*,
    374 U.S. 174 (1963)...................................................................................................35

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
    506 F.3d 832 (9th Cir. 2007) .....................................................................................14

*Toscano v. PGA Tour, Inc.*,
    70 F. Supp. 2d 1109 (E.D. Cal. 1999)..................................................................33, 34

*TransWeb, LLC v. 3M Innovative Props. Co.*,
    812 F.3d 1295 (Fed. Cir. 2016)............................................................................26, 28

*Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*,
    No. 18-CV-00042 (JRG) (E.D. Tex. Jan. 23, 2019) ...........................................12, 25

*Vizio, Inc. v. Funai Elec. Co.*,
    No. CV 09-0174 (AHM), 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010)...........18, 20, 33, 41

*VLSI Tech. LLC v. Intel Corp.*,
    No. 17-CV-05671 (BLF) (N.D. Cal. Feb. 8, 2019) ...................................................11

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 96 (3d Cir. 2001)...................................................................................14, 19

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017).......................................................................................27

*Wi-LAN Inc. v. LG Elecs. Inc.*,
    382 F. Supp. 3d 1012 (S.D. Cal. 2019)............................................................24, 25, 41

*Yokohama Rubber Co. v. S. China Tire & Rubber Co.*,
    No. CV04-1866GHKPLAX, 2004 WL 5569948 (C.D. Cal. Oct. 19, 2004)............40

*Zhang v. Superior Court*,
    304 P.3d 163 (Cal. 2013) ...........................................................................................40

**Statutes**

15 U.S.C. § 18..............................................................................................................35

15 U.S.C. § 26........................................................................................................38, 40

1    **I.     INTRODUCTION**

2          In a detailed, 50-page Complaint, Plaintiffs Intel Corporation ("Intel") and Apple Inc.

3    ("Apple") allege an ongoing anticompetitive scheme by Fortress Investment Group LLC and

4    Fortress Credit Co. LLC (collectively, "Fortress") and patent assertion entities ("PAEs") Fortress

5    controls.[1]  Through a series of transactions to consolidate ownership of patents purportedly

6    covering electronics products (including substitute and complementary patents), Fortress has

7    assembled a massive portfolio of weak patents—dispersed across Defendant PAEs—that enables

8    it to demand licensing royalties that far exceed competitive levels.  If targeted potential licensees,

9    like Apple and Intel, decline to pay these supracompetitive prices, Fortress weaponizes its patent

10   portfolio by pursuing waves of litigation against its targets.  Despite the weakness of the

11   individual patents, the size, scope, diffusion, and obfuscation of ownership of Defendants' patent

12   portfolio guarantee endless litigation until a target surrenders and pays.  This scheme taxes the

13   electronics industry by increasing prices and decreasing output, and harms potential licensees

14   and end consumers.

15         Defendants attempt to portray this case as one in which they are being bullied by Apple

16   and Intel.  But this case is not about "two of the largest, most powerful companies in the world"

17   picking on "companies a tiny fraction of their size."  Defs.' Mem. at 1.  Rather, it is about

18   Fortress—an investment firm, owned by the global conglomerate SoftBank Group, that manages

19   over $39 billion in assets—anticompetitively aggregating patents to force companies to

20   capitulate to supracompetitive licensing demands.  The antitrust laws protect competition,

21   whether anticompetitive effects are visited on small companies or large ones.

22         Defendants' attempts to immunize their patent aggregation scheme from antitrust scrutiny

23   are nothing more than an ostrich-like refusal to confront the anticompetitive nature of their

24   actions.  And contrary to Defendants' contention that these are "unprecedented 'antitrust'

25   _____

26   [1] Fortress-controlled PAEs include Uniloc 2017 LLC ("Uniloc 2017"); Uniloc USA, Inc. ("Uniloc USA");  Uniloc
     Luxembourg S.a.r.l. ("Uniloc Luxembourg") (together with Uniloc 2017 and Uniloc USA, the "Uniloc
27   Defendants"); VLSI Technology LLC ("VLSI"); INVT SPE LLC ("INVT");  Inventergy Global, Inc. ("Inventergy");
     DSS Technology Management, Inc. ("DSS"); IXI IP, LLC ("IXI IP"); and Seven Networks, LLC ("Seven
     Networks") (collectively, the "Defendant PAEs," and together with Fortress, the "Defendants").

28

claims," *id.*, the claims at issue simply involve applying established antitrust doctrine to a new form of anticompetitive behavior.  For example, Defendants insist that Fortress's loans and investments represent "commercially common and unremarkable" transactions.  *Id.*  But courts regularly find that business transactions that would be ordinary in one context violate antitrust laws in another when they result in anticompetitive effects like those alleged in the Complaint. Similarly, Defendants' claim that they litigate simply to enforce "Constitutionally-protected patent enforcement rights" rings hollow.  *Id.*  Typical patent assertions of individual patents by inventors or their transferees are different in kind from the scheme to anticompetitively aggregate patents to harm competition and inflate royalties to licensees alleged in the Complaint.

## II.     STATEMENT OF ISSUES TO BE DECIDED

Defendants' more specific arguments in support of dismissal also cannot immunize their anticompetitive conduct from scrutiny.

*First*, Defendants' claim that Plaintiffs fail to plead viable antitrust markets and Defendants' power in those markets disregards controlling Supreme Court and Ninth Circuit precedents.  Defendants ignore that settled case law establishes that allegations regarding direct evidence of market power—like Plaintiffs' allegations here regarding supracompetitive prices and restricted output in the Electronics Patents Market—are sufficient to plead market power. Such allegations obviate any need for the extended pleading that Defendants demand regarding the precise contours of the market and Defendants' share therein.  Similarly, courts consistently recognize that the Input Technology Markets Apple alleges represent viable antitrust markets in which standard essential patent ("SEP") holders have market power.

*Second*, Defendants overlook the antitrust injuries that Plaintiffs allege.  Plaintiffs have suffered antitrust injury resulting from Defendants' anticompetitive behavior in two ways that courts recognize—paying litigation costs and facing an ongoing threat that Plaintiffs will be forced to capitulate to Defendants' supracompetitive licensing demands.  As Plaintiffs allege, these injuries are the result of Defendants' anticompetitive patent aggregation scheme, which

combines substitute patents, decreases the number of separate patent owners, increases the value of weak patents, increases costs for product suppliers, and reduces investments in innovation. Defendants' arguments to the contrary insist on a level of detail that courts do not require when deciding fact-intensive issues, like antitrust injury, on a motion to dismiss.

*Third*, Defendants mischaracterize Plaintiffs' allegations in an effort to shield their anticompetitive conduct behind the *Noerr-Pennington* doctrine. But *Noerr-Pennington* does not bar Plaintiffs' claims because the conduct giving rise to the claims is not protected petitioning activity but rather anticompetitive patent aggregation that enables Defendants to demand supracompetitive royalties and, where necessary, to sue to collect the fruits of Defendants' unlawful conduct. Litigation is merely one part of the larger anticompetitive scheme. *Noerr-Pennington* does not prevent licensees and potential licensees, like Plaintiffs, from challenging under the antitrust laws patent-related anticompetitive schemes that result in supracompetitive royalties or impose litigation costs on potential licensees that refuse to capitulate to anticompetitive demands.

*Fourth*, Defendants' claim that Plaintiffs have not alleged an unlawful agreement as required by Section 1 of the Sherman Act is easily dispensed with under controlling precedent. Defendants propose that Plaintiffs must allege that "all seven Section 1 Defendants [] had a 'meeting of the minds'" regarding an illegal scheme and that Defendants' agreements were nothing other than ordinary business transactions. But courts recognize that Plaintiffs do not need to allege that all named Defendants to a claim under Section 1 of the Sherman Act are party to a single agreement. And it is settled antitrust law that agreements taking the same form of ordinary business transactions violate antitrust laws when they produce anticompetitive effects.

*Fifth*, Plaintiffs' claim under Section 7 of the Clayton Act is adequately pleaded and is not time-barred. A Section 7 claim does not become untimely simply because older transactions are cited as part of the ongoing conspiracy, and Plaintiffs' Section 7 claim alleges numerous transactions within the limitations period. Moreover, Plaintiffs' Section 7 claim is timely under the equitable doctrine of laches given the injunctive relief sought by Plaintiffs.

*Finally*, Defendants mischaracterize Plaintiffs' claims under California's Unfair Competition Law.  Neither California's anti-SLAPP statute nor the litigation privilege applies here, because the claims center on Defendants' anticompetitive patent aggregation, rather than any protected petitioning activity.  Further, even if Defendants' activities did constitute protected activity, the anti-SLAPP statute still does not bar Plaintiffs' claims because they easily surpass the minimum merit required to move forward.  And, contrary to Defendants' characterization, the Unfair Competition Law claim rests on Defendants' attempts to avoid FRAND commitments by transferring SEPs, rather than Defendants simply possessing SEPs.

The Court should reject Defendants' efforts to shield their anticompetitive scheme from scrutiny and deny the motion to dismiss.

## III.   STATEMENT OF FACTS

### A.   To Boost Declining Returns on Investment, Fortress Invested in PAEs to Aggregate Electronics Patents

Fortress's initial share value, shortly after it went public in 2007, was over $35 per share. Compl. ¶ 8.  Over the next decade, as the firm struggled with poor returns, Fortress's share price declined more than 85%.  *Id.*  As Fortress's returns declined, Fortress began to invest in PAEs. *Id.* ¶¶ 30, 51-81.  These investments give Fortress control over a massive patent portfolio, including groups of patents on substitute and complementary technologies, which enables Fortress to monetize weak patents—*i.e.*, those that have little or no inventive value and would not have been asserted by their former owners—and eliminate competition among substitute technologies.  *Id.* ¶¶ 8-9, 32-33, 41-44.  In 2017, when its shares dropped to $5 per share, Fortress was acquired by SoftBank Group Corp. ("SoftBank") for $3.3 billion.  *Id.*  Despite Fortress's poor performance—and belying Defendants' claim that Plaintiffs are asserting antitrust claims against companies "a tiny fraction of their size," Defs.' Mem. at 1—Fortress purports to manage approximately $39.2 billion in assets as of March 2019.  Compl. ¶ 8.

Fortress conditions its investments in PAEs on terms that, in effect, require PAEs to make repeated, aggressive, and reckless patent assertions to generate the revenue necessary to satisfy

their obligations to Fortress.  *Id.* ¶¶ 30, 51-52, 64-69, 70-71, 74, 79-80.  For instance, in October 2014, shortly after Defendant Inventergy acquired hundreds of patents, *id.* ¶¶ 61-63, Fortress affiliates DBD Credit Funding, LLC and CF DB EX LLC gave Inventergy $11 million in financing in exchange for revenues generated from patent monetization.  *Id.* ¶¶ 64-65.  Under the agreement, if Inventergy failed to make required payments, Fortress could accelerate Inventergy's obligations and foreclose on its security interests, which would put Inventergy out of business.  *Id.* ¶ 65.  Under the threat of Fortress's foreclosure—and flush with Fortress's investment—Inventergy aggressively pursued licensing revenues, threatening at least one potential licensee with "an IP bloodbath" if it declined to take a license because "Fortress[] does not settle" in litigation.  *Id.* ¶ 66.

When PAEs fail to fulfill their heavy financial obligations, Fortress assumes ownership or control over the patents and continues, or escalates, the aggressive patent assertions.  *Id.* ¶¶ 30, 53-54, 72, 75-77, 81.  In December 2016, for example, Fortress entered into a Patent License Agreement with Defendants Uniloc Luxembourg and Uniloc USA that granted Fortress a license to, among other things, "exploit the Licensed Patents in any lawful manner in *Licensee's sole and absolute discretion*."  *Id.* ¶ 52.  In February 2018, disappointed by licensing returns, Fortress formed Defendant Uniloc 2017.  *Id.* ¶ 53.  James K. Noble, Fortress's Secretary, signed the certificate of formation, and Constantine Dakolias, Fortress's Co-Chief Investment Officer of Credit Funds, served as president.  *Id.* ¶¶ 53-54.  Months later, Uniloc Luxembourg assigned nearly 600 patents to Uniloc 2017.  *Id.* ¶ 54.  The patent transfer not only offered Fortress greater control over patent assertions but, as one court observed, was "perhaps designed to insulate Uniloc Luxembourg from any award of sanctions in the event Uniloc loses [an ongoing] litigation (or some substantial part thereof)."  *Id.* ¶ 55.

Not only does Fortress take over existing PAEs to consolidate patents on substitute and complementary technologies and assert weak patents, but it also establishes new PAEs as vehicles to anticompetitively aggregate and assert patents.  In 2016, Fortress created Defendant VLSI for this purpose.  *Id.* ¶¶ 30, 57-60.  Marc Furstein, Fortress's Managing Director and

President and Chief Operating Officer of Credit Funds, signed VLSI's formation document. *Id.*

¶ 58.  VLSI is a subsidiary of CF VLSI Holdings LLC ("VLSI Holdings"), which was formed by

Justin Klein, then-Chief Financial Officer of Fortress's credit arm, two days after VLSI's

formation. *Id.*  Eran Zur, who serves as Managing Director of Fortress's Intellectual Property

Group, is an "authorized signatory" for VLSI and has signed several documents assigning

patents to VLSI. *Id.*  VLSI now holds nearly 200 patents. *Id.* ¶ 59.  Neither VLSI nor VLSI

Holdings manufacturers or sells any products, and VLSI appears to have a single employee—its

Chief Executive Officer Michael Stolarski. *Id.* ¶ 60.

### B.     Fortress Controls a Massive Electronics Patent Portfolio Held Across Defendant PAEs

Through its investments, Fortress now controls a portfolio of well over a thousand U.S.

patents that purportedly cover high-tech consumer and enterprise electronic devices and

components or software therein and processes used to manufacture them. *Id.* ¶ 30.  Electronics

patents in Fortress's portfolio claim to cover technologies that are both substitutes and

complements for one another. *Id.* ¶¶ 32-33.  That is because when a firm wishes to build an

electronic device, there are multiple alternative ways to do so, each of which requires many

technologies. *Id.*  The technologies used in one alternative are complements to each other

because they are each needed to create the electronic device using that alternative. *Id.*  Other

times, the technologies compete with one another because a firm can choose among alternative

ways to build an electronic device, with one alternative using a given technology and another

alternative using a substitute for that technology. *Id.*  The same holds true for individual patents:

Patents can be both substitutes for and complements to one another. *Id.*  Patent A is a substitute

for Patent B if a manufacturer can use technology covered by Patent A instead of technology

covered by Patent B to build the same device. *Id.*  At the same time, a manufacturer may be able

to build that device or a different device using both technologies. *Id.*  In that case, Patent A and

Patent B are complements. *Id.*  As a result, Fortress's massive portfolio of electronics patents

comprises patents that are both substitutes for and complements to one another. *Id.*  Fortress has

1   accumulated that portfolio through the anticompetitive patent transfer scheme challenged here.

2   *Id.* ¶¶ 9-10, 30, 51-81.

3   By consolidating the formerly diffuse patent ownership structure that prevailed before the

4   challenged patent transfers, Defendants' patent aggregation scheme has harmed competition in

5   two separate but equally troublesome ways. First, Fortress's aggregation eliminates competition

6   because substitute patents once held by separate entities that competed with one another to obtain

7   licenses are now controlled by a single entity. *Id.* ¶¶ 38, 41. The aggregation combines

8   substitute patents, which decreases potential licensees' options and raises royalty rates and

9   lowers licensing output. *Id.* ¶¶ 38-39, 41-42, 48. Second, by creating a portfolio of enormous

10  size and scope, Fortress and Defendant PAEs it controls can profitably assert patents that their

11  predecessors would not have asserted pre-transfer. *Id.* ¶ 39. Before aggregation, original owners

12  did not have an incentive to assert weak patents because there was no expectation of a positive

13  financial return. *Id.* Weak patents could be expected to be proven invalid, not infringed, or

14  unenforceable in litigation, or easily designed around. *Id.* But aggregating the patents changes

15  the calculus. *Id.* After aggregation, Fortress can assert waves of weak patents, increasing the

16  likelihood that a potential licensee will agree to pay a supracompetitive royalty or that a weak

17  patent will slip through the controls of the jury system and be found enforceable when it should

18  not be. *Id.* This increases the value of asserting these patents far beyond the value to the original

19  owners. *Id.*

20  These anticompetitive effects are magnified by the fact that Fortress itself does not hold

21  the entire portfolio; rather, Fortress purposely obscures its control over the patents through its

22  web of PAEs. *Id.* ¶ 44. Often, Fortress's only publicly disclosed connections to its PAEs are

23  Fortress employees serving as Defendant PAEs' directors or the pattern of unexplained "CF"

24  prefixes as parts of Defendant PAEs' corporate affiliates' names (*e.g.*, "CF VLSI Holdings

25  LLC," "CF DB EZ LLC," "CF INVT Holdings LLC," "CF SVN LLC"). *Id.* ¶¶ 44, 58, 64, 69,

26  77. Because Fortress spreads patents among its PAEs and obfuscates which entities own which

27  patents, potential licensees often cannot identify patents that they might want to license or that

28

would be substitutes for patents that a PAE is asserting against them. *Id.* And even if a potential licensee could identify patents to license, no single entity can offer a comprehensive license across the Fortress portfolio. *Id.* ¶ 45. This diffusion increases the transaction costs for licensees because they must determine which Fortress-controlled entities hold the relevant patents and then negotiate with several entities to obtain a comprehensive license. *Id.* And because licensees must negotiate with multiple Fortress-controlled entities, Defendants have multiple opportunities to extract supracompetitive royalties. *Id.*

Further, the structure of Fortress's patent portfolio—spread across several PAEs that Fortress owns or controls—limits Fortress's exposure as it aggressively asserts weak patents. *Id.* ¶ 46. If one of Fortress's PAEs is subject to an award of significant sanctions or attorneys' fees, Fortress has the option to cut its losses and no longer fund the PAE, without putting at risk the larger patent portfolio. *Id.* Fortress's ability to profitably assert weak patents after aggregation raises costs for electronic-device suppliers which, in turn, reduces suppliers' incentive to invest in innovation, and ultimately harms end consumers. *Id.* ¶¶ 39, 42.

What is more, Fortress's focus on high-tech electronics patents is purposeful, and an essential component of its scheme. *Id.* ¶ 31. An article co-authored by Eran Zur, Managing Director of Fortress's Intellectual Property Finance Group, explains the advantages of asserting high-tech patents. *Id.* First, "the sheer complexity of interoperable components and systems sold as part of functional units, if not integrated devices" in the field of high-tech electronics yields "oversized awards." *Id.* Second, "because technology invention tends to be incremental, . . . an individual patent owner can be awarded damages on the price of the *entire end product* as opposed to their specific patent claim." *Id.* Third, defending patent infringement suits imposes "substantial legal costs." *Id.* Fortress recognizes the attractiveness of an aggregated portfolio of substitute and complementary electronics patents as an investment vehicle when weaponized strategically. *Id.*

### C.     Fortress and Defendant PAEs Engage in Serial Patent Assertions to Monetize Their Aggregation Scheme

Defendants weaponize the portfolio by serially asserting weak patents against Plaintiffs and other practicing entities to profit from Fortress's anticompetitive aggregation. *Id.* ¶ 82. When targeted potential licensees refuse to pay the supracompetitive royalties Defendants demand, Defendants turn to high-volume, low-quality patent assertions against their targets. *Id.* ¶¶ 7, 9. This conduct represents a numbers game where the chances of success are based not on the quality of the patents themselves but rather on the enormous quantity of assertions. *Id.* ¶ 7. Defendant PAEs incur loss after loss, with the hope that they will eventually hit a windfall— from a potential licensee surrendering or a weak patent mistakenly being found enforceable— exceeding the costs of their losses. *Id.*

This pattern of serial litigation divorces patent assertions from the merits of the underlying patents. *Id.* To enhance their ability to exploit potential licensees by threatening such serial litigation, Fortress has increasingly been aggregating an enormous patent portfolio that contains within it patents on substitute technologies. *Id.* ¶¶ 37-39. Through this type of aggregation, asserting weak patents becomes profitable. *Id.* ¶¶ 9, 35-39. Aggregation allows a Defendant PAE to assert one weak patent after another, which taxes the resources of targeted licensees and increases the likelihood that at least one patent will mistakenly be found enforceable. *Id.* ¶ 39. It also takes patents from original patent owners that face substantial constraints in asserting weak patents and puts them in the hands of PAEs with few, if any, such constraints. *Id.* ¶ 46. The original patent owners were vulnerable to patent assertions by others, so would have asserted patents only to protect their product businesses from improper copying by infringers or to gain appropriate compensation for truly inventive patents. By contrast, Defendant PAEs—having no products of their own—can freely assert weak patents because they are not vulnerable to reciprocal patent assertions and do not control substantial assets that could be exposed to court-ordered sanctions or attorneys' fees. *Id.* As a result, aggregation enables Fortress and Defendant PAEs to bring patent infringement suits that have little—or nothing—to

do with the merits of the underlying patents. *Id.* ¶ 9.  Litigation becomes a weapon for Defendants to bludgeon their targets into paying supracompetitive royalties. *Id.* ¶¶ 7, 9.

Plaintiffs detail dozens of lawsuits Fortress-controlled PAEs asserted against them. *Id.* ¶¶ 83, 98-101, 106, 108, 110, 114-15, 118, 122-23.  In a three-year span, for example, the Uniloc Defendants have filed more than two dozen "separate" lawsuits against Apple for patent infringement. *Id.* ¶¶ 83, 88.  And Plaintiffs are not the only targets of the Uniloc Defendants' coercive litigation:  Since Uniloc 2017 was formed in February 2017, it has filed more than 130 patent infringement suits against high-tech suppliers in serial litigation waves. *Id.* ¶¶ 85, 87.

To pressure Plaintiffs to settle, Defendants have repeatedly asserted multiple patents in tranches of litigation against practicing entities. *Id.* ¶ 84.  For instance, in June 2016, Defendants Uniloc USA and Uniloc Luxembourg sued Apple on four patents; between April and October 2017, Uniloc USA and Uniloc Luxembourg sued Apple on another sixteen patents; in February 2018, Uniloc USA and Uniloc Luxembourg sued Apple on another seven patents; in April 2018, Uniloc USA and Uniloc Luxembourg sued Apple on another two patents; and in October 2018, Uniloc 2017 and Uniloc Licensing USA LLC sued Apple on another four patents. *Id.*

Defendant VLSI uses a similar strategy. *Id.* ¶¶ 98-101.  In October 2017, VLSI sued Intel in the Northern District of California, asserting eight patents against nearly every one of Intel's microprocessors sold since 2011 (the "California Action"). *Id.* ¶ 98.  Only months later, in June 2018, VLSI again sued Intel, this time in the District of Delaware, asserting five different patents against many of the same products accused in the California Action (the "Delaware I Action"). *Id.* ¶ 99.  The Delaware I Action has imposed substantial burdens on Intel:  As of the filing of Plaintiffs' Complaint, Intel had produced over a million pages of documents related to the accused products, 2.5 TB of source code, and thousands of pages of noninfringement and invalidity contentions. *Id.*

Meanwhile, VLSI suffered setback after setback in the California Action, losing multiple discovery- and damages-related disputes. *Id.* ¶ 98.  On March 1, 2019, after the Patent Trial and Appeals Board ("PTAB") instituted *inter partes* review proceedings to assess the patentability of

the claims in six of the asserted patents, the parties agreed to stay the California Action. *Id.* ***That same day,*** VLSI filed a second lawsuit against Intel in the District of Delaware, asserting six new patents against many of the same products at issue in the previous cases (the "Delaware II Action"). *Id.* ¶ 100. On April 11, 2019, less than six weeks later—and only hours after Intel filed its reply brief in support of its motion to consolidate the Delaware Actions—VLSI voluntarily dismissed the Delaware II Action. *Id.* ¶ 101. And again, ***that same day***, following its modus operandi, VLSI filed three new suits against Intel in yet a third district, the Western District of Texas, where it asserted the same six patents at issue in the Delaware II Action, as well as two additional patents. *Id.* But VLSI's assertions did not stop there: On May 5, 2019, VLSI filed two lawsuits in China, *id.* ¶ 104, including one in which it asserted a Chinese counterpart to a U.S. patent after the PTAB had already determined it would review the patentability of the U.S. patent claims. *See* Defendant Intel Corporation's Notice of Institution of *Inter Partes* Review of U.S. Patent Nos. 7,268,588 and 8,004,922, at 2, *VLSI Tech. LLC v. Intel Corp.*, No. 17-CV-05671 (BLF) (N.D. Cal. Feb. 8, 2019).

Defendants' high-volume litigation strategy encompasses unethical litigation tactics to further pressure Plaintiffs to settle and pay supracompetitive royalties. *See, e.g.*, *id.* ¶¶ 96, 98-101. One court caught the Uniloc Defendants misrepresenting facts about their connections to Texas and lack of connections to California to try to force Plaintiffs to litigate in an inconvenient forum. *Id.* ¶ 96. The court found multiple facts that "fly in the face of Uniloc's prior representations" to the court. *Id.* The Uniloc Defendants' deceptive statements were, in the court's words, "troubling, particularly because they are not isolated exceptions." *Id.*

Their anticompetitive patent transfer scheme has enabled Defendants to seek exorbitant, baseless damages in litigation using questionable tactics. *Id.* ¶¶ 95-96. By aggregating patents that have little or no value on the inventive merits and were not worth asserting when owned by predecessors, Fortress and Defendant PAEs can profitably bring infringement suits that are not grounded in the merits of the underlying patents. *Id.* ¶¶ 88-94, 98, 103, 112, 116-17, 124. For instance, Uniloc USA and Uniloc Luxembourg sued Apple even though the prior patent owner

1   concluded that Apple's products did not infringe the patent. *Id.* ¶ 89.  Given Defendants'

2   strategy of serial assertions of weak patents, it is hardly surprising that one court dismissed

3   Defendants' infringement claims as "bogus and conclusory." *Id.* ¶ 88.

4       **D.    Fortress, INVT, Inventergy, and the Uniloc Defendants Executed Patent**
         **Transfer Schemes to Evade FRAND Commitments**

5

6           Defendants' patent aggregation is not limited to patents that purportedly cover electronics

7   products.  Fortress, Defendants INVT and Inventergy, and the Uniloc Defendants also hold

8   patents that they claim are essential to cellular standards. *Id.* ¶¶ 126, 150.  For example, the

9   Uniloc Defendants claim that their U.S. Patent No. 6,868,079 is essential to the LTE mobile-

10  communications standard and that their U.S. Patent No. 7,167,487 is essential to the 3G

11  (HSPA/HSPA+) mobile-communications standard. *See* Plaintiffs' Opposition to Defendants'

12  Motion to Consolidate at 2-4, *Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*, No. 18-CV-00042

13  (JRG) (E.D. Tex. Jan. 23, 2019).  Standards, such as 2G (*e.g.*, GSM), 3G (*e.g.*,

14  WCDMA/UMTS), and 4G (LTE), are created and publicly distributed by standard-setting

15  organizations ("SSOs").  Compl. ¶ 127.  Standard setting allows device manufacturers to invest

16  in designing and marketing their products knowing that those products will interoperate

17  effectively with other manufacturers' devices. *Id.*

18          Industry standards benefit companies and consumers because devices made by different

19  companies can interoperate when they support the same standard. *Id.*  At the same time,

20  standards create risks for suppliers of products that include standardized technology because

21  companies make significant investments in designing their products and supply chains around

22  the standard, and therefore become "locked in" to the standard after making costly initial

23  investments. *Id.* ¶¶ 127, 144.  This creates a risk that a patentee will engage in "patent hold-up"

24  after product suppliers have become locked into technology covered by a patent. *Id.* ¶ 127.

25  Patent hold-up occurs when, after a standard has become widely adopted, a patent holder claims

26  to have SEPs—*i.e.*, the standard cannot be practiced without using the patent—and demands

27  royalties for far more than its technology is worth or seeks to enjoin the use of its products. *Id.*

28

---

The patentee capitalizes not on the patent's incremental inventive value but rather on the implementers' investments in supporting the standard. *Id.*

To constrain the potential abuse of standard-setting activity, SSOs, such as the European Telecommunications Standards Institute ("ETSI"), require members to disclose during the standard-setting process patents or patent applications that may cover technology to be included in the standard. *Id.* ¶¶ 134-37. As a condition of having their technology considered for inclusion, ETSI members must promise to license those patents on fair, reasonable, and non-discriminatory ("FRAND") terms. *Id.* ¶¶ 137-38. If an ETSI participant is unwilling to commit to license its patents on FRAND terms, ETSI mandates that the participant's technologies are excluded from the standard. *Id.* ¶ 140.

In October 2013, Defendant Inventergy acquired nearly 500 patents from Panasonic Corporation ("Panasonic") that relate to 3G and 4G mobile telecommunications. *Id.* ¶ 62. These patents are claimed SEPs and are therefore subject to commitments to license on FRAND terms and conditions. *Id.* Panasonic transferred the patents to Inventergy subject to a revenue-sharing agreement, which included certain guaranteed payments Inventergy must make to Panasonic. *Id.* ¶¶ 62, 150. Similarly, in 2018, Uniloc 2017 acquired patents claimed to be SEPs. *Id.* ¶¶ 56, 150. These patents originated with Koninklijke Philips Electronics N.V. ("Philips"). *Id.* ¶ 56. Philips had previously provided a commitment to ETSI to license any of its essential patents on FRAND terms and conditions. *Id.*

Transfers from operating companies, like Panasonic and Philips, to PAEs eliminate constraints on SEP licensing demands. *Id.* ¶ 151. If an operating company demands non-FRAND royalties, it risks retaliatory demands from potential licensees that own other SEPs. *Id.* And operating companies, as SSO members, may damage valuable reputational interests by demanding non-FRAND royalties, including risking that SSOs will not standardize the operating company's technology in the future if the company gains a reputation for acting abusively regarding SEPs. *Id.* ¶ 152. By transferring their SEPs to PAEs, like Inventergy and Uniloc 2017, operating companies evade these constraints and, through revenue-sharing agreements

1   with PAEs, share in the supracompetitive non-FRAND royalties that the PAEs extract from

2   licensees.[2]  *Id.*  And free from the constraints of potential reciprocal assertions and reputational

3   effects that disciplined the prior SEP owners, Fortress, Inventergy, and the Uniloc Defendants

4   exploit the monopoly power associated with their claimed SEPs by demanding exorbitant

5   royalties from product suppliers.  *Id.* ¶¶ 151-54.

6   **IV.   ARGUMENT**

7       **A.    Standard of Review**

8       When deciding a motion to dismiss, a court must assume that all well-pled factual

9   allegations are true, and then determine whether they plausibly give rise to an entitlement to

10  relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  "A claim has facial plausibility when

11  the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

12  defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*,

13  550 U.S. 544, 556 (2007)).  A "court must also construe the alleged facts in the light most

14  favorable to the plaintiff."  *Dang v. S.F. Forty Niners*, 964 F. Supp. 2d 1097, 1103 (N.D. Cal.

15  2013) (citing *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989)).

16      Antitrust complaints need not satisfy a heightened pleading standard.  *See Iqbal*, 556 U.S.

17  at 684 (explaining that the same pleading standard applies to "all civil actions" (quoting Fed. R.

18  Civ. P. 1)).  The Supreme Court has "repeatedly instructed" courts not to impose heightened

19  pleading standards "in the absence of an explicit requirement in a statute or federal rule."  *Skaff*

20  *v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 841 (9th Cir. 2007) (citations omitted); *see*

21  *also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 96, 98 (3d Cir. 2001) (rejecting the

22  district court's suggestion that courts should subject antitrust complaints to "heightened

23

24

25  _____

[2] SEP transfer schemes that involve transferring a portion of an operating company's SEP portfolio also make it
impossible for suppliers, like Plaintiffs, to license all necessary SEPs through a single license.  *Id.* ¶ 153.  For
26  example, in 2012, Apple entered into an agreement with Philips that granted Apple a license to certain Philips
patents.  *Id.*  At that time, however, Philips had already transferred one of those patents, without retaining a right to
license Apple.  *Id.*  That patent ultimately ended up with Uniloc 2017.  *Id.*  Although Philips asserts that the
27  transferred patent was not standard-essential, Uniloc alleges that the patent is an SEP and that Apple's devices
infringe the transferred patent because the devices support 3G and LTE standards.  *Id.*

28

scrutiny").  Antitrust complaints are measured against "the minimal notice pleading requirements of Federal Rule of Civil Procedure 8."  *Oracle Am., Inc. v. Micron Tech., Inc.*, No. 10-4340-PJH, 2011 WL 999583, at *2 (N.D. Cal. Mar. 21, 2011).  "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests."  *In re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d 1011, 1017 (N.D. Cal. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam)).  "[D]etailed evidentiary matter" is not required for antitrust complaints "to survive a motion to dismiss."  *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 756 (E.D. Pa. 2014) (quoting *Direct Benefits, LLC v. TAC Fin. Inc.*, No. 13-CV-1185, 2014 WL 671616, at *8 (D. Md. Feb. 20, 2014)).

## B.   Defendants Have Market Power in the Electronics Patents Market and Input Technology Markets

Defendants argue that Plaintiffs fail to properly allege a defined Electronics Patents Market or offer evidence of Defendants' power therein.  *See* Defs.' Mem. at 10-16.  This argument ignores Supreme Court and Ninth Circuit precedent holding that allegations regarding the direct effects of market power eliminate any need to offer circumstantial proof—including market definition and market share—of market power.  And the argument overlooks Plaintiffs' allegations regarding the direct evidence of Defendants' market power in the Electronics Patents Market, including their ability to extract supracompetitive royalties and restrict output.

Further, Defendants mischaracterize Apple's allegations regarding the Input Technology Markets.  *See id.* at 16-17.  Apple's allegations center on an SEP transfer scheme *after* the standard-setting process rather than, as Defendants claim, misconduct *during* the standard-setting process.  By misconstruing Apple's allegations, Defendants ignore controlling precedents establishing that input technology markets like those Apple alleges are cognizable antitrust markets.

### 1.   Defendants Have Market Power in the Electronics Patents Market

Defendants suggest that Plaintiffs were required to allege Defendants' market power by defining the Electronics Patents Market and identifying Defendants' share in that market.  *See id.*

at 10-16.  But the Supreme Court has made clear that allegations of direct evidence of market

power eliminates any need to allege market share in a relevant market.  *See F.T.C. v. Ind. Fed'n*

*of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market

definition and market power is to determine whether an arrangement has the potential for

genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of

output, can obviate the need for an inquiry into market power, which is but a surrogate for

detrimental effects." (internal quotation marks and citations omitted)).  Defendants' argument

thus ignores settled Supreme Court and Ninth Circuit authority holding that market power may

be alleged either (1) through circumstantial evidence—*i.e.*, defining a relevant market and

alleging that the defendant has a high market share there—**or** (2) through direct proof of market

effects showing that the defendant holds market power.  *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield*

*Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (evidence of "restricted output and supracompetitive

prices" directly establishes market power); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th

Cir. 1991) ("If the plaintiff can make a showing of anti-competitive effects, a formal market

analysis becomes unnecessary." (citing *Ind. Fed'n of Dentists*, 476 U.S. at 460-61)); *Oltz v. St.*

*Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988) ("Given that the ability to raise price

and to exclude competition are hallmarks of market power, the finding of actual harm to

competition suffices under Sherman Act § 1 even in the absence of extended market analysis.").

Defendants rely on inapposite case law that examines whether plaintiffs have adequately

alleged ***circumstantial*** evidence of market power.  *See* Defs.' Mem. at 10-14.  By contrast, as set

forth below, Plaintiffs' detailed allegations of ***direct*** evidence that Fortress and Defendant PAEs

have market power, *see, e.g.*, Compl. ¶¶ 9-11, 30, 41-42, 48-49, 159-64, 167, as demonstrated by

their ability to extract supracompetitive royalties from licensees and restrict output in the

Electronics Patents Market as a result of horizonal restraints on competition, negate any need to

define a relevant market.  *See Ind. Fed'n of Dentists*, 476 U.S. at 460-61 (finding actual

anticompetitive effects from agreements between competing dentists eliminated need to define

relevant market); *see also In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*, No. 3:18-

1    CV-00825-JHM, 2019 WL 5386484, at *9-10 (W.D. Ky. Oct. 21, 2019) (denying the

2    defendant's motion to dismiss where the plaintiff, without defining the relevant market, alleged

3    actual evidence of adverse effects on competition because agreements at issue were horizontal).

4           In light of this controlling authority, Plaintiffs' allegations regarding the direct evidence

5    of Defendants' market power in the Electronics Patents Market nullify any need for an extended

6    market analysis based on circumstantial evidence, including precisely defining the contours of a

7    market and market share therein.  Pointing to just four paragraphs in Plaintiffs' 50-page

8    Complaint, Defendants argue that Plaintiffs allege only a "bare assertion" that Fortress has

9    market power in the Electronics Patents Market.  Defs.' Mem. at 15.  This argument disregards

10   Plaintiffs' detailed allegations, *see, e.g.*, Compl. ¶¶ 9-11, 30, 41-42, 48-49, 159-64, 167, that

11   Fortress and Defendant PAEs have market power, as demonstrated by their ability to extract

12   supracompetitive royalties from licensees and restrict output in the Electronics Patents Market.

13   *See Rebel Oil Co.*, 51 F.3d at 1434.

14          The Complaint alleges that "Defendants' illegal scheme has resulted in inflated licensing

15   royalties—*i.e.*, higher prices" for Plaintiffs and other purchasers in the Electronics Patents

16   Market.  Compl. ¶ 169.  In particular, the challenged patent transfers have positioned Fortress

17   and Defendant PAEs to exploit their market power "to charge far more than the value of the

18   inventive contributions (if any) of the patents and of competitive prices for licenses," *id.* ¶ 10,

19   and far more than the former owners of the patents were able to charge before the

20   anticompetitive patent transfers.  *Id.* ¶¶ 9, 35-40, 50, 160, 169.  Before aggregation, patent

21   holders competed with one another for licensing rates, and licensees benefitted from that

22   competition through more favorable licensing terms.  *Id.* ¶ 41.  But now that the patents are

23   aggregated and controlled by Fortress, that competition is eliminated, and Fortress can demand

24   supracompetitive royalties for licenses.  *Id.*  These royalties are so significantly inflated that they

25   reduce the number of licensing transactions and cause Plaintiffs and other potential licensees to

26   divert resources from innovation to spend millions of dollars responding to Defendants' licensing

27   demands.  *Id.* ¶¶ 40-41, 170, 176, 181, 185, 191.  That decreases Plaintiffs' and other suppliers'

28

output.  *Id.*  These supracompetitive royalties and reduced output of licenses and downstream products are the direct effects of Defendants' patent aggregation scheme, which Fortress designed to "captur[e] hold-up values that exceed the values at which Fortress or the other Defendants acquired the patents."  *Id.* ¶ 48.

Plaintiffs allege specific, direct evidence of Defendants' market power, notwithstanding that such specific facts are "not necessary" to survive a motion to dismiss.  *In re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d at 1017 (quoting *Erickson*, 511 U.S. at 93).  For example, the Complaint explains that "the Uniloc Defendants have been able to coerce several parties (including Amazon.com, Inc. and Huawei Device Co. Ltd.) to license its patents, even though its patents have repeatedly been shown to lack merit."  Compl. ¶ 160.  And, facing the threat of litigation like that Plaintiffs face following Defendants' demands for above-market royalties, "many victims have agreed to settle, rather than to challenge Fortress and its PAEs, for amounts that reflect not the merits of the underlying patents but the effectiveness of the Fortress model." *Id.* ¶ 11.  That Defendants have been able to strong-arm product suppliers into paying substantial royalties notwithstanding that their patents lack merit and would not even have been asserted absent the patent transfers, *id.* ¶¶ 9, 39, 160, 169, demonstrates that—post-patent acquisition— Defendants are able to extract supracompetitive prices, which is direct evidence of Defendants' market power.

Courts regularly find that allegations like these are sufficient to plead direct evidence of market power.  *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 328 (D.R.I. 2017) ("Plaintiffs have met their burden by plausibly alleging that Warner Chilcott charged supracompetitive prices for Loestrin drugs without losing sales, and thus Warner Chilcott had market power in the relevant market."); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 247 (D. Conn. 2015) ("The plaintiffs' allegations that Boehringer is able to charge supracompetitive prices for Aggrenox in a market with no cross-elasticity of demand with other drugs are highly plausible."); *Vizio, Inc. v. Funai Elec. Co.*, No. CV 09-0174 (AHM), 2010 WL 7762624, at *7 (C.D. Cal. Feb. 3, 2010) ("Because Vizio alleges that Funai has increased prices to

supracompetitive levels and has excluded other companies from using A/65–compatible technology through blocking importation of competing products, its allegations are sufficient to plead market power."). Similarly, courts conclude that allegations like those contained in the Complaint regarding reduced output are also sufficient to plead direct evidence of market power. *See, e.g.*, *W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 100-01 (concluding that allegations regarding the plaintiff's reduced services and abandoned projects were sufficient to suggest anticompetitive effects in the relevant market). Here, it would be "premature on a motion to dismiss for the court to make a more probing factual inquiry" going beyond Plaintiffs' "highly plausible" allegations of supracompetitive prices and restricted output. *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d at 247.

Defendants' reliance on *Rick-Mik Enterprises v. Equilon Enterprises LLC* is misplaced. Defs.' Mem. at 15. In *Rick-Mik*, the Ninth Circuit, following the Supreme Court's *Illinois Tool Works* decision, explained that an allegation that a defendant owns patents—without more—is insufficient to allege market power. *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 973 (9th Cir. 2008) ("Because intellectual property rights are no longer presumed to confer market power, Rick-Mik's conclusory allegation that Equilon's intellectual property rights nonetheless do confer market power, unaccompanied by supporting facts, is insufficient." (citing *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42-43 (2006))).

Here, Plaintiffs go far beyond alleging that Defendants "either acquired or control[] a portfolio of well over a thousand U.S. patents" in the Electronics Patents Market. Compl. ¶ 30. They also allege that Defendants gained that enormous portfolio through anticompetitive acquisitions of both substitute and complementary patents—which have enabled them to extract supracompetitive royalties and depress output in the Electronics Patents Market. *See, e.g.*, *id.* ¶¶ 9-11, 30, 41-42, 44-46, 48-49, 159-64, 167. Thus, unlike in *Rik-Mik*, Plaintiffs have not merely alleged patent acquisitions but have alleged patent acquisitions ***with demonstrable anticompetitive effects***—*i.e.*, direct proof of market power. *See Ind. Fed'n of Dentists*, 476 U.S. at 461 (finding "actual, sustained adverse effects on competition" negated the need for "elaborate

market analysis"); *Rebel Oil Co.*, 51 F.3d at 1434 ("If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power."); *Funai*, 2010 WL 7762624, at *7 (ruling allegations that the defendant increased patent licensing prices to "supracompetitive levels" were sufficient to plead market power).

That Defendants hold market power is unsurprising; their patent aggregation scheme was "intended for an anticompetitive purpose." Compl. ¶ 10; *see also id.* ¶¶ 48-49. Allegations of anticompetitive intent are probative of whether transactions, such as Defendants' patent transfers and aggregation, result in market power. *See, e.g.*, *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988) ("Since the effect on competition is the touchstone of rule of reason analysis, the intent of the defendants is relevant but not dispositive." (citations omitted)); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 n.10 (2010) ("[K]nowledge of intent may help the court to interpret facts and to predict consequences." (quoting *Board of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918))).

Further, Defendants misrepresent the Complaint in suggesting that Plaintiffs' factual allegations regarding direct evidence of Defendants' market power are inconsistent with Plaintiffs' allegations that Defendants have "weak" patents. Defs.' Mem. at 15-16. Through their aggregation scheme, Defendants have collected patents that are weak on their individual merit into a portfolio, and that aggregation has enabled Defendants to extract supracompetitive royalties and restrict output. That is direct evidence of market power. The Complaint sets forth in detail how asserting "weak" patents becomes profitable under Fortress's anticompetitive aggregation model when it otherwise would not have been. *See, e.g.*, Compl. ¶¶ 9, 35-39, 44, 103. Without aggregation, a patent holder lacks incentive to assert a weak patent due to the high likelihood that the patent would be found invalid, not infringed, or unenforceable in litigation. *Id.* ¶ 39. With aggregation, however, weak patents can be profitably asserted against a potential licensee to extract supracompetitive royalties. *Id.* That a target could deal with one or a handful of weak patents does not mean that it could do the same when the patents are aggregated into a

huge portfolio. *See, e.g.*, *id.* ¶¶ 83, 85, 98-101, 106-08, 114-15, 122-23. Far from suggesting an inconsistency in the Complaint, the weaknesses of the patents Defendants have aggregated is one more feature of their illegal patent transfer scheme.

In sum, the Complaint establishes that Defendants charge supracompetitive royalties and restrict market output and also contains allegations regarding Defendants' anticompetitive intent. This is more than adequate direct proof of market effects and more than sufficient to plead market power in the Electronics Patents Market under well-established precedent.

Finally, even if Plaintiffs were required to allege a relevant market, they have done so. *See* Compl. ¶ 156 (defining the Electronics Patents Market as the "market for patents for high-tech consumer and enterprise electronics devices and components or software therein and processes used to manufacture them"). Contrary to Defendants' arguments, Defs.' Mem. at 12-14, the Electronics Patents Market is not overly broad. Relevant markets are not always limited to substitute products, particularly in the intellectual property context. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d 610, 622 (D. Md. 2015) (accepting the relevant market as the defendant's financial-services license portfolio, which included complementary patents); *Meredith Corp. v. SESAC LLC*, No. 09-CIV-9177 (NRB), 2011 WL 856266, at *9-10 (S.D.N.Y. Mar. 9, 2011) (accepting relevant market as the market for television-performance rights to works within the defendant's music repertory).

### 2. Fortress, INVT, and Uniloc 2017 Have Market Power in the Input Technology Markets

Similarly, the Complaint includes more than sufficient factual allegations of market power in the Input Technology Markets. Defendants Fortress, INVT, and Uniloc 2017 argue that Apple failed to adequately plead Input Technology Markets because it failed to (1) identify the SEPs at issue, (2) allege that the SSO was considering alternative technologies when the SSO standardized technology covered by the SEPs, and (3) allege that the SSO would have adopted one of these alternatives but for a Defendant's failure to disclose relevant intellectual property or false promise to license such technology on FRAND terms. Defs.' Mem. at 17.

1    This argument misconstrues Apple's claim.  Defendants wrongly assert that Apple is

2    alleging a claim based on standard-setting misconduct, such as non-disclosure of intellectual

3    property during the standard-setting process.  *Id.*  Apple's claim, in fact, is based on Defendants'

4    ***subsequent, post–standard setting*** efforts to evade FRAND commitments through their

5    collective acquisition by INVT and Uniloc 2017.  *See, e.g.*, Compl. ¶ 188 ("Fortress, Fortress

6    Credit, Uniloc USA, Uniloc Luxembourg, Uniloc 2017, INVT, and Inventergy's unfair business

7    practices include their efforts to evade FRAND commitments through the ***transfer of SEPs to***

8    ***INVT and Uniloc 2017***." (emphasis added)).  The Complaint repeatedly makes plain that the

9    "transfer schemes" represent the unfair business practices Apple seeks to remedy.  *See, e.g.*, *id.*

10   ¶ 153 ("Patent ***transfer schemes*** like INVT's and the Uniloc Defendants' frustrate the purposes

11   of the FRAND commitment in another way."), ¶ 154 ("Over the long run, abusive patent

12   ***transfer schemes***, like INVT and the Uniloc Defendants have employed here, chill standard-

13   setting activities and the procompetitive benefits they bring."), ¶ 170 ("Licensing customers are

14   also harmed, even when they do not acquiesce to an inflated royalty, by being forced to incur

15   substantial expenses, uncertainty, and burdens in resisting the patent litigations and threats that

16   the aggregation and ***transfer schemes*** of Defendants have enabled."), ¶ 171 ("The ***transfer of***

17   ***those SEPs to PAEs*** in exchange for a share of licensing revenue has imposed exorbitant non-

18   FRAND royalties (or heavy costs in trying to avoid such royalties) on Apple and other suppliers

19   of products that support cellular standards.") (emphases added).  While the FRAND obligations

20   remain binding on the recipient PAEs post-transfer, *Barnes & Noble, Inc. v. LSI Corp.*, 849 F.

21   Supp. 2d 925, 932 (N.D. Cal. 2012) (explaining in the context of evaluating FRAND

22   commitments on transferred patents that "any of the patentee's previous acts that have legal

23   consequences[] flow to the new assignee of a patent" (internal quotation marks and citations

24   omitted)), the transfers facilitate recipient PAEs' non-compliance with those FRAND obligations

25   because, as described above, these entities are not burdened by the reputational and reciprocal

26   constraints that disciplined the original owner.  Compl. ¶¶ 151, 152.

27

28

1      Because Defendants mischaracterize Apple's claim, the cases on which Defendants rely

2  in support of their argument are inapposite because they address claims based on a party's failure

3  to disclose patents during the standard-setting process. *See* Defs.' Mem. at 17; *ChriMar Sys. v.*

4  *Cisco Sys.*, 72 F. Supp. 3d 1012, 1018 (N.D. Cal. 2014) (reviewing the counter-plaintiff's

5  allegations regarding "ChriMar's failure to disclose its belief that the '250 Patent was essential

6  . . . to the standard setting organization"); *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-

7  LHK, 2012 WL 1672493, at *4 (N.D. Cal. May 14, 2012) (reviewing the counter-plaintiff's

8  allegations regarding "Samsung's failure to disclose its [intellectual property rights] in the

9  patents essential to the [Universal Mobile Telecommunications Standard ("UMTS")], and its

10  affirmative misrepresentations regarding Samsung's intent to license its UMTS patents on

11  FRAND terms, in conjunction with Samsung's subsequent failure to license on FRAND terms").

12  Properly understood, Apple's claim based on Defendants' SEP transfer schemes does not require

13  Apple to plead specific facts regarding the exclusion of alternatives during the standard-setting

14  process.

15      Next, Defendants claim that Apple fails to adequately allege Input Technology Markets.

16  Defs.' Mem. at 16-18. But Apple alleges cognizable markets under well-established case law.

17  Apple alleges that Fortress, INVT, and Uniloc 2017 claim to hold SEPs for cellular standards

18  that are subject to commitments to license on FRAND terms. Compl. ¶¶ 146, 150. If technology

19  selected to be included in the cellular standard is protected by an SEP, that SEP holder controls

20  the supply of that particular input technology. *Id.* ¶ 145. This is because, to the extent that an

21  SEP is essential for anyone implementing the standard, there is no substitute for that SEP. *Id.*

22  ¶ 144. And this is true for each function comprising the cellular standard for which the patented

23  technology was selected. *Id.* ¶ 145. For antitrust purposes, the functionality for cellular

24  standards associated with each input technology comprises its own relevant market—an Input

25  Technology Market. *Id.* ¶ 146. As a result, the SEP holder gains a monopoly—*i.e.*, a 100

26  percent share—in the relevant market. *Id.* ¶¶ 146, 148. Therefore, since acquiring SEPs from

27  Panasonic and Philips, "Fortress, INVT, and Uniloc 2017 hold monopoly power in the various

28

1    Input Technology Markets for the various functions claimed to be covered by their declared

2    SEPs." *Id.* ¶ 146.

3         Courts recognize that Input Technology Markets of the type Apple alleges are proper

4    antitrust markets.  These markets are defined by technologies competing "to perform each of the

5    various functions covered by each of [the defendants'] purported essential patents" before the

6    standard was adopted.  *Wi-LAN Inc. v. LG Elecs. Inc.*, 382 F. Supp. 3d 1012, 1021 (S.D. Cal.

7    2019); *see also Samsung*, 2012 WL 1672493, at *5 (accepting allegations of markets defined as

8    "the various markets for technologies that—before the standard was implemented—were

9    competing to perform each of the various functions covered by each of Samsung's purported

10   essential patents"); *Apple Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178 (BBC), 2011 WL

11   7324582, at *13 (W.D. Wis. June 7, 2011) ("The relevant markets include the various

12   technologies competing to perform the functions covered by Motorola's declared-essential

13   patents for each of the relevant standards.").  Once the standard has been adopted, as Apple

14   alleges, "the relevant market may be defined as congruent with the scope of the defendant's

15   patents." *Funai Elec. Co. v. LSI Corp.*, No. 16-CV-01210, 2017 WL 1133513, at *7 (N.D. Cal.

16   Mar. 27, 2017) (internal quotation marks and citation omitted); *see also Broadcom Corp. v.

17   Qualcomm Inc.*, 501 F.3d 297, 315 (3d Cir. 2007) (relevant market was "the market for

18   Qualcomm's proprietary WCDMA technology, a technology essential to the implementation of

19   the UMTS standard"); *Microsoft Mobile Inc. v. InterDigital, Inc.*, No. 15-723 (RGA), 2016 WL

20   1464545, at *2 (D. Del. Apr. 13, 2016) (relevant markets were "the markets for technologies

21   covered by the InterDigital patents . . . that are essential, or alleged to be essential, to the 3G and

22   4G cellular standards . . . , together with all other alternative technologies to the InterDigital

23   patents that could have been used in the cellular standards").

24        Finally, contrary to Defendants' argument, Defs.' Mem. at 17-18, Apple need not include

25   specific allegations regarding the individual patents at issue to identify the relevant technology

26   markets in which Defendants have market power.  Information regarding those patents that

27   Defendants hold and declare to be SEPs is fully within Defendants' control.  *See Concha v.*

28

1    *London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Even in cases where fraud is alleged, we relax

2    pleading requirements where the relevant facts are known only to the defendant." (citing *Wool v.*

3    *Tandem Computs., Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987))).  Apple's allegations more than

4    "give the defendant fair notice of what . . . the claim is and the grounds upon which it rests."  *In*

5    *re Cathode Ray Tube Antitrust Litig.*, 738 F. Supp. 2d at 1017 (quoting *Erickson*, 511 U.S. at 93)

6    (alterations omitted).  As many courts have held, allegations like those Apple makes here are

7    sufficient to plead relevant SEP Input Technology Markets.  *See, e.g.*, *Broadcom*, 501 F.3d at

8    315; *Wi-LAN Inc.*, 382 F. Supp. at 1021; *Funai*, 2017 WL 1133513, at *7; *InterDigital*,  2016 WL

9    1464545, at *2; *Samsung*, 2012 WL 167493, at *5; *Motorola Mobility*,  2011 WL 7324582, at

10   *13.

### C.      Defendants' Patent Aggregation and Efforts to Evade FRAND Commitments Have Resulted in Antitrust Injury to Plaintiffs

12           Plaintiffs have suffered antitrust injury as a result of the anticompetitive conduct alleged

13   in the Complaint.  Defendants' conduct increases the prices that Plaintiffs and other product

14   suppliers—consumers in the Electronics Patents Market and Input Technology Markets—must

15   pay for licenses to supracompetitive levels and reduces licensing output in those markets.  *See,*

16   *e.g.*, Compl. ¶¶ 9, 10, 39, 41, 48, 49, 50, 160, 164, 168.  "Harm to consumers in the form of

17   higher prices resulting from competitive restraints has long been held to constitute an actual

18   injury to competition."  *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 504

19   (9th Cir. 2010).  Indeed, "it is difficult to image [sic] a more typical example of anti-competitive

20   effect than higher prices."  *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996).

21           Defendants argue that Plaintiffs have failed to allege antitrust injury because "Plaintiffs

22   needed to plead injury to 'competition (rather than consumers).'"  Defs.' Mem. at 21 (quoting

23   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1203 (9th Cir. 2012)).  But Plaintiffs do

24   precisely that.  Plaintiffs detail how Defendants' aggregation reduces competition by aggregating

25   substitute patents, decreasing the number of separate patent owners, eliminating competitive

26   constraints that the former owners faced, increasing licensing costs for product suppliers, and

reducing investments in research and development.  *See* Compl. ¶¶ 32-45; *see also, e.g.*, *id.* ¶¶ 9-11 (describing how Fortress's patent aggregation scheme, rather than promoting the procompetitive benefits of the patent system, "impos[es] a tax on the electronics industry that increases prices, decreases output, and ultimately harms consumers"), ¶¶ 48-49 (describing how the scheme "captur[es] hold-up values that exceed the values at which Fortress or other Defendants acquired the patents, leading to reduced output"), ¶ 50 (describing how the scheme reduces or eliminates the reputational constraints that the patent holders face, which allows Defendants to demand supracompetitive royalties and wage endless litigation).  As described above, this reduction in competition has resulted in supracompetitive royalties and restricted output in the Electronics Patents Market and Input Technology Markets.  *Id.* ¶¶ 9, 35-40, 50, 160, 169.  These injuries to competition directly stem from the manner in which Defendants have aggregated a massive patent portfolio.  *See id.* ¶¶ 11, 38, 44, 162, 163.

Contrary to Defendants' claims, Defs.' Mem. at 20, Plaintiffs have suffered antitrust injury, notwithstanding that they have yet to pay supracompetitive royalties, in two separate ways.  First, Plaintiffs have been forced to litigate repeatedly to avoid paying inflated royalties resulting from Defendants' anticompetitive conduct.  *See, e.g.*, Compl. ¶¶ 83, 98-101, 106, 108, 110, 114-15, 118, 122-23.  Courts in this District have held that if a plaintiff's "litigation costs stem directly from [a defendant's] alleged anticompetitive behavior, these litigation costs are a sufficient basis for a potential award of antitrust damages." *Apple, Inc. v. Samsung Elecs.*, No. 11-CV-01846 (LHK), 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012); *see Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (explaining that litigation expenses can be recovered "where the patent litigation is used to further the harm caused under a more traditional antitrust theory" (internal quotation marks omitted)); *see also TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1310 (Fed. Cir. 2016) (upholding an award of treble damages based on defense fees as an antitrust injury where "[t]he competition-reducing aspect of 3M's behavior was its attempt at achieving a monopoly by bringing the subject lawsuit" (internal quotation marks omitted)).

1   Defendants argue that Plaintiffs cannot recover patent litigation expenses because

2   Plaintiffs do not compete with Defendants.  *See* Defs.' Mem. at 23-24.  But Defendants misplace

3   reliance on cases where the anticompetitive conduct was the ***litigation itself***.  *See In re*

4   *Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 151 (3d Cir. 2017)

5   (antitrust claim for "anticompetitive litigation"); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986,

6   996 (9th Cir. 1979) (antitrust claim for "patent enforcement conduct"); *Aventis Pharma S.A. v.*

7   *Amphastar Pharm., Inc.*, No. 03-00887-MRP PLA, 2009 WL 8727693, at *4 (C.D. Cal. Feb. 17,

8   2009) (antitrust claims based on sham litigation).  In the circumstances of such cases,

9   competitors are alleging antitrust injury because the competition-reducing conduct—*i.e.*,

10  anticompetitive litigation—has excluded them from the market and thus harmed competition.

11  By contrast, Plaintiffs are not alleging litigation as the competition-reducing conduct, but rather

12  unlawful patent acquisitions, which inflate royalties and depress licensing output.  In these

13  circumstances, it is customers for licenses, like Plaintiffs, that suffer antitrust injury because their

14  injuries "flow[] from that which makes the conduct unlawful"—namely, the impairment of

15  competition from the illegal patent acquisitions.  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190

16  F.3d 1051, 1055 (9th Cir. 1999); *see also Sheahan v. State Farm Gen. Ins. Co.*, 394 F. Supp. 3d

17  997, 1011 (N.D. Cal. 2019) ("[A]ntitrust injury is injury that is suffered by competitors or

18  consumers as a result from anti-competitive monopolistic practices."); *Capital One*, 99 F. Supp.

19  3d at 628-29 (concluding that non-competitors adequately alleged antitrust injury based on

20  allegations that anticompetitive practices "prevent[ed] them from access[ing] . . . competitively

21  priced commercial banking services technology and forc[ed] them to choose between paying

22  costly litigation expenses or excessive licensing fees" (internal quotation marks omitted)).

23  Plaintiffs cite no authority suggesting that litigation expenses are not recoverable where, like

24  here, non-competitors incur such expenses as a form of antitrust injury.

25  Second, Plaintiffs face an ongoing threat that they will be forced to capitulate to

26  Defendants' supracompetitive licensing demands.  Compl. ¶¶ 39, 154, 169, 176, 181.  Such a

27  threat also constitutes an antitrust injury.  *See InterDigital*, 2016 WL 1464545, at *3 (concluding

28

1   that, among other allegations, the "substantial threat that Microsoft will be forced to capitulate to

2   InterDigital's supra-competitive licensing demands" represents a sufficient allegation of antitrust

3   injury); *Motorola Mobility*, 2011 WL 7324582, at *14 (denying Motorola's motion to dismiss

4   based on Apple's allegations that "it has suffered the threat of being forced to pay exorbitant

5   royalties, the uncertainty created by Motorola's refusal to offer a [FRAND] license, the expense

6   of multiple patent infringement suits by Motorola and injury to Apple's business and property").

7   It makes no sense to require a victim of anticompetitive patent acquisitions to capitulate and pay

8   supracompetitive royalties to have standing to bring an antitrust claim; the victim has been

9   injured once it has been forced to defend against demands for supracompetitive royalties that the

10  defendant is able to make as a result of the acquisitions. *See Samsung*, 2012 WL 2571719, at

11  *27; *Hynix Semiconductor*, 527 F. Supp. 2d at 1097; *see also TransWeb*, 812 F.3d at 1310.

12         Defendants again insist that Plaintiffs must allege details regarding the specific patents

13  for which Defendants received supracompetitive royalties as a result of this anticompetitive

14  conduct, Defs.' Mem. at 19-20, but Plaintiffs need not plead such "detailed evidentiary matter" at

15  this stage of litigation. *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d at 756 (quoting *Direct*

16  *Benefits, LLC*, 2014 WL 671616, at *8). Courts recognize that determining "the existence of

17  antitrust injury 'involves complex questions of fact,' ill-suited for resolution upon a motion to

18  dismiss." *Otsuka Pharmaceutical Co. v. Apotex Corp.*, 143 F. Supp. 3d 188, 195 n.5 (D.N.J.

19  2015) (citing *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir.

20  1997); *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995); *In re Niaspan Antitrust*

21  *Litig.*, 42 F. Supp. 3d at 757).

22         Accordingly, the allegations in the Complaint detailed above that "competition itself has

23  been eliminated" and that "consumers are harmed by this anti-competitive restraint, in the form

24  of higher prices . . . and potentially lower-quality services" are sufficient to plead antitrust injury.

25  *Coal. for ICANN Transparency, Inc.*, 611 F.3d at 502-03; *see also Funai*, 2017 WL 1133513, at

26  *7 (finding sufficient allegations that "Defendants' wrongful conduct has brought about and

27  continues to threaten to bring about a significant threat of injury for downstream price, quality,

28

and innovation competition for devices"); *InterDigital*, 2016 WL 1464545, at *3 (finding sufficient allegations, among others, that "the downstream market is injured in the form of higher prices, reduced innovation, and more limited choices for such [s]tandard-compliant products" (internal quotation marks and alterations omitted)).

**D.    The *Noerr-Pennington* Doctrine Does Not Bar Plaintiffs' Claims**

     **1.    *Noerr-Pennington* Does Not Apply to Plaintiffs' Claims**

In arguing that the *Noerr-Pennington* doctrine bars Plaintiffs' claims, Defendants once again construct a strawman argument by mischaracterizing the Complaint as being based on allegations that Defendants are engaged in "sham litigation." Defs.' Mem. at 24-30 (asserting that "Plaintiffs do not satisfy either prong of the 'sham' litigation test"). Not so—the anticompetitive conduct alleged in the Complaint is *transfers* to aggregate patents in Defendants' enormous portfolio, with litigation simply being the way Defendants collect the fruits of the illegal conduct Plaintiffs challenge. Compl. ¶¶ 32-39, 41-44, 47-49, 153-55, 160, 162-65. As the Ninth Circuit has recognized, "when there is a conspiracy prohibited by the antitrust laws, and the otherwise legal litigation is nothing more than an act in furtherance of that conspiracy, general antitrust principles apply, notwithstanding the existence of *Noerr* immunity." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263 (9th Cir. 1982).

In *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1091-97 (N.D. Cal. 2007), a court in this District analyzed in detail "the viability of a 'scheme' claim based on patent litigation protected by the *Noerr-Pennington* doctrine." The court concluded that "the Federal Circuit and the Supreme Court would recognize some 'scheme' antitrust allegations that include constitutionally protected litigation within the 'overall course of conduct,' but only those in which the patent litigation is 'causally connected' to anticompetitive harms." *Id.* at 1096-97; *see also id.* at 1097 ("[W]here the patent litigation is used to further the harm caused under a 'more traditional antitrust theory,' a plaintiff should be allowed a full recovery."). The court elaborated that:

> before otherwise protected litigation can be part of an 'anticompetitive scheme' claim, the court must first find that the other aspects of the scheme independently produce anticompetitive harms.  Once this step has been established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms.  If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme.

*Id.* at 1097.  Other cases have found this reasoning persuasive.  *See, e.g.*, *Funai*, 2017 WL 1133513, at *6.  Because, like in *Hynix*, Plaintiffs' claims include litigation as merely a part of a scheme that independently causes anticompetitive harm (*i.e.*, patent transfers that violate the antitrust laws), the *Noerr-Pennington* doctrine does not bar them.

This case is thus similar to *Funai*, in which the court determined that a potential licensee's antitrust claims were not barred by the *Noerr-Pennington* doctrine because the claims were grounded in alleged anticompetitive conduct that preceded litigation to enforce patents, rather than based on the patent litigation itself.  2017 WL 1133513, at *5; *see also Coal. for ICANN Transparency*, 611 F.3d at 506 (holding the alleged use of a variety of coercive tactics in addition to filing a lawsuit removed the case from *Noerr-Pennington* immunity since "*Noerr-Pennington* immunizes only litigation [and other petitioning] activity, not other forms of threats or harassment").  The same reasoning applies here—the competitive harm results from the challenged patent transfer scheme that impairs the competitive process, with patent assertions (sometimes including litigation) as the means by which Defendants monetize their anticompetitive conduct.

The conduct giving rise to Plaintiffs' antitrust claims is not merely lawful petitioning activity, but a broader anticompetitive scheme that litigation furthers.  *See, e.g.*, Compl. ¶¶ 38, 41-42, 48-50.  *Noerr-Pennington* thus does not apply to the allegations in the Complaint.[3]

---

[3] Indeed, the Department of Justice has taken the position that "[a]n acquiring entity is not protected from the antitrust laws just because it may subsequently exercise its unlawfully obtained market power through litigation." Brief for the United States of America and the Federal Trade Commission as Amici Curiae in Support of Neither Party (Corrected) at 10, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 937 F.3d 1359 (Fed. Cir. 2019) (No. 18-1367).  It further states that "the *Noerr-Pennington* doctrine does not protect anticompetitive patent acquisitions from antitrust liability regardless of whether the patent acquirer engages in protected litigation activity." *Id.* at 10-11.

### 2. Plaintiffs Need Not Be Competitors with Defendants to Escape Application of the *Noerr-Pennington* Doctrine

Defendants argue that Plaintiffs and Defendants must be competitors for an exception to *Noerr-Pennington* to apply. *See* Defs.' Mem. at 25 n.11, 26-27. However, this argument again distorts the Complaint. Plaintiffs are complaining about a pattern of anticompetitive patent transfers that led to supracompetitive royalties, not sham litigation. And, as demonstrated above (*supra* Section III.C), Plaintiffs—as potential licensees targeted by Defendants—have suffered antitrust injury as a result of that conduct. Several courts have found that licensees or potential licensees have standing to complain about patent-related anticompetitive schemes that result in inflated royalties or litigation costs. *See, e.g.*, *Hynix Semiconductor*, 527 F. Supp. 2d at 1086-87 (parties were participants in standard-setting organizations—*i.e.*, not necessarily competitors); *Funai*, 2017 WL 1133513, at *1 (same); *Coal. for ICANN Transparency*, 611 F.3d at 499 (plaintiff was an organization of participants in the Internet domain name system, including website owners; the defendant was the operator of each domain name registry under a contract with ICANN, which coordinates the domain name system).

### E. Defendants' Unlawful Agreements Violate Section 1 of the Sherman Act

Plaintiffs allege that the purpose and effect of the challenged agreements are to restrain competition in the relevant markets. *See* Compl. ¶¶ 30, 37-50, 168-70. Plaintiffs squarely allege illegal agreements between Fortress, on the one hand, and one or more other Defendants on the other. *E.g.*, *id.* ¶¶ 51-54 (Uniloc USA and Uniloc Luxembourg), ¶¶ 64-69 (Inventergy), ¶¶ 70-72 (DSS), ¶ 74 (IXI IP). Defendants complain that Plaintiffs do not "allege that all seven Section 1 Defendants ever had a 'meeting of the minds'" or "agreed to achieve any unlawful objective." Defs.' Mem. at 30. However, Plaintiffs need not allege that all of the Defendants were party to a single, overarching agreement nor do Defendants cite any support for such a proposition. *See, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012) (determining that the complaint sufficiently alleged an anticompetitive impact that "resulted not from isolated

parent-subsidiary agreements" but from "a lattice-work of horizontal and vertical agreements" in which not all of the defendants coordinated with each other).

Contrary to Defendants' argument, Plaintiffs are not merely complaining about the transfer of a patent monopoly from one owner to another. *See* Defs.' Mem. at 30-34 (citing *Carefusion Corp. v. Medtronic, Inc.*, No. 10-CV-01111-LHK, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010); *Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187 (9th Cir. 2000); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981)).  Rather, Plaintiffs allege that Fortress's patent aggregation scheme has caused harm by eliminating competitive constraints on royalties by combining substitute and complementary patents.  Thus, unlike *Carefusion*, the Complaint explains how Fortress's conduct results in increased consumer prices. *Cf. Carefusion*, 2010 WL 4509821, at *7 ("[I]t is not clear from Plaintiffs' Complaint how Defendants' Medicare 'marketing and pricing scheme,' even if true, amounts to the type of 'exclusionary or predatory conduct' that is sufficient to establish anticompetitive conduct."). The Complaint includes specific allegations regarding how Fortress's conduct decreases competition and results in increased prices for consumers. *See, e.g.*, Compl. ¶ 38 ("Fortress has inevitably acquired substitute patents that, before aggregation, competed with each other.  When the patents were held by their original owners, there was competition and a prospective licensee could choose between competing options (or forego those options and design its product in a different way).  But now, under control of Fortress, the prospect of competition disappears and so does the feasibility of redesigning products."), ¶¶ 41-42 ("Fortress introduces a new cost to suppliers of electronic devices and the components and software for those devices that dampens incentives for product suppliers to invest in research and development to drive innovation, thereby further undermining competition and harming end consumers.  Exposing the targeted suppliers to another cost benefits their competitors by making the targeted suppliers' products more expensive and/or less innovative. . . . Fortress's aggregation thus undermines competition in the sales of electronic devices and components and software for those devices."), ¶¶ 49-50, ¶¶ 168-70.  This case thus also differs from *SCM*, where the plaintiff failed to show that the

patent transfer itself was unlawful.  645 F.2d at 1206 ("[W]*here a patent has been lawfully*

*acquired*, subsequent conduct permissible under the patent laws cannot trigger any liability

under the antitrust laws." (emphasis added)).

Defendants wrongly argue that the agreements in question cannot be illegal because they

were in a form that ordinary business transactions can also take. Defs.' Mem. at 30-34.  Courts

routinely find that agreements taking the same form as ordinary business transactions violate the

antitrust laws when they create anticompetitive effects.  For example, the Eleventh Circuit has

held that "[a]lthough exclusive dealing arrangements are common and can be procompetitive . . .

[they] can harm competition in certain circumstances." *McWane, Inc. v. F.T.C.*, 783 F.3d 814,

827 (11th Cir. 2015).  Consistent with Supreme Court precedent, the court analyzed "the

'practical effect' of exclusive dealing arrangements" to determine that the agreement "posed a

greater threat to competition than a conventional exclusive dealing contract." *Id.* at 834 (citing

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326-28 (1961); *Eastman Kodak Co. v.*

*Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992)).  As the Ninth Circuit stated in *49er*

*Chevrolet, Inc. v. General Motors Corp.*, on which Defendants rely, although the "antitrust laws

are not offended by agreements as such," they ***are*** violated by "those with an anticompetitive

content."  803 F.2d 1463, 1467 (9th Cir. 1986); *see also Funai*, 2010 WL 7762624, at *6

(finding the complaint alleged an illegal patent transfer agreement because "Thomson and Funai

shared a commitment to a common scheme to circumvent Thomson's FRAND commitment to

the ATSC by agreeing that Funai would collect a second royalty for the same technology, and to

share the proceeds of that second royalty between Thomson and Funai").

Defendants also cite *Toscano v. PGA Tour, Inc.*, 70 F. Supp. 2d 1109 (E.D. Cal. 1999),

*aff'd*, 258 F.3d 978 (9th Cir. 2001), as "requiring plaintiff to provide additional evidence of

conspiracy beyond allegations of written contracts."  Defs.' Mem. at 31.  To begin, that case

addressed the sufficiency of evidence at the summary-judgment stage, a much higher standard

than the question before this Court—whether the 50-page Complaint states a Section 1 claim.

Moreover, the court in *Toscano* determined that there was no evidence that the local sponsors

agreed with the PGA on a common objective, because "the PGA Tour independently set the terms of the contracts, and the sponsors merely accepted them." *Id.* at 984. Here, by contrast, Plaintiffs allege that, through agreements they negotiated, Fortress and each of the Defendant PAEs "conscious[ly] commit[ted] to a common scheme designed to achieve an unlawful objective," *id.* at 1116 (quoting *Monstanto v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)): aggregating patents through anticompetitive acquisitions. *See, e.g.*, Compl. ¶ 48 ("But Fortress's aggregation is intended for an anticompetitive purpose—to invest in patents at costs lower than the holdup value of the patents to ensnare as many potential licensees and to allow it and the other Defendants to assert as many possible claims of infringement to tax the commercial use of existing technology at rates beyond the actual value (if any) of the aggregated patents. And Fortress's aggregation scheme has had its intended anticompetitive effects, capturing hold-up values that exceed the values at which Fortress or the other Defendants acquired the patents, leading to reduced output."), ¶ 49 ("Defendants' transfers are made with the purpose and effect of stifling competition by allowing Fortress and those using Fortress-backed patents to extort supracompetitive royalties unrelated to the value (if any) of the Fortress-backed patents."), ¶ 173 ("As alleged above, Fortress and Fortress Credit reached agreements with various parties, including Uniloc USA, Uniloc Luxembourg, Inventergy, DSS, and IXI IP (collectively the 'Agreeing Parties'), to aggregate patents under Fortress's control and to assert patents to increase the total royalties obtained from licensing the Fortress-backed patents. Fortress and each of the Agreeing Parties intended that through their agreements they would extract royalties from their targets—like Intel and Apple—beyond the royalties that could have been obtained but for aggregation by Fortress."), ¶ 175 ("The agreements to aggregate and assert patents generated no efficiencies, and in fact were designed to create inefficiencies in the licensing that Fortress could exploit to harm Intel, Apple, and other potential licensees, as well as finished product consumers.").

Similarly misplaced is Defendants' reliance on *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015), *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042

(9th Cir. 2008), and *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795

F.3d 1124 (9th Cir. 2015), to argue that "Plaintiffs' theory of liability is equivalent to a rule that

a bank's lending to multiple borrowers pursuant to a single investment strategy is sufficient in

and of itself to establish that the lender and its borrowers have engaged in a combination or

conspiracy in violation of Section 1." Defs.' Mem. at 31. As set forth immediately above,

Defendants have alleged much more than that Fortress pursued a common investment strategy.

Rather, they have alleged that Fortress entered into agreements with each of the Agreeing Parties

to aggregate patents through an anticompetitive scheme. *See* Compl. ¶¶ 173, 175.

Finally, Defendants' argument that Plaintiffs are simply complaining about Defendants'

aggressiveness misses the point. Plaintiffs allege anticompetitive patent aggregation, *see, e.g.*,

Compl. ¶¶ 48-50, not simply aggressive patent assertions. Therefore, this case is similar to

*Singer Manufacturing*, which found that an agreement to transfer a patent for the effect of

"suppress[ing] the Japanese machine competition in the United States through the use of the

patent" contravened Section 1 of the Sherman Act. *United States v. Singer Mfg. Co.*, 374 U.S.

174, 194-95 (1963) (addressing an unlawful agreement transferring a patent that was

subsequently asserted).

### F.   Defendants' Patent Acquisitions Violate Section 7 of the Clayton Act

#### 1.   Defendants' Conduct Has Harmed Competition

Plaintiffs allege in detail that Fortress's patent acquisitions have harmed competition by

(among other things) combining substitute patents, which, absent the transfers, would have

competed with one another and represented alternatives for licensees. *See, e.g.*, Compl. ¶¶ 38,

41, 168-70. Indeed, Defendants recognize that acquiring substitute patents would be grounds for

a Section 7 claim. *See* Defs.' Mem. at 36. Plaintiffs adequately allege that by, among other

things, eliminating competition between substitute patents, the effect of Fortress's patent

acquisitions "*may* be to substantially lessen competition, or tend to create a monopoly" in

violation of Section 7 of the Clayton Act. *See* 15 U.S.C. § 18 (emphasis added); *see also, e.g.*,

1   Compl. ¶¶ 167-71.  This case is thus like *Intellectual Ventures I LLC v. Capital One Fin. Corp.*,

2   in which the plaintiff was alleged to have amassed a financial-services patent portfolio that gave

3   banks no option but to license from them.  99 F. Supp. 3d at 623.  The court determined that "at

4   some point, the acquisitions, as alleged, created a monopoly and crossed the line to actionable

5   under § 7."  *Id.* at 630; *see also, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S.

6   586, 606-07 (1957) (evidence of post-acquisition effects demonstrated Section 7 violation).

7          Defendants contend that Plaintiffs fail to allege that Defendants' patent acquisitions

8   harmed competition because the anticompetitive effects materialized only after the acquisitions

9   were completed.  Defs.' Mem. at 35.  But that is the case for any anticompetitive acquisition.

10   The conduct violating Section 7 is the acquisition itself—which alters competitive conditions in

11   ways that lead to higher prices or lower output *after the merger is consummated*.  Moreover,

12   Defendants' argument is directly contradicted by the allegations of the Complaint, in which

13   Plaintiffs specifically plead how the acquisitions have substantially lessened competition.  *See*

14   Compl. ¶¶ 37-38, ¶ 39 (explaining how "Fortress's patent aggregation enables the use of weak

15   patents to force targets to pay undeserved and inflated royalties"), ¶¶ 40-49, ¶ 50 ("Because

16   transfers of patents from product companies to Fortress and its PAEs lessen or eliminate these

17   [constraints that apply to operating companies] and other constraints and place the patents with a

18   party with different incentives, those transfers result in inflated royalties or other less favorable

19   licensing terms."), ¶¶ 168-70.  Plaintiffs allege ongoing harm both to actual and potential

20   licensees in the Electronics Patents Market and to downstream consumers.  *See, e.g.*, Compl.

21   ¶¶ 168-71.

22          **2.      Plaintiffs' Section 7 Claim Is Not Time-Barred**

23          Contrary to Defendants' assertions, Defs.' Mem. at 38-39, Plaintiffs' Section 7 claim is

24   not time-barred.  Plaintiffs have identified transactions within the four-year limitations period for

25   private damages actions under Section 7 involving Defendants Fortress, Uniloc 2017, VLSI, and

26   INVT; that some older transactions are cited as part of an ongoing conspiracy and predicate to

27

28

anticompetitive effects from later transactions does not negate the timeliness of Section 7 challenges to transactions within the limitations period. And as to all the Section 7 Defendants—including the two Defendants (Seven Networks and IXI IP) that were not party to transactions within the four-year period—because Plaintiffs seek injunctive relief, the claim is assessed under the doctrine of laches rather than a four-year limitations period, and is timely under that doctrine.

*First*, the Complaint identifies transactions within the limitations period for Defendants Fortress, Uniloc 2017, VLSI, and INVT. Fortress is alleged throughout the Complaint to have entered into multiple challenged agreements. *E.g.*, Compl. ¶¶ 53-56 (Fortress formed Uniloc 2017 on February 23, 2018 to more directly control asserting patents previously owned by Uniloc Luxembourg and Uniloc USA), ¶ 58 (Fortress formed VLSI on June 27, 2016), ¶ 67 (Fortress entered a Restructuring Agreement with Inventergy), ¶ 69 (Fortress formed INVT on Apr. 27, 2017). Uniloc 2017 is alleged to have acquired patents on May 3, 2018. *Id.* ¶ 54. VLSI acquired patents through an assignment dated August 16, 2016, well within the limitations period. *Id.* ¶ 59. INVT was not even formed until April 27, 2017, also within the limitations period. *Id.* ¶ 69. Moreover, some of the transactions that Fortress identifies as outside of the limitations period occurred when Fortress obtained a security interest in patents, not when it actually acquired the patents, which was within the statutory period. *See* Defs.' Mem. at 38-39. And some of the parties identified by Defendants in their brief were not even accused in Plaintiffs' Section 7 claim.[4]

*Second*, Plaintiffs' Section 7 claim, which also seeks injunctive relief, is assessed under the equitable doctrine of laches—not a statutory limitations period—and is timely under that

---

[4] In fact, Defendants focus this section of their brief on parties against whom Plaintiffs' Section 7 claim is not asserted. Specifically, Plaintiffs do not assert a Section 7 claim against DSS, Inventergy, Uniloc Luxembourg, or Uniloc USA. Yet Defendants identified February 13, 2014 as when Fortress invested in DSS and gained an interest in ten semiconductor patents, Compl. ¶ 70, even though DSS did not transfer the patents to Fortress until June 26, 2018, *id.* ¶ 72. Defendants also identified October 1, 2014 as when Fortress invested in Inventergy and gained an interest in "Inventergy's licensing revenues," *id.* ¶¶ 64-65, ignoring the December 22, 2016 Restructuring Agreement identified in the Complaint, *id.* ¶¶ 67-68. Additionally, Defendants identified December 30, 2014 as when Fortress entered into a licensing and revenue sharing agreement with Uniloc, *id.* ¶¶ 51-52, even though the patents were not assigned to Uniloc 2017 until May 3, 2018, *id.* ¶ 54. Again, Plaintiffs' Section 7 claim is not brought against any of these parties (other than Uniloc 2017).

doctrine.  *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1084 (9th Cir. 2014) ("Because Plaintiffs seek only injunctive relief under federal law, their federal antitrust claim is subject to the equitable doctrine of laches and not the four-year statute of limitations in section 4B of the Clayton Act, 15 U.S.C. § 15b.").  Plaintiffs allege in their Section 7 claim that "absent an injunction and rescission of these transactions, Intel and Apple will continue to suffer from these effects." Compl. ¶ 181; *see also id.* ¶ 26 (invoking jurisdiction under 15 U.S.C. § 26).  Accordingly, laches should be used to evaluate the timeliness of the claim.  *See Oliver*, 751 F.3d at 1084-86.  "[I]n applying laches, [courts] look to the same legal rules that animate the four-year statute of limitations."  *Oliver*, 751 F.3d at 1086.  Accordingly, "[a] cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act."  *Id.*  Further, "the limitations period may start to run after the defendant's initial violation of the antitrust law, if it is 'uncertain' or 'speculative' whether the defendants' antitrust violation has injured the plaintiff at the time of the violation."  *Id.* (quoting *AMF, Inc. v. Gen. Motors Cop. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68, 72 (9th Cir. 1979)).

Here, even if the at-issue patent transfers from Seven Networks and IXI IP occurred earlier than four years before Plaintiffs filed their Complaint, injury to Plaintiffs occurred much more recently.  Specifically, Seven Networks sued Apple in 2019.  Compl. ¶ 122.  Likewise, IXI IP amended its infringement contentions in litigation against Apple in 2019, thereby seeking "to restart the litigation that it comprehensively lost five years after the complaint was filed."  *Id.* ¶ 118.  Accordingly, Plaintiffs' Section 7 claim seeking injunctive relief as to both Seven Networks and IXI IP is timely under the doctrine of laches.

### G.    Defendants' Actions Violate California's Unfair Competition Law

#### 1.    Plaintiffs' Claims Are Not Barred by the Anti-SLAPP Statute

California's anti-SLAPP statute aims to deter lawsuits brought to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.  *See*

*Barry v. State Bar of Calif.*, 386 P.3d 788, 789 (Cal. 2017).  "The analysis of an anti-SLAPP motion proceeds in two steps:  First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity.  If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim."  *Id.* at 790 (internal quotation marks omitted).

Defendants' anti-SLAPP argument fails at the outset because they have not made a threshold showing that Plaintiffs' claims arise from protected activity.  As with Defendants' arguments regarding *Noerr-Pennington*, Defendants' arguments that Plaintiffs' claims should be stricken under California's anti-SLAPP statute misconstrue the Complaint.  Plaintiffs' claims do not arise from Defendants' individual patent infringement lawsuits.  Rather, Plaintiffs' claims are based on Defendants' anticompetitive illegal patent transfer scheme.  Just as *Noerr-Pennington* does not immunize patent-related anticompetitive schemes simply because patent assertions are part of the pattern of conduct, California's anti-SLAPP statute does not immunize Defendants' illegal patent transfers, which violate California's Unfair Competition Law.  Because Plaintiffs' claims are based on Defendants' anticompetitive patent transfer scheme—not patent assertions in isolation—Defendants have not met the threshold showing for step one of the anti-SLAPP analysis that Plaintiffs' causes of action arise from protected activity.

Moreover, even if Plaintiffs' claims are premised on protected activity under step one of the anti-SLAPP analysis, Plaintiffs' claims have a reasonable probability of prevailing on the merits and thus are not barred by the anti-SLAPP statute under step two.  "'Reasonable probability' in the anti-SLAPP statute has a specialized meaning" and "requires only a 'minimum level of legal sufficiency and triability."  *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010).  This step "is often called the 'minimum merit' prong."  *Id.*  As discussed in detail above, Plaintiffs' claims are more than sufficient to clear this bar.

1

2          **2.      Plaintiffs' Claims Are Not Barred by the Litigation Privilege**

3          As with Defendants' anti-SLAPP arguments, the litigation privilege does not bar

4   Plaintiffs' unfair competition claim.  Here again, Defendants focus their opposition on the

5   argument that *the filing of a lawsuit* is protected.  But that is not the activity from which

6   Plaintiffs' claims arise—it is Defendants' anticompetitive aggregation schemes involving patent

7   transfers that comprise the anticompetitive activity.  Thus, unlike in *Kane v. DeLong*, No. C-12-

8   5437 EMC, 2013 WL 1149801, at *12 (N.D. Cal. Mar. 19, 2013), cited by Defendants, Defs.'

9   Mem. at 41, Defendants' actions involve far more than instituting lawsuits—they include, for

10  example, acquiring substitute patents.  "[T]he crux of Defendants' UCL claim is [] what makes

11  these acts unfair and injurious."  *Kane*, 2013 WL 1149801, at *12.  In *Kane*, "the ultimate act of

12  filing the instant infringement action" was the crux of the UCL claim.  *Id.*  In contrast, here, what

13  makes Defendants' actions unfair and injurious is the anticompetitive patent aggregation scheme,

14  and Defendants' arguments that the litigation privilege bars Plaintiffs' claims fail.  *See, e.g.*,

15  Compl. ¶¶ 168-71.

16          **3.      Plaintiffs Seek Injunctive Relief Regarding Their UCL Claim**

17          In the Complaint, Plaintiffs seek injunctive relief for Defendants' UCL violations.  *See id.*

18  ¶ 184 (alleging regarding UCL claim that "absent an injunction and rescission of these

19  transactions, [competition] will continue to be injured"); *see also id.* ¶ 26 (invoking jurisdiction

20  under 15 U.S.C. § 26).  Accordingly, and contrary to Defendants' argument, Defs.' Mem. at 42-

21  43, Plaintiffs seek an appropriate UCL remedy.  *See Zhang v. Superior Court*, 304 P.3d 163,

22  167-68 (Cal. 2013).  Moreover, even if Plaintiffs had not sought an available remedy under the

23  UCL, that would still not be grounds for dismissal.  *See Yokohama Rubber Co. v. S. China Tire*

24  *& Rubber Co.*, No. CV04-1866GHKPLAX, 2004 WL 5569948, at *4 (C.D. Cal. Oct. 19, 2004)

25  (holding that "[the plaintiff]'s error in seeking a remedy unavailable under the UCL does not

26  necessitate dismissal under Rule 12(b)(6)," because injunctive relief was available—the judge

27

28

could order injunctive relief prohibiting the defendant from enforcing or attempting to enforce the challenged patent).

### 4. Apple Adequately Pled Its Unfair Competition Law Claim

Apple's allegations are sufficient to support its UCL claim in Count 4.  Defendants incorrectly assert that Apple's UCL claim "rests on the allegations that defendants Fortress, INVT, and Uniloc 2017 have 'claim[ed]' in various litigations to have certain patents (or SEPs) that read on standards set by standard-setting organizations (or SSOs)."  Defs.' Mem. at 44.  In fact, Apple's claim rests on those Defendants' "efforts to evade FRAND commitments through the transfer of SEPs to INVT and Uniloc 2017," which "would then demand non-FRAND royalties in violation of those FRAND commitments."  Compl. ¶ 188.  Those allegations support a cognizable UCL claim.  *See Funai*, 2010 WL 7762624, at *6 (refusing to dismiss a Section 1 claim, which can form the basis of a UCL violation, where patent transfers were used to evade FRAND commitments); *see also Wi-LAN*, 382 F. Supp. 3d at 1025 ("[A] plaintiff that adequately alleges a claim for violation of the Sherman Act also adequately alleges a claim for violation of California's UCL under the 'unfair' prong.").

Accordingly, Apple has adequately alleged its Unfair Competition Law claim in Count 4 of the Complaint.

## V. CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion to Dismiss and to Strike the Plaintiffs' Complaint.

DATED: March 19, 2020

Respectfully submitted,

By: */s/ Mark D. Selwyn*

Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER
  PICKERING HALE AND
  DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile:  +1 650 858 6100

William F. Lee
william.lee@wilmerhale.com
Joseph J. Mueller
joseph.mueller@wilmerhale.com
Timothy Syrett
timothy.syrett@wilmerhale.com
WILMER CUTLER
  PICKERING HALE AND
  DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile:  +1 617 526 5000

Leon B. Greenfield
leon.greenfield@wilmerhale.com
Amanda L. Major (admitted *pro hac vice*)
amanda.major@wilmerhale.com
WILMER CUTLER
  PICKERING HALE AND
  DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile:  +1 202 663 6363

*Attorneys for Plaintiffs*
INTEL CORPORATION, APPLE INC.

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on March 19, 2020, I electronically filed the foregoing documents

3 using the CM/ECF system which will send notification of such filing to the e-mail addresses

4 registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

5

6 DATED: March 19, 2020                  */s/ Mark D. Selwyn*
                                         Mark D. Selwyn
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28