IAN SIMMONS (*pro hac vice* pending)
isimmons@omm.com
MATT SCHOCK (*pro hac vice* pending)
mschock@omm.com
KRISTIN R. MARSHALL (*pro hac vice* pending)
kmarshall@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
T: +1-202-383-5300
F: +1-202-383-5414

ANNA T. PLETCHER (Bar #239730)
apletcher@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
T: +1-415-984-8700
F: +1-415-984-8701

*Attorneys for* Amici Curiae
*Fair Standards Alliance*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTEL CORPORATION and APPLE INC., | Case No. 3:19-cv-07651-EMC |
| Plaintiffs, | **BRIEF FOR *AMICI CURIAE* FAIR STANDARDS ALLIANCE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., DSS TECHNOLOGY MANAGEMENT, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC, | Hon. Edward M. Chen<br>Date: TBD (*see* Gen. Order No. 72)<br>Time: TBD<br>Dept.: TBD |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

I. STATEMENT OF INTEREST ........................................................................................... 1
II. STANDARD SETTING AND THE ANTITRUST LAWS ............................................... 2
III. THE COMPLAINT STATES A CLAIM UNDER THE ANTITRUST LAWS ............... 5
    A. The Relevant Markets Are Adequately Pleaded ....................................................... 6
    B. Unlawful Restraints ................................................................................................... 7
    C. Anticompetitive Effects and Substantial Lessening of Competition ........................ 8
    D. Injury to Plaintiffs ................................................................................................... 13
IV. CONCLUSION .................................................................................................................. 13

# TABLE OF AUTHORITIES

Page

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988) ............................................................................................. 9

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982) ............................................................................................. 3

*Apple, Inc. v. Motorola Mobility, Inc.*,
  886 F. Supp. 2d 1061 (W.D. Wis. 2012) ..................................................... 10, 11

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) .............................................................................. 2, 3

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972) ........................................................................................... 11

*Continental T. V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977) ............................................................................................... 5

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ............................................................................................. 6

*FTC v. Qualcomm, Inc.*,
  411 F. Supp. 3d 658 (N.D. Cal. 2019) ................................................................. 3

*In re Qualcomm Litig.*,
  2019 WL 7834768 (S.D. Cal. Mar. 20, 2019) ................................................... 10

*Intellectual Ventures I LLC v. Symantec Corp.*,
  No. 13-cv-440, 2014 WL 4773954 (D. Del. Sept. 24, 2014) .............................. 7

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ............................................................................................. 5

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  No. 12-cv-7465, 2013 WL 2099227 (S.D.N.Y. May 14, 2013) ......................... 4

*Microsoft Corp. v. Motorola, Inc.*,
  795 F.3d 1024 (9th Cir. 2015) ........................................................................... 11

*Microsoft Corp. v. Motorola, Inc.*,
  864 F. Supp. 2d 1023 (W.D. Wash. 2012) .......................................................... 3

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ............................................................................................... 7

**TABLE OF AUTHORITIES**
**(continued)**

Page

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Newcal Indus. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) .......................................................................................... 6

*Otter Tail Power Co. v. United States*,
  410 U.S. 366 (1973) ....................................................................................................... 11

*Prof'l. Real Estate v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) ......................................................................................................... 11

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ............................................................................................ 6

*Research in Motion Ltd. v. Motorola, Inc.*,
  644 F. Supp. 2d 788 (N.D. Tex. 2008) ............................................................................. 3

*Silver v. N.Y. Stock Exch.*,
  373 U.S. 341 (1963) ......................................................................................................... 2

*Staley v. Gilead Sci., Inc.*,
  No. 19-cv-02573, 2020 WL 1032320 (N.D. Cal., Mar. 3, 2020) ...................................... 7

*TCL Communication Technology Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*,
  943 F.3d 1360 (Fed. Cir. 2019) ........................................................................................ 2

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171 (D.D.C. 2017) ................................................................................. 3

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ......................................................................................................... 7

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) ......................................................................................................... 6

**Statutes**

15 U.S.C. § 18 .......................................................................................................................... 5

**Other Authorities**

A. Douglas Melamed & Carl Shapiro, *How Antitrust Law Can Make FRAND Commitments More Effective*, 127 Yale L. J. 2110 (2018) ......................................... 4

DOJ, *Antitrust Guidelines for the Licensing of Intellectual Property* (Jan. 12, 2017) ............................................................................................................................... 2

ETSI Rule of Procedure 6.1 ................................................................................................... 10

**TABLE OF AUTHORITIES**
**(continued)**

Page

Fair Standards Alliance, An Introduction .................................................................................. 10

Fair Standards Alliance, Publications .......................................................................................... 2

Herbert J. Hovenkamp, *FRAND and Antitrust*, Faculty Scholarship at Penn Law
    2093 (2019) ................................................................................................................ 4, 9, 10, 11

# I. STATEMENT OF INTEREST[1]

*Amicus curiae* Fair Standards Alliance a.s.b.l. ("FSA") respectfully submits this brief in support of Plaintiffs' opposition to Defendants' motion to dismiss. FSA is a non-profit standard setting organization ("SSO") dedicated to promoting a transparent and sustainable licensing framework for standard essential patents ("SEPs") that fosters creativity, innovation, and job creation while preventing abusive licensing practices that harm industry and consumers. This case implicates important antitrust issues of significance to all patents, including SEPs. Although FSA takes no position on the ultimate merits of the case, it believes the Complaint states a claim under the antitrust laws and raises serious issues of particular importance to the innovation ecosystem that may be meaningfully informed by discovery. Accordingly, FSA respectfully urges the Court to deny Defendants' motion to dismiss and permit the case to proceed.

FSA is composed of a diverse membership ranging from small and medium-sized enterprises to multinational corporations throughout a variety of industries, including automotive, telecom, broadcasting, semiconductor, and communications infrastructure. Annually, FSA members' collective revenue is about $2 trillion, and in aggregate they spend more than $120 billion on research and development and innovation. FSA members are innovators that hold an extensive portfolio of patents, including SEPs, and develop a broad range of inventive products and services. FSA members employ more than three million people worldwide.

SEPs cover important standard-implementing components in many of FSA's members' products. Accordingly, FSA seeks to ensure that SEPs are licensed on fair, reasonable, and non-discriminatory ("FRAND") terms, and that SEP royalties reflect the value of the underlying inventions, and not the exclusivity associated with inclusion in a technology standard or aggregation with other intellectual property. Because FRAND terms generally guarantee licenses to all comers, FSA believes that, although SEP infringement litigation is occasionally inevitable, it should be avoided except when the patent owner refuses to offer licenses that comply with its

---

[1] Plaintiffs' counsel consents to the filing of this brief. Defendants' counsel requested to review an advance copy of this brief, which we did not agree to provide. Accordingly, defendants' counsel do not consent to the filing of this brief. FSA submits this brief on its own accord. The positions and statements herein do not necessarily reflect the positions of FSA's members.

FRAND obligations. FSA discourages improper uses of SEP exclusivity, including demands for supracompetitive royalties and repetitive, seriatim infringement litigation to coerce compliance with those unfair demands, such as based on the costs of litigation or the threat of market exclusion. A collection of FSA's position papers on these and other issues is publicly available on FSA's website.[2]

FSA has provided analysis as amicus curiae in other important SEP-related cases, including *TCL Communication Technology Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, 943 F.3d 1360 (Fed. Cir. 2019) ("TCL") and *FTC v. Qualcomm, Inc.*, No. 19-16122 (9th Cir. 2020).

## II. STANDARD SETTING AND THE ANTITRUST LAWS

Standard setting and the antitrust laws serve a common procompetitive purpose: to promote the dissemination of technology and resulting outputs with the aim of maximizing consumer welfare. *Cf.* DOJ, *Antitrust Guidelines for the Licensing of Intellectual Property* 2 (Jan. 12, 2017), https://www.justice.gov/atr/IPguidelines/download ("The intellectual property laws and the antitrust laws share the common purpose of promoting innovation and enhancing consumer welfare."). The antitrust laws serve "to maximize consumer welfare by promoting competition among firms," *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007), and "to protect competitive freedom, *i.e.*, the freedom of individual business units to compete unhindered by the group action of others[,]" *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 359–60 (1963). Likewise, standard setting, which determines the commercial framework for SEPs, "enlarge[s] the overall consumer market," "enhance[s] competition among suppliers," "permits firms to spread the costs of research and development across a greater number of consumers, resulting in lower per-unit prices," and allows implementers to "readily make an objective comparison between competing technologies, patent positions, and licensing terms before an industry becomes locked in to a standard." *Broadcom Corp.*, 501 F.3d at 308–09. Standard setting also reduces costs by "promot[ing] interoperability of different devices through the use of the same protocol," *TCL*, 943 F.3d at 1364, allowing "substitution and price competition [to

---

[2] Fair Standards Alliance, Publications, https://fair-standards.org/publications/.

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

restrain a potential monopolist from profitably raising prices," *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 198 (D.D.C. 2017). In return for the adoption of a standard, standard setting facilitates the licensing of technology on FRAND terms. FRAND commitments mandate fair royalties for SEP licenses and "safeguard[ ] against monopoly power" by prohibiting "hold-up"— *i.e.*, the refusal to license SEPs in order to extract supracompetitive royalties. *Broadcom Corp.*, 501 F.3d at 314; *see also Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 794 (N.D. Tex. 2008) ("RIM") (an SEP owner's FRAND commitment is a "promise it w[ill] allow competitors to 'pass through the gates' on FRAND terms."). Thus, by setting standards and requiring FRAND commitments, SSOs enhance output, facilitate quality products at competitive prices, and ensure that patent holders are rewarded for their innovations.

Despite its potential to generate substantial economic benefits, SEP standard setting "can be rife with opportunities for anticompetitive activity." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982). Because "[a] standard, by definition, eliminates alternative technologies," *Broadcom Corp.*, 501 F.3d at 314, selecting an SEP for a standard confers "gatekeeper" power on the SEP holder, "giving it the power to eliminate all competition, should it so desire," *RIM*, 644 F. Supp. 2d at 794. FRAND commitments also pose competitive risks. Although they are "intended as a 'bulwark' against the unlawful accumulation of monopoly power that antitrust laws are designed to prevent," *id.* at 795–96, FRAND commitments can be manipulated to extract supracompetitive prices through larger anticompetitive schemes, such as tying and exclusive dealing, *see, e.g., FTC v. Qualcomm, Inc.*, 411 F. Supp. 3d 658 (N.D. Cal. 2019). SSOs seek to mitigate these risks **before** setting a standard by declining to "incorporate patented technology into a standard unless [they] can obtain a declaration from the patent holder agreeing to either license free of charge or on [F]RAND terms." *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1032 (W.D. Wash. 2012). As two leading scholars observe: "Put simply: without some checks, SEP holders could opportunistically engage in patent holdup, taking advantage of the fact that the firms and users adopting the standard become individually and collectively locked in to the standard over time. Of course, it is precisely this danger of ex post opportunism that motivates market participants

and standard-setting organizations (SSOs) to require participants in the standard-setting process to make FRAND commitments in the first place." A. Douglas Melamed & Carl Shapiro, *How Antitrust Law Can Make FRAND Commitments More Effective*, 127 Yale L. J. 2110, 2111 (2018) ("Melamed & Shapiro"); *see also* Herbert J. Hovenkamp, *FRAND and Antitrust*, Faculty Scholarship at Penn Law 2093 (2019) ("Hovenkamp"), at 6 ("*Ex ante*, a patent may offer one of many technological paths to a certain goal. However, *ex post*, after a standard has been adopted and others have developed their technologies in reliance, the range of acceptable alternatives can decrease dramatically.").

No similar mechanism exists to deter SEP-exclusivity abuse ***after*** a standard is set and implementers coalesce around it. Under those circumstances, and as Plaintiffs have alleged here, a patent asserting entity ("PAE") can acquire an expansive portfolio of patents—including SEPs—"that allows it to charge far more than the value of the inventive contributions (if any) of the patents and of competitive prices for licenses." Compl. ¶ 10. By deploying their patent portfolios in voluminous and repetitive litigation, PAEs force innovative product manufacturers (including FSA members) to choose between funding "the extreme expense of litigation defense" and licensing the PAEs' patents at inflated rates. *Id.* ¶¶ 11, 31. Plaintiffs allege that this is no choice at all, particularly where: (i) there is potential coordination among PAEs, *id.* ¶ 9; (ii) PAEs may employ shell entities to obscure their identities and assets from litigation adversaries, *id.* ¶ 3; and (iii) at least some PAEs have purportedly sought to evade FRAND commitments by acquiring portions of SEP portfolios from operators and refusing to license those patents on FRAND terms, *id.* ¶ 153. This purported web of aggregation, obfuscation, and repetitive litigation, if confirmed, would clearly "impos[e] a tax on the electronics industry that increases prices, decreases output, and ultimately harms consumers," *id.* ¶ 9, and circumvent precisely the procompetitive goals that standard setting and the antitrust laws are designed to stop. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12-cv-7465, 2013 WL 2099227, at *5 (S.D.N.Y. May 14, 2013) ("[C]onduct that undermines the procompetitive benefits of private standard setting may . . . be deemed anticompetitive under antitrust law." (quotation omitted)); Melamed & Shapiro, 127 Yale L. J. at 2112–15.

When faced with the type of conduct the Complaint alleges, many of FSA's members, including a number of small and medium-sized enterprises, are confronted with a Hobson's choice: take the supracompetitive terms the PAE offers or defend against a surfeit of infringement claims at a prohibitive cost. This conduct is anathema to the policies underlying standard setting and the antitrust laws, and FSA supports efforts to discourage and rebuke it. Unduly pressuring innovative companies like FSA's members harms not only those companies and their industries, but innovation more broadly. As those companies and their customers consider entering industry areas where they may be exposed to aggressive coercion and insurmountable litigation expenses, they may be deterred, even if they believe they can provide a superior technological solution. This deterrence inures ultimately to the detriment of businesses and consumers that benefit from innovation being brought to the market. Again, while FSA takes no position on the ultimate merits of the case, it believes the Complaint states a claim under the antitrust laws and raises serious issues that may be meaningfully informed by discovery, and respectfully urges the Court to deny Defendants' motion to dismiss and permit the case to proceed.

### III. THE COMPLAINT STATES A CLAIM UNDER THE ANTITRUST LAWS

Under Section 1 of the Sherman Act, Plaintiffs need only plead that Defendants entered into an agreement that unreasonably restrains trade in the relevant market, as determined by the rule of reason.[3] *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007). Under Section 7 of the Clayton Act, Plaintiffs must plead that, "in any line of commerce," Defendants acquired assets "where . . . the effect . . . may be substantially to lessen competition, or . . . tend[s] to create a monopoly." 15 U.S.C. § 18.[4]

The Complaint pleads with sufficient specificity all of the elements needed to make out these antitrust claims: (i) relevant markets; (ii) unlawful restraints, including agreements and asset acquisitions; and (iii) anticompetitive effects, or a substantial lessening of competition.

---

[3] "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).

[4] Plaintiffs also plead two claims under California's unfair competition law; this brief focuses on the federal claims.

### A. The Relevant Markets Are Adequately Pleaded

Relevant market analysis generally determines the scope of competition and potential market power in an antitrust case. In some instances, direct evidence reveals a defendant's market power, but more commonly, a plaintiff relies on circumstantial economic evidence of a relevant market and a defendant's power in that market. *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). The relevant product market is defined by substitution: if a product gets too expensive or becomes unavailable, where do purchasers turn, and at what point do they switch to a substitute?[5] *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469, 481–82 (1992) (interchangeability and cross-elasticity of demand are core inquiries in determining a relevant product market); *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (relevant product market "encompass[es] the product at issue as well as all economic substitutes for the product."). In some cases, a "cluster of products" has been found to "compose[ ] a distinct line of commerce," and has been considered a relevant market "sufficiently inclusive to be meaningful in terms of trade realities," even if some of the individual products in the cluster are harder to substitute than others. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 356–57 (1963).

Under this standard, Plaintiffs adequately plead both of their relevant markets: one for patents covering "high-tech consumer and enterprise electronic devices" and their contents and manufacturing processes, and another for SEP-covered technologies and their associated functionalities. Compl. ¶¶ 142–46, 156. Both of these markets can be seen as well recognized *Philadelphia National Bank*-style "clusters" that comprise a variety of products with varying levels of substitutability. *See id.* ¶¶ 32–34 (showing how "aggregating a massive portfolio of electronics patents allows Fortress and its PAEs to amass a range of patents that are both substitutes for and complements to one another," though not all patents have the same substitutes as others); *id.* ¶ 38 (alleging that Fortress's cluster of patents "ensures that it can effectively exercise hold-up power by eliminating substitutes . . . that, before aggregation, competed with

---

[5] The relevant geographic market is also defined in terms of substitution. Defendants do not challenge Plaintiffs' geographic market definitions.

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

| | |
|---|---|
| 1 | each other"). Additionally, in the market for SEP-covered technologies and their associated |
| 2 | functionalities, Plaintiffs highlight the fact that SEP-covered technologies are already subject to |
| 3 | high barriers to entry, because "standardization constrains or eliminates as substitutes all the |
| 4 | technologies that would have been capable of performing the functionality in the standard but that |
| 5 | were not chosen to perform that function." *Id.* ¶ 144. |
| 6 | Defendants argue that the scope of these relevant markets is unclear, but Plaintiffs clearly |
| 7 | allege that Defendants' own efforts to aggregate patents, "obscure" ownership, and "reduce the |
| 8 | availability of information" to potential licensees make it impossible to determine the exact |
| 9 | boundaries of either market. *Id.* ¶ 164; *see also id.* ¶ 44 (alleging that "[a]fter aggregation, |
| 10 | potential licensees lose the ability to decipher" ownership and availability of substitutes and |
| 11 | noting the emergence of "mysterious patterns" connecting Fortress to a web of otherwise |
| 12 | unaffiliated NPEs). The Court should not dismiss a plaintiff's claim based on relevant market |
| 13 | allegations where (i) a defendant's own conduct so clearly precludes the plaintiff from obtaining |
| 14 | information necessary to show the market's precise boundaries, and (ii) as shown below, the |
| 15 | plaintiff has alleged harm to competition stemming from the defendant's preclusion. *Cf.* |
| 16 | *Intellectual Ventures I LLC v. Symantec Corp.*, No. 13-cv-440, 2014 WL 4773954, at *3 (D. Del. |
| 17 | Sept. 24, 2014) (denying motion to dismiss where relevant market allegations were based in part |
| 18 | on tying to "a large and undisclosed number of . . . patents" and holding that a relevant market |
| 19 | analysis would "require additional factual information not in the record"); *see also Staley v.* |
| 20 | *Gilead Sci., Inc.*, No. 19-cv-02573, 2020 WL 1032320, at *28 (N.D. Cal., Mar. 3, 2020) (Chen, |
| 21 | J.) ("[W]hat the appropriate product market is depends on what anticompetitive harm is being |
| 22 | claimed."). |
| 23 | **B.  Unlawful Restraints** |
| 24 | Agreements and acquisitions that raise prices and reduce output pose serious threats to |
| 25 | competition. Where, for example, an agreement or acquisition eliminates direct substitutes or |
| 26 | incentives to offer lower prices, that agreement or acquisition is likely an unlawful restraint on |
| 27 | competition. *See, e.g., United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 |
| 28 | (1956); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 112 (1984). |

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

Plaintiffs allege numerous potentially anticompetitive acquisitions and agreements by and among Defendants here. *See, e.g.*, Compl. ¶ 50 (alleging "[t]hat Fortress and its PAEs have repeatedly entered patent transfer agreements with no efficiency rationale and [that] those agreements have resulted in inflated royalties"); *id.* ¶¶ 51–81 (detailed allegations of agreements among Defendants that stand to cause significant competitive harm). FSA agrees that these alleged agreements and acquisitions, if proven, pose serious threats to competition. Specifically, FSA believes that if the alleged agreements and acquisitions are permitted to continue unchecked, they will irreparably compromise companies' ability to assess the availability of essential technologies (and any substitutes) in the market and to reach agreement on FRAND-level licensing fees to use those technologies. And, as explained more fully below, the agreements and acquisitions Plaintiffs allege pave the way for Defendants to continue exercising market power over Plaintiffs and other market participants by threatening or instituting waves of infringement litigation, forcing a no-win choice between inflated license fees and crushing litigation expenses. Agreements and acquisitions that evince these results risk harm to competition and should be subjected to antitrust scrutiny.

### C. Anticompetitive Effects and Substantial Lessening of Competition

Campaigns of repetitive, seriatim, and largely meritless patent infringement suits pose serious risks to competition by threatening to raise prices, reduce output, and stifle innovation. These litigation crusades are particularly concerning, where, as Plaintiffs allege here, the contents of an NPE's patent portfolio, coordination among NPEs, and other imperative facts are hidden from the litigations' targets, obscured by shell entities, non-disclosure agreements, and other cloaking devices. In the realm of SEPs, these litigious onslaughts undermine the commitments SEP holders make to SSOs and SSO members (including FRAND commitments) by withholding access to essential technologies and charging supracompetitive rates to license them. SSO commitments (also referred to as "undertakings") are vital to a well-functioning standard setting regime, and undercutting them compromises the procompetitive goals that SSOs and industry organizations like FSA seek to promote. *See supra* § II.

*Noerr-Pennington* does not absolve the anticompetitive tactics alleged here. Although

- 8 -

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

*Noerr-Pennington* generally immunizes the litigation process from antitrust liability, the obligatory contractual nature and procompetitive purpose of an SEP holder's commitments to SSOs limit *Noerr-Pennington's* safe harbor.

As Plaintiffs explain, SSOs require their members to timely disclose any intellectual property rights covering technology included in a proposed standard. Compl. ¶¶ 129, 135 (The European Telecommunications Standards Institute (ETSI) requires its members to "use its reasonable endeavors . . . to inform ETSI of essential [intellectual property rights] in a timely fashion," especially if a member submits "a technical proposal for a standard or technical specification"). These disclosures allow SSO members to understand where property rights lie— an essential consideration for the SSO when it decides which technologies to include in a standard. *Id.* ¶ 137.

Once a standard is adopted, implementers begin to invest in efforts incorporating that standard, effectively "locking-in" the selected technology. *Id.* ¶¶ 127, 144–45. Standardization can create significant market power because as demand for the standardized technology goes up, demand for alternative technologies goes down. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988). FRAND obligations exist to mitigate the amount of market power an SEP holder can exercise. *See supra* § II, Compl. ¶ 129. Because the core objective of standardization is widespread adoption of the technologies the standard covers, most SSO participants voluntarily agree to grant SEP licenses on FRAND terms. Compl. ¶¶ 137, 138 (ETSI requires its members to submit "an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on [FRAND] terms and conditions under [essential intellectual property rights]"). If a participant refuses to commit to FRAND terms, many SSOs must take steps to incorporate "viable alternative technolog[ies]" whose providers are willing to license on FRAND terms. *See id.* ¶ 140 (ETSI obligation to incorporate technologies that will be licensed on FRAND terms). All told, these SSO undertakings represent an equitable and procompetitive trade-off: in exchange for market power, an entity must vow to offer its standardized technology to all interested licensees on FRAND terms. *Cf.* Hovenkamp at 32–33 ("A FRAND obligation indicates that the patentee has made a prior voluntary commitment to share its technology on

FRAND terms. In exchange it expects that others would rely on that commitment, designing their own technology around the expectation that FRAND-encumbered patents would be available to them for a FRAND royalty.").

The application of *Noerr-Pennington* to SEP-infringement lawsuits must be viewed against the backdrop of SSO undertakings. An SEP holder's commitments to an SSO carry the force of a contractual obligation. *In re Qualcomm Litig.*, 2019 WL 7834768, at *1 (S.D. Cal. Mar. 20, 2019) ("The 'FRAND commitment' is a contractual obligation between the SEP holder and the SSO."); *see also* Compl. ¶ 133 (ETSI Intellectual Property Rights Policy is of a "contractual nature"). Any potential licensee can seek to enforce these obligations as a third-party beneficiary. *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012) ("As a potential user of the standards at issue and a prospective licensee of essential patents, Apple is a third party beneficiary of the agreements between Motorola and [SSOs]."); *see also* Hovenkamp at 10 ("[T]he courts have had little difficulty concluding that participating members of the SSO are third-party beneficiaries of FRAND commitments.") (collecting cases). Transferring an SEP from one holder to another does not nullify the FRAND obligations associated with that SEP; if a FRAND-encumbered SEP is transferred, the FRAND commitment should follow. *See, e.g.,* ETSI Rule of Procedure 6.1 ("FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances that bind all successors-in-interest."); *see also In the Matter of Google, Inc.*, FTC File No. 121-0120, Complaint (filed by the Federal Trade Commission) (July 23, 2013), ¶ 24 ("Upon acquiring Motorola, Google assumed the FRAND commitments made by Motorola and affirmed its obligation to abide by Motorola's FRAND commitments."); Fair Standards Alliance, An Introduction, https://fair-standards.org/wp-content/uploads/2016/08/FSA-POSITION-PAPER-June2016.pdf (last accessed March 9, 2020) (warning that FRAND obligations should transfer with an SEP to "ensure that patent assertion entities are not utilized as mere proxies to obscure behaviour that seeks to get around FRAND commitments"). Actions attempting to circumvent these obligations are contract breaches, regardless of whether they also implicate the litigation process. Courts in this Circuit and others agree that actions akin to breach of contract should not be shielded by *Noerr-Pennington*. *See,*

*e.g., Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1047–48 (9th Cir. 2015) (noting that "[a] number of courts" have held that *Noerr-Pennington* does not "immunize a party from actions that amount to a breach of contract"); *Apple*, 886 F. Supp. 2d at 1078 (finding *Noerr-Pennington* did not protect Apple's breach of contract claims regarding Motorola's contracts with SSOs to which Apple was a third party beneficiary); *see also* Hovenkamp at 9 ("A firm's violation of its FRAND commitment is very likely a breach of contract, as several decisions have held.") (collecting cases).

But even if *Noerr-Pennington* does apply to repetitive, seriatim infringement litigation, the sham exception bars immunization for lawsuits brought with an intent to harass. A sham is "evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) ("One claim, which a court or agency may think baseless, may go unnoticed; but a ***pattern*** of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused." (emphasis added)). Importantly, the success of a few claims otherwise adrift in a sea of meritless lawsuits does not necessarily take the ***pattern*** of baseless claims out of the sham exception. *Prof'l. Real Estate v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 73 (1993) (Stevens, J. concurring) ("A rule that a single meritorious action can never constitute a sham cannot be dispositive."). In fact, "[r]epetitive filings, some of which are successful and some unsuccessful, may support an inference that the [litigation] process is being misused." *Id*. Here, Plaintiffs allege an aggressive pattern of largely meritless suits, designed to harass Plaintiffs and deter others through the litigation process. *E.g*., Compl. ¶¶ 83 (listing 25 patent cases filed by the Uniloc Defendants against Apple), 87 (explaining that Uniloc Defendants brought 35 lawsuits against Google in three months), 98–101 (listing suits filed against Intel by VLSI). Therefore, even if *Noerr-Pennington* applies to the type of conduct Plaintiffs allege, then so too does the sham exception.

Either way, the ultimate harm to the market remains the same with respect to SEPs: licensees end up effectively paying above-FRAND rates. *See generally* Compl. ¶¶ 126–55. As

discussed above, the FRAND system depends on open and notorious ownership of property rights. But the "web of entities" alleged by Plaintiffs can obscure ownership, *e.g.*, *id.* ¶ 9, making it difficult to discern who owns which patents (SEP or otherwise) and to identify possible substitutes for a patent. Any effort to untangle this web of ownership and negotiate lower licensing fees incurs transaction costs. *Id.* ¶ 44–45. And even if the ownership landscape is eventually revealed, it may become apparent that patents once considered substitutes are now owned by the same entity, or an affiliated entity, with no incentive to compete on price. *Id.* ¶¶ 32–33, 38, 41.

What is more, as explained above, some SEP holders exploit their market power over standardized technology by refusing to license on FRAND terms. *Id.* ¶ 127. Instead, they demand inflated royalties above and beyond the actual value of the invention (the "hold-up value"). *Id.*; *see also supra* § II. Sometimes these demands are not, strictly speaking, for above-FRAND rates. Instead, a patent holder may insist on bundling an SEP offered at the FRAND rate with other extraneous or overvalued patents to drive up the price. Either way, locked into the technology, implementers are left with no real choice—they must pay or negotiate the inflated licensing fee (whether bundled or not) or expend resources needlessly on legal action. *See* Compl. ¶ 149.

An implementer could also choose to make the product without a license, but in that case, a patent infringement suit is almost sure to follow over the held-up SEP. Resolving this dispute unnecessarily depletes time and money to resolve an easy question: that the SEP holder was, in fact, subject to FRAND terms. But the attacks Plaintiffs allege here go far beyond a single SEP-infringement suit. If an SEP owner engaging in hold-up has also aggregated a "stable" of other patents (SEP or otherwise), *id.* ¶ 9, it can use these patents offensively to bring wave after wave of additional lawsuits.[6] *See generally id.* ¶ 39. In other words, although the original disagreement may center on the licensing fee for Patent A (an SEP), a patent assertion entity

---

[6] PAEs in possession of SEPs are not constrained by the same threat of retaliation, Compl. ¶ 151, or reputational harm, *id.* ¶ 152, as other SEP holders because PAEs do not supply their own products nor participate in SSOs. The same can be true for non-SEP holders. *Id.* ¶ 50. Therefore the suits keep coming, generally unchecked by externalities otherwise limiting abuse of the judicial process.

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

(PAE) with a book of other patents can threaten to also exercise Patents B–Z (which the PAE claims, notwithstanding the facts, are infringed by the implementer's product design). Even worse, if that PAE coordinates with other PAEs or a coordinating entity, the number of possibly "infringed" patents skyrockets—as does the number of suits. *See e.g.*, *id.* ¶ 30 ("Fortress describes its investing approach as 'making control-oriented investments in cash flow generating assets.'"). And with little transparency as to which entity owns or controls a given patent, implementers cannot predict which patents may be exercised against them or whether a PAE asserting litigation claims may be in cahoots with another PAE or patent-owning entity.

No matter which of these avenues of anticompetitive conduct is pursued, SEP licensing costs end up exceeding FRAND rates, undermining innovation and the development and promulgation of next-generation technologies. The implementer either caves and shells out a supracompetitive price, or invests significant legal fees into litigation to clarify its SEP rights. With these increased costs, implementers must shift resources away from procompetitive endeavors—including research and development, higher efficiency technology, and talent retention efforts—that would increase overall output and innovation. *Id.* ¶¶ 42–43. These disincentives to procompetitive behavior are manifestly harmful to the market. *Id.* ¶ 48.

### D. Injury to Plaintiffs

Likewise, Plaintiffs sufficiently allege that this conduct harms them. E.g., *id.* ¶ 170 ("Intel and Apple have spent millions of dollars to date on outside resources (including counsel, experts, and vendors) to defend against Fortress-backed demands and assertions."); *id.* (explaining efforts undertaken to defend against Fortress-backed suits); *see also id.* ¶ 95 ("Uniloc USA and Uniloc Luxembourg have suggested that they are entitled to between $2.6 and $5.1 billion in damages from just four of its 25 cases against Apple"); *id.* ¶ 102 ("VLSI claims up to $7.1 billion in connection with eight patents in the California Action and multiple billions of dollars in damages in the Delaware I Action.").

## IV. <u>CONCLUSION</u>

Preventing patent abuse is particularly critical in today's technology economy, as standardized technologies migrate from the telecommunications sector into hundreds of other

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

industries.  FSA members, comprising large and small companies and representing diverse industry verticals, support application of existing antitrust jurisprudence to prevent the types of patent abuses alleged in the Complaint.  For the reasons set forth above, FSA respectfully requests the Court deny Defendants' motion to dismiss.

Respectfully submitted,

Dated:  March 19, 2020      By:    /s/ *Anna T. Pletcher*
ANNA T. PLETCHER (Bar #239730)
apletcher@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
T: +1-415-984-8700
F: +1-415-984-8701

IAN SIMMONS (*pro hac vice* pending)
isimmons@omm.com
MATT SCHOCK (*pro hac vice* pending)
mschock@omm.com
KRISTIN R. MARSHALL (*pro hac vice* pending)
kmarshall@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
T: +1-202-383-5300
F: +1-202-383-5414

*Attorneys for* Amici Curiae
*Fair Standards Alliance*

# CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of March, 2020, I caused the foregoing document entitled Brief of Amici Curiae Fair Standards Alliance in Opposition to Defendants' Motion to Dismiss to be filed via the court's CM/ECF system, which shall send notice to the counsel of record for the parties.

Dated: March 19, 2020  BY: */s/ Anna T. Pletcher*
Anna T. Pletcher (Bar #239730)
apletcher@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
T: +1-415-984-8700
F: +1-415-984-8701

Ian Simmons (*pro hac vice* pending)
isimmons@omm.com
Matt Schock (*pro hac vice* pending)
mschock@omm.com
Kristin R. Marshall (*pro hac vice* pending)
kmarshall@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
T: +1-202-383-5300
F: +1-202-383-5414

*Attorneys for* Amici Curiae
*Fair Standards Alliance*