1

2

MAKAN DELRAHIM
Assistant Attorney General, Antitrust Division

3

4

DAVID L. ANDERSON (CABN 149604)
United States Attorney

5

WILLIAM J. RINNER
Senior Counsel and Chief of Staff to the Assistant Attorney General, Antitrust Division

6

7

MICHAEL F. MURRAY
Deputy Assistant Attorney General, Antitrust Division

8

9

ELYSE DORSEY, TAYLOR M. OWINGS, ANDREW ROBINSON
Counsel to the Assistant Attorney General, Antitrust Division

10

11

12

13

14

DANIEL E. HAAR, ANDREW N. DeLANEY, ERIC D. DUNN
Attorneys, Antitrust Division
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-2846
Facsimile: (202) 514-0536
E-mail: andrew.delaney@usdoj.gov

15

Attorneys for the United States of America

16

UNITED STATES DISTRICT COURT

17

NORTHERN DISTRICT OF CALIFORNIA

18

19

20

21

INTEL CORPORATION, APPLE INC.,

          Plaintiffs,

v.

No. 3:19-cv-07651-EMC

**STATEMENT OF INTEREST OF
THE UNITED STATES**

22

23

24

25

26

27

28

FORTRESS INVESTMENT GROUP LLC,
FORTRESS CREDIT CO. LLC, UNILOC
2017 LLC, UNILOC USA, INC., UNILOC
LUXEMBOURG S.A.R.L., VLSI
TECHNOLOGY LLC, INVT SPE LLC,
INVENTERGY GLOBAL, INC., DSS
TECHNOLOGY MANAGEMENT, INC.,
IXI IP, LLC, and SEVEN NETWORKS,
LLC,

          Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND...................................................................................................................2

  A. Patent Licensing Can Incentivize Innovation.....................................................................2

  B. Relevant Allegations and Procedural History ....................................................................3

III.  ARGUMENT ....................................................................................................................5

  A.  Plaintiffs' Antitrust Markets are Not Properly Defined .....................................................5

    1. The Importance of Proper Market Definition ..................................................................5

    2.  Plaintiffs' Electronics Patent Market Is Not Limited to Substitutes and Is Facially
    Overbroad ..........................................................................................................................8

  B.  Plaintiffs Have Failed to Adequately Allege an Impact on Competition Under Both Section
    1 and Section 7..................................................................................................................11

    1. General Principles on Competitive Impact .....................................................................11

    2. Plaintiffs Fail to Allege Competitive Impact Under Either Section 1 or Section 7.............13

  C.  Unilateral Conduct is Properly Assessed Under Section 2 of the Sherman Act ..................16

  D.  *Noerr-Pennington* Does Not Protect the Aggregation of Patents from Antitrust Challenge
    Even if Those Patents Are Enforced Through Litigation ..................................................188

  E.  An Alleged FRAND Violation Does Not Constitute Anticompetitive Harm ......................19

IV. CONCLUSION...............................................................................................................211

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*,
  432 F. Supp.2d 408 (D. Del. 2006) ........................................... 19

*Amphastar Pharmaceuticals Inc. v. Momenta Pharmaceuticals, Inc.*,
  850 F.3d 52 (1st Cir. 2017) ..................................................... 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................... 13

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007) ........................................................... 5, 14

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ............................................ 12, 14

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ............................................................ 7, 8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................... 16

*California Motor Transportation Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972) ............................................................... 18

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
  20 Cal. 4th 163 (Cal. 1999) ..................................................... 20

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
  2006 U.S. Dist. LEXIS 2176 (N.D. Cal. 2006) ........................ 15, 16

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ............................................................... 16

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ............................................................... 18

*FTC v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986) ................................................................. 6

*Golden Gate Pharmaceutical Services v. Pfizer, Inc.*,
  433 Fed. App'x 598 (9th Cir. 2011) ..................................... 10, 11

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ................................................... 6

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   No. CV-00-20905 RMW, 2008 U.S. Dist. LEXIS 123822 (N.D. Cal. Jan. 5, 2008)..............7, 8

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
   2013 U.S. Dist. LEXIS 177836 (E.D. Va. 2013)....................................................10, 14, 16, 17

*Les Shockley Racing, Inc. v. National Hot Rod Association*,
   884 F.2d 504 (9th Cir. 1989) ..........................................................................................12, 13

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) ................................................................................................16

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
   No. 18-CV-02054-MMC, 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019).....................10, 11, 12

*Microsoft Corp. v. Motorola, Inc.*,
   795 F.3d 1024 (9th Cir. 2015) ................................................................................................20

*NYNEX v. Discon, Inc.*,
   525 U.S. 128 (1998)..........................................................................................................13, 17

*Ohio v. American Express Co.*,
   138 S. Ct. 2274 (2018)..............................................................................................................6

*PrimeTime 24 Joint Venture v. National Broadcasting Co.*,
   219 F.3d 92 (2d Cir. 2000) ......................................................................................................19

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
   508 U.S. 49 (1993)...................................................................................................................18

*ProMedica Health System, Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014) ....................................................................................................9

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ....................................................................................................8

*Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ....................................................................................................6

*Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*,
   No. 09-CV-102 H WMC, 2010 WL 6675046 (S.D. Cal. Apr. 20, 2010)..................................10

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) ....................................................................................................5

*Synopsys, Inc. v. Atoptech, Inc.*,
   2015 U.S. Dist. LEXIS 104763 (N.D. Cal. 2015) ............................................................13, 16

*Times-Picayune Publishing Co. v. United States*,
345 U.S. 594  (1953)..................................................................................................7

*United Mine Workers v. Pennington*,
381 U.S. 657 (1965)..................................................................................................18

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)....................................................................................................9

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602 (1974)....................................................................................................5

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966)....................................................................................................6

*Westlake Services, LLC v. Credit Acceptance Corp.*,
2015 WL 9948723, (C.D. Cal. Dec. 7, 2015) ........................................................10

**Statutes**

15 U.S.C. § 2..............................................................................................................16

15 U.S.C. § 18............................................................................................................12

28 U.S.C. § 517............................................................................................................1

Cal. Bus. & Prof. Code 17200 ..................................................................................19

U.S. Constitution Article I, § 8 ...................................................................................2

**Other Authorities**

Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, (4th ed. 2019)  ....................................................................3, 7, 9, 12

Stephen Haber*, Patents and the Wealth of Nations*, 23 Geo. Mason L. Rev. 811 (2016) ..............3

B. Zorina Khan*, Trolls and Other Patent Inventions: Economic History and the Patent Controversy in the Twenty-First Century*, 21 Geo. Mason L. Rev. 825 (2014) ......................2, 3

Adam Mossoff*, Who Cares What Thomas Jefferson Thought About Patents? Reevaluating the Patent "Privilege" in Historical Context*, 92 Cornell L. Rev. 953 (2007) ...................................2

U.S. Department of Justice & Federal Trade Commission, Antitrust Guidelines for the Licensing of Intellectual Property (2017)...........................................................................1, 8, 9

U.S. Department of Justice & Federal Trade Commission, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007) .................................1

U.S. Department of Justice & Federal Trade Commission,
  Horizontal Merger Guidelines (2010)..........................................................................................7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal court.[1]  The Antitrust Division of the Department of Justice enforces the federal antitrust laws, including Section 1 of the Sherman Act and Section 7 of the Clayton Act, and has a strong interest in their correct application.  The United States has a particular interest in this case because it involves the intersection of antitrust law and intellectual property rights, a topic which the United States has long studied and with which it has considerable enforcement experience.[2]  The United States seeks to ensure that the antitrust laws are correctly applied to promote innovation and enhance consumer welfare, and are not misinterpreted in ways that could undermine these critical goals.

The United States urges the Court to grant Defendants' Motion to Dismiss with respect to Count 1 (Sherman Act) and Count 2 (Clayton Act).  *First*, Plaintiffs' claims under Section 1 of the Sherman Act and Section 7 of the Clayton Act are premised on a facially overbroad market definition that groups together complementary and unrelated products.  *Second*, Plaintiffs' federal antitrust claims also fail because they have not sufficiently identified any harm to *competition* here.  The United States also writes here to describe, as relevant to this matter, the

---

[1] Though the text of 28 U.S.C. § 517 itself contains no timing requirement other than that a matter be "pending," we note that the United States has endeavored to file this Statement of Interest at a time useful to the Court in its consideration of the motion to dismiss.  The United States was prepared to file this Statement of Interest prior to the Plaintiffs' filing of their Response brief but, at the Plaintiffs' request, waited until after their brief had been filed.

[2] *See* U.S. Dep't Of Justice & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property (2017), https://www.ftc.gov/system/files/documents/public_statements/1049793/ip_guidelines_2017.pdf; U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/07/11/222655.pdf.

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 3:19-cv-07651-EMC                    1

applicability of the Sherman Act to unilateral conduct, the scope of the *Noerr-Pennington* doctrine, and the relevance of federal law to certain of the state law claims.

## II.   BACKGROUND

### A.  Patent Licensing Can Incentivize Innovation

Because this case involves antitrust claims against parties that license others' patented inventions, we begin with some background on the role such licensing intermediaries can play in the patent system generally.  Patent owners have the "exclusive Right" to make and use their inventions.  *See* U.S. Const. art. I, § 8; 35 U.S.C. § 271.  For hundreds of years, inventors have benefited from this exclusivity directly, for example, by selling products, and indirectly, for example, by licensing their inventions to others so that they can sell products instead.  *See generally* B. Zorina Khan, *Trolls and Other Patent Inventions: Economic History and the Patent Controversy in the Twenty-First Century*, 21 Geo. Mason L. Rev. 825, 831 (2014).  The ability to pursue either path is an important part of the U.S. patent system in which inventors obtain the benefit of a limited period of exclusivity in exchange for making their idea publicly available going forward.  *See* Adam Mossoff, *Who Cares What Thomas Jefferson Thought About Patents? Reevaluating the Patent "Privilege" in Historical Context*, 92 Cornell L. Rev. 953, 962 (2007).

The possibility of licensing or even selling a patent is not only an important tool for inventors, it is also an important driver of innovation.  In particular, it allows inventors to focus on developing new ideas rather than attempting to be "marketers, producers, and commercializers of patented discoveries."  *See* Khan, *Trolls and Other Patent Inventions: Economic History and the Patent Controversy in the Twenty-First Century*, 21 Geo. Mason L. Rev. at 833.  Intermediaries, including those that acquire and license patents, can play a valuable role in connecting "specialized independent inventors" with "manufacturers who either want[] to

license or purchase" their patents.  *See* Stephen Haber, *Patents and the Wealth of Nations*, 23

Geo. Mason L. Rev. 811, 824 (2016).  Intermediaries can help inventors market—and, therefore,

monetize—their patents in numerous ways.  *See* Khan, *Trolls and Other Patent Inventions:*

*Economic History and the Patent Controversy in the Twenty-First Century*, 21 Geo. Mason L.

Rev. at 832 ("[I]ntermediaries have the ability to reduce the costs of search and exchange,

enhance liquidity, improve market depth and breadth, and increase overall efficiency.").

Ensuring that such intermediary activity is not unduly constrained by overly expansive

application of antitrust law can help ensure that such inventors are properly rewarded for

beneficial research and development efforts—and are incentivized to proceed with them.  *See*

Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their

Application ("Areeda & Hovenkamp") (4th ed. 2019) ¶ 707 ("Many patented innovations are

developed by people or firms who lack the capacity or desire to practice the patent themselves.

For them, the incentive to innovate comes entirely from their ability to license the patent to

others.").[3]

### B.  Relevant Allegations and Procedural History

On November 20, 2019, Plaintiffs Intel Corporation ("Intel") and Apple Inc. ("Apple")

filed suit against numerous entities, including Fortress Investment Group LLC and Fortress

Credit Co. LLC ("Fortress") among others (collectively, "Defendants").[4]  Fortress and the other

defendant entities own and license patents, which they have acquired, to downstream licensees.

---

[3] The United States takes no position on whether the general benefits of the practices described in Part II.A apply to the specific practices of the Defendants.
[4] The other defendants include Uniloc 2017 LLC, Unilock USA, Inc., Uniloc Luxembourg S.A.R.L. (collectively, "Uniloc"), VLSI Technology LLC ("VLSI"), INVT SPE LLC ("INVT"), Inventergy Global, Inc. ("Inventergy"), DSS Technology Management, Inc. ("DSS"), IXI IP, LLC ("IXI"), and Seven Networks, LLC ("Seven Networks").

*See* Compl. ¶¶ 9, 157.  Intel and Apple (collectively, "Plaintiffs") each market technology products and, as such, are licensees of patents.  *See id*. ¶¶ 9, 169-170.  According to the Complaint, Fortress entered into agreements with a "web" of companies to launch a "campaign of anticompetitive patent aggregation" and bring "endless, meritless litigation" asserting their purported patent rights against potential licensees.  *Id*. ¶¶ 9, 163, 173.  This campaign allegedly involved acquiring control over a portfolio of patents within the "Electronics Patents Market." *Id.* at ¶¶ 9, 56, 168.  This broad market consists of all "patents for high-tech consumer and enterprise electronic devices and components or software therein and processes used to manufacture them."  *Id.* ¶ 156.  In the course of aggregating patents, Plaintiffs allege that Defendants "inevitably" have acquired patents that are substitutes for one another.  *Id.* ¶ 38. Based on this conduct, Plaintiffs allege that Defendants violated Section 1 of the Sherman Act, Section 7 of the Clayton Act, and California law.  *Id.* at ¶¶ 172–185.  Apple also separately alleges that a subset of Defendants violated California law by demanding excessive royalties in violation of contractual commitments with regard to certain patents.  *Id.* at ¶ 188.

On February 4, 2020, Defendants filed a motion to dismiss on a number of grounds.  *See* Defendants' Joint Motion to Dismiss, Doc. 111 ("MTD").  The United States expresses views only on those grounds addressed in this Statement of Interest and expresses no views on the remaining claims or arguments.  As relevant to the discussion below, Defendants argue that Plaintiffs' federal antitrust claims fail in full because Plaintiffs (1) do not properly specify the "Electronics Patents Market" in which they allege the harm occurred and (2) do not plead an adequate antitrust injury because the "alleged injuries . . .. did not flow from any alleged harm to competition."  *Id.* at 19.  As to the Section 7 claims specifically, Defendants argue that any alleged harm does not relate to the challenged acquisitions, but rather from conduct after the

acquisition.  *Id.* at 37.  Defendants further argue that the Section 1 claims should be dismissed under the *Noerr-Pennington* doctrine.  *Id.* at 24.  Finally, Defendants maintain that Apple's state law claims fail in part because they would improperly extend antitrust liability for the seeking of allegedly excessive royalties.  *Id.* at 44.

## III.   ARGUMENT

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  Thus, plaintiffs must allege enough facts to "nudge[] their claims across the line from conceivable to plausible" and fit those facts to a cognizable legal theory.  *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).  If they do not, "[the] complaint must be dismissed."  *Id.*

Dismissal is proper here under this standard.  Throughout the Complaint, Plaintiffs fail to allege facts that would allow a court to conclude Defendants *actually reduced competition* through the aggregation of otherwise competing products within a relevant market or otherwise. This failure manifests in two primary shortcomings.  *First*, Plaintiffs fail to plead the existence of a plausible relevant market that is limited to a set of competing products.  *Second*, Plaintiffs fail to plead (other than in an inadequate, conclusory manner) that Defendants harmed competition through the combination or elimination of previously-competitive substitutes.  In the absence of adequate pleadings on these points, the harms claimed by Plaintiffs do not sound in antitrust.

### A.  Plaintiffs' Antitrust Markets are Not Properly Defined

#### 1. The Importance of Proper Market Definition

Courts have held that a properly defined market is essential in a case involving Section 7 of the Clayton Act.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

("Determination of the relevant product and geographic markets is 'a necessary predicate' to

deciding whether a merger contravenes the Clayton Act."); *see also see Saint Alphonsus Med.*

*Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (same).  While

in some Section 1 challenges a plaintiff can avoid detailed definition of the relevant market, for

example by providing direct evidence of adverse effects,[5] a properly defined relevant market is

often important for courts to consider in determining whether a practice violates Section 1 of the

Sherman Act as well.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("[C]ourts

usually cannot properly apply the rule of reason [under Section 1] without an accurate definition

of the relevant market.  Without a definition of the market there is no way to measure the

defendant's ability to lessen or destroy competition.") (internal quotation marks and alterations

omitted).  Although a plaintiff need not define a market by "metes and bounds," *United States v.*

*Pabst Brewing Co.*, 384 U.S. 546, 549 (1966), or "plead a relevant market with specificity . . . [,]

a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition

is facially unsustainable," *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018)

---

[5] In a subset of Section 1 challenges, "unlike in cases challenging a merger under §7 of the
Clayton Act [], it may well be unnecessary to undertake a sometimes complex, market power
inquiry."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2291 (2018) (Breyer, J., dissenting) (citing
*FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986)).  Thus, as the Supreme Court has
noted, the necessity of defining a relevant market in a Section 1 challenge is unnecessary where
the question of "whether horizontal restraints had an adverse effect on competition" involves
proof of actual adverse effects on competition.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274,
2285 n.7 (2019) (Thomas, J.).  As "horizontal restraints involve agreements *between competitors*
*not to compete in some way*, this Court concluded [in such Section 1 cases] that it did not need to
precisely define the relevant market to conclude that these agreements were anticompetitive."
*Id.* (emphasis added).  As discussed below, Plaintiffs do not adequately allege that the challenged
Section 1 agreements actually reduced competition, as they fail to identify any specific
substitutable patents offered by any of the co-Defendants.  *See supra* Part III.B.  Therefore, as
discussed below, Plaintiffs do not adequately allege "direct evidence of anticompetitive effects
flowing from the challenged restraint" as would be necessary to obviate a discussion of market
definition.  *See Am. Express*, 138 S. Ct. at 2291 (Breyer, J., dissenting); *supra* Part III.B.

1

2
(upholding a motion to dismiss Section 1 and Section 2 claims because plaintiffs "failed to plead any plausible product markets").

3

4
  A relevant market is composed of substitutes, which are competitive products that a hypothetical purchaser can choose between.  *See, e.g.*, *Brown Shoe Co. v. United States*, 370

5

6
U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself

7

8
and substitutes for it."); *see also* Areeda & Hovenkamp at ¶ 565 ("The requirement that a

9

10
relevant market must be limited to substitutes is so clear that few courts fail to see it.").  A relevant market, in fact, need not include every substitute.  "For every product, substitutes exist.

11

12
But a relevant market cannot meaningfully encompass that infinite range."  *Times-Picayune Pub.*

13
*Co. v. United States*, 345 U.S. 594 613 n.31 (1953).  The market is focused upon close

14
substitutes that provide each other with meaningful competitive constraints.  *See* U.S. Dep't of

15
Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines, § 4 (2010) ("Merger Guidelines")

16
("Market definition focuses solely on demand substitution factors.").

17

18
  The importance of substitutes in market definition is illustrated by the "iterative process"

19
courts go through when defining an antitrust market.  *See Hynix Semiconductor Inc. v. Rambus*

20
*Inc.*, No. CV-00-20905 RMW, 2008 U.S. Dist. LEXIS 123822 (N.D. Cal. Jan. 5, 2008).

21

22
That process starts with considering what would happen if a "hypothetical monopolist" imposed a "small but significant and non-transitory increase in price ('SSNIP')" for a group of substitute

23

24
products.  *See* Merger Guidelines at § 4.1.1.[6]  If this SSNIP is not profitable because, for

25
example, too many customers respond by switching to other products, then the relevant market

26
would properly be expanded to include an additional substitute.  *Id.*  The hypothetical monopolist

27

28
---

[6] A "non-price change such as a reduction in product quality or service" may also help define a relevant market in certain circumstances.  *See* Merger Guidelines at § 4.

test is then repeated—with the addition of substitutes in the relevant market—until a price increase is profitable. *Id.* At that point, the scope of antitrust market is properly defined as including the product and those substitutes that are sufficiently close to impact pricing as described. *See id.*[7] The approach to defining a market based on particular technology (such as may be covered by a patent or patents) is "conceptually analogous to the analytical approach" for defining a market based on a particular product based on substitutability.[8] *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property at § 3.2.2 n.35 (Jan. 12, 2017) ("IP Guidelines"); *see also Hynix*, U.S. Dist. LEXIS 123822, at *3, *19 (holding that courts defining a technology market should remain "focused on the economic substitutability of [potential alternative] technologies" and applying the hypothetical monopolist test in order to define a technology market in a Sherman Act case).[9]

   2.   *Plaintiffs' Electronics Patent Market Is Not Limited to Substitutes and Is Facially Overbroad*

Plaintiffs allege that Defendants possess market power and have harmed competition in the "Electronics Patent Market," which is "an antitrust market for patents for high-tech consumer and enterprise electronic devices and components or software therein and processes used to

---

[7] For example, a hypothetical monopolist who controls the market for SUVs might find that raising the price on SUVs causes some customers to buy large cars. If this substitution effect makes increasing the prices on SUVs unprofitable, then the market would be properly defined as including large cars along with SUVs. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("If the sales of other producers substantially constrain the price-increasing ability of the monopolist or hypothetical cartel, these other producers must be included in the market.").

[8] Per this analysis, a technology market may be, but is not necessarily, coextensive with a specific patent.

[9] A market can also be defined with reference to qualitative evidence, *see Brown Shoe Co.* 370 U.S. at 325 (describing "practical indicia" that can be used to delineate markets), but even then such evidence serves the same purpose—identifying the range of close substitutes constituting the zone of competition in which to analyze competitive effects.

1    manufacture them."  Compl. ¶¶ 156, 159.[10]  This "market" on its face appears to include an

2    indefinite number of patents utilized by or licensed to an unknown number of end users for an

3    untold variety of purposes.  The Complaint alleges that this market includes patents covering

4    components, software, and manufacturing processes utilized by companies ranging from Barnes

5    & Noble and Cisco to Google and Netflix (among many others).  *Id.* at ¶ 85.  The market also,

6    explicitly, includes complementary products as well as substitutes and, apparently, unrelated

7    products.  *See, e.g., id.* at ¶ 32 (claiming that the relevant market includes "a range of patents that

8    are both substitutes for and complements to one another"); *id.* at ¶ 85 (market includes patents

9    for "electronic devices or components or software for such devices"); *id.* at ¶ 90 (patents for

10   Bluetooth technology); *id.* at ¶ 93 (patents for accelerometers); *id.* ¶ 156 (patents for "consumer

11   and enterprise electronic devices").  A market this broad—one that includes virtually any patent

12   related to any aspect of technology without regard for whether the patented technologies are

13   substitutes, complements, or even related to one another—undermines "the entire concept of a

14   'market,' [which] includes the notion that the prices of the goods in the market tend to be

15   uniform, or to rise and fall together" and "introduce[s] economic nonsense" into the assessment

16   of market power and antitrust harm.   Areeda and Hovenkamp at ¶ 565; *see also* IP Guidelines at

17   § 3.2.2.[11]

---

[10] Plaintiffs' Input Technology Markets are not relevant to their federal antitrust claims and the
United States takes no position on whether those markets are properly defined.

[11] Plaintiffs have not alleged that their Electronics Patent Market includes different technologies
that ought to be "clustered" together for administrative convenience because the competitive
conditions relevant to each are similar, *see, e.g.*, *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d
559, 567 (6th Cir. 2014) (distinguishing "the manner in which one defines a relevant *market*"
from "the conditions under which one can cluster admittedly *different* markets"), or due to a
commercial reality that the products are always or almost always sold together, *see United States
v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Courts dismiss antitrust claims that are based on allegations of markets that are not limited to substitutes.  For example, in *Westlake Servs., LLC v. Credit Acceptance Corp.*, 2015 WL 9948723, (C.D. Cal. Dec. 7, 2015), the plaintiffs' alleged market under Section 2 of the Sherman Act was defined based on "e-commerce software" that "facilitate[d]" making certain types of car loans.  2015 WL 9948723 at *5.  The defendant moved to dismiss, challenging "the breadth, and consequently the legal sufficiency, of the[] alleged product market definitions."  *Id.* In siding with the defendant, the district court held that a product market including such a broad range of software was unsustainable, even at the motion to dismiss stage, because it wrongly included products "that cannot plausibly be considered substitutes."  *Id.*  There are numerous examples where courts have dismissed claims, at the pleadings stage, due to facial overbreadth in the markets pled.  *See, e.g., Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*, No. 09-CV-102 H WMC, 2010 WL 6675046, at *3 (S.D. Cal. Apr. 20, 2010) (dismissing Section 2 claim where product market was defined as "cold-weather face, neck and head protection" gear "includ[ing] wool hats, scarves, helmets, lotions, and a variety of other products that are not economic substitutes for the products at issue in this case"); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, No. 18-CV-02054-MMC, 2019 WL 1767335, at *4 (N.D. Cal. Apr. 22, 2019) (dismissing claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act where product market was "veterinary wellness and medication products" because the proposed definition left the court with no "means of delineation" to decide whether included products were actually substitutes); *see also Golden Gate Pharm. Servs. v. Pfizer, Inc.*, 433 Fed. App'x 598, 599 (9th Cir. 2011) (upholding motion to dismiss claims under Section 1 of the Sherman Act and Section 7 of the Clayton Act where product market was "the pharmaceutical industry," including "all pharmaceutical products"); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 2013 U.S.

Dist. LEXIS 177836 (E.D. Va. 2013) (granting motion to dismiss claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act because plaintiffs did "not allege that this proposed market contains all, or even any, of the available substitutes for the technologies included within that proposed market or that the included technologies all pertain to the same aspects of the commercial banking operations, or even to those at issue in this case").

Plaintiffs' Electronics Patent Market is *far* broader than those held to be facially overbroad in the cases cited above.  Indeed, it would include any patent covering any aspect of the operation or production of any component or software of any piece of consumer or business electronics.[12]  As such, Plaintiffs' Section 7 claims fail because their market definition is facially unsustainable.  *See Med Vets*, 2019 WL 1767335, at *4; *Golden Gate*, 433 Fed. App'x at 599. Plaintiffs Section 1 claim would fail for lack of a proper market definition as well unless, as described, *see supra* note 5, they adequately allege direct evidence of adverse effects stemming from a reduction of competition.  As discussed below, Plaintiffs also fail to properly plead a reduction of competition.

### B. Plaintiffs Have Failed to Adequately Allege an Impact on Competition Under Both Section 1 and Section 7

#### *1. General Principles on Competitive Impact*

In order to state a claim for an antitrust violation, under Section 1 of the Sherman Act or Section 7 of the Clayton Act, a private plaintiff must (among other things) adequately plead there has been an impact on competition.  "Every antitrust suit should begin by identifying the ways in which a challenged restraint might possibly impair competition.  This step occasionally reveals

---

[12] Accepting such a broad market definition also threatens innovation by raising the prospect of antitrust liability for patent owners or intermediaries simply because they have acquired and licensed a large number of patents regardless of whether those patents are actually substitutes for each other and thus a threat to *competition*.  *See* Part II.A *supra*.

1   that competition is not implicated at all and thus that the parties' dispute is not an antitrust case."

2   *See* Areeda and Hovenkamp at ¶ 1503.  Under a Section 1 Rule of Reason analysis, a private

3   plaintiff must plead that a challenged agreement is an "unreasonabl[e] restraint[]" that "actually

4   injures competition."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).

5   Under Section 7, a private plaintiff seeking damages must demonstrate the effect of a challenged

6   acquisition "may be substantially to lessen competition, or tend to create a monopoly."  *See* 15

7   U.S.C. § 18 (Section 7 of the Clayton Act).

8           At the pleading stage, it is possible to establish the requisite impact on competition by

9   allegations that, whether through acquisition or agreement, a defendant increased its market

10  power via aggregating substitutes (i.e., bringing previously competitive substitutes under

11  common ownership or control) within a relevant market.  *Les Shockley Racing, Inc. v. Nat'l Hot*

12  *Rod Ass'n.*, 884 F.2d 504, 508 (9th Cir. 1989) (addressing Section 1 and holding that

13  "[o]rdinarily, the factual support needed to show injury to competition must include proof of the

14  relevant geographic and product markets and demonstration of the restraint's anticompetitive

15  effects within those markets.");  *Med Vets*, 2019 WL 1767335, at *3 ("Where, as here, plaintiffs

16  bring claims under Section 7 of the Clayton Act . . . they must allege a relevant market in which

17  defendants have market power.").[13]

18          Without establishing the aggregation of substitute products or some other reduction in

19  previously existing competition, a plaintiff cannot show an "unreasonable restraint" (under

20  Section 1) or "substantial[] lessen[ing of] competition" (under Section 7) merely by alleging a

21  price increase.  *See* Areeda and Hovenkamp ¶ 1503 ("Identifying the type of possible harm to

22  competition is the first essential step. . . .  Generally, . . . [courts] must go on to determine

---

[13] *See also supra* note 5 discussing market definition as relevant to Section 1 claims.

STATEMENT OF INTEREST OF THE UNITED STATES

whether that harm is not only possible but likely and significant.  This ordinarily requires examination of the market circumstances."); *see also NYNEX v. Discon, Inc.*, 525 U.S. 128, 136-37 (1998) (price increases alone do not demonstrate harm to competition).  Where "none of the factual allegations in plaintiffs' complaint suggests a market in which the removal of [a limited number of sellers] from the pool of competing sellers would adversely and unreasonably affect overall competitive conditions," plaintiffs have failed to adequately allege a harm to competition. *See Les Shockley Racing, Inc.*, 884 F.2d at 509 (upholding motion to dismiss Section 1 claims in part by highlighting the absence of allegations related to market share and entry conditions in the alleged market).[14]  Merely asserting that the challenged conduct "reduced competition" and "increased prices" in the absence of such supporting factual allegations are akin to inadequate "naked assertions devoid of further factual enhancement" under *Iqbal.  Synopsys, Inc. v. Atoptech, Inc.*, 2015 U.S. Dist. LEXIS 104763, *16 (N.D. Cal. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)); *see also Les Shockley Racing, Inc.*, 884 F.2d at 508 (upholding the dismissal of Section 1 claims by noting that "Plaintiffs correctly argue that removal of one or more competing sellers from any market necessarily has an effect on competitive conditions within that market.  But removal of one or a few competitors need not equate with injury to competition.").

> 2. *Plaintiffs Fail to Allege Competitive Impact Under Either Section 1 or Section 7*

Under these principles, Plaintiffs have failed to plead harm to competition under Section 1 or a substantial reduction of competition under Section 7.  Beyond the deficiencies in

---

[14] As discussed above, *see supra* note 5, while "direct evidence of anticompetitive effects" can obviate a need for a precise definition of a market in certain Section 1 claims, a plaintiff still must sufficiently allege harm to competition as discussed in this Part.

Plaintiffs' allegations of a relevant market, *see* Part III.A *supra*, they have not adequately pleaded anticompetitive harm within that market.

Although harm to competition could result from the reduction of substitutes within a relevant market, Plaintiffs fail to identify a *single specific patent* that Fortress acquired (or reached an agreement regarding the marketing of) that was a substitute *of any other patent* in its portfolio.  The most Plaintiffs plead is that Fortress has "inevitably acquired substitute patents that, before aggregation, competed with each other."  Compl. ¶ 38; *see also id.* ¶¶ 32-33 (discussing how a hypothetical set of substitute and complement technologies could function). The number, identity, and significance of any such "inevitably" acquired patents, (let alone whether Plaintiffs licensed or attempted to license such patents) is unstated.  In other words, Plaintiffs do not identify what competition previously existed, what competition was eliminated (if any), what alternatives to that competition still exist, or what market share Fortress and the other defendants possessed before the transactions or after.  *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 2013 U.S. Dist. LEXIS 177836, *29 (E.D. Va. 2013) (dismissing Section 7 claim because "[Plaintiff] fails to allege any facts, including the identity of any particular patents or when they were acquired, that make plausible its claim that the effect of [defendant's] patent acquisition 'may be substantially to lessen competition, or to tend to create a monopoly.'") (alterations omitted).  As the pleadings here are insufficient to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Brantley v. NBC Universal, Inc.,* 675 F.3d 1192, 1198 (9th Cir. 2012) ("In order to plead injury to competition . . . sufficiently to withstand a motion to dismiss, a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably.  Rather, a claimant must, at a

1   minimum, sketch the outline of the injury to competition with allegations of supporting factual

2   detail.") (internal quotation marks and alterations omitted).[15]

3       Plaintiffs' (fatal) lack of specificity regarding the reduction of substitutes stands in

4   contrast to the detail of what appears to be the actual thrust of the Complaint: that Fortress

5   asserted its patents in litigation more aggressively than did the prior patent holders, that these

6   assertions are meritless, and that these assertions are used to extract higher licensing payments or

7   litigation windfalls.[16]  In the absence of harm to competition (through a mechanism like

8   aggregation of substitutes), this activity does not violate the antitrust laws, but at most reflects

9   only a harm to particular individual firms.  *See, e.g., Chip-Mender, Inc. v. Sherwin-Williams Co.*,

10  2006 U.S. Dist. LEXIS 2176, **14-15 (N.D. Cal. 2006) ("A claim of injury in the form of

11  attorneys' fees in defending against a patent infringement suit is not an injury to 'competition' or

12  the type of injury that the antitrust laws were designed to protect against, but is rather a purely

13  individual economic injury to [one party] that has no effect on competition in the relevant

14  market.").  Indeed, the claimed harm of defending against "endless, meritless litigation" leading

15  to increased litigation costs and/or increased licensing costs, *see* Compl. ¶ 163, would be faced

16  by Plaintiffs whether or not any *substitutes* were aggregated (that is, whether or not competition

17  was reduced at all).  Nor have Plaintiffs alleged that they compete with Defendants such that

18  these increased costs would impair a rival firm.  Therefore, Plaintiffs' claims of meritless patent

---

[15] Indeed, the allegations themselves appear to undermine any claim that Defendants have actually aggregated substitute patents that Plaintiffs wished to license by casting doubt on the inherent value of the patent portfolio.  *See, e.g.*, Compl. ¶ 48 (referring to the "actual value (if any) of the aggregated patents."); ¶ 163 (referring to the patents held by Defendants as "meritless").

[16] The United States takes no position on the merits of Defendants' patent assertions.

1   assertions (and resulting increased licensing payments) fail to allege an impact on competition

2   adequate to state a claim under Section 1 or Section 7.[17]

3   **C. Unilateral Conduct is Properly Assessed Under Section 2 of the Sherman Act**

4   As described above, Plaintiffs have not properly alleged that the concerted action at

5   issue—aggregation of patents under Fortress's effective control—caused harm to competition.

6   Rather, it appears the actual focus of the complaint is on Fortress's unilateral action (namely, the

7   alleged prodigious litigation activity it carried out or directed) following the aggregation of the

8   patents.  Such conduct, if cognizable at all, is only cognizable as unilateral action under Section

9   2 of the Sherman Act (15 U.S.C. § 2) rather than Section 1 or Section 7 of the Clayton Act.  *See,*

10  *e.g.*, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984) ("The conduct of

11  a single firm is governed by § 2 alone.").  Plaintiffs do not bring a Section 2 challenge here.

12  The district court's decision in *Intellectual Ventures I LLC v. Capital One Fin. Corp.*,

13  2013 U.S. Dist. LEXIS 177836 (E.D. Va. 2013) is instructive.  There, plaintiffs brought a

---

[17] Derivative of Plaintiffs' failure to plead harm to competition is that they have also failed to allege they have suffered antitrust injury—i.e., injury derived from and sufficiently proximate to the claimed harm to competition.  *See* MTD at 18-24.  It is axiomatic that a private plaintiff must allege it has suffered "antitrust injury" in order to state a claim under the antitrust laws.  *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Antitrust injury refers to "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489.  "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations would be likely to cause." *Id.* (alterations and internal quotation marks omitted).  Where a complaint alleges harms that "do not flow from that which would make the acquisitions unlawful, i.e., the anticompetitive effects due to increased market power" but rather a new owner's different business strategy, there is no antitrust injury.  *Synopsys, Inc. v. Atoptech, Inc.*, 2015 U.S. Dist. LEXIS 104763, *13 (N.D. Cal. 2015) (citing *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998) (where the injury "bore no relationship to the size of either the acquiring company or its competitors" no antitrust injury was alleged.)).  As the alleged harm of having to defend against meritless patent litigation does not flow from any reduction in competition, litigation defense in this context does not constitute antitrust injury.  *See Chip-Mender, Inc.*, 2006 U.S. Dist. LEXIS 2176 at *15.

Section 7 claim on the basis that defendant "has amassed a financial services patent portfolio of extraordinary breadth" through acquisitions. *Id.* at *28. The district court noted that while Section 7 did apply to acquisitions of patents, it "addresses only those situations in which the acquisition of a patent substantially lessens competition, and not situations in which anticompetitive effects arise at some point after the acquisition." *Id.* at *29. That was the case in *Intellectual Ventures* as plaintiff did not "allege that [defendant's] acquisitions" had "lessened competition as if, for example, [defendant] had acquired all substitutes or competing technologies." *Id.* Rather, the anticompetitive effects were based on post-acquisition litigation threats and resulting settlements. *Id.* Therefore, "the complained of anticompetitive effects d[id] not arise from the acquisition of the patents, but from conduct that post-dates the acquisition" and were not cognizable under Section 7. *Id* at *30. The district court examined the alleged activity under Section 2 before ultimately dismissing those claims as well. *Id.* at **13-27 (noting "relief for any such liability would more likely come through various doctrines of tort liability, statutory fees or judicial sanctions" rather than antitrust laws). This analysis applies to both the Section 1 and Section 7 claims here, as both are premised on the same patent aggregation conduct and Plaintiffs do not adequately allege that the challenged patent aggregations eliminated competing substitute technologies, but rather focus on unilateral, post-aggregation conduct. Therefore, Plaintiffs' antitrust claims should be dismissed.[18]

---

[18] Any Section 2 claim in this context could face difficulties as well. To the extent it would be based on increased licensing rates or litigation defense spending, such harms to a customer, where they do not arise from any harm to the competitive process, do not suffice to demonstrate the necessary exclusionary conduct under Section 2. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (high prices were insufficient to demonstrate the necessary "harm, not just to a single competitor, but to the competitive process, i.e., to competition itself").

### D. *Noerr-Pennington* Does Not Protect the Aggregation of Patents from Antitrust Challenge Even if Those Patents Are Enforced Through Litigation

The *Noerr-Pennington* doctrine protects the right to petition the government, including the courts, for redress and provides "that no violation of the [antitrust laws] can be predicated upon mere attempts to influence the passage or enforcement of laws." *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *accord United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (clarifying that the doctrine extends to "[t]he right of access to the courts"). Defendants argue that the *Noerr-Pennington* doctrine necessitates the dismissal of Plaintiffs' claims under Section 1 of the Sherman Act.[19] *See* MTD at 24-30. For the reasons described above, the United States does not believe it is necessary to reach this issue here as the federal antitrust claims fail for independent reasons.

If the Court does reach these issues, the United States would counsel consideration of the following principles. As the United States explained in its *amicus curiae* brief to the court of appeals in *Intellectual Ventures*, even if wholly post-acquisition conduct (such as litigation) is protected by the *Noerr-Pennington* doctrine,[20] the doctrine does not bar liability where the acquisition itself of patents lessens competition. *See,* Brief of the United States of America and the Federal Trade Commission as Amici Curiae, *Intellectual Ventures I LLC et al. v. Capital One Fin. Corp. et al.*, Case 18-1367 (Filed May 11, 2018). If the complaint were held to allege

---

[19] The Defendants also cite to this doctrine as necessitating the dismissal of Plaintiffs' claims under Section 17200 of the California Business and Professions Code. The United States expresses no view on the application of the *Noerr-Pennington* doctrine to Plaintiffs' state law claims.

[20] The United States notes, however, that courts have found that litigation does not qualify for *Noerr-Pennington* protection in situations where, among other things, a lawsuit was a "sham." *See Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).

adequately the elimination of competition through acquisition[21] or agreement, then such challenged conduct would not be exempt from antitrust enforcement under *Noerr-Pennington*.[22] This conduct remains subject to the antitrust laws even if there is subsequent litigation to enforce the patents.  *See, e.g., PrimeTime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 98-103 (2d Cir. 2000) (rejecting defendants' argument that *Noerr-Pennington* blocked Section 1 liability where defendants subsequently filed lawsuits after improperly agreeing not to deal with plaintiff); *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp.2d 408, 429 (D. Del. 2006) ("[A]n unlawful agreement or an unlawful overall scheme do not become lawful because they may be enforced by immunized litigation.") (internal citations omitted); *cf. Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017) ("The mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct.").

### E. An Alleged FRAND Violation Does Not Constitute Anticompetitive Harm

Plaintiff Apple raises a state law unfair competition claim (under Cal. Bus. & Prof. Code 17200) based upon allegations that certain defendants attempted to "evade FRAND commitments through the transfer of SEPs" and ultimately "would . . . demand non-FRAND royalties in violation of those FRAND commitments."  Compl. ¶ 188.  To the extent the analysis of that claim would draw on federal antitrust principles, the United States offers its perspective on federal law as relevant to this claim.

---

[21] Defendants do not argue that the doctrine would block Section 7 claims based on acquisition of patents.  The United States, as expressed previously, is of the view that the doctrine would not offer relief against such Section 7 claims.  *See,* Brief of the United States of America and the Federal Trade Commission as Amici Curiae, *Intellectual Ventures I LLC et al. v. Capital One Fin. Corp. et al.*, Case 18-1367 (Filed May 11, 2018).

[22] As noted, *see* Parts III.A & III.B, the federal antitrust claims based on alleged unlawful aggregation should be dismissed for failure to plead a relevant market and for failure to plead anticompetitive harm.

1

2

Standard-setting organizations (SSOs) in many technical industries implement standards

to increase the interoperability of devices from different manufacturers.  When creating an

3

industry standard, SSOs often require that any licensor that owns patents that are incorporated

4

into the standard (standard essential patents, or "SEPs"), commit in advance to license such SEPs

5

on fair, reasonable, and non-discriminatory ("FRAND") terms.  *See* Compl. ¶¶ 127-29.

6

7

California courts look to federal antitrust law when interpreting state unfair competition

claims.  *See, e.g., Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186 (Cal.

8

1999).  As expressed more fully elsewhere, the United States reiterates here its position that it is

9

not a violation of federal antitrust laws merely for SEP licensors to seek allegedly supra-FRAND

10

terms.  *See*, United States Statement of Interest, *Cont'l Auto. Sys., Inc. v. Avanci LLC, et al.* Case

11

3:19-cv-02933-M, Dkt. 278 (filed Feb. 27, 2020).  Fundamentally, these claims are contractual

12

pricing disputes that are properly vindicated through contract law remedies and do not state an

13

14

antitrust claim.  *See, e.g., Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1040-45 & n.2 (9th

15

Cir. 2015) (upholding district court's analysis of FRAND rate and range in breach of contract

16

action).[23]  To the extent principles of federal antitrust law principles (or materially similar ones)

17

apply, an allegation that a licensor sought supra-FRAND rates alone cannot be the basis of

18

antitrust liability.

19

20

21

22

23

---

24

[23] As Defendants note, courts in this circuit have allowed claims based on FRAND-licensing disputes to go forward in specific contexts, specifically when premised on allegations that the SEP holder "deceived" the SSO regarding its willingness to license on FRAND terms.  *See* MTD at 45.  While the United States disagrees that claims based on alleged "deception" of an SSO regarding willingness to license on FRAND terms should be permitted to go forward, *see* United States Statement of Interest, *Continental v. Avanci*, Case 3:19-cv-02933-M, for substantially the reasons stated by Defendants, the Plaintiffs do not adequately allege the circumstances under which courts have allowed SSO deception-based claims to go forward.

25

26

27

28

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss as to Plaintiffs' Count 1 (Sherman Act) and Count 2 (Clayton Act), and respectfully recommends that the Court apply the above-discussed legal framework when it evaluates Plaintiffs' remaining claims.

*        *        *

Respectfully submitted,

MAKAN DELRAHIM
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

WILLIAM J. RINNER
Senior Counsel and Chief of Staff to the
Assistant Attorney General

MICHAEL F. MURRAY
Deputy Assistant Attorney General

ELYSE DORSEY
TAYLOR M. OWINGS
ANDREW ROBINSON
Counsel to the Assistant Attorney General

DANIEL E. HAAR
ANDREW N. DELANEY
ERIC D. DUNN
Attorneys

Dated:  March 20, 2020                         /s/ Andrew DeLaney
                                               ANDREW N. DeLANEY

                                               Attorneys for the United States of America