# Exhibit 1

Matthew S. Warren (Bar No. 230565)
Erika H. Warren (Bar No. 295570)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
19-7651@cases.warrenlex.com

*Attorneys for High Tech Inventors Alliance and*
*Computer & Communications Industry Association*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTEL CORPORATION, APPLE INC., <br><br> Plaintiffs, <br><br> v. <br><br> FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., DSS TECHNOLOGY MANAGEMENT, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC, <br><br> Defendants. | Case No. 5:19-cv-07651-EMC <br><br> ***AMICUS CURIAE* BRIEF OF HIGH TECH INVENTORS ALLIANCE AND COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Judge:    Hon. Edward M. Chen |

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ….…..……….…..………….……………………..…..…..1

INTRODUCTION …………….…...…..……….………………………………………….2

ARGUMENT …………………….………………………………………………………….2

I.    PAE Patent Aggregation Raises Antitrust Concerns………………….….……...….…....2

    A.    PAE Aggregators Purchase Low-Value Assets for High-Value Returns ……………….….3

    B.    PAE Aggregators Seek Inflated License Fees ...…………….…...................................4

II.    Even if It Applies, *Noerr-Pennington* Does Not Protect the Defendants' Litigation …………….…...7

    A.    Defendants' Focus on Resolution of Individual Cases Ignores Governing Law…………....7

    B.    The Standard of the Courts of Appeals Recognizes the Realities of Litigation....…..........10

        1.    Litigation Is Inherently Costly....………………............................................10

        2.    Litigation Is Inherently Uncertain……………………………………….....10

    C.    Defendants Have Failed to Demonstrate That the Objectively Baseless Analysis Requires Adverse Judgment ……………….….………….…………………………………..11

CONCLUSION…………………………………………………………………………….12

1

**<u>TABLE OF AUTHORITIES</u>**

2

*Cases*                                                                                                 **Pages**

3
*Cal. Motor Transp. Co. v. Trucking Unlimited,*
4
    404 U.S. 508 (1972) …………….......................................................................7-10

5
*ERBE Elektromedizin GmbH v. Canady Tech. LLC,*
6
    629 F.3d 1278 (Fed. Cir. 2010)…………………………………….......................9, 12

7
*Ford Motor Co. v. United States,*
8
    405 U.S. 562 (1972)……………………………………………………………….2

9
*Georgia-Pacific Corp. v. U.S. Plywood Corp.,*
10
    318 F. Supp. 1116 (S.D.N.Y. 1970)………………………..………………...6-7

11
*Google LLC v. SEVEN Networks, LLC,*
12
    No. 17-4600, Docket No. 44-12 (N.D. Cal. 2019) …………………….......................6

13
*Hanover 3201 Realty, LLC v. Village Supermarket., Inc.,*
14
    806 F.3d 162 (3rd Cir. 2015)……………………………….......................9

15
*In Re Packaged Seafood Prods. Antitrust Litig.,*
16
    338 F. Supp. 3d 1118 (S.D. Cal. 2018) ……………………………………….......................5

17
*Intellectual Ventures I LLC v. Capital One Fin. Corp.,*
18
    99 F. Supp. 3d 610 (D. Md. 2015) …………………………………………...3

19
*Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.,*
20
    863 F.3d 1178 (9th Cir. 2017) …………………………………………....11

21
*Kimble v. Marvel Entm't, LLC,*
22
    135 S. Ct. 2401 (2015)…………………………………………………....4

23
*Primetime 24 Joint Venture v. Nat'l Broad., Co.,*
24
    219 F.3d 92 (2d Cir. 2000)…………………………………………………...9

25
*Prof. Real Estate Inv'r, Inc. v. Columbia Pictures Indus., Inc.,*
26
    508 U.S. 49 (1993)  ……………………………………………………….................8-10

27
*Puerto Rico Tel. Co., Inc. v. San Juan Cable Co. LLC,*
28
    196 F. Supp. 3d 248 (D.P.R. 2016)…………………………………….........................9

*Raniere v. Microsoft Corp.,*
   887 F.3d 1298 (Fed. Cir. 2018)……………………………………………………….11

*Seven Networks, LLC v. ZTE (USA) Inc. et al.*
   No. 17-1495, Docket No. 3 (N.D. Tex. 2017) ………………...............……………….....6

*Uniloc 2017 LLC et al. v. Box, Inc.,*
   No. 18-3432, Docket No. 36 (E.D. Tex. 2019) ……………………………………............6

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council,*
   31 F.3d 800 (9th Cir. 1994)……………………………………………...……………...8-12

*Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*
   728 F.3d 354 (4th Cir. 2013)………………………………………………..........................9

*Miscellaneous*

American Intellectual Property Law Association, *2019 Report of the Economic Survey* (2019)......3, 5, 10

Alan Devlin, *Antitrust Limits on Targeted Patent Assertion,*
   67 Fla. L. Rev. 775 (2016) ……………………………………………………………...5

Cohen et al., *The Growing Problem of Patent Trolling,*
   Science 352 (6285) (Apr. 28, 2016)…………………………………………………..........10

Eric Young, *A Bridge Over the Patent Trolls: Using Antitrust Law to Rein in Patent Aggregators,*
   68 Hastings Int'l & Comp. L. Rev. 203, 210 (2016) ………………………………..........4, 5, 7

Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* (2011).........................................................................................................3

Fiona M. Scott Morton & Carl Shapiro, *Strategic Patent Acquisitions,*
   79 Antitrust L. J. 463, 476 (2014)………………………………………………….......................5

James Bessen, *The Value of U.S. Patents by Owner and Patent Characteristics,*
   SSRN Elec. J. (Mar. 8, 2006)…………………………………………….............................4

Jim Kerstetter, *How Much Is That Patent Lawsuit Going to Cost You?*, CNET News (Apr. 2012)...........11

PricewaterhouseCoopers, *2018 Patent Litigation Study* (May 2018).........................................................12

Robert Pitkethly, *The Valuation of Patents: A Review of Patent Valuation Methods with Consideration of Option Based Methods and the Potential for Further Research* (1997)...................................................4

### INTEREST OF *AMICI CURIAE*

High Tech Inventors Alliance ("HTIA") is a non-profit corporation dedicated to advancing a patent system that promotes and protects real investments in technologies and American jobs. HTIA supports fair and reasonable patent policy through publication of policy research, providing testimony and comments to Congress and government agencies including the United States Patent & Trademark Office, and sharing industry perspective with courts considering issues important to the technology industry.

HTIA's members, listed at https://www.hightechinventors.com/about, are some of the most innovative technology companies in the world, creating the computer, software, semiconductor, and communications products and services that support growth in every sector of the economy.[1] HTIA members rely on a well-functioning patent system as they collectively invest about $75 billion in research and development each year. HTIA members also contribute significantly to employment and the economy, providing more than 1.3 million jobs and generating more than $600 billion in annual revenues. HTIA's mission is to promote balanced patent policies that preserve critical incentives to invest in innovation, research, and American jobs.

The Computer & Communications Industry Association ("CCIA") is an international non-profit association representing a broad cross-section of computer, communications, and Internet industry firms, listed at http://www.ccianet.org/members, that collectively employ nearly a million workers and generate annual revenues in excess of $540 billion. CCIA believes that open, competitive markets and original, independent, and free speech foster innovation. It regularly promotes that message through *amicus* briefs in this and other courts on issues including competition and patent law.

CCIA's members rely on the patent system to protect innovation. CCIA members receive more than 150,000 U.S. patents each year and regularly appear in the list of top U.S. patent recipients. At the same time, CCIA members are frequently the recipients of baseless patent assertions. CCIA seeks to promote a balanced system that rewards innovation while also preventing abusive patent acquisition and assertion campaigns that chill investment in productive activity and harm the competitive process.

This case involves important questions about patent acquisition and assertion. HTIA and CCIA support a balanced patent system that ensures high quality patents and benefits to innovation.

---

[1] Although plaintiff Intel Corporation is a member company of HTIA and CCIA, Intel did not contribute to this brief.

**INTRODUCTION**

Patents have historically driven growth and expansion, promoting innovation and rewarding those who introduce new or improved technologies in their fields.  Only within the last two decades have non-practicing "patent assertion entities" or "PAEs" become commonplace.  More recently still, certain PAEs have begun aggregating high volumes of patents, often by purchasing large patent portfolios from defunct or downsized practicing entities or, in some cases, from other PAEs.  In the last few years, the number of patents bought by PAE aggregators has grown substantially, creating troubling trends in both licensing and litigation.  With enough patents and no fear of any threat to their operating businesses—because they have no operating businesses—PAE aggregators can demand royalties based not on the actual value of their portfolios, but instead on the *in terrorem* threat of multiple parallel litigations, with all the cost and risk that each litigation entails.  PAE aggregators can likewise avoid counterclaims, have no need for cross-licensing, and need not divert spending from R&D in order to litigate.  When a PAE aggregator amasses enough patents, even patents of poor quality, that cost and risk can lead a defendant to settle even claims that lack merit, thus subverting the purpose of the patent system by rewarding assertion of weak patents simply because they are asserted in aggregate—and transferring money from practicing companies (which spend substantial resources on innovation) to PAE aggregators (which do not).

Plaintiffs' complaint alleges that defendants behave in exactly this fashion.  If these allegations are correct, defendants' activity is deeply concerning to technology companies such as HTIA and CCIA's members, which rely on a balanced patent system that rewards innovation, not litigation.  In considering these allegations, the Court should decline to adopt defendants' narrow conception of antitrust law.  *Amici* HTIA and CCIA respectfully submit that the Court should deny the motion to dismiss, and allow this action to proceed to discovery.

**ARGUMENT**

**I.    PAE Patent Aggregation Raises Antitrust Concerns**

In their motion to dismiss, Docket No. 111, defendants argue that mass patent aggregation cannot give rise to antitrust liability because their patent rights come from the Constitution.  Mot. at 1:2-5.  But "[e]ven constitutionally protected property rights such as patents may not be used as levers for obtaining objectives proscribed by the antitrust laws."  *Ford Motor Co. v. United States*, 405 U.S. 562, 576 n.11

(1972).  Here, the complaint alleges that "the scope of Fortress's aggregation and its focus on electronics patents ensures that it can effectively exercise hold-up power by eliminating substitutes," and that "aggregation elevates the value of asserting weak patents by Fortress-backed PAEs, untethered to the value of the patents themselves."  Compl. ¶¶ 38, 39.  Courts have recognized that antitrust claims may address patent aggregation, particularly where the aggregator is not an operating company seeking to protect its path to commercialization, but instead seeks only to tax commercial use of technology. *Intellectual Ventures I LLC v. Capital One Fin. Corp*., 99 F. Supp. 3d 610, 626 (D. Md. 2015).

PAE aggregators behave differently than practicing companies, and differently too from ordinary PAEs.  Their aggregation or "stockpile" business model enables PAE aggregators to credibly threaten companies with extreme costs—both monetary and human capital—to defend lawsuit after lawsuit. *See* Fed. Trade Comm'n, *The Evolving IP Marketplace:  Aligning Patent Notice and Remedies with Competition* at 65-66 (2011).  Importantly, patent defendants incur these high costs whether claims are good or bad, since even a total defense victory at trial usually costs millions of dollars.  *See* American Intellectual Property Law Association, *2019 Report of the Economic Survey* at 50-51 (2019).  Knowing this, PAE aggregators seek license fees based not on the value of any specific technology, but rather on the cost they can impose through serial litigation.  This is precisely the conduct plaintiffs allege:  that defendants "extract higher payments from licensees that reflect hold-up value rather than the actual value of the patents based on their technical and commercial merits," a value that is "beyond the royalties that could have been obtained but for aggregation."  Compl. ¶¶ 160, 173.

### A.    PAE Aggregators Purchase Low-Value Assets for High-Value Returns

Although patent owners are not required to list the price they pay for assignment of patents, it is an open secret that PAE aggregators strategically purchase low-value portfolios to suit their business model. They seek quantity with no regard for quality, because quality is largely irrelevant to their enterprise: with more patents they have more assertion power, and with more assertion power they can impose higher litigation costs on their targets.  For example, assets that PAE aggregators assert are almost always asserted for the first time, even though PAE aggregators frequently purchase assets from operating entities that could have—but did not—assert them, though the sellers had their own patent licensing programs, and money to pay for lawsuits.  *See* Compl. ¶ 9.  Operating entities considering patent litigation face

constraints that PAE aggregators do not:  among other things, they must assess the risk of counterclaims, potential cross-licensing, and allocation of human and financial capital away from operations to litigation. These constraints push operating entities away from asserting low-quality patents.  PAE aggregators face no such constraints.

Similarly, PAE aggregators also purchase patents at or very near their expiration dates in order to present portfolios with high numbers of patents, again without regard to merits.  Even weak or expired patents add to "strength in numbers," and indeed the scale of a portfolio can shield low-merit patents that would, on their own, be worth very little.  *See* Eric Young, *A Bridge Over the Patent Trolls:  Using Antitrust Law to Rein in Patent Aggregators*, 68 Hastings Int'l & Comp. L. Rev. 203, 210 (2016) ("Bringing patents under common ownership can 'enhance litigation leverage and thereby increase—in some cases radically—incentives to assert even very weak patents.'").  The public record reveals that defendants in this action have acquired significant numbers of near-expired and now-expired assets—in two cases, inactive assets represent a majority of defendants' holdings.[2]  Expired and near-expired patents are less valuable than other patents for obvious reasons:  the law prohibits recovery of damages for infringement after expiry, and so a patent's value can be judged in part by its remaining useful life.  *See Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2406-07 (2015); *see also* Robert Pitkethly, *The Valuation of Patents:  A Review of Patent Valuation Methods with Consideration of Option Based Methods and the Potential for Further Research* at 18 (1997) ("In a similar way to normal options their value decreases as the patent ages and the time to expiry of the patent decreases.").  More troubling still, many of the patents in these portfolios appear to have expired for failure to pay maintenance fees, meaning the patent holders themselves did not consider them to have significant value.  *See* James Bessen, *The Value of U.S. Patents by Owner and Patent Characteristics* at 5, SSRN Elec. J. (Mar. 8, 2006).

### B.    PAE Aggregators Seek Inflated License Fees

The complaint alleges injury in the form of inflated, supra-competitive licensing prices—that defendants "extort supracompetitive royalties unrelated to the value (if any) of the Fortress-backed

---

[2] As of the time of this filing, all of IXI IP's patents have expired.  Similarly, nearly 60% of defendant DSS Technology Management Inc.'s patents have expired.  Over 40% of the Uniloc defendants' portfolio has expired, as has 35% of Inventergy's patents.

patents."  Compl. ¶ 49; *see also In Re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1183 (S.D. Cal. 2018).  These allegations are consistent with the PAE aggregator business model, which includes amassing large portfolios, threatening and asserting them on a large scale, and increasing uncertainty and costs for their targets in order to achieve high-value settlements.

For example, PAE aggregators generally seek license rates on a portfolio-wide basis.  *See* Alan Devlin, *Antitrust Limits on Targeted Patent Assertion*, 67 Fla. L. Rev. 775, 819 (2016); Young, *supra*, at 210.  Unlike the threat of litigation over a single patent or family of patents, a defendant facing potentially dozens of lawsuits cannot reasonably assess the fair market value of each patent in the bunch, which would require investigating the viability of thousands of claims and defenses, including invalidity on a patent-by-patent basis.  According to a recent survey conducted by American Intellectual Property Law Association, the median cost of a single pre-litigation opinion letter addressing validity and infringement is $15,000; this would translate to tens of millions of dollars to assess risk on the merits of a portfolio of thousands of patents.  *See* AIPLA, *2019 Report of the Economic Survey* at I-102.  Apple and Intel allege that defendants "can deploy patent after patent in case after case against their targets with the threat of ever more patent assertions and ever more litigation" and that, "[f]aced with this threat, many victims have agreed to settle, rather than to challenge Fortress and its PAEs, for amounts that reflect not the merits of the underlying patents but the effectiveness of the Fortress model.  Thus, Fortress and the other defendants foreclose the possibility—which existed before aggregation—that litigation can be an economic alternative to licensing patents."  Compl. ¶ 11.

Likewise, PAE aggregators cause competitive harm by creating "shell companies to hold patents and assert them.  This practice is intended to make it difficult to determine who actually owns which patents and whether they are patents for which target firms already have licenses."  Fiona M. Scott Morton & Carl Shapiro, *Strategic Patent Acquisitions*, 79 Antitrust L. J. 463, 476 (2014).  By obfuscating ownership, PAE aggregators amplify uncertainty for their targets, who cannot reasonably determine the scope of the portfolio and attendant risk to their businesses.  In some cases, obfuscated ownership has been used to require a target to pay "for intellectual property to which it already has rights."  *Id.* at 476.  Here, the complaint specifically alleges that defendants obfuscate their ownership structure.  *See* Compl. ¶ 50.  Though defendants repeatedly challenge these fact allegations, referring to their financial

arrangements as "garden variety" and "run-of-the-mill" contractual relationships (Mot. at 3:25-27, 31:25), the public record supports plaintiffs' allegations:  defendants parcel out patent rights in varying degrees to entity after entity.[3]  Indeed, even defendants do not always know who owns what.  *See, e.g.*, *Uniloc 2017 LLC et al. v. Box, Inc.,* No. 18-3432, Docket No. 36 at 1-2, 2 n.1 (E.D. Tex. 2019) (plaintiffs' motion seeking dismissal without prejudice following a standing challenge, noting that "[c]ounsel who drafted the Complaint was unaware that on May 3, 2018 Uniloc Luxembourg had assigned the patent to Uniloc 2017 LLC ('Uniloc 2017')" and that "[a]t the same time, Uniloc Licensing USA LLC ('Uniloc Licensing') replaced Uniloc USA as licensee.").

PAE aggregation thus permits entities to extract license fees on the basis of scale, and not—as patent law requires—on the value of the underlying patent claims.  Under established case law, the reasonable royalty determination, on the merits, demands consideration of competitive factors including "[t]he commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor," and "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of

---

[3] Plaintiffs allege that defendants have hidden ownership of individual patents through a web of holding entities with shared corporate officers.  Compl. ¶ 44.  The public record suggests that discovery will confirm plaintiffs' allegations.  For example, Constantine M. Dakolias is Fortress' Co-Chief Investment Officer of Credit Funds, but is also President of Uniloc 2017 LLC, *see* USPTO, Patent Assignment 46532-88 (Jul. 12, 2018), https://m.warrenlex.com/46532-88; President of CF INVT Holdings LLC, which in turn owns INVT SPE LLC, *see* USPTO, Patent Assignment 42688-49 (Jun. 5, 2017), https://m.warrenlex.com/42688-49; and Officer of CF SVN LLC, which in turn owns Seven Networks.  *See Google LLC v. SEVEN Networks, LLC*, No. 17-4600, Docket No. 44-12 (N.D. Cal. 2019); *Seven Networks, LLC v. ZTE (USA) Inc. et al.*, No. 17-1495, Docket No. 3 (N.D. Tex. 2017).  Mr. Dakolias is also President of Fortress' Drawbridge Special Opportunities Fund LP, which owns defendant PAE investments; *see* Drawbridge Special Opportunities Fund LP, Drawbridge Special Opportunities Fund's Form SC 13G/A (Feb. 12, 2016), https://sec.report/Document/0001341004-16-001129; President of DBD Credit Funding, which owns security interests in many if not most of defendants' patents, *see* USPTO, Patent Assignment 30830-945 (Jul. 18, 2013), https://m.warrenlex.com/30830-945; and President of FCO V CLO Transferor LLC, which owns security interests in IXI IP's patents.  *See* USPTO, Patent Assignment 33098-56 (Jun. 5, 2014), https://m.warrenlex.com/33098-56; USPTO, Patent Assignment 33718-687 (Sep. 11, 2014), https://m.warrenlex.com/33718-687; Fortress Credit Corp., EX-10.1 to Exhibit 101, First Amendment in Agreement with TipTree Operating Company, LLC, EDGAR, Securities and Exchange Commission (Jan. 26, 2015), https://www.sec.gov/Archives/edgar/data/1393726/000139372615000005/ex101.htm.

such derivative or convoyed sales." *Georgia-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  But PAE aggregators can achieve high royalties not on the basis of the value of the patented invention or its competitive importance, but rather on the basis of the size of their patent holdings.  *See Young, supra* at 209; Compl. ¶ 9.

## II.     Even if It Applies, *Noerr-Pennington* Does Not Protect Defendants' Litigation

Defendants argue the alleged conduct is protected petitioning activity under *Noerr-Pennington*. Mot. § V, at 24-30.  This is incorrect for two reasons.  First, as Apple and Intel explain in detail in their response, the complaint concerns anticompetitive conduct *before* litigation—namely, aggregation.  Opp. at 29:10-13 (citing Compl. ¶¶ 32-39, 41-44, 47-49, 153-55, 160, 162-65); *see* Opp. § IV. D, at 29-31.  Taking the fact allegations as true, as the Court must on a motion to dismiss, Apple and Intel have alleged antitrust claims on the basis of non-petitioning activity, and so *Noerr-Pennington* does not protect defendants.

Even if the Court agrees with defendants that *Noerr-Pennington* applies, however, it should deny defendants' motion to dismiss because, to the extent the complaint alleges litigation conduct, it sufficiently alleges sham litigation under *Noerr-Pennington*.  Defendants ask the Court to apply a crimped and incorrect understanding of what the law considers a sham, arguing that the Court must view the factual allegations under a stringent "objectively baseless" standard, and urging that this standard allows the Court to find a sham only if one or all of their cases have specifically resulted in a judgment of non-infringement.  Mot. at 29:22-23 ("The Complaint fails to identify a single finding of non-infringement on any of the relevant patents, much less all of them."); *see also id.* at 5:22-24.  The Court should not adopt defendants' incorrect understanding of sham litigation.

### A.     Defendants' Focus on Resolution of Individual Cases Ignores Governing Law

The Supreme Court has long held that aggregation of "baseless, repetitive" claims can bring them outside the protection of the *Noerr-Pennington* doctrine.  *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 513 (1972), concerned a complaint alleging "concerted action by petitioners to institute state and federal proceedings to resist and defeat applications by respondents to acquire operating rights or to transfer or register those rights."  *Id.* at 509.  The district court dismissed the complaint for failure to

state a claim, citing the *Noerr-Pennington* doctrine; the court of appeals reversed, and the Supreme Court

affirmed.  *Id.*  As the Supreme Court explained its reasoning:

> There are many other forms of illegal and reprehensible practice which may corrupt the
> administrative or judicial processes and which may result in antitrust violations.
> Misrepresentations, condoned in the political arena, are not immunized when used in the
> adjudicatory process.  Opponents before agencies or courts often think poorly of the other's
> tactics, motions, or defenses and may readily call them baseless.  One claim, which a court or
> agency may think baseless, may go unnoticed; but **a pattern of baseless, repetitive claims may
> emerge which leads the factfinder to conclude that the administrative and judicial processes
> have been abused**.  That may be a difficult line to discern and draw.  But once it is drawn, the
> case is established that abuse of those processes produced an illegal result, *viz.*, effectively barring
> respondents from access to the agencies and courts.  Insofar as the administrative or judicial
> processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the
> umbrella of "political expression."

*Id.* at 513 (emphasis added).

Separately, the Supreme Court fleshed out its standard for determining whether a single lawsuit is

a sham in *Prof. Real Estate Inv'r, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ("*PRE*").  In

*PRE*, the Court found that a lawsuit is a sham if it was "objectively baseless in the sense that no

reasonable litigant could realistically expect success on the merits" in order to interfere with a

competitor's business relationships.  *Id.* at 61.  Under this standard, "sham litigation must constitute the

pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable

relief."  *Id.* at 62.

Shortly after *PRE*, the Ninth Circuit considered whether an "objectively baseless" standard applies

where a plaintiff alleges injury from a pattern or series of legal proceedings, and found that it does not:

> When dealing with a series of lawsuits, the question is not whether any one of them has
> merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to
> a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a
> market rival.  The inquiry in such cases is prospective:  Were the legal filings made, not out of a
> genuine interest in redressing grievances, but as part of a pattern or practice of successive filings
> undertaken essentially for purposes of harassment?

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11

(9th Cir. 1994).  *USS-POSCO* explained that *PRE* did not overrule *California Motor Transport*:

> We reconcile these cases by reading them as applying to different situations.  *Professional Real
> Estate Investors* provides a strict two-step analysis to assess whether a single action constitutes
> sham petitioning.  This inquiry is essentially retrospective:  If the suit turns out to have objective

merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham.

*California Motor Transport* deals with the case where the defendant is accused of bringing a whole series of legal proceedings. Litigation is invariably costly, distracting and time-consuming; having to defend a whole series of such proceedings can inflict a crushing burden on a business. *California Motor Transport* thus recognized that **the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade**.

*Id*. at 810-11 (emphasis added and citations omitted). Under *California Motor Transport* and *USS-POSCO*, courts apply a different standard to allegations of a pattern or series of litigation: instead of a retrospective analysis of the merits of an individual lawsuit, "[t]he inquiry in such cases is prospective: were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Id*. at 811. The *USS-POSCO* complaint alleged a pattern of filing a high volume of suits "with or without probable cause and regardless of the merits of the claims asserted therein." *Id*. at 810.

The Federal Circuit has confirmed that *PRE* is limited to whether a *single* lawsuit is a sham, but has expressly withheld decision on whether the *USS-POSCO* standard controls where the alleged conduct includes serial patent litigation. *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1291 (Fed. Cir. 2010) ("Because *PRE*, however, only looks to whether a single lawsuit is a sham, two circuit courts have applied a different standard where there is a 'whole series of legal proceedings.'"). *ERBE*, which resolved an appeal from summary judgment, found that "[o]n these particular facts" the Court "need not determine whether to adopt the test of our sister courts because there is no 'series' of legal proceedings."). *Id*. Since *ERBE*, two additional courts of appeals have joined the Ninth and Second Circuits in applying the *California Motor Transport* test where the plaintiff alleges a pattern or series of litigation. *See Hanover 3201 Realty, LLC v. Village Supermarket, Inc.*, 806 F.3d 162, 180 (3rd Cir. 2015); *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 365 (4th Cir. 2013); *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 101 (2d Cir. 2000); *see also, e.g., Puerto Rico Tel. Co., Inc. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 248, 317 (D.P.R. 2016) ("Absent direct guidance from the First Circuit, this Court adopts the Second, Third, Fourth, and Ninth

Circuit approaches to reconciling *California Motor Transport* and *PRE*.")  No court of appeals has come to the conclusion that defendants urge, and *amici* respectfully submit that this Court should not either.

## B.    The Standard of the Courts of Appeals Recognizes the Realities of Litigation

The four circuits that followed *California Motor Transport* adopted a rule that recognizes the realities of litigation:  "Litigation is invariably costly, distracting and time-consuming; having to defend a whole series of such proceedings can inflict a crushing burden on a business."  *USS-POSCO*, 31 F.3d at 811.  This is so because of two imperfections in our adversarial system:  it is costly, and it is unpredictable.  In this imperfect system, a PAE aggregator can threaten and press lawsuits against the same defendant until that defendant's risk tolerance (or ability to pay for defense) tips to settlement.

### 1.    Litigation Is Inherently Costly

Recent studies confirm a defendant facing a patent lawsuit—just one lawsuit—should factor in an average cost of several *million* dollars.  *See* AIPLA, *2019 Report of the Economic Survey* at 50.  This comes as no surprise, as patent litigation almost always requires expert discovery, as well as additional—and often voluminous—disclosures not found in other civil litigation.  Because of these costs, in many cases "a threat of legal action is sufficient to induce most targeted firms to settle, whether the asserted patent is valid and/or infringed."  Cohen et al., *The Growing Problem of Patent Trolling*, Science 352 (6285), 521-22 (Apr. 28, 2016).  Plaintiffs allege that defendants leverage these costs against their litigation targets, bringing enough claims to "foreclose the possibility—which existed before aggregation—that litigation can be an economic alternative to licensing patents."  Compl. ¶ 11.  Indeed, despite defendants' overall *low* success rate in litigation, their parent entity reports consistently high returns—indicating that the campaign is lucrative regardless of the merits of its component lawsuits.  *See* Fortress Investment Group LLC, Fortress' Form 10-Q for Q3 of 2017 at 61 (Sep. 30, 2017), https://m.warrenlex.com/fbeae.  As a result, plaintiffs allege, defendants' "assertion of weak patents as part of a wave of assertions against a target generates economic value even if many of those assertions are defeated in litigation."  Compl. ¶ 39.

### 2.    Litigation Is Inherently Uncertain

The Court is fully familiar with the uncertainties of the legal system.  It would be nearly impossible for a patent defendant to achieve total victory in hundreds of lawsuits, each of which includes

uncertainties against which even the best defenses are no guarantee.  The uncertainty of litigation is magnified in lawsuits, such as patent cases, that turn on highly technical issues.  "What happens in that courtroom is that it's a very technical presentation to a jury that has no technical background. . . . In a lot of these cases, the juries say this is above my head, and the judgment goes to the lawyer they like the most.  That introduces great risk into the equation."  Jim Kerstetter, *How Much Is That Patent Lawsuit Going to Cost You?*, CNET News (Apr. 2012).  Because of these uncertainties, a patent defendant's risk analysis must include a potential loss on the merits, even if the patents asserted are weak.  And because of *those* uncertainties, PAE aggregators such as defendants may—and plaintiffs allege, do—seek to avoid scrutiny by filing more and more lawsuits until their targets say 'uncle' and settle.  *See* Compl. ¶ 11.

For precisely these reasons, the *USS-POSCO* standard must govern allegations of improper aggregate litigation:  if a single success were enough to gain protection, as defendants appear to argue, the law would reward patent aggregators for increasingly voluminous filings, one of which would eventually succeed, if only by sheer chance.  To avoid this perverse incentive and the others that *amici* have already explained, this Court should apply *USS-POSCO* to any consideration of the *Noerr-Pennington* doctrine.  "In such a context, the legal success of an occasional sham suit is irrelevant."  *Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, 863 F.3d 1178, 1187 (9th Cir. 2017).

### C.     Defendants Have Failed to Demonstrate That the Objectively Baseless Analysis Requires Adverse Judgment

Even if the Court concludes that *USS-POSCO* does not apply, it should not adopt defendants' cramped understanding of *PRE*, which would *require* an adverse judgment—a specific judgment of non-infringement—to survive a motion to dismiss.[4]  *See* Mot. at 29:22-23.  Plaintiffs allege, among many other things, that defendants have filed voluminous lawsuits over the course of several years.  *See* Compl. ¶¶ 85, 87, 104, 106, 110, 114, 120.  Defendants do not contest these assertions—they could not at the pleading stage, and in any event they are true—but instead seek to inject counterfacts:  namely, that

---

[4] This standard would also conflict with recent authority on what constitutes a "prevailing" defendant.  The Federal Circuit has rejected the argument that "prevailing" requires a defendant to obtain a "favorable judgment on the merits."  *Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1303-04, 1308 (Fed. Cir. 2018).

"Defendants have prevailed in *inter partes* review proceedings, obtained favorable *Markman* and summary judgment rulings, and survived various other challenges brought by Plaintiffs."  Mot. at 2:8-11. Tellingly, however, defendants do not cite *a single judgment of infringement* anywhere in their motion, ignoring their win-loss record in favor of their assertions that they have occasionally scored a goal.  And defendants ignore their losses on validity, both before district courts and in *inter partes* review proceedings.  *See, e.g.*, Compl. ¶¶ 89-91, 124.  Defendants' low success rate compares poorly to other patent litigants:  a 2018 study concluded that practicing companies win more than half of cases tried before a judge, and more than 70% of the time before a jury.  The statistics were similarly high—36% and 72%—for non-practicing entities.  PricewaterhouseCoopers, *2018 Patent Litigation Study* (May 2018). Particularly under these circumstances, the Court should not adopt defendants' proposed standard, which would ignore their overall low success rate and focus solely on whether they have received a particular kind of adverse judgment from a particular kind of court.  Although defendants quibble with plaintiffs' allegations, the Court cannot conclude, without fact discovery, whether the numerous alleged litigations were objectively baseless.

Thus, if the Court decides that *PRE* applies and *USS-POSCO* does not, it should apply the test in *PRE* itself, which requires consideration of whether each individual case is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Prof. Real Estate Inv'r, Inc.*, 508 U.S. 49 at 60.  Defendants' brief provides no basis for the Court to resolve this question in their favor.  *See, e.g.*, *ERBE*, 629 F.3d at 1292 (affirming summary judgment against antitrust claimant based on its "fail[ure] to present a genuine issue of material fact" that the infringement claim was objectively baseless).  As a result, even under *PRE*, the law requires denial of the motion to dismiss.

//
//
//
//
//
//
//

1

**CONCLUSION**

2          For the foregoing reasons, the Court should deny the motion to dismiss, and allow the parties to

3     proceed to discovery.

4

5     Date:  March 23, 2020                                        Respectfully submitted,

6

7     _____

8                                                                  Matthew S. Warren (Bar No. 230565)
                                                                   Erika H. Warren (Bar No. 295570)
9                                                                  WARREN LEX LLP
                                                                   2261 Market Street, No. 606
10                                                                 San Francisco, California, 94114
                                                                   +1 (415) 895-2940
11                                                                 +1 (415) 895-2964 facsimile
                                                                   19-7651@cases.warrenlex.com
12
                                                                   *Attorneys for High Tech Inventors Alliance and*
13                                                                 *Computer & Communications Industry Association*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28