1  IRELL & MANELLA LLP
   Morgan Chu (SBN 70446)
2  Benjamin W. Hattenbach (SBN 186455)
   A. Matthew Ashley (SBN 198235)
3  Michael D. Harbour (SBN 298185)
   Olivia Weber (SBN 319918)
4  1800 Avenue of the Stars, Suite 900
   Los Angeles, California 90067-4276
5  Telephone:   (310) 277-1010
   Facsimile:   (310) 203-7199
6  Email: mchu@irell.com
   Email: bhattenbach@irell.com
7  Email: mashley@irell.com
   Email: mharbour@irell.com
8  Email: oweber@irell.com
   *Counsel for Defendants*
9  FORTRESS INVESTMENT GROUP LLC,
   FORTRESS CREDIT CO. LLC,
10 VLSI TECHNOLOGY LLC

11 PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
12 Martin Flumenbaum (*pro hac vice*)
   1285 Avenue of the Americas
13 New York, NY 10019-6064
   Telephone:   (212) 373-3191
14 Facsimile:   (212) 492-0191
   Email:  mflumenbaum@paulweiss.com
15 *Counsel for Defendants*
   FORTRESS INVESTMENT GROUP LLC,
16 FORTRESS CREDIT CO. LLC

17 Additional counsel listed on signature page

18                **UNITED STATES DISTRICT COURT**

19              **NORTHERN DISTRICT OF CALIFORNIA**

20 INTEL CORPORATION and APPLE INC.,        | Case No. 3:19-cv-07651-EMC

21              Plaintiffs,

22       v.                                  | **DEFENDANTS' JOINT REPLY**
                                             | **MEMORANDUM IN SUPPORT OF**
23 FORTRESS INVESTMENT GROUP LLC,           | **JOINT MOTION TO DISMISS AND TO**
   FORTRESS CREDIT CO. LLC, UNILOC          | **STRIKE PLAINTIFFS' COMPLAINT**
24 2017 LLC, UNILOC USA, INC., UNILOC
   LUXEMBOURG S.A.R.L., VLSI                 | Hon. Edward M. Chen
25 TECHNOLOGY LLC, INVT SPE LLC,
   INVENTERGY GLOBAL, INC., DSS             | Date:    June 18, 2020
26 TECHNOLOGY MANAGEMENT, INC., IXI         | Time:    1:30 p.m.
   IP, LLC, and SEVEN NETWORKS, LLC,        | Dept.:   Courtroom 5
27
              Defendants.
28

10823600

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    PLAINTIFFS FAIL TO PLEAD A RELEVANT MARKET OR MARKET
       POWER ..................................................................................................................3

       A.     Plaintiffs Fail To Allege Market Power In The "Electronics Patents
              Market" ......................................................................................................3

              1.     Plaintiffs Fail To Allege Any "Direct Evidence" Of Market
                     Power ..............................................................................................3

              2.     Plaintiffs Fail To Offer Sufficient Market Analysis ......................6

              3.     Plaintiffs Cannot Save Their Proposed "Electronics Patents
                     Market" ...........................................................................................8

       B.     Apple's Proposed "Input Technology Markets" Fail .................................9

III.   PLAINTIFFS FAIL TO PLEAD ANTITRUST INJURY ..................................10

IV.    *NOERR-PENNINGTON* BARS PLAINTIFFS' CLAIMS .................................15

V.     PLAINTIFFS FAIL TO ALLEGE AN UNLAWFUL AGREEMENT ............19

       A.     Plaintiffs Have Not Pleaded Evidentiary Facts Of A Conspiracy ..........19

       B.     Pleading Ordinary Financial Agreements Does Not State A Section
              1 Claim ....................................................................................................21

VI.    PLAINTIFFS FAIL TO STATE A CLAYTON ACT SECTION 7 CLAIM .....22

VII.   THE COMPLAINT SHOULD BE STRICKEN UNDER THE ANTI-
       SLAPP LAW .......................................................................................................25

       A.     Plaintiffs' Claims "Arise From" Protected Activity ...............................25

       B.     Plaintiffs Have Not Demonstrated A Reasonable Likelihood Of
              Success ....................................................................................................26

VIII.  CONCLUSION ....................................................................................................28

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*49er Chevrolet, Inc. v. General Motors Corp.*,
 803 F.2d 1463 (9th Cir. 1986).................................................................................19, 20

5

6

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
 141 F.3d 947 (9th Cir. 1998)...........................................................................................21

7

8

*In re Aggrenox Antitrust Litig.*,
 94 F. Supp. 3d 224 (D. Conn. 2015) ................................................................................7

9

*Am. Ad Mgmt. v. Gen. Tel. Co. of Calif.*,
 190 F.3d 1051 (9th Cir. 1999).........................................................................................11

10

11

*Analogix Semiconductor, Inc. v. Silicon Image, Inc.*,
 No. C 08-2917-JF, 2008 WL 8096149 (N.D. Cal. Oct. 28, 2008).....................................7

12

13

*Anderson News, LLC v. American Media, Inc.*,
 680 F.3d 162 (2d Cir. 2012).............................................................................................21

14

*In re Apple iPhone Antitrust Litig.*,
 No. 11-CV-06714-YGR, 2013 WL 4425720 (N.D. Cal. Aug. 15, 2013)................................17

15

16

*Apple, Inc. v. Motorola Mobility, Inc.*,
 886 F. Supp. 2d 1061 (W.D. Wis. 2012).........................................................................18

17

18

*Apple, Inc. v. Motorola Mobility, Inc.*,
 No. 11-CV-178-BBC, 2011 WL 7324582 (W.D. Wis. June 7, 2011) .......................................15

19

*Apple, Inc. v. Samsung Elecs. Co.*,
 No. 11-cv-01846-LHK, 2012 WL 2571719 (N.D. Cal. June 30, 2012) ....................................12

20

21

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ..........................................................................................................4

22

*Aventis Pharma S.A. v. Amphastar Pharm. Inc.*,
 No. 5:03-00887-MRP-PLA, 2009 WL 8727693, at *16 (C.D. Cal. Feb. 17,
 2009)...................................................................................................................................12

23

24

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ..........................................................................................................3

25

26

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
 142 F. Supp. 2d 296 (E.D.N.Y. 2001), *aff'd*, 35 F. App'x 29 (2d Cir. 2002)....................13, 14

27

28

*Bhan v. NME Hospitals, Inc.*,
　929 F.2d 1404 (9th Cir. 1991) ..................................................................................................6

*Braman v. The CME Grp., Inc.*,
　149 F. Supp. 3d 874 (N.D. Ill. 2015) ......................................................................................4

*Brown Shoe Co. v. U.S.*,
　370 U.S. 294 (1962) ..........................................................................................................22, 23

*Bubar v. Ampco Foods, Inc.*,
　752 F.2d 445 (9th Cir. 1985) ................................................................................................11

*Castro v. Sanofi Pasteur Inc.*,
　No. CV 11-7178, 2012 WL 12516573 (D.N.J. Dec. 20, 2012) ...................................4

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
　738 F. Supp. 2d 1011 (N.D. Cal. 2010) ................................................................................7

*Church & Dwight Co. v. Mayer Labs., Inc.*,
　868 F. Supp. 2d 876 (N.D. Cal. 2012)
　*reconsidered in part on other grounds*, 2012 WL 1745592 (N.D. Cal. May 16,
　2012)..........................................................................................................................................5

*City of San Jose v. Office of Comm'r of Baseball*,
　No. C-13-02787 RMW, 2013 WL 5609346 (N.D. Cal. Oct. 11, 2013)....................14

*Clipper Exxpress v. Rocky Mountain Motor*,
　690 F.2d 1240 (9th Cir. 1982)........................................................................................17, 18

*Club Members v. Sierra Club*,
　45 Cal. 4th 309 (2008)............................................................................................................26

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
　611 F.3d 495 (9th Cir. 2010) ................................................................................................19

*E. I. du Pont de Nemours & Co. v. Berkley & Co.*,
　620 F.2d 1247 (8th Cir. 1980) ...............................................................................................6

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
　504 U.S. 451 (1992) ................................................................................................................22

*Equifax, Inc. v. FTC*,
　618 F.2d 63 (9th Cir. 1980) ..................................................................................................23

*Feitelson v. Google Inc.*,
　80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...............................................................................15

*Flanigan v. San Francisco Police Dep't*,
　No. 16-CV-00066-LB, 2016 WL 737859 (N.D. Cal. Feb. 25, 2016) ................25, 27

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986) .................................................................................................6

*Funai Elec. Co. v. LSI Corp.*,
    No. 16-CV-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) ...................19

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) ......................................................12, 17, 19

*Intel Corp. v. Fortress Inv. Grp. LLC et al.*,
    No. 5:19-CV-06856-EJD (N.D. Cal. Oct. 21, 2019)...............................................24

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    280 F. Supp 3d 691 (D. Md. 2017)
    *aff'd*, 937 F. 3d 1359 (Fed. Cir. 2019) ...................................................................18

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    99 F. Supp. 3d 610 (D. Md. 2015) ............................................................8, 9, 14, 24

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    No. 1:13-CV-740, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) .........................4, 13

*Jones v. Micron Tech. Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019) ...................................................................11

*Kane v. Delong*,
    No. C-12-5437 EMC, 2013 WL 1149801 (N.D. Cal. Mar. 19, 2013) ................26, 27

*Kearney v. Foley & Lardner, LLP*,
    590 F.3d 638 (9th Cir. 2009)...................................................................................25

*Kendall v. Visa USA Inc.*,
    518 F.3d 1042 (9th Cir. 2008)..................................................................................19

*Korea Kumho v. Flexsys Am.*,
    No. C07-01057 MJJ, 2007 WL 2318906 (N.D. Cal. Aug. 13, 2007) .......................17

*In re Loestrin 24 Fe Antitrust Litig.*,
    261 F. Supp. 3d 307 (D.R.I. 2017)............................................................................7

*Malaney v. UAL Corp.*,
    No. C 10-02858 RS, 2011 WL 6845773 (N.D. Cal. Dec. 29, 2011), *aff'd*, 552 F.
    App'x 698 (9th Cir. 2014)........................................................................................23

*McCarty v. Grguric*,
    2006 WL 1328264 (E.D. Cal. May 16, 2006)
    *adopted by*, 2006 WL 1582322 (E.D. Cal. June 2, 2006) ........................................24

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015)..................................................................................22

*Meredith Corp. v. SESAC LLC*,
   2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) ...........................................................................8, 9

*Microsoft Mobile, Inc. v. InterDigital, Inc.*,
   No. 15-723-RGA, 2016 WL 1464545 (D. Del. Apr. 13, 2016) ................................................15

*In re Musical Instruments & Equipment Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015)..................................................................................................21

*Nero AG v. MPEG LA, LLC*,
   No. 10-CV-3672-MRP-RZ, 2010 WL 4366448 (C.D. Cal. Sept. 14, 2010) ............................14

*Newport Harbor Offices v. Morris Cerullo World Evangelism*,
   23 Cal. App. 5th 28, 48 (2018) ................................................................................................26

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
   305 F. Supp. 3d 1065 (N.D. Cal. 2018) ...................................................................................14

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ...............................................................................................................7

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014)..................................................................................................25

*Oltz v. St. Peter's Community Hospital*,
   861 F.2d 1440 (9th Cir. 1988)................................................................................................6, 7

*In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*,
   2019 WL 5386484 (W.D. Ky. Oct. 21, 2019).............................................................................7

*PNY Techs., Inc. v. SanDisk Corp.*,
   No. C-11-04689, 2012 WL 1380271 (N.D. Cal. Apr. 20, 2012) ................................................4

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
   No. 11-cv-2652, 2013 WL 3873074 (S.D. Cal. July 25, 2013), *aff'd*, 642 F.
   App'x 665 (9th Cir. 2016)......................................................................................................4, 11

*Rambus Inc. v. FTC*,
   522 F.3d 456 (D.C. Cir. 2008) ...................................................................................................9

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)......................................................................................................7

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004)......................................................................................................7

*Rickards v. Canine Eye Registration Found.*,
   783 F.2d 1329 (9th Cir. 1986)................................................................................................5, 6

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ................................................................................................25

*Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*,
   No. 09-CV-102 H WMC, 2010 WL 6675046 (S.D. Cal. Apr. 20, 2010) ..................................8

*Sheahan v. State Farm Gen. Ins. Co.*,
   394 F. Supp. 3d 997 (N.D. Cal. 2019) ...............................................................................14, 15

*Snyder v. Nationstar Mortg. LLC*,
   No. 15-CV-03049-JSC, 2015 WL 7075622 (N.D. Cal. Nov. 13, 2015) ..................................27

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) ............................................................................................10, 11

*Staley v. Gilead Scis., Inc.*,
   No. 19-cv-02573-EMC, 2020 WL 1032320 (N.D. Cal. Mar. 3, 2020) .....................8, 10, 12, 20

*Stewart v. Gogo, Inc.*,
   No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013) ........................................5

*Sumotext Corp. v. Zoove, Inc.*,
   No.16-cv-013720-BLF, 2020 WL 127671 (N.D. Cal. Jan. 10, 2020) .......................................7

*Synopsys, Inc. v. ATopTech, Inc.*,
   No. C 13-2965 MMC, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ........................................4

*TransWeb, LLC v. 3M Innovative Props. Co.*,
   812 F.3d 1295 (Fed. Cir. 2016) ...........................................................................................12

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965) ............................................................................................................17

*United States v. Singer*,
   374 U.S. 174 (1963) ............................................................................................................22

*Vizio, Inc. v. Funai Elec. Co.*,
   No. CV 09-0174 AHM RCX, 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010) .............7, 18, 22, 28

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   No. MDL 2672 CRB, 2019 WL 4581340 (N.D. Cal. Sept. 20, 2019) ................................16, 17

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ....................................................................................................7

*Wilson v. Cable News Network, Inc.*,
   7 Cal. 5th 871, 892 (2019) ..................................................................................................25

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ................................26

*Yokohama Rubber Co. v. S. China Tire & Rubber Co.*,
   No. CV 04-1866-GHK, 2004 WL 5569948 (C.D. Cal. Oct. 19, 2004) ...................................27

**Statutes**

15 U.S.C. § 18 ...........................................................................................................................24

Cal. Bus. & Prof. Code § 17204 ...............................................................................................26

**Other Authorities**

Phillip Areeda & Herbert Hovenkamp, Antitrust Law:  An Analysis of Antitrust
   Principles and Their Application (4th ed. 2019) ....................................................................6, 9

1  **I.      INTRODUCTION**

2           Plaintiffs' Opposition confirms that there are multiple independent reasons compelling the

3  Complaint's dismissal.  No matter how many times Plaintiffs repeat their story about a "scheme"

4  to "aggregate patents" and charge "supracompetitive" prices for patents covering virtually every

5  electronic device on the planet, that rhetoric cannot overcome the Complaint's numerous pleading

6  defects.  Indeed, Plaintiffs essentially concede that they have not defined a relevant market, that

7  they have not suffered antitrust injury, that Defendants' litigation is activity protected by *Noerr-*

8  *Pennington*, and that they have not alleged a conspiracy.  For the reasons explained below, each of

9  these concessions independently justifies dismissal of the Complaint; taken together, they

10 underscore that Plaintiffs have no prospect of ever prevailing on any of their unfounded claims.

11          <u>No Relevant Market</u>.  Plaintiffs essentially concede that their "Electronics Patents

12 Market"—composed of an unknown number of technologies covering a mind-boggling array of

13 products—is not a properly defined antitrust market.  There are two problems with Plaintiffs' fall-

14 back argument based on purported "direct evidence" of anticompetitive effects.  First, Plaintiffs do

15 not allege a cognizable market in which this Court could identify such effects.  Second, they do not

16 adequately allege any supracompetitive prices or a market-wide reduction in output.  Apple's

17 "Input Technology Markets" similarly fail because Apple does not identify any of the standard-

18 essential patents (SEPs) at issue or allege that these markets contained competing substitute

19 technologies eliminated by the standard-setting process.

20          <u>No Antitrust Injury</u>.  Plaintiffs concede that they never paid <u>any</u> price—much less a

21 supracompetitive price—for a license to any of the patents at issue, and therefore they do not plead

22 a cognizable antitrust injury.  Plaintiffs' litigation costs and purported concerns about "having to

23 pay" future licensing fees also do not constitute antitrust injury because those supposed injuries do

24 not flow from any alleged conduct that eliminated or reduced competition, but instead flow only

25 from the patent system itself.

26          *Noerr-Pennington*.  Plaintiffs concede that Defendants' litigation is not an objectively

27 baseless "sham."  And while Plaintiffs assert that this litigation was part of a broader

28 anticompetitive "scheme," they do not allege—as they must—any non-litigation conduct that

1   constitutes an independent antitrust violation.  The *Noerr-Pennington* doctrine therefore bars

2   Plaintiffs' claims challenging Defendants' constitutionally-protected litigation activity.

3          <u>No Unlawful Agreement</u>.  Plaintiffs concede that they have not alleged a conspiracy

4   among <u>all</u> Defendants, and the Complaint proffers no facts plausibly suggesting that any two

5   Defendants reached an unlawful agreement to restrain trade in any way.  Plaintiffs can point only

6   to everyday commercial contracts between some Defendants, allegations insufficient to plead an

7   unlawful agreement in restraint of trade.

8          <u>No Section 7 Claim</u>.  As noted, Plaintiffs essentially concede that they have not alleged a

9   proper antitrust market composed of competing substitute technologies, and that alone dooms their

10  claim under Section 7 of the Clayton Act.  Plaintiffs also do not offer a plausible account of how

11  Defendants' alleged "aggregation" of substitute technologies (not one of which is ever identified)

12  reduced competition in any market.  Moreover, many of the Section 7 allegations are untimely

13  because they challenge patent acquisitions that took place over four years ago.

14         <u>No Section 17200 Claim</u>.  Plaintiffs' Section 17200 claims should be stricken under the

15  Anti-SLAPP statute or, alternatively, dismissed under Rule 12(b)(6).  These claims attack

16  Defendants' petitioning activity.  There is no reasonable likelihood of success because:  these

17  claims fall within California's statutory litigation privilege; Plaintiffs do not plead a remedy

18  available under Section 17200; and Plaintiffs' allegation that patent transfers somehow "evaded"

19  the original owners' FRAND obligations is insufficient to state a claim.

20         Throughout their Opposition, Plaintiffs tout their "50-page Complaint" as if length alone

21  were sufficient to state a claim.  It is not, and Plaintiffs—despite their story-telling—fail to plead

22  the factual content necessary to save their claims from dismissal.  At the end of the day, Plaintiffs'

23  real complaint is with having to defend patent infringement claims because, in Plaintiffs' view, the

24  asserted patents are "weak" or otherwise lack merit.  But that is a complaint with the

25  constitutionally-protected patent system, which already provides multiple avenues for challenging

26  patents that purportedly lack merit.  Despite their efforts, Plaintiffs cannot transform their

27  unhappiness with having to defend patent infringement claims into a treble-damages lawsuit under

28  the antitrust and unfair competition laws.  Their Complaint should be dismissed.

1  **II.      PLAINTIFFS FAIL TO PLEAD A RELEVANT MARKET OR MARKET POWER**

2          Plaintiffs' Opposition essentially concedes that they have not adequately defined their

3  proposed "Electronics Patents Market."  They do not contest that their proposed market is both

4  vague and overly broad.  They do not contest that the alleged market includes patented

5  technologies for thousands of products—from microprocessors and semiconductors, to

6  microwaves and clock radios, to commercial photocopiers and cash registers.  Nor do Plaintiffs

7  dispute that their proposed market encompasses countless patents that are not economic

8  substitutes.  Instead, Plaintiffs argue that they are excused from defining a market because they

9  claim to have alleged "direct evidence of market power."  Opp. at 2.  But conclusory allegations of

10  market power (no matter how many times repeated) do not constitute "direct evidence" for

11  pleading purposes.  Even if they did, courts agree that plaintiffs who attempt to rely on direct

12  evidence of market power must still provide market analysis sufficient to identify the market in

13  which the anticompetitive effects allegedly occurred.  Vague and overly broad markets like those

14  Plaintiffs allege here are insufficient even under a "direct evidence" theory.  Finally, Apple's

15  proposed "Input Technology Markets" also fail because Apple does not identify even one SEP or

16  any substitute patents or technologies that have been eliminated through the alleged conduct.

17          **A.      Plaintiffs Fail To Allege Market Power In The "Electronics Patents Market"**

18                  **1.      Plaintiffs Fail To Allege Any "Direct Evidence" Of Market Power**

19          Despite the Opposition's rhetoric, Plaintiffs have not actually alleged any direct evidence

20  that plausibly demonstrates market power.  To be sure, Plaintiffs proclaim repeatedly that

21  Defendants "have market power" and the ability to charge "supracompetitive royalties" and

22  "restrict output," *e.g.*, Opp. at 16, but these assertions are mere "labels and conclusions" and

23  amount to nothing more than a "formulaic recitation" of the generic indicia of market power.  *Bell*

24  *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* DOJ Stmt. at 13 ("Merely asserting that

25  the challenged conduct 'reduced competition' and 'increased prices' in the absence of []

26  supporting factual allegations are akin to inadequate 'naked assertions devoid of further factual

27  enhancement' under *Iqbal*.").  The cited allegations from the Complaint are all to the same effect,

28  and not a single one of them actually provides any concrete basis to support Plaintiffs' conclusory

allegations.  *See* Opp. at 16-19 (citing Cmplt. ¶¶ 9-11, 30, 35-42, 44-46, 48-50, 159-64, 167, 169-70, 176, 181, 185, 191).[1]  For example, not one of those paragraphs identifies any patents, alleges any price that any Defendant has sought from Plaintiffs or anyone else for a license, or alleges any price that Plaintiffs or anyone else has ever paid (or offered to pay) to any Defendant for a license.  And not one of those paragraphs alleges what a <u>competitive</u> price for a license would be, which is required to plausibly allege that another price is "supracompetitive" in comparison.[2]  *See Synopsys, Inc. v. ATopTech, Inc.*, No. C 13-2965 MMC, 2015 WL 4719048, at *6 (N.D. Cal. Aug. 7, 2015) (dismissing Section 7 claim despite allegations of "increased prices for consumers" for lack of "any facts showing the state of the market before the challenged acquisitions").

Even if one could characterize some of the allegations as providing "factual content" (to be clear, one cannot), those facts would not come close to making it plausible—as opposed to merely possible—that Defendants have market power and are using it to raise prices in the "Electronics Patents Market."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Given the massive scope of this supposed "market"—one in which Plaintiffs own many times more patents than Defendants do and even Plaintiffs own only a fraction of the overall number of patents—it would be an understatement to say that it is implausible that Defendants have market power in this market.[3]

In the end, none of this is surprising.  Plaintiffs concede that neither of them has ever actually purchased a license from Defendants for the patents at issue.  *See* Opp. at 26.  Plaintiffs

---

[1] Courts routinely dismiss antitrust claims where plaintiffs try to avoid defining a relevant market based on conclusory allegations of "direct evidence."  *See, e.g., Braman v. The CME Grp., Inc.*, 149 F. Supp. 3d 874, 896 (N.D. Ill. 2015); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13-CV-740, 2013 WL 6682981, at *6 (E.D. Va. Dec. 18, 2013); *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-2652, 2013 WL 3873074, at *15 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x 665 (9th Cir. 2016); *Castro v. Sanofi Pasteur Inc.*, No. CV 11-7178, 2012 WL 12516573, at *8–9 (D.N.J. Dec. 20, 2012); *PNY Techs., Inc. v. SanDisk Corp.*, No. C-11-04689, 2012 WL 1380271, at *8 (N.D. Cal. Apr. 20, 2012).

[2] An illustrative example is Plaintiffs' allegation that "the Uniloc Defendants have been able to coerce several parties (including Amazon.com, Inc. and Huawei Device Co. Ltd.) to license its [sic] patents, even though its [sic] patents have repeatedly been shown to lack merit" (Cmplt. ¶ 160)—Plaintiffs do not identify any of the patents, the price Amazon and Huawei agreed to pay, or what a competitive price for those purportedly weak patents would have been.

[3] As Defendants pointed out in their opening brief, while they allegedly own "well over a thousand" (Cmplt. ¶ 30) patents, public records show that Plaintiffs themselves own tens of thousands of patents, and their proposed market contains hundreds of thousands, if not millions, of patents.  Mot. at 7 n.3, 16 n.7.  Plaintiffs do not dispute these numbers.

themselves therefore cannot claim to have paid <u>any</u> price for licenses to these patents—much less

a "supracompetitive" price.  *See infra* at 10-11.  And while Plaintiffs may contend Defendants

have demanded higher royalties than Plaintiffs are willing to pay, this Court has previously

rejected that as inadequate because "high prices are not equivalent to <u>supracompetitive</u> prices."

*Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 897 (N.D. Cal. 2012) (emphasis

added), *reconsidered in part on other grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012).

Moreover, Defendants' infringement suits place the determination of appropriate licensing fees in

the hands of the district courts.  Any damages awarded in these cases would by definition not be

"supracompetitive," despite Plaintiffs' allegations that courts might "improperly" find Defendants'

patents "infringed, valid, and enforceable."  Cmplt. ¶¶ 9, 39.

Even if Plaintiffs had adequately alleged supracompetitive prices (they have not), their

effort to allege direct evidence of market power nonetheless fails because they do not plausibly

allege any restriction in output.  *See Stewart v. Gogo, Inc.*, No. C-12-5164 EMC, 2013 WL

1501484, at *4 n.3 (N.D. Cal. Apr. 10, 2013).  To plausibly allege reductions in output across a

market as overbroad and unwieldy as their "Electronics Patents Market," Plaintiffs must provide

factual content suggesting that has indeed occurred.  Instead, both the Opposition and Complaint

rely on conclusory rhetoric about Defendants' purported ability to "restrict output" without any

factual basis to support those allegations.  While Plaintiffs baldly assert that there was more

licensing activity before Defendants' alleged patent "aggregation" and that "Plaintiffs' and other

suppliers' output" decreased as a result, *see, e.g.*, Opp. at 17-19, the Complaint provides no factual

basis for these allegations either.  Not one of Plaintiffs' cited paragraphs (Cmplt. ¶¶ 9-11, 30, 35-

42, 44-46, 48-50, 159-64, 167, 169-70, 176, 181, 185, 191) identifies any patents as to which

licensing activity was reduced, or specifies any of Plaintiffs' or other suppliers' products as to

which output was reduced.  And not one of those paragraphs alleges what licensing activity or

product output levels were <u>before</u> Defendants' alleged "aggregation" activity, which would be a

necessary predicate to alleging that output was actually restricted afterward by comparison.[4]

---

[4] Plaintiffs' unsupported allegations about Defendants' purported anticompetitive intent are
irrelevant.  Opp. at 20 (citing Cmplt. ¶¶ 10, 48-49).  "[M]ere expression of anticompetitive intent
is insufficient to establish a section 1 claim," *Rickards v. Canine Eye Registration Found.*, 783

**2.      Plaintiffs Fail To Offer Sufficient Market Analysis**

Contrary to Plaintiffs' assertions, even under their "direct evidence" theory, they must

supply an adequate analysis of the relevant market.  Plaintiffs place heavy reliance on *FTC v.*

*Indiana Federation of Dentists*, 476 U.S. 447 (1986), but in that case, the FTC defined markets for

dental services and insurance with great geographic specificity.  *Id.* at 461.  Further, the alleged

anticompetitive restraint—a Federation rule prohibiting dentists from submitting x-rays to

insurers—produced easily observable effects, since insurers were "actually unable to obtain

compliance with their requests for submission of x rays."  *Id.* at 460.  After a trial on the merits,

the Court reviewed the FTC's decision and concluded there was no need for an "elaborate market

analysis."  *Id.* at 461 (emphasis added).  Notably, the Supreme Court did not say that there was no

need for any market analysis whatsoever—indeed, that would make no sense:  it would be

impossible to observe anticompetitive effects in the absence of some market analysis.  One of the

cases Plaintiffs themselves cite, *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404 (9th Cir. 1991),

demonstrates this point.  In that case, the court rejected the plaintiff's direct-evidence theory

because he could only show an "anticompetitive effect" on himself—not the entire market.  *Id.* at

1414.  And *Bhan* explained that, even where such a theory is made out, it merely means a "lesser"

market analysis is acceptable—not that market analysis can be avoided entirely.  *Id.* at 1413.

Accordingly, *Bhan* "cannot be understood to mean that a reduction in the collective output of the

[defendants] is sufficient; rather . . . sufficient market analysis must be performed to indicate that

the relevant output reduction is marketwide."  Phillip Areeda & Herbert Hovenkamp, Antitrust

Law:  An Analysis of Antitrust Principles and Their Application (4th ed. 2019) ¶ 1914b

(hereinafter "Areeda & Hovenkamp") (emphasis added).  Plaintiffs also cite *Oltz v. St. Peter's*

*Community Hospital*, 861 F.2d 1440 (9th Cir. 1988), but in that case, the plaintiffs actually did

propose a very specific market— for anesthesia services in Helena, Montana—and it was only

because the jury found "actual detrimental effects on competition among anesthesia service

---

F.2d 1329, 1332 (9th Cir. 1986), especially in the patent context where "every good faith effort to
enforce a patent involves a legitimate anticompetitive intent," *E. I. du Pont de Nemours & Co. v.*
*Berkley & Co.*, 620 F.2d 1247, 1273 (8th Cir. 1980).

DEFENDANTS' JOINT REPLY ISO MOTION TO DISMISS
AND TO STRIKE PLAINTIFFS' COMPLAINT
Case No. 3:19-cv-07651-EMC

1  providers in that area" that there was no need to "pinpoint precisely the relevant market through

2  detailed market analysis." *Id.* at 1448 (emphasis added). Finally, Plaintiffs' argument finds no

3  support in *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), which mentioned the

4  "direct-evidence" method in passing without applying it at all, *see id.* at 1434.[5]

5       Thus, even if resting their case on supposed "direct proof of market effects" (Opp. at 16),

6  Plaintiffs must adequately allege market-wide effects on prices and output, and that is possible

7  only if there is a market within which those effects can plausibly be observed. *See Republic*

8  *Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (explaining that this method

9  does not allow "an antitrust plaintiff to dispense entirely with market definition," but is available

10  only once plaintiff has shown both the "rough contours of a relevant market" and "that the

11  defendant commands a substantial share of the market"); *Sumotext Corp. v. Zoove, Inc.*, No.16-cv-

12  013720-BLF, 2020 WL 127671, at *7 (N.D. Cal. Jan. 10, 2020) ("[I]t appears that 'an accurate

13  definition of the relevant market' is required even where the plaintiff relies on direct evidence, at

14  least in the context of a Section 1 claim." (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285

15  & n.7 (2018))); *Analogix Semiconductor, Inc. v. Silicon Image, Inc.*, No. C 08-2917-JF, 2008 WL

16  8096149, at *6 (N.D. Cal. Oct. 28, 2008) (allegation that defendant could "boost" prices was

17  insufficient "because of the vagueness of the market to which they apply") (granting dismissal).[6]

18       Plaintiffs do not provide any analysis of their proposed "Electronics Patents Market,"

19  much less sufficient analysis indicating a market-wide increase in price or reduction in output. As

20  Defendants have explained, the "Electronics Patents Market" includes an unknown (but

21

22       [5] This Court should reject Plaintiffs' invitation to rely on dictum from *In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*, 2019 WL 5386484 (W.D. Ky. Oct. 21, 2019). That case

23  involved a no-poaching agreement that was unlawful *per se*, meaning the plaintiffs were not required to plead a relevant market or market power. *Id.* at *8-9.

24       [6] The other cases Plaintiffs cite are not to the contrary: each involved a proposed market that was sufficiently well defined to permit plausible observation of anticompetitive effects. *See*

25  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) (markets were for "specialized hospital services" and "health insurance" in Allegheny County); *In re Loestrin 24 Fe*

26  *Antitrust Litig.*, 261 F. Supp. 3d 307, 327 (D.R.I. 2017) (market consisted of a single drug); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246 (D. Conn. 2015) (same); *Vizio, Inc. v. Funai*

27  *Elec. Co.*, No. CV 09-0174 AHM RCX, 2010 WL 7762624, at *7 (C.D. Cal. Feb. 3, 2010) (court found properly-defined market alleged to encompass all economic substitutes). Plaintiffs also

28  repeatedly cite *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010), an inapposite case that does not discuss the direct-evidence theory at all.

1    indisputably massive) number of patents for technologies covering a bewildering array of

2    products, ranging from clock radios to commercial databases to online shopping.  Mot. at 10-14.

3    Given the extraordinary size of the purported market, Plaintiffs make no effort to allege the prices

4    and output levels for "electronics patents" under competitive conditions, or how Defendants'

5    conduct caused a market-wide increase in price or reduction in output of all "electronics patents."

6    In the absence of even the most rudimentary market analysis, Plaintiffs cannot claim to have

7    plausibly alleged market power via "direct evidence."  *See* DOJ Stmt. at 12 ("Without establishing

8    the aggregation of substitute products or some other reduction in previously existing competition,

9    a plaintiff cannot show an 'unreasonable restraint' . . . merely by alleging a price increase."); *id.* at

10   6 n.5 (for that reason, "Plaintiffs do not adequately allege direct evidence of anticompetitive

11   effects flowing from the challenged restraint" (quotation marks omitted)).

12                **3.      Plaintiffs Cannot Save Their Proposed "Electronics Patents Market"**

13              As noted, Plaintiffs devote the bulk of their Opposition to arguing that they need not define

14   an antitrust market, essentially conceding that their "Electronics Patents Market" is not properly

15   defined according to the well-established approach to market definition.  And rightly so.  As the

16   DOJ correctly explained, a "market this broad—one that includes virtually any patent related to

17   any aspect of technology without regard for whether the patented technologies are substitutes,

18   complements, or even related to one another—undermines the entire concept of a market."  DOJ

19   Stmt. at 9 (quotation marks omitted); *see also Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC,

20   2020 WL 1032320, at *29 & n.31 (N.D. Cal. Mar. 3, 2020) (rejecting market definition where it

21   was "not clear from the [complaint] what exactly the . . . market is" and plaintiffs did not explain

22   "how there is reasonable interchangeability of use").  In defense of their market, Plaintiffs provide

23   one paragraph arguing that an antitrust market need not be "limited to substitute products."  Opp.

24   at 21.  This is incorrect.  *See, e.g.*, *Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*, No. 09-

25   CV-102 H WMC, 2010 WL 6675046, at *3 (S.D. Cal. Apr. 20, 2010) (market not viable because

26   it included "products that are not economic substitutes for the products at issue").  Regardless,

27   Plaintiffs rely on cases addressing a different issue:  *Intellectual Ventures I LLC v. Capital One*

28   *Fin. Corp.*, 99 F. Supp. 3d 610, 625 (D. Md. 2015), and *Meredith Corp. v. SESAC LLC*, 2011 WL

856266, at *9 (S.D.N.Y. Mar. 9, 2011).  In each case, the market was defined by the defendant's intellectual property portfolio:  the question was thus whether each proposed market, being <u>limited</u> to property in the hands of the defendant, was too <u>narrow</u>.  *See Intellectual Ventures*, 99 F. Supp. 3d at 620–21; *SESAC*, 2011 WL 856266, at *9.  But the question presented here is the opposite: whether Plaintiffs' proposed market is too <u>broad</u>.  The answer to that question is obvious, which is why Plaintiffs never attempt to identify what substitute technologies compete with Defendants' patents in the market for "high-tech consumer and enterprise electronics devices and components or software therein."[7]  Opp. at 21.  And as noted, Plaintiffs provide no facts plausibly suggesting that Defendants have market power in such a facially overbroad market.

**B.     Apple's Proposed "Input Technology Markets" Fail**

Apple's proposed "Input Technology Markets," which Plaintiffs do not dispute are only relevant to Apple's UCL claim (Count 4), *compare* Mot. at 16-17 *with* Opp. at 21-25, fail for several independent reasons.  First, Apple fails to identify any SEPs that Defendants own.  Absent those facts, it is impossible to define these purported markets or to identify any market-wide effects.  *See* Areeda & Hovenkamp ¶ 1914b.  Second, Apple fails to identify any substitute technologies that were considered and rejected by the SSO before standardization.  This allegation is critical because for an SEP to have antitrust significance, there must be an exclusion of substitute technologies by the SSO.  If no such technologies were actually excluded, the process had no effect on competition, and the SEP's "market power" (if any) would flow only from the <u>lawful</u> power conferred by the patent laws.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 466-67 (D.C. Cir. 2008).  Third, Apple does not allege that Defendants actually control any SEP, only that Defendants "claim" to do so.  This allegation cannot establish market power.  Mot. at 16-18.

Rather than address these basic flaws, Apple asserts that Defendants cited inapposite cases based on "standard-setting misconduct" rather than "subsequent, post-standard setting efforts to evade FRAND commitments."  Opp. at 22.  Apple cites no authority for its position that antitrust claims (like Apple's) that merely allege "subsequent, post-standard setting efforts to evade

---

[7] Plaintiffs' suggestion that Defendants <u>must</u> have acquired control over substitutes merely because of the portfolios' size is speculation and cannot substitute for proper market definition.

1  FRAND commitments" are held to a lower pleading standard for market definition and market

2  power than claims alleging "standard-setting misconduct."  *Id.*  Regardless of how Apple tries to

3  frame its theory, it must allege a plausible antitrust market and market power.  The "Input

4  Technology Markets" Apple proffers do not pass that test.  Indeed, in every case Apple cites, the

5  plaintiffs did what Apple fails to do here:  define the substitute technologies composing the

6  alleged market with some specificity.  If anything, Apple's cases show that "Input Technology

7  Markets" are only cognizable when they are defined by reference to the SEPs, standards, and

8  substitute technologies displaced during the standard-setting process.  *Id.* at 24.  Apple fails to do

9  that, and falls back on the conclusory allegation that "[t]he functionality for cellular standards

10  associated with each input technology comprises its own relevant market for antitrust purposes."

11  Cmplt. ¶ 146.  That is inadequate to define an antitrust market or plead market power.

12  **III.    PLAINTIFFS FAIL TO PLEAD ANTITRUST INJURY**

13        Plaintiffs' Opposition demonstrates that Plaintiffs have not suffered any antitrust injury,

14  which is fatal to their claims.  "[A]ntitrust injury consists of four elements:  '(1) unlawful conduct,

15  (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful,

16  and (4) that is of the type the antitrust laws were intended to prevent.'"  *Gilead Sciences*, 2020 WL

17  1032320, at *22 (quoting *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013)).  Plaintiffs do

18  not dispute that they are not Defendants' competitors.  Plaintiffs also admit that they never

19  purchased a license from Defendants for any of the patents at issue, Opp. at 26, meaning that they

20  are not "consumers" either.  Nor do any of Plaintiffs' other purported "injuries"—*i.e.*, the mere

21  possibility that they may decide to pay a purportedly inflated license fee in the future, and the

22  payment of litigation costs in lawsuits stemming from Defendants' lawful exercise of their patent

23  rights—flow from any alleged harm to competition.

24        Plaintiffs Are Not Consumers.  Plaintiffs' failure to plead that they are "consumers" dooms

25  their claim to have suffered an antitrust injury.  Although Plaintiffs argue they suffered an antitrust

26  injury because "Defendants' conduct increases the prices that Plaintiffs and other product

27  suppliers—consumers in the Electronics Patents Market and Input Technology Markets—must

28  pay for licenses to supracompetitive levels," Opp. at 25 (emphasis added), that statement is

affirmatively misleading.  The Complaint does not allege that Plaintiffs purchased a single license from Defendants for any of the patents at issue, let alone at a supracompetitive price.  Indeed, Plaintiffs concede "they <u>have yet to pay</u> supracompetitive royalties" to Defendants.  *Id.* at 26 (emphasis added).  This failure to proffer a single factual allegation that Plaintiffs suffered an antitrust injury warrants dismissal of their claims.  *See Somers*, 729 F.3d at 963 (antitrust injury requires "the injured party be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." (quotation marks omitted)).

Plaintiffs cannot overcome this fatal pleading deficiency by arguing that their vague allegations about harm to unidentified "consumers" are somehow sufficient to establish antitrust injury to Plaintiffs.  Opp. at 25.  As a threshold matter, the ten paragraphs of the Complaint cited in support of these assertions do not contain a single non-conclusory allegation that <u>any entity</u>— much less Plaintiffs—actually paid supracompetitive rates or reduced output.  *See* Cmplt. ¶¶ 9, 10, 39, 41, 48-50, 160, 164, 168.  Such conclusory allegations fail as a matter of law to support antitrust injury.  *See Prime Healthcare*, 2013 WL 3873074, at *13.  In any event, allegations of harm to <u>non-parties</u> cannot show antitrust injury to Plaintiffs themselves.  The "determination of antitrust standing requires an evaluation of the <u>plaintiff's harm</u>, the alleged wrongdoing by the defendant, and the relationship between them."  *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448-49 (9th Cir. 1985) (emphasis added); *see also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 911 (N.D. Cal. 2019) ("To show that an injury is the type of injury antitrust laws were intended to prevent, a plaintiff must also show that <u>his</u> injury occurred 'in the market where competition is being restrained.'" (quoting *Am. Ad Mgmt. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) (emphasis added)).  Plaintiffs plead no such relationship.[8]

<u>Plaintiffs' Litigation Costs Are Not Antitrust Injury</u>.  Plaintiffs also cannot rely on costs they have incurred in defending patent litigation to plead an antitrust injury.  Opp. at 27.  Such

---

[8] Plaintiffs' argument that they have pleaded injury to competition from "aggregat[ion of] substitute patents," Opp. at 25, also fails.  As explained below, Plaintiffs have not actually alleged aggregation of "substitute patents."  *See infra* at 13-14.  That purported "aggregation" of unspecified patents is the false premise underlying all of Plaintiffs' alleged harms to competition.

expenses constitute antitrust injury only if the defendant is an "actual competitor or ready to be a competitor."  Mot. at 23 (citing *Aventis Pharma S.A. v. Amphastar Pharm. Inc.*, No. 5:03-00887-MRP-PLA, 2009 WL 8727693, at *16 (C.D. Cal. Feb. 17, 2009)).  Plaintiffs' cited cases demonstrate precisely this point, as they address claims brought by actual competitors.  *See Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846-LHK, 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012) (claim by competing cellphone manufacturer); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (claim by competing developer of DRAM interface technology); *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1310 (Fed. Cir. 2016) (claim by competing manufacturers of filters).  By contrast, Plaintiffs do not allege that they are Defendants' competitors, nor do they allege that Defendants' litigation has driven other competitors out of the Electronics Patents Market.  Mot. at 24.

*Apple*, *Hynix*, and *TransWeb* are also distinguishable for a second, independent reason.  All three cases involved allegations that a patent holder (i) obtained a patent or secured its inclusion in a standard through intentional nondisclosure or other fraudulent conduct that excluded competition in violation of Section 2 of the Sherman Act, and (ii) then sought to extract monopoly rents by enforcing the patent through litigation.  In *Apple*, Samsung failed to disclose essential patents to the European Telecommunication Standards Institute, which "caused inclusion of Samsung's patented technology in [a standard] with anticompetitive effects," and then brought infringement counterclaims to enforce those patents.  *See Apple*, 2012 WL 2571719, at *26-27.  Similarly, in *Hynix*, Rambus failed to disclose its patents to an SSO that was setting a computer memory standard, and then it began a litigation campaign to extract royalties.  *Hynix*, 527 F. Supp. 2d at 1088-89, 1097-98.  Finally, in *TransWeb*, the defendant fraudulently obtained a patent, and then it sought to enforce its monopoly through litigation.  *TransWeb*, 812 F.3d at 1309-10.  Crucially, in each case, the defendant <u>caused</u> the exclusion of competition when it wrongfully obtained its patent or secured the inclusion of its patents in a standard, and then it sought to profit from that conduct by enforcing its patent rights in litigation.  The plaintiff's antitrust injury in each case flowed from the wrongful *ex ante* SSO or patent office exclusionary conduct (*i.e.*, the elimination of competition "which makes the conduct unlawful," *Gilead Sciences*, 2020 WL 1032320, at *22),

1   and litigation was the direct means by which the patent holder sought to enforce its ill-gotten

2   patent monopoly.  Here, by contrast, Plaintiffs do not allege that any of the (unidentified) patents

3   at issue was obtained through fraud or that any of the (unidentified) SEPs was included in a

4   standard as a result of fraudulent or exclusionary conduct, much less that any of the Defendants

5   ever made fraudulent statements about any patent or owned a patent at the time it was included in

6   a standard.  Thus, the litigation to enforce those patents does not stem from any competition-

7   reducing conduct by Defendants and is not a cognizable antitrust injury.  Instead, these losses flow

8   from the patent system itself.  *See* DOJ Stmt. at 15.  They are the ordinary costs incurred when

9   implementers (like Plaintiffs) elect not to license patented technology but choose to require a

10  patent holder to exercise its constitutionally-protected right to enforce its patents in court.[9]

11        Plaintiffs Do Not Allege Antitrust Injury from "Acquisitions."  Plaintiffs cannot avoid this

12  result by claiming that their alleged injury flows from so-called "illegal patent acquisitions" as

13  opposed to "the litigation itself."  Opp. at 27.  Indeed, as explained below in Section IV, Plaintiffs'

14  attempt to disavow the central role that litigation plays in their antitrust allegations is simply an

15  improper rewriting of their Complaint.  As Defendants have noted repeatedly, Plaintiffs have not

16  alleged any acquisitions of substitute patents that would have the effect of reducing competition.

17  *See* Mot. at 7–8, 22, 36; *see also supra* at 8-9.  Though the Opposition, much like the Complaint,

18  makes vague references to substitute patents in the abstract, it never identifies any patents owned

19  by Defendants that are supposedly substitutes for one another, any combination of patents that

20  Plaintiffs cannot design around, or any products that Plaintiffs cannot make without licensing one

21  of Defendants' patents.  *Intellectual Ventures*, 2013 WL 6682981 at *9 (dismissing antitrust

22  claims because plaintiff "fail[ed] to allege any facts, including the identity of any particular

23  patents or when they were acquired, that make plausible its claim that the effect of [defendant's]

24  patent acquisition" was anticompetitive); *see also Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142

25  F. Supp. 2d 296, 303 (E.D.N.Y. 2001) (The "failure to identify 'substitute products'" makes it

26

27        _____

28        [9] As the DOJ explains, "it is not a violation of federal antitrust laws merely for SEP
      licensors to seek allegedly supra-FRAND terms."  DOJ Stmt. at 20.  Thus, the conclusory
      allegation that a licensor sought such terms "cannot be the basis for antitrust liability."  *Id.*

1    "impossible for a court to determine what, if any, injury there is to competition.") (dismissing

2    antitrust claim), *aff'd*, 35 F. App'x 29 (2d Cir. 2002).  Nor can Plaintiffs rely on the wholly

3    conclusory allegation that "Fortress has inevitably acquired substitute patents," Cmplt. ¶ 38,

4    without alleging any facts about the patents at issue.  *See Nero AG v. MPEG LA, LLC*, No. 10-CV-

5    3672-MRP-RZ, 2010 WL 4366448, at *7 (C.D. Cal. Sept. 14, 2010) (rejecting the "'inference'

6    that because the patent pool has grown so large" it must serve an anticompetitive purpose).

7          Plaintiffs attempt to rely on *Intellectual Ventures*, but there the court found plausible

8    allegations that the counter-defendant had acquired "an indispensable body of [banking] patents"

9    and then "foreclosed Capital One's access to competitively priced commercial banking services

10   technology."  99 F. Supp. 3d at 625, 628.  In contrast, Plaintiffs do not allege here that Defendants

11   own an "indispensable body of patents" for their products or electronics products in general.

12   Instead, they allege that Defendants' patents are "meritless" and "weak."  Cmplt. ¶ 9.[10]

13          <u>An "Ongoing Threat" of Litigation Is Not Antitrust Injury</u>.  Plaintiffs' allegations about an

14   "ongoing threat" of future litigation and their fears they "will be forced to capitulate" to

15   Defendants' licensing demands also do not constitute a cognizable antitrust injury.  Opp. at 27.

16   An inchoate concern about indeterminate future events is not an "injury" at all.  *See, e.g.,*

17   *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.,* 305 F. Supp. 3d 1065, 1074

18   (N.D. Cal. 2018) (allegation of "only potential harm" is not sufficient to "plead an antitrust

19   injury"); *City of San Jose v. Office of Comm'r of Baseball*, No. C-13-02787 RMW, 2013 WL

20   5609346, at *11 (N.D. Cal. Oct. 11, 2013) ("[i]njury that has not yet occurred, indirect, or merely

21   speculative is generally insufficient to give rise to standing under section 4 of the Clayton Act").

22          Even more fundamentally, the "ongoing threat" that Plaintiffs allege is not an antitrust

23   injury because it is nothing more than a concern about the potential exercise of patent rights by a

24   patent holder.  It does not flow from any alleged exclusion of competition through exclusionary

25

26          [10] Plaintiffs' reliance on *Sheahan v. State Farm Gen. Ins. Co.*, 394 F. Supp. 3d 997, 1011-
27   12 (N.D. Cal. 2019) is similarly misplaced.  There, the district court held that the plaintiffs <u>failed</u>
     to allege antitrust injury because the plaintiffs were neither competitors nor consumers of the
     defendant, and the harm they allegedly suffered stemmed from misuse of software and alleged
28   misrepresentations by defendants, not anticompetitive conduct.  *Id.* at 10, 11-12.

1   conduct such as fraud or failure to disclose patents during the standard-setting process causing the

2   adoption of one technology over another.  Again, Plaintiffs' cited cases are inapposite because

3   they involved monopolization claims under Sherman Act Section 2 based on exclusionary conduct

4   that included, *inter alia*, allegations that the defendant eliminated competition by making false

5   promises or failing to disclose patents during a standard-setting process, and where the plaintiff's

6   harm flowed from that exclusionary conduct.  *See Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-

7   CV-178-BBC, 2011 WL 7324582, at *14 (W.D. Wis. June 7, 2011) (Motorola failed to disclose

8   patents to SSO and made false promises leading to adoption of "standards incorporating its own

9   patents and eliminating competing alternative technologies"); *Microsoft Mobile, Inc. v.*

10  *InterDigital, Inc.*, No. 15-723-RGA, 2016 WL 1464545, at *2 (D. Del. Apr. 13, 2016) (IDC made

11  a "'false promise that [it] would license its . . . technology on FRAND terms, on which promise

12  [ETSI] relied in choosing the . . . technology for inclusion' in the relevant standards.").

13          <u>Dismissal for Lack of Antitrust Injury Is Appropriate</u>.  Finally, there is no merit to

14  Plaintiffs' last-ditch effort to argue that Defendants demand too much of their pleading and that

15  antitrust injury should not be resolved on a motion to dismiss.  Opp. at 28.  Defendants do not

16  demand "detailed evidentiary matter."  They seek what well-settled law requires:  allegations

17  about whether Plaintiffs were customers or competitors in the purported market (they admit they

18  were not), whether Plaintiffs ever licensed or paid an allegedly supracompetitive price for any of

19  Defendants' patents (they admit they did not), and whether Plaintiffs allege that their claimed

20  injuries flow from conduct by Defendants that excluded alternative technologies or otherwise

21  eliminated competition (they cannot).  These are fundamental pleading deficiencies, not factual

22  issues to resolve.  Pleading plausible antitrust injury is a crucial threshold issue in any antitrust

23  case, and courts routinely grant motions to dismiss where, as here, the plaintiff fails to adequately

24  plead it.  *See Sheahan*, 394 F. Supp. 3d at 1011-12 (dismissing claim for lack of antitrust injury);

25  *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1028-29 (N.D. Cal. 2015) (same).

26  **IV.    *NOERR-PENNINGTON* BARS PLAINTIFFS' CLAIMS**

27          Plaintiffs' Sherman Act Section 1 and state law claims should also be dismissed with

28  prejudice because they are predicated on constitutionally-protected litigation activity.  Defendants'

1    Motion demonstrated that, under *Noerr-Pennington*, antitrust liability can arise from alleged

2    litigation misconduct only where the lawsuit(s) is a mere "sham" designed to harm a competitor's

3    business, meaning the lawsuit(s) is (i) "objectively baseless" and (ii) filed not to achieve a

4    litigation outcome but instead to harm a competitor's business.  Mot. at 24-30.  Plaintiffs'

5    Opposition concedes that they have not pleaded these required elements of the sham exception.

6    Instead, the Opposition argues that Plaintiffs are not "complaining about . . . sham litigation,"

7    Opp. at 31:5-6, but rather about alleged "***transfers*** to aggregate patents," Opp. at 29:10-12

8    (emphasis in original).  Plaintiffs' argument fails as a matter of law for multiple reasons.

9        <u>First</u>, "Plaintiffs cannot use their opposition brief to amend their complaint."  *In re*

10   *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB,

11   2019 WL 4581340, at *3 (N.D. Cal. Sept. 20, 2019).  The Complaint repeatedly alleges that what

12   makes Defendants' purported acquisitions/transfers unlawful is not the mere acquisition/transfer of

13   patents itself, but instead what Defendants subsequently do in litigation and associated licensing

14   demands.  Nearly ninety paragraphs attack Defendants' petitioning activity.[11]  And the Complaint

15   makes these allegations a central feature of Plaintiffs' broader theory that "Defendants [] assert as

16   many possible [sic] claims of infringement to tax the commercial use of existing technology at

17   rates beyond the actual value (if any) of the aggregated patents."  Cmplt. ¶ 10.  The Complaint's

18   core premise is that Fortress is allegedly "[a] central player in [an] emerging investment strategy"

19   in which "deep-pocketed investment firms" back "PAEs" to "fuel their litigation," thereby

20   "increas[ing] prices" and "decreas[ing] output."  *Id*. ¶¶ 6-10; *see id.* ¶ 82 ("Consistent with

21   Fortress's intent, the PAEs it has created or in which it has invested have engaged in prolific

22   patent assertions and litigation campaigns," which are allegedly designed "to impose a crushing

23   burden on their targets."); *id*. ¶¶ 82-125 ("Litigation and Licensing Campaigns" Section).

24       In their Opposition, Plaintiffs run away from these allegations, concede that Defendants'

25   litigation is not a "sham," and pivot to the theory that Defendants unlawfully transferred or

26   "aggregated" patents.  Yet the Complaint admitted that "[t]here is nothing inherently illegal with

27   _____

28       [11] *See* Cmplt. ¶¶ 2-12, 27, 30-31, 37-40, 42-43,45-50, 53, 57, 66, 82-106, 107-08, 110-25,
     153, 159, 160, 162-63, 167-71, 173, 175, 178, 181, 185, 188, 191.

1  owning many patents or obtaining those patents through acquisition." Cmplt. ¶ 48. The

2  Opposition cannot rewrite the Complaint to avoid *Noerr-Pennington*. *In re Volkswagen*, 2019 WL

3  4581340, at *3. Nor can it "contradict" the Complaint's admission that patent acquisitions

4  standing alone are not unlawful. *See, e.g.*, *In re Apple iPhone Antitrust Litig.*, No. 11-CV-06714-

5  YGR, 2013 WL 4425720, at *12 (N.D. Cal. Aug. 15, 2013) (granting motion to dismiss).

6  <u>Second</u>, even if it were consistent with the Complaint, Plaintiffs' attempt to refocus their

7  claims away from litigation and toward "aggregation" would fail. Plaintiffs' sole argument

8  against *Noerr-Pennington* immunity is that the "conduct giving rise to Plaintiffs' antitrust claims

9  is not merely lawful petitioning activity, but a broader anticompetitive scheme that litigation

10  furthers." Opp. at 30:20-21. However, this argument contradicts the Supreme Court's holding

11  that petitioning activity "is not illegal, either standing alone <u>or as part of a broader scheme.</u>"

12  *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) (emphasis added); *Korea*

13  *Kumho v. Flexsys Am.*, No. C07-01057 MJJ, 2007 WL 2318906, at *4 n.5 (N.D. Cal. Aug. 13,

14  2007) (dismissing antitrust claims despite allegation that patent-related petitioning activity was

15  part of a broader scheme). The cases that Plaintiffs cite stand for the unremarkable proposition

16  that an "<u>independent</u> antitrust violation" does "not become immune simply because the defendants

17  used legal means . . . to enforce the violation[]." *Clipper Exxpress v. Rocky Mountain Motor*, 690

18  F.2d 1240, 1265 (9th Cir. 1982) (emphasis added); *see also Hynix*, 527 F. Supp. 2d at 1097-98 (no

19  immunity where "the other aspects of the scheme independently produce anticompetitive harms"

20  and "the patent litigation is used to further the harm caused under a 'more traditional antitrust

21  theory.'"). For example, if two parties engaged in a "horizontal conspiracy to fix prices" and then

22  sued those who refused to pay, the conspirators would not escape antitrust liability because price

23  fixing is independently "per se violative of the Sherman Act." *See Clipper,* 690 F.2d at 1263.

24  Plaintiffs have not pleaded facts demonstrating that any "independent," "traditional"

25  antitrust violation occurred here. *Hynix*, 527 F. Supp. 2d at 1097-98. There is nothing illegal or

26  improper in acquiring many patents. Cmplt. ¶ 48. Indeed, each of the Plaintiffs concededly has

27  patent portfolios many times the size of Defendants' alleged portfolios. *See* Mot. at 7 & n.3. And

28  Plaintiffs nowhere put forth a plausible account of how any patent acquisitions amounted to an

1   antitrust violation independent of litigation conduct.  Plaintiffs nowhere plausibly allege that

2   Defendants combined "substitute" patents in a way that would reduce competition.  *See supra* at

3   13-14.  And the Complaint's core theory is that Defendants' "weak" patents would lack value but

4   for a purportedly aggressive serial litigation strategy—a theory that by definition does not describe

5   an antitrust violation "independent" of litigation conduct.  Cmplt. ¶¶ 35, 39, 49.

6       Other courts have rejected the exact argument Plaintiffs make here.  In *Apple, Inc. v.*

7   *Motorola Mobility*, *Inc*., Apple asserted an antitrust claim, alleging that the defendant failed to

8   disclose patents to an SSO, made false commitments that led to the establishment of standards

9   incorporating its patents and eliminating alternative technologies, and then enforced those patents

10  against Apple in litigation.  886 F. Supp. 2d 1061 (W.D. Wis. 2012).  But like here, Apple had not

11  paid royalties to the defendant; instead, "the only injury Apple suffered as a result of [defendant's]

12  alleged antitrust violation was the attorney fees and costs that it has incurred responding to the

13  patent litigation[.]"  *Id.* at 1076.  The court held that *Noerr-Pennington* barred Apple's claim

14  because the "allegations and arguments [made] clear that its antitrust claim is necessarily based on

15  [defendant's] patent litigation."  *Id.*[12]  The same is true here.  Similarly, in *Intellectual Ventures*,

16  the counter-defendant was allegedly a "patent troll" whose "business practice [was] to acquire a

17  vast portfolio of thousands of patents" and "then threaten[] to file a patent infringement claim . . .

18  until the prospect of endless high-cost litigation forces the [target] to capitulate and license the

19  entire portfolio."  280 F. Supp. 3d 691, 696-697 (D. Md. 2017), *aff'd*, 937 F.3d 1359 (Fed. Cir.

20  2019).  The counter-plaintiff argued that this "aggregation of patents" constituted an antitrust

21  violation "on its own," but the court held that *Noerr-Pennington* applied because "the allegation of

22  sham litigation [was] an integral component of [the] alleged strategy underlying all of [the]

23  claims" and the alleged scheme "could not succeed absent the allegedly sham litigation."  *Id.*

24      In contrast, Plaintiffs' cases are distinguishable.  *Clipper* involved a horizontal price-fixing

25  conspiracy, and defendant's petitioning activity was simply a means of executing that traditional,

26  *per se* antitrust violation.  690 F.2d at 1263.  Plaintiffs also cite *Hynix* and *Funai,* but both cases

27

28      **12** As noted above, while the court found that Apple suffered antitrust injury from allegedly
    exclusionary standard-setting misconduct, there is no such allegation here.  *See supra* at 9-10.

1   involved defendants who "lied to the [SSOs] in order to induce those SSOs to incorporate

2   [d]efendants' technologies" into a standard so the defendants could charge non-FRAND rates.

3   *Funai Elec. Co. v. LSI Corp.*, No. 16-CV-01210-BLF, 2017 WL 1133513, at *5 (N.D. Cal. Mar.

4   27, 2017); *see also Hynix*, 527 F. Supp. 2d at 1098 (SSO participant intentionally withheld

5   information so industry would be "irreversibly 'locked in' to the standard."). Those courts held

6   that such deceitful conduct constituted antitrust violations independent of litigation activity.[13]

7   Plaintiffs allege no similar conduct by Defendants. Finally, Plaintiffs rely on *Coalition for ICANN*

8   *Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495 (9th Cir. 2010), for the proposition that a

9   defendant's "use of a variety of coercive tactics in addition to filing a lawsuit remove[s] the case

10  from *Noerr-Pennington* immunity." Opp. at 30:12-14. But *ICANN* is inapposite. There, the

11  "coercion" included "financial pressure," "stacked" public meetings, and "negative press

12  coverage." 611 F.3d at 501, 505, 507. No such tactics are alleged here—just Defendants'

13  litigation campaign and related licensing demands. Accordingly, *Noerr-Pennington* applies.

14  **V.      PLAINTIFFS FAIL TO ALLEGE AN UNLAWFUL AGREEMENT**

15          The Opposition does nothing to shore up the Complaint's failure to plead the required

16  evidentiary facts of an <u>unlawful agreement to restrain trade</u>. Instead, like the Complaint, the

17  Opposition improperly lumps Defendants together, points amorphously to garden variety financial

18  agreements, and then parrots the legal standard. That does not state a Section 1 claim.

19          **A.      Plaintiffs Have Not Pleaded Evidentiary Facts Of A Conspiracy**

20          Plaintiffs do not dispute that, to state a Section 1 claim, they must plead "evidentiary facts"

21  that Defendants entered into a "contract, combination, or conspiracy" that was "intended to harm

22  or restrain trade." *Kendall v. Visa USA Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008); Mot. at 30:19-

23  21. Under Plaintiffs' own authority, this means they must plead evidentiary facts showing that the

24  Section 1 Defendants (per Plaintiffs, the "Agreeing Parties") shared "a conscious commitment to a

25  common scheme designed to achieve an unlawful objective." *49er Chevrolet, Inc. v. General*

26

27  ――――――――――――
    [13] To the extent that Apple argues that some of the Defendants' alleged <u>transfers</u> of SEPs
    constitutes an independent antitrust violation: (i) this is incorrect for the reasons set forth in
28  Section VI, *infra*; DOJ Stmt. at 19-20, and (ii) Apple has only asserted a SEP-based claim in its
    Section 17200 claim, not the federal antitrust claims.

1   *Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986).  The Complaint fails to meet this burden.

2        As Defendants' Motion demonstrated, the Complaint nowhere alleges (let alone with

3   evidentiary facts) that any two Defendants conspired to pursue the allegedly "meritless" litigation

4   repeatedly referenced in the Complaint.  Mot. at 30-34.  Having no answer to this, the Opposition

5   now claims the alleged conspiracy was only to "aggregate" supposedly "substitute" patents (the

6   descriptions of petitioning conduct that encompass nearly half of the Complaint are apparently not

7   part of the purported conspiracy).  Opp. at 32:9, 35:8.

8        In addition to being belied by the Complaint (Section IV, *supra*), Plaintiffs' new theory

9   fails for the same reason as the old one.  The Complaint fails to allege any evidentiary facts

10  demonstrating that any two or more Defendants collectively agreed to aggregate "substitute"

11  patents.  Plaintiffs' only counter is that they "need not allege that all of the Defendants were party

12  to a single, overarching agreement."  Opp. at 31.[14]  This is a straw man.  As the Motion

13  demonstrated (Mot. at 30-32), and the Opposition ignores, the Complaint fails to allege

14  evidentiary facts that <u>any two Defendants</u> ever reached any such agreement.  Indeed, like the

15  Complaint, the Opposition is replete with conclusory allegations of what Fortress supposedly

16  intended but totally lacking in evidentiary facts of what anyone ever actually agreed with Fortress

17  to do.[15]  *See* DOJ Stmt. at 16 ("[I]t appears the actual focus of the complaint is on Fortress's

18  unilateral action[.]").  That is not enough to assert a Section 1 claim.  Plaintiffs must "adequately

19  allege that *each* [] defendant knew of its connection to a conspiracy to restrain trade."  *Gilead*

20  *Sciences*, 2020 WL 1032320, at *9 (emphasis added).  Not only does the Complaint fail to meet

21  this requirement, the Complaint's own rhetoric suggests just the opposite.  For instance, the

22  Complaint alleges that Fortress places such "severe" conditions on its financing agreements that

23  "PAEs have no choice but to make aggressive and reckless patent assertions" to generate sufficient

24  revenue to make payment, and, "[w]hen they fail to do so . . . Fortress steps in and assumes even

25  more control."  Cmplt. ¶ 30.  It makes no economic sense for the alleged "PAEs" to have

---

26

27  [14] While Plaintiffs purport to disclaim an overarching conspiracy, they then try to use the purported existence of an overarching conspiracy theory to excuse the tardiness of their Section 7 claims.  *See* Opp.at 3:24-25 ("[O]lder transactions are cited as part of the ongoing conspiracy[.]").

28      [15] *See, e.g.*, Cmplt. ¶¶ 9-10, 30, 38, 41-42, 49, 45, 48, 167, 173-74; Opp. at 34:3-25.

1    "conspired" to cause their own demise.  *See Adaptive Power Sols., LLC v. Hughes Missile Sys.*

2    *Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense.").

3          Plaintiffs rely on *Anderson News, LLC v. American Media, Inc*., 680 F.3d 162 (2d Cir.

4    2012), but that case just serves to demonstrate the Complaint's failings.  The complaint in

5    *Anderson* contained specific evidentiary allegations—including the dates of meetings and

6    communications among competitors, the names of the participants, and what they discussed—

7    regarding the defendants' agreement to engage in anticompetitive boycotts, a quintessential

8    Section 1 antitrust violation.  *See, e.g.*, *id.* at 187-88.  Such evidentiary facts "evincing [an]

9    agreement" to restrain trade are precisely what the Complaint lacks.  *Id.* at 187.

10         The Complaint's failure to allege facts is exacerbated by its improper and repeated

11   lumping together of all Section 1 Defendants.  Mot. at 33.  Indeed, despite the Motion's discussion

12   of specific deals between specific defendants (*id.* at 32-33), the Opposition never addresses any of

13   them.  For instance, Plaintiffs never explain how DSS taking out a loan in 2014 in exchange for a

14   lien on "ten semiconductor patents," Cmplt. ¶ 70, was somehow part of a conspiracy to amass an

15   "enormous" patent portfolio of "substitute" patents, Opp. at 7:8-9.  The Motion cited authority

16   proscribing this blunderbuss approach (Mot. at 33:1-17), yet the Opposition ignores it.

17         **B.      Pleading Ordinary Financial Agreements Does Not State A Section 1 Claim**

18         Plaintiffs' allegations of loans and other ordinary financial agreements are insufficient to

19   state a Section 1 claim.  Plaintiffs argue that "agreements taking the same form as ordinary

20   business transactions violate the antitrust laws <u>when they create anticompetitive effects</u>" (Opp. at

21   33) (emphasis added), but that is a circular argument that merely assumes its conclusion.  What

22   Plaintiffs fail to allege in anything other than wholly conclusory terms is that any of the alleged

23   financial agreements is anything other than an ordinary business transaction.  Pleading everyday

24   agreements is not enough because they "just as easily suggest rational, legal business behavior by

25   defendants as they could suggest an illegal conspiracy."  *In re Musical Instruments & Equipment*

26   *Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (affirming dismissal).  Borrowers want to

27   obtain money to finance their operations; lenders want to secure a profitable return and to

28   collateralize the repayment obligation.  None of this is anticompetitive.

1    Again, Plaintiffs' cited authority demonstrates the deficiency of the Complaint.  Plaintiffs

2  cite *United States v. Singer*, 374 U.S. 174 (1963), but that case did not involve mere loans or sales

3  of patents.  Instead, it outlined in explicit detail communications by defendants with a "common

4  design <u>to exclude the Japanese machines in the United States</u>," including by taking coordinated

5  dives on each other's patent validity challenges.  *Id.* at 195 (emphasis added); *see id.* at 190 (the

6  "purpose to exclude the Japanese was the only one disclosed to [the co-conspirator]").  Plaintiffs

7  also cite *Vizio*, but that case did not involve an ordinary financial agreement; it involved an

8  express agreement to "<u>fix prices</u>," which is a *per se* violation under Section 1.  2010 WL 7762624,

9  at *6 (emphasis added).  The rest of Plaintiffs' cited authority is irrelevant.  *McWane, Inc. v. FTC*,

10  783 F.3d 814 (11th Cir. 2015), is not a Section 1 case nor does it involve a pleading challenge.

11  Thus, it has nothing to do with the proper pleading of an agreement to unlawfully restrain trade

12  under Section 1.[16]  Plaintiffs cite *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451,

13  466-67 (1992), without explanation.  But *Eastman* just advises courts to "examine[] closely the

14  economic reality of the market at issue."  *Id.* at 467.  This is ironic given that, as Defendants have

15  shown, Plaintiffs' "market" is about as unrealistic an antitrust market as one could imagine.

16  **VI.    PLAINTIFFS FAIL TO STATE A CLAYTON ACT SECTION 7 CLAIM**

17    The Opposition similarly serves to underscore why Plaintiffs' Section 7 claim should be

18  dismissed.  First, Plaintiffs essentially concede that no relevant antitrust market has been pleaded,

19  which alone compels dismissal.  Second, Plaintiffs do not address <u>any</u> of the authority cited by

20  Defendants holding that Plaintiffs' proffered theory fails to state a claim under Clayton Act

21  Section 7.  Finally, Plaintiffs proffer a conclusory "conspiracy" theory against Defendants' statute

22  of limitations argument, yet elsewhere in their Opposition, Plaintiffs concede that they did not

23  plead an overarching conspiracy.  For each of these independent reasons the Section 7 claim fails.

24    <u>No Market</u>.  "Determination of the relevant market is a necessary predicate to a finding of

25  a violation of the Clayton Act." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 324 (1962) (quotation

26  marks omitted).  The Clayton Act expressly requires that the alleged "monopoly . . . substantially

27

28    [16] And evidence in that case revealed that the defendant's "express purpose was to raise [a competitor's] costs and impede it from becoming a viable competitor."  *McWane*, 783 F.3d at 821.

1    lessen competition" within a "<u>line of commerce</u>," *i.e.*, a "product market." *Id.* at 324 (emphasis

2    added).  Moreover, "[s]ubstantiality can be determined only in terms of the market affected." *Id.*

3    (emphasis added); *see also Equifax, Inc. v. FTC*, 618 F.2d 63, 66 (9th Cir. 1980) ("A

4    determination of the relevant service market is, of course, a necessary predicate to finding a

5    violation of section 7 of the Clayton Act."); *Malaney v. UAL Corp.*, No. C 10-02858 RS, 2011 WL

6    6845773, at *4 (N.D. Cal. Dec. 29, 2011) ("plaintiffs <u>must</u> plead a viable relevant market" for a

7    Section 7 claim (emphasis in original)), *aff'd*, 552 F. App'x 698 (9th Cir. 2014); DOJ Stmt. at 5-6.

8    As a result, the "direct-evidence" theory Plaintiffs advance for their Section 1 claim—which fails,

9    *see supra* at 3-5—is not even cognizable to support their Section 7 claim.

10        <u>No *Acquisition-Based* Threat</u>.  The Complaint's allegation of anticompetitive harm is

11   premised entirely on alleged <u>post-acquisition</u> petitioning activity.  *See, e.g.,* Cmplt. ¶¶ 2, 9, 31, 39,

12   40, 88, 97, 103, 163-64.  But as demonstrated in the Motion (in authority completely unaddressed

13   by Plaintiffs), a Section 7 claim must be predicated on the acquisition itself, not post-acquisition

14   conduct, such as the prosecution of an infringement suit.  *Compare* Mot. at § VII.A., pp. 35:5-

15   37:28, *with* Opp. at 35-36 (addressing <u>none</u> of the cited authority).  Here, the alleged patent

16   acquisitions themselves could not have substantially lessened competition (and the Complaint

17   does not so allege) because, according to the Complaint, these patents are "weak" and would lack

18   any value absent Defendants' alleged <u>post-acquisition</u> litigation strategy.  Cmplt. ¶¶ 39, 49.

19        Faced with this fatal flaw in their Section 7 claim, Plaintiffs in their Opposition reverse

20   course and try to disavow the importance of the post-acquisition infringement suits, focusing

21   instead on Defendants' alleged acquisition of substitute patents.  But as explained above, *see*

22   *supra* Section III, the Complaint does not plausibly allege that Defendants' patent <u>acquisitions</u>

23   themselves harmed competition, and the Opposition's conclusory assertions that Defendants have

24   acquired "substitute" patents do not change this.[17]  Even if the Complaint contained any facts to

25   support this allegation, "weak" patents still lack value whether they are substitutes or not.

26

27   _____

         [17] Plaintiffs take issue with the Motion mentioning certain Defendants that are not Section
28   7 Defendants.  Yet Plaintiffs never identify which Defendants supposedly acquired the
     "substitutes" that Plaintiffs so heavily emphasize in their Opposition.

1   Moreover, the Opposition is self-contradictory.  With respect to the statute of limitations,

2   Plaintiffs argue that they were injured not by the acquisitions themselves (several of which were

3   outside the limitations period), but instead by Defendants' infringement suits.  Opp. at 38:16-20.

4        Plaintiffs' citation to *Intellectual Ventures*, 99 F. Supp. 3d at 625-27, does not help them.

5   In that case, the alleged "market" was limited to the defendant's <u>own patent portfolio</u>, and the

6   court determined that the alleged patent acquisitions ultimately "created a monopoly."  *Id.* at 621,

7   630.  Under that (tautological) theory, any time a patent was acquired by the defendant, the

8   defendant by definition wielded monopoly power because it owned 100% of its own patent

9   portfolio.  Even assuming such a circular market was proper in that case, it is not even <u>alleged</u> in

10  this case.[18]  Plaintiffs do not allege any facts showing that the supposed acquisitions "tend to

11  create a monopoly," 15 U.S.C. § 18—nor can they, given the sheer size of their purported market.

12       <u>Untimeliness</u>.  Plaintiffs concede that the Seven Networks and IXI IP acquisitions occurred

13  more than four years before the Complaint was filed.  Opp. at 38.  Accordingly, Plaintiffs' Section

14  7 claim based upon these transactions is time-barred.  Plaintiffs assert that these older transactions

15  were simply "cited as part of an ongoing conspiracy," *id.* at 36:26, but any such purported

16  conspiracy—which Plaintiffs concede they have not pleaded, *id.* at 31:24—has nothing to do with

17  whether their Section 7 claim is untimely.  Plaintiffs do not and cannot dispute that acquisitions

18  occurring outside the four-year limitations period cannot give rise to any damages claim under

19  Section 7.  This means that Plaintiffs have no damages claim against Seven Networks and IXI IP,

20  even under the most expansive interpretation of the Complaint's vague allegations.  Moreover,

21  neither the Complaint nor the Opposition ever identifies which transactions allegedly trigger the

22  Section 7 claim (versus those they were supposedly citing to show any "ongoing conspiracy").  A

23  complaint is supposed to provide "fair notice and state facts to support a claim," not "make vague

24  allegations to avoid limitations defenses."  *McCarty v. Grguric*, 2006 WL 1328264, at *5 (E.D.

25  Cal. May 16, 2006), *adopted by*, 2006 WL 1582322 (E.D. Cal. June 2, 2006).

26

27       [18] In fact, Intel did include such a market (as an "alternative" to the "Electronics Patents Market") in the related case that Intel filed and dismissed before co-filing this action with Apple.

28  *Intel Corp. v. Fortress Inv. Grp. LLC et al.*, No. 5:19-CV-06856-EJD (N.D. Cal. Oct. 21, 2019), Dkt. 1, ¶¶ 128-38.  However, Apple and Intel did <u>not</u> re-assert any such market in this case.

1    Plaintiffs nevertheless argue that their untimely Section 7 claim survives because the word

2 "injunction" appears in the fifty-page Complaint (Cmplt. ¶ 181), requiring a laches analysis.  This

3 argument fails because (1) neither the Complaint nor the Opposition ever identifies what

4 "injunction" Plaintiffs are seeking, *Flanigan v. San Francisco Police Dep't*, No. 16-CV-00066-

5 LB, 2016 WL 737859, at *3 (N.D. Cal. Feb. 25, 2016) (plaintiff seeking injunction "needs to

6 specify the injunctive relief he seeks."); (2) the fact that an injunction is sought does not in any

7 event affect the statute of limitations on the damages portion of the claim, *Samsung Elecs. Co. v.

8 Panasonic Corp.*, 747 F.3d 1199, 1202-05 (9th Cir. 2014) (antitrust claim for damages governed

9 by statute of limitations, even if separate claim is asserted for injunction); and (3) Plaintiffs do not

10 ever even attempt to show why "laches" (for the unidentified "injunction") would lead to a

11 different result than a limitations analysis.  *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th

12 Cir. 2014) ("In applying laches, we look to the same legal rules that animate the four-year statute

13 of limitations[.]").  The Section 7 claim should therefore be dismissed as untimely.

14 **VII.    THE COMPLAINT SHOULD BE STRICKEN UNDER THE ANTI-SLAPP LAW**

15         **A.    Plaintiffs' Claims "Arise From" Protected Activity**

16    Plaintiffs fail to address any of the authorities cited by Defendants demonstrating that the

17 filing of a lawsuit is protected by California's Anti-SLAPP law.  Instead, Plaintiffs argue that the

18 statute does not apply because their antitrust claims supposedly "arise from" Defendants' "illegal

19 patent transfer scheme" as opposed to Defendants' protected "infringement lawsuits."  Opp. at

20 39:10-12.  The argument fails for multiple reasons.

21    <u>First</u>, Plaintiffs do not dispute that their Section 17200 claims mirror their federal antitrust

22 claims, Mot. at 43:23.  Because *Noerr-Pennington* immunity applies to the federal claims, it

23 follows that Anti-SLAPP protection applies to the state law counterparts.  *Kearney v. Foley &

24 Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) ("arose from" prong satisfied because federal

25 claims were subject to *Noerr* and the "state claims [were] based on the same conduct.").

26    <u>Second</u>, because "protected" conduct "supplies a necessary element" of Plaintiffs' state

27 law claims, the Anti-SLAPP statute necessarily applies.  *Wilson v. Cable News Network, Inc.*, 7

28 Cal. 5th 871, 892 (2019).  Plaintiffs do not dispute that a required element of a UCL claim is "lost

1   money or property." Cal. Bus. & Prof. Code § 17204; *see also* Mot. at 42:17-23.  Here, the only

2   "lost money or property" that Plaintiffs allege is litigation expenses for defending against

3   indisputably protected activity.  Cmplt. ¶¶ 185, 191.[19]

4       Third, even if Plaintiffs could establish that an alleged "patent transfer scheme" was

5   independently unlawful, "an anti-SLAPP motion may be directed to specific allegations of

6   protected activity which constitute claims for relief but do not constitute an entire cause of action

7   as pleaded." *Newport Harbor Offices v. Morris Cerullo World Evangelism*, 23 Cal. App. 5th 28,

8   48 (2018); *see also Club Members v. Sierra Club*, 45 Cal. 4th 309, 319 (2008).  Plaintiffs' UCL

9   counts incorporate by reference the nearly 90 paragraphs that directly attack Defendants' litigation

10  conduct and associated licensing (Cmplt. ¶¶ 182, 186; *see supra* n.11) and also attack "serial

11  nuisance suits" (*id*. ¶¶ 185, 191).  At the very least these allegations should be stricken.

12      **B.      Plaintiffs Have Not Demonstrated A Reasonable Likelihood Of Success**

13      As Defendants' Motion demonstrates, the second step of the Anti-SLAPP analysis is

14  satisfied because Plaintiffs' Section 17200 claims fail as a matter of law for three independent

15  reasons.[20]  Plaintiffs' Opposition fails to successfully rebut any of these reasons.

16      Litigation Privilege.  Plaintiffs do not dispute that the litigation privilege is even broader

17  than *Noerr-Pennington* immunity and that any doubts as to its application must be resolved in

18  favor of the privilege.  Mot. at 41:7-25.  Plaintiffs attempt to distinguish this case from this

19  Court's decision in *Kane v. Delong*, No. C-12-5437 EMC, 2013 WL 1149801 (N.D. Cal. Mar. 19,

20  2013), arguing that this case "involve[s] far more than instituting lawsuits," Opp. at 40:6-8.  But

21  so did *Kane*.  2013 WL 1149801, at *12 (defendant "encourage[d] . . . others" to purchase

22  products that formed the basis of infringement claim and made false assurances that it would not

23  bring suit).  Nevertheless, this Court correctly held that, while these actions did "not fall within the

24  _____

25  [19] Plaintiffs concede that they have not entered into any licenses with any Defendant
    concerning the patents at issue, Opp. at 27:25-28:11, and they ignore authority holding that a
    "hypothetical" risk of paying future royalties fails to state a UCL claim.  Mot. at 42:17-23; *see*

26  *also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL
    3727318, at *22 (N.D. Cal. Aug. 30, 2017) (risk of "future costs" does not establish UCL injury).

27  [20] Plaintiffs claim that they are only required to demonstrate a "minimum level of legal

28  sufficiency" to survive an Anti-SLAPP motion, Opp. at 39:19-25, but the relevant standard is
    whether Plaintiffs can satisfy Rule 12(b)(6), which they have not.  Mot. at 41 & n.22.

litigation privilege," the UCL claim was barred because these actions "caused no harm in the absence of the infringement suit." *Id.* The same is true here. Cmplt. ¶¶ 185, 191 (alleging harm from Defendants' purported "serial nuisance suits").

**No UCL Remedy.** Plaintiffs do not contend that any of the remedies identified in their "Prayer for Relief"—*i.e.*, damages, rescission, or a declaration that Defendants' patents are unenforceable—are available under the UCL. Instead, they argue that their UCL claims refer to "injunctive relief," Opp. at 40:16, but never identify the injunctive relief sought. If a plaintiff "wants injunctive relief, he needs to specify the injunctive relief he seeks." *Flanigan*, 2016 WL 737859, at *3; *see also Snyder v. Nationstar Mortg. LLC*, No. 15-CV-03049-JSC, 2015 WL 7075622, at *11 (N.D. Cal. Nov. 13, 2015) (dismissing UCL claim "[b]ecause Plaintiff fail[ed] to state what particular unfair business practices she seeks to enjoin").[21]

**FRAND Allegations Insufficient.** Count 4, which is brought only by Apple against seven of the Defendants, is based on the alleged refusal to abide by FRAND commitments. As the Motion demonstrates, this claim fails because it is wholly conclusory. Mot. at 44:8-16. The Complaint does not identify any Count 4 Defendant who <u>actually possesses</u> any SEPs—much less who failed to license it on FRAND terms. Plaintiffs' Opposition does not address this fatal defect.

In addition, the courts that have permitted antitrust claims based on FRAND violations have required the plaintiff to plead that an SSO member deceptively induced the SSO to adopt a standard that it otherwise would not have implemented. Mot. at 45:2-11. The Complaint does not plead that any of the Defendants are members of any SSO or that any of them deceived an SSO. *See* DOJ Stmt. at 20 ("While the United States disagrees that claims based on alleged 'deception' of an SSO" constitute an antitrust violation, "the Plaintiffs do not adequately allege the circumstances under which courts have allowed SSO deception-based claims to go forward."). Instead, citing no authority, Apple argues that these requirements only apply to conduct that occurred prior to the adoption of the standard, not post-adoption transfers. Opp. at 41:4-15.

---

[21] Plaintiffs rely on *Yokohama Rubber Co. v. S. China Tire & Rubber Co.*, No. CV 04-1866-GHK, 2004 WL 5569948 (C.D. Cal. Oct. 19, 2004), but that case merely held that the UCL claimant could seek to enjoin enforcement of the patent being litigated in *Yokohama*. In addition, the *Yokohama Rubber* court dismissed the claim on litigation privilege grounds. *Id.* at *5.

1  However, if an SSO member's refusal to abide by a FRAND commitment standing alone is not

2  anticompetitive, then there is no reason why a transferee's alleged refusal to do so would be

3  anticompetitive.  Plaintiffs rely exclusively on *Vizio,* but that case involved a <u>price-fixing</u>

4  conspiracy, not the mere failure to honor a FRAND commitment.  2010 WL 7762624, at *5-6.

5  Indeed, *Vizio* held that the failure to honor a FRAND requirement can only constitute

6  anticompetitive conduct where the "<u>defendant itself</u> had entered into a FRAND obligation with the

7  standard setting organization." *Id.* (emphasis added).  A transferees' alleged "repudiat[ion]" of the

8  transferor's FRAND commitments is not sufficient. *Id.* at 5.

9  **VIII.  CONCLUSION**

10       The Court should dismiss the Complaint in its entirety and strike Counts 3 and 4.

11  Dated:  April 13, 2020                    Respectfully submitted,

12                                           IRELL & MANELLA LLP

13

14                                           By:*/s/ A. Matthew Ashley*
                                             _____
14                                               A. Matthew Ashley

15                                               *Counsel for Defendants*
                                                 FORTRESS INVESTMENT GROUP LLC,
                                                 FORTRESS CREDIT CO. LLC,
16                                               VLSI TECHNOLOGY LLC

17

18                                               */s/ Martin Flumenbaum*
                                                 _____
18                                               Martin Flumenbaum (*pro hac vice*)
                                                 mflumenbaum@paulweiss.com
19                                               PAUL, WEISS, RIFKIND, WHARTON &
                                                 GARRISON LLP
20                                               1285 Avenue of the Americas
                                                 New York, NY 10019-6064
21                                               Telephone:  212-373-3191
                                                 Facsimile:  212-492-0191
22                                               *Counsel for Defendants*
                                                 FORTRESS INVESTMENT GROUP LLC,
23                                               FORTRESS CREDIT CO. LLC

24

25                                               */s/ Christopher A. Seidl*
                                                 _____
25                                               Christopher A. Seidl (*pro hac vice*)
                                                 CSeidl@RobinsKaplan.com
26                                               ROBINS KAPLAN LLP
                                                 800 LaSalle Avenue, Suite 2800
27                                               Minneapolis, MN 55402
                                                 Telephone:  612 349 8468
28                                               Facsimile:  612 339 4181

1
2

Counsel for Defendants
INVT SPE LLC
INVENTERGY GLOBAL, INC.

3

4

/s/ Nathaniel Lipanovich
Nathaniel Lipanovich (Bar No. 292283)
nlipanovich@thoits.com
THOITS LAW
400 Main Street, Suite 250
Los Altos, CA 94022
Telephone: 650 327-4200
Facsimile: 650-325-5572
Counsel for Defendant
DSS TECHNOLOGY MANAGEMENT,
INC.

5

6

7

8

9

10

11

/s/ Jason D. Cassady
Jason D. Cassady (pro hac vice)
jcassady@caldwellcc.com
CALDWELL CASSADY & CURRY
2121 N. Pearl Street, Suite 1200
Dallas, TX 75201
Telephone: 214 888-4841
Facsimile: 214-888-4849
Counsel for Defendant
IXI IP, LLC

12

13

14

15

16

/s/ James J. Foster
James J. Foster
jfoster@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
Telephone: 617 456-8022
Facsimile: 617 456-8100
Counsel for Defendant
UNILOC 2017 LLC

17

18

19

20

21

22

/s/ Daniel. R. Shulman
Daniel R. Shulman (pro hac vice)
daniel.shulman@lathropgpm.com
Dean C. Eyler (pro hac vice)
dean.eyler@lathropgpm.com
LATHROP GPM LLP
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612 632-3335
Facsimile: 612 632-4000
Counsel for Defendants
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC

23

24

25

26

27

28

DEFENDANTS' JOINT REPLY ISO MOTION TO DISMISS
AND TO STRIKE PLAINTIFFS' COMPLAINT
Case No. 3:19-cv-07651-EMC

10823600

- 29 -

1

2
/s/ Samuel F. Baxter_____
Samuel F. Baxter (pro hac vice)

3
sbaxter@mckoolsmith.com
John Briody (pro hac vice)

4
jbriody@mckoolsmith.com
MCKOOL SMITH

5
104 East Houston, Suite 100
Marshall, TX 75670

6
Telephone:  903 923-9001
Facsimile:  903 923-9099

7
One Manhattan West

8
395 9th Avenue, 50th Floor
New York, NY 10001-8603

9
Telephone: 212.402.9438
Counsel for DefendantCounsel for Defendant

10
SEVEN NETWORKS, LLC

11

12
**ECF ATTESTATION**

13
        I, Olivia Lauren Weber, am the ECF user whose ID and password are being used to file

14
DEFENDANTS' JOINT REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION TO

15
DISMISS AND TO STRIKE PLAINTIFFS' COMPLAINT.  I hereby attest that I received

16
authorization to insert the signatures indicated by a conformed signature (/s/) within this e-filed

17
document.

18
                              By: /s/   Olivia Lauren Weber_____

19
                                    Olivia Lauren Weber

20

21

22

23

24

25

26

27

28