UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTEL CORPORATION, et al.,

        Plaintiffs,

   v.

FORTRESS INVESTMENT GROUP LLC, et al.,

        Defendants.

Case No. 19-cv-07651-EMC

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND**

Docket Nos. 111, 114

Intel Corporation and Apple Inc. filed suit against Fortress[1] and other affiliated or associated companies. The bulk of Plaintiffs' complaint is devoted to allegations that Defendants have violated antitrust laws by (1) aggregating a massive portfolio of "weak" patents covering electronics products and (2) aggressively enforcing those patents – *e.g.*, by demanding that licenses be obtained and/or by filing meritless patent infringement actions. *See* Compl. ¶¶ 9-11. Per the complaint, the "range of patents [covers] both substitutes for and complements to one another." Compl. ¶ 32. In addition, per the complaint, weak patents are patents that "have questionable validity, infringement, enforceability, and/or are easily designed around, and therefore have little or no meaningful value, are either not asserted, or are asserted to demand a license at an amount that is [not] commensurate with the value of the patent's merits." Compl. ¶ 35.

---

[1] Plaintiffs formally sued two Fortress entities: Fortress Investment Group LLC and Fortress Credit Co. LLC.

1   Currently pending before the Court is Defendants' joint motion to dismiss.  *See* Docket

2   No. 111.  There is also a supplemental brief filed by one defendant.  *See* Docket No. 114 (Supp.

3   Br.).  That defendant (DSS) has joined the joint motion to dismiss but has also filed the

4   supplemental brief in order to address "two additional grounds specific to DSS that also require

5   dismissal."  Docket No. 114 (Supp. Br. at 1).

6   Having considered the parties' briefs, as well as the oral argument of counsel, the Court

7   hereby **GRANTS** the motion to dismiss but gives Plaintiffs leave to amend.

## I.       FACTUAL & PROCEDURAL BACKGROUND

9   In the complaint, Plaintiffs allege as follows.

10  A.     Parties

11  Plaintiffs are Intel and Apple.  Intel is a company that "develops, manufactures, and sells

12  integrated digital technology products."  Compl. ¶ 13.  Apple is a company that sells "consumer

13  electronics such as the iPhone, iPad, and MacBook."  Compl. ¶ 14.

14  Defendants are:

15  (1) Fortress;

16  (2) Uniloc[2];

17  (3) VLSI;

18  (4) INVT[3];

19  (5) DSS;

20  (6) IXI; and

21  (7) Seven.

22  Other than Fortress, Defendants are all patent assertion entities ("PAEs").  According to

23  Plaintiffs, these PAEs do not "promote the progress of science and useful arts."  Compl. ¶ 2.  The

24  complaint implies, but does not expressly allege, that PAEs do not operate businesses using the

25  patents they acquire.  Instead, PAEs are entities that "aggressively pursue meritless [patent

26

27  [2] Plaintiffs formally sued three Uniloc entities: Uniloc 2017 LLC; Uniloc USA, Inc.; and Uniloc Luxembourg S.A.R.L.

28  [3] Plaintiffs formally sued two INVT entities: INVT SPE LLC and Inventergy Global, Inc.

United States District Court
Northern District of California

infringement] litigation." *Id.* In recent years, "PAEs have increasingly been partnering with investment firms to fuel their litigation." Compl. ¶ 6. Fortress is one such investment firm. *See* Compl. ¶ 8.

Fortress has invested in or, in some instances, is responsible for creating the PAEs above. *See, e.g.*, Compl. ¶ 64 (alleging that Fortress provided $11 million in financing to [INVT], consisting of $10 million in debt financing and $1 million in sale of stock"); Compl. ¶ 70 (alleging that "Fortress and [other undisclosed] investors granted a loan to DSS in exchange for it placing a lien in favor of the investors on ten semiconductor patents and assigned to the investors certain funds recoverable from successful patent litigation involving these patents"); Compl. ¶¶ 53-54 (alleging that "Fortress formed Uniloc 2017 in order for Fortress to direct and control the assertion of Uniloc patents" and that "Uniloc Luxembourg assigned nearly 600 patents to Uniloc 2017"); Compl. ¶ 57 (alleging that Fortress created VLSI and transferred patents to the company). According to Plaintiffs, for PAEs that Fortress has invested in, Fortress conditions its investments "on terms so severe that the PAEs have no choice but to make aggressive and reckless patent assertions to attempt to generate the revenue required to meet their obligations to Fortress." Compl. ¶ 30. Moreover, when the PAEs "fail to do so – as is often the case – Fortress steps in and assumes even more control and/or ownership of the patents." Compl. ¶ 30.

B.    Fortress's Aggregation of Patents

Through its investment in and creation of PAEs, Fortress has aggregated and obtained control over "a massive portfolio of patents that purportedly read on high-tech consumer and enterprise electronic devices and components or software therein and processes used to manufacture them." Compl. ¶ 9. The portfolio – "dispersed across [various] PAEs," Opp'n at 1 – consists of "well over a thousand U.S. patents." Compl. ¶ 30. The patents cover a wide range of "substitutes for and complements to" electronic products and components. Compl. ¶ 32.

Plaintiffs provide the following explanation for substitutes and complements.

> When a company wants to build an electronic device, such as a smartphone, there are many ways to do so. Each alternative requires multiple technologies. However, the alternatives do not require the same combination of technologies. For example, Alternative 1 might require technologies A, B and C, while Alternative 2 might

> require technologies D, E and F.  The technologies used for Alternative 1 (A, B and C) are complements: they are each needed to create the device using Alternative 1.  Similarly, the technologies used for Alternative 2 (D, E, and F) are complements.  The technologies comprising Alternative 1 are also a substitute for the technologies comprising Alternative 2, because the bundle of technologies used in Alternative 1 can be used as a substitute for the bundle of technologies used in Alternative 2.

Compl. ¶ 32.

According to Plaintiffs, "[h]olding a broad array of patents that can act as both substitutes and complements in different circumstances allows Fortress and its PAEs flexibility to stifle competition in a variety of ways and against a variety of electronic device suppliers."  Compl. ¶ 33.  For example, a smartphone company might ordinarily design around Alternative 1 by using Alternative 2, but, if Fortress and its PAEs have patents that cover both Alternative 1 and Alternative 2, then the smartphone company is in a difficult position.  To put the matter simply, aggregation by Fortress and its PAEs has "eliminat[ed] substitutes."  Compl. ¶ 38.

> Fortress has . . . acquired substitute patents that, before aggregation, competed with each other.  When the patents were held by their original owners, there was competition and a prospective licensee could choose between competing options (or forego those options and design its products in a different way).  But now, under the control of Fortress, the prospect of competition disappears and so does the feasibility of redesigning products.  Fortress and its PAEs can thus threaten a target with the serial risk that the next best alternative design to an asserted patent is also subject to a patent claim by one of Fortress's PAEs.

Compl. ¶ 38.[4]

Through aggregation of a large number of patents, Fortress and its PAEs "benefit by asserting weak patents – i.e., those that never would have been asserted by their former owners."  Compl. ¶ 9; *see also* Compl. ¶ 39 (alleging that, "[b]efore aggregation, there would be no incentive to assert [weak] patents," which could easily be defeated or designed around).  The power of the patent portfolio comes not from the merits of the individual patents but rather from

---

[4] As indicated above, Plaintiffs have alleged the acquisition of both substitute and complementary patents.  But Plaintiffs' complaint largely focuses on substitutes – or at least presumes substitutes are at play.  The Court therefore focuses on substitutes as well; whether Plaintiffs may have an antitrust claim based on the acquisition of complementary patents alone (*i.e.*, without regard to substitute patents) is an issue that the Court need not reach.

United States District Court
Northern District of California

United States District Court
Northern District of California

the size and scope of the portfolio.  *See* Opp'n at 1; *see also* Compl. ¶ 163 (alleging that "the power of Fortress's patent portfolio is not based on the value or lawful scope of its constituent patents, but on [*inter alia*] the size of the portfolio itself, which imposes hurdles to design around regardless of the merits of the patents within it").  For instance, because of the size and scope of the portfolio, Fortress and its PAEs can engage in serial litigation – "deploy[ing] patent after patent in case after case against their targets with the threat of ever more patent assertions and ever more litigation."  Compl. ¶ 11.  This approach "stretch[es] the resources of [Defendants'] targets and increase[s] the possibility that [the] weak patents will improperly be found valid or infringed or the prospect that a target (like Intel or Apple) will agree to a license to resolve the threat posed by Fortress and its PAEs."[5]  Compl. ¶ 9.

Examples of serial litigation by Fortress and its PAEs include the following:

- VLSI has sued Intel 6 times.  *See* Compl. ¶¶ 98-101; *see also* Compl. ¶ 104 (alleging that VLSI has also initiated multiple suits against Intel in China).

- Uniloc has sued Apple 25 times.  *See* Compl. ¶ 83 (listing suits filed from 2016 through 2018); *see also* Compl. ¶ 87 (also alleging that Uniloc has sued Google 35 times during a three-month period in 2018).

- INVT has sued Apple 2 times.  *See* Compl. ¶¶ 106, 108.

As indicated above, Plaintiffs maintain that aggregation effectively results in the elimination of substitutes, and the elimination of substitutes constitutes, in and of itself, the elimination of competition – comparable to a merger.[6]  *See* Compl. ¶¶ 38, 41; *see also* Opp'n at 7 (asserting that "Fortress's aggregation eliminates competition because substitute patents once held

---

[5] According to Plaintiffs, aggregation of patents by Fortress and its PAEs also creates problems because the patents are deliberately dispersed across various PAEs and ownership of the patents is purposefully obfuscated.  *See* Opp'n at 1; *see also* Compl. ¶¶ 44, 163.  "Because Fortress spreads patents among its PAEs and obfuscates which entities own which patents, potential licensees often cannot identify patents that they might want to license or that would be substitutes for patents that a PAE is asserting against them."  Opp'n at 7-8.  Furthermore, "there is no single entity that can offer a comprehensive license [across] the Fortress portfolio."  Compl. ¶ 45.

[6] At the hearing on the motion to dismiss, the Court asked Plaintiffs if there could be an antitrust violation if Defendants engaged in serial litigation involving weak patents that did *not* involve substitutes and complements.  Plaintiffs expressly disavowed making such a claim.

by separate entities that competed with one another to obtain licenses are now controlled by a single entity"). Accordingly, through aggregation, Fortress and its PAEs can "force companies to capitulate to supracompetitive licensing demands." Opp'n at 1 (emphasis added). In other words, Fortress and the PAEs can "charge far more than the value of the inventive contributions (if any) of the patents and of competitive prices for licenses." Compl. ¶ 10; *see also* Compl. ¶ 167 (alleging that, "through their aggregation scheme, Fortress and the other Defendants seek and/or obtain far more for their patents than the costs at which they acquired those patents or the rates at which they would have been licensed before aggregation"). Furthermore, "[l]icensing customers are [still] harmed, even when they do no acquiesce to an inflated royalty, by being forced to incur substantial expenses, uncertainty, and burdens in resisting the patent litigations and threats that the aggregation . . . scheme[] of defendants [has] enabled." Compl. ¶ 170 (emphasis added).

According to Plaintiffs, although

> [t]here is nothing inherently illegal with owning many patents or obtaining those patents through acquisition, . . . Fortress's patent aggregation scheme is unlike the development of patent portfolios by operating companies that use patents to safeguard their ability to offer their own products and services free from infringement by others. And it is different, too, from a company acquiring patents for the purpose of licensing based on the intrinsic value of those patents. Both of those scenarios have the potential to increase output and lower prices by putting patents to efficient use. But Fortress's aggregation is intended for an anticompetitive purpose – to invest in patents at costs lower than the holdup value of the patents to ensnare as many potential licensees and to allow it and the other Defendants to assert as many possible claims of infringement to tax the commercial use of existing technology at rates beyond the actual value (if any) of the aggregated patents.

Compl. ¶ 48.

C.      Transfer of SEPs to Fortress and its PAEs

Although the instant case is largely targeted at the aggregation and assertion of patents by Fortress and its PAEs, Apple also brings a claim based on independent conduct – namely, the transfer of standard essential patents ("SEPs") from third parties to Fortress and the PAEs.[7]

---

[7] At the hearing on the motion to dismiss, Apple maintained that the transfer of even a single SEP under the circumstances detailed herein (*i.e.*, transfer to a non-operating PAE) was illegal because, as noted below, a PAE is not subject to tempering market forces that assume compliance with standard-setting rules; but, Apple added, the aggregation of such SEPs by Fortress and its PAEs

United States District Court
Northern District of California

United States District Court
Northern District of California

According to Apple, Fortress and certain of its PAEs claim that some of the patents they hold in their portfolio are SEPs – *i.e.*, patents essential to the practice of an industry standard.  An industry standard is typically set by a standard-setting organization ("SSO").  If a standard cannot be practiced without using a patent, the SSO often "impose[s] a requirement that [the] patent holder[] claiming to have [an] essential patent[] timely disclose [the] patent[] to the SSO and commit to license [the patent] on FRAND[8] terms and conditions."  Compl. ¶ 129.  ETSI, "an independent, non-profit SSO that produces globally-accepted standards for the telecommunications industry" (including cellular standards), has such a requirement.  Compl. ¶¶ 131, 134, 142.  The requirement is, in effect, an acknowledgment that "standardization constrains or eliminates as substitutes all the technologies that would have been capable of performing the functionality in the standard but that were not chosen to perform that function."  Compl. ¶ 144 (emphasis added); *see also* Opp'n at 23 (asserting that, "to the extent that an SEP is essential for anyone implementing the standard, there is no substitute for that SEP").

With respect to the instant case, Uniloc and INVT (who have both sued Apple) "hold what they claim are SEPs for cellular standards."  Compl. ¶ 126.  The PAEs acquired the patents from operating companies that actually make products and that participate in SSOs.  *See* Compl. ¶ 151.  When a patent is directly held by an operating company, there is far less risk of unreasonable conduct by the patent holder because "it remains an operating company and an SSO participant."  Compl. ¶ 151.  "[F]or example, an operating company would face constraints in demanding non-FRAND royalties or otherwise failing to adhere to a FRAND commitment because it could be subject to reciprocal demands or conduct from other SEP holders."  Compl. ¶ 151.  Also, such conduct by the operating company would "make SSOs and their members less likely to standardize the operating company's technology in future standards."  Compl. ¶ 152.  But "[b]y transferring SEPs to PAEs, operating companies avoid these constraints and enlist PAEs that are not subject to the same constraints to exploit the monopoly power associated with their claimed

enhanced the violation of the law.

[8] "FRAND" means fair, reasonable, and nondiscriminatory.

SEPs."  Compl. ¶ 152.  In fact, Plaintiffs allege here that, because of the transfer of SEPs to PAEs, transactions costs have been "driv[en] up" and FRAND commitments have been "evad[ed]." Compl. ¶ 153; *see also* Compl. ¶ 154 (referring to "abusive licensing").

D.      Product Markets

In their complaint, Plaintiffs have identified two product markets: (1) the Electronics Patents Market and (2) the Input Technology Markets.

The Electronics Patents Market is expressly defined as the U.S. "market for patents for high-tech consumer and enterprise electronic devices and components or software therein and processes used to manufacture them."  Compl. ¶ 156; *see also* Compl. ¶ 158 (defining the geographical scope of the market).  This market is relevant to Plaintiffs' claims about the aggregation and assertion of patents by Fortress and its PAEs.

The Input Technology Markets are relevant to Apple's independent claim about the transfer of SEPs to PAEs.  As alleged in the complaint, "[e]ach cellular standard developed by [*e.g.*] ETSI [a SSO in the telecommunications industry] . . . consists of many different technologies that perform a variety of functions," and "[t]he technologies that perform each of these functions are essential inputs into the manufacture and supply of products and services that support the standards."  Compl. ¶ 142.  According to Apple, "[t]he functionality for cellular standards associated with each input technology comprises its own relevant market . . . (individually, an 'Input Technology Market,' and collectively, the relevant 'Input Technology Markets')."  Compl. ¶ 146; *see also* Compl. ¶ 166 (alleging that "Fortress, INVT, and Uniloc . . . possess monopoly power for their SEPs in the Input Technology Markets that perform each of those standardized functions").  Unlike the Electronics Patents Market, the Input Technology Markets are worldwide in scope.  *See* Compl. ¶ 147.

E.      Causes of Action

Based on, *inter alia*, the above allegations, Plaintiffs have asserted the following causes of action:

(1) **Violation of § 1 of the Sherman Act** (both Plaintiffs against Fortress, Uniloc, INVT, DSS, and IXI).  *See* 15 U.S.C. § 1 ("Every contract, combination in the form of trust or

United States District Court
Northern District of California

otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign natures, is declared to be illegal.").  The relevant defendants allegedly agreed "to aggregate patents under Fortress's control and to assert patents to increase the total royalties obtained from licensing the Fortress-backed patents."  Compl. ¶ 173.

(2) **Violation of § 7 of the Clayton Act** (both Plaintiffs against Fortress, Uniloc, VLSI, INVT, IXI, and Seven).  *See* 15 U.S.C. § 18 ("[N]o person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person also engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.").  According to Plaintiffs, through, *e.g.*, investment in PAEs or the transfer of patents, the relevant defendants have acquired patents or interests in patents, which constitute assets, and the acquisitions have had anticompetitive effects, in particular, in the Electronics Patents Market.  *See* Compl. ¶ 178.

(3) **Violation of California Business & Professions Code § 17200** (both Plaintiffs against all Defendants).  This § 17200 claim is derivative of the first two claims: "Defendants have engaged in illegal conduct by violating the Sherman and Clayton Acts."  Compl. ¶ 183.  Plaintiffs also claim "unfair[ness] in that [there has been a violation of] the spirit and policy of the antitrust laws."  Compl. ¶ 183.

(4) **Violation of § 17200** (Apple against Fortress, Uniloc, and INVT).  For this separate § 17200 claim (brought by Apple only), the relevant defendants allegedly engaged in unlawful and unfair conduct – violating § 5 of the Federal Trade Commission Act and "the spirit and policy of the antitrust laws" – by obtaining SEPs from operating companies and then demanding non-FRAND royalties in violation of FRAND commitments.  Compl. ¶¶ 187-88; *see also* Compl. ¶ 190 (alleging that the FTC brought an action when "an acquiring firm refused to abide by licensing commitments that its predecessor made in connection with industry standing-setting activities").

9

1

## II.    DISCUSSION

2  A.    Legal Standard

3           Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

4  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

5  complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

6  Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

7  after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

8  *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . .

9  . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d

10  1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and

11  construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

12  *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

13  complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

14  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

15  effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).  "A claim has facial

16  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

17  inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The

18  plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

19  possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted); *see  also*

20  *Twombly*, 550 U.S. at 557.

21  B.    Counts One through Three: Product Market – Electronics Patents Market

22           As indicated above, Plaintiffs' first three causes of action are antitrust claims.  The first

23  two causes of action are federal antitrust claims, brought pursuant to § 1 of the Sherman Act

24  (illegal agreement to restrain trade) and § 7 of the Clayton Act (unlawful acquisition of assets).

25  The third cause of action is a derivative § 17200 claim.  Defendants argue that all three antitrust

26  claims should be dismissed for failure to adequately plead a relevant market.

27

28

United States District Court
Northern District of California

1   1.  Legal Background

2     a.  Clayton Act, § 7 – Relevant Market

3  Section 7 of the Clayton Act provides that

4     no person subject to the jurisdiction of the Federal Trade
      Commission shall acquire the whole or any part of the assets of
5     another person also engaged in commerce or in any activity
      affecting commerce, where in any line of commerce or in any
6     activity affecting commerce in any section of the country, the effect
      of such acquisition may be substantially to lessen competition, or to
7     tend to create a monopoly.

8 15 U.S.C. § 18.  The Supreme Court has held that "determination of the relevant market is a

9 necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly

10 must be one which will substantially lessen competition within the area of effective competition.

11 Substantiality can be determined only in terms of the market affected." *Brown Shoe Co. v. United*

12 *States*, 370 U.S. 294, 324 (1962) (internal quotation marks omitted); *see also United States v. Mar.*

13 *Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (stating that "[d]etermination of the relevant

14 product and geographic markets is 'a necessary predicate' to deciding whether a merger

15 contravenes the Clayton Act"); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.,*

16 *Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (stating the same).

17     b.  Sherman Act, § 1 – Relevant Market

18   Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of

19 trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

20 with foreign natures, is declared to be illegal."  15 U.S.C. § 1.  The Supreme Court has held that,

21 for § 1 purposes,

22     [r]estraints can be unreasonable in one of two ways.  A small group
      of restraints are unreasonable *per se* because they "'always or
23     almost always tend to restrict competition and decrease output.'"
      Typically only "horizontal" restraints – restraints "imposed by
24     agreement between competitors" – qualify as unreasonable *per se*.
      Restraints that are not unreasonable *per se* are judged under the
25     "rule of reason."  The rule of reason requires courts to conduct a
      fact-specific assessment of "market power and market structure . . .
26     to assess the [restraint]'s actual effect" on competition. . . .

27     . . . .

28     To determine whether a restraint violates the rule of reason, . . . a

United States District Court
Northern District of California

1
2
3
4
5

three-step, burden-shifting framework applies.  Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.  If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint.  If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

6    *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018).

7         With respect to step one of the rule-of-reason framework, a plaintiff may prove that the

8    challenged restraint has a substantial anticompetitive effect that harms consumers in the *relevant*

9    *market* through direct evidence or through indirect evidence.  "Direct evidence of anticompetitive

10   effects would be proof of actual detrimental effects [on competition], such as reduced output,

11   increased prices, or decreased quality in the relevant market."  *Id.* at 2284; *see also Rebel Oil Co.*

12   *v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (noting that "[a] predator has sufficient

13   market power when, by restricting its own output, it can restrict marketwide output and, hence,

14   increase marketwide prices[;] [p]rices increase marketwide in response to the reduced output

15   because consumers bid more in competing against one another to obtain the smaller quantity

16   available").  In contrast, "[i]ndirect evidence would be proof of market power plus some evidence

17   that the challenged restraint harms competition."  *Am. Express*, 138 S. Ct. at 2284.

18        Notably, a "full-blown market analysis" is not necessary where a plaintiff relies on direct

19   evidence of anticompetitive effects, as opposed to indirect evidence of such.  *Bhan v. NME*

20   *Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) (noting that "[a] lesser analysis may show that

21   the restraint has actually produced significant anti-competitive effects, such as a reduction in

22   output[;] [i]f the plaintiff can make a showing of anti-competitive effects, a formal market analysis

23   becomes unnecessary").  In *FTC v. Indiana Federation of Dentists*, 476 U.S. 477 (1986)), the

24   Supreme Court explained that "the purpose of the inquiries into market definition and market

25   power is to determine whether an arrangement has the potential for genuine adverse effects on

26   competition"; therefore, "'proof of actual detrimental effects [on competition], such as a reduction

27   of output, *can obviate the need for an inquiry into market power*, which is but a 'surrogate for

28   detrimental effects.'"  *Id.* at 460-61 (emphasis added; "conclud[ing] that the finding of actual,

1    sustained adverse effects on competition in those areas where IFD dentists predominated, viewed

2    in light of the reality that markets for dental services tend to be relatively localized, is legally

3    sufficient to support a finding that the challenged restraint was unreasonable even in the absence

4    of elaborate market analysis").  But, as Defendants point out, a "lesser" market analysis is not the

5    same thing as *no* market analysis (which is what Plaintiffs seem to suggest).  *See* Reply at 7.  As

6    the court explained in *Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717 (7th Cir.

7    2004), *Indiana Federation* does not "allow[] an antitrust plaintiff to dispense entirely with market

8    definition"; rather, it simply reflects that, "if a plaintiff can show the rough contours of a relevant

9    market, and show that the defendant commands a substantial share of the market, then direct

10   evidence of anticompetitive effects can establish the defendant's market power – in lieu of the

11   usual showing of a precisely defined relevant market and a monopoly market share."  *Id.* at 737;

12   *cf. Am. Express*, 138 S. Ct. at 2284-85 (noting that direct evidence of anticompetitive effects

13   includes "reduced output, increased prices or decreased quality *in the relevant market*"; also

14   stating that "courts usually cannot apply the rule of reason without an accurate definition of the

15   relevant market" because, without such, "'there is no way to measure [the defendant's] ability to

16   lessen or destroy competition") (emphasis added).

17          Hence, the Sherman Act § 1 analysis requires some definition of the relevant market.

18          2.      Vague and Overbroad Market

19          As noted above, in the instant case, Defendants argue that the federal antitrust claims, and

20   the derivative § 17200 claim, should be dismissed for failure to adequately plead a relevant

21   market.  The United States agrees with Defendants on this issue.  See Docket No. 148 (United

22   States' statement of interest).

23          The market asserted by Plaintiffs for all three causes of action is the Electronics Patents

24   Market, which Plaintiffs define as the "market for patents for high-tech consumer and enterprise

25   electronic devices and components or software therein and processes used to manufacture them."

26   Compl. ¶ 156; *see also* Compl. ¶ 158 (defining the geographical scope of the market).  Defendants

27   contend that the market, as defined, is both vague and overbroad.

28          On vagueness, Defendants assert that "it is entirely unclear what products might fall within

13

the alleged market": the market definition is so

> imprecise that it would include patents covering thousands upon thousands of products and devices in the home or office – many with disparate uses and applications.  These products and devices include basic computer hardware components (*e.g.*, microprocessors and semiconductors), widely diverse consumer goods (*e.g.*, smartphone, clock radios, televisions, and microwave ovens), large enterprise software (*e.g.*, IT services and large commercial databases), and internet-based services (*e.g.*, online shopping and video streaming), in addition to the processes used to manufacture these wide-ranging devices, components, and software.

Mot. at 10-11.

On overbreadth, Defendants maintain that the market "is so implausibly vast that it provides no meaningful boundaries at all given the wide variety of technologies, products, and customers it allegedly encompasses."  Mot. at 12; *see also* Docket No. 148 (U.S. St. at 11) (noting that the market as defined "would include any patent covering any aspect of the operation or production of any component or software of any piece of consumer or business electronics"); Docket No. 112 (Defs.' RJN at 5) (noting that "the USPTO has issued over 524,000 patents since January 1, 2000 under the CPC classification for 'Electronic Digital Data Processing' and over 368,000 patents since January 1, 2000 under the CPC classification for 'Semiconductor Devices'").  Moreover, Defendants contend, by being so broad in reach, the market necessarily "includes patents that are not economic substitutes, thus making it nonviable as a matter of law."  Mot. at 12.  As noted in *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008), a product market "encompass[es] the product at issue as well as all economic substitutes for the product"; "'[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" [9]  *Id.* at 1045.

The Court agrees with Defendants and the United States (which filed a statement of

---

[9] "Elasticity of demand is a concept used to signify the relationship between changes in price and responsive changes in demand."  *United States v. LSL Biotechnologies*, 379 F.3d 672, 697 (9th Cir. 2004); *see also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992) (indicating that cross-elasticity of demand refers to "the extent to which consumers will change their consumption of one product in response to a price change in another").

United States District Court
Northern District of California

interest pursuant to 28 U.S.C. § 517).  The market as defined in the complaint covers all patents for "high-tech" (whatever that means exactly) electronics products, whether consumer or business-oriented, as well as all related components and software.  Plaintiffs have not explained how, *e.g.*, patents for a smartphone could be part of the same market as patents for a refrigerator, particularly when the products are not substitutes for one another and would appear to involve at least some different technologies.[10]

In response, Plaintiffs argue that they have made, in their complaint, allegations about actual detrimental effects on competition (*i.e.*, direct evidence of anticompetitive effects), *see, e.g.*, Compl. ¶ 102 (alleging that VLSI claims billions of dollars in damages based on eight of its patents but that former owner offered license to those patents for far less – *i.e.*, VLSI has charged supracompetitive prices),[11] which "eliminate any need to offer circumstantial proof – including market definition and market share – of market power."  Opp'n at 15.  But Plaintiffs' argument is problematic because, as discussed above, direct evidence of anticompetitive effects means that a lesser market analysis can be done, but it does not do away entirely with a market analysis. Plaintiffs seem to admit as much at one point in their opposition.  *See* Opp'n at 17 (arguing that "allegations regarding the direct evidence of Defendants' market power in the Electronics Patent Market nullify any need for an *extended* market analysis based on circumstantial evidence, including precisely defining the contours of market and market share therein") (emphasis added).

Furthermore, putting that point aside, the problem for Plaintiffs is that their allegations about actual detrimental effects on competition are largely conclusory in nature.  *See* Opp'n at 16-17 (citing Compl. ¶¶ 9-11, 30, 41-42, 48-49, 159-64, 167).  For example:

- Paragraph 9 states in relevant part: "Fortress uses aggregation to . . . creat[e] a structure in which Fortress and its PAEs benefit by asserting weak patents – i.e., those that never would have been asserted by their former owners – in order to

---

[10] As noted above, the Court acknowledges that Plaintiffs have put at issue both substitutes and complements.  However, for purposes of the analysis here, the Court need only focus on substitutes.

[11] It is not clear from ¶ 102 whether the eight patents at issue have eliminated substitutes.

United States District Court
Northern District of California

stretch the resources of their targets and increase the possibility that those weak patents will improperly be found valid and infringed or the prospect that a target (like Intel or Apple) will agree to a license to resolve the threat posed by Fortress and its PAEs. . . . Fortress and its PAEs acquire and seek to monetize meritless patents that never would have been asserted by their original owners, imposing a tax on the electronics industry that increases prices, decreases output**,** and ultimately harms consumers." Compl. ¶ 9 (emphasis added). But Plaintiffs do not give any concrete example where Fortress and its PAEs have aggregated patents on a specific technology such that an alleged infringer is essentially deprived of substitutes and is thus forced to take a license from Fortress and/or its PAEs and pay a supracompetitive price for that license.

- Paragraph 41 states in relevant part: "[B]y aggregating patents covering technologies that are actual or potential alternatives for one another, Fortress injures competition in the same way as any merger or combination of competitors. Before aggregation, when multiple parties held such patents, those parties competed with one another to license the patents, and licensees benefited from that competition through more favorable licensing terms. Multiple holders of substitute patents were forced to compete with each other to offer better terms to secure licensees. Once the patents were aggregated and controlled by Fortress, however, that competition was eliminated." Compl. ¶ 41. But similar to above, Plaintiffs have not given any concrete example of this specific situation.

- Paragraph 160 states as follows: "The supracompetitive licensing returns Fortress's PAEs have obtained are direct evidence of its market power. For example, the Uniloc Defendants have been able to coerce several parties (including Amazon.com, Inc. and Huawei Device Co. Ltd.) to license its patents, even though its patents have repeatedly been shown to lack merit. Fortress has been able to acquire patents at costs below their hold-up value and then, through the benefit of its anticompetitive scheme, extract higher payments from licensees that reflect

hold-up value rather than the actual value of the patents based on their technical and commercial merits."  Compl. ¶ 160.  Although this paragraph is more specific than the other paragraphs on which Plaintiffs rely, it still has problems.  For example, once again, there is no indication that Uniloc's patents actually eliminate substitutes.  Nor is there a description of the number and viability of substitutes still available, if any.  Also, putting aside the issues of whether Plaintiffs have alleged enough to suggest that Uniloc's patents "have repeatedly been shown to lack merit," Compl. ¶ 160, and whether Amazon and Huawei licensed any of those patents (as opposed to meritorious patents), there is no specific indication that the companies paid supracompetitive prices for those licenses.

In short, Plaintiffs have essentially presented the Court with the *possibility* that Fortress and its PAEs have aggregated patents to such an extent as to deprive alleged infringers of substitutes.  Plaintiffs' allegations do not detail any specific and concrete examples.  Plaintiffs have not crossed the threshold to *plausibility* in asserting antitrust violations.[12]

C.      Count Four: Product Market – Input Technology Markets

In addition to challenging the product market for the first three causes of action (all antitrust), Defendants challenge the product markets for the fourth cause of action – *i.e.*, Apple's independent § 17200 claim based on the transfer of SEPs from operating companies to PAEs.

As an initial matter, the Court notes that this claim is not an antitrust claim but that, per Plaintiffs' complaint, it is based in part on the "spirit and policy of the antitrust laws," Compl. ¶ 187 (also claiming a violation of the FTCA) – which is presumably why Apple identified product markets for the claim.  *Cf.* S*tevenson Real Estate Servs., Inc. v. CB Richard Ellis Real Estate Servs., Inc.*, 138 Cal. App. 4th 1215, 1225 (2006) ("'When a plaintiff who claims to have suffered

---

[12] In their motion, Defendants argue that, even if Plaintiffs did present nonconclusory allegations of market power, Plaintiffs' case would still founder because "weak" patents cannot give rise to market power; in other words, if patents are weak, then they cannot be used to control prices, exclude competition, and so forth.  *See* Mot. at 15-16.  At this early stage of the proceedings, however, the Court is not in a position to say that this could never be true, especially in view of Plaintiffs' theory of aggregation and the ability to extract supracompetitive prices.  *See also* Docket No. 133-1 (amicus brief filed by the Electronic Frontier Foundation).

injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.").

The product markets that Apple has identified for the § 17200 claim are the Input Technology Markets. As alleged in the complaint, "[e]ach cellular standard developed by [*e.g.*] ETSI [a SSO in the telecommunications industry] . . . consists of many different technologies that perform a variety of functions," and "[t]he technologies that perform each of these functions are essential inputs into the manufacture and supply of products and services that support the standards." Compl. ¶ 142. According to Apple, "[t]he functionality for cellular standards associated with each input technology comprises its own relevant market . . . (individually, an 'Input Technology Market,' and collectively, the relevant 'Input Technology Markets')." Compl. ¶ 146; *see also* Compl. ¶ 166 (alleging that "Fortress, INVT, and Uniloc . . . possess monopoly power for their SEPs in the Input Technology Markets that perform each of those standardized functions"). Apple's point seems to be that, if a patent holder has a SEP, then there are no substitutes available as a practical matter, which means that the patent holder has a 100% share of the market as defined by the SEP. *See* Opp'n at 23.

Defendants challenge the Input Technology Markets on several grounds. For purposes of this opinion, the Court need only address Defendants' contention that the markets as defined are vague and overbroad.[13] According to Defendants, the markets are vague and overbroad because

---

[13] Although the Court does not make any ruling on the matter at this time, it does find questionable Defendants' argument that Apple's claim is not viable without allegations that the SSO considered alternative technology and would have adopted the technology but for the defendant's misconduct. As Apple notes, it is not claiming that misconduct took place *during* the standard-setting process but rather *after*. In other words, Apple is not arguing that an antitrust violation occurred because defendants *acquired* a monopoly unlawfully; rather, it is arguing that Defendants violated the "spirit" of the antitrust laws by now deviating from the FRAND commitment subsequent to the standard-setting process. (Admittedly, there is a fair argument that such conduct constitutes a breach of contract.)

On the other hand, it is also questionable whether Apple can simply allege that Defendants *claim* to own SEPs instead of alleging that Defendants own or control patents that actually are SEPs. *See, e.g.*, Compl. ¶ 56 (alleging that Uniloc obtained "patents claimed to be [SEPs] for cellular standards that originated with [Philips]"). If a SEP is a problem because it effectively

"a single device or product alone [such as a cell phone] can encompass scores of standardized technologies," Mot. at 17, and Apple has not even identified any specific SEPs at issue. The Court agrees. It is both vague and overbroad for Apple to refer broadly to SEPs for cellular standards without any additional specificity. Admittedly, there is some specificity in the complaint because Apple refers to transfers of SEPs to Uniloc and INVT. (These two defendants plus Fortress are the only defendants for this § 17200 claim.) *See, e.g.*, Compl. ¶ 150 (alleging that "Uniloc Luxembourg received SEPs that originated with Philips, to which Uniloc Luxembourg granted Uniloc USA rights to be an exclusive licensee, and which it later transferred to Uniloc 2017"; further alleging that "INVT acquired SEPs from Panasonic subject to obligations for INVT to share with Panasonic the royalties it obtains from licensees"). However, this identification is still lacking because it is unclear whether Apple means that any patent Uniloc and INVT received from Philips and Panasonic is an SEP. Furthermore, it is not clear from the complaint whether the SEPs transferred from Philips and Panasonic are the only SEPs at issue in this case. (The Court also notes that Apple has not adequately pled that a defendant refused to license a SEP on anything but FRAND terms.)

D.     Counts One Through Three: Antitrust Injury

Defendants next challenge the three antitrust claims (*i.e.*, the first three causes of action) on the basis that Plaintiffs have failed to adequately an antitrust injury.

"It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). Thus, the Ninth Circuit has repeatedly "held that antitrust injury consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013); *see also Am. Ad.*, 190 F.3d at

---

eliminates substitutes as a practical matter (*i.e.*, businesses have an interest in conforming with a standard in order to sell their products), then it is not clear why Apple can avoid pleading that Defendants have patents that are in fact SEPs. At the hearing, Apple indicated that, in the *Apple v. Samsung* litigation, Judge Koh did not require Apple to plead that the patents at issue were, in fact, SEPs, but Apple did not provide Judge Koh's reasoning on this point.

1056 (noting that "[i]t is not enough that the plaintiff's claimed injury flows from the unlawful conduct[;] [a]n antitrust injury must 'flow[] from that which makes defendants' acts unlawful'"). In *Somers*, the Ninth Circuit added that it has also "imposed a fifth element – that 'the injured party be a participant in the same market as the alleged malefactors,' meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" *Somers*, 729 F.3d at 963.

As pled, the complaint suggests two possibilities for antitrust injury: (1) the payment of inflated royalties to Defendants (*i.e.*, supracompetitive prices for licenses) or the risk of paying such; and (2) the payment of litigation costs for defending against Defendants' patent infringement suits or the risk of paying such. For example, the following is alleged in ¶ 170:

> Defendants' illegal conduct causes obvious harm to licensees such as Intel and Apple – i.e., customers in the Electronics Patents Market . . . – when they are compelled to pay inflated royalties. Licensing customers are also harmed, even when they do not acquiesce to an inflated royalty, by being forced to incur substantial expenses, uncertainty, and burdens in resisting the patent litigations and threats that the aggregation and transfer schemes Defendants have enabled. For example, Intel and Apple have also each been harmed by the enormous amounts of time their employees have been forced to spend on these matters, including negotiating with Defendants as well as collecting information and documents and preparing for depositions, rather than doing their jobs. . . . Intel and Apple continue to experience the unlawful effects of Defendants' unlawful conduct so long as they are subject to litigation by Fortress-backed patents.

Compl. ¶ 170 (referring to patent infringement litigation previously brought by Uniloc against Apple and VLSI against Intel in the period 2016 through 2019).

To the extent Defendants argue that the above injuries do not flow from harm to competition, that argument is problematic, at least in part. Plaintiffs' basic theory, as indicated above, is that aggregation of patents by Defendants has led to the elimination of substitutes – and the elimination of substitutes constitutes the elimination of competition. If proven, there could well be antitrust injury suffered as a result of the elimination of competition. However, Plaintiffs have not clearly alleged with sufficient specificity that Defendants' aggregation has in fact eliminated substitutes (1) which has actually impacted Plaintiffs (*i.e.*, Plaintiffs have already paid inflated royalties or have already incurred litigation costs) or (2) which will likely impact Plaintiffs

in the future (*i.e.*, there is a real or immediate threat that they will be subject to inflated royalty demands from Defendants or patent infringement suits brought by Defendants).  Although Plaintiffs have pointed to past lawsuits brought by Uniloc and INVT (against Apple) as well as VLSI (against Intel), where Plaintiffs presumably did incur litigation costs, it is not clear that those lawsuits came about *because of the elimination of substitutes*.  Thus, as presently pled, Plaintiffs' complaint is deficient in alleging antitrust injury.

E.      Counts One and Three: *Noerr-Pennington* Doctrine

        For two of the antitrust claims – *i.e.*, count one (violation of § 1 of the Sherman Act) and count three (violation of § 17200, to the extent it is based on a violation of § 1 of the Sherman Act) – Defendants further argue that the *Noerr-Pennington* doctrine is a bar to suit.

        The *Noerr-Pennington* doctrine "exempts bringing a lawsuit – that is, petitioning a court – from antitrust liability."  *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1183 (9th Cir. 2005); *see also Sosa v. DirecTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (noting that the "doctrine derives from the First Amendment's guarantee of 'the right of the people . . . to petition the Government for a redress of grievances'[;] [u]nder the . . . doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct").  "While *Noerr-Pennington* immunity is broad, it is not so broad as to cover all litigation: 'Sham' petitions [do not] fall within the protection of the doctrine."  *Freeman*, 410 F.3d at 1183-84.

        The Ninth Circuit has noted there are two types of sham petitions.

> First, if the alleged anticompetitive behavior consists of bringing a single sham lawsuit (or a small number of such suits), the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships.

> Second, if the alleged anticompetitive behavior is the filing of a series of lawsuits, "the question is not whether any one of them has merit – some may turn out to, just as a matter of chance – but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."

*Id.* at 1184; *see also Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1046 (9th Cir.

2009) (noting that the Supreme Court's decision *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries*, 508 U.S. 49 (1993), applies when the issue is whether a single action constitutes sham petitioning,[14] and that the Supreme Court's decision *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508 (1972), applies where the defendant is accused of bringing a series of legal proceedings[15]); *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994) (similarly noting that the *Professional Real Estate Investors* "inquiry is essentially retrospective" while the *California Motor Transport* inquiry is "prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part a pattern or practice of successive filings undertaken essentially for purposes of harassment?").[16]

---

[14] In *Professional Real Estate Investors*, the Supreme Court

> outline[d] a two-part definition of "sham" litigation.  First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.  Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.  Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor" through the "use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon."

*Professional Real Estate Investors*, 508 U.S. at 60-61 (emphasis in original).

[15] In *California Motor Transport*, the Supreme Court noted that

> [t]here are many . . . forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations.  [For example,] [o]ne claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused.

*California Motor Transport*, 404 U.S. at 513.

[16] In their papers, Defendants question whether Ninth Circuit law – which makes the above distinction between sham petitioning – as opposed to Federal Circuit should apply.  *See* Mot. at 25 n.11 (citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (stating that "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of

1    The instant case would appear to implicate the second type of sham petition – *i.e.*,

2    Plaintiffs have alleged that Defendants' have filed a series of meritless patent infringement

3    lawsuits.  Plaintiffs argue, however, that the Court need not even get into the issue of whether a

4    sham petition theory is a way out of the *Noerr-Pennington* doctrine because the alleged

5    misconduct of Defendants is not so much (1) their enforcement of patents through litigation but

6    rather (2) their aggregation of patents in the first place.  *See* Opp'n at 29 (arguing that "litigation

7    [is] simply . . . the way Defendants collect the fruits of the illegal conduct Plaintiffs challenge").

8    In other words, according to Plaintiffs, the *Noerr-Pennington* doctrine has no application to the

9    instant case at all because the true anticompetitive conduct at issue is Defendants' aggregation of

10   patents.

11   In support of their position, Plaintiffs primarily rely on *Hynix Semiconductor Inc. v.*

12   *Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. 2007) (Whyte, J.).  In *Hynix*, Rambus was a

13   member of a SSO (standard-setting organization) and allegedly used its membership in the SSO to

14   discover how a particular standard was developing and then drafted patent claims to cover the

15   standard.  "Once the industry became 'locked in' to the DRAM standard, Rambus sprang the

16   'patent trap' and demanded royalties," and further "backed up its royalty demands with

17   infringement litigation."  *Id.* at 1089.  Hynix subsequently brought an antitrust claim based on

18   Rambus's "'overall course of conduct' – including [its] patent litigation."  *Id.*

19   Before Judge Whyte, Rambus argued that, "because its use of the courts to enforce its

20   patents is protected petitioning activity pursuant to the *Noerr-Pennington* doctrine . . . , Hynix

21   could not claim its litigation expenses as damages."  *Id.* at 1086.  Judge Whyte ultimately

22   disagreed.

23   He noted that there were "three possible approaches to whether patent litigation can be an

24   anticompetitive act in violation of the antitrust laws."  *Id.* at 1091.

25        • Under the first approach (the Second Circuit's "absolute bar"), "only frivolous

26   _____

27   its immunity from the antitrust laws is to be decided as a question of Federal Circuit law")).
     However, Ninth Circuit law applies with respect to this distinction which concerns the First

28   Amendment, even when the underlying issue is whether a series of patent infringement lawsuits is
     protected by the *Noerr-Pennington* doctrine.  *See generally Kaiser*, 552 F.3d at 1033.

United States District Court
Northern District of California

patents can be anticompetitive and part of an unlawful scheme." *Id.* at 1091-92.

- Under the second approach (labeled the "*Kobe* claim") – and at "the opposite end of the spectrum" – even nonfrivolous patent litigation can be anticompetitive if part of a broader anticompetitive scheme (*i.e.*, "brought in conjunction with other antitrust misconduct"). *Id.* at 1092-94.

- The third approach was a middle ground between the first two approaches. *See id.* at 1094. Under the third approach, "good faith litigation" could be "unlawful if done as part of an anticompetitive scheme" but, in order to get litigation costs as part of the damages for the antitrust violation, there must be "an explicit linkage between [the] antitrust violation and the litigation" – *i.e.*, a causal connection. *Id.* at 1095.

Judge Whyte endorsed the third approach, explaining as follows:

> The jurisprudence contains a debate between the need to keep courts open for good faith litigation and a desire to prevent "smothering" and "aggressive weapon" patent litigation. At one end is [the] *Kobe* court's "smothering" reasoning, which appears unconcerned that its hypothetical "potential competitor" was an infringer with no legal right to be competing in the product market. . . . Taken as a whole, the *Kobe* decision represents hostility to patent rights inconsistent with a modern understanding of intellectual property and competition law. On the other hand, the Second Circuit's position would allow litigation brought to further anticompetitive schemes to go unchecked. . . .
>
> With these considerations in mind, the court believes that the Federal Circuit and the Supreme Court would recognize some "scheme" antitrust allegations that include constitutionally protected litigation within the "overall course of conduct," but only those in which the patent litigation is "causally connected" to anticompetitive harms. . . . The court concludes that before otherwise protected litigation can be a part of an "anticompetitive scheme" claim, the court must first find that the other aspects of the scheme independently produce anticompetitive harms. Once this step has been established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms. If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme.

*Id.* at 1096-97. He added: "[W]here the patent litigation is used to further the harm caused under a 'more traditional antitrust theory,' a plaintiff should be allowed a full recovery." *Id.* at 1097.

Several district courts have endorsed the *Hynix* approach. *See, e.g., Funai Elec. Co. v. LSI*

1    *Corp.*, No. 16-cv-01210-BLF, 2017 U.S. Dist. LEXIS 44866 (N.D. Cal. Mar. 27, 2017) (finding

2    *Hynix* persuasive and "join[ing] those courts which have followed it"); *Apple, Inc. v. Samsung*

3    *Elecs. Co.*, No. 11-CV-01846-LHK, 2012 U.S. Dist. LEXIS 90889, at *88-89 (N.D. Cal. June 29,

4    2012) (noting that, "[i]n *Hynix*, the cost of litigation was causally connected to the anticompetitive

5    harms and flowed from the alleged violations of the statute[;] [t]hus, because Apple has alleged

6    patent holdup stemming from Samsung's failure to disclose essential patents to ETSI and

7    Samsung's failure to license on FRAND terms, and because Apple's litigation costs stem directly

8    from Samsung's alleged anticompetitive behavior, these litigation costs are a sufficient basis for a

9    potential award of antitrust damages").  *But see Aventis Pharma S.A. v. Amphastar Pharms., Inc.*,

10   No. 5:05-00887-MRP (PLA), 2009 U.S. Dist. LEXIS 132345 (C.D. Cal. Feb. 17, 2009) (stating

11   that "*Hynix* [2007] was decided before *Kaiser* [2009], where the Ninth Circuit's approach is

12   incompatible with the *Hynix* test" and that "the *Hynix* test conflates *Noerr-Pennington* immunity

13   with the substantive § 2 element of antitrust injury").

14        In addition, a respected legal treatise has endorsed what is, in essence, a modified *Hynix*

15   approach, drawing a distinction between liability and damages.  More specifically, *liability* can be

16   based on nonpetitioning activity only (such as aggregation of patents) – or else *Noerr-Pennington*

17   would be implicated – but *injury* can be related to petitioning activity (*i.e.*, patent infringement

18   litigation).

19            "[T]he only difference between *Hynix* and the Second Circuit
20            approach is one of damages: a plaintiff that can prove an antitrust
             violation without the use of protected petitioning can recover
21            damages caused by that petitioning as well as damages by the
             conduct that proved the violation."  We think that *outcome* "makes
22            sense," but it should be distinguished from recognition of a broader
             "overall scheme" theory that allows liability to turn on the existence
23            of protected petitioning.

24   Hovenkamp, *et al.*, IP & Antitrust § 11.04[F] (emphasis added).

25        The First Circuit also seems to have endorsed the modified *Hynix* approach.

26            Courts have recognized that "[t]here is an important difference, for
             purposes of the *Noerr-Pennington* doctrine, between using litigation
27            . . . as a basis of antitrust liability and awarding damages for efforts
             to use the courts to carry out private cartel agreements."  *Premier*
28            *Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d

United States District Court
Northern District of California

358, 374 (7th Cir. 1987) (Easterbrook, J.); see also *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1561 (11th Cir. 1992) (citing *Premier* for the proposition that "the institution of state court litigation against the Sherman Act plaintiff . . . could furnish the source of the antitrust injury . . . even if it could not provide a basis for a Sherman Act violation under the *Noerr-Pennington* doctrine"). The mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct. *See, e.g.*, *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *United States v. Singer Mfg. Co.*, 374 U.S. 174, 196-97 (1963); *Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 102-03 (2d Cir. 2000).

*Amphastar Pharm. Inc. v. Momenta Pharm., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017).

The modified *Hynix* approach is consistent with the United States's position that "[a]n acquiring entity is not protected from the antitrust laws just because it may subsequently exercise its unlawfully obtained market power through litigation." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 18-1367 (Fed. Cir.) (Docket No. 41) (U.S. Br. at 10) (adding that, "[a]ccordingly, if the Court reaches the *Noerr-Pennington* issue, it should clarify that the *Noerr-Pennington* doctrine does not protect anticompetitive patent acquisitions from antitrust liability regardless of whether the patent acquirer engages in protected litigation activity"); Docket No. 148 (U.S. St. at 18-19) (asserting that, "[i]f [Plaintiffs'] complaint were held to allege adequately the elimination of competition through acquisition or agreement, then such challenged conduct would not be exempt from antitrust enforcement under *Noerr-Pennington*[;] this conduct remains subject to the antitrust laws even if there is subsequent litigation to enforce the patents").

The Court finds the modified *Hynix* approach persuasive. The approach recognizes that liability cannot be predicated on petitioning activity but if a defendant engages in anticompetitive conduct which does not constitute petitioning activity, it cannot immunize itself from liability for litigation-related damages if it asserts or tries to assert its unwarranted accumulation of market power through litigation. Because Plaintiffs' theory of liability is consistent with the modified *Hynix* approach, the Court concludes that *Noerr-Pennington* is not a bar to their antitrust claims.

F.   Count One: Unlawful Agreement to Restrain Trade

In addition to attacking product market and antitrust injury for all three antitrust causes of action, Defendants also challenge each antitrust cause of action on an independent ground. For the first cause of action, an alleged violation of § 1 of the Sherman Act, Defendants contend that

Plaintiffs have failed to allege an unlawful agreement to restrain trade.  *See* 15 U.S.C. § 1 (providing that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign natures, is declared to be illegal."); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (stating that, "[i]n order to establish a claim under Section 1, a plaintiff must demonstrate: (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce") (internal quotation marks omitted); *see also E.W. French & Sons v. Gen. Portland*, 885 F.2d 1392, 1397 (9th Cir. 1989) (stating that "[t]he essence of a section 1 claim is concerted action"); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110 (3d Cir. 1980) (stating that "[u]nilateral action, no matter what its motivation, cannot violate § 1").

In evaluating Defendants' argument, the Court notes at the outset that it is not clear from either Plaintiffs' complaint or their opposition whether Plaintiffs are asserting (1) an overarching conspiracy claim (*i.e.*, a claim that *all* Defendants are part of one big conspiracy); (2) a claim that Fortress and *each* of the other defendants was in a separate conspiracy; or (3) something in between.  This should be clarified because it will likely have an impact on the merits of Plaintiffs' case; for example, the more defendants there are in one big conspiracy, the greater the likelihood that aggregation of patents has resulted in the elimination of substitutes.

If Plaintiffs are asserting on overarching conspiracy claim (*i.e.*, a claim that *all* Defendants are part of one big conspiracy), then there are insufficient allegations that all Defendants "'had a conscious commitment to a common scheme to achieve an unlawful objective.'"  *Monsanto v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  Although, "[t]o be held a part of a conspiracy, a conspirator need not know all dimensions of the wrongful conduct taken in its furtherance," *Meredith Corp. v. Sesac, LLC*, 1 F. Supp. 3d 180, 213 (S.D.N.Y. 2014).  a plaintiff "must [still] show that each [d]efendant had knowledge of an agreement as to the overall conspiracy" – *i.e.*, "must prove that each [d]efendant was united in a common unlawful goal or purpose, or knew of the conspiracy's general scope and purpose."  *In re Vitamins Antitrust Litg.*, 320 F. Supp. 2d 1, 15 (D.D.C. 2004); *see also Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC, 2020 U.S. Dist.

United States District Court
Northern District of California

LEXIS 36747, at *32 (N.D. Cal. Mar. 3, 2020) (noting that a defendant must know of his connection to the charged conspiracy – *i.e.*, was aware of the unlawful object toward which the agreement was directed).  There are no specific allegations indicating that the defendant PAEs knew they were part of a broader scheme being facilitated by Fortress.  *Cf. United States v. Briscoe*, 896 F.2d 1476, 1505 (7th Cir. 1990) (in a criminal drug conspiracy case, noting that "[t]he government may establish a defendant's knowing participation in a single conspiracy by offering evidence that: [the] parties to the agreement were *aware that others were participating in the scheme*"; "[i]n other words, the government may establish that a defendant knowingly became a member of a single narcotics conspiracy if each [defendant retailer] knew, or had reason to know, that other retailers were involved with the . . . organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture. . . .") (emphasis added; internal quotation marks omitted).  Indeed, it is entirely possible that only Fortress knew of the (alleged) broad scheme to aggregate patents from various PAEs; but unilateral action by Fortress cannot sustain a § 1 claim which requires concerted action involving all the PAEs.

Even if Plaintiffs are claiming a conspiracy between Fortress and some, but not all, of the PAE defendants, the same problem above would obtain.  There are insufficient allegations indicating which PAEs, if any, knew they were part of a broader scheme.

Finally, even if Plaintiffs are claiming separate bilateral conspiracies between Fortress and each PAE defendant, there are still insufficient allegations of an agreement by both Fortress and each PAE to aggregate weak patents.  As Defendants argue, for the most part, Plaintiffs have simply alleged that Fortress invested in a given PAE – which is consistent with "rational, legal business behavior."  Mot. at 31.

G.    Count Two: Unlawful Acquisition of Assets

The second cause of action is an antitrust claim brought pursuant to § 7 of the Clayton Act. Section 7 provides as follows:

[N]o person subject to the jurisdiction of the Federal Trade

United States District Court
Northern District of California

> Commission shall acquire the whole or any part of the assets of another person also engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18.  "'[A]cquisition' as used in § 7 . . . means holding as well as obtaining assets" – *i.e.*, "acquisition" means "both the act of first obtaining assets *and* the retention and use of those assets."  *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 240, 243 (1975) (emphasis added).  According to Plaintiffs, the relevant defendants have acquired patents or interests in patents, which constitute assets, and the acquisitions have allegedly had anticompetitive effects, in particular, in the Electronics Patents Market.  *See* Compl. ¶ 178.

As discussed above, Defendants have attacked the § 7 claim on the basis of failure to adequately allege product market and antitrust injury.  As independent grounds for dismissal of the § 7 claim (in whole or in part), Defendants argue: (1) any alleged injury did not come from acquisition of any patents but rather post-acquisition enforcement of patents  and (2) at least some of the conduct underlying the § 7 claim is time barred.

       1.    <u>Acquisition of Patents v. Post-Acquisition Enforcement of Patents</u>

Defendants contend that the § 7 claim should be dismissed because the real wrongdoing (as alleged) is not their acquisition of patents but rather their post-acquisition enforcement of patents.  *See* Mot. at 35.  But Defendants' position is problematic given that, as noted above, the Supreme Court has explained that "acquisition" includes not just the "the act of first obtaining assets" but also "the retention and use of those assets."  *ITT*, 420 U.S. at 240.

Furthermore, to the extent Defendants' point implicates the *Noerr-Pennington* doctrine discussed above, the Court finds in favor of Plaintiffs on that issue – *i.e.*, the conduct on which Plaintiffs base their *liability* theory is the elimination of competition through the *aggregation* of patents; where Plaintiffs do or did not sustain antitrust injury (*damages*) until after aggregation when Defendants tried to enforce their patents, *Noerr-Pennington* is not implicated

That being said, Plaintiffs have not adequately alleged that there has been such an aggregation of patents as to eliminate substitutes, thus constituting unfair competition cognizable under § 7.  *Cf.* Mot. at 36 (recognizing that the Areeda & Hovenkamp antitrust treatise states that

1    "'§ 7's concern with asset acquisitions that may substantially lessen competition' could arise 'if

2    some of the acquired patents operated as substitutes rather than as complements, and if the

3    patentee had acquired enough of these so as to limit *unreasonably* the technology choices in the

4    market'") (emphasis added).

5              2.       Statute of Limitations

6        Defendants also argue that at least part of the § 7 claim should be dismissed because some

7    of the alleged misconduct (*i.e.*, unlawful acquisitions) falls outside the limitations period.

8                   a.       Damages v. Injunctive Relief

9        In evaluating this argument, the Court bears in mind that, for the § 7 claim, Plaintiffs are

10   seeking damages *and* injunctive relief.  The statute of limitations for a claim for damages differs

11   from that for a claim for injunctive relief.

12       Where a plaintiff seeks damages for a § 7 violation, there is a four-year statute of

13   limitations.  *See* 15 U.S.C. § 15 (providing that, in general, "any person who shall be injured in his

14   business or property by reason of anything forbidden in the antitrust laws may sue therefor in any

15   district court of the United States . . . without respect to the amount in controversy, and shall

16   recover threefold the damages by him sustained, and the cost of suit, including a reasonable

17   attorney's fee"); *id.* § 15b (providing that "[a]ny action to enforce any cause of action under

18   section 4, 4A, or 4C [15 U.S.C. § 15, 15a, or 15c] shall be forever barred unless commenced

19   within four years after the cause of action accrued").  "Ordinarily, '[a] cause of action in antitrust

20   accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs

21   from the commission of the act.'"  *Solo v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *see*

22   *also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000) (stating that

23   "[a]n antitrust cause of action generally 'accrues and the statute begins to run when a defendant

24   commits an act that injures a plaintiff's business'").

25       There are, however, exceptions to this rule.  As the Ninth Circuit has explained:

26           First, "[i]n the context of a continuing conspiracy to violate antitrust
             laws, . . . each time a plaintiff is injured by an act of the defendant[]
27           a cause of action accrues to him to recover the damages caused by
             that act.  "[A]s to those damages, the statute of limitations runs from
28           the commission of the act."  In order to restart the statute of

United States District Court
Northern District of California

> limitations, there must be a new overt act that: (1) is "new and independent . . . [and] not merely a reaffirmation of a previous act," and (2) "inflict[s] new and accumulating injury on the plaintiff."

*Solo*, 751 F.3d at 1086.  *Solo* gave as an example "each time a defendant sells its price-fixed product, [as] the sale constitutes a new overt act causing injury to the purchaser."  *Id.*; *see also Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (noting that the continuing violation doctrine "is meant to differentiate those cases were a continuing violation is ongoing – and an antitrust suit can therefore be maintained – from those where all of the harm occurred at the time of the initial violation"); *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir. 1979) (noting that, "'[w]here the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act'").

As to the second exception, the Ninth Circuit explained that

> the limitations period may start to run after the defendant's initial violation of the antitrust law, if it is "uncertain" or "speculative" whether the defendants' antitrust violation has injured the plaintiff at the time of the violation.  In such cases, the statute of limitations period begins on the date that the plaintiff's damages first "accrued and became ascertainable."

*Solo*, 751 F.3d at 1086.

Where a plaintiff seeks injunctive relief for a § 7 violation, *see generally* 15 U.S.C. § 26 (providing that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damages by a violation of the antitrust laws, including sections two, three, seven, and eight of this Act [15 U.S.C. §§ 13, 14, 18, and 19]"), "there is no statute of limitations" per se.  *Id.* at 1085.  However, a claim for injunctive relief is "subject to the equitable defense of laches [a]nd, 'in computing the laches period,' section 4B's four-year statute of limitation is used as a 'guideline.'"  *Id.* at 1085-86.

b.    Claim for Damages

As noted above, a claim for damages has a four-year statute of limitations.  Because the instant case was filed on November 20, 2019, the statute of limitations reaches back to November

United States District Court
Northern District of California

20, 2015.  Thus, the Court must consider whether, as to each defendant sued for a § 7 violation (not all Defendants have been sued),[17] whether any patent acquisition occurred on or after November 20, 2015.  (As noted above, the Court bears in mind that acquisition includes first obtaining the asset as well as holding or using the asset.)

- Fortress.  Plaintiffs allege that, in November 2017, a Fortress affiliate acquired a patent portfolio from Crossroads.  *See* Compl. ¶ 81.  Thus, Plaintiffs have adequately pled that Fortress obtained patents during the limitations period (*i.e.*, after November 20, 2015).

- Uniloc (specifically, the entity known as Uniloc 2017).  Plaintiffs allege that Fortress formed Uniloc 2017 in February 2018 and that, in May 2018, Uniloc Luxembourg assigned nearly 600 patents to Uniloc 2017.  *See* Compl. ¶¶ 53-54.  Thus, Plaintiffs have adequately pled that Uniloc 2017 obtained patents during the limitations period (*i.e.*, after November 20, 2015).

- VLSI.  Plaintiffs allege that Fortress formed VLSI in June 2016 and that VLSI was assigned patents beginning in August 2016.  *See* Compl. ¶ 58.  Thus, Plaintiffs have adequately pled that VLSI obtained patents during the limitations period (*i.e.*, after November 20, 2015).

- INVT.  Plaintiffs allege that Inventenergy and a Fortress affiliate formed INVT in April 2017.  *See* Compl. ¶ 69.  Given that INVT was not formed until April 2017, it presumably acquired patents at some point thereafter, which would be during the limitations period (*i.e.*, after November 20, 2015).

- IXI.  Plaintiffs seem to admit that the relevant interactions between Fortress and IXI pre-dated November 20, 2015.  *See, e.g.*, Compl. ¶ 74 (alleging that IXI assigned security interests in patents to Fortress and a Fortress subsidiary in June and September 2014).  However, Plaintiffs argue that this does not bar them from seeking injunctive relief vis-à-vis IXI.

---

[17] The only Defendants that have been sued are: Fortress; Uniloc (specifically, the entity known was Uniloc 2017); VLSI; INVT; IXI; and Seven.

United States District Court
Northern District of California

United States District Court
Northern District of California

- Seven.  Similar to above, Plaintiffs seem to admit that the relevant interactions between Fortress and Seven pre-dated November 20, 2015.  *See, e.g.*, Compl. ¶ 76 (alleging that Fortress gained control over Seven before July 2015 and that patents passed to Seven in July 2015).  However, Plaintiffs argue that this does not bar them from seeking injunctive relief vis-à-vis Seven.

     c.     <u>Claim for Injunctive Relief</u>

As noted above, for a claim for injunctive relief, there is no statute of limitations but such a claim is "subject to the equitable defense of laches [a]nd, 'in computing the laches period,' section 4B's four-year statute of limitation is used as a 'guideline.'"  *Solo*, 751 F.3d at 1085-86.  Thus, "in applying laches, we look to the same legal rules that animate the four-year statute of limitations under section 4B."  *Id.* at 1086.

Plaintiffs argues that, even if, for IXI and Seven, patents were acquired *before* the four-year damages limitations period, Plaintiffs still suffered injury *during* the limitations period.  For example:

- IXI.  "IXI . . . amended its infringement contentions in litigation against Apple in 2019, thereby seeking 'to restart the litigation that it comprehensively lost five years after the complaint was filed.'"  Opp'n at 38.
- Seven.  "Seven . . . sued Apple in 2019."  Opp'n at 38.]

As indicated above, the Ninth Circuit has noted that a

> limitations period may start to run after the defendant's initial violation of the antitrust law, if it is "uncertain" or "speculative" whether the defendants' antitrust violation has injured the plaintiff at the time of the violation.  In such cases, the statute of limitations period begins on the date that the plaintiff's damages first "accrued and became ascertainable."

*Solo*, 751 F.3d at 1086.  Plaintiffs' allegations appear to invoke this reasoning – *i.e.*, even if the patents were acquired before the limitations period, any injury to Plaintiffs was uncertain or speculative until Defendants took concrete action such as starting or restarting a lawsuit.  The Court therefore does not find at this time a bar to the claims for injunctive relief.

H.    Counts Three and Four: Anti-SLAPP Statute, Litigation Privilege, and Failure to State a

Claim

Counts three and four of the complaint are the § 17200 claims.  The first § 17200 claim is

derivative of the two federal antitrust claims (§ 1 of the Sherman Act and § 7 of the Clayton Act).

The second § 17200 claim is the claim brought by Apple against Fortress and certain PAEs based

on the transfer of alleged SEPs from third parties to those defendants.

For the § 17200 claims, Defendants raise the following arguments: (1) the claims should be

stricken pursuant to California's anti-SLAPP statute and (2) the claims should be dismissed for

failure to state a claim for relief and/or based on a clear affirmative defense.  The Court has

already discussed above why Plaintiffs have failed to state a claim for relief, for both the § 1 and §

7 claims on which the first § 17200 claim depends as well as Apple's independent § 17200 claim.

Accordingly, the Court need not address Defendants' remaining arguments.

I.    Supplemental Brief Filed by DSS

As noted above, although all Defendants have joined in the motion to dismiss, one

defendant – namely, DSS – has also filed a separate supplemental brief, arguing that there are

independent bases for dismissing all claims against it.  The only claims that Plaintiffs have

asserted against DSS are the Sherman Act, § 1 claim and the derivative § 17200 claim.  DSS

contends that the two claims should be dismissed because (1) the claims are covered by settlement

agreement between DSS and Intel (which resolved a patent infringement lawsuit brought by DSS

against Intel) and (2) the claims are time barred.

1.    Settlement Agreement Between DSS and Intel

a.    Terms of Settlement Agreement

As indicated in Plaintiffs' complaint, DSS filed suit against Intel in February 2015 in the

Eastern District of Texas.  Two patents were implicated in that suit.  *See* Compl. ¶ 110.  The

patents were the '552 and '924 patents.

In January 2019, DSS and Intel signed a settlement agreement which resolved the lawsuit

between the parties.  *See* Compl. ¶ 113.  A copy of the settlement agreement between DSS and

Intel can be found at Docket No. 116 (Defs.' RJN, Ex. A) (settlement agreement).

The agreement contains releases on each side:

- "DSS . . . fully and forever irrevocably and unconditionally releases, acquits and discharges each Defendant . . . from all past, present and future Claims, arising out of or in any way related to, in any manner or degree, the Covered Patents, the Litigation or the IPR Appeal or the facts raised in the Litigation or the IPR Appeal."  Docket No. 116 (Sett. Agmt. ¶ 2.1(i)).
- "[E]ach Defendant . . . hereby fully and forever irrevocably and unconditionally releases, acquits and discharges DSS . . . from any and all Claims asserted by such Defendant . . . in the Litigation."  Docket No. 116 (Sett. Agmt. ¶ 2.1(iv)).

"Claims" is defined in the agreement as follows:

> "Claims" means claims, counterclaims, answers, cross-claims and any judicial, administrative or other proceeding of any kind in any jurisdiction, as well as any and all actions, causes of action, costs, damages, debts, demands, expenses, liabilities, losses, obligations, proceedings, and suits of every kind and nature . . . , whether asserted or unasserted, whether presently known or unknown, whether anticipated or unanticipated, and whether direct or derivative.

Docket No. 116 (Sett. Agmt. ¶ 1.2).

In its answer to DSS's patent infringement complaint, Intel asserted various affirmative defenses, including: no infringement (first through third affirmative defenses); unenforceability (fourth affirmative defense); and invalidity (fifth affirmative defense).  *See* Docket No. 116 (Def.'s RJN, Ex. B) (answer).

          b.    <u>Apple</u>

As an initial matter, the Court takes that the settlement agreement at issue is between DSS and Intel only – *i.e.*, Apple is not involved.  Thus, Plaintiffs argue that, at the very least, *Apple's* claims against DSS are viable.  The problem with this argument is that Apple has not clearly asserted a claim against DSS; for example, there is nothing to suggest that DSS has any patents that relate to Apple's products or services or that DSS has tried to enforce its patents against Apple.  To the extent Apple suggests it still has claims against DSS because DSS is part of a larger conspiracy involving all Defendants – *i.e.*, there is a huge patent portfolio aggregated by all

1   Defendants that does impact Apple – that argument is problematic because, as discussed above,

2   there are insufficient allegations supporting an overall conspiracy.

3               c.      "Claims"

4        Plaintiffs argue next that the settlement agreement is not a bar to their antitrust claims

5   against DSS because the agreement only releases "Claims asserted by [Intel] . . . in the Litigation,"

6   Docket No. 116 (Sett. Agmt. ¶ 2.1(iv)), and Intel never asserted any counterclaims in the patent

7   infringement lawsuit that DSS brought against it.  Intel emphasizes that there is a difference

8   between affirmative defenses and counterclaims.  Intel's argument, however, is problematic given

9   that the settlement agreement defines "Claims" to include "answers" – and an affirmative defense

10  is part of an answer.

11       Intel contends still that, even if its affirmative defenses count, it only asserted affirmative

12  defenses for noninfringement, unenforceability, and invalidity – none of which implicated antitrust

13  issues.  It is true that, as a facial matter, noninfringement and invalidity would not seem to

14  implicate any antitrust issues.  However, unenforceability might.  Intel's unenforceability

15  affirmative defense indicated that it was based on "one or more applicable equitable doctrines,

16  such as laches, acquiescence, estoppel, collateral estoppel, waiver, or *unclean hands*."  Docket No.

17  116 (fourth affirmative defense) (emphasis added).  "The doctrine of patent misuse is an extension

18  of the equitable doctrine of unclean hands to the patent field.  As an affirmative defense, patent

19  misuse relates generally to the use of patent rights to obtain or coerce an unfair commercial

20  advantage."  *In re Gabapentin Patent Litig.*, 648 F. Supp. 2d 641, 651 (D.N.J. 2009) (internal

21  quotation marks omitted).

22       Moreover, even if unclean hands did not include patent misuse (*i.e.*, an antitrust or

23  antitrust-related theory), the specific antitrust theory being articulated by Plaintiffs here does

24  implicate the issue of unenforceability:  should Plaintiffs prevail herein, they will seek to enjoin

25  enforcement of the aggregated weak patents.[18]

26  _____

27  [18] To be fair, DSS could have negotiated for a better release, one more comparable to the release
    that it gave to Intel.  *See* Docket No. 116 (Sett. Agmt. ¶ 2.1(i)) ("DSS . . . fully and forever

28  irrevocably and unconditionally releases, acquits and discharges each Defendant . . . from all past,
    present and future Claims, *arising out of or in any way related to*, in any manner or degree, the

United States District Court
Northern District of California

United States District Court
Northern District of California

d.    Summary

The Court therefore finds merit to DSS's argument that the settlement agreement is a bar. However, the settlement agreement at most only resolves a dispute between DSS and Intel as to two specific patents.  Thus, in theory, Plaintiffs are not barred by the settlement from bringing antitrust claims based on different patents.  That being said, the problems discussed above with respect to claims brought against the other defendants applies to DSS as well.

2.    Statute of Limitations

DSS argues that, regardless of the settlement agreement, there is an independent basis for dismissal of the antitrust claims – namely, they are time barred.

The parties agree that there is a four-year limitations period for the antitrust claims (both the Sherman Act, § 1 claim and the derivative § 17200 claim).  *See* 15 U.S.C. § 15 (providing that, in general, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee"); *id.* § 15b (providing that "[a]ny action to enforce any cause of action under section 4, 4A, or 4C [15 U.S.C. § 15, 15a, or 15c] shall be forever barred unless commenced within four years after the cause of action accrued"); *see also Blanks v. Seyfarth Shaw LLP*, 171 Cal. App. 4th 336, 364 (2009) (noting that "[t]he UCL has a four-year statute of limitations, which applies even if the borrowed statute has a shorter limitations statute").  Because Plaintiffs filed the instant action in November 2019, they must point to conduct by DSS that took place in or after November 2015.

Some of DSS's conduct does appear to have taken place prior to November 2015 – *e.g.*, in February 2014, Fortress first entered into an Investment Agreement with DSS, under which Fortress gave DSS a loan "in exchange for it placing a lien in favor of the investors on ten semiconductor patents."  Compl. ¶ 70.  Also, DSS filed its patent infringement suit against Intel in February 2015.

---

Covered Patents, the Litigation or the IPR Appeal or the facts raised in the Litigation or the IPR Appeal.") (emphasis added).

However, there is also conduct by DSS that took place after November 2015:

- "On December 2, 2016, following DSS's default on its payment obligations under the . . . Investment Agreement, the parties amended that agreement – including . . . to require that DSS share proceeds from monetization efforts associated with certain additional patents.  DSS also granted Fortress and the investors a security interest in certain of DSS's unencumbered semiconductor patents to further collateralize the amounts owed under the . . . Investment Agreement."  Compl. ¶ 71.

- "On June 26, 2018, DSS entered into an agreement with Fortress Credit, pursuant to which DSS transferred to Fortress Credit all the remaining economic rights to certain of DSS's semiconductor related patents."  Compl. ¶ 72.

In its papers, DSS suggests that this conduct should not count as "new" conduct but rather is simply affirmation of a previous act.  As noted above, the Ninth Circuit explained in *Solo* that, "[i]n the context of a continuing conspiracy to violate antitrust laws, . . . each time a plaintiff is injured by an act of the defendant[] a cause of action accrues to him to recover the damages caused by that act"; but, "[i]n order to restart the statute of limitations, there must be a new overt act that: (1) is new and independent . . . [and] not merely a reaffirmation of a previous act, and (2) inflict[s] new and accumulating injury on the plaintiff."  *Solo*, 751 F.3d at 1086 (internal quotation marks omitted); *see also Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1200 (2013), (indicating that, "'[w]hen an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period'").  DSS has not provided a persuasive explanation as why there is not new conduct; for example, in paragraph 71 of the complaint, different semiconductor patents appear to be implicated, and, in paragraph 72, even if the same semiconductor patents are at issue, there appear to be additional rights granted.

However, to the extent Plaintiffs argue that additional "new" conduct within the limitations period is nothing more than continued litigation by DSS (*i.e.*, of its February 2015 Texas lawsuit against Intel), that seems questionable.  *See Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237-28 (9th Cir. 1987) (rejecting plaintiff's contention that "each phase of the state court action

United States District Court
Northern District of California

from the filing of [defendant's] complaint through resolution of the final appeal constituted

discrete overt acts which restarted the statute of limitations"; "hold[ing] that where the alleged

antitrust violation is the attempted enforcement of an illegal contract through judicial process, the

initiation of judicial proceedings is the last overt act for purposes of the statute of limitations"

because "[t]he initiation of a lawsuit is the final, immutable act of enforcement of an allegedly

illegal contract" and "[a]ll subsequent acts are controlled by the exigencies of litigation, not

enforcement of the contract").

### III.   CONCLUSION

For the foregoing reasons, the Court rules as follows.

**Count One: Violation of § 1 of the Sherman Act.**

- Failure to adequately plead a product market. The product market as alleged is vague and overbroad. Even if Plaintiffs are claiming direct evidence of anticompetitive effects (*e.g.*, supracompetitive prices), there still needs to be some market analysis and definition. In addition, although Plaintiffs claim direct anticompetitive effects, they have done so in a conclusory fashion only – *e.g.*, they have not specified where Fortress and its PAEs have aggregated so many patents on a specific technology that an alleged infringer is essentially deprived of substitutes.

- Failure to adequately plead antitrust injury. Although Plaintiffs have alleged that they incurred litigation costs to defend against patent infringement suits, it is not clear that those lawsuits came about because of patent aggregation, *i.e.*, the elimination of substitutes specifically.

- *Noerr-Pennington* immunity. Plaintiffs may assert *liability* based on Defendants' non-petitioning activity (*i.e.*, aggregation and acquisition of patents) and would not be barred by *Noerr-Pennington* from seeking *damages* in the form of litigation costs.

- Failure to adequately allege a conspiracy to restrain trade. Plaintiffs have not made sufficient allegations that there was one big conspiracy involving all Defendants. Even if Plaintiffs are claiming separate conspiracies between Fortress and each

PAE defendant, there are not sufficient allegations of an agreement between Fortress and each of the Defendant PAEs to aggregate weak patents for anti-competitive purposes.

- The motion to dismiss Count One is granted, but with leave to amend.

**Count Two: Violation of § 7 of the Clayton Act.**

- Failure to adequately plead a product market. The same analysis above for § 1 of the Sherman Act largely applies here.

- Failure to adequately plead antitrust injury. The same analysis above for § 1 of the Sherman Act largely applies here.

- Failure to state a claim for relief. Plaintiffs have not adequately pled that there has been such aggregation of patents that substitutes have been eliminated sufficiently to impair competition.

- Statute of limitations. Plaintiffs have articulated a basis for at least certain damages claims as being timely; the claims for injunctive relief against IXI and Seven at this point do not appear to be time barred.

- The motion to dismiss Count Two is granted, but with leave to amend.

**Count Three: Violation of § 17200 (derivative of federal antitrust claims).**

- Because this § 17200 claim is derivative of the federal antitrust claims, the motion to dismiss the claim is likewise granted, but with leave to amend.

**Count Four: Violation of § 17200 (based on transfer of SEPs to Fortress and certain PAEs).**

- Failure to adequately plead a product market. This claim admittedly is not a direct antitrust claim – which would then require market analysis. However, the claim is based at least in part on a violation of the "spirit" of antitrust law; thus, presumably, that is why Plaintiffs have identified a product market(s) here. The product market(s) as alleged are vague and overbroad; Plaintiffs have not clearly identified what SEPs are even at issue.

- The motion to dismiss Count Four is granted, but with leave to amend.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   **Antitrust Claims Against DSS specifically.**

2   • Plaintiffs can point to some conduct by DSS that falls within the limitations period.

3   However, to the extent Plaintiffs are basing antitrust claims on DSS's '552 and

4   '924 patents, those claims – *i.e.*, claims based on those patents specifically – were

5   settled with Intel in January 2019.

6   • The motion to dismiss claims based on the '552 and '924 patents is granted with

7   prejudice.

8   Plaintiffs have four weeks from the date of this order to file an amended complaint,

9   addressing the deficiencies identified above.

10   The order is to be temporarily filed under seal in its entirety.  The parties are to meet and

11   confer to determine what parts, if any, if the order should remain under seal.  The parties shall file

12   a joint stipulation and proposed order regarding sealing within one week of the date of this order.

13   This order disposes of Docket Nos. 111 and 114.

14

15   **IT IS SO ORDERED**.

16

17   Dated: July 7, 2020

18

19   _____

20   EDWARD M. CHEN
      United States District Judge

21

22

23

24

25

26

27

28