IRELL & MANELLA LLP
Morgan Chu (SBN 70446)
Benjamin W. Hattenbach (SBN 186455)
Michael D. Harbour (SBN 298185)
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:    (310) 203-7199
Email:  mchu@irell.com
Email:  bhattenbach@irell.com
Email:  mharbour@irell.com

A. Matthew Ashley (SBN 198235)
Olivia L. Weber (SBN 319918)
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone:   (949) 760-0991
Facsimile:    (949) 760-5200
Email:  mashley@irell.com
Email:  oweber@irell.com

*Counsel for Defendants*
FORTRESS INVESTMENT GROUP LLC,
FORTRESS CREDIT CO. LLC,
VLSI TECHNOLOGY LLC

Additional counsel listed on signature page

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTEL CORPORATION and APPLE INC., | Case No. 3:19-cv-07651-EMC |
| Plaintiffs, | |
| v. | **DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' AMENDED COMPLAINT** |
| FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC, | Hon. Edward M. Chen |
| | Date:      December 17, 2020 |
| | Time:      1:30 p.m. |
| | Dept.:     Courtroom 5 |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

**Page**

NOTICE OF MOTION AND MOTION ................................................................X

STATEMENT OF ISSUES TO BE DECIDED...........................................................X

I.      INTRODUCTION.................................................................1

II.     THE AMENDED COMPLAINT ..........................................4

        A.      The Alleged Conspiracy To "Aggregate Substitute" Patents And Seek Supracompetitive Prices Through "Meritless" Patent Litigations...........................................4

                1.      The Conspiracy Allegations ....................................4

                2.      The "Meritless" Litigation Allegations ...........................7

        B.      Plaintiffs' Proposed Markets And Defendants' Alleged "Market Power".................................................8

        C.      Plaintiffs' "Input Technology Markets".......................10

        D.      Plaintiffs' Alleged Injury ......................................10

III.    THE AC AGAIN FAILS TO ALLEGE A RELEVANT MARKET OR MARKET POWER ....................................11

        A.      The AC's Alleged Patent Markets Are Facially Unsustainable ....................................................11

        B.      Plaintiffs Fail To Properly Allege Market Power .................16

        C.      Plaintiffs' Input Technology Markets Fail As A Matter Of Law...........................................................20

IV.     PLAINTIFFS HAVE NOT SUFFICIENTLY PLEADED ANTITRUST INJURY ............................................20

        A.      The AC's Conclusory Allegations Of Supracompetitive Royalties Fail................................................21

        B.      The AC Fails To Connect Plaintiffs' Litigation Costs To Anticompetitive Harm...........................................26

V.      PLAINTIFFS' CLAIMS ARE BARRED UNDER *NOERR-PENNINGTON* ..................................................28

VI.     THE AC FAILS TO ALLEGE A CONSPIRACY TO RESTRAIN TRADE...........................................................29

VII.    THE CLAYTON SECTION 7 CLAIM FAILS AS A MATTER OF LAW BECAUSE THERE ARE NO ALLEGATIONS REGARDING MARKET CONCENTRATION OR MARKET SHARE..........................................................33

**Page**

VIII.   PLAINTIFFS' UCL CLAIMS SHOULD BE STRICKEN UNDER CALIFORNIA'S ANTI-SLAPP STATUTE OR, ALTERNATIVELY, DISMISSED ..................................................................35

    A.   Plaintiffs' UCL Claims Arise From Protected Activity ...........................35

    B.   Plaintiffs' UCL Claims Fail As A Matter Of Law ...................................36

        1.   Plaintiffs Are Not Entitled To Any Remedy Available Under The UCL ...........................................................37

        2.   Plaintiffs' UCL Claims Are Barred By The Litigation Privilege ........................................................................38

        3.   Count 4 Sounds In Contract Law, Not Antitrust Law ..................38

    C.   Alternatively, Plaintiffs' Section 17200 Claims Should Be Dismissed ...............................................................................40

IX.   CONCLUSION ....................................................................................40

### TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple v. Samsung*,
No. 11-CV-01846-LHK, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) ...................................20

*In re Automotive Parts Antitrust Litig.*,
No. 12-CV-00203, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016)..........................................31

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
No. 17CV205-MMA (MDD), 2017 WL 6059145 (S.D. Cal. Dec. 6, 2017) ............................22

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999).....................................................................................................24

*Bayer Schering Pharma AG v. Watson Pharm., Inc.*,
207CV01472KJDGWF, 2010 WL 11578470 (D. Nev. Mar. 31, 2010) ...................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ *passim*

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
142 F. Supp. 2d 296 (E.D.N.Y. 2001), *aff'd*, 35 F. App'x 29 (2d Cir. 2002).....................11, 27

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012)...................................................................................................27

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3rd Cir. 2007).....................................................................................................39

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ......................................................................................................16, 18, 34

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
429 U.S. 477 (1977) ............................................................................................................21, 34

*Brunswick Corp. v. Riegel Textile Corp.*,
752 F.2d 261 (7th Cir. 1984).....................................................................................................19

*Cal. Inst. of Tech. v. Apple. Inc.*,
2:16-cv-03714-GW-AGR (C.D. Cal. Aug. 3, 2020), Dkt. 2245 ...............................................24

*Carefusion Corp. v. Medtronic, Inc.*,
No. 10-CV-01111-LHK, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ...................................35

*ChriMar Sys., Inc. v. Cisco Sys., Inc.*,
72 F. Supp. 3d 1012 (N.D. Cal. 2014) ......................................................................................15

*City of San Jose v. Office of Comm'r of Baseball*,
No. C-13-02787 RMW, 2013 WL 5609346 (N.D. Cal. Oct. 11, 2013), *aff'd*,
776 F.3d 686 (9th Cir. 2015) ...................................................................................21, 26

*Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*,
217 F.3d 1187 (9th Cir. 2000) ................................................................................17

*Continental Automotive Systems, Inc. v. Avanci, LLC et al.*,
No. 3:19-cv-02933-M (N.D. Tex. Sept. 10, 2020), Dkt. 316 ..................................38

*Contractor Util. Sales Co. v. Certain-teed Prod. Corp.*,
638 F.2d 1061 (7th Cir. 1981) ................................................................................33

*Cupp v. Alberto-Culver USA, Inc.*,
310 F. Supp. 2d 963 (W.D. Tenn. 2004) ................................................................12

*Dehoog v. Inbev*,
2016 WL 5853733 (D. Or. July 22, 2016), *adopted*, 2016 WL 5858663 (D. Or.
Oct. 3, 2016), *aff'd*, 899 F.3d 758 (9th Cir. 2018) ................................................34

*Delano Farms Co. v. Cal. Table Grape Comm'n.*,
655 F.3d 1337 (Fed. Cir. 2011) ..............................................................................14

*Digital Sun v. The Toro Co.*,
No. 10-CV-4567-LHK, 2011 WL 1044502 (N.D. Cal. Mar. 22, 2011) ...................17

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) ................................................................................................14

*Eastman v. Quest Diagnostics Inc.*,
108 F. Supp. 3d 827 (N.D. Cal. 2015) ....................................................................22

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
243 F.3d 980 (6th Cir. 2001) ..................................................................................27

*Fed. Trade Comm'n v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ........................................................................ *passim*

*Fitbit, Inc. v. Laguna 2, LLC*,
No. 17-CV-00079-EMC, 2018 WL 306724 (N.D. Cal. Jan. 5, 2018) .....................28

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*,
2017 WL 750700 (D. Del. Feb. 27, 2017), *adopted*, 2017 WL 1055958 (D. Del.
Mar. 20, 2017) ........................................................................................................39

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
No. C-09-3854 MMC, 2009 WL 4723739 (N.D. Cal. Dec. 2, 2009) ......................34

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ................................................................................14

*In re High-Tech Emp. Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................................................................37

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
   602 F.3d 237 (3d Cir. 2010) .................................................................................31

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   No. CV-00-20905 RMW, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ...................14, 28

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006) ...............................................................................................17

*Int'l. Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
   No. CV 07-00043 MMM, 2007 WL 4976364 (C.D. Cal. Oct. 29, 2007), *aff'd*,
   323 Fed. Appx. 571 (9th Cir. 2009) .....................................................................32

*Int'l Shoe Co. v. FTC*,
   280 U.S. 291 (1930) .............................................................................................34

*Intel Corp. v. Fortress Inv. Grp. LLC et al.*,
   No. 5:19-CV-06856-EJD (N.D. Cal. Oct. 21, 2019), Dkt. 1...................................23

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   No. 1:13-CV-00740 AJT, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) .............27, 29

*JM Computer Servs., Inc. v. Schlumberger Technologier, Inc.*,
   C 95-20349 JW, 1996 WL 241607 (N.D. Cal. May 3, 1996) ..................................12

*Kearney v. Foley & Lardner, LLP*,
   590 F.3d 638 (9th Cir. 2009)................................................................................36

*Kewanee Oil Co. v. Bicron Corp.*,
   416 U.S. 470 (1974) .............................................................................................38

*Kirkwood Florist, Inc. v. Hi-Float, Inc.*,
   812 F. Supp. 2d 1000 (E.D. Mo. 2011) ................................................................26

*Lazo v. Bank of Am.*,
   No. C 12-00762 LB, 2012 WL 1831577 (N.D. Cal. May 18, 2012) .........................39

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
   573 F. Supp. 2d 1125 (E.D. Ark. 2008), *aff'd*, 591 F.3d 591 (8th Cir. 2009)...........16

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
   No. 18-CV-02054-MMC, 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019), *aff'd*,
   811 Fed. Appx. 422 (9th Cir. 2020) ................................................................17, 34

*Mitchell v. Reg'l Serv. Corp.*,
   No. C 13-04212 JSW, 2014 WL 12607809 (N.D. Cal. Apr. 23, 2014) ....................36

*Moss Bros. Toy v. Ruiz*,
  27 Cal. App. 5th 424, 435 (2018)..............................................................36

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015)...........................................................30, 32

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  795 F.3d 1124 (9th Cir. 2015)...........................................................30, 33

*Nelson v. Pearson Ford Co.*,
  186 Cal. App. 4th 983 (2010), *reversed in part on other grounds by Raceway
  Ford Cases*, 2 Cal.5th 161 (2016) .........................................................37

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ....................................................................21

*Newcal Industries, Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008)...............................................................14

*NSS Labs, Inc. v. Symantec Corp.*,
  No. 18-CV-05711-BLF, 2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) ............................11, 15

*Openwave Messaging, Inc. v. Open-Xchange, Inc.*,
  No. 16-CV-00253-WHO, 2016 WL 6393503 (N.D. Cal. Oct. 28, 2016)..................................33

*Optis Wireless Technology, LLC v. Apple Inc.*,
  2:19-cv-000660-JRG (E.D. Tex. Aug. 11, 2020), Dkt. 483....................................24

*Orion Elec. Co., Ltd. v. Funai Elec. Co., Ltd.*,
  No. 01 CV 3501 (AGS), 2002 WL 377541 (S.D.N.Y. Mar. 11, 2002) .......................17, 19, 20

*Papst Motoren GMBH & Co. KG v. Kanematsu-Goshu (U.S.A.) Inc.*,
  629 F. Supp. 864 (S.D.N.Y. 1986)...........................................................17

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
  890 F.3d 828 (9th Cir. 2018).............................................................35, 36

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)...........................................................................28

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)...............................................................15

*Ramachandran v. City of Los Altos*,
  359 F. Supp. 3d 801 (N.D. Cal. 2019) .................................................35, 36

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
  381 F.3d 717 (7th Cir. 2004)...............................................................18

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
   532 F.3d 963 (9th Cir. 2008) ........................................................................................17, 19, 22

*Rothman v. Jackson*,
   49 Cal. App. 4th 1134 (1996) .......................................................................................................38

*Rusheen v. Cohen*,
   37 Cal. 4th 1048 (2006) ................................................................................................................38

*Schauer v. Mandarin Gems of Cal., Inc.*,
   125 Cal. App. 4th 949 (2005) .......................................................................................................37

*Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*,
   No. 09-CV-102 H WMC, 2010 WL 6675046 (S.D. Cal. Apr. 20, 2010) ....................................15

*Shames v. Hertz Corp.*,
   No. 07-CV-2174 H, 2008 WL 11318291 (S.D. Cal. Apr. 8, 2008) ............................................31

*Sheahan v. State Farm Gen. Ins. Co.*,
   394 F. Supp. 3d 997 (N.D. Cal. 2019) ........................................................................................11

*Sidibe v. Sutter Health*,
   C 12-04854 LB, 2013 WL 2422752 (N.D. Cal. June 3, 2013) ...................................................12

*Snyder v. Nationstar Mortg. LLC*,
   No. 15-CV-03049-JSC, 2015 WL 7075622 (N.D. Cal. Nov. 13, 2015) .....................................37

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013) ................................................................................................ *passim*

*Soukup v. Law Offices of Herbert Hafif*,
   39 Cal. 4th 260 (2006) ..................................................................................................................36

*Spindler v. Johnson & Johnson Corp.*,
   C 10-01414 JSW, 2011 WL 12557884 (N.D. Cal. Aug. 1, 2011) ..............................................15

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ........................................................................................................18

*Staley et al. v. Gilead*,
   No. 19-CV-02573-EMC, 2020 WL 5507555 (N.D. Cal. July 29, 2020) ............................ *passim*

*Staley v. Gilead Scis., Inc.*,
   446 F. Supp. 3d 578 (N.D. Cal. 2020) .........................................................................11, 16, 29, 32

*Stewart v. Gogo, Inc.*,
   No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013)....................................18, 19

*Surface Supplied, Inc. v. Kirby Morgan Dive Sys., Inc.*,
   No. C-13-0575 MMC, 2013 WL 5496961 (N.D. Cal. Oct. 3, 2013) ..........................................19

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*,
    No. SACV 14-0341 ................................................................................................36

*Top Rank, Inc. v. Haymon*,
    No. CV 15-4961-JFW, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ...............................19, 30

*United States v. Bibbero*,
    749 F.2d 581 (9th Cir. 1984)................................................................................30, 31

*United States v. CalPortland Constr.*,
    CV1604479JFWSSX, 2018 WL 6262877 (C.D. Cal. Mar. 9, 2018), *aff'd*, 801
    Fed. Appx. 547 (9th Cir. 2020) ...............................................................................32

*United States v. Westinghouse Elec. Corp.*,
    648 F.2d 642 (9th Cir. 1981)...................................................................................26

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
    375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006) .......................14

*VirnetX Inc. v. Apple Inc.*,
    6:12-cv-00855-RWS (E.D. Tex. Aug. 30, 2018), Dkt. 798 .......................................25

*In re Vitamins Antitrust Litig.*,
    320 F. Supp. 2d 1 (D.D.C. 2004) .............................................................................31

*Vizio, Inc. v. Funai Elec. Co.*,
    No. CV 09-0174 AHM RCX, 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010)...........................39

*Wang v. Heck*,
    203 Cal. App. 4th 677 (2012)..................................................................................38

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
    No. CV 15-07490 SJO, 2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ......................................13

*Wilson v. Cable News Network, Inc.*,
    7 Cal. 5th 871, 892 (2019)......................................................................................35

*Zhang v. Superior Court*,
    57 Cal. 4th 364 (2013)...........................................................................................37

**Statutes**

15 U.S.C. § 1 ......................................................................................................x

15 U.S.C. § 18 ....................................................................................................x

Cal. Bus. & Prof. Code § 17200....................................................................................x, 39

Cal. Bus. & Prof. Code § 17204..................................................................................36

Cal. Civ. Code § 47(b) .........................................................................................38

Cal. Civ. Proc. Code § 425.16(c)(1) ................................................................................x

Cal. Code Civ. Proc. § 425.16 .........................................................................................x

**Rules**

Fed. R. Civ. P. 12(b)(6) ...........................................................................................x, 36

**Other Authorities**

Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 565(a) (3rd ed. 2016 update) ........................16, 28

1

## NOTICE OF MOTION AND MOTION

2 **PLEASE TAKE NOTICE THAT**, at 1:30 p.m. on December 17, 2020 in Courtroom 5,

3 17th floor of 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Judge

4 Edward M. Chen, Defendants Fortress Investment Group LLC ("Fortress"), Fortress Credit Co.

5 LLC ("Fortress Credit"), Uniloc 2017 LLC ("Uniloc 2017"), Uniloc USA, Inc. ("Uniloc USA"),

6 Uniloc Luxembourg S.a.r.l. ("Uniloc Luxembourg"), VLSI Technology LLC ("VLSI"), INVT

7 SPE LLC ("INVT"), Inventergy Global, Inc. ("Inventergy"), IXI IP LLC ("IXI"), and Seven

8 Networks, LLC ("Seven Networks" and collectively, "Defendants") will appear and move to

9 dismiss with prejudice and strike the Amended Complaint ("AC") of Plaintiffs Apple Inc.

10 ("Apple") and Intel Corporation ("Intel" and collectively, "Plaintiffs").  Defendants move

11 pursuant to Federal Rule of Civil Procedure 12(b)(6) and California Code of Civil Procedure

12 § 425.16.  This motion is based on this Notice, the Memorandum of Points and Authorities, the

13 Declaration of Olivia L. Weber, Defendants' Request for Judicial Notice, and any other filing,

14 evidence, or argument presented in this matter.

15 If they prevail on their motion to strike, Defendants are entitled to an award of attorneys'

16 fees and costs.  Cal. Civ. Proc. Code § 425.16(c)(1).  Should Defendants prevail, they request that

17 the amount of the award be reserved for later briefing following the December 17, 2020 hearing.

18

## STATEMENT OF ISSUES TO BE DECIDED

19 1. Whether Plaintiffs have pleaded a viable antitrust market or market power;

20 2. Whether Plaintiffs have pleaded a cognizable antitrust injury;

21 3. Whether the *Noerr-Pennington* doctrine bars Plaintiffs' claims under Section 1 of

22 the Sherman Act, 15 U.S.C. § 1, and California Business & Professions Code § 17200;

23 4. Whether Plaintiffs have pleaded a viable Sherman Act Section 1 claim, 15 U.S.C.

24 § 1;

25 5. Whether Plaintiffs have pleaded a viable Clayton Act Section 7 claim, 15 U.S.C.

26 § 18; and

27 6. Whether Plaintiffs' California state law claims should be stricken under

28 California's Anti-SLAPP statute or alternatively dismissed under Rule 12(b)(6).

## I.      INTRODUCTION

This Court dismissed the Complaint because it lacked virtually every core attribute of a viable antitrust case:  no antitrust market; no market power; no antitrust injury; no conspiracy to restrain trade; and no anticompetitive merger.  Dkt. 190 (herein, "Order").  While the Amended Complaint ("AC") adds some more volume, it is still long on rhetoric and short on well-pleaded facts.  Ultimately, it suffers from the same deficiencies that compelled dismissal of the Complaint and some new ones as well.  The AC should be dismissed with prejudice.

No Cognizable Antitrust Market.  The AC pleads thirteen "Patent Markets."  Its delineation of each "market" consists of:  (i) a few-sentence description of a general area of technology, (ii) identification of a handful of allegedly "substitute" or "complement" patents that Defendants have supposedly "aggregated" that relate to the technology, and (iii) a bare assertion that there is a relevant antitrust market in which holders of patents related to the technology compete to license their patents.  However, the AC never alleges how many and what other substitute and complement patents (or non-patented technology) are in each market or even how to determine which other substitutes and complements make up the markets.  Consequently, the size and boundaries of each market are entirely unknown, rendering each market facially deficient.  In addition, like the Complaint, the AC alleges no facts demonstrating the interchangeability and cross-elasticity of demand of the purported substitutes and complements, which is the defining feature of a proper antitrust market.  For instance, the AC pleads no facts plausibly suggesting that consumers in these markets (*i.e.*, makers of products with the functionalities of the alleged markets) will change their consumption of one product (patented technology) in the alleged market in response to a price change in another product.  Courts in this District routinely dismiss antitrust claims for failing to plead facts showing the size and boundaries of alleged markets and the interchangeability of substitutes and cross-elasticity of demand.  The Court should do the same here.

No Market Power.  The AC's theory of market power is that Defendants have "aggregated" "substitute" and/or "complementary" patents in each purported market such that Defendants have market power to force companies to take licenses and pay supracompetitive

1  royalties.  However, Plaintiffs still do not allege that "Fortress and its PAEs have aggregated so

2  many patents on a specific technology that an alleged infringer is essentially deprived of

3  substitutes," Order at 39, nor do they provide "a description of the number and viability of

4  substitutes still available, if any," *id.* at 17; *see also id.* at 16.  Nor does the AC allege Defendants'

5  respective (or combined) market shares or any barrier to entry.  Instead, for each "market," the AC

6  merely identifies a handful of patents owned by one or more of the "PAE" defendants,[1] and makes

7  a conclusory assertion that they are either "substitutes" or "complements" (or in some cases that

8  Plaintiffs do not know which one they are).  The AC then declares without any factual basis that

9  Defendants' alleged ownership of this handful of patents somehow gives them "market power."

10  These allegations fall far short of pleading a plausible claim of market power.

11       No Antitrust Injury.  Like the dismissed Complaint, the AC repeatedly parrots antitrust

12  buzzwords like "supracompetitive" prices and "reduced output"; however, also like the dismissed

13  Complaint, it pleads no facts showing either.  *See, e.g.*, Order at 17 ("there is no specific indication

14  that [Amazon and Huawei] paid supracompetitive prices for those licenses").  Plaintiffs still do not

15  allege that they have ever entered into any license with any of the Defendants let alone one with

16  "supracompetitive" rates.  While the AC again asserts in conclusory fashion that third parties have

17  paid "supracompetitive" rates for Defendants' licenses, Plaintiffs never even identify what these

18  supposed "rates" are much less explain how they are supracompetitive.  The AC also alleges that

19  Defendants have "demanded" more in litigation damages than previous patent holders sought in

20  negotiations outside of litigation.  But this allegation failed to show supracompetitive royalties in

21  the dismissed Complaint, and it fares no better in the AC.  Order at 15-17.  Moreover, the AC

22  never explains what this has to do with the aggregation of so-called "substitute" patents, which is

23  the essence of Plaintiffs' antitrust claims.  For example, the AC does not allege that any PAE has

24  ever sought to leverage the so-called "substitute" patents held by one of the other PAEs in order to

25  obtain a higher royalty rate.  Nor would it be possible for a PAE to seek greater damages in

26  litigation based on patents held by other PAEs who are not parties to that litigation.  More

27  _____

28       [1] In order to be consistent with the vernacular in the AC and for purposes of this motion only, Defendants use the term "PAE" in the same way that the AC employs it.

1   fundamentally, the assertion that Defendants are seeking to obtain greater royalties for certain

2   patents than their prior owners allegedly sought does not constitute antitrust injury.  The Ninth

3   Circuit has flatly rejected the "erroneous" assumption that "royalties are 'anticompetitive'—in the

4   antitrust sense—unless they precisely reflect a patent's current, intrinsic value and are in line with

5   the rates other companies charge for their own patent portfolios."  *Fed. Trade Comm'n v.*

6   *Qualcomm Inc.*, 969 F.3d 974, 999 (9th Cir. 2020).

7         In addition to the above broad failings that infect the entire AC, each of Plaintiffs' claim-

8   specific allegations under the Sherman Act, Clayton Act, and California's Unfair Competition

9   Law ("UCL") is deficient as a matter of law for the following additional reasons:

10        No Conspiracy to Restrain Trade.  With respect to Plaintiffs' Sherman Act Section 1 claim,

11  the AC attacks the same transactions that the Complaint attacked using the same description of

12  each transaction.  The Court already found that these allegations did not state a claim for

13  conspiracy to violate the antitrust laws.  The only new allegation is a repeated refrain that each

14  PAE allegedly "understood that the transaction would enable Fortress to aggregate substitute and

15  complementary patents to eliminate competition[.]"  AC ¶ 50.  This allegation is unaccompanied

16  by the required pleading of evidentiary facts.  The AC's conspiracy claim therefore fails as a

17  matter of law for the same reason that the Complaint's virtually identical claim failed as a matter

18  of law.

19        No Anticompetitive Merger.  Clayton Act Section 7 does not prohibit all acquisitions, only

20  those that "substantially" lessen competition or "tend to create a monopoly."  Yet the AC's

21  Section 7 claim fails to allege any facts showing either the concentration of firms (*i.e.*, licensors)

22  or market share (*i.e.*, the percentage of supposed substitutes owned) in any of the thirteen proposed

23  markets either before or after any of the purportedly anticompetitive acquisitions.  The Section 7

24  claim therefore fails as a matter of law to show a substantial lessening of competition or the

25  tendency to create a monopoly.

26        No Unfair Competition.  Plaintiffs' UCL claims fail as a matter of law because they are

27  dependent upon the deficient antitrust claims and seek remedies unavailable under the UCL.  In

28  addition, Apple's UCL claim based on standard essential patents (SEPs) fails because Apple never

1   alleges that Defendants actually possess any SEPs or have failed to offer FRAND terms.  In

2   addition, an alleged failure to license on FRAND terms as a matter of law does not constitute an

3   antitrust violation.  *Qualcomm*, 969 F.3d at 997.

4          Plaintiffs' repeated failure to plead the basic requirements of an antitrust claim, even after

5   this Court specifically identified the numerous deficiencies in the Complaint, is telling.  It

6   demonstrates that Plaintiffs cannot plead an antitrust claim and that their real grievance has

7   nothing to do with protecting competition.  Rather, it has to do with the United States patent

8   system itself.  Faced with the risk that they might lose underlying patent litigations, Plaintiffs are

9   attempting to use federal antitrust law to head off the potential future judgments and to deter

10  Defendants and future patent holders from exercising their rights to address infringement of their

11  patent portfolios.  In addition, Plaintiffs are seeking other extraordinary and unprecedented relief,

12  including rescission of all of Defendants' licensing agreements and a declaration that all of

13  Defendants' patents are void.  The antitrust laws were never intended to serve such ends.  As the

14  Ninth Circuit recently held, the question of whether a patent royalty is "reasonable . . . sounds in

15  patent law, not antitrust law."  *Qualcomm*, 969 F.3d at 1002.

16         The Court should dismiss this case, this time with prejudice.

17  **II.     THE AMENDED COMPLAINT**

18         Much of the AC tracks the Complaint verbatim, and what is new does not cure the multiple

19  core deficiencies this Court found in the Complaint.

20         **A.     The Alleged Conspiracy To "Aggregate Substitute" Patents And Seek**

21                **Supracompetitive Prices Through "Meritless" Patent Litigations**

22                **1.     The Conspiracy Allegations**

23         The AC's conspiracy theory remains the same:  namely, that Defendants allegedly

24  conspired to "aggregate substitute patents" and then pursue "meritless" litigation over "weak"

25  patents.  *Compare* AC ¶¶ 10, 30, 34, 38-39, 43, 50, 56, 82, 125, 429-431, 439-443 *with*

26  Cmplt.¶¶ 9, 31-32, 38-41, 44, 163-164.  In its Order dismissing the Complaint, this Court held

27  that:

28         it is not clear from either Plaintiffs' complaint or their opposition whether Plaintiffs
           are asserting (1) an overarching conspiracy claim (*i.e.*, a claim that *all* Defendants

1    are part of one big conspiracy); (2) a claim that Fortress and *each* of the other
     defendants was in a separate conspiracy; or (3) something in between.  This should
2    be clarified because it will likely have an impact on the merits of Plaintiffs' case[.]

3    Order at 27:12-17 (emphasis in original).  Despite this Court's specific direction, the AC still fails

4    to define the contours of the supposed conspiracy.

5         For instance, like the Complaint, the AC does not allege an overarching agreement of any

6    kind.  Instead, every allegedly improper transaction is only between Fortress or Fortress Credit

7    and a single other Defendant.  AC ¶¶ 51-57, 62-74.  There are no alleged agreements among any

8    of the PAEs themselves, and there are no allegations that any of the PAEs even knew the others

9    existed or that Fortress did business with any other PAE.

10        As for the bilateral transactions the AC identifies, they are the very same commercial

11   transactions that the Complaint attacked (minus the DSS transaction, as DSS has been dropped).[2]

12   Like the Complaint, the AC never identifies whether these transactions are the supposed

13   conspiratorial "agreement(s)."  Also like the Complaint, the AC never identifies a single provision

14   of any of these garden-variety commercial transactions that evinces anticompetitive intent or

15   effect.  *See* Order at 28 ("As Defendants argue, for the most part, Plaintiffs have simply alleged

16   that Fortress invested in a given PAE – which is consistent with 'rational, legal business

17   behavior.'").  Instead, the AC asserts:

18        [W]hen Defendant PAEs entered into the agreements described below with Fortress
          and/or its affiliate Fortress Credit, they understood that the transaction would
19        enable Fortress to aggregate substitute and complementary patents to eliminate
          competition existing when those patents were held by PAEs that were competing
20        independently with one another and not under common Fortress control.  The PAEs
          received compensation in the form of favorable terms, reflecting the fact that the
21        PAEs were sharing in the supracompetitive royalties Defendants obtain by
          eliminating competition.  Thus, each of the Defendants entered into separate
22        agreements with Fortress with a common objective with Fortress to eliminate
          competition and reap the rewards from doing so.

23

24   AC ¶ 50.[3]  However, these are conclusions and suppositions, not evidentiary facts.

25

26        [2] *Compare* AC ¶¶ 51-57, 62-74 *with* Cmplt. ¶¶ 51-56, 61-69, 73-74.  The range of
     transactions that Plaintiffs identify includes arms-length commercial loan transactions that
27   Fortress allegedly made with independent companies in exchange for patent licensing revenue, AC
     ¶¶ 51-52, 65-66, 68-70, and an assignment of security interests, *id.* ¶ 73.

28        [3] Similar rote language is then mimicked for each transaction.  *See* AC ¶¶ 56, 71, 73.

For instance, there are no allegations that any PAE's purported "understanding" was part of an <u>agreement</u> to restrain trade.  Nor does the AC allege when any such agreement was reached, how it was reached, which individuals reached it, whether and how it was memorialized, or which "substitute" and/or "complementary" patents were the subject of each PAE's purported "understanding."  The AC never ties any PAE's purported "understanding" to any of the thirteen markets alleged in the AC—leaving Defendants and the Court to guess which market or markets each PAE supposedly "understood" would suffer an "eliminat[ion]" of "competition."  There is also no allegation that any PAE shared in the risk or the returns of any transaction between Fortress and any other PAE, or that any PAE had an expectation that it would so share, or even that any PAE knew or expected that Fortress had, or was going to have, dealings with any other PAEs.

In fact, the AC does not allege that any PAE ever did anything other than attempt to enforce or license its <u>own patents</u>.  For example, Plaintiffs never allege facts showing that the PAEs collectively (or Fortress and any one or more PAEs) attempted to package their so-called substitute patents together or somehow use each other's patent portfolios to extract higher licensing rates.  And while the AC alleges that the Section 1 Defendants[4] "intended [] through their agreements" to "extract royalties" from their "targets," which included "Intel and Apple," AC ¶ 440, the AC never alleges that any Section 1 Defendant has ever licensed to or sued Intel.[5]

Moreover, despite the AC's boilerplate language that each PAE received "favorable terms" from Fortress as "compensation" for the purported conspiracy (AC ¶ 50), the AC never identifies a single such "favorable term."  *See id.* ¶¶ 51-57, 62-74.  Indeed, the AC elsewhere alleges that "Fortress's model is to condition its investments in PAEs on <u>terms so severe</u> that the PAEs have no choice but to make aggressive and reckless patent assertions to attempt to generate the revenue required to meet their obligations to Fortress."  *Id.* ¶ 29 (emphasis added); *see also* Cmplt. ¶ 30.

---

[4] The Defendants that are sued in the Sherman Section 1 claim (the "Section 1 Defendants") are Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Inventergy, and IXI IP.

[5] VLSI, which is not a Section 1 Defendant, is the only defendant alleged to have sued Intel.

1  The AC never attempts to reconcile how the PAEs could be rewarded for participation in a

2  supposed conspiracy with unidentified "<u>favorable terms</u>" yet simultaneously be forced to pursue

3  supposedly reckless litigation because of unidentified "<u>severe terms</u>."

**2.     The "Meritless" Litigation Allegations**

5       Like the Complaint, the AC pleads only minimal facts about the allegedly "meritless"

6  patent infringement suits through which Defendants allegedly carried out their purported

7  anticompetitive scheme.  *Compare* AC ¶¶ 10, 30, 38-39, 43, 88-96, 105, 313, 430-431 *with* Cmplt.

8  ¶¶ 9, 11, 31, 83-84, 88-93, 97-101, 103, 106-112, 115-118, 122-124.  For the majority of the

9  lawsuits, the AC makes no allegations at all regarding their merit.  The AC does not identify any

10  Rule 11 violation or other sanctions in any of the purportedly "meritless" cases.  Indeed, the AC

11  does not plead facts sufficient to show that even one, let alone all or a majority of, Defendants'

12  suits were objectively baseless or brought for an improper purpose.  Moreover, the AC once again

13  fails to mention the numerous rulings in those cases that have been decided in Defendants' favor.

14  To take just one example, the AC identifies a handful of claims that have been invalidated through

15  the *inter partes* review process, *see, e.g., id.* ¶¶ 91, 93, 114, but ignores the many patents that have

16  survived such challenges from Plaintiffs.[6]

17       Given these deficiencies and Plaintiffs' prior representations to the Court,[7] it is evident that

18

---

19       [6] *See, e.g., Apple Inc. v. Seven Networks, LLC*, IPR2020-00425 (P.T.A.B. Sept. 1, 2020);
*Apple, Inc. v. Seven Networks, LLC*, IPR2020-00507 (P.T.A.B. Sept. 1, 2020); *Apple Inc. v. Seven*
20  *Networks, LLC*, IPR2020-00189 (P.T.A.B. June 11, 2020); *Apple Inc. v. INVT SPE LLC*,
IPR2018-01473 (P.T.A.B. Mar. 25, 2020); *Apple Inc. v. INVT SPE LLC*, IPR2018-01555
21  (P.T.A.B. Feb. 28, 2020); *Apple Inc. v. INVT SPE LLC*, IPR2018-01581 (P.T.A.B. Feb. 28, 2020);
*Intel Corporation v. VLSI Technology LLC*, IPR 2018-01312 (P.T.A.B. Feb. 19, 2020); *Intel*
22  *Corporation v. VLSI Technology LLC*, IPR2018-01040 (P.T.A.B. Feb. 12, 2020); *Intel*
*Corporation v. VLSI Technology LLC*, IPR2018-01107 (P.T.A.B. Feb. 10, 2020); *Intel*
23  *Corporation v. VLSI Technology LLC*, No. IPR2019-01196 (P.T.A.B. Jan. 7, 2020); *Intel*
*Corporation v. VLSI Technology LLC*, No. IPR2018-01296 (P.T.A.B. Apr. 11, 2019); *Intel*
24  *Corporation v. VLSI Technology LLC,* No. IPR2019-00034 (P.T.A.B. Apr. 11, 2019); *Apple Inc.*
*v. Uniloc 2017 LLC*, No. IPR2017-01993 (P.T.A.B. Mar. 6, 2019); *Apple Inc. and ZTE (USA) Inc.*
25  *v. INVT SPE LLC*, No. IPR2018-01474 (Mar. 5, 2019); *Apple Inc. and ZTE (USA) Inc. v. INVT*
*SPE LLC*, No. IPR2018-01478 (P.T.A.B. Feb. 19, 2019); *Intel Corporation v. VLSI Technology*
26  *LLC*, No. IPR2018-01038 (P.T.A.B. Dec. 4, 2018); *Apple Inc. v. Uniloc Luxembourg S.A.*, No.
IPR2017-02202 (P.T.A.B. May 1, 2018).

27       [7] *See Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss and to Strike Plaintiffs'*
28  *Complaint*, Dkt. 136 at 29:9-13; 31:5-6 ("Plaintiffs are complaining about a pattern of
anticompetitive patent transfers that led to supracompetitive royalties, not sham litigation.").

1   the AC, like the Complaint, does not even attempt to plead that any of the underlying patent

2   litigations against Plaintiffs constitute sham litigation.  Despite this, the AC dedicates over 150

3   paragraphs to what amounts to conclusory mudslinging.

4          **B.    Plaintiffs' Proposed Markets And Defendants' Alleged "Market Power"**

5          The AC alleges thirteen purported antitrust markets and defines each of them as:  "an

6   antitrust market for patents purporting to cover [insert technological functionality]."  AC ¶¶ 128,

7   155, 179, 212, 235, 251, 291, 320, 340, 361, 368, 375, 382.  The thirteen technological

8   functionalities making up the "markets" are:  network-based voice messaging, remote software

9   updates, mobile device-to-device communication, local cache management, shared memory

10  access, device authorization, health monitoring, MOSFET channel fabrication, digital rights

11  management, cryptographic algorithms using modular multiplication, DRAM refreshing,

12  input/output pads, and fingerprint authentication.  *See id.*

13         The allegations for each of the thirteen alleged markets (set forth in Section III of the AC)

14  all follow the same flawed pattern.  First, the AC describes the "technology" at issue in general

15  terms.  Second, the AC admits that Defendants are <u>not</u> the only holders of alleged substitutes in

16  the market and acknowledges that "other holders of patents claimed to read on" the technology are

17  also part of the market.  AC ¶¶ 128, 155, 179, 212, 235, 251, 291, 320, 340, 361, 368, 375, 382.

18  Finally, the AC lists several patents that Plaintiffs contend certain Defendants own or control and

19  which are purportedly either "substitutes" or "complements" for each other in the alleged market.[8]

20         However, for each of the thirteen alleged markets, there are <u>no</u> allegations setting forth:

21         (i)     the other purported "substitute" and "complement" patents, as well as non-

22                 patented technology, making up each market;

23         (ii)    the total number of substitutes and complements (including substitutes for

24                 the complements) making up each market, and how many Defendants

25                 allegedly control;

26

27  _____

    [8] *See* AC ¶¶ 129, 136, 141, 165, 180, 195, 198, 213, 220, 225, 234, 236, 243, 250, 252,
28  280, 292, 299, 307, 319, 321, 332, 341, 345, 349, 354, 359, 360, 362, 367, 369, 374, 376, 381,
    383.

(iii)    the characteristics that supposedly make a patent (or non-patented technology) a "substitute" or a "complement" in the market; or

(iv)    which technologies cannot be practiced or products cannot be manufactured by Plaintiffs (or anyone for that matter) without the identified substitutes and complements.

In short, there are no allegations of any facts tending to show that Defendants have blocked all, most, or even a substantial portion of the available substitutes (or complements, or substitutes for complements) in any market, or that the purported substitutes and complements which Defendants have acquired are needed by Plaintiffs—or anyone for that matter—to make or do anything.  This is the same deficiency that the Court previously identified in Plaintiffs' Complaint.  Order at 16 ("Plaintiffs do not give any concrete example where Fortress and its PAEs have aggregated patents on a specific technology such that an alleged infringer is essentially deprived of substitutes and is thus forced to take a license from Fortress and/or its PAEs and pay a supracompetitive price for that license.").  Indeed, the AC contains no allegation of Defendants' market shares, who their competitors are, and the state of competition in any alleged market.  Moreover, in four of Plaintiffs' proposed "markets," the AC concedes that "none of the patents have yet been asserted by Defendants[.]"  *Id.* ¶ 359.

Like the Complaint, the AC also alleges that Fortress has a "massive patent portfolio" and allegedly "obscures" its ownership of that patent portfolio.  AC ¶ 9.  The AC, however, contains no plausible allegations of "obfuscation."  Nor do Plaintiffs ever allege that they were unaware of Fortress's interests underlying the loans and investments that the AC attacks.  In addition, the AC's theory of "supracompetitive" pricing is that licensees faced with a demand for a license by a PAE submit and pay the price because they fear never-ending additional litigation funded by Fortress and other PAEs.  *Id.* ¶ 38.  Yet the AC never explains how this could be the case if Fortress's role in the PAEs is "obfuscated" to the market.

As for the "sheer size" of Fortress's alleged patent portfolio, the AC never addresses the "size" of this alleged patent portfolio in comparison with any of the thirteen markets alleged in the AC.  Instead, like the Complaint, the AC alleges that "Fortress has used its stable of PAEs to

aggregate a massive but obscured portfolio of patents <u>that purportedly read on high-tech consumer</u>
<u>and enterprise electronic devices and components or software therein and processes used to</u>
<u>manufacture them</u>."  *Compare* AC ¶ 9 (emphasis added) *with* Cmplt. ¶ 9.  But this Court already
rejected Plaintiffs' proposed market for "high-tech consumer and enterprise electronic devices or
software therein and processes used to manufacture them," Order at 13-15, rendering irrelevant the
number of patents Defendants supposedly have in that "market."[9]

### C.   Plaintiffs' "Input Technology Markets"

Apple again alleges, as to Count 4 only, that seven Defendants[10] allegedly engaged in
unfair business practices by acquiring "declared" or "purported" SEPs and then demanding "non-
FRAND" royalties.  AC ¶¶ 394-427, 453-458.  But Apple never alleges that any of the named
Defendants own patents that are actually essential to any standard.  *Id.* ¶¶ 418-422.  In addition,
Apple never identifies a single SEP where a non-FRAND royalty was charged or what Apple
claims the royalty was or should have been.

### D.   Plaintiffs' Alleged Injury

Like the dismissed Complaint, the AC is replete with conclusory allegations about
"supracompetitive" prices and "reduced output," yet it pleads no facts plausibly alleging either
one.  *See, e.g.*, AC ¶¶ 141, 152, 165, 176, 209, 435.  For example, the AC fails to allege that either
Apple or Intel ever consummated a single patent license with any Defendant.  Instead, the AC
references nebulous third-party license agreements and settlements with Defendants and also court
proceedings that "<u>possibly</u> indicat[e] settlements."  *Id.* ¶¶ 169, 145 (emphasis added); *see also id.*
¶¶ 176, 310, 317 (referencing third-party settlements).  But the AC pleads no evidentiary facts at
all about those third-party licenses or settlements, such as their terms or how they are
supracompetitive.  *See id.*

---

[9] Like the Complaint, the AC never identifies how many patents in total "purportedly read
on high-tech consumer and enterprise electronic devices and components or software therein and
processes used to manufacture them" (AC ¶ 9), but it is likely hundreds of thousands if not
millions.  *Defendants' Request for Judicial Notice*, Dkt. 112 at 5.

[10] Fortress, Fortress Credit, Uniloc USA, Uniloc Luxembourg, Uniloc 2017, INVT, and
Inventergy (the "Count 4 Defendants").  AC ¶ 454.

1      Instead, like the Complaint, the AC alleges that Defendants' royalty rates are

2 supracompetitive because Defendants have allegedly sought more in damages for their patents

3 than the prior owners previously sought. *Compare* AC ¶¶ 151, 174, 228, 229, 247, 317, 335, *with*

4 Cmplt. ¶¶ 9, 39, 102. But the AC adds nothing to these allegations, which the Court previously

5 concluded were insufficient. Order at 15:4-21. In particular, the AC never alleges any facts

6 connecting these asserted damages claims to the alleged aggregation of substitutes. For instance,

7 it does not allege any facts showing that any PAE has ever attempted to leverage a purported

8 substitute patent it holds with a purported substitute patent another PAE holds.

9 **III.     THE AC AGAIN FAILS TO ALLEGE A RELEVANT MARKET OR MARKET**

10 **POWER**

11      The AC has not corrected the deficiencies this Court previously found in the Complaint's

12 market and market power allegations. Consequently, the antitrust claims and the state law claims

13 that depend upon them (*see* Order at 17:19-18:4) fail as a matter of law.

14      **A.     The AC's Alleged Patent Markets Are Facially Unsustainable**

15      The Court previously held that Plaintiffs' alleged "Electronics Patent Market" was facially

16 deficient because it was impossible to tell which products would fall within this market and why.

17 Order at 13-15; *see also Sheahan v. State Farm Gen. Ins. Co.*, 394 F. Supp. 3d 997, 1010 (N.D.

18 Cal. 2019) (dismissal for failure to "clearly allege[] what the relevant market is"); *Staley v. Gilead*

19 *Scis., Inc.*, 446 F. Supp. 3d 578, 617 n.31 (N.D. Cal. 2020) (dismissal for failure to plead "which

20 cART drugs are included and which are not"). The AC now asserts thirteen alleged "markets," but

21 this fatal deficiency remains.

22      As a threshold matter, Plaintiffs fail to identify the relevant "substitute" patents that make

23 up each of the alleged markets. *See, e.g.*, *NSS Labs, Inc. v. Symantec Corp.*, No. 18-CV-05711-

24 BLF, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissing antitrust claims because

25 plaintiff "fail[ed] to identify the economic substitutes for the product markets"); *Beyer Farms, Inc.*

26 *v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001), *aff'd*, 35 F. App'x 29 (2d Cir.

27 2002) (granting dismissal and noting that "many district courts have dismissed antitrust

28 complaints for failure to identify 'substitute products'"). Instead, for each proposed "market," the

AC (i) refers to a broad area of technology (*e.g.*, "health monitoring," "mobile device-to-device communication," etc.) and then (ii) identifies a handful of supposedly "substitute" patents purportedly owned or controlled by one or more Defendants that generally relate to this area of technology.  But Plaintiffs never allege that these are most of the "substitutes"—let alone the only "substitutes" available in the market.  Indeed, the AC concedes that for each alleged market there are <u>other</u> "substitute" patents that compete with Defendants' technology, yet the AC never identifies any of those other substitutes or alleges how many there are.[11]  This makes it impossible to determine the boundaries of the proposed markets, rendering each of them legally deficient. *See, e.g.*, *JM Computer Servs., Inc. v. Schlumberger Technologier, Inc.*, C 95-20349 JW, 1996 WL 241607, at *5 (N.D. Cal. May 3, 1996) (dismissal where plaintiff "[did] not identify the specific products or services in product markets"); *Sidibe v. Sutter Health*, C 12-04854 LB, 2013 WL 2422752, at *16 (N.D. Cal. June 3, 2013) (dismissal where "allegations about the relevant market do not identify the services that compete"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (dismissal where plaintiff failed to identify the "boundaries of the market" by "specifying how many other such companies or brands exist.").

Even with respect to the patents that the AC actually identifies, Plaintiffs fail to allege facts plausibly showing that these patents are substitutes for one another.  At best, the AC alleges that one or more of the PAEs have acquired patents that fall within the same general technical field. But for the vast majority of these patents, Plaintiffs do not even attempt to explain how they are interchangeable.[12]  And for the few ones in which they do, Plaintiffs' explanations are nothing more than conclusory hand-waving.  For example:

- **"health monitoring"** – Plaintiffs allege that this market includes U.S. Patent No.

---

[11] *See, e.g.,* AC ¶ 128 ("The Network-based Voice Messaging Patents Market constitutes a relevant antitrust market where Fortress . . . <u>and other holders of patents claimed to read on electronic devices that support</u> network-based voice messaging compete with one another to license patents[.]") (emphasis added); *see also* AC ¶¶ 155, 179, 212, 235, 251, 291, 320, 340, 361, 368, 375, 382.

[12] *See, e.g.*, AC ¶¶ 163-64, 165 (identifying Seven Network's '158 patent but not alleging how it is interchangeable with any other patent in the "remote software updates" market); *id.* ¶¶ 183, 196, 198 (same as to '986 patent in "mobile device-to-device communication" market); *id.* ¶¶ 257-58, 280 (same as to '395 patent in "device authorization" market).

6,215,403, which "relates to a wireless monitoring . . . suffocation prevention system," as well as U.S. Patent No. 7,220,220, which relates to an "exercise monitoring system." *See* Request for Judicial Notice ("RJN") at 3.  While the AC alleges that the '403 patent is an "alert-driven method" for processing patient data and that the '220 patent is a "display driven method" for the same, AC ¶ 307, the AC does not explain how an alert-driven patent meant "to ensure proper breathing to infants and bed-ridden individuals" is interchangeable with a display-driven patent relating to "exercise monitoring system and methods."  *See* RJN at 3.

- **"mobile device-to-device communications" (*i.e.*, cellphones)** – Plaintiffs allege that this market includes U.S. Patent No. 7,136,999, which is allegedly "directed to" methods for allowing long-range communications between "two devices," and U.S. Patent No. 9,712,986, which is allegedly "directed to multiple devices receiving coordinated services from a particular service provider (*e.g.*, app developer)."  AC ¶¶ 181, 183.  No allegation is made as to how one is interchangeable with the other.

- **"device authorization"** – Plaintiffs allege that this market includes U.S. Patent No. 6,856,616, which allegedly relates to a "System and Method for Providing Service Provider Configurations for Telephones" and U.S. Patent No. 9,286,466, which allegedly relates to "Registration and Authentication of Computing Devices Using a Digital Skeleton Key," AC ¶¶ 265, 274.  No allegation is made as to how one is interchangeable with the other.

- **"local cache management"** – Plaintiffs allege that this market includes U.S. Patent No. 7,434,009, which relates to writing data to a cache memory in "bursts," and U.S. Patent No. 6,058,437, which relates to the use of a "Translation Lookaside Buffer" that keeps track of data location in a shared memory.  RJN at 3.  No allegation is made as to how one is interchangeable with the other.

Absent any facts explaining how these facially distinct patents are somehow substitutes, Plaintiffs' market definitions are implausible.  *See Westlake Servs., LLC v. Credit Acceptance Corp.*, No. CV 15-07490 SJO (MRWX), 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7, 2015)

1    (granting dismissal because alleged markets "include[d] products that cannot plausibly be

2    considered substitutes").  And this is to say nothing of the thousands of other patents that likely

3    make up these alleged markets but which the AC fails to even identify.

4         Moreover, even assuming that the patents identified in the AC are somehow "substitutes"

5    for each other in that they vaguely relate to similar technological "function[s]," AC ¶ 126, that is

6    not the relevant antitrust question.  The relevant antitrust question is whether the patents are

7    appropriately viewed as <u>economic</u> substitutes, not <u>technological</u> substitutes, for one another.  *See,*

8    *e.g.*, *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at *4

9    (N.D. Cal. Jan. 5, 2008) ("To be sure, the inquiry is always focused on the economic

10   substitutability of the two technologies, not just whether the technologies accomplish a similar

11   function."); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004)

12   ("economic substitutability" and not "technological substitution" is what is "critical to market

13   definition"), *rev'd on other grounds*, 546 U.S. 394 (2006).  Nor does the mere fact that the

14   USPTO has issued patents on a certain technology mean that technology constitutes a "market"

15   for antitrust purposes.  *Delano Farms Co. v. Cal. Table Grape Comm'n.*, 655 F.3d 1337, 1351–52

16   (Fed. Cir. 2011) ("[T]he aspects of an invention that may have led the PTO to issue a patent are

17   not *per se* coterminous with the features of the patented product that may lead consumers to select

18   that product over other similar ones.") (affirming dismissal of antitrust claim).  Plaintiffs'

19   purported "markets" that are vaguely grouped by technology area are accordingly "'artificial,' and

20   'contorted to meet [Plaintiffs'] litigation needs.'"  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121

21   (9th Cir. 2018).

22        As this Court previously noted, "the outer boundaries of a product market are determined

23   by the reasonable interchangeability of use or the cross-elasticity of demand between the product

24   itself and substitutes for it."  Order at 14 (quoting *Newcal Industries, Inc. v. Ikon Office Solution*,

25   513 F.3d 1038 (9th Cir. 2008).  Cross-elasticity of demand is "the extent to which consumers will

26   change their consumption of one product in response to a price change in another."  *Eastman*

27   *Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992).  A failure to allege facts showing

28   reasonable interchangeability or cross-elasticity of demand warrants dismissal. *See, e.g.*, *Hicks*,

1  897 F.3d at 1120–21 (affirming dismissal of markets "contorted to meet [] litigation needs" and

2  highlighting the requirement that "[e]conomic substitutes have a reasonable interchangeability of

3  use or sufficient cross-elasticity of demand with the relevant product.") (internal quotation marks

4  omitted); *NSS Labs*, 2019 WL 3804679, at *9 (dismissal for failure to "plead any facts regarding

5  the cross-elasticity of demand between the Relevant Product Markets and their substitutes.").[13]

6          Here, the AC fails to allege a single fact showing economic substitutability of any of the

7  identified patents (much less the unidentified ones) in any of the AC's proposed markets.  For

8  instance, the AC contains no factual allegations showing that all patents falling within the broad

9  category "health monitoring" are reasonably interchangeable with each other from a consumer

10  perspective, or that a price change for one health monitoring patent invariably leads customers to

11  change their consumption of all other health monitoring patents.  The same holds true for patents

12  in the other "markets."  And while the AC fails to identify the boundaries of its proposed markets,

13  USPTO group classifications help illustrate the proposed markets' overbreadth.  As just one

14  example, the AC identifies a total of eight "health monitoring" patents—three substitutes and five

15  complements—all allegedly owned by a single entity, Uniloc 2017.  AC ¶¶ 293-306.  All three of

16  the allegedly substitute patents share the same USPTO classification group for "Detecting,

17  measuring or recording for diagnostic purposes; Identification of persons."  RJN at 4.  A search of

18  the USPTO database reveals at least 62,000 patents in this classification alone.  *Id.* at 4.  62,000

19  patents are obviously not all economically interchangeable with one another.

20  _____

21          [13] *See also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.
1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule
22  of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally
insufficient and a motion to dismiss may be granted."); *ChriMar Sys., Inc. v. Cisco Sys., Inc.*, 72 F.
23  Supp. 3d 1012, 1017–18 (N.D. Cal. 2014) (dismissal appropriate "if a plaintiff fails to define [the]
proposed relevant market with reference to the rule of reasonable interchangeability and cross-
24  elasticity of demand") (internal quotation marks omitted); *Spindler v. Johnson & Johnson Corp.*,
C 10-01414 JSW, 2011 WL 12557884, at *3 (N.D. Cal. Aug. 1, 2011) (market definition "facially
25  unsustainable" where "Plaintiffs fail to allege that all pharmaceuticals are reasonably
interchangeable by nursing home residents."); *Seirus Innovative Accessories, Inc. v. Cabela's,*
26  *Inc.*, No. 09-CV-102 H WMC, 2010 WL 6675046, at *3 (S.D. Cal. Apr. 20, 2010) (dismissal
where "no allegations regarding whether the goods in this market enjoy reasonable
27  interchangeability of use and cross-elasticity of demand."); *Bayer Schering Pharma AG v. Watson
Pharm., Inc.*, 207CV01472KJDGWF, 2010 WL 11578470, at *4–5 (D. Nev. Mar. 31, 2010)
28  (dismissal where plaintiff failed to "plead facts regarding potential substitutes, interchangeability
of similar products, and cross-elasticity of demand.").

1    Finally, the alleged markets expressly include both identified and unidentified

2  "complements."  *See, e.g.*, AC ¶¶ 136, 220, 271, 299.  However, the "outer boundaries" of a

3  market are defined by interchangeability of use and cross-elasticity of demand between the

4  product at issue "and substitutes for it," not complements.  *Brown Shoe Co. v. United States*, 370

5  U.S. 294, 325 (1962).  As a leading treatise notes, "<u>the requirement that a relevant market must be</u>

6  <u>limited to substitutes is so clear that few courts fail to see it</u>[.]"  Areeda & Herbert Hovenkamp,

7  *Antitrust Law*, ¶ 565(a) (3rd ed. 2016 update) ("Hovenkamp") (emphasis added).  Indeed,

8  "[g]rouping complementary goods into the same market is economic nonsense," because an

9  increase in the price of a substitute "typically occasions a price increase in the other" substitute,

10  while the prices for "complements in demand . . . tend to move in opposite directions."  *Id.*; *see*

11  *also Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1144 (E.D. Ark.

12  2008), *aff'd*, 591 F.3d 591 (8th Cir. 2009) (when an alleged market includes "complements,"

13  "what follows is not that both sets of services are in the same product market but rather the

14  opposite") (granting dismissal).[14]  Accordingly, the AC's inclusion of complements in the

15  proposed markets is an additional and independent basis for finding the markets deficient as a

16  matter of law.

17        **B.    Plaintiffs Fail To Properly Allege Market Power**

18    For many of the same reasons this Court already found with respect to the Complaint, and

19  some additional ones as well, Plaintiffs' market power allegations fail as a matter of law.

20    <u>First</u>, because Plaintiffs have not alleged any relevant antitrust market, the AC's market

21  power allegations fail.  *See Staley*, 446 F. Supp. 3d at 616 ("a market definition provides the

22  context against which to measure competitive effects of an agreement") (internal quotation marks

23  omitted).  Indeed, if Plaintiffs' alleged market definitions were sufficient, then any person or entity

24

_____

25    [14] *Staley et al. v. Gilead* does not warrant a different result.  No. 19-CV-02573-EMC, 2020
WL 5507555, at *6–*7 (N.D. Cal. July 29, 2020).  There, the Court recognized the general rule
26  that markets do not include complements but held that the plaintiffs had pleaded facts
"illustrat[ing] the interchangeability of use of different types of cART drugs" and showed that
27  drugs could function as both substitutes and complements simultaneously depending upon which
antiretroviral drug regimen was selected.  *Id.* at *7.  The AC pleads no such facts or anything
28  remotely like them.

1  who obtained a handful of patents within a broad area of generally-related technologies would

2  thereby have unlawful market power.  But courts have consistently rejected the proposition that

3  patent ownership or transfer of ownership by itself confers such power, *Illinois Tool Works Inc. v.*

4  *Indep. Ink, Inc.*, 547 U.S. 28, 45–46 (2006) (holding "that a patent does not necessarily confer

5  market power upon the patentee"), and Plaintiffs admit that "[t]here is nothing inherently illegal

6  with owning many patents or obtaining those patents through acquisition."  AC ¶ 47; *see also*

7  *Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190 (9th Cir.

8  2000) ("[T]he question of who owns the patent monopoly is a 'matter of indifference' to the

9  antitrust laws.").

10        Second, as noted above, for each of the alleged markets, the AC leaves out half of the

11  market power equation:  namely, the number of additional patents as well as non-patented

12  technology owned by others that can serve as substitutes for the Defendant-owned patents that the

13  AC identifies.  This is the exact same deficiency that the Court identified in the Complaint.  *See*

14  Order at 17 ("Nor is there a description of the number and viability of substitutes still available, if

15  any."); *see also Digital Sun v. The Toro Co.*, No. 10-CV-4567-LHK, 2011 WL 1044502, at *3

16  (N.D. Cal. Mar. 22, 2011) (dismissal of patent-based antitrust claim where there were no

17  "allegations regarding [defendant's] share of the relevant market."); *Orion Elec. Co., Ltd. v. Funai*

18  *Elec. Co., Ltd.*, No. 01 CV 3501 (AGS), 2002 WL 377541, at *6 (S.D.N.Y. Mar. 11, 2002) ("To

19  demonstrate market power flowing from a patent, a plaintiff must show that, within the relevant

20  market, there are no acceptable substitutes for the patented product and that the patent, therefore,

21  enables the patentee to exclude competition.").[15]  Indeed, without any allegations regarding

22  Defendants' alleged "share" or "percentage" of each market, Plaintiffs cannot plausibly allege that

23  Defendants possess market power.  *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,

24  532 F.3d 963, 972–973 (9th Cir. 2008); *Med Vets Inc. v. VIP Petcare Holdings, Inc*., No. 18-CV-

25  02054-MMC, 2019 WL 1767335, at *6 (N.D. Cal. Apr. 22, 2019), *aff'd*, 811 Fed. Appx. 422 (9th

26

27  [15] *See also Papst Motoren GMbH & Co. KG v. Kanematsu-Goshu (U.S.A.) Inc.*, 629 F.
    Supp. 864, 872 (S.D.N.Y. 1986) (dismissal where "[n]either side has furnished the court with any
28  information about the size of the brushless electric motor market, the availability of substitute
    products, or the portion of the relevant market allegedly dominated by each of Papst's patents.").

1    Cir. 2020) (dismissal for failure to provide "any figures corresponding to [defendant's] share of

2    ostensibly restricted" products).

3         For instance, as noted above, there are at least 62,000 active patents that share the same

4    USPTO classification group as several of the purported "health monitoring market" patents, RJN

5    at 4, but Defendants are alleged to own just eight of them.  AC ¶ 307.  Moreover, a search of the

6    USPTO database reveals that Apple and Intel own 153 and 124 patents, respectively, in this single

7    group, RJN at 4, which is more than thirty times the number that Defendants allegedly own.

8    Similarly, the AC identifies eight patents that the Uniloc entities and IXI IP supposedly own in the

9    "Digital Rights Management Patents Market," AC ¶ 354, seven of which share the same USPTO

10   classification group ("Security arrangements for protecting computers, components thereof,

11   programs or data against unauthorized activity").  RJN at 4.  The USPTO has issued over 67,000

12   other active patents in this group, and Apple and Intel own 730 and 1,935 of these patents,

13   respectively—several hundred times more than Defendants are alleged to own.  *Id.* at 4.  These are

14   just examples of why the AC's conclusory allegation that Defendants have "market power" in any

15   of these purported "markets" is implausible and in no way sufficient to show that "Fortress and its

16   PAEs have aggregated so many patents on a specific technology that an alleged infringer is

17   essentially deprived of substitutes."  Order at 39.

18        Plaintiffs cannot cure this fatal defect by appealing to "direct evidence" of market power.

19   As this Court previously noted, a Sherman Act Section 1 "direct evidence" theory still requires

20   Plaintiffs to plead "the rough contours of a <u>relevant</u> market," which Plaintiffs have failed to do

21   here.  *See* Order at 13 (quoting *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737

22   (7th Cir. 2004) (emphasis added)).[16]  Moreover, a direct evidence theory also requires a plaintiff to

23   plead facts of "supracompetitive prices" and "restricted output."  *Stewart v. Gogo, Inc.*, No. C-12-

24   5164 EMC, 2013 WL 1501484, at *4 n.3 (N.D. Cal. Apr. 10, 2013).  Here Plaintiffs have not

25

26       [16] A Clayton Section 7 claim always requires a relevant antitrust market, and the degree of
     pleading required does not change by purporting to assert "direct evidence" of market power.  *See*
27   *Brown Shoe Co.*, 370 U.S. at 324 ("[D]etermination of the relevant market is a necessary predicate
     to a finding of a violation of the Clayton Act.") (quotation marks omitted); *St. Alphonsus Med.*
28   *Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (same).

1   alleged facts showing either.  The AC's repeated references to "supracompetitive licensing

2   returns," AC ¶¶ 152, 176, 209, 232, 248, 288, 317, 337, 357, are ineffective because just like the

3   Complaint, they are "unaccompanied by supporting facts."  *Rick-Mik*, 532 F.3d at 973; *see infra*

4   Section IV.  Indeed, no "licensing returns" are ever identified at all, much less are any shown to be

5   "supracompetitive" by, for instance, a comparison to other licensing returns.  But even if the AC

6   had included such facts, it would still be insufficient to show direct evidence of market power

7   because the AC fails to allege facts showing any restriction in <u>output</u>.  *See Gogo, Inc.*, 2013 WL

8   1501484, at *4 n.3 (rejecting direct evidence theory of market power where complaint failed to

9   include "allegations of restricted output").  Indeed, the AC does not allege a single non-conclusory

10  fact showing that "licensing output" (AC ¶ 141) was reduced in any of the thirteen purported

11  patent markets.  *See, e.g.*, *id.* ¶¶ 141, 165, 198, 225, 243, 280, 307, 332, 354, 435.  Consequently,

12  Plaintiffs' conclusory allegations of "market power and anticompetitive effects" once again fail as

13  a matter of law.  *See, e.g.*, *Top Rank, Inc. v. Haymon*, No. CV 15-4961-JFW (MRWx), 2015 WL

14  9948936, at *8 (C.D. Cal. Oct. 16, 2015) ("conclusory" assertion that defendant had "ability to

15  elicit 'exclusionary' terms from broadcasters and to make 'exclusionary demands' of venues" was

16  not sufficient to plead market power); *Surface Supplied, Inc. v. Kirby Morgan Dive Sys., Inc*., No.

17  C-13-0575 MMC, 2013 WL 5496961, at *6 (N.D. Cal. Oct. 3, 2013) (the "bare assertion" of

18  monopoly power "absent supporting factual allegations is, in essence, a legal conclusion, which

19  the Court is not bound to accept as true") (internal quotation marks omitted).

20          Plaintiffs' continued failure to allege <u>facts</u> showing market power is unsurprising.  The AC

21  alleges that Defendants' patents are "weak" because they have "questionable validity,

22  infringement, enforceability, and/or are easily designed around" (AC ¶ 34).  These alleged

23  characteristics (assuming the truth of the AC's own allegations) do not suddenly change with

24  "aggregation."  Indeed, "a patent known to the trade to be invalid will not discourage competitors

25  from making the patented product or using the patented process, and so will not confer monopoly

26  power."  *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984).  In other

27  words, "if the patents, as construed by a court, do not allow [the patentee] to exclude competitors

28  from the relevant markets, then [the patentee] does not have market power[.]"  *Orion Elec. Co.*,

1    2002 WL 377541, at *6; *see also id.* ("It is only the legal force of the Asserted Patents themselves

2    that can exclude competitors").  That is why the AC, like the Complaint, is long on conclusory

3    language like "supracompetitive" prices and bereft of facts supporting that assertion.

4          **C.    Plaintiffs' Input Technology Markets Fail As A Matter Of Law**

5          This Court noted in its Order that "it is [] questionable whether Apple can simply allege

6    that Defendants claim to own SEPs instead of alleging that Defendants own or control patents <u>that</u>

7    <u>actually are SEPs</u>."  Order at 18 n.13 (emphasis added).  Despite this, the AC still fails to allege

8    that Defendants own or control patents "that actually are SEPs."

9          Instead, Apple alleges that certain Defendants have obtained so-called "declared" or

10   "purported" SEPs, AC ¶¶ 418-422, or that certain Defendants have "claimed" to possess such

11   SEPs, *id.* ¶¶ 57, 63.[17]  But there is no market for "purported" or "declared" or "claimed" SEPs, nor

12   would a Defendant's possession of one give it the power to exclude anyone or impede

13   competition.  *See* Order at 18 n.13; *see also Apple v. Samsung*, No. 11-CV-01846-LHK, 2011 WL

14   4948567, *4 n.6 (N.D. Cal. Oct. 18, 2011) ("Apple also alleges that Samsung has <u>declared</u>

15   essential many patents that are not, in fact, essential . . . If, as Apple alleges, some Samsung

16   patents are not essential to the standard, it will likely be difficult for Apple to establish that

17   Samsung's conduct has antitrust implications") (emphasis added) (dismissing antitrust claims).

18   Accordingly, Apple again has failed to allege a cognizable antitrust market for Count 4, which is

19   the only Count in the AC that references the Input Technology Markets.

20   **IV.    PLAINTIFFS HAVE NOT SUFFICIENTLY PLEADED ANTITRUST INJURY**

21         The Court previously held that the Complaint did not satisfy the antitrust injury

22   requirement because Plaintiffs had failed to allege with "sufficient specificity" that their alleged

23   harms flowed from Defendants' alleged anticompetitive conduct, specifically the purported

24   aggregation of substitute patents.  Order at 20:25-21:6.  The AC has not cured this deficiency.

25         To plead an antitrust injury, Plaintiffs "must allege facts showing that" the injury they have

26   suffered is "'of the type the antitrust laws were intended to prevent'—*i.e.*, an injury to

27   _____

28         [17] The only two Defendants that are alleged to own "declared" and/or "purported" SEPs are
     INVT and Uniloc 2017.

1    competition." *Somers v. Apple, Inc.*, 729 F.3d 953, 967 (9th Cir. 2013) (emphasis added) (quoting

2    *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also* Order at

3    19:21-24.  Moreover, the alleged injury "must flow[] from that which makes [defendant's]

4    conduct unlawful"—*i.e.*, the anticompetitive nature of Defendants' alleged wrongdoing.  Order at

5    19:22-24 (quoting *Somers*, 729 F.3d at 963).

6         The Court previously ruled that Plaintiffs did not allege facts showing that "Defendants'

7    aggregation has in fact eliminated substitutes [] which has actually impacted Plaintiffs."  Order at

8    20:25-27.  As the Court observed, the Complaint "suggest[ed] two possibilities for antitrust injury:

9    (1) the payment of inflated royalties to Defendants (*i.e.*, supracompetitive prices for licenses)" and

10   "(2) the payment of litigation costs for defending against Defendants' patent infringement suits."

11   *Id.* at 20:7-10.  The Complaint, however, never alleged that Plaintiffs had purchased a license from

12   Defendants or somehow "paid inflated royalties."  *Id.* at 20:25-21:2.  Although the Complaint did

13   allege that Plaintiffs had incurred costs defending themselves against Defendants' infringement

14   suits, "it [was] not clear that those lawsuits came about <u>because of the elimination of substitutes</u>."

15   *Id.* at 20:7-10; 21:4-5 (emphasis in original).  The AC, which alleges the same theory and the same

16   injuries as the Complaint, suffers from these same fatal defects.

17         **A.    The AC's Conclusory Allegations Of Supracompetitive Royalties Fail**

18         With respect to the AC's allegations of "supracompetitive" royalties, Plaintiffs still do not

19   allege that they have ever purchased <u>any</u> license from any Defendant, let alone at supracompetitive

20   rates.  Nor do Plaintiffs allege that they have any intention of ever purchasing any license from

21   any Defendant in the future.  Plaintiffs thus cannot assert antitrust injury on this basis.  *See In re*

22   *New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 15 (1st Cir. 2008) (plaintiff who

23   failed to allege any "intention to buy or lease another new vehicle within such a time frame as

24   could be deemed imminent" had no standing to bring antitrust claim); *City of San Jose v. Office of*

25   *Comm'r of Baseball*, No. C-13-02787 RMW, 2013 WL 5609346, at *11 (N.D. Cal. Oct. 11, 2013)

26   ("[I]njury that has not yet occurred . . . or merely speculative is generally insufficient to give rise"

27   to a cognizable antitrust injury), *aff'd*, 776 F.3d 686 (9th Cir. 2015); *see also* Order at 21:1 (the

28   alleged risk must be "real or immediate").

1    Moreover, like the Complaint, the AC's conclusory assertion that <u>other</u> companies have

2  paid "supracompetitive" licensing rates (AC ¶¶ 152, 166, 176, 199) is "unaccompanied by

3  supporting facts," and thus insufficient to plead antitrust injury.  *Rick-Mik Enterprises*, 532 F.3d at

4  973 (affirming dismissal of antitrust claims); *see also* Order at 17:9-10 ("[T]here is no specific

5  indication that the companies paid supracompetitive prices for those licenses.").  For instance,

6  while the AC repeatedly asserts that Defendants' alleged "aggregation" of "substitute patents" has

7  allowed them to "extract supracompetitive royalties" (*e.g.*, AC ¶ 125), Plaintiffs never identify the

8  price that Defendants have been able to obtain for their patents post aggregation or how those

9  prices compare to the supposedly competitive price.  *Eastman v. Quest Diagnostics Inc.*, 108 F.

10  Supp. 3d 827, 835 (N.D. Cal. 2015) (dismissing antitrust claims because plaintiffs "have not

11  alleged what [defendant's] prices are or how they compare to competitive prices"); *Aya*

12  *Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17CV205-MMA (MDD), 2017 WL

13  6059145, at *5 (S.D. Cal. Dec. 6, 2017) (granting dismissal where plaintiff failed to "allege that

14  prices increased from $X to $Y amount as a result of the alleged conduct.").

15    Plaintiffs also claim that Defendants have secured multiple settlements for "substantial

16  royalties," AC ¶¶ 142, 166, 199, 308, 355, but the AC never identifies what these settlement

17  amounts were nor how they compare to any alleged competitive price.  Consequently, the AC

18  alleges mere <u>speculation</u> about "substantial" royalties (whatever that means), not <u>facts</u> showing

19  any truly "supracompetitive" pricing.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

20  ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

21    Having no facts to allege, the AC employs the same sophistry as the failed Complaint.  It

22  again alleges that Defendants have sought "damages" in litigation that are "significantly more"

23  than what the prior owners sought outside of litigation.  *See, e.g.*, AC ¶¶ 151, 228, 229, 247, 335;

24  *see also id.* ¶ 317 (royalties "far" exceed actual value of patents).  However, there is no

25  explanation of why one party demanding in litigation more than what a different party sought

26  outside of litigation renders the litigation demand "supracompetitive."  Moreover, the only

27  supposed instance of this occurring is the very same allegation Plaintiffs asserted in the failed

28  Complaint, namely that "VLSI claims billions of dollars in damages based on eight of its patents

1  but [the] former owner offered license to those patents for far less[.]"  Order at 15; *Compare*

2  Cmplt. ¶ 102 *with* AC ¶ 104.  The AC then just repeats that same assertion a few more times,

3  repackaging it a little each time.  *See* AC ¶ 228 at 70:11-13; *id.* ¶ 335 at 101:3-5.  But it never

4  explains how this somehow shows "supracompetitive" pricing or alleges any facts linking VLSI's

5  damages demand to purported "aggregation of substitute patents."

6       Indeed, the AC does not allege that each of these eight patents are substitutes or that they

7  were aggregated from different sources.  Instead according to the AC, each of these patents was

8  obtained by VLSI <u>from the same prior owner</u>, NXP.  AC ¶¶ 58, 60.  This demonstrates that

9  Plaintiffs are not really complaining about "aggregation" of patents into the hands of a single

10  owner—that was true before VLSI acquired them.[18]  Instead, Plaintiffs just do not like that VLSI

11  seeks more in damages than Plaintiffs felt they could get NXP to accept.  That is not an injury at

12  all, much less the type of injury to competition that the antitrust laws were intended to address.

13  Rather, courts will adjudicate VLSI's requested damages in accordance with the patent laws.

14       The AC's only new allegations of purported "supracompetitive" pricing are even more

15  deficient than the one the AC cribbed from the Complaint.  Specifically the AC alleges that

16  various Defendants made damages demands in litigation that allegedly exceed what prior owners

17  charged . . . <u>but for different patents</u>.[19]  "Demanding" more for a product/technology than another

18

19

---

20  **[18]** Indeed, Intel previously alleged that the patents VLSI obtained were "only a fraction of
the original patent portfolio owned by NXP" who previously owned "a patent portfolio of over

21  9,000 patent families."  *Intel Corp. v. Fortress Inv. Grp. LLC et al.*, No. 5:19-CV-06856-EJD
(N.D. Cal. Oct. 21, 2019), Dkt. 1 ¶¶ 44, 86.  So if anything, VLSI's deal with NXP constituted a

22  <u>disaggregation</u> of patents, not an aggregation of them.

    **[19]** *See* AC ¶ 151 ("This damages demand is significantly more than the original owner of

23  the '252 patent—Philips—<u>has demanded for other of its patents</u>.") (emphasis added); *id.* ¶ 174
("This is far more than the original owners of other patents in the Remote Software Update Patents

24  Market—Philips with respect to the '088 patent and IBM with respect to the '228 patent—<u>have
sought for other patents</u>.") (emphasis added); *id.* ¶ 228 ("VLSI's damages estimate is also

25  significantly more than Freescale <u>has sought for other of its patents</u> concerning microprocessor
features.") (emphasis added); *id.* ¶ 229 ("This amount is significantly more than NXP <u>has sought</u>

26  <u>for other of its patents</u> concerning microprocessor features.") (emphasis added); *id.* ¶ 247 ("This
amount is significantly more than NXP <u>has sought for other of its patents</u> concerning

27  microprocessor features") (emphasis added); *id.* ¶ 317 ("Likewise, the damages demands made of
Apple far exceed the amounts that the original owner of one of the patents in the Health

28  Monitoring Patents Market (*i.e.*, the '403 patent, which was assigned to IBM on its face) <u>has
sought for other of its patents</u>.") (emphasis added); *id.* ¶ 335 ("VLSI's damages estimate is also

party charged for a <u>different</u> product/technology is hardly evidence of "supracompetitive" pricing.
Moreover, if the "other" patents were truly equivalent to the ones Defendants are asserting in
litigations, as the AC seems to imply (without any supporting facts), then Plaintiffs by definition
would still have these equivalent substitutes at their disposal and at a low price.

In any event, even if all of these inconsistencies and fundamental defects were set aside,
the AC's allegations about Defendants' litigation "demands" cannot possibly demonstrate
supracompetitive prices.  First, what a party "demands" is irrelevant; "the pertinent inquiry is on
the prices <u>actually paid</u>, the transaction prices."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112,
129 (3d Cir. 1999) (emphasis added).

Second, the AC never ties these supposedly inflated demands to Defendants' alleged
aggregation of substitute patents.  As noted above, the AC never alleges that any PAE has ever
sought to license any patents other than the ones it owns.  Nor does it allege that any PAE based
its royalty rates, settlement demands, or litigation damages assessments on any patents owned by
other PAEs.  Indeed, it would be impossible for any patent owner to base its damages on anything
other than its own patents-in-suit.  For example, a court will ultimately determine the value of
VLSI's patents in its underlying litigations against Intel.  This damages analysis will have nothing
to do with whether (i) Fortress, who is not even a party to those suits, has "aggregated substitute
patents" through various other PAEs who are also not party to those suits, or (ii) other PAEs
allegedly controlled by Fortress own "substitute" patents.  In other words, each PAE's alleged
damages demand "sounds in patent law, not antitrust law."  *See Qualcomm*, 969 F.3d at 999.

Third, "there are [] other 'obvious alternative explanation[s]'" for why a patent holder
might seek more damages than the patent's previous owner that are wholly unrelated to decreased
competition.  *See Somers*, 729 F.3d at 965 (quoting *Twombly*, 550 U.S. at 567).[20]  For example,

---

significantly more than Freescale <u>has sought for other of its patents</u> concerning microprocessor
features.") (emphasis added).

[20] Given Apple's and Intel's massive revenues, it is unsurprising that patent owners'
damages claims and resulting jury awards involving those companies are also very large.  *See,
e.g.*, *Optis Wireless Technology, LLC v. Apple Inc.*, 2:19-cv-000660-JRG (E.D. Tex. Aug. 11,
2020), Dkt. 483 (verdict form awarding $506,200,000 in past sales); *Cal. Inst. of Tech. v. Apple
Inc.*, 2:16-cv-03714-GW-AGR, (C.D. Cal. Aug. 3, 2020), Dkt. 2245 (judgment and order for
Apple to pay over $880,000,000 in damages and pre-judgment interest); *VirnetX Inc. v. Apple Inc.*,

the subsequent owner might have a different assessment of the patent's value or have a different theory of infringement.  Anticompetitive conduct should not be presumed simply because a supposed "fair value" (according to Apple and Intel) does not correspond "to the prices the market appears willing to pay" for those patents.  *Qualcomm*, 969 F.3d at 999.  Accordingly, "without some further factual enhancement," the AC's conclusory assertions of supracompetitive rates "stop[] short of the line between possibility and plausibility' of antitrust injury."  *Somers*, 729 F.3d at 965 (quoting *Twombly*, 550 U.S. at 557).

Finally, the AC makes the conclusory assertion that Defendants have obtained royalties that "exceed[] the actual value of the patents based on their technical and commercial merits."  AC ¶¶ 152, 176, 209, 232, 248, 288, 317, 337, 357.  But Plaintiffs' bare allegations that Defendants' patents are "weak" and "meritless" are conclusory.  The AC attempts to support this conclusory assertion by further speculating that prior patent owners never asserted the "weak" (*e.g.*, *id.* ¶ 43) patents due to "competitive constraints" (*e.g.*, *id.* ¶¶ 49, 176, 204, 226) such as the "risk of patent countersuits" (*id.* ¶ 49), and thus Defendants' settlements with third parties supposedly reflect "supracompetitive" royalties.  *See, e.g.*, *id.* ¶¶ 176, 204, 226.  However, given that the AC never alleges how much anyone has ever paid for any Defendant's alleged license, it is speculation to conclude that those payments are "supracompetitive."  Moreover, the notion that prior owners did not assert their patents due to the risk of countersuits shows that, if anything, those patents were previously undervalued.  Regardless, a prior owner's mere non-assertion does not plausibly demonstrate that Defendants' subsequent demands or licenses with third parties are supracompetitive.  If the mere allegation that a patent holder has demanded more than a prior owner were sufficient to state an antitrust claim, this would expose a patent holder to antitrust liability any time it had a different opinion of value, a different theory of infringement, or just more resources to overcome a recalcitrant defendant than the prior owner had.  There is no basis in antitrust law for this, and it would chill patentees' Constitutional right to assert their patents.  It

---

6:12-cv-00855-RWS, (E.D. Tex. Aug. 30, 2018), Dkt. 798 (noting jury-awarded damages of approximately $302 million in '417 action and jury-awarded damages of more than $502 million in '855 action).

1  would also flatly contradict the Ninth Circuit's recent rejection of the premise "that royalties are

2  'anticompetitive'—in the antitrust sense—unless they precisely reflect a patent's current, intrinsic

3  value and are in line with the rates other companies charge for their own patent portfolios."

4  *Qualcomm*, 729 F.3d at 999.

5       **B.**    **The AC Fails To Connect Plaintiffs' Litigation Costs To Anticompetitive Harm**

6       The AC's allegations regarding litigation costs are likewise deficient.  Like the Complaint,

7  the AC alleges that Plaintiffs have incurred costs defending themselves against Defendants'

8  infringement suits.  But like the Complaint, the AC fails to allege facts showing that these

9  infringement suits "came about <u>because of the elimination of substitutes</u>."  Order at 21:2-6

10  (emphasis in original).  In other words, Plaintiffs have not alleged that the reason that they have

11  been subjected to Defendants' infringement suits is because Defendants have effectively cornered

12  the market on certain technologies.  Indeed, four of the alleged markets (AC ¶¶ 359-389) concern

13  patents that Plaintiffs admit the Defendants have never asserted against them.  *Id.* ¶ 359.[21]  Thus,

14  there is no link between the supposed injury—*i.e.*, Plaintiffs' litigation costs—and the purported

15  anticompetitive conduct—*i.e.*, Defendants' aggregation of substitutes.

16       Under some circumstances, an "attempt to monopolize an industry by acquiring <u>all</u> present

17  and future patents relevant to that industry" might possibly constitute an antitrust violation.

18  *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981) (emphasis added).

19  Under that scenario, any company that wants to remain in the relevant market faces the following

20  dilemma:  either reach a settlement with the monopolist by agreeing to whatever royalties the

21  monopolist demands or be subject to a patent infringement suit.  The AC does not allege that

22  Plaintiffs face such a predicament or anything remotely close to it.

23       Plaintiffs never allege that they cannot escape Defendants' infringement suits because

24  Defendants have aggregated all, most, or even a key subset of substitute patents to such an extent

25

26      [21] While Plaintiffs allege that they face the "threat" that Defendants might sue them in the future, *id.*, Plaintiffs do not allege that any Defendant has ever made any such threat.  In any event,

27  the mere "'threat' of an injury is insufficient," let alone the speculation of a potential future "threat."  *Kirkwood Florist, Inc. v. Hi-Float, Inc.*, 812 F. Supp. 2d 1000, 1007 (E.D. Mo. 2011)

28  (granting dismissal); *see also City of San Jose*, 2013 WL 5609346, at *11 (speculative injury is insufficient to give rise to antitrust injury).

that Plaintiffs are forced to take a license.  Order at 16:7-11 ("Plaintiffs do not give any concrete example where Fortress and its PAEs have aggregated patents on a specific technology such that an alleged infringer is essentially deprived of substitutes."); *Intellectual Ventures I LLC v. Capital One Fin. Corp*., No. 1:13-CV-00740 AJT, 2013 WL 6682981, at *9 (E.D. Va. Dec. 18, 2013) (dismissing antitrust claims because there was no allegation that defendant "had acquired <u>all</u> substitutes or competing technologies") (emphasis added); *Beyer Farms, Inc.*, 142 F. Supp. 2d at 303–04 (finding insufficient allegations of "injury . . . to competition" because the possibility of "alternatives" necessarily "lessen[s] the anti-competitive impact"); *see also Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 990 (6th Cir. 2001) ("[A]n essential element in attempting to establish the fact of damage because of exclusion from a specified source of supply is the lack of an alternative comparable substitute for the desired merchandise.") (internal quotations omitted).  For example, the AC does not identify a single product that Plaintiffs cannot make or a single technology that they cannot practice without infringing one of Defendants' patents.  Nor does the AC allege that if Plaintiffs were to lose one of the referenced lawsuits then Plaintiffs would have no substitutes (including other patents or a design-around) to use in lieu of the litigated patents.[22]

Indeed, the AC alleges that, prior to Defendants' allegedly aggressive litigation campaign, there was no market for Defendants' patents at all because they have "little or no meaningful value."  AC ¶ 34.  Thus, the alleged basis for Plaintiffs' injury is not that Defendants' have aggregated an important (or even potentially important) portfolio of substitute patents.  Rather, it is that Defendants have aggregated a sufficient number of so-called "weak" patents that litigation "becomes simply a numbers game" whereby Defendants bring waves of successive infringement suits until they hit the "jackpot."  *Id*. ¶ 7.  As a result of such conduct, Plaintiffs claim that they are

---

[22] Even assuming that Plaintiffs' conclusory allegations were sufficient to demonstrate that Defendants aggregated some purported "substitutes," that would only show that Defendants have aggregated <u>some</u> substitute patents that were previously in the hands of different owners, thereby limiting Plaintiffs' choice of licensing partners.  But mere "allegations that conduct 'has the effect of reducing consumers' choices . . . do[] not sufficiently allege an injury to competition" because this effect is "'fully consistent with a free, competitive market.'"  *See Qualcomm,* 969 F.3d at 990 (quoting *Brantley v. NBC Universal, Inc*., 675 F.3d 1192, 1202 (9th Cir. 2012)).

1  forced to either take a license for Defendants' allegedly "weak" patents or face the risk that a court

2  could "improperly" find that one of them was "valid and infringed," thereby giving Defendants a

3  "windfall." *Id.* ¶¶ 7, 10.  However, the risk of an erroneous (according to Plaintiffs) judgment is

4  not "the type [of injury] the antitrust laws were intended to prevent." *See Somers*, 729 F.3d at

5  953.  It is what the appellate process is intended to address.

6  **V.      PLAINTIFFS' CLAIMS ARE BARRED UNDER *NOERR-PENNINGTON***

7         Given the AC's numerous deficiencies, this Court need not decide the issue of *Noerr-*

8  *Pennington* to resolve this motion.  Nevertheless, under the "modified *Hynix* approach" that the

9  Court applied in its Order (Order at 26), *Noerr-Pennington* is an additional ground for dismissal of

10  the AC.

11         *Noerr-Pennington* protects litigation conduct unless the litigation constitutes a "sham."

12  *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).  To allege

13  that litigation is a sham, a complaint must plead—with particularity—facts showing both

14  (i) "objective baselessness" and that (ii) the litigations were brought not to achieve a litigation

15  outcome (*e.g.*, a verdict or settlement) but instead were solely intended to interfere with the

16  business of a competitor.  *Id.* at 60-61, 66; *see Fitbit, Inc. v. Laguna 2, LLC*, No. 17-CV-00079-

17  EMC, 2018 WL 306724, at *10 (N.D. Cal. Jan. 5, 2018) (sham allegations must meet a

18  "heightened pleading requirement").  Plaintiffs do not attempt to plead facts, much less with

19  particularity, to establish either of these elements.  Indeed, Plaintiffs conceded this in the last

20  round of briefing.  *See* Dkt. 136 at 31:5-6.

21         Under the "modified *Hynix* approach" to *Noerr-Pennington*, a court must assess whether a

22  complaint's non-litigation-related allegations state an independent antitrust claim solely on their

23  own.  *See* Order at 25 ("[A] plaintiff that can prove an antitrust violation without the use of

24  protected petitioning can recover damages caused by that petitioning.") (quoting Hovenkamp, *et*

25  *al.*, IP & Antitrust § 11.04[F]).  The only potentially "independent" antitrust theory that the AC

26  proffers is the purported "aggregation" of substitute patents.  As demonstrated above, that theory

27  fails as a matter of law, so it is not an <u>independent</u> basis for liability here.  Consequently, all that

28  the AC is left with are hollow assertions of litigation misconduct without even an attempt to meet

1  the stringent requirements for pleading sham litigation.  Under these circumstances, *Noerr-*

2  *Pennington* immunity applies.  *See, e.g.*, *Intellectual Ventures*, 2013 WL 6682981, at *7 (*Noerr-*

3  *Pennington* applied where "claim of monopolization reduces simply to IV's alleged ability . . . to

4  credibly threaten serial litigation, not for the purpose of enforcing its patents, but rather to

5  bludgeon Capital One into a licensing agreement that could not otherwise be obtained or justified

6  based on the merits of its patents, were they to be dispersed individually among many holders.").

7  **VI.      THE AC FAILS TO ALLEGE A CONSPIRACY TO RESTRAIN TRADE**

8         In addition to the universal failings discussed above, the Section 1 claim fails as a matter of

9  law because, like the dismissed Complaint, the AC fails to allege any <u>evidentiary facts</u> of an

10  unlawful agreement between any two parties.  Instead, also like the dismissed Complaint, the AC

11  only offers conclusions parroting the legal standard, and those conclusions are often flatly

12  contradicted by the AC's own admissions.

13         To begin with, despite this Court's directive to Plaintiffs, it is still not clear "whether

14  Plaintiffs are asserting (1) an overarching conspiracy claim," "(2) a claim that Fortress and <u>each</u> of

15  the other defendants was in a separate conspiracy," or "(3) something in between."  Order at

16  27:12-16 (emphasis in original).  The AC never delineates the scope of the alleged conspiracy(ies)

17  or whether Plaintiffs are alleging one overarching conspiracy or numerous separate mini-

18  conspiracies.  Indeed, if anything, the AC exacerbates the confusion over the nature of the alleged

19  conspiracy and its supposed scope.  For example, the AC now alleges thirteen separate markets,

20  but it never alleges that each of the Section 1 Defendants own patents within each of these alleged

21  markets.  The AC never alleges which Defendant(s) "conspired" to restrain trade in which of the

22  thirteen separate "markets" and how.  *See Staley*, 446 F. Supp. 3d at 593 (plaintiff must

23  "adequately allege that each [] defendant knew of its connection to a conspiracy to restrain trade in

24  or monopolize" in a particular market).  The AC also alleges that Fortress and each of the

25  Section 1 Defendants "intended [] through their agreements" to "extract royalties" from both

26  "Intel and Apple."  AC ¶ 440.  But the AC does not allege that Intel has ever been sued or

27  threatened by <u>any</u> of the Section 1 Defendants.  It is thus not clear how any of the Section 1

28  Defendants could have been part of a conspiracy to aggregate substitute patents and bring "weak"

1   or "meritless" claims against Intel.  *Staley*, 2020 WL 5507555, at *7 (alleged co-conspirators

2   "must each have had an understanding about the nature of the conspiracy and its scope").  Nor is it

3   clear how the Section 1 Defendants' (none of whom has sued Intel) "profits" were somehow

4   "dependent upon the success" of Fortress's alleged scheme against Intel.  *Id.* at *9 (quoting *United*

5   *States v. Bibbero*, 749 F.2d 581, 588 (9th Cir. 1984)).

6           In any event, regardless of the type of conspiracy the AC is attempting to allege, Plaintiffs'

7   Section 1 claim fails as a matter of law because it contains no "evidentiary facts" of an unlawful

8   agreement to restrain trade.  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186,

9   1194 n.6 (9th Cir. 2015) (affirming dismissal) (internal quotation marks omitted).  As this Court

10  held, to plead a Section 1 conspiracy claim, a plaintiff must provide "specific allegations" that the

11  defendant was "aware of the unlawful object toward which the agreement was directed."  Order at

12  27:19-28:16.  <u>Yet the AC re-pleads precisely the same allegations of ordinary loan and sales</u>

13  <u>transactions that this Court already found deficient as a matter of law in dismissing the Complaint.</u>

14  *Compare* AC ¶¶ 51-57, 62-77 *with* Cmplt. ¶¶ 51-56, 61-74.  The AC again attacks:  (1) a

15  "Revenue Sharing" and "Patent License Agreement" with Uniloc USA and Uniloc Luxembourg,

16  AC ¶¶ 51-52, Cmplt. ¶¶ 51-52; (2) a 2014 Revenue Sharing/Note Purchase Agreement and 2016

17  Restructuring Agreement with Inventergy, AC ¶¶ 65, 71, Cmplt. ¶¶ 64, 67; and (3) an "agreement

18  that gave rise to an assignment of a security interest" with IXI IP, AC ¶ 73, Cmplt. ¶ 74.  As the

19  Court previously noted, these agreements are "consistent with rational, legal business behavior"

20  and are therefore insufficient to state a Section 1 claim.  Order at 28:20-24; *see also Name.Space,*

21  *Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015) ("We

22  cannot, however, infer an anticompetitive agreement when factual allegations just as easily

23  suggest rational, legal business behavior.") (internal quotation marks omitted); *Top Rank, Inc.*,

24  2015 WL 9948936, at *13 (dismissing Section 1 claim where investment agreements did not

25  "suggest or hint of an agreement to restrain trade" and were "entirely consistent with rational,

26  legal business behavior").

27          Rather than attempting to allege evidentiary facts evincing an unlawful agreement to

28  restrain trade, the AC merely adds and repeatedly parrots a conclusory allegation that each

1    company "understood that [its] transaction would enable Fortress to aggregate substitute and

2    complementary patents to eliminate competition." AC ¶ 50; *see also id.* ¶¶ 56, 71, 73.  However,

3    "it does not suffice to simply say that the defendants had knowledge; there must be factual

4    allegations to plausibly suggest as much." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,

5    602 F.3d 237, 255 (3d Cir. 2010) (emphasis added); *see also Shames v. Hertz Corp.*, No. 07-CV-

6    2174 H, 2008 WL 11318291, at *3 (S.D. Cal. Apr. 8, 2008) (dismissing Section 1 claim where

7    "complaint contains only conclusory assertions and general allegations that [defendant] had

8    knowledge"); *In re Automotive Parts Antitrust Litig.*, No. 12-CV-00203, 2016 WL 8200512, at *4

9    (E.D. Mich. Apr. 13, 2016) ("the factual allegations in the CACs must show each Defendant's

10   understanding of the common purpose of the overarching conspiracy"; denying motion to amend)

11   (emphasis added); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 15 (D.D.C. 2004) ("to

12   establish the requisite knowledge of the conspiracy, Plaintiffs must prove that each Defendant was

13   united in a common unlawful goal or purpose, or knew of the conspiracy's general scope and

14   purpose.").  Here, the AC contains none of these required factual allegations.

15          For instance, the AC "furnishes no clue as to" who specifically made an agreement

16   between Fortress and each other Defendant "or when and where the illicit agreement took place."

17   *Twombly*, 550 U.S. at 565 n.10.  To highlight just one example of this deficiency, the AC claims

18   that the Uniloc entities started their "extensive" litigation campaign "[b]eginning in 2003."  AC

19   ¶ 342.  But the first alleged "agreement" between Fortress and Uniloc did not occur until

20   December 30, 2014, and the most recent alleged "agreement" is dated March 28, 2018.  *Id.* ¶¶ 51-

21   54.  Consequently, it is entirely unclear whether the agreed-upon conspiracy to restrain trade

22   supposedly occurred in 2003, 2014, sometime in between 2003 and 2014, or sometime after.

23          Moreover, to the extent the AC attempts to allege an overarching conspiracy, it contains no

24   allegations that the PAEs were aware of each other's existence and participation in the alleged

25   scheme.  *Staley*, 2020 WL 5507555, at *7 (conspirators in alleged "overarching" conspiracy must

26   have knowledge that "there was more than just a bilateral conspiracy").  Nor does it allege facts—

27   or even conclusions—showing that each PAE "realized that [its] own profits . . . were dependent

28

1  upon the success of each" agreement, *id.* at *9 (quoting *Bibbero*, 749 F.2d at 588), or "how [one

2  Defendant] benefitted from the agreement between" any other Defendants, *id.*

3      The Ninth Circuit and courts within it routinely dismiss Section 1 claims that lack the

4  required factual detail regarding the defendants' purported knowledge of a conspiracy.  *See, e.g.,*

5  *In re Musical Instruments*, 798 F.3d at 1194 n.6 (affirming dismissal and noting that "plaintiffs

6  must plead evidentiary facts:  who did what, to whom (or with whom), where, and when.")

7  (internal quotation marks omitted); *Staley*, 2020 WL 5507555, at *9 (dismissing overarching

8  conspiracy claim where amended complaint failed to sufficiently allege facts showing

9  understanding of nature and scope of conspiracy); *United States v. CalPortland Constr.*, No. CV

10 16-04479 JFW (SSx), 2018 WL 6262877, at *3 (C.D. Cal. Mar. 9, 2018) (granting dismissal

11 because "[t]he Complaint does not identify individuals at each of the Defendant companies who

12 entered into agreements, [or] state when, where, and how those individuals met to discuss and

13 enforce agreements."), *aff'd*, *Kraft v. CalPortland Constr.*, 801 Fed. Appx. 547 (9th Cir. 2020);

14 *Int'l. Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. CV 07-00043 MMM (SSx), 2007 WL

15 4976364, at *10 (C.D. Cal. Oct. 29, 2007) (dismissing Section 1 claim with prejudice where

16 plaintiff failed to plead "who made the decision, how it was made or what the parameters of the

17 agreement were."), *aff'd*, 323 Fed. Appx. 571 (9th Cir. 2009); *see generally Staley*, 446 F. Supp.

18 3d at 606 (dismissing bilateral conspiracy claim and observing that "*Twombly* and *Iqbal* require

19 specific allegations plausibly suggesting a conspiracy").  The same result is warranted here.

20     Indeed, the AC's conspiracy assertions are not only conclusory, they are also undermined

21 by the AC's own admissions.  For instance, the AC never attempts to reconcile its conclusory

22 assertion that each PAE somehow "understood" it was part of Fortress's alleged scheme to

23 aggregate substitute patents with the AC's allegation that Fortress has intentionally "obfuscat[ed]"

24 the "scope" of its alleged patent portfolio by spreading its patents amongst different PAEs whose

25 connection to Fortress is supposedly difficult or impossible to ascertain.  *See, e.g.*, AC ¶¶ 43, 124.

26 Given this alleged "obfuscation," it is not clear how each PAE could have known that Fortress had

27 aggregated (or would later aggregate with the help of other PAEs) substitute patents or that there

28 were other PAEs involved in this alleged scheme.

1    Similarly, while the AC asserts that each PAE received "compensation in the form of

2    favorable terms" and thus "share[d] in the supracompetitive royalties," AC ¶ 50, the AC never

3    identifies the "favorable terms" or explains what made them "favorable."  Nor does the AC ever

4    attempt to reconcile its "favorable terms" assertion with the opposite assertion that Fortress

5    controlled the PAEs by "condition[ing] its investments in PAEs on <u>terms so severe</u> that the PAEs

6    have no choice but to make aggressive and reckless patent assertions."  *Id.* ¶ 29 (emphasis

7    added).**23**  As this District has held, "[c]ourts may dismiss a claim as not plausible where its

8    supporting factual allegations are contradictory."  *Openwave Messaging, Inc. v. Open-Xchange,*

9    *Inc.*, No. 16-CV-00253-WHO, 2016 WL 6393503, at *5 (N.D. Cal. Oct. 28, 2016).  And even if

10   the AC's "favorable terms" allegation (AC ¶ 50) were not conclusory and self-contradictory, the

11   mere fact that the PAEs "benefitted from [] preferential business terms does not establish [them]

12   as a co-conspirator."  *Contractor Util. Sales Co. v. Certain-teed Prod. Corp.*, 638 F.2d 1061, 1076

13   (7th Cir. 1981).  Rather, this allegation is equally consistent with "rational business behavior."

14   *Name.Space*, 795 F.3d at 1130.

15   Accordingly, the AC fails to sufficiently allege that there was a conspiracy between <u>any</u>

16   two Defendants to restrain trade, let alone an overarching conspiracy.

17   **VII.   THE CLAYTON SECTION 7 CLAIM FAILS AS A MATTER OF LAW BECAUSE**

18   **THERE ARE NO ALLEGATIONS REGARDING MARKET CONCENTRATION**

19   **OR MARKET SHARE**

20   In addition to the global failings of a lack of market, market power, and antitrust injury,

21   Plaintiffs' Section 7 claim fails as a matter of law because it pleads no facts regarding market

22   concentration or Defendants' market share, either before or after each of the challenged

23   acquisitions.

24   The Court previously dismissed Plaintiffs' Clayton Section 7 claim because, in addition to

25   failing to allege a cognizable market or antitrust injury, "Plaintiffs [had] not adequately alleged

26   that there has been such an aggregation of patents as to eliminate substitutes, thus constituting

27   _____

28   **23** The AC also never explains why Fortress would need "severe terms" to force the PAEs
to do something if in fact the PAEs had already supposedly "agreed" to do it.

1   unfair competition cognizable under § 7." Order at 29:26-28. The AC does not cure this defect.

2   Instead, it alleges that Defendants have acquired a handful of supposedly substitute patents in each

3   of various purported markets. That is plainly insufficient. Every acquisition decreases

4   competition to some degree, but that does not mean that all acquisitions necessarily give rise to a

5   Section 7 claim. *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 298 (1930) ("Mere acquisition by one

6   corporation of the stock of a competitor, even though it result[s] in some lessening of competition,

7   is not forbidden."); *Brunswick Corp.*, 429 U.S. at 487 ("Every merger of two existing entities into

8   one, whether lawful or unlawful, has the potential for producing economic readjustments that

9   adversely affect some persons."). Rather, Section 7 prohibits "only those whose effect 'may be

10  substantially to lessen competition, or to tend to create a monopoly." *Brown Shoe Co.*, 370 U.S. at

11  324 (emphasis added) (internal quotation marks omitted).

12          Therefore, in order to state a Section 7 claim, Plaintiffs "must adequately allege" that

13  Defendants' alleged patent acquisitions have "produce[d] 'a firm controlling an undue percentage

14  share of the relevant market, and [would] result . . . in a significant increase in the concentration of

15  firms in the market.'" *Dehoog v. Inbev*, No. 1:15-CV-02250-CL, 2016 WL 5853733, at *3 (D. Or.

16  July 22, 2016), *adopted*, 2016 WL 5858663 (D. Or. Oct. 3, 2016), *aff'd*, *DeHoog v. Anheuser-*

17  *Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018). The AC, however, never describes

18  Defendants' alleged share of substitute patents nor the change in concentration of the competing

19  licensors in any of Plaintiffs' proposed "markets" following Defendants' alleged acquisitions.[24]

20  Indeed, the AC never even specifies which of these alleged markets the Section 7 Defendants have

21  supposedly monopolized. Courts in this District routinely dismiss Section 7 claims that fail to

22  contain factual allegations showing a merger's alleged effect on market concentration and market

23  share. *See, e.g.*, *Med Vets*, 2019 WL 1767335, at *6 (dismissing Section 7 claim where complaint

24

25          [24] For example, while Plaintiffs conceded in prior briefing that the acquisition of Seven
    Networks was only a "*predicate to* anticompetitive effects from later transactions," Dkt. 136 at 36-
26  37 (emphasis added), the AC nevertheless pleads virtually identical facts in the AC concerning
    Fortress's acquisition of Seven Networks. This is plainly insufficient to plead a Section 7 claim
27  against Seven Networks, and the Section 7 claim (as well as the state claim premised upon it)
    should be dismissed. Moreover, the AC fails to even plead whether and how Seven's patents are
28  substitutes to any other patents in any alleged relevant market. *See supra* n.12.

1    had not "provided any figures as to what share of the market either defendant possessed prior to

2    the merger."), *aff'd*, 811 Fed. Appx. 422 (9th Cir. 2020); *Golden Gate Pharmacy Servs., Inc. v.*

3    *Pfizer, Inc*., No. C-09-3854 MMC, 2009 WL 4723739, at *5 (N.D. Cal. Dec. 2, 2009) (dismissing

4    Section 7 claim because complaint failed to contain facts about the "number of suppliers" in the

5    market pre and post-merger); *Carefusion Corp. v. Medtronic, Inc.*, No. 10-CV-01111-LHK, 2010

6    WL 4509821, at *8 (N.D. Cal. Nov. 1, 2010) (dismissal appropriate where the "Complaint

7    includes no allegations as to the state of the relevant markets, and specifically no allegations as to

8    [plaintiff's] position in those markets, before [the] acquisition.").  This Court should do the same.

9    **VIII.   PLAINTIFFS' UCL CLAIMS SHOULD BE STRICKEN UNDER CALIFORNIA'S**

10   **ANTI-SLAPP STATUTE OR, ALTERNATIVELY, DISMISSED**

11          This Court previously dismissed Plaintiffs' UCL claims for failure to state a claim and did

12   not rule on Defendants' Anti-SLAPP motion.  Order at 34.  Because a prevailing defendant in

13   connection with an Anti-SLAPP motion is statutorily entitled to attorneys' fees, Defendants renew

14   their Anti-SLAPP motion.

15          California's Anti-SLAPP law applies to state law claims brought in federal court, and the

16   analysis proceeds in two steps:

17          At step one, the court decides whether the defendant has made a threshold showing
             that the challenged cause of action is one arising from the protected activity . . . .
18          At step two, the burden shifts to the plaintiff to demonstrate that each challenged
             claim based on protected activity is legally sufficient and factually substantiated.
19

20   *Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 810 (N.D. Cal. 2019) (internal quotation

21   marks and citations omitted); *see Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*

22   *Progress*, 890 F.3d 828, 834 (9th Cir. 2018) (anti-SLAPP law applies to state law claims in federal

23   court).  Plaintiffs' UCL claims should be stricken because (i) they arise from protected activity and

24   (ii) Plaintiffs cannot meet their burden of demonstrating a legally sufficient and factually

25   substantiated claim.

26          **A.   Plaintiffs' UCL Claims Arise From Protected Activity**

27          Plaintiffs' UCL claims "arise from" protected activity for at least two independent reasons.

28   First, when a defendant's protected conduct "supplies a necessary element" of a plaintiff's UCL

1   claim, "the defendant's burden at the first step of the anti-SLAPP analysis has been carried."

2   *Wilson v. Cable News Network, Inc*., 7 Cal. 5th 871, 892 (2019).  One element of a UCL claim is

3   that the plaintiff "lost money or property" as a result of defendant's allegedly unfair conduct.  *TCL*

4   *Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-0341 JVS

5   (DFMx), 2016 WL 7049263, at *2 (C.D. Cal. Aug. 9, 2016) (quoting Cal. Bus. & Prof. Code

6   § 17204).  Here, the AC's only allegation of lost money or property is the "litigation costs"

7   Plaintiffs have incurred defending against Defendants' alleged "serial nuisance suits."  AC ¶¶ 452,

8   458.[25]  Because prosecuting those lawsuits is by definition "protected activity," Plaintiffs' suit

9   necessarily "arises from" protected conduct and satisfies step one of the anti-SLAPP test.  *Soukup*

10   *v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 291 (2006) ("The filing of lawsuits is an aspect of

11   the First Amendment right of petition."); *Moss Bros. Toy v. Ruiz*, 27 Cal. App. 5th 424, 435 (2018)

12   ("arising from" prong satisfied because "[b]ut for [defendant's] filing of the complaint," plaintiff

13   "would not have incurred any . . . damages.").

14       Second, and independently, the UCL claims are predicated on alleged violations of federal

15   antitrust law.  AC ¶¶ 450, 454.  Because Plaintiffs' antitrust claims are barred by the *Noerr-*

16   *Pennington* doctrine (*see, supra*, Section V), the UCL claims by definition arise from protected

17   activity.  *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) ("arising from"

18   prong satisfied where "state claims [were] based on the same conduct" as federal claims barred by

19   *Noerr-Pennington*).

20       **B.    Plaintiffs' UCL Claims Fail As A Matter Of Law**

21       Plaintiffs cannot meet their burden of demonstrating that their UCL claims are legally

22   sufficient.  *Ramachandran*, 359 F. Supp. 3d at 810.[26]  As a threshold matter, the UCL claims are

23   predicated on Defendants' alleged antitrust violations, and "[i]f the underlying claim that the UCL

24

---

25       [25] As demonstrated below, Plaintiffs' attempt to recover their litigation costs fails as a
26   matter of law because the UCL only permits restitution, not damages.  Nevertheless, "litigation
    costs" are the only purportedly lost money or property that the AC alleges.  *See* AC ¶¶ 452, 458,
27   Prayer at (b).

28       [26] Defendants' motion to strike is based solely on the legal insufficiency of Plaintiffs' UCL
    claims, and the Rule 12(b)(6) standard thus applies.  *Planned Parenthood*, 890 F.3d at 834.

1    claim is predicated upon fails then the UCL claim fails as well." *Mitchell v. Reg'l Serv. Corp.*, No.

2    C 13-04212 JSW, 2014 WL 12607809, at *5 (N.D. Cal. Apr. 23, 2014); *see also* Order at 34:10-

3    11.  The UCL claims should be stricken on this basis alone.

4          In addition, the UCL claims are deficient as a matter of law because:  (1) the AC does not

5    seek a proper UCL remedy; (2) the UCL claims are barred by California's litigation privilege; and

6    (3) Count 4 sounds in contract law, not antitrust law.

7                **1.    Plaintiffs Are Not Entitled To Any Remedy Available Under The UCL**

8          The UCL claims fail as a matter of law because none of the relief that Plaintiffs seek is

9    available under the UCL.  *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1125

10   (N.D. Cal. 2012) ("[B]ecause 'the only relief the UCL provides is unavailable here, [Plaintiffs']

11   UCL claim fails.'").

12         Plaintiffs seek damages in the form of litigation-related expenses.  AC ¶¶ 452, 458, Prayer

13   at (b).  However, UCL remedies are "narrow in scope" and are "generally limited to injunctive

14   relief and restitution."  *Zhang v. Superior Court*, 57 Cal. 4th 364, 371 (2013).  Here, Plaintiffs do

15   not seek to "restore" any money they paid to Defendants (such as patent licensing fees).  *Id.*

16   Instead Plaintiffs seek compensation for money spent defending against Defendants' infringement

17   suits.  Such "compensatory" damages are not recoverable under the UCL.  *Id.* at 376.  Though the

18   AC also makes vague references to "injunctive relief," AC ¶¶ 451, 458, it never specifies what

19   Plaintiffs are seeking to enjoin.  This is also insufficient as a matter of law.  *Snyder v. Nationstar*

20   *Mortg. LLC*, No. 15-CV-03049-JSC, 2015 WL 7075622, at *11 (N.D. Cal. Nov. 13, 2015)

21   (dismissing UCL claim "[b]ecause Plaintiff fail[ed] to state what particular unfair business

22   practices she seeks to enjoin").

23         Plaintiffs also seek to "void" Defendants' patent transfer agreements.  AC Prayer at (c).

24   However, rescission is not an available remedy under the UCL.  *Nelson v. Pearson Ford Co.*, 186

25   Cal. App. 4th 983, 1018 (2010) ("We have found no authority supporting the remedy of rescission

26   in a UCL action."), *reversed in part on other grounds by Raceway Ford Cases*, 2 Cal.5th 161

27   (2016).  And even if it were, a plaintiff cannot rescind a "contract to which she was not a party."

28

1    *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 960 (2005).  There is no allegation

2    that Plaintiffs were a party to any of the patent transfer agreements the UCL claims seek to rescind.

3        Finally, Plaintiffs seek to have Defendants' patents declared unenforceable.  AC Prayer at

4    (d).  However, Section 17200's narrow remedial scope does not empower courts to grant such

5    extraordinary relief, nor could it given that a state law cannot render a federal patent

6    unenforceable.  *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 480 (1974) (holding that

7    where patent law and state law clash, the "state law must fall").

8        Accordingly, none of the relief that Plaintiffs seek is available under the UCL, and the

9    claims therefore fail as a matter of law.

10              **2.    Plaintiffs' UCL Claims Are Barred By The Litigation Privilege**

11       Plaintiffs' UCL claims also fail for the independent reason that they are barred by

12    California's statutory litigation privilege.  Under California law, any "publication or broadcast"

13    made as part of a "judicial proceeding" cannot give rise to liability.  *Rusheen v. Cohen*, 37 Cal. 4th

14    1048, 1057 (2006); California Civil Code § 47b.  The <u>only</u> exception to California's litigation

15    privilege is a malicious prosecution claim, *id.* at 1058, and California's litigation privilege is even

16    broader than the *Noerr-Pennington* doctrine given that it provides "absolute" immunity even

17    where the underlying lawsuit is alleged to be a mere sham.  *See Rothman v. Jackson*, 49 Cal. App.

18    4th 1134, 1149 (1996).  Moreover, "[a]ny doubt about whether the privilege applies is resolved in

19    favor of applying it."  *Wang v. Heck*, 203 Cal. App. 4th 677, 686 (2012).  Here, over 150

20    paragraphs in the AC are directed at attacking litigation conduct, all of which paragraphs are

21    incorporated by reference in the UCL claims and all of which form the basis for Plaintiffs'

22    "damages" assertions (they do not claim to have paid any license fees).  Consequently Plaintiffs'

23    UCL claims fall squarely within the litigation privilege and are barred as a matter of law.

24              **3.    Count 4 Sounds In Contract Law, Not Antitrust Law**

25       Count 4 is brought only by Apple against the seven Count 4 Defendants.  AC ¶¶ 453-458.

26    In addition to the reasons discussed above, it fails as a matter of law on three independent grounds.

27       First, <u>the Ninth Circuit just confirmed that an alleged breach of a FRAND commitment as a

28    matter of law does not "amount[] to anticompetitive conduct."</u>  *Qualcomm*, 969 F.3d at 997

1   (emphasis added).  Instead, "the remedy for such a breach lies in contract and patent law," not

2   antitrust law.  *Id.* at 1005; *see also Continental Automotive Systems, Inc. v. Avanci, LLC et al.*, No.

3   3:19-cv-02933-M (N.D. Tex. Sept. 10, 2020), Dkt. 316 at 21-24 (dismissing with prejudice

4   antitrust claim premised on alleged FRAND breaches); Order at 18 n.13 ("Admittedly, there is a

5   fair argument that such conduct constitutes a breach of contract."); *Vizio, Inc. v. Funai Elec. Co.*,

6   No. CV 09-0174 AHM RCX, 2010 WL 7762624, at *6 (C.D. Cal. Feb. 3, 2010) (patent

7   transferee's alleged failure to offer FRAND is not an antitrust violation; granting dismissal); *Godo*

8   *Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, 2017 WL 750700, at *6 (D. Del.

9   Feb. 27, 2017) (same), *adopted*, 2017 WL 1055958 (D. Del. Mar. 20, 2017).[27]  Indeed, the Ninth

10  Circuit expressly warned against "using the antitrust laws to remedy what are essentially

11  contractual disputes between private parties."  *Qualcomm*, 969 F.3d at 997.  That is exactly what

12  Count 4 is attempting to do, and binding precedent now proscribes it.

13          Second, even if the alleged breach of a FRAND commitment could constitute a violation of

14  antitrust law, the AC pleads no facts showing that any Count 4 Defendant (much less all of them)

15  refused to license SEPs on FRAND terms.  *See Lazo v. Bank of Am.*, No. C 12-00762 LB, 2012

16  WL 1831577, at *12 (N.D. Cal. May 18, 2012) (dismissing UCL claim based on "conclusory and

17  unsupported" allegations of improper charges).  For example, Plaintiffs never allege what price

18  Defendants have supposedly charged for SEPs or how that price compares to the purported

19  FRAND rate.

20          Finally, Apple's Input Technologies Markets are facially deficient for the reasons

21  explained in Section III, *supra*, and the Court should dismiss them again on this ground.  *See* Order

22  at 40:22-27 (dismissing Count 4 because of Apple's "[f]ailure to adequately plead a product

23  market").

24

25

---

26          [27] The Ninth Circuit noted that the <u>only</u> instance in which courts have previously found
    that "breach of [] SSO commitments may rise to the level of an antitrust violation" is where the
27  SSO member "intentionally deceived [the] SSO[] by inducing [it] to standardize one of its
    patented technologies."  *Qualcomm*, 969 F.3d at 996 (citing *Broadcom Corp. v. Qualcomm Inc.*,
28  501 F.3d 297 (3rd Cir. 2007)).  Apple not only fails to allege any such deception, Apple has
    expressly disclaimed it.  Dkt. 136, Opp. at 22:1-3.

1     **C.    Alternatively, Plaintiffs' Section 17200 Claims Should Be Dismissed**

2          If this Court declines to strike Plaintiffs' UCL claims, the Court should still dismiss them

3     with prejudice under 12(b)(6) for all of the above-discussed reasons.

4     **IX.    CONCLUSION**

5          This Court's Order delineated multiple failings of the Complaint, and the AC not only

6     failed to correct them, it added additional deficiencies.  Given that "the Court gave Plaintiffs an

7     opportunity to cure the deficiency but Plaintiffs were unable to do so," *Staley*, 2020 WL 5507555,

8     at *9 (granting dismissal with prejudice), the Court should dismiss the AC with prejudice and

9     strike Counts 3 and 4.

10

11    Dated:  September 15, 2020                    Respectfully submitted,

12                                                  IRELL & MANELLA LLP

13

14                                                  By:*/s/ A. Matthew Ashley*
                                                       A. Matthew Ashley
15                                                     *Counsel for Defendants*
                                                       FORTRESS INVESTMENT GROUP LLC,
16                                                     FORTRESS CREDIT CO. LLC,
                                                       VLSI TECHNOLOGY LLC
17

18                                                     */s/ Christopher A. Seidl*
                                                       Christopher A. Seidl (*pro hac vice*)
19                                                     CSeidl@RobinsKaplan.com
                                                       ROBINS KAPLAN LLP
20                                                     800 LaSalle Avenue, Suite 2800
                                                       Minneapolis, MN 55402
21                                                     Telephone:  612 349 8468
                                                       Facsimile:  612 339-4181
22                                                     *Counsel for Defendants*
                                                       INVT SPE LLC
23                                                     INVENTERGY GLOBAL, INC.

24

25                                                     */s/ Jason D. Cassady*
                                                       Jason D. Cassady (*pro hac vice*)
26                                                     jcassady@caldwellcc.com
                                                       CALDWELL CASSADY & CURRY
27                                                     2121 N. Pearl Street, Suite 1200
                                                       Dallas, TX 75201
28                                                     Telephone: 214 888-4841
                                                       Facsimile:  214-888-4849

*Counsel for Defendant*
IXI IP, LLC

*/s/ James J. Foster*
James J. Foster
jfoster@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
Telephone:  617 456-8022
Facsimile:  617 456-8100
*Counsel for Defendant*
UNILOC 2017 LLC

*/s/ Daniel. R. Shulman*
Daniel R. Shulman (*pro hac vice*)
dan@shulmanbuske.com
SHULMAN & BUSKE PLLC
126 North Third Street, Suite 402
Minneapolis, MN 55401
Telephone: 612 870 7410
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC

*/s/ Dean C. Eyler*
Dean C. Eyler (*pro hac vice*)
dean.eyler@lathropgpm.com
LATHROP GPM LLP
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612 632-3335
Facsimile: 612 632-4000
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC

*/s/ Samuel F. Baxter*
Samuel F. Baxter (*pro hac vice*)
sbaxter@mckoolsmith.com
John Briody (*pro hac vice*)
jbriody@mckoolsmith.com
MCKOOL SMITH
104 East Houston, Suite 100
Marshall, TX 75670
Telephone:  903 923-9001
Facsimile:  903 923-9099
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001-8603
Telephone: 212.402.9438

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Counsel for Defendant*
SEVEN NETWORKS, LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ECF ATTESTATION

I, Olivia Lauren Weber, am the ECF user whose ID and password are being used to file DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' AMENDED COMPLAINT.  I hereby attest that I received authorization to insert the signatures indicated by a conformed signature (/s/) within this e-filed document.

By: */s/   Olivia Lauren Weber*
      Olivia Lauren Weber