**Brian Scarpelli (*pro hac vice*)**
**bscarpelli@actonline.org**
**ACT | THE APP ASSOCIATION**
**1401 K Street NW**
**Washington, DC 20005**
**Telephone: + 1 202 331-2130**
**Facsimile: +1 202 331-2130**

Attorney for *Amicus Curiae* ACT | The App Association

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| INTEL CORPORATION, APPLE INC., | ) Case No. 3:19-cv-07651-EMC |
| Plaintiffs, | ) |
| v. | ) **BRIEF OF *AMICUS CURIAE* ACT \| The** ) **APP ASSOCIATION IN SUPPORT OF** ) **INTEL AND APPLE RESPECTING** ) **DEFENDANT'S MOTION TO DISMISS** |
| FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT UNION CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL INC., DSS TECHNOLOGY MANAGEMENT, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC, | ) ) ) ) ) ) Date: December 17, 2020 ) Time: 1:30 p.m. ) Place: Courtroom 5 ) Judge: Hon. Edward M. Chen ) |
| Defendants. | ) ) ) ) ) ) ) ) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.      STATEMENT OF INTEREST ................................................................................. 1

II.     PRELIMINARY STATEMENT ........................................................................... 2

III.    ARGUMENT ......................................................................................................... 2

    A. U.S. Small Business Technology Firms Rely on a Fair and Consistent Patent
    Framework to Invest and Innovate............................................................................ 2

    B. Abuse of the Court System Threatens Small Businesses, Such as the Tactics Raised in
    the Complaint, Undermines Confidence on the U.S. Patent System, and Discourages
    Innovation ................................................................................................................. 4

    C. Abusive Tactics with Respect to Standard-Essential Patents (SEPs) Raised in the
    Complaint are Uniquely Damaging to the Innovation Ecosystem................................ 7

IV.    CONCLUSION ..................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548 et al. (Fed. Cir. Dec. 14, 2012)................................ 9

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 29 (3d Cir. 2007) ............................................. 9, 10

*Lotes Co. LTD. v. Hon Hai Precision Indus. Co. LTD.*, No. 12-cv-7465, 2013 WL
  2099227, at *5 (S.D.N.Y. May 14, 2013) ................................................................... 10

*Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015)...................................... 8, 9, 10

*Oil States Energy Servs. v. Greene's Energy Grp*, 138 S. Ct. 1365 (2018)................................. 7

*TC Heartland v. Kraft Foods Brand*, 137 S. Ct. 1514 (2017) ................................................ 7

**Other Authorities**

App Annie, *State of the App Economy 2020* (Jan. 2020), *available at*
  https://www.appannie.com/en/go/state-of-mobile-2019......................................... 3

Christine Godt, Scientific Competition: The Role of Patents in Scientific
  Competition: A Closer Look at the Phenomenon of Royalty Stacking 151-172
  (Max Albert et al. eds., 2008). ............................................................... 5

Commissioner Terrell McSweeny, *Holding the Line on Patent Holdup: Why
  Antitrust Enforcement Matters*, Mar. 21, 2018. ............................................ 6

ETSI, *ETSI Guidelines for Antitrust Compliance*, §§ A-B ......................................... 9

ETSI, *Guidelines for Antitrust Compliance*, § B ............................................... 10

ETSI, *Intellectual Property Rights Policy*, ¶ 3.1................................................ 10

*Innovation in Small Businesses' Drivers of Change and Value Use*, SMALL
  BUSINESS ADMINISTRATION, *available at*
  https://www.sba.gov/sites/default/files/rs342tot_0.pdf.................................. 3

Kristin Garr, *IP Protection For Startups: The Role of Legislation Stopping Patent
  Trolls and Encouraging Innovation*, B.C. INTELL. PROP. & TECH. F. 1(2018) .................... 4

Mark Lemley & Carl Shapiro, *Patent Hold Up and Royalty Stacking*, 85 Tex. L.
  Rev. 1991 (2007)........................................................................... 5

Mark Lemley & Carl Shapiro, *The Role of Antitrust in Preventing Patent Holdup*,
  University of Pennsylvania Law Review (publication forthcoming), *available
  at* https://faculty.haas.berkeley.edu/shapiro/patentholdup.pdfark Lemley &
  Carl Shapiro, *Patent Hold Up and Royalty Stacking*, 85 Tex. L. Rev. 1991
  (2007) ................................................................................... 5

Minda Zetlin, *Patent Trolls Target Small Businesses With Lawsuit Threats. Here's How One Startup Fought Back*, INC., (Feb. 2018), *available at* https://www.inc.com/minda-zetlin/patent-trolls-target-small-businesses-with-lawsuit-threats-heres-how-one-startup-fought-back.html. ........................................................... 4

*Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the H. Subcomm. on Antitrust, Commercial, and Administrative Law*, 116th Cong. 2 (2019) (statement of Morgan Reed, President, ACT | The App Association) *available at* https://actonline.org/wp-content/uploads/Online-Platforms-and-Market-Power-Part-2-Innovation-and-Entrepreneurship-1.pdf. ........................................................................................... 1

Statement of the Federal Trade Commission, *In the Matter of Robert Bosch GmbH*, FTC File Number 121-0081. ..................................................................... 10

**Page(s)**

## I.      STATEMENT OF INTEREST

*Amicus curiae* ACT | The App Association ("App Association") respectfully submits its perspective regarding the important issues presented in this action, and encourages a full adjudication on the facts and merits of Intel Corporation's ("Intel") and Apple Inc.'s ("Apple") claims against Fortress Investment Group LLC, Fortress Credit Co. LLC, Uniloc 2017 LLC, Uniloc USA, Inc., Uniloc Luxembourg S.A.R.L., VSLI Technology LLC, INVT SPE LLC, Inventergy Global, Inc., DSS Technology Management, Inc., IXI IP LLC, and Seven Networks LLC ("Fortress IP").

The App Association is a not-for-profit grassroots advocacy and education organization representing more than 5,000 small business software application developers and technology firms that create the technology innovations used on consumer mobile devices and in enterprise systems around the globe. Today, the ecosystem the App Association represents is valued at approximately $1.7 trillion and is responsible for 5.9 million American jobs.[1] Our members lead in developing innovative applications and products across consumer and enterprise use cases, driving the adoption of the internet of things ("IoT").[2]

The App Association has a keen interest in the U.S. patent system functioning predictably and fairly while continuously rewarding innovation. Our members include companies that own patents as well as those who license patents, all of which are directly impacted by the courts' approaches to patent rights and litigation. Systematic and systemic patent system abuse is a primary concern for the App Association's thousands of member companies that innovate across electronic consumer and enterprise verticals. Further information about the App Association and its activities is available on our website at http://actonline.org.

---

[1] *Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the H. Subcomm. on Antitrust, Commercial, and Administrative Law*, 116th Cong. 2 (2019) (statement of Morgan Reed, President, ACT | The App Association) *available at* https://actonline.org/wp-content/uploads/Online-Platforms-and-Market-Power-Part-2-Innovation-and-Entrepreneurship-1.pdf.

[2] The IoT will involve everyday products using the internet to communicate real-time analysis of data collected through sensors. IoT is expected to enable improved efficiencies in processes, products, and services across every sector, both consumer and enterprise. In key segments of the U.S. economy, from agriculture to retail to healthcare and beyond, the rise of IoT is demonstrating efficiencies unheard of even a few years ago. See Department of Commerce Internet Policy Task Force and Digital Leadership Team (Jan. 2017), *available at* https://www.ntia.doc.gov/files/ntia/publications/iot_green_paper_01122017.pdf.

## II.     PRELIMINARY STATEMENT

The App Association and its members rely on a strong, fair, and predictable legal framework to protect and enforce intellectual property rights. Our members develop and utilize a variety of patented technologies to bring next-generation IoT technologies to consumer and enterprise verticals. Driven by the small business community the App Association represents, new IoT innovations will generate advancements in countless sectors of the economy including financial, agricultural, consumer entertainment, healthcare (and others), creating millions of American jobs. Realizing the potential of IoT, however, requires a fair and predictable legal environment, particularly with respect to intellectual property. The App Association's small business members are directly impacted by new and novel forms of abuse with respect to patents, as well as by tactics that jeopardize confidence in the U.S. patent system.

Below, we address the important role our members play in the growing IoT world and how a fair and predictable patent system is crucial to our members' growth and job creation. We then discuss how our members are impacted by the new patent licensing tactics at issue in this case, which are described by the Complaint. Further, we describe our members' reliance on open technical standards to innovate, and how access to the essential patents in these standards is critical to ingenuity, ensured by the voluntary fair, reasonable, and non-discriminatory ("FRAND") licensing commitment that standard-essential patent ("SEP") holders make.

We conclude by urging this Court to deny the Motion to Dismiss because we firmly believe it is important that the complaint be fully considered and adjudicated to ensure that the innovation economy is not suppressed. The revised complaint is responsive to concerns raised earlier in the case with respect to market definition and raising direct harms based on the abusive conduct at issue, and merits exploration through discovery.

## III.     ARGUMENT

### A.     U.S. Small Business Technology Firms Rely on a Fair and Consistent Patent Framework to Invest and Innovate

The small business software and hardware technology industry is a driving force behind

*Amicus Curiae* ACT | The App Association
3:19-cv-07651-EMC

the growth of the IoT revolution. IoT is an all-encompassing concept capturing how everyday consumer and enterprise products begin to use the internet to communicate data collected through sensors, and act on the data in a timely way. IoT is predicted to improve efficiencies in processes, products, and services across every sector of the economy. For example, IoT will soon play a major role in how we irrigate our crops, provide medical treatment, and purchase everyday items.

Additionally, the app economy's success – and the growth of IoT – relies on continuous innovation and investment in connected devices, which in turn requires a strong and consistent legal framework for intellectual property rights. Small businesses can obtain their competitive edge in the large electronic hardware and software market through their patented technologies. Patents allow small business developers to protect their investments, attract venture capital, create and maintain a competitive marketplace, and level the playing field with larger and more established companies/competitors. Small businesses produce sixteen times more patents per employee than large patenting firms.[3] Furthermore, over half of the App Association's members who hold patents have experience with patent infringement litigation.[4]

The limits are undefined and endless when it comes to how IoT devices will change all Americans' lives, with a predicted 25.2 billion connected devices deployed by 2025, almost every sector of the U.S. economy will be impacted ranging from finance and health to gaming and the global digital ecosystem.[5]

The App Association's members' ability to take part in the booming cross-sectoral IoT ecosystem, creating millions of further American jobs in the process, heavily depends on the ability to rely on and plan according to legal and business norms and policymaking that appropriately balances creating a pro-innovation environment with the public interest. A core ignitor of the growth and ingenuity for small businesses in emerging IoT sectors is, and must

---

[3] *Innovation in Small Businesses' Drivers of Change and Value Use*, SMALL BUSINESS ADMINISTRATION, *available at* https://www.sba.gov/sites/default/files/rs342tot_0.pdf.
[4] *The Results are in: Intellectual Property is Still in Style, Holds Value for App Developers*, ACT | THE APP ASSOCIATION ONLINE BLOG, (March 27th, 2018), *available at* https://actonline.org/2018/03/27/the-results-are-in-intellectual-property-is-still-in-style-holds-value-for-app-developers/.
[5] *See* App Annie, *State of the App Economy 2020* (Jan. 2020), *available at* https://www.appannie.com/en/go/state-of-mobile-2019.

continue to be a fair, reliable, and predictable intellectual property rights system, particularly with respect to patents. According to a recent focus group survey, more than half of our members have dealt with some type of patent infringement claim. Attempts to abuse the patent system, however unique they may be, must be adjudicated and addressed by the courts to ensure that the patent system can still be relied upon.

B.     Abuse of the Court System Threatens Small Businesses, Such as the Tactics Raised in the Complaint, Undermines Confidence on the U.S. Patent System, and Discourages Innovation

Patent system abuse undermines the confidence of the entire intellectual property system and negatively impacts both large and small companies, syphoning off resources that would otherwise be committed to research and development.[6] Small companies that the App Association represents, in particular, often do not have the resources or time to engage in lengthy and expensive litigation, and abusers of the patent system know this, banking on a quick settlement with little or no protest.[7] Startups and small businesses needlessly pulled into patent litigation often have two choices: (1) fold their entire business due to cost of litigation; or (2) pay exorbitant royalty rates for use of (often questionable) patents in order to keep their doors open.

Further, a healthy patent system must avoid high licensing fees and royalty stacking. Traditionally, devices have been developed to provide a single solution (e.g., a dedicated device to measure blood glucose levels). More recently, however, a multi-functional technology product can easily have hundreds, and sometimes thousands, of pieces of patented technologies contained in it (such as a smartphone), requiring many licenses to be negotiated before production, sale, and use. Cutting-edge healthcare devices that utilize internet connectivity and sensors (the capabilities of a smartphone) to enable real-time analytics for improved treatment decisions, for example, will include numerous patented technologies to enable the medical functionality (e.g., blood glucose

---

[6] *See* Kristin Garr, *IP Protection For Startups: The Role of Legislation Stopping Patent Trolls and Encouraging Innovation*, B.C. INTELL. PROP. & TECH. F. 1, 3-4 (2018) (noting the financial challenges small startups endure when faced with bad faith patent infringement claims).
[7] *E.g.*, Minda Zetlin, *Patent Trolls Target Small Businesses With Lawsuit Threats. Here's How One Startup Fought Back*, INC., (Feb. 2018), *available at* https://www.inc.com/minda-zetlin/patent-trolls-target-small-businesses-with-lawsuit-threats-heres-how-one-startup-fought-back.html.

reading technology), along with a high number of patented technologies that enable internet connectivity (antennae, processing, etc.). Developers of these new multi-function devices face the very real possibility of the demands for licenses to so many patented technologies "stacking" up to exceed the cost of developing and getting a product to market. In this way, royalty stacking can tax innovation and prevent technological progress.

Royalty stacking and its negative effects are well-documented and widely acknowledged. Royalty stacking effectively consumes a commercial product developer's profit margins, significantly diminishing the incentives to research and develop.[8] Royalty stacking can also constrain technology transfers from universities and research institutes to industry.[9] Further, royalty stacking exacerbates patent holdup, when the bargaining position of a patent holder increases considerably after a patent is included in a technical standard, enabling the patent holder to act unreasonably in leveraging its position.[10]

The case before this Court presents a unique, expansive, and multi-pronged approach to patent assertion involving many parties. The Complaint filed in this case discusses how Fortress IP and its affiliated assertion entities have aggregated a high number of patents and have systematically used threats of litigation to seek royalties for those patents that exceed the value of the patents under its "Privateering Option" approach, even for, in some cases, invalidated patents. We are particularly troubled by the dynamic of excessive royalties being sought on patents through holdup tactics and abuse of holdup power due to the expectations of investors, representing a predatory approach to patent portfolio management unlike any encountered before. Each of the new markets defined in the revised Complaint are ones that App Association members are part of and are therefore affected by the abusive behavior at issue. We strongly encourage this Court to allow this case to move to the discovery phase to assess the defendants'

---

[8] *E.g.*, Mark Lemley & Carl Shapiro, *Patent Hold Up and Royalty Stacking*, 85 Tex. L. Rev. 1991, 1993 (2007) (Lemley & Shapiro); Mark Lemley & Carl Shapiro, *The Role of Antitrust in Preventing Patent Holdup*, University of Pennsylvania Law Review (publication forthcoming), *available at* https://faculty.haas.berkeley.edu/shapiro/patentholdup.pdf.
[9] Christine Godt, Scientific Competition: The Role of Patents in Scientific Competition: A Closer Look at the Phenomenon of Royalty Stacking 151-172 (Max Albert et al. eds., 2008).
[10] Commissioner Terrell McSweeny, *Holding the Line on Patent Holdup: Why Antitrust Enforcement Matters*, Mar. 21, 2018.

*Amicus Curiae* ACT | The App Association
3:19-cv-07651-EMC

unique "business model" and its impact on the electronic patent industry at large. Small businesses are often overlooked in cases, such as the current dispute, but the Defendants' tactics at issue in this case would have devastating effects on small businesses when it comes to licensing and litigation, even more so than patent holdup abuse typically faced would.

For example, in healthcare, a miniaturized and embedded connected medical device must be able to automatically communicate bi-directionally in real-time. This capability enables a healthcare practitioner to monitor a patient's biometric data as well as for the patient to be able to communicate with a caregiver in the event of a medical emergency. Other uses, such as sensors deployed to alert security of an unauthorized presence, may only require the ability to send data to security professionals with minimal (or even no) capability to receive communications. Cutting-edge healthcare devices that utilize internet connectivity and sensors to enable real-time analytics for improved treatment decisions, for example, will include numerous patented technologies to enable the medical functionality (e.g., blood glucose reading technology), along with a high number of patented technologies that enable internet connectivity (antennae, processing, etc.). Developers of these new multi-function devices face the very real possibility that abusive behavior per the scheme detailed in the Complaint would prevent such products from ever reaching the market and saving countless lives. Small businesses facing aggressive and convoluted schemes such as the one at issue in this case where, for example, patents are aggregated into a portfolio for serial and baseless assertions to obtain patent royalties greatly exceeding the value of the inventive contributions (if any) of, and competitive prices for, the patents, have little to no practical chance to defend their good faith efforts to develop new innovations.

Both the law and public policy interests demand that courts act to avoid anticompetitive and abusive behavior that undermines the U.S. patent system. In recent years, the Supreme Court has demonstrated its commitment to creating a more reliable patent litigation system. For example, in *TC Heartland v. Kraft Foods Brand*, 137 S. Ct. 1514, 1520 (2017) ("TC

Heartland"),[11] the Supreme Court ruled that good-faith innovators can avoid surprise patent suits in unknown jurisdictions where they have no meaningful contacts. 137 S. Ct. 1514, 1520 (2017). Furthermore, in *Oil States Energy Servs. v. Greene's Energy Grp*, 138 S. Ct. 1365, 1373 (2018)[12] the Supreme Court affirmed the constitutionality of the United States Patent and Trademark Office's use of the *inter partes* review process. 138 S. Ct. 1365, 1373 (2018). These decisions, among others, demonstrate the U.S. legal system's commitment to ensuring the U.S. patent system's fairness and reliability. The App Association opposes the Defendants' motion to dismiss and requests that this case be adjudicated on the merits. The App Association's thousands of small business members face harm across each of the markets defined in Plaintiffs' revised complaint.

### C. Abusive Tactics with Respect to Standard-Essential Patents (SEPs) Raised in the Complaint are Uniquely Damaging to the Innovation Ecosystem

A particular area of concern for small business innovators in this case is patent abuse with respect to standard-essential patents. Members of the App Association rely on, utilize, and innovate from standardized technologies, including technologies for wireless communication. The convergence of computing and communication technologies, driven by the app economy, will continue as a diverse array of industries come together to build the IoT. As discussed above, IoT is an encompassing technological approach where everyday products use the internet to collect, utilize, and communicate data that was captured through standardized sensors. IoT's seamless interconnectivity will utilize known and yet-to-be-developed industry standards, such as 5G, Wi-Fi, LTE, Bluetooth, and countless others. As such, reasonable licensing for SEPs is a "must have" for many small companies, such as our members, their customers, and suppliers, which want to have a legitimate chance to compete in the IoT's tech-driven areas.

App Association members use technical standards, and specifically the interoperability they provide, to support a wide variety of innovation and—absent abuses—to create and promote

---

[11] 137 S. Ct. 1514, 1520 (2017).
[12] 138 S. Ct. 1365, 1373 (2018).

competition. Standardization is particularly critical in today's highly digitized markets. Developed industries, such as medical, automotive, health, manufacturing, and finance, are each evolving to implement wireless technologies as IoT takes shape. Simultaneously, new, highly connected industries and markets implementing wireless standards are just now being created. In each of these markets, "downstream" innovative technologies utilize these "upstream" standardized communication technologies to develop a panoply of unique and diverse products, many of which include our Association's members.

The benefits of these standards only accrue when technical standard-setting processes are operating as intended. When the system is gamed, standardization processes carry significant competitive risks.[13] Standard setting can involve close technical collaboration between horizontal and vertical market participants.[14] From a competition law standpoint, technologies selected for inclusion in a standard might be viewed as "winners" that are collaboratively "whitelisted" by industry participants. Conversely, technologies that are not selected might be viewed as "losers" that are collaboratively "blacklisted."[15]

Accordingly, thorny competition law issues may be presented where the patented technologies of certain companies are utilized rather than those of other companies. The companies whose technologies are utilized may have unchecked and significant market power to demand excessive royalties, exclude competitors, or otherwise take advantage of an industry's collaborative *agreement* to make products in a certain way (*i.e.*, in accordance with the standard) rather than another.[16]

---

[13] *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1030-31 (9th Cir. 2015) (stating that standardization "creates an opportunity for companies to engage in anti-competitive behavior").

[14] *See, e.g.*, ETSI, *ETSI Guidelines for Antitrust Compliance*, §§ A-B (ETSI is "a forum in which competitors interact with each other. Therefore, the market-related rules apply to the decisions which are adopted by the Institute as a standardization body as well as with regard to the activities of Members within ETSI"; accordingly, "[t]he imposition of discriminatory and unfair conditions by the dominant company, to any categories of users, or any other company having contractual relationships with the dominant company, is abusive"), *available at* *http://www.etsi.org/images/files/IPR/etsi%20guidelines%20for%20antitrust%20compliance.pdf*

[15] *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) ("standard[ization], by definition, eliminates alternative technologies").

[16] *See, e.g.*, *Microsoft*, 795 F.3d at 1030-31 (addressing "hold up" power of patents incorporated into standards); FTC, Brief of Amicus Curie in Support of Neither Party 3-4, *Apple Inc. v. Motorola, Inc.*, Nos. 2012-1548 et al. (Fed. Cir. Dec. 14, 2012) ("[t]he problem of patent hold-up can be particularly acute in the standard-setting context, where an entire industry may be locked into a standard that cannot be avoided without infringing or obtaining a license for numerous (sometimes thousands) of standard-essential patents.")

To address these competition law issues, many standard-setting organizations ("SSOs") have adopted patent policies that require members to license the patents necessary for the implementation of the standard on terms that are fair, reasonable, and non-discriminatory ("FRAND"). The FRAND promise—when kept—serves to minimize the competition law issues associated with standardization by providing that patent licenses will remain available to all market participants on terms that are reasonable and that promote a "level playing field" for competition.[17] In other words, while no company has an *obligation* to commit its patents to a standard, where a company chooses to do so the FRAND promise acts as a crucial constraint on the abuse of market power associated with SEPs. As the Ninth Circuit has explained, the voluntary FRAND commitment "must be construed in the public interest because it is crafted for the public interest",[18] as it is designed to protect against the competitive abuses and consumer harm that standardization can otherwise enable.

The public interest function of FRAND breaks down where a company violates its obligation to license on FRAND terms. While breach of FRAND may surely give rise to contractual or similar claims by particular parties, it may also involve significant competition law problems and violations. As the Federal Trade Commission ("FTC") has noted in addressing a prior matter to enforce competition law interests in connection with SEPs:

> While not every breach of a FRAND licensing obligation will give rise to [competition law] concerns, when such a breach tends to undermine the standard-setting process and risks harming American consumers, the public interest demands action rather than inaction from the Commission.[19]

In other words, the practice of SEP "hold up" is also a competition law problem.[20] These anti-

---

[17] ETSI, *Intellectual Property Rights Policy*, ¶ 3.1 ("[T]he ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and "others applying ETSI STANDARDS . . . , that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD . . . being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs."); ETSI, *Guidelines for Antitrust Compliance*, § B (noting that the competition interests addressed by the ETSI Policies are "aimed at allowing firms to compete on a level playing field.").

[18] *Microsoft v. Motorola*, 795 F. 3d 1024, 1052 (9th Cir. 2015).

[19] Statement of the Federal Trade Commission, *In the Matter of Robert Bosch GmbH*, FTC File Number 121-0081.

[20] *See, e.g., Broadcom*, 501 F.3d at 314 (FRAND commitments serve as "important safeguards against monopoly power"; "the patent holder's subsequent breach of that [FRAND] promise, is actionable anticompetitive conduct."); *Lotes Co. LTD. v. Hon Hai Precision Indus. Co. LTD.*, No. 12-cv-7465, 2013 WL 2099227, at *5 (S.D.N.Y. May 14,

competition concerns have serious implications for developing industries.

Although some large corporations may be able to absorb the cost of FRAND abuses or to seek redress through litigation to prevent them, small business innovators who need reasonable access to SEPs in order to protect and defend their interests easily may find themselves financially barred from similar protections. As a result, small business innovators faced with FRAND abuse may be forced to abandon their business plans involving standards altogether; accept excessive royalty demands made by the SEP holders, and thus transfer the value of their own innovations to entrenched, upstream SEP holders; or change their product's design to avoid the standard (an impossible task for markets requiring interoperability). None of these outcomes are in the public interest.

The net effect of unchecked SEP abuses would be the exclusion of the tens of thousands of American small businesses, not only from established markets, but also within the emerging vertical markets for IoT technologies. Therefore, as abusive behavior with respect to SEPs is alleged, the App Association urges the court to consider the serious implications of this case for the future of industry, including small businesses innovating in IoT. Thorough fact-finding on the Complainants' allegations provide just the opportunity for such consideration.

## IV.    CONCLUSION

The Plaintiffs' revised complaint is responsive to issues raised by the court, responsibly scoping the markets at issue and alleging direct effects of the Defendants' patent aggregation scheme. Because the Plaintiffs' improved complaint raises novel issues supported by a complete and viable factual allegation about abuse of the patent system is a competition law problem impacting companies throughout the consumer and enterprise industries, particularly for small businesses such as the App Association's members, we oppose the Defendants' motion to dismiss.

Respectfully submitted

---

2013) ("conduct that undermines the procompetitive benefits of private standard setting may … be deemed anticompetitive under antitrust law.").

*Amicus Curiae* ACT | The App Association
3:19-cv-07651-EMC

1

2

3   Dated: October 27, 2020                          ACT | The App Association
                                                     Brian Scarpelli (*pro hac vice*)

4

5                                                    By:   *Brian Scarpelli*

6                                                    Brian Scarpelli
                                                     Attorney for *Amicus Curiae*
7                                                    ACT | The App Association

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28