WILMER CUTLER PICKERING
  HALE AND DORR LLP
Mark D. Selwyn (SBN 244180)
mark.selwyn@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Fax: (650) 858-6100

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Leon B. Greenfield (admitted *pro hac vice*)
leon.greenfield@wilmerhale.com
Amanda L. Major (admitted *pro hac vice*)
amanda.major@wilmerhale.com
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 663-6000
Fax: (202) 663-6363

WILMER CUTLER PICKERING
  HALE AND DORR LLP
William F. Lee (admitted *pro hac vice*)
william.lee@wilmerhale.com
Joseph J. Mueller (admitted *pro hac vice*)
joseph.mueller@wilmerhale.com
Timothy D. Syrett (admitted *pro hac vice*)
timothy.syrett@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

*Attorneys for Plaintiffs*
*Intel Corporation, Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| INTEL CORPORATION, APPLE INC., <br><br> Plaintiffs, <br><br> v. <br><br> FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., DSS TECHNOLOGY MANAGEMENT, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC, <br><br> Defendants. | Case No. 3:19-cv-07651-EMC <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' AMENDED COMPLAINT** |

# TABLE OF CONTENTS

I.    Introduction ................................................................................................... 1

II.   The Amended Complaint .................................................................................. 2

   A.   Detailed Allegations Regarding 13 Exemplar Patent Markets and Substitute
        Patents Aggregated Therein ..................................................................... 2

   B.   More Detailed Allegations Regarding Input Technology Markets .................... 4

   C.   More Detailed Allegations Regarding Patent Assertions Seeking
        Supracompetitive Royalties Enabled by Reduction of Competition from
        Challenged Patent Transfers .................................................................... 5

   D.   More Detailed Allegations Regarding Antitrust Injury to Apple and Intel from
        Defendants' Aggregation .......................................................................... 8

   E.   More Detailed Allegations that Fortress and Each of the Defendant PAEs Share a
        Common Understanding to Unlawfully Aggregate Patents ............................. 8

   F.   Assertion by VoiceAge EVS Against Apple ............................................... 9

III.  Argument ....................................................................................................... 9

   A.   Plaintiffs Have Adequately Pled Relevant Antitrust Markets and Direct Evidence
        of Anticompetitive Effects ........................................................................ 10

        1.   Defendants Ignore that Plaintiffs Need Only Plead the "Rough Contours"
             of the Markets .............................................................................. 12

        2.   Plaintiffs Were Not Required to Identify Every Patent in Each Antitrust
             Market ........................................................................................ 13

        3.   Plaintiffs Have Sufficiently Alleged Substitutability of Patents in Each
             Patent Market ............................................................................... 16

   B.   Plaintiffs Have Adequately Alleged Direct Evidence of Anticompetitive Effects 20

   C.   Plaintiffs Have Adequately Alleged Input Technology Markets for Apple's UCL
        Claim .................................................................................................. 23

   D.   Plaintiffs Have Adequately Pled Antitrust Injury ........................................ 25

   E.   Plaintiffs Have Adequately Alleged a Section 1 Claim ................................. 30

        1.   Plaintiffs Have Adequately Alleged Separate Bilateral Agreements to
             Restrain Trade .............................................................................. 31

2.   Plaintiffs' Allegations Regarding Defendants' Intent Are Sufficient for a Section 1 Claim ................................................................................. 33

F.   Plaintiffs Have Adequately Alleged a Section 7 Claim ...................................... 36

G.   Plaintiffs' Claims Are Not Barred by *Noerr-Pennington* .................................... 37

H.   Plaintiffs' UCL Claims Should Not Be Stricken or Dismissed .......................... 37

1.   Plaintiffs' Claims Are Not Based on Protected Activity ......................... 37

2.   Plaintiffs Have Otherwise Stated Valid UCL Claims ............................. 38

IV.   Conclusion ................................................................................................................. 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*F.T.C. v. Actavis, Inc.*,
    570 U.S. 136 (2013)................................................................................... 33

*In re Adobe Sys., Inc. Privacy Litig.*,
    66 F. Supp. 3d 1197 (N.D. Cal. 2014)........................................................ 39

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
    92 F.3d 781 (9th Cir. 1996)........................................................................ 26

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018).........................................................................12, 28

*Antman v. Uber Techs., Inc.*,
    No. 3:15-cv-01175-LB, 2015 WL 6123054 (N.D. Cal. Oct. 19, 2015) ............................ 39

*Apple Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846, 2012 WL 1672493 (N.D. Cal. May 14, 2012)...........................17, 24, 40

*Apple Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846-LHK, 2011 WL 4948567 (N.D. Cal. Oct. 18, 2011)............................. 24

*Apple, Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846-LHK, 2012 WL 2571719 (N.D. Cal. June 30, 2012)............................ 28

*Aya Healthcare Servs. v. AMN Healthcare*,
    No. 17cv205-MMA (MDD), 2017 WL 6059145 (S.D. Cal. Dec. 6. 2017)......................... 29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................... 30

*Bhan v. NME Hosps., Inc.*,
    929 F.2d 1404 (9th Cir. 1991) .......................................................... 12, 14, 15, 36

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
    No. CV 19-12533-WGY, 2020 WL 5100291 (D. Mass. Aug. 31, 2020).......................13, 14

*City of San Jose v. Off. of Comm'r of Baseball*,
    No. C-13-02787 RMW, 2013 WL 5609346 (N.D. Cal. Oct. 11, 2013)............................. 29

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010)....................................................................... 26

*Cont'l Auto. Sys., Inc. v. Avanci, LLC*,
  No. 3:19-CV-02933-M, 2020 WL 5627224 (N.D. Tex. Sept. 10, 2020) ............................ 39

*Cupp v. Albert-Culver USA, Inc.*
  310 F. Supp. 2d 963 (W.D. Tenn. 2004) ........................................................................ 14

*Delano Farms Co. v. Cal. Table Grape Comm'n*,
  655 F.3d 1337 (Fed. Cir. 2011) ................................................................................... 18

*E & E Co., Ltd. v. Kam Hing Enters., Inc.*,
  429 Fed. App'x 632 (9th Cir. 2010) ............................................................................. 22

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) ...................................................................................... 11

*Eastman v. Quest Diagnostics Inc.*,
  108 F. Supp. 3d 827 (N.D. Cal. 2015) .......................................................................... 29

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ...................................................................................... 39

*Funai Elec. Co. v. LSI Corp.*,
  No. 16-CV-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) ............................ 23

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*,
  No. CV 15-634-SLR-SRF, 2017 WL 750700 (D. Del. Feb. 27, 2017) .............................. 39

*Hahn v. Or. Physicians' Serv.*,
  868 F.2d 1022 (9th Cir. 1988) ..................................................................................... 21

*Helix Milling Co. v. Terminal Flour Mills Co.*,
  523 F.2d 1317 (9th Cir. 1975) ..................................................................................... 34

*Hicks v. PGA Tour, Inc.*
  897 F.3d 1109 (9th Cir. 2018) ..................................................................................... 18

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) ........................................................................................ 35

*Hurricane Shooters, LLC v. Emi Yoshi, Inc.*,
  No. 8:10-CV-762-T-30AEP, 2010 WL 4983673 (M.D. Fla. Dec. 2, 2010) ....................... 33

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
  527 F. Supp. 2d 1084 (N.D. Cal. 2007) ........................................................................ 28

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  No. CV-00-20905 RMW, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ....................... 12, 18, 22

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)............................................................................12, 13, 36

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
No. CV 07-00043 MMM, 2007 WL 4976364 (C.D. Cal. Oct. 29, 2007) ........................... 32

*JM Comput. Servs., Inc. v. Schlumberger Techs., Inc.*,
No. C 9520349 JW, 1996 WL 241607 (N.D. Cal. May 3, 1996) ........................................ 14

*Kiva Health Brands LLC v. Kiva Brands Inc.*
402 F. Supp. 3d 877 (N.D. Cal. 2019).............................................................................. 19

*FTC v. Lab. Corp. of Am.*,
No. CV 10-1873-AG, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011)................................. 36

*In re Loestrin 24 Fe Antitrust Litig.*,
261 F. Supp. 3d 307 ......................................................................................................... 20

*In the Matter of Negotiated Data Solutions LLC*,
FTC File No. 051-0094, Decision and Order (Jan. 23, 2008) ............................................. 39

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
No. 18-CV-02054-MMC, 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019)........................... 15

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
No. CV 15-723-RGA, 2016 WL 1464545 (D. Del. Apr. 13, 2016).............................24, 40

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ....................................................................................32, 34

*Name Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
795 F.3d 1124 (9th Cir. 2015) ......................................................................................... 34

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ................................................................................................ 29

*Newcal Indus., Inc. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) ......................................................................................... 11

*Oltz v. St. Peter's Cmty. Hosp.*,
861 F.2d 1440 (9th Cir. 1988) ....................................................................................12, 13, 36

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)........................................................................................12, 15, 36

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC.*,
532 F.3d 963 (9th Cir. 2008)............................................................................................ 15

*Samsung Elecs. Co. v. Panasonic Corp.*,
No. C 10-03098 JSW, 2015 WL 10890655 (N.D. Cal. Sept. 30, 2015)............................. 13

*Sanford v. MemberWorks, Inc.*,
625 F.3d 550 (9th Cir. 2010) .......................................................................................... 30

*Sidibe v. Sutter Health*,
No. C 12-04854 LB, 2013 WL 2422752 (N.D. Cal. June 3, 2013) ................................... 14

*Spectators' Commc'n Network, Inc. v. Colonial Cty. Club*,
253 F.3d 215 (5th Cir. 2001) .......................................................................................... 34

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*,
778 F.3d 775 (9th Cir. 2015) .......................................................................................... 26

*Staley v. Gilead*,
No. 19-CV-02573-EMC, 2020 WL 5507555 (N.D. Cal. July 29, 2020) .......................19, 32

*Stewart v. Gogo, Inc.*,
No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013).................................. 22

*Surface Supplied, Inc. v. Kirby Morgan Dive Sys., Inc.*,
No. C-13-0575 MMC, 2013 WL 5496961 (N.D. Cal. Oct. 3. 2013)................................... 22

*TCL Commc'ns Tech. Holdings Ltd v. Telefonaktenbologet LM Ericsson*,
No. SACV1400341JVSANX, 2014 WL 12588293 (C.D. Cal. Sept. 30, 2014)..............24, 40

*Top Rank, Inc. v. Haymon*,
No. CV 15-4961-JFW (MRW), 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)................... 22

*TransWeb, LLC v. 3M Innovative Props. Co.*,
812 F.3d 1295 (Fed. Cir. 2016) ...................................................................................... 28

*United States v. E.I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957)........................................................................................................ 36

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)........................................................................................................ 19

*United States v. LSL Biotechnologies*,
379 F.3d 672 (9th Cir. 2004) .......................................................................................... 11

*United States v. Phila. Nat. Bank*,
374 U.S. 321 (1963)........................................................................................................ 37

*United States v. Singer Mfg.*,
374 U.S. 174 (1963)........................................................................................................ 33

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978)................................................................................................... 33

*Unitherm Food Sys., Inc. v. Swiftt-Eckrich, Inc.*,
  375 F.3d 1341 (Fed. Cir. 2004) .............................................................................. 18

*Vizio, Inc. v. Funai Elec. Co.*,
  No. CV 09-0174 (AHM), 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010)...........................20, 39

*VoiceAge EVS LLC v. Apple Inc.*,
  No. 1:20-cv-01061-CFC (D. Del. Aug. 12, 2020)................................................................. 9

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010)........................................................................................30, 32

*Wi-LAN Inc. v. LG Elecs., Inc.*,
  382 F. Supp. 3d 1012 (S.D. Cal. 2019) ........................................................................ 23

*Yokohama Rubber Co. v. S. China Tire & Rubber Co.*,
  No. CV 04-1866-GHK, 2004 WL 5569948 (C.D. Cal. Oct. 19, 2004)............................... 38

*Zenith Elecs., LLC v. Sceptre, Inc.*,
  No. LA CV14-05150 JAK (AJWx), 2015 WL 12765633 (C.D. Cal. Feb. 5,
  2015).............................................................................................................................. 24

**State Cases**

*Barry v. State Bar of Calif.*,
  386 P.3d 788 (Cal. 2017) ............................................................................................. 37

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
  104 Cal. App. 4th 508 (2002) ....................................................................................... 40

*Zhang v. Super. Ct.*,
  304 P.3d 163 (Cal. 2013) ............................................................................................. 38

**Federal Statutes**

15 U.S.C. § 18.................................................................................................................... 27

FTC Act § 5 ....................................................................................................................... 39

Sherman Act § 1................................................................................................................*passim*

## I. INTRODUCTION

Plaintiffs' Amended Complaint alleges in great detail Defendants' ongoing anticompetitive patent aggregation scheme and remedies each of the deficiencies in the original Complaint that the Court identified in its Order of July 7, 2020. The Amended Complaint explains that Defendants' patent aggregation has combined substitute patents in 13 separate exemplar patent markets, eliminated competition that previously existed between the aggregated patents in those markets, and thus enables Defendants to demand excessive, supracompetitive patent royalties. The Amended Complaint further details how Defendants' conduct has inflated royalties, reduced licensing output, and imposed substantial litigation costs on Plaintiffs as they defend themselves against Defendants' exploitation of illegally obtained market power through excessive royalty demands, and that Plaintiffs face an ongoing threat of continuing exorbitant demands resulting from Defendants' patent aggregation.

Faced with the Amended Complaint's 134 pages of detailed factual allegations curing each of the prior shortcomings, Defendants try to erect a series of impossible standards that are inappropriate at the pleading stage:

- Even though Plaintiffs have alleged in detail the specific technologies that comprise each of the exemplar patent markets, Defendants argue that Plaintiffs failed to assign shares within those markets. But they disregard the Court's holding that "a 'full-blown market analysis' is not necessary where a plaintiff relies on direct evidence of anticompetitive effects" (Order at 12), as Plaintiffs do here.

- Despite Plaintiffs' detailed allegations regarding direct evidence of anticompetitive effects from Defendants' patent transfers and aggregation, Defendants argue that Plaintiffs fall short because they do not allege specific details about Defendants' confidential licensing terms. But not only do Defendants fault Plaintiffs for a lack of information they could only obtain through discovery, Defendants *denied* an earlier request for permission to file under seal in the Amended Complaint information about Defendant VLSI's acquisitions of patents and damage demands that Intel received from Defendant VLSI in separate litigation.

- Notwithstanding the Court's recognition that Plaintiffs can demonstrate antitrust injury by showing that they have incurred litigation costs or face ongoing threats of inflated royalty demands, Defendants insist that Plaintiffs must allege they have already paid inflated royalties.

Defendants also raise several other meritless objections. For example, Plaintiffs have alleged details regarding a series of anticompetitive bilateral agreements between Fortress and individual Defendant PAEs to aggregate, but Defendants incorrectly fault Plaintiffs for failing to

allege a meeting of the minds regarding a single overarching conspiracy. And even though the Court has already rejected Defendants' *Noerr-Pennington* argument, Defendants raise it again.

Because Plaintiffs' Amended Complaint provides the additional detailed allegations the Court called for in its prior Order, the Court should deny the motion and, with it, Defendants' attempt to avoid liability for their ongoing wrongdoing.

## II.   THE AMENDED COMPLAINT

In its Order dismissing Plaintiffs' original Complaint, the Court identified several areas in which Plaintiffs should allege more specifics in an amended complaint. On August 4, 2020, Plaintiffs filed their Amended Complaint, which adds 77 pages of extraordinary detail beyond that in the original Complaint and cures each of the pleading deficiencies the Court identified:

- *Market Definition.* Plaintiffs respond to the Court's direction that Plaintiffs allege at least the "rough contours" of more specific and narrower antitrust markets (*see* Order at 13) by alleging 13 exemplar patent markets with substantial details regarding each market.

- *Direct Evidence of Anticompetitive Effects.* Plaintiffs address the Court's finding that the original Complaint lacked sufficient details regarding direct evidence of anticompetitive effects (*see* Order at 15) by alleging (i) specific substitute patents that were combined under Fortress's control as a result of the challenged patent transfers and (ii) concrete examples of Defendants' supracompetitive royalty demands that were enabled by eliminating pre-acquisition competition between prior owners of those patents.

- *Antitrust Injury.* Plaintiffs respond to the Court's direction to provide more detail regarding antitrust injury (*see* Order at 20-21) by alleging specifics about how Apple and Intel are being harmed by the elimination of competition resulting from Defendants' illegal patent transfers.

- *Conspiracy to Restrain Trade.* Plaintiffs respond to the Court's finding that the original Complaint was insufficiently clear about the scope and nature of Defendants' Section 1 conspiracies (*see* Order at 27-28) by making clear that Plaintiffs are alleging a series of illegal bilateral agreements between Fortress and individual Defendant PAEs—rather than an overarching conspiracy between Fortress and all of the PAEs—and alleging additional details regarding the specifics of those bilateral agreements.

### A.   Detailed Allegations Regarding 13 Exemplar Patent Markets and Substitute Patents Aggregated Therein

Plaintiffs allege 13 exemplar patent markets based on discrete technologies for which Defendants have aggregated substitute patents. *See* Am. Compl. ¶¶ 127-393. Those markets are:

(1) Network-based Voice Messaging; (2) Remote Software Updates; (3) Mobile Device-to-Device Communication; (4) Local Cache Management; (5) Shared Memory Access; (6) Device Authorization; (7) Health Monitoring; (8) MOSFET Channel Fabrication; (9) Digital Rights Management; (10) Cryptographic Algorithms Using Modular Multiplication; (11) DRAM Refreshing; (12) Input/Output Pads; and (13) Fingerprint Authentication.

For each patent market, Plaintiffs have alleged in detail specific functions that technologies covered by patents in the relevant market perform.  For example:

- The Local Cache Management Patents Market includes patents claiming to read on electronic devices that support local cache management, which enables computer processors to store and retrieve information more efficiently.  Am. Compl. ¶¶ 211-212.

- The MOSFET Channel Fabrication Patents Market includes patents claiming to read on MOSFET channel fabrication techniques.  MOSFET channel fabrication corresponds to a part of the semiconductor fabrication process in which nanoscale MOSFET channels are formed on a semiconductor substrate.  Am. Compl. ¶ 319. Modern digital processors "include millions or billions of integrated MOSFET devices per chip, each of which includes a respective channel." *Id.*

- The Shared Memory Access Patents Market includes patents claiming to read on electronic devices or components thereof that support shared memory access capabilities.  Shared memory access capabilities "provide a way for electronic devices or components thereof in which memory is shared by multiple processors to handle requests to access that shared memory." *See* Am. Compl. ¶¶ 234-235. When multiple requests are received simultaneously, shared memory access techniques determine the order in which requests are processed; therefore, shared memory access techniques are essential for multi-processor electronic devices. *Id.*

- *See also id.* ¶¶ 127-128, 154-155, 178-179, 211-212, 250-251, 290-291, 339-340, 360-361, 367-368, 374-375, 381-382.

The Amended Complaint also adds detailed allegations regarding specific patents that were aggregated in each of the 13 exemplar patent markets, for instance:

- Plaintiffs allege at least six substitute patents Defendants have aggregated in the Network-based Voice Messaging Patents Market.  Am. Compl. ¶ 129.  These patents include U.S. Patent Nos. 7,020,252, 7,535,890, 8,243,723, 8,724,622, 8,995,433, and 7,920,579, all of which purport to cover alternative techniques to enable multiple recipients to access a voice message. *Id.*

- Plaintiffs allege at least eight patents Defendants have aggregated in the Mobile Device-to-Device Communications Patents Market.  Am. Compl. ¶ 180.  These patents include U.S. Patent Nos. 7,136,999, 9,712,986, 8,018,877, 6,446,127, 6,161,134, 7,299,008, 6,845,097, and 7,551,593, all of which purport to cover alternative techniques to establish communication between multiple devices that are connected via a network. *Id.*

For each patent, Plaintiffs include the title, issue date, abstract information, details about the patent, ownership information, and allegations regarding Defendants' transfer of the patent:

- *See, e.g.*, Am. Compl. ¶ 130 ("U.S. Patent No. 7,020,252 ('the '252 patent') is titled 'Group Audio Message Board' and issued on March 28, 2006. According to its abstract, the '252 patent relates to '[a] communications system . . . comprising a communal audio message recordal apparatus GAMB [] with multiple users [] enabled to record and access recorded messages.' Its claims are directed to a community messaging system (*e.g.*, voice chat rooms with recorded messages accessible to multiple people)."), ¶ 131 ("On its face, the '252 patent is assigned to Koninklijke Philips Electronics N.V. ('Philips'). On January 30, 2009, Philips assigned the '252 patent to IPG Electronics 503 Limited ('IPG Electronics 503'). On April 10, 2012, IPG Electronics 503 assigned the '252 patent to Pendragon Wireless LLC ('Pendragon Wireless'). On January 31, 2018, Pendragon Wireless assigned the '252 patent to Defendant Uniloc Luxembourg. Less than five months later, on May 3, 2018, Defendant Uniloc Luxembourg assigned the '252 patent to Defendant Uniloc 2017."). *See also id.* ¶¶ 130-140, 157-164, 180-197, 213-224, 236-242, 252-279, 292-306, 321-331, 341, 362-366, 367-373, 374-380, 383-389.

**B.   More Detailed Allegations Regarding Input Technology Markets**

For the Input Technology Markets—which are relevant to Apple's claim that certain Defendants violated California's Unfair Competition Law (UCL) by transferring claimed standard essential patents (SEPs) to evade FRAND commitments by their prior owners (Count Four)—Plaintiffs have now identified specific transferred SEPs. *See* Order at 19. For example, Plaintiffs identified claimed SEPs held by INVT:

- "Inventergy acquired declared essential SEPs from Panasonic subject to obligations for Inventergy to share with Panasonic the royalties it obtained from licensees. Inventergy, through its wholly-owned subsidiary Inventergy, Inc., transferred these patents to INVT, including, for example, U.S. Patent Nos. 6,366,763, 6,637,001, 6,813,323, 6,940,428, 6,847,828, 5,583,851, 6,336,040, 5,818,869, 6,175,558, 6,697,384, 6,466,563, 6,370,134, RE37,420, 6,760,590, 5,757,870, 5,873,027, 6,295,301, 6,301,237, 6,529,492, 6,370,131, 6,381,445, 6,370,359, 6,487,394, 6,597,894, 7,035,233, 6,584,088, 6,549,526, RE39,954, 6,505,035, 6,973,289, 6,611,676, 6,734,810, 7,339,949, 6,799,053, 7,206,587, 7,460,502, 7,386,321, 6,922,159, 7,636,551, 8,175,604, and 7,535,864 which have directly (or as family members) been declared essential to the UMTS standard, and U.S. Patents Nos. 7,646,702, 8,775,890, 6,760,590, 6,799,053, 7,206,587, 8,238,226, 9,397,794, and 9,015,546 which have directly (or as family members) been declared essential to the LTE standard." *Id.* ¶ 418; *see also id.* ¶¶ 419 (identifying INVT SEPs that originated with Nokia), 421-422 (identifying Uniloc 2017 SEPs that originated with Philips).

**C.    More Detailed Allegations Regarding Patent Assertions Seeking Supracompetitive Royalties Enabled by Reduction of Competition from Challenged Patent Transfers**

Plaintiffs added detailed allegations regarding Defendants' assertions of substitute patents in most of the 13 exemplar patent markets.  The allegations detail how Defendants, after aggregation, asserted patents that the previous patent holders had never asserted.  Further, the allegations provide details regarding the assertions, including which Defendants made the assertions, which entities they sued and on which patents, and the disposition (if known) of each suit.  For example:

- In the Network-based Voice Messaging Patents Market, Plaintiffs allege that in 2016, shortly after acquiring four named patents from Empire IP, Defendants Uniloc Luxembourg and Uniloc USA (under the control of Fortress) "began a litigation campaign."  Plaintiffs list 40 lawsuits in which Defendants asserted at least one, but often multiple, of these patents, of which at least 10 lawsuits resulted in settlement.  For the remaining 30 lawsuits, Plaintiffs provide details of the disposition of those lawsuits.  Am. Compl. ¶¶ 143-145.

- In the Health Monitoring Patents Market, as another example, Plaintiffs allege that, between June 2017 and November 2017, Uniloc Luxembourg and Uniloc USA (under the control of Fortress) asserted at least one of four named patents in 13 lawsuits, at least four of which resulted in settlements.  Plaintiffs provide details of the disposition of the remaining nine lawsuits.  Am. Compl. ¶¶ 309-311; *see also* Am. Compl. ¶¶ 167-172, 200-208, 227-230, 246-247, 282-286, 335-336.

The Amended Complaint adds specific allegations regarding how Defendants' aggregation of patents in many of the exemplar patent markets has reduced competition and resulted in supracompetitive royalties.  These include allegations about how the aggregation of patents under Fortress's control is designed to and does eliminate competition among the prior owners by putting substitute patents in the hands of PAEs that are commonly controlled and can charge supracompetitive royalties because they no longer must compete against independent owners of those patents.  *Id.* ¶¶ 9, 29, 40, 50, 56, 71, 73.  Plaintiffs also provide allegations about demands made for patents within these narrow markets and allegations about what royalties prior owners sought for the same patents or others within the prior owners' portfolio.  For instance, the Amended Complaint alleges that Fortress, the Uniloc Defendants, and Seven Networks have aggregated four substitute patents that "purportedly cover techniques for identifying devices that are eligible for

1  remote software updates" within the Remote Software Updates Patents Market, three of which

2  were acquired from other companies and one of which originated with Uniloc Luxembourg before

3  being transferred to Uniloc 2017. Am. Compl. ¶¶ 154-164. The Amended Complaint then details

4  how, following aggregation, Defendants sought supracompetitive royalties when their prior

5  owners did not. For example, IBM was a prior owner of a patent in the Remote Software Updates

6  Patents Market (the '228 patent) now assigned to Uniloc 2017, and IBM never asserted the patent.

7  Further, after the Uniloc Defendants and Seven Networks aggregated patents in the Remote

8  Software Updates Patents Market, Uniloc 2017, which also owns the competing '852 and '088

9  patents, demanded between $756,709,869 and $1,475,852,582 for a single patent in this market.

10  *See* Am. Compl. ¶¶ 162, 166, 174. ██████████████████████████

11  ██████████████████████████████. *Id*. ¶ 174. Further, although Plaintiffs lack access to

12  the confidential terms of the settlements, the Amended Complaint describes how the Uniloc

13  Defendants and Seven Networks have been able to coerce at least Zendesk and Google to license

14  patents in the Remote Software Updates Patents Market to settle litigation. *Id*. ¶¶ 168, 172, 176.

15  Before filing the Amended Complaint, Plaintiffs also sought authorization from VLSI to

16  provide more detail, based on information subject to protective orders in VLSI's litigations against

17  Intel, about precisely what VLSI has demanded for certain of its patents along with the terms of

18  its purchase of patents from NXP. VLSI, however, refused to allow Plaintiffs to provide that

19  information to the Court under seal. *Id*. ¶¶ 228, 229, 230, 247, 335. Nonetheless, Plaintiffs have

20  alleged that VLSI acquired certain patents ██████████████████████████

21  ██████ and—after aggregating those patents (including the '014 patent with substitutes in the

22  Local Cache Management Patents Market and the '303 patent with substitutes in the MOSFET

23  Channel Fabrication Patents Market)—has demanded $7.1 billion in the VLSI California Action

24  based on alleged infringement *Id*. ¶¶ 104, 228-29, 330-338.

25  Plaintiffs also have included other detailed allegations regarding how Defendants'

26  aggregation of substitute patents decreased competition leading to supracompetitive royalties and

27  reduced licensing output. For example:

28

- Plaintiffs allege that aggregation of patents in the Device Authorization Patents Market by Fortress, the Uniloc Defendants, INVT, VLSI, Seven Networks, and IXI IP has reduced competition in that market, leading to inflated royalties and decreased licensing output.  Am. Compl. ¶¶ 250, 280.  Specifically, one example relates to Defendants' assertion of U.S. Patent Nos. 8,213,907 and 6,856,616.  The '907 patent purports to cover "a method of granting access privileges to a mobile device based on a 'digital fingerprint' of that device.  Defendants have also asserted that the '616 patent covers a method of granting access privileges to a mobile device based on that device's 'part number' and a configuration associated therewith." *Id.*  Plaintiffs allege that before Defendants' aggregation of both patents, an entity seeking to use one of those potential substitute technologies could take advantage of competition between the owners of those patents; now that Defendants have unlawfully aggregated the patents and control both substitutes, such competition is impossible.  Plaintiffs provide additional specific allegations regarding the direct effects of Defendants' aggregation on competition in each of the nine patent markets where, to Plaintiffs' knowledge, Defendants have asserted patents.  *See* Am. Compl. ¶¶ 141, 165, 198, 225, 243, 280, 307, 332, 354.

- Plaintiffs also allege that the prior owners of patents in each of the 13 relevant patent markets never asserted those patents because of the competitive constraints they faced, which made assertions unprofitable.  Plaintiffs allege that Defendants, enabled by the lessening of competition in each of the relevant patent markets, seek and receive supracompetitive royalties on those previously unasserted patents.  *See* Am. Compl. ¶ 142 ("That lessening of competition is reflected by the evidence of supracompetitive royalties sought and received by Defendants.  Whereas the prior owners of the '252 patent (Philips) and the '5890 patent, the '433 patent, the '723 patent, and/or the '622 patent (Ayalogic, then Empire IP) never asserted these patents because of the competitive constraints they faced, Defendants have pursued numerous assertions and secured multiple settlements for substantial royalties."); *see also id.* ¶¶ 166, 199, 226, 244, 281, 308, 333, 335.

The Amended Complaint also provides further detail regarding how Defendants have obscured information regarding their patent holdings:

- "Information to evaluate these damages demands, as well as even basic information like how many patents Uniloc has acquired, has been kept obscured.  The Federal Circuit remarked as much on July 9, 2020, when it found that sealing requests filed by Uniloc were 'grossly excessive' and Uniloc's 'flouting of Local Rule 79-5 particularly flagrant.'   Another court recently found good cause to unseal information originally redacted by Uniloc regarding the number of patents transferred from prior owners.  Uniloc has even gone so far as to obscure the specific patents it owns.  For example, it recorded a version of a patent assignment agreement with the US Patent & Trademark Office that, compared to produced versions of the exact same agreement, omit a specific patent later asserted against Apple—specifically, obscuring ownership of U.S. Patent No. 8,872,646 and its foreign counterparts." *Id.* ¶ 97.

- "Fortress obfuscates the patent aggregation scheme that it accomplishes in concert with Defendant PAEs by using a web of entities to assemble and assert substitute and complementary patents in certain technological areas.  That structure hides the full extent of the patent aggregation carried out by Fortress and Defendant PAEs and accentuates the anticompetitive effects of Fortress's patent aggregation scheme." *Id.* ¶ 124.

### D.   More Detailed Allegations Regarding Antitrust Injury to Apple and Intel from Defendants' Aggregation

The Amended Complaint includes detailed allegations regarding how Apple and Intel suffered antitrust injury from the decreased competition caused by Defendants' patent transfers because the aggregations left them with the choice of paying exorbitant royalties or litigating. For example, in the Device Authorization Patents Market, Plaintiffs allege that by "eliminating competition, this aggregation positioned Defendants to seek supracompetitive royalties that the prior patent holders were unable to seek because of the competitive constraints they faced. Because they have refused to capitulate to exorbitant royalty demands, Intel and Apple have been injured by Fortress, VLSI, the Uniloc Defendants, and IXI IP having targeted Intel and Apple as part of their litigation based on these patents. Moreover, Apple and Intel have been injured as a result of the ongoing threat that Defendants will continue to assert patents in the Device Authorization Patents Market against them." *Id.* ¶ 287; *see also id.* ¶¶ 149, 173, 204, 231, 245, 312, 334, 356.

Further, Plaintiffs allege injury based on the fact that "Intel, Apple, and other purchasers in the Relevant Patents Markets have also been harmed by the ongoing threat that Defendants will seek exorbitant royalties based on their aggregation of substitute and complement patents in the Relevant Patents Markets and the uncertainty caused by such threat." *Id.* ¶ 437.

### E.   More Detailed Allegations that Fortress and Each of the Defendant PAEs Share a Common Understanding to Unlawfully Aggregate Patents.

Plaintiffs added more detail to their allegations regarding the "common understanding" between Fortress and the PAE Defendants to unlawfully aggregate patents. For example, Plaintiffs allege:

- "Further, when Defendant PAEs entered into the agreements described below with Fortress and/or its affiliate Fortress Credit, they understood that the transaction would enable Fortress to aggregate substitute and complementary patents to eliminate competition existing when those patents were held by PAEs that were competing independently with one another and not under common Fortress control. The PAEs received compensation in the form of favorable terms, reflecting the fact that the PAEs were sharing in the supracompetitive royalties Defendants obtain by eliminating competition. Thus, each of the Defendants entered into separate agreements with Fortress with a common objective with Fortress to eliminate competition and reap the rewards from doing so." Am. Compl. ¶ 50.

Plaintiffs also allege specific details regarding the understanding between each of those Defendant PAEs and Fortress:

- With respect to the Uniloc Defendants, Plaintiffs allege that: "In entering the Uniloc-Fortress Revenue Sharing Agreement and Patent License Agreement in 2014, Fortress, Uniloc USA, and Uniloc Luxembourg understood that the agreements would enable aggregation of substitute and complementary patents under Fortress's control, and Uniloc USA and Uniloc Luxembourg understood they benefitted by contributing to Fortress's scheme, including by sharing in supracompetitive royalties that would be extracted by virtue of eliminating competition. As Fortress, Uniloc USA, and Uniloc Luxembourg understood, the 2018 Asset Purchase Agreement, by which patents were ultimately transferred to Uniloc 2017, further facilitated these objectives. As a result, at least the substitute and complementary patents described in detail below have been aggregated under Fortress's control." *Id.* ¶ 56; *see also id.* at ¶¶ 71 (allegations regarding Inventergy and INVT); ¶ 73 (allegations regarding IXI).

## F.    Assertion by VoiceAge EVS Against Apple

On August 12, 2020, shortly after the Amended Complaint was filed, VoiceAge EVS sued Apple, asserting five patents claimed to be essential to the EVS codec in the LTE cellular standard and subject to FRAND commitments. *See VoiceAge EVS LLC v. Apple Inc.*, No. 1:20-cv-01061-CFC, Complaint ¶¶ 4, 13-14, 38-39, 63 (D. Del. Aug. 12, 2020). VoiceAge EVS, a Fortress affiliate, obtained the asserted (and other) patents from VoiceAge Corporation in 2018. *VoiceAge Corporation Announces Strategic Transaction with Affiliates of Fortress Investment Group to License Voiceage's Evs Patent Portfolio* (Dec. 10, 2018), *available at* https://voiceageevs.com/news_1.aspx.

If Defendants' motion is denied, Plaintiffs intend to seek leave to amend to include allegations regarding VoiceAge EVS, at least for Apple's UCL claim (Fourth Count) based on transfers of claimed SEPs to avoid FRAND commitments.

## III.    ARGUMENT

Notwithstanding that Plaintiffs have addressed each of the deficiencies the Court identified in the original Complaint by alleging an extraordinary amount of new detail, Defendants make several arguments that the Amended Complaint still fails to state a claim. None has merit.

### A.   Plaintiffs Have Adequately Pled Relevant Antitrust Markets and Direct Evidence of Anticompetitive Effects

The Court found that the Complaint had not sufficiently defined the "rough contours" of a relevant market, as required to rely on allegations of direct evidence of anticompetitive effects. *See* Order at 13.  Plaintiffs' Amended Complaint addresses that identified shortcoming.

As detailed above, the Amended Complaint alleges 13 exemplar patent markets based on discrete technologies in which Defendants have aggregated patents covering technologies that compete to perform a particular function included in electronic devices.  Am. Compl. ¶¶ 124-358. Plaintiffs allege specific patents in those markets that Defendants have aggregated under Fortress's control through the challenged acquisitions.  For example, Plaintiffs allege that Fortress, the Uniloc defendants, Seven Networks, and INVT have aggregated under Fortress's control patents in the "Network-based Voice Messaging Patents Market." Am. Compl. ¶¶ 127-128. The Network-based Voice Messaging Patents Market includes substitute patents U.S. Patent No. 7,020,252, U.S. Patent No. 7,535,890, U.S. Patent No. 8,243,723, U.S. Patent No. 8,724,622, U.S. Patent No. 8,995,433, and U.S. Patent No. 7,920579. ¶ 129.  Plaintiffs also allege in detail *why* those patents are substitutes for one another.  Am. Compl. ¶ 141 ("[T]he '252 patent and the '5890 patent each purport to cover techniques that enable multiple recipients to access a shared voice message. Specifically, the '252 describes a recipient-driven method in which the shared voice message is posted to a communal message board where recipients can access the message.  On the other hand, the '5890 patent describes a sender-driven method in which the sender selects the recipients and the message is delivered to the selected recipients.  A substitute for posting a voice message to a communal message board includes delivering a voice message to sender-selected recipients, and vice versa.").

As a result of these new allegations, the 13 exemplar patent markets are much narrower and more clearly defined than the Electronics Patents Market described in the original Complaint and thus remedy the Court's finding that the Electronics Patents Market was overbroad and insufficiently precise. Order at 14-15.  Plaintiffs' new allegations plainly put Defendants on notice

---

regarding the contours of the markets in which the challenged patent transfers have harmed competition. *See, e.g.*, *United States v. LSL Biotechnologies*, 379 F.3d 672, 699 (9th Cir. 2004) (explaining plaintiffs' "short and plain statement" defining the relevant market "was more than sufficient to put the defendants on fair notice of the claim and relevant market and enable them to frame responsive pleadings").

Nonetheless, Defendants argue the 13 exemplar patent markets suffer the "same deficiency" the Court previously identified. MTD at 9. Defendants both misconstrue the Court's analysis and misrepresent Plaintiffs' allegations. Defendants ignore that the Court has already concluded that, because Plaintiffs are relying on allegations of direct anticompetitive effects, they need only plead the "rough contours" of markets, not detailed circumstantial showings of market power. *See* Order at 13. This fundamental misconception of the relevant standard pervades the specific arguments Defendants make, including that Plaintiffs were required to identify all patents within each of the 13 patent markets and that they have not sufficiently alleged substitutability of patents within those markets. MTD at 11-15. As shown below, the detailed allegations in the Amended Complaint make these objections unavailing. Indeed, those detailed allegations force Defendants to insist on a level of extreme specificity that contravenes the standard for notice pleading.

Market definition is a highly factual inquiry and is therefore rarely decided at the motion to dismiss phase. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("There is no requirement that [relevant markets] be pled with specificity."; "[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

Moreover, the sort of granular pleading that Defendants demand is especially inappropriate for markets encompassing patents on technologies that compete to perform a particular function.

"[A] flexible approach to defining technology markets accords with economic research on technology markets." *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at *4 (N.D. Cal. Jan. 5, 2008). "Commentators have recognized that creating a 'bright-line' market definition in innovative sectors of the economy is often difficult and can be counterproductive." *Id.* That is especially true where "'direct evidence as to market power or anticompetitive effect is available and convincing.'" *Id.* (quoting Jonathan B. Baker, *Market Definition: An Analytical Overview*, 74 Antitrust L.J. 129, 131 (2007)).

### 1. Defendants Ignore that Plaintiffs Need Only Plead the "Rough Contours" of the Markets

Defendants persist in disregarding that Plaintiffs rely on allegations of direct anticompetitive effects from Defendants' patent aggregation, not a circumstantial showing of market power. *See* MTD at 11-12. As the Court already found, a plaintiff bringing a rule of reason claim may rely on either (1) circumstantial allegations of market power—i.e., defining a relevant market and alleging high market shares and barriers to entry—*or* (2) allegations of direct anticompetitive effects from the challenged conduct. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *see also* Order at 12 ("a 'full-blown market analysis' is not necessary where a plaintiff relies on direct evidence of anticompetitive effects"). Because Plaintiffs have alleged direct evidence of anticompetitive effects, they need only allege the "rough contours" of a relevant market. *See* Order at 15; *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) ("A lesser analysis may show that the restraint has actually produced significant anti-competitive effects, such as a reduction in output. If the plaintiff can make a showing of anti-competitive effects, a formal market analysis becomes unnecessary."). Plaintiffs have done that.

Where a plaintiff alleges *direct evidence of anticompetitive effects* (as Plaintiffs have done here), market definition serves the limited purpose of giving context to those allegations. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988) ("Given that the ability to raise price and to exclude competition are hallmarks of market

power, the finding of actual harm to competition suffices under Sherman Act § 1 even in the absence of extended market analysis."). Thus, where a plaintiff has alleged that anticompetitive effects have ***actually occurred***, unlike when alleging market power through circumstantial evidence, it need not identify competitors or assign shares to allege an implication of market power to show competitive harm is ***possible***. *Oltz*, 861 F.2d at 1448 (because "market definition and market power are merely tools designed to uncover competitive harm," direct evidence of competitive harm "can obviate the need" for a full-blown market analysis (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (2009))).

## 2. Plaintiffs Were Not Required to Identify Every Patent in Each Antitrust Market

Defendants claim that Plaintiffs have failed to allege cognizable markets because they have not identified "the relevant 'substitute patents' that make up each of the alleged markets." MTD at 12. But a plaintiff is not required to allege every patent that belongs in a relevant market. Patent markets are defined with reference to functions that competing technologies perform, not by enumerating every patent included in the market. *See Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. CV 19-12533-WGY, 2020 WL 5100291, at *9 (D. Mass. Aug. 31, 2020) ("The fact that 10X has not specified the applicable patents or intellectual property is not fatal to its market definition, as a technology market may be defined by the economic cross-elasticity of substitute technologies rather than by reference to specific intellectual property."); *Samsung Elecs. Co. v. Panasonic Corp.*, No. C 10-03098 JSW, 2015 WL 10890655, at *3 (N.D. Cal. Sept. 30, 2015) (finding plausible on motion to dismiss "a market in the technology used in the production of SD Cards, consisting of technology developed for this end use or that might be applied toward this end-use"); U.S. Dept. of Justice & Fed. Trade Comm., Antitrust Guidelines for the Licensing of Intellectual Property (Jan. 12, 2017) (IP Guidelines) at 9 ("Technology markets consist of the intellectual property that is licensed . . . and its close substitutes—that is, the technologies or goods that are close enough substitutes to constrain significantly the exercise of market power with respect to the intellectual property that is licensed.").

Here, Plaintiffs have alleged in detail specific functions that technologies in the relevant markets perform and technologies outside the relevant markets do not perform. *See, e.g.*, Am. Compl. ¶ 154 (describing functions technologies in the Remote Software Updates Patents Market perform, including "identifying devices that are eligible for remote software updates"), ¶ 319 (describing functions technologies in the MOSFET Channel Fabrication Patents Market perform, including the formation of MOSFET channels on a semiconductor substrate). No more is required to allege a relevant patent market, *Bio-Rad*, 2020 WL 5100291 at *9, even putting aside that Plaintiffs have alleged direct evidence of anticompetitive effects and thus need not present a "full blown" market analysis. *Bhan*, 929 F.2d at 1413.

Defendants' arguments to the contrary are unavailing. None of the cases Defendants cite— each of which involved allegations of circumstantial evidence of market power—supports their argument that Plaintiffs are required to enumerate "all" substitute patents included in the markets Plaintiffs allege. MTD at 11-12. In *NSS Labs, Inc. v. Symantec Corp.*, unlike here, plaintiffs failed to allege any reason why the products outside the markets they alleged were not substitutes for in-market products. No. 18-cv-05711-BLF, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019). Likewise, in *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, the court found that plaintiffs had failed to "explain why certain products or sources of products are not part of the [relevant market]." 142 F. Supp. 2d 296, 304 (E.D.N.Y 2001). In neither case did the market allegations come remotely close to the detailed exemplar markets Plaintiffs identify in their Amended Complaint, which describe the function that technologies within each market compete to perform and thus delineate how technologies not performing that function fall outside the market. This also is not a case where Plaintiffs have failed to plead a geographic market and alleged a broad, vague market like all "hair products" (*cf. Cupp v. Albert-Culver USA, Inc.* 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004)) or failed to identify the relevant products or services that belong in the market (*Sidibe v. Sutter Health*, No. C 12-04854 LB, 2013 WL 2422752, at *16 (N.D. Cal. June 3, 2013); *JM Comput. Servs., Inc. v. Schlumberger Techs., Inc.*, No. C 9520349 JW, 1996 WL 241607, at *5 (N.D. Cal. May 3, 1996)). Significantly, none of Defendants' cases requires a plaintiff to

enumerate ***all*** suppliers of substitutes products in a proposed relevant market.  That is true even when—unlike here—plaintiffs have relied only on allegations of circumstantial facts regarding market power.  *See Rebel Oil*, 51 F.3d at 1434.

Similarly, Defendants argue that the Amended Complaint "leaves out half of the market power equation" because it does not "allege the number" of patented or non-patented technologies "owned by others that can serve as substitutes for Defendant-owned patents that the Amended Complaint identifies."  MTD at 17-18.  But they once again are insisting that Plaintiffs plead facts that might be pertinent for an antitrust claim alleging only ***circumstantial*** evidence of market power.  *See*, *e.g.*, *Bhan*, 929 F.2d at 1413.  The cases on which Defendants rely are inapposite. Unlike here, all of those cases involved efforts to allege circumstantial evidence of market or monopoly power, so the failure to allege market shares or the range of alternative suppliers was dispositive.  In none did the plaintiffs allege direct evidence of anticompetitive effects—i.e., actual evidence of inflated prices or reduced output.  *See e.g. Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972-73 (9th Cir. 2008) (finding market power allegations inadequate where the plaintiff did not allege direct evidence of anticompetitive effects and relied on circumstantial evidence); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, No. 18-CV-02054-MMC, 2019 WL 1767335, at *6 (N.D. Cal. Apr. 22, 2019) (finding multiple issues with plaintiffs market definition and market power where plaintiffs were relying on circumstantial evidence).

Moreover, insofar as there are limits to the details Plaintiffs can allege regarding the specific patents that Defendants have aggregated in individual patent markets, that is because Defendants have obfuscated their patent ownership and transfers that aggregated patents under

1  Defendants' control.  *See, e.g.*, Am. Compl. ¶¶ 97, 124.  Fortress conceals its patent aggregation

2  scheme by using a web of entities to assemble and assert substitute and complementary patents:



12  *Id.* at ¶ 124.  Defendants' obfuscation—including failing to disclose PAEs' connections to

13  Fortress—impedes Plaintiffs, without discovery, from specifically identifying all substitute patents

14  that are now controlled by Defendants.  *Id.* at ¶ 97 ("Information to evaluate these damages

15  demands, as well as even basic information like how many patents Uniloc has acquired, has been

16  kept obscured. . . .   Uniloc has even gone so far as to obscure the specific patents it owns.").

17  Defendants should not benefit from their obfuscation by using it to fault Plaintiffs for not alleging

18  even more detail about Defendants' aggregation scheme, including identifying additional patents

19  under Fortress' control.

20      **3.    Plaintiffs Have Sufficiently Alleged Substitutability of Patents in Each
              Patent Market**

21      Defendants' argument that Plaintiffs have not adequately alleged facts to show that the

22  patents in the Relevant Patents Markets are substitutes for one another (MTD at 12-15) is

23  unavailing.  Defendants wrongly claim that "Plaintiffs do not even attempt to explain how [the

24  patents PAEs have acquired] are interchangeable." *Id.* at 12.  Specifically, Defendants point to

25  three paragraphs of the Amended Complaint that address the Remote Software Updates Patents

Market and claim that Plaintiffs do not allege "how [the '158 patent] is interchangeable with any other patent" in the market. *Id.* at 12 n.12.

Defendants mischaracterize the Amended Complaint. Plaintiffs clearly allege that the '158 patent (along with the '852 patent, the '088 patent, and the '228 patent) "purport to cover alternative techniques for identifying devices that are eligible for remote software updates." Am. Compl. ¶ 156. Plaintiffs have sufficiently alleged (i) the boundaries of the relevant market by identifying the function performed by technologies covered by patents within the market and (ii) competitive alternatives that have been eliminated through Defendants' patent aggregation scheme (i.e., the four patents that PAE Defendants acquired). *Id.* at ¶ 15, 163-165; *see also Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 WL 1672493, at *5 (N.D. Cal. May 14, 2012) (finding plaintiffs sufficiently pled an antitrust market by alleging the bounds of the market coextensive with the patents and competitive alternatives that had been eliminated).

Defendants' arguments regarding the Mobile Device-to-Device Communication Patents Market, Am. Compl. ¶¶ 180, 183, 196, 198 (alleging substitutability among the '986 patent, '999 patent, '877 patent, '127 patent, '134 patent, '008 patent, '097 patent, and '593 patent where all "purport to cover alternative techniques to establish communication between multiple devices that are connected via a network), and the Device Authorization Patents Market, *id.* ¶¶ 252, 257-258, 280 (alleging substitutability among the '242 patent, '620 patent, '395 patent, '633 patent, '976 patent, '907 patent, '616 patent, '033 patent, and '532 patent where all "purport to cover alternative techniques to restrict access to network resources in a computer network"), fail for the same reason.

Defendants also wrongly argue that Plaintiffs have not alleged economic substitutability of patents in the relevant markets. MTD at 14. Again, this misreads the Amended Complaint. In the Remote Software Updates Patents Market, for example, Plaintiffs allege how the '582 patent (which covers a method of providing software updates where a "device identifier" is used to determine eligibility) and the '088 patent (which covers a method of providing software updates in which a list of acceptable unacceptable configurations is used to determine eligibility for an update) are economic substitutes. Am. Compl. ¶ 165. Plaintiffs allege that before challenged

patent transfers eliminated those competitive alternatives, a licensee seeking to use one of these substitute technologies would have been able to "take advantage of competition" between the owners of the patents to secure a license. *Id.*

Defendants' cases on economic substitutability do not support their argument.  In *Hynix*, the court recognized in assessing ***summary judgment*** that licensing and other "financial data" is "less likely to be available or quantifiable" in technology markets "because licensing terms are often secret," and that "a technology market can still be defined by determining what other technologies a buyer could switch to if necessary"—as Plaintiffs have done here.  *See* 2008 WL 73689 at *3.  In *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1351-52 (Fed. Cir. 2011), the plaintiff (unlike here) failed to allege "anything other than the issuance of a patent," as the basis for defining the market, but the Federal Circuit found that, at the motion to dismiss phase, the plaintiff "did not have to provide empirical or statistical evidence that would define the market with precision."  And *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004), did not even address the ***pleading*** standard for market definition, but rather the sufficiency of the plaintiff's expert economic analysis.  In *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018), the proposed antitrust sub-markets were not patent markets at all (they related to golf advertising), and excluded "'many reasonbl[y] interchangeab[le]' products," a concern Defendants have ***not*** raised about Plaintiffs' patent markets.

Defendants also incorrectly claim that Plaintiffs' alleged markets are too broad because they encompass patents that are not substitutes to perform similar functions.  MTD at 14-15. Defendants identify the Health Monitoring Patents Market in particular, suggesting that the market is overly broad because it could include "at least 62,000 patents" with the USPTO classification for "Detecting, measuring, or recording for diagnostic purposes; Identification of persons."  MTD at 15.  But Plaintiffs' market definition is not based on that broader USPTO classification; the Health Monitoring Patents ***antitrust*** market is based on the allegation that Defendants have aggregated patents covering technology in certain electronic devices, such as "wearable devices, smartphones, medical devices, or the like, to monitor and process patient data from sensors."  Am.

Compl. ¶ 290.   USPTO classifications "exist solely for administrative purposes," *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 893 (N.D. Cal. 2019), and do not purport to define relevant antitrust markets.  Plaintiffs' definition of the Health Monitoring Patents Market is sufficient to put Defendants on notice of the types of patents that are within and outside of the market.

Finally, Defendants' argument that Plaintiffs' markets are not cognizable because they include complements, and not just substitutes, also is misplaced.  Plaintiffs here allege many substitute patents in the relevant markets.  But they also allege in detail how—depending on the circumstances of a particular electronics device manufacturer—patents can be both substitutes and complements for one another in the context of antitrust markets consisting of patents that perform specific functions in electronic products, given alternative methods of building electronic devices that require different combinations of technology.  Am. Compl. ¶¶ 31-32.  Defendants ignore these allegations.  Similarly, in *Staley v. Gilead,* No. 19-CV-02573-EMC, 2020 WL 5507555, at *6-7 (N.D. Cal. July 29, 2020), the Court denied a motion to dismiss a complaint that alleged a market for "drugs [that] sometimes may be complements for one another but other times may be substitutes," recognizing that this was one of the "[c]ommercial realities" of the alleged market and that it would be inappropriate to resolve the issue of a "complex and multidimensional" market at the pleading stage.   Thus, while markets are generally defined by groupings of substitute products, courts (like in *Staley*) have recognized that in certain circumstances a more flexible market definition is required to reflect "commercial realities."  *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities.").  By contrast, *Little Rock Cardiology Clinic*, 573 F. Supp. 2d 1125, 1144 (E.D. Ark. 2009), *aff'd*, 591 F.3d 591 (8th Cir. 2009), on which Defendants rely, is inapposite.  *See* MTD at 16.  That case involved services provided by a hospital (general hospital services) and a cardiologist (cardiology procedures) that are *never* substitutes for one another.  *Id.* at 1144.

**B.      Plaintiffs Have Adequately Alleged Direct Evidence of Anticompetitive Effects**

The Court found that the allegations in the Original Complaint regarding actual detrimental effects on competition were "largely conclusory in nature." Order at 15.  To address that concern, the Amended Complaint includes additional allegations regarding supracompetitive royalties and inflated licensing demands enabled by Defendants' patent aggregation scheme.  Plaintiffs have added detailed factual allegations showing the links between Defendants' patent transfers and anticompetitive effects.  *See supra* Sections II.C-D.  They allege detailed facts regarding specific patent transfers and how those transfers harmed competition by combining substitute patents under Defendants' control, thus eliminating competitive constraints from the former independent owners of those patents.  *See, e.g.*, Am. Compl. ¶¶ 130-135, 157-164, 183-197, 214-224, 236-242, 252-279, 292-306, 321-331, 341, 362-366, 369-373, 376-380, 383-389 (describing in detail Defendants' aggregation of specific patents and the transactions involved).   And Plaintiffs specifically allege that Defendants' royalties and royalty demands have been inflated in patent markets because of that elimination of competition.[1]  *See, e.g.*, Am. Compl. ¶ 176 (alleging that Uniloc Defendants and Seven Networks have coerced at least Zendesk, Inc. and Google to license its patents in the Remote Software Updates Patents Market and have extracted inflated royalties from licensees that reflect competition that has been eliminated through Defendants' patent aggregation); *see also id.* ¶¶ 143-145, 167-172, 200-208, 227-230, 246-247, 282-286, 309-311, 335-336 (describing how Defendants' royalties and demands have been inflated as a result of their aggregation scheme).   Such allegations are sufficient to plead direct evidence of anticompetitive effects.  *See, e.g.*, *Vizio, Inc. v. Funai Elec. Co.*, No. CV 09-0174 (AHM), 2010 WL 7762624, at *7 (C.D. Cal. Feb. 3, 2010) (finding, in a case involving patent markets, that the plaintiff's allegations were "sufficient to plead market power" where plaintiff alleged that the defendants "increased prices to supracompetitive levels"); *see also In re Loestrin 24 Fe Antitrust Litig.*, 261

---

[1]  Defendants' contention that Plaintiffs have failed to allege that Defendant PAEs have "leverage[d]" substitute patents from one market to another (MTD at 2, 11) misapprehends Plaintiffs' allegations.

F. Supp. 3d 307, 328 ((D.R.I. Aug. 8, 2017) (finding the plaintiffs sufficiently pled market power "by plausibly alleging" that the defendants "charged supracompetitive prices").

Plaintiffs' allegations regarding the anticompetitive purpose of Defendants' aggregation scheme also support the conclusion that Defendants' actions unlawfully restrain trade.  *See, e.g.*, Am. Compl. ¶¶ 11, 47-48 ("Fortress's aggregation is thus intended for an anticompetitive purpose—to invest in patents at costs lower than the holdup value of the patents to ensnare as many potential licensees as possible and to allow it and the other Defendants to assert as many possible claims of infringement to tax the commercial use of existing technology at rates beyond the actual value (if any) of the aggregated patents."); *see also Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988) ("Since the effect on competition is the touchstone of rule of reason analysis, the intent of the defendants is relevant but not dispositive." (citations omitted)).

Thus, contrary to Defendants' argument, MTD at 18-19, Plaintiffs have addressed the Court's findings by sufficiently alleging direct evidence showing that the challenged patent transfers have enabled Defendants to raise prices above and reduce output below competitive levels.  *See, e.g.,* ¶ 142 ("Whereas the prior owners of the '252 patent (Philips) and the '5890 patent, the '433 patent, the '723 patent, and/or the '622 patent (Ayalogic, then Empire IP) never asserted these patents because of the competitive constraints they faced, Defendants have pursued numerous assertions and secured multiple settlements for substantial royalties."); *see also* ¶ 149, 166 (describing how Defendants' scheme has allowed Defendants to extract inflated royalties and settlements), ¶¶ 141, 165, 431 (describing how Defendants' scheme has led to reduced licensing output in the patent markets).

Defendants' argument that paragraphs 152, 176, 209, 232, 248, 288, 317, 337, and 357 (describing the supracompetitive licensing returns Defendants have obtained) are allegations "unaccompanied by supporting facts" (MTD at 19) is misplaced.  By focusing only on selected paragraphs, Defendants ignore the many other detailed factual allegations in the Amended Complaint described above.

The Amended Complaint's detailed allegations also contrast sharply with Defendants' cited cases. In those cases, the plaintiffs failed to allege *any* facts regarding pricing or output (*Top Rank, Inc. v. Haymon*, No. CV 15-4961-JFW (MRW), 2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015)); simply asserted that the defendant "has monopoly power" without alleging any facts to support that conclusion (*Surface Supplied, Inc. v. Kirby Morgan Dive Sys., Inc*., No. C-13-0575 MMC, 2013 WL 5496961, at *6 (N.D. Cal. Oct. 3. 2013)); or defined a relevant market excluding obvious substitutes (*Stewart v. Gogo, Inc*., No. C-12-5164 EMC, 2013 WL 1501484, at *4 (N.D. Cal. Apr. 10, 2013)).

Defendants also argue that Plaintiffs have not alleged sufficient specifics about licensing returns, royalty levels, or settlements that Defendants have demanded or received and how those compare to royalties before the challenged patent transfers. But those specifics are in the possession of ***Defendants*** and confidential. MTD at 22-23. Accordingly, Plaintiffs are not required to allege such details in the absence of discovery. *See E & E Co., Ltd. v. Kam Hing Enters., Inc.*, 429 Fed. App'x 632, 633 (9th Cir. 2010) (even in fraud cases, pleading standards "may be relaxed as to matters within the opposing party's knowledge"); *Hynix*, 2008 WL 73689, at *3-4 (recognizing that information about patent licensing terms is often confidential and unavailable). Plaintiffs' allegations include that Intel "sought VLSI's permission to disclose (under seal) the damages estimate for Intel's alleged infringement of the '014 patent, as well as the financial terms of its purchase of the patent from NXP (which had merged with Freescale); however VLSI refused that consent." Am. Compl. ¶ 228. Therefore, not only are Defendants on notice of the specifics of their licensing returns, royalty levels, and settlement agreements, they have taken action to keep Plaintiffs from being able to allege more specific details. *Id.*

Defendants also misconstrue Plaintiffs' arguments regarding direct evidence of anticompetitive effects, arguing that Plaintiffs' position would result in "any person or entity who obtained a handful of patents within a broad area of generally-related technologies would have thereby have unlawful market power." MTD at 16-17. First, Plaintiffs' have not alleged a "broad area" of technology. Instead, as described above, Plaintiffs' have alleged 13 specific patent

markets and substitute patents within each of those markets. *See supra* Section II.A. Second, Plaintiffs allege detailed direct evidence of anticompetitive effects resulting from Defendants' aggregation of patents and elimination of competition in the relevant markets. *See supra* Section II.C. These allegations go far beyond allegations that a defendant engaged in anticompetitive conduct solely because it "obtained a handful of patents" in the same general area.

Finally, Defendants wrongly argue that Plaintiffs' allegation that some of the transferred patents were "weak" conflicts with allegations that Defendants have harmed competition through their patent aggregation scheme. *See* MTD at 19. They disregard that the Court already rejected this argument, concluding that, given Plaintiffs' theory that Defendants have anticompetitively aggregated patents and can extract supracompetitive prices as a result, it could not agree with Defendants' argument that aggregation of "weak" patents could not give rise to market power. *See* Order at 17 n.12. Defendants also disregard that Plaintiffs define "weak" patents as "those that never would have been asserted by their former owners," Am. Compl. ¶ 10, not as patents that have no ability to harm competition when aggregated. To the contrary, Plaintiffs allege in detail that Defendants' aggregation of substitute patents—whether weak or not—harmed competition by eliminating alternatives for potential licensees. *See, e.g.*, Am. Compl. ¶¶ 34-38, 43, 96.

### C.   Plaintiffs Have Adequately Alleged Input Technology Markets for Apple's UCL Claim

Defendants argue that Apple's UCL claim based on conduct affecting Input Technology Markets fails because Apple does not allege that Defendants own or control patents that actually are SEPs. MTD at 20. But Defendants misstate the law: Apple need not allege that the patents actually *are* SEPs; it is sufficient to allege that Defendants have *represented* that the patents are standard essential. *See, e.g.*, *Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1021 (S.D. Cal. 2019) (denying motion to dismiss Section 2 claim based on "Wi-LAN's purported essential patents" and allegation "assuming that the Patents-in-Suit are—as Wi-LAN claims—essential to the IEEE 802.16 and 3GPP LTE standards"); *Funai Elec. Co. v. LSI Corp.*, No. 16-CV-01210-BLF, 2017 WL 1133513, at *7 (N.D. Cal. Mar. 27, 2017) (denying motion to dismiss Section 2

claim based on "allegedly essential patents"); *Microsoft Mobile Inc. v. Interdigital, Inc.*, No. CV 15-723-RGA, 2016 WL 1464545, at *2 (D. Del. Apr. 13, 2016) (denying motion to dismiss antitrust claim where the plaintiff "defines the relevant markets as 'the markets for technologies covered by the InterDigital patents . . . that are essential, or ***alleged to be essential***, to the 3G and 4G cellular standards'" (emphasis added)); *TCL Commc'ns Tech. Holdings Ltd v. Telefonaktenbologet LM Ericsson*, No. SACV1400341JVSANX, 2014 WL 12588293, at *4 (C.D. Cal. Sept. 30, 2014) (a plaintiff is not required to concede patents are essential for breach of FRAND claim at motion to dismiss stage); *Zenith Elecs., LLC v. Sceptre, Inc.*, No. LA CV14-05150 JAK (AJWx), 2015 WL 12765633, at *4 (C.D. Cal. Feb. 5, 2015) (allowing breach of contract claim based on failure to provide terms for patents where the defendant challenged whether actually standard essential).[2]  Here, the Amended Complaint alleges that Defendants have held out the relevant SEPs as essential.  Am. Compl. ¶ 57 ("The patents that Uniloc Luxembourg assigned to Uniloc 2017 also included patents claimed to be standard-essential patents ('SEPs') for cellular standards that originated with Koninklijke Philips Electronics N.V."), ¶ 63 (describing that patents transferred from Panasonic to Inventergy and later to INVT "are claimed to be essential to cellular standards"), ¶ 107 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████), ¶ 394 ("INVT and Uniloc 2017 hold what they claim are SEPs for cellular standards").

---

[2] Defendants cite to an earlier decision in *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2011 WL 4948567, at *4 n.6 (N.D. Cal. Oct. 18, 2011), dismissing Apple's antitrust claims, but they ignore that Apple's Amended Complaint, which also did ***not*** concede that Samsung's patents were standard essential, survived a second motion to dismiss. *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 1672493, at *5 (N.D. Cal. May 14, 2012) ("Apple has pled that '[t]he relevant markets in which to assess the anticompetitive effects of Samsung's conduct . . . are the various markets for technologies that—before the standard was implemented—were competing to perform each of the various functions covered by each of ***Samsung's purported essential patents*** for UMTS (collectively, the relevant 'Input Technologies Markets').'  Apple further identifies each of ***Samsung's Declared-Essential Patents*** in the UMTS standard that form the relevant technology markets for its Section 2 claim.  These allegations define the bounds of the relevant markets." (emphases added) (record citations omitted)).

Moreover, Plaintiffs have now expressly identified specific declared SEPs, *see* Am. Compl. ¶¶ 419-422 (providing detailed information regarding declared SEPs), addressing a critique of the original Complaint in the Court's Order.  Order at 19.

### D.    Plaintiffs Have Adequately Pled Antitrust Injury

The Court has already found that Plaintiffs' theory of antitrust injury is sound:  an injury to Plaintiffs resulting from "elimination of competition" between substitute patents can constitute cognizable antitrust injury in the form of either actual or likely expenditures on royalties or defending litigation.  Order at 20-21.  The Court also found, however, that, Plaintiffs had not alleged with sufficient specificity that Defendants' patent transfers have "actually impacted Plaintiffs" or "will likely impact Plaintiffs in the future" by eliminating competition between substitute patents.  *Id.*  The Amended Complaint cures that deficiency.

Plaintiffs allege in detail that Defendants' unlawful patent transfers aggregated substitute patents under the control of Fortress and the Defendant PAEs, thereby eliminating competition between substitutes in each of the alleged patent markets.  *See* Am. Compl. ¶¶ 31-43 (describing the anticompetitive effects of the aggregation of substitute patents); *see also, e.g.*, *id.* ¶ 9 (describing how Fortress's patent aggregation scheme, rather than promoting the procompetitive benefits of the patent system, "impos[es] a tax on the electronics industry that increases prices, decreases output, and ultimately harms consumers"), ¶¶ 10-11, 44-49, 86.  Further, the Amended Complaint provides additional details linking Apple's and Intel's injuries directly to Defendants' patent aggregation scheme in the specific patent markets alleged.  *See, e.g.*, Am. Compl. ¶¶ 149, 173, 204, 231, 245, 287, 312, 334, 356 (describing how Plaintiffs' refusal to capitulate to supracompetitive royalty demands enabled by challenged patent transfers forced them to defend lawsuits brought by Defendants).  The Amended Complaint alleges that Defendants first (1) aggregate substitute patents in a particular market and then (2) take advantage of the fact that the patent transfers have eliminated alternatives by demanding supracompetitive royalties from Plaintiffs and other parties.  *See, e.g.*, Am. Compl. ¶ 437.  Those demands leave Apple and Intel (and other targets) with a choice—capitulate and pay exorbitant royalties or incur the costs of

litigating.  For example, Plaintiffs explain that Defendants have sued Apple on the very patents they have unlawfully aggregated "*[b]ecause* it has refused to capitulate to exorbitant royalty demands" for those patents.  *E.g.* Am. Compl ¶ 149 (allegations as to the Network-based Voice Messaging Patents Market); *id.* ¶ 231 (parallel allegation as to litigation against Intel in the Local Cache Management Patents Market).  Plaintiffs have thus alleged they have already been injured because of litigation costs incurred in contesting Defendants' exorbitant royalty demands and that they face an immediate threat of paying supracompetitive royalties, as the price to end litigation.

Further, the Amended Complaint details multiple examples of Defendants seeking or obtaining supracompetitive royalties on specific technologies in most of the 13 exemplar patent markets that Plaintiffs allege, including settlements with other licensees.  Am. Compl. ¶¶ 125, 142, 152, 166, 173, 176, 199, 204.  "Harm to consumers in the form of higher prices resulting from competitive restraints has long been held to constitute an actual injury to competition."  *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 504 (9th Cir. 2010).  Indeed, "it is difficult to imagine a more typical example of anti-competitive effect than higher prices."  *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996).  Plaintiffs also allege that they are "purchasers" in the Relevant Patent Markets.  Am. Compl. ¶ 436.  Therefore, the supracompetitive royalties Defendants seek and obtain because of their anticompetitive aggregation scheme demonstrates Plaintiffs' antitrust injury—Plaintiffs are stuck between paying those prices or litigating.  *Id.*  Thus, contrary to Defendants' argument (MTD at 26), Plaintiffs have alleged injuries flowing directly from Defendants' anticompetitive aggregation of substitute patents.

Further, by alleging facts demonstrating that the competition eliminated through the patent transfers has led to supracompetitive royalties and royalty demands, Plaintiffs have alleged much more than is required.  Acquisitions that lessen competition are illegal even if the lessened competition has not resulted in inflated prices.  Potential customers in a market in which competition has been harmed have standing to challenge transactions creating that harm, even before the defendant has sought to extract inflated prices from the plaintiff.  *See, e.g.*, *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775 (9th Cir. 2015) ("Section 7 does not

1  require proof that a merger or other acquisition has caused higher prices in the affected market.

2  All that is necessary is that the merger create an appreciable danger of such consequences in the

3  future." (citing *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986))).

4          In the face of these detailed allegations, Defendants wrongly claim that to allege antitrust

5  injury from being forced to defend against Defendants' patent assertions, Plaintiffs would need to

6  allege that Defendants aggregated "all, most, or even a key subset of substitute patents." MTD at

7  26-27.  They also claim that Plaintiffs have not addressed the Court's finding that the original

8  complaint did not "give any concrete example where Fortress and its PAEs have aggregated

9  patents on a specific technology such that an alleged infringer is essentially deprived of

10  substitutes." *Id.* (quoting Order at 16).  But Plaintiffs have directly addressed this point in the

11  Amended Complaint and pled the type of specific allegations about harm to competition because

12  of aggregation that the Court identified.  Am. Compl. ¶ 280 ("For example, the '907 patent purports

13  to cover a method of granting access privileges to a mobile device based on a 'digital fingerprint'

14  of that device.  Defendants have also asserted that the '616 patent covers a method of granting

15  access privileges to a mobile device based on that device's 'part number' and a configuration

16  associated therewith.  Using digital fingerprints to grant access privileges to a mobile device is a

17  substitute for using a part number, and vice versa.  When the '907 and '616 patents were owned

18  by different entities, a party wishing to use one of these potential substitute technologies would be

19  able to take advantage of competition between the owners of these patents when attempting to

20  secure a license. But because of Defendants' unlawful aggregation of patents, Defendants now

21  control both substitute technologies, making such competition impossible.); *see also* ¶¶ 141, 165,

22  198, 225, 243, 307, 332, 354.   Again, because Plaintiffs are alleging direct evidence of

23  anticompetitive effects from Defendants' aggregation scheme (namely, evidence of

24  supracompetitive royalties and royalty demands), Plaintiffs' allegations that Defendants

25  eliminated competitive constraints in the 13 exemplar patent markets, leading to inflated royalties

26  and reduced licensing output, are sufficient.  15 U.S.C. § 18 (proscribing transactions where the

27  "effect of such acquisition may be to substantially lessen competition, *or* tend to create a

28

monopoly" (emphasis added)); *Am. Express*, 138 S. Ct. at 2284 (the "goal" under Section 1 rule of reason inquiry is to identify restraints with anticompetitive effects that harm consumers).

Defendants again insist that Plaintiffs cannot have suffered antitrust injury because the Amended Complaint does not allege that Plaintiffs have taken a license from Defendants.  MTD at 24.  But as the Court has already recognized (Order at 20), Plaintiffs need not have actually paid inflated royalties to have suffered antitrust injury; it is enough that they have been forced to litigate repeatedly to avoid paying inflated royalties resulting from anticompetitive conduct and that they face an ongoing threat of Plaintiffs' future licensing demands.  *See also Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012) ("[B]ecause Apple's litigation costs stem directly from Samsung's alleged anticompetitive behavior, these litigation costs are a sufficient basis for a potential award of antitrust damages."); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (litigation expenses can be recovered "where the patent litigation is used to further the harm caused under a 'more traditional antitrust theory'"); *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1310 (Fed. Cir. 2016) (upholding an award of treble damages in attorneys' fees as an antitrust injury even though the antitrust scheme was ultimately unsuccessful where "[t]he 'competition-reducing aspect' of 3M's behavior was its attempt at achieving a monopoly by bringing the subject lawsuit").

Similarly, Defendants argue that the Amended Complaint does not explicitly allege that Plaintiffs have an "intention of ever purchasing any license from any Defendant in the future." MTD at 21.  This is wrong.  The Amended Complaint alleges that Plaintiffs have "engaged in licensing negotiations" with Defendants.  *See, e.g.*, Am. Compl. ¶¶ 107, 109 (Apple and Inventergy); *accord id.* ¶ 437 ("Intel and Apple have also each been harmed by the enormous amounts of time their employees have been forced to spend on these matters, including negotiating with Defendants . . . .").  In any event, Plaintiffs' "intentions" are irrelevant.  As the Court has recognized, Plaintiffs can suffer antitrust injury from having to defend against Defendants' serial

attempts to extract inflated royalties, made possible by elimination of competition between substitute patents resulting from the challenged patent transfers. Order at 20.

The cases on which Defendants rely—which involved purely speculative claims of antitrust injury—do not help them. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 15 (1st Cir. 2008); *City of San Jose v. Off. of Comm'r of Baseball*, No. C-13-02787 RMW, 2013 WL 5609346, at *11 (N.D. Cal. Oct. 11, 2013). Unlike here, neither case involved a plaintiff alleging harm based on litigation costs flowing from an antitrust violation. And neither case involved allegations that a plaintiff had a foreseeable possibility of having to pay inflated prices or incur litigation defense costs in the future because of anticompetitive conduct. *See New Motor Vehicles*, 5222 F.3d at 15 (the plaintiffs alleged no "current threat" of injury and threat of future harm was "speculative"); *City of San Jose*, 2013 WL 5609346, at *11 (the plaintiff had not yet suffered any injury and the prospect of future harm was speculative).

Defendants also complain that "Plaintiffs never identify the price that Defendants have been able to obtain" in licensing agreements or settlement agreements relating to the aggregated patents. MTD at 22. But Plaintiffs are not required to allege facts that are confidential and within the Defendants' exclusive control. *See supra* at 21-22. The cases Defendants cite also do not address a situation like this one, where Defendants have access to the information they claim is missing from the Amended Complaint and have taken action to ***prevent*** Plaintiffs from alleging that information (*supra* at 6, 21-22).[3] And Plaintiffs do allege that Defendants' scheme has

---

[3] In *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827 (N.D. Cal. 2015), the plaintiffs were complaining about ***discounts*** offered by the defendant. Thus, the plaintiff's inability to compare defendants' prices to competitive prices was fatal because the discounts were "presumably pro-competitive under the antitrust laws." *Id.* Here, by contrast, Plaintiffs are alleging ***supracompetitive*** pricing resulting from the challenged conduct. And in *Aya Healthcare Servs. v. AMN Healthcare*, No. 17cv205-MMA (MDD), 2017 WL 6059145, at *5 (S.D. Cal. Dec. 6, 2017), the court found that because plaintiffs "are 'in the industry,' and thus are in a position to detect and allege specific facts supporting higher prices," their failure to allege specific price changes was fatal. Here, where the specific prices are the subject of confidential agreements, Plaintiffs have no access to the sort of detail that Defendants claim they must allege. To follow Defendants' argument and hold otherwise would immunize from antitrust scrutiny conduct where some specifics regarding anticompetitive harm are confidential.

---

resulted in large increases in royalty demands, compared to the demands of prior owners before the patents were consolidated under Defendants' control. *See, e.g.*, Am. Compl. ¶ 218 ("That lessening of competition is reflected by the evidence of supracompetitive royalties sought by Defendants. Whereas the prior owners of the '633 patent, the '616 patent, the '033 patent, and the '532 patent never asserted them because of the competitive constraints they faced, VLSI, the Uniloc Defendants, and IXI IP have pursued litigation based on these patents.").[4]

For purposes of a motion to dismiss, Plaintiffs have alleged with sufficient particularity patents for which challenged transactions have inflated royalty rates. The Supreme Court has rejected any "heightened" pleading standard for antitrust claims. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (rejecting the district court's suggestion that courts must act as "gatekeepers" and subject antitrust and complex cases to "heightened scrutiny"). Regardless, even in cases where there is a heightened pleading standard, the standard is relaxed where "plaintiffs cannot be expected to have personal knowledge of the relevant facts." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010). That is the case here, with respect to the details of Defendants' confidential licensing and settlement agreements.

## E.    Plaintiffs Have Adequately Alleged a Section 1 Claim

Defendants argue that the Amended Complaint is insufficiently specific about the types of illegal agreements it alleges and contains no 'evidentiary facts' of an intent to enter illegal agreement to restrain trade. MTD at 29-33. Their arguments are meritless.

---

[4] Defendants' argument that Plaintiffs have not alleged antitrust injury regarding VLSI's acquisition of eight patents from NXP because those patents are not alleged to be substitutes or "aggregated from different sources" (MTD at 23) misses the point. Plaintiffs allege that those patents were aggregated under Fortress's control with patents acquired from other sources, resulting in elimination of competition that existed pre-acquisition and harm to competition. Am. Compl. ¶¶ 211-233, 234-249, 250-251, 260, 281-282, 287-289, 330-336. In addition, VLSI has asserted at least the '014 and '303 patents against Plaintiffs in the VLSI California Action. *Id.* ¶¶ 223, 226, 321, 330-336. Plaintiffs have alleged that each of those patents is encompassed by one of their 13 exemplar patent markets (the Local Cache Management Patents Market for the '014 and the MOSFET Channel Fabrication Patents Market for the '303).

### 1.   Plaintiffs Have Adequately Alleged Separate Bilateral Agreements to Restrain Trade

The Court found that Plaintiffs should clarify the type of conspiracies they were alleging. Order at 27.   The Court also found that insofar as Plaintiffs are alleging several bilateral conspiracies between Fortress, on the one hand, and individual Defendant PAEs, on the other, Plaintiffs should allege more specifics regarding the relevant agreements. *Id.* at 28.   To be clear, Plaintiffs do not allege a single, overarching conspiracy involving all Defendants.   Rather, they allege that Fortress entered separate, bilateral agreements to restrain trade with individual Defendants PAEs.

The Amended Complaint adds new allegations regarding individual agreements between Fortress and Defendant PAEs and clearly pleads that Fortress and each Defendant PAE shared a common illegal objective to eliminate competition that existed pre-patent transfer and thereby enabled Defendants to extract supracompetitive royalties.   For example, Plaintiffs explain:

> [W]hen Defendant PAEs entered into the agreements described below with Fortress and/or its affiliate Fortress Credit, they understood that the transaction would enable Fortress to aggregate substitute and complementary patents to eliminate competition existing when those patents were held by PAEs that were competing independently with one another and not under common Fortress control.   The PAEs received compensation in the form of favorable terms, reflecting the fact that the PAEs were sharing in the supracompetitive royalties Defendants obtain by eliminating competition.   ***Thus, each of the Defendants entered into separate agreements with Fortress with a common objective with Fortress to eliminate competition and reap the rewards from doing so.***

Am. Compl. ¶ 50 (emphasis added); *see also, e.g., id.* ¶ 56 ("In entering the Uniloc-Fortress Revenue Sharing Agreement and Patent License Agreement in 2014, Fortress, Uniloc USA, and Uniloc Luxembourg understood that the agreements would enable aggregation of substitute and complementary patents under Fortress's control, and Uniloc USA and Uniloc Luxembourg understood they benefitted by contributing to Fortress's scheme, including by sharing in supracompetitive royalties that would be extracted by virtue of eliminating competition."), ¶¶ 71, 73, 124-125.

Defendants once again insist that Plaintiffs allege details that they are not required to provide at this stage of the litigation.   They argue that Plaintiffs should identify "who specifically

made an agreement between Fortress and each other Defendant 'or when the illicit agreement took place'" and that the Amended Complaint "contains no 'evidentiary facts' of an unlawful agreement to restrain trade." MTD at 30-31 (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015)). But Plaintiffs *do* allege details regarding the agreements, as cited above, including the agreements, the dates of the agreements, which parties signed the agreements, and the general contents of the agreements. Plaintiffs also allege in detail how the agreements have restrained trade. *See, e.g.*, Am. Compl. ¶¶ 429-432 (explaining how Defendants' aggregation scheme harms competition), ¶¶ 435-438 (same); *see also id.* ¶¶ 425-426 (explaining how transferring SEP portfolios is anticompetitive). Plaintiffs have met their pleading burden.

Moreover, Plaintiffs have clearly alleged facts regarding a series of bilateral agreements between Fortress and Defendant PAEs. In *Staley v. Gilead Sciences, Inc.*, cited by Defendants at 31-32, while the Court determined that the plaintiffs had not alleged sufficient facts for an *overarching* conspiracy, it also determined that the plaintiffs *had* alleged sufficient facts regarding bilateral agreements. 2020 WL 5507555 at *9. The other cases on which Defendants rely, unlike here, involved circumstances where the plaintiffs failed adequately to allege *any* agreement at all. In *United States v. CalPortland Construction*, the plaintiff was unable even to show an agreement between the defendants. No. CV 16-04479 JFW (SSx), 2018 WL 6262877, at *4 (C.D. Cal. Mar. 9, 2018), *aff'd sub nom. Kraft v. CalPortland Constr.*, 801 F. App'x 547 (9th Cir. 2020) ("At most, the Complaint alleges the mere possibility Defendants could have entered into an antitrust conspiracy because they participate in the same markets and therefore had the same motives and opportunities to conspire."). The same is true of the plaintiffs in *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. CV 07-00043 MMM (SSx), 2007 WL 4976364, at *10 (C.D. Cal. Oct. 29, 2007), *aff'd*, 323 F. App'x 571 (9th Cir. 2009) ("Norcent has not alleged any facts supporting its claim that the Group of 10 agreed not to sell video disc players that did not comply with the DVD standard. It has not alleged when the purported agreement was made. Nor has it stated who made the decision, how it was made or what the parameters of the agreement were."). Plaintiffs have clearly adequately alleged Section 1 agreements here. *See, e.g.*, *W. Penn Allegheny Health Sys.,*

*Inc. v. UPMC*, 627 F.3d 85, 99-100 (3d Cir. 2010) (holding the complaint included "non-conclusory allegations of direct evidence of [] an agreement" to exclude defendants' competitors, including identifying the agreements, correspondence, and the intended anticompetitive purpose of the agreements).

Defendants also argue that the Amended Complaint "re-pleads precisely the same allegations of ordinary loan and sales transactions that this Court already found deficient as a matter of law in dismissing the Complaint." MTD at 30. Defendants are wrong. The Court indicated that Plaintiffs need to provide allegations "of an agreement by both Fortress and each PAE to aggregate weak patents." Order at 28. Plaintiffs have done precisely that, as described above. Moreover, that the agreements took the form of what Defendants characterize as otherwise ordinary transactions does not immunize them from the antitrust laws. *See, e.g., F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 149 (2013) ("[P]atent-related settlement agreements can sometimes violate the antitrust laws."); *United States v. Singer Mfg.*, 374 U.S. 174, 194-95 (1963) (holding a cross-license and assignment agreement violated antitrust laws where there was "concerted action to restrain trade, clearly established by the course of dealings"); *Hurricane Shooters, LLC v. Emi Yoshi, Inc.*, No. 8:10-CV-762-T-30AEP, 2010 WL 4983673, at *2 (M.D. Fla. Dec. 2, 2010) (holding that allegations that the patent owner "acquired title to a competitor's patent . . . in order to restrain commerce in the relevant market, by requiring other competitors, like Defendant, to take a license from Plaintiff at an exorbitant royalty" were sufficient to state a Section 1 claim).

### 2. Plaintiffs' Allegations Regarding Defendants' Intent Are Sufficient for a Section 1 Claim

Contrary to Defendants' arguments (MTD at 30-33), Plaintiffs have also alleged much more regarding each Defendants' knowledge regarding their agreements than they were required to allege. A civil Section 1 Plaintiff need not allege that a defendant entered an illegal agreement with specific intent to violate the antitrust laws—i.e., knowledge that the agreement would harm competition. Rather, a plaintiff need only allege that the defendant ***intended to enter the agreement***, and the agreement was anticompetitive. *See United States v. U.S. Gypsum Co.*, 438

U.S. 422, 436 n.13 (1978) (distinguishing between specific intent requirement for criminal Section 1 cases and lack of such requirement for civil Section 1 cases, observing that "a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect"). *Helix Milling Co. v. Terminal Flour Mills Co.*, 523 F.2d 1317, 1321 (9th Cir. 1975), is instructive. There, the plaintiff, which was seeking to re-enter a milling market by buying an existing mill, claimed that the sale of the mill instead to a leading incumbent miller violated Section 1 and sued both the seller of the mill and the incumbent supplier. *Id.* at 1319-20. The Ninth Circuit held that the seller of the mill could be liable for its agreement to sell to the incumbent, without any showing that it had any specific intent to harm competition: "'It is . . . not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the antitrust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements.'" *Id.* at 1320-21 (quoting *United States v. Griffith*, 334 U.S. 100, 105 (1948)); *see also Spectators' Commc'n Network, Inc. v. Colonial Cty. Club*, 253 F.3d 215, 220-221 (5th Cir. 2001) ("Antitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy").

The conspiracy cases on which Defendants rely (MTD at 30) are inapposite. They involved alleged multiparty conspiracies—e.g., a hub-and-spoke conspiracy—where, to show the defendants entered an agreement for purposes of Section 1, the plaintiff was required to prove that each defendant did not simply engage in independent, parallel conduct but agreed to act in concert. *E.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193-95 (9th Cir. 2015) (observing that the plaintiffs disclaimed relying on bilateral vertical agreements and were attempting to allege plausible inference of overarching hub-and-spoke agreement). Even in such a case, it is not necessary to show that the parties shared an anticompetitive intent; it is enough to show that the parties agreed with each other regarding the conduct at issue and did not simply act unilaterally. Thus, the question, unlike here, was whether the defendants had adequately alleged or proven, based on circumstantial evidence, that the defendants entered into ***any*** agreement at all. *E.g.*, *Name Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130

1  (9th Cir. 2015).  Here, Defendants do not argue that Plaintiffs have failed to allege agreements that

2  aggregated control of multiple patents under Fortress's control.

3          Defendants also assert that Plaintiffs have not sufficiently pled that the PAE Defendants

4  knew that Fortress was aggregating patents in an anticompetitive manner, arguing that "there must

5  be factual allegations to plausibly suggest as much." MTD at 30-31 (quoting *Howard Hess Dental*

6  *Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010)).  Defendants' argument is

7  wrong for two reasons.  First, as demonstrated above, Plaintiffs alleged more than required by

8  pleading that the PAE Defendants had such knowledge.  Second, *Howard Hess*, like the other

9  cases cited by Defendants, is inapposite because it concerned whether the defendants had entered

10  into any agreement at all.  In that case, there were no allegations of explicit agreements involving

11  the defendants.  Rather, the plaintiffs "invite[d] [the court] to infer that the Dealers [defendants]

12  were aware of each other's involvement in the conspiracy because, as market participants, they all

13  knew that Dentsply was the dominant player in the artificial tooth market and because they all had

14  an economic incentive to create and maintain a regime in which Dentsply reigned and the Dealers

15  did its bidding." *Howard Hess Dental Labs.*, 602 F.3d at 255.  Here, by contrast, Plaintiffs have

16  alleged ***explicit, written*** bilateral agreements between Fortress and each of the Defendant PAEs to

17  place patents under Fortress's control and are relying on those explicit agreements as a basis for

18  their claims.  No inference of agreement is necessary.

19          Finally, Defendants claim that Plaintiffs' allegations that each PAE understood it was part

20  of Fortress's scheme to aggregate patents somehow conflicts with Plaintiffs' allegation that

21  Fortress intentionally obfuscated the scope of its patent portfolio.  MTD at 32.  This argument, too,

22  both mischaracterizes the Amended Complaint and is wrong as a matter of law.  Plaintiffs do not

23  allege that Fortress obfuscated the scope of its patent portfolio ***from its partner PAEs***; rather,

24  Plaintiffs allege Fortress obfuscated the scope of its patent portfolio ***from the targets of***

25  ***Defendants' patent aggregation scheme***, such as Plaintiffs.  It is sufficient to allege that

26  Defendants entered into agreements that are anticompetitive; it is not necessary to allege that all

27  the parties shared or even understood the anticompetitive purpose or effect of the agreements.

28

### F.      Plaintiffs Have Adequately Alleged a Section 7 Claim

The Court held that "Section 7's concern with asset acquisitions that may substantially lessen competition" could arise "if some of the acquired patents operated as substitutes rather than as complements, and if the patentee had acquired enough of these so as to limit unreasonably the technology choices in the market." Order at 30.  The Amended Complaint adequately alleges such a pattern of illegal acquisitions, providing detailed allegations regarding how Defendants have aggregated substitute patents in 13 exemplar patent markets.  Am. Compl. ¶¶ 127-389.

Defendants claim Plaintiffs have "ple[d] no facts regarding market concentration or Defendants' market share, either before or after the challenged acquisitions."  MTD at 33.  But, as with Section 1, the Court has already recognized that "direct evidence of anticompetitive effects means that a lesser market analysis can be done."  Order at 15.  As demonstrated above, Plaintiffs' allegations of direct evidence that Defendants' patent transfers have harmed competition obviates any need to allege shares or concentration in a relevant market.  *See, e.g.*, *Ind. Fed'n of Dentists*, 476 U.S. at 460-61; *Rebel Oil*, 51 F.3d at 1434; *Bhan*, 929 F.2d at 1413; *Oltz*, 861 F.2d at 1448. The same is true for Section 7 claims.  *See, e.g.*, *FTC v. Lab. Corp. of Am.*, No. CV 10-1873-AG, 2011 WL 3100372, at *14 (C.D. Cal. Mar. 11, 2011) (holding market shares and concentration "do[] not exhaust the possible ways to prove a § 7 violation on the merits" (quoting *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008))); *see also, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) (finding a Section 7 violation based on post-acquisition effects).

The cases on which Defendants rely are inapposite.  They all involve the plaintiffs' attempts to rely on circumstantial evidence of market power for ***unconsummated*** mergers—where there was necessarily no direct evidence of anticompetitive effects to observe.  MTD at 34-35. Because Congress designed Section 7 to stop anticompetitive mergers in their "incipiency," *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589 (1957), most Section 7 challenges are brought before a merger is consummated.  *See* Horizontal Merger Guidelines § 1 ("Most merger analysis is necessarily predictive, requiring an assessment of what will likely happen if a merger

proceeds as compared to what will likely happen if it does not.").  That timing calls on courts to make predictions about the anticompetitive effects of challenged mergers ***before*** there is direct evidence of anticompetitive effects.  *See United States v. Phila. Nat. Bank*, 374 U.S. 321, 362 (1963) (explaining that a Section 7 analysis "requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future").  Here, by contrast, Plaintiffs have pled a Section 7 claim based on acquisitions that have already taken place, and that have already harmed and continue to harm competition.

### G.    Plaintiffs' Claims Are Not Barred by *Noerr-Pennington*

Defendants argue that Plaintiffs' claims are barred by *Noerr-Pennington*.  MTD at 28-29.  The Court, however, already held that "Plaintiffs' theory of liability is consistent with the modified *Hynix* approach" and, therefore, "that *Noerr-Pennington* is not a bar to [Plaintiffs'] antitrust claims."  Order at 26.  The Amended Complaint is likewise not barred by *Noerr-Pennington.*

Defendants' only argument is that *Noerr-Pennington* applies because Plaintiffs have failed to allege an antitrust violation that is independent of Defendants' patent assertions.  MTD at 28-29.  As demonstrated above, however, Plaintiffs have alleged Section 1 and Section 7 violations independent of Defendants' patent assertions.

### H.    Plaintiffs' UCL Claims Should Not Be Stricken or Dismissed

Defendants argue that Plaintiffs' UCL claims are barred by California's anti-SLAPP statute.  MTD at 35-39.  "The analysis of an anti-SLAPP motion proceeds in two steps: First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity.  If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim."  *Barry v. State Bar of Calif.*, 386 P.3d 788, 790 (Cal. 2017) (internal quotation marks omitted).  Defendants' anti-SLAPP motion fails at both steps.

#### 1.    Plaintiffs' Claims Are Not Based on Protected Activity

Defendants' anti-SLAPP argument fails at the first step because Plaintiffs' claims are not based on protected litigation activity.  Plaintiffs' claims arise from Defendants' patent transfer

scheme and the resulting elimination of competition that has enabled Defendants'
supracompetitive royalty demands against Plaintiffs and others. The Court has already recognized
this distinction in holding that *Noerr-Pennington* does not bar Plaintiffs' claims. Order at 26.

### 2.    Plaintiffs Have Otherwise Stated Valid UCL Claims

Defendants' step two anti-SLAPP arguments are similarly unavailing. *First*, Defendants
argue that insofar as Plaintiffs' UCL claim is premised on underlying antitrust claims, it fails
because Plaintiffs have not sufficiently alleged antitrust claims. MTD at 36-37. But as
demonstrated herein, Plaintiffs have alleged valid antitrust claims.

*Second*, Defendants claim that Plaintiffs do not seek a proper remedy under the UCL
because UCL remedies are "generally limited to injunctive relief and restitution," and Plaintiffs
supposedly do not allege a basis for either type of relief. MTD at 37. But Plaintiffs have pled the
need for an injunction to prevent continued harm from Defendants' illegal patent aggregation
scheme. *See* Am. Compl. ¶ 451 (alleging regarding UCL claim that "absent an injunction and
rescission of these transactions, [competition] will continue to be injured"); *see also id.* ¶ 26
(invoking jurisdiction under 15 U.S.C. § 26). Contrary to Defendants' argument, MTD at 37-38,
Plaintiffs seek an appropriate UCL remedy and have made clear the business practices they seek
enjoined: continued illegal patent transfers and patent assertions that seek to exploit Defendants'
illegally obtained market power. *See Zhang v. Super. Ct.*, 304 P.3d 163, 167-68 (Cal. 2013).
Moreover, even if Plaintiffs had not pled an available remedy under the UCL, that would still not
be grounds for dismissal, so long as there is an available UCL remedy if Plaintiffs prevail. *See
Yokohama Rubber Co. v. S. China Tire & Rubber Co.*, No. CV 04-1866-GHK (PLAx), 2004 WL
5569948, at *4 (C.D. Cal. Oct. 19, 2004) (holding that failure to request injunctive relief under
UCL does not necessitate dismissal because injunctive relief was available).

*Third*, Plaintiffs also argue that the UCL claims are barred by the California litigation
privilege because they are "directed at attacking litigation conduct." MTD at 38. But as the Court
already held (Order at 26), Plaintiffs' claims are not premised on litigation, but rather on patent
transfers that Plaintiffs' claim are illegal. *See, e.g.*, Am. Compl. ¶¶ 435-438.

*Fourth*, Defendants wrongly argue that Apple's UCL claim (Count 4) fails because Apple has failed to allege an underlying antitrust violation based on Defendants' evasion of FRAND commitments. MTD at 38-39. Defendants fundamentally misconstrue Apple's claim. A violation of another statute (or the spirit of another statute) gives rise to a UCL violation under the UCL's "unlawful" element. *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1225 (N.D. Cal. 2014) ("The 'unlawful' prong of the UCL prohibits 'anything that can properly be called a business practice and that at the same time is forbidden by law.'"); *Antman v. Uber Techs., Inc.*, No. 3:15-cv-01175-LB, 2015 WL 6123054, *6 (N.D. Cal. Oct. 19, 2015). Here, Apple alleges that four of the Defendants violated Section 5 of the Federal Trade Commission Act ("FTC Act") by seeking to evade FRAND commitments on declared SEPs. Am. Compl. ¶¶ 454-457 & n.104 (citing *In the Matter of Negotiated Data Solutions LLC*, FTC File No. 051-0094, Decision and Order (Jan. 23, 2008). Thus, contrary to Defendants' argument, Apple is not basing Count 4 on an underlying Sherman Act violation, but on a violation of Section 5 of the FTC Act. Thus, even assuming Defendants' evasion of FRAND commitments do not constitute a Sherman Act violation, that would be irrelevant to determining whether Count 4 is pled sufficiently.[5]

Allegations that Defendants attempted to evade FRAND commitments are cognizable under the UCL. *See, e.g.*, *Vizio*, 2010 WL 7762624, at *6 (refusing to dismiss a Section 1 claim, which can form the basis of a UCL violation, where patent transfers were used to evade FRAND commitments). Conduct that violates the FTC Act is actionable as "unlawful" conduct under the

---

[5] For that reason, Defendants' reliance on *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), is misplaced. *See* MTD at 38-39. There, the court was addressing claims under Sections 1 and 2 of the Sherman Act, not Section 5 of the FTC Act or the UCL. *Id*. at 982. The same is true of the other cases on which Defendants rely (MTD at 39). *See Cont'l Auto. Sys., Inc. v. Avanci, LLC*, No. 3:19-CV-02933-M, 2020 WL 5627224, at *14 (N.D. Tex. Sept. 10, 2020) (not reaching merits of UCL claim and dismissing based on lack of subject matter jurisdiction after court dismissed Sherman Act Section 1 and 2 claims); *Vizio*, 2010 WL 7762624, at *6 (addressing only Sherman Act claims and refusing to dismiss a Section 1 claim based on transfers to evade FRAND commitments); *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, No. CV 15-634-SLR-SRF, 2017 WL 750700, at *7 (D. Del. Feb. 27, 2017), report and recommendation adopted, No. CV 15-634-SLR-SRF, 2017 WL 1055958 (D. Del. Mar. 20, 2017) (addressing claims under Sections 1 and 2 of Sherman Act).

1  UCL.  *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002)

2  ("With respect to the *unlawful* prong, '[v]irtually any state, federal or local law can serve as the

3  predicate for an action' under section 17200." (citation omitted)).  Apple has thus properly pled its

4  UCL claim under the unlawful element.  Am. Compl. ¶ 457.

5         Finally, Defendants argue that Apple fails to identify specific license terms that were

6  offered for claimed SEPs or how those rates compare to the purported FRAND rate.  MTD at 39.

7  But, as Defendants' absence of authority on this point underscores, there is no such requirement.

8  Courts have denied motions to dismiss antitrust or unfair competition claims based on failure to

9  offer FRAND terms without requiring details of what constitute FRAND terms.  *See, e.g.*,

10  *Microsoft Mobile Inc. v. InterDigital, Inc.*, 2016 WL 1464545, at *2 (denying a motion to dismiss

11  a Section 2 claim where "the complaint alleges, IDC refused to comply with its FRAND licensing

12  obligations"); *TCL Commc'ns Tech. Holdings Ltd v. Telefonaktenbologet LM Ericsson*, No. SACV

13  14-00341 JVS (ANx), 2014 WL 12588293, at *8 (C.D. Cal. Sept. 30, 2014) (denying a motion to

14  dismiss a UCL claim alleging the patent holder was "charging 'extortionist royalties' for certain

15  patents in violation of its FRAND obligations"); *Apple Inc. v. Samsung Elecs. Co.*, 2012 WL

16  1672493, at *2 (denying a motion to dismiss Apple's antitrust and UCL claims where Apple had

17  alleged that Samsung "only offered licensing terms that are not FRAND").  Apple's allegation of

18  Defendants demanding non-FRAND royalties are sufficient.  *See, e.g.*, Am. Compl. ¶¶ 107-109

19  (███████████████████████████████████████████████████████████).

20         Defendants' alternative argument that Plaintiffs' UCL claims should be dismissed if not

21  stricken fails because, for all the reasons discussed above, Plaintiffs have stated valid UCL claims.

22  **IV.    CONCLUSION**

23         For the reasons set forth above, the Court should deny Defendants' Motion.

24

25

26

27

28

1    DATED: October 27, 2020                    Respectfully submitted,

2
                                                By: */s/ Mark D. Selwyn* _____
3

4                                               Mark D. Selwyn (SBN: 244180)
                                                mark.selwyn@wilmerhale.com
5                                               WILMER CUTLER
                                                  PICKERING HALE AND
6                                                 DORR LLP
                                                2600 El Camino Real, Suite 400
7                                               Palo Alto, CA 94306
                                                Telephone: +1 650 858 6000
8                                               Facsimile:  +1 650 858 6100

9                                               William F. Lee
                                                william.lee@wilmerhale.com
10                                              Joseph J. Mueller
                                                joseph.mueller@wilmerhale.com
11                                              Timothy Syrett
                                                timothy.syrett@wilmerhale.com
12                                              WILMER CUTLER
                                                  PICKERING HALE AND
13                                                DORR LLP
                                                60 State Street
14                                              Boston, MA 02109
                                                Telephone: +1 617 526 6000
15                                              Facsimile:  +1 617 526 5000

16                                              Leon B. Greenfield
                                                leon.greenfield@wilmerhale.com
17                                              Amanda L. Major (admitted *pro hac vice*)
                                                amanda.major@wilmerhale.com
18                                              WILMER CUTLER
                                                  PICKERING HALE AND
19                                                DORR LLP
                                                1875 Pennsylvania Avenue, N.W.
20                                              Washington, DC 20006
                                                Telephone: +1 202 663 6000
21                                              Facsimile:  +1 202 663 6363

22

23                                              *Attorneys for Plaintiffs*
                                                INTEL CORPORATION, APPLE INC.
24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2020, I electronically filed the foregoing documents using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.


DATED: October 27, 2020                */s/ Mark D. Selwyn*
                                        Mark D. Selwyn