IAN SIMMONS (admitted *pro hac vice*)
isimmons@omm.com
MATT SCHOCK (admitted *pro hac vice*)
mschock@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
T: +1-202-383-5300
F: +1-202-383-5414

ANNA T. PLETCHER (Bar #239730)
apletcher@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
T: +1-415-984-8700
F: +1-415-984-8701

*Attorneys for* Amici Curiae
*Fair Standards Alliance*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTEL CORPORATION and APPLE INC., <br><br> Plaintiffs, <br><br> v. <br><br> FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC, <br><br> Defendants. | Case No. 3:19-cv-07651-EMC <br><br> **BRIEF FOR *AMICI CURIAE* FAIR STANDARDS ALLIANCE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND STRIKE PLAINTIFFS' AMENDED COMPLAINT** <br><br> Hon.  Edward M. Chen <br><br> Date:  December 17, 2020 <br> Time:  1:30 p.m. <br> Dept.:  Courtroom 5 |

# TABLE OF CONTENTS

**Page**

I.      STATEMENT OF INTEREST ........................................................................... 1

II.     STANDARD SETTING AND THE ANTITRUST LAWS ............................... 2

III.    THE COMPLAINT STATES A CLAIM UNDER THE ANTITRUST LAWS ............... 6

        A.      The Relevant Markets Are Adequately Pleaded ........................................ 6

        B.      Unlawful Restraints Are Adequately Pleaded ........................................ 9

        C.      Anticompetitive Effects and Substantial Lessening of Competition ..................... 9

                1.      SSO Undertakings ...................................................................... 10

                2.      Undermining SSO Undertakings To Demand Supracompetitive
                        Rates ......................................................................................... 11

        D.      Injury to Plaintiffs ............................................................................. 14

IV.     PATENT HOLDERS' REPRESENTATIONS ARE SUFFICIENT TO SHOW
        ESSENTIALITY ............................................................................................... 14

V.      CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988) ............................................................................. 2, 10

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982) ................................................................................... 3

*Apple, Inc. v. Motorola Mobility, Inc.*,
   886 F. Supp. 2d 1061 (W.D. Wis. 2012) ................................................. 11

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010) ...................................................................... 7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................... 9

*Bhan v. NME Hosps., Inc.*,
   929 F.2d 1404 (9th Cir. 1991) ................................................................... 6

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ................................................................................... 7

*Continental T. V., Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977) ..................................................................................... 6

*FTC v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986) ................................................................................... 6

*FTC v. Qualcomm, Inc.*,
   411 F. Supp. 3d 658 (N.D. Cal. 2019) ...................................................... 4

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   No. CV-00-20905 RMW, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ........ 7

*In re Comp. of Managerial, Prof'l & Tech. Emps. Antitrust Litig.*,
   No. 02-CV-2924(GEB), 2008 WL 3887619 (D.N.J. Aug. 20, 2008) ......... 6

*In re Qualcomm Litig.*,
   2019 WL 7834768 (S.D. Cal. Mar. 20, 2019) ......................................... 11

*Intellectual Ventures I LLC v. Symantec Corp.*,
   No. 13-cv-440, 2014 WL 4773954 (D. Del. Sept. 24, 2014) ..................... 8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ................................................................................... 6

**TABLE OF AUTHORITIES**
(continued)

Page

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    No. 12-cv-7465, 2013 WL 2099227 (S.D.N.Y. May 14, 2013) ................................. 5

*Microsoft Corp. v. Motorola, Inc.*,
    864 F. Supp. 2d 1023 (W.D. Wash. 2012) ................................................................. 4

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
    No. CV 15-723-RGA, 2016 WL 1464545 (D. Del. Apr. 13, 2016) ......................... 15

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) ........................................................................................ 2

*Nayab v. Capital One Bank (USA), N.A.*,
    942 F.3d 480 (9th Cir. 2019) ..................................................................................... 7

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ..................................................................................................... 9

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ..................................................................................... 6

*Research in Motion Ltd. v. Motorola, Inc.*,
    644 F. Supp. 2d 788 (N.D. Tex. 2008) ................................................................... 3, 4

*Staley v. Gilead Scis., Inc.*,
    No. 19-cv-02573, 2020 WL 1032320 (N.D. Cal., Mar. 3, 2020) .............................. 8

*TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*,
    943 F.3d 1360 (Fed. Cir. 2019) ................................................................................. 3

*TCL Commc'ns Tech. Holdings Ltd v. Telefonaktiebolaget LM Ericsson*,
    No. SACV1400341JVSANX, 2014 WL 12588293 (C.D. Cal. Sept. 30, 2014) ..................... 15

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017) ........................................................................... 3

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ................................................................................................... 9

**Statutes**

15 U.S.C. § 18 ................................................................................................................ 6

**TABLE OF AUTHORITIES**
(continued)

Page

**Other Authorities**

A. Douglas Melamed & Carl Shapiro, *How Antitrust Law Can Make FRAND Commitments More Effective*, 127 YALE L. J. 2110 (2018) ................................................... 4, 5

Herbert J. Hovenkamp, *FRAND and Antitrust*, Faculty Scholarship at Penn Law 2093 (2019) ............................................................................................................... 4, 10, 11

Jonathan B. Baker, *Market Definition: An Analytical Overview,* 74 ANTITRUST L.J. 129 (2007) ........................................................................................................................ 7

Michael L. Katz & Howard A. Shelanski, *Mergers and Innovation*, 74 ANTITRUST L.J. 1 (2007) ........................................................................................................................ 7

Robin Stitzing et al., *Over-Declaration of Standard Essential Patents and Determinants of Essentiality* (2018) ....................................................................................... 14

I.      **STATEMENT OF INTEREST**[1]

    *Amicus curiae* Fair Standards Alliance a.s.b.l. ("FSA") respectfully submits this brief in support of Plaintiffs' opposition to Defendants' joint motion to dismiss and to strike Plaintiffs' Amended Complaint ("AC").  FSA is a non-profit association of companies dedicated to promoting a transparent and sustainable standard essential patent ("SEP") licensing framework that fosters creativity, innovation, and job creation while preventing abusive licensing practices that harm industry and consumers.  This case implicates important antitrust issues of significance to all patents, including SEPs.  Although FSA takes no position on the ultimate merits of the case, it believes the AC states a claim under the antitrust laws and raises serious questions of particular importance to the patent licensing and innovation ecosystem that may be meaningfully informed by discovery.  Accordingly, FSA respectfully urges the Court to deny Defendants' motion and permit the case to proceed.

    FSA's constituents have strong interests in procompetitive developments to the patent licensing and innovation ecosystem.  Its members range from small and medium-sized enterprises to multinational corporations throughout a variety of industries, including automotive, telecom, energy, broadcasting, semiconductor, and communications infrastructure.  Annually, FSA members' collective revenue is about $2 trillion, and in aggregate they spend more than $160 billion on research and development and innovation.  FSA members are innovators that hold an extensive portfolio of patents, including SEPs, and develop a broad range of inventive products and services.  FSA members employ more than three million people worldwide.

    SEPs cover important standard-implementing components in many of FSA's members' products.  FSA seeks to ensure that SEPs are licensed on fair, reasonable, and non-discriminatory ("FRAND") terms, and that SEP royalties reflect the value of the underlying inventions, and not the exclusivity associated with inclusion in a technology standard or aggregation with other

---

[1] Plaintiffs' counsel consents to the filing of this brief.  Defendants' counsel requested to review an advance copy of this brief, which we did not agree to provide.  Defendants' counsel thus do not consent to the filing of this brief.  FSA submits this brief on its own accord.  The positions and statements herein do not necessarily reflect the corporate positions of FSA's individual members.

1   intellectual property.  Because FRAND terms generally guarantee licenses to all comers, FSA

2   believes that, although SEP infringement litigation is sometimes inevitable, it can generally be

3   avoided when patent owners comply with their FRAND obligations.  FSA discourages improper

4   uses of SEP exclusivity, including unfair demands for supracompetitive royalties and repetitive,

5   seriatim infringement litigation to coerce compliance with those demands, based on, for example,

6   the costs of litigation or the threat of market exclusion.  A collection of FSA's position papers on

7   these and other issues is available on FSA's website.[2]

8        FSA has provided analysis as amicus curiae in other important SEP-related cases,

9   including *TCL Communication Technology Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*,

10  No. 2018-1363 (Fed. Cir. 2019) and *FTC v. Qualcomm, Inc.*, No. 19-16122 (9th Cir. 2020); FSA

11  previously submitted an amicus brief in this proceeding.

12  **II.     STANDARD SETTING AND THE ANTITRUST LAWS**

13       Private standard setting and the antitrust laws lie at the heart of this case.  These two

14  regimes serve a common procompetitive purpose: to promote the dissemination of technology

15  and resulting outputs with the aim of enhancing product utility and innovation.  Where firms take

16  advantage of standard setting through anticompetitive acts—by, for example, levying

17  unreasonable prices, refusing to license, or tying products together—the antitrust laws provide

18  redress to parties injured by those acts.

19       Courts recognize that "[t]he primary goal of antitrust law is to maximize consumer

20  welfare by promoting competition among firms," and that "[s]tandard setting advances this goal

21  on several levels."  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007)

22  (internal citations omitted).  Indeed, "standards promulgated by standard-setting organizations

23  can be flush with 'significant procompetitive advantages.'"  *N. Am. Soccer League, LLC v. United

24  States Soccer Fed'n, Inc.*, 883 F.3d 32, 43 (2d Cir. 2018) (quoting *Allied Tube & Conduit Corp.

25  v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988)).  These advantages include "enlarging the overall

26  consumer market," "enhancing competition among suppliers," "permit[ting] firms to spread the

27  costs of research and development across a greater number of consumers, resulting in lower per-

28  

---

[2] Fair Standards Alliance, Publications, https://fair-standards.org/publications/.

unit prices," and allowing implementers to "readily make an objective comparison between competing technologies, patent positions, and licensing terms before an industry becomes locked in to a standard." *Broadcom Corp.*, 501 F.3d at 308–09.  Standard setting can also reduce costs by "promot[ing] interoperability of different devices through the use of the same protocol," *TCL Communication Technology Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, 943 F.3d 1360, 1364 (Fed. Cir. 2019), and empowering "substitution and price competition [to] restrain a potential monopolist from profitably raising prices," *United States v. Anthem, Inc*., 236 F. Supp. 3d 171, 198 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (DC Cir. 2017).

In many cases, standard setting's core objective is to strike a bargain that harmonizes with antitrust principles.  For one thing, standard setting generates regimes that cover some patents but not others, creating valuable exclusivity by limiting available substitutes.  For another, standard setting based on FRAND obligations requires the holders of those covered patents—SEPs—to grant licenses to all comers on FRAND terms: they cannot, for example, price discriminate or take unjustified price increases, or arbitrarily refuse to deal.  By combining exclusivity and licensing restrictions, standard setting works to promote a procompetitive balance, ensuring fair royalties for SEP licenses while also "safeguard[ing] against monopoly power," *Broadcom Corp.*, 501 F.3d at 314, making the SEP holder "promise it w[ill] allow competitors to 'pass through the gates' on FRAND terms," *Research in Motion Ltd. v. Motorola, Inc*., 644 F. Supp. 2d 788, 794 (N.D. Tex. 2008) ("*RIM*").  When these functions of standard setting are honored, the results are almost certain to include enhanced output, quality products at competitive prices, and patent holders who are rewarded for their innovations.

Admittedly, standard setting is not without risk.  Despite its potential to generate substantial economic benefits, standard setting "can be rife with opportunities for anticompetitive activity."  *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp*., 456 U.S. 556, 571 (1982).  Because "[a] standard, by definition, eliminates alternative technologies," *Broadcom Corp.*, 501 F.3d at 314, selecting an SEP for a standard confers "gatekeeper" power on the SEP holder.  This power ostensibly allows an SEP holder to "to eliminate all competition, should it so desire." *RIM*, 644 F. Supp. 2d at 794.

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

FRAND commitments also pose competitive risks.  Although FRAND is "intended as a 'bulwark' against the unlawful accumulation of monopoly power that antitrust laws are designed to prevent," *id.* at 795–96, FRAND commitments can be evaded or manipulated to extract supracompetitive prices through anticompetitive schemes, such as tying and exclusive dealing, *see, e.g., FTC v. Qualcomm, Inc.*, 411 F. Supp. 3d 658 (N.D. Cal. 2019), *rev'd in part on other grounds*, 969 F.3d 974 (9th Cir. 2020).  Standard setting organizations ("SSOs") seek to mitigate these risks *before* setting a standard by declining to "incorporate patented technology into a standard unless [they] can obtain a declaration from the patent holder agreeing to either license free of charge or on [F]RAND terms."  *Microsoft Corp. v. Motorola, Inc*., 864 F. Supp. 2d 1023, 1032 (W.D. Wash. 2012).   As two leading scholars observe:

> Put simply:  without some checks, SEP holders could opportunistically engage in patent holdup, taking advantage of the fact that the firms and users adopting the standard become individually and collectively locked in to the standard over time.  Of course, it is precisely this danger of ex post opportunism that motivates market participants and [SSOs] to require participants in the standard-setting process to make FRAND commitments in the first place.

A. Douglas Melamed & Carl Shapiro, *How Antitrust Law Can Make FRAND Commitments More Effective*, 127 YALE L. J. 2110, 2111 (2018) ("Melamed & Shapiro"); *see also* Herbert J. Hovenkamp, *FRAND and Antitrust*, Faculty Scholarship at Penn Law 2093 (2019) ("Hovenkamp"), at 6 ("*Ex ante*, a patent may offer one of many technological paths to a certain goal.  However, *ex post*, after a standard has been adopted and others have developed their technologies in reliance, the range of acceptable alternatives can decrease dramatically.").

As Professor Hovenkamp notes, few mechanisms exist to deter the abuse of exclusivity *after* a standard is decided and implementers coalesce around it.  Put another way, once a standard is set, the only explicit restraint on an SEP holder's anticompetitive conduct is a FRAND commitment: No FRAND, no restraint.  If a patent assertion entity ("PAE") or other enterprise insists on licensing SEPs in ways that ignore or circumvent FRAND—for instance, by "charg[ing] far more than the competitive prices for licenses and the value of the inventive contributions (if any) of the patents," AC ¶ 11—antitrust concerns are likely to arise.

Other PAE actions may set off additional alarms.  Patent aggregation and repetitive litigation, for example, should raise red flags: by deploying broad patent portfolios in voluminous and relentless infringement lawsuits (and ignoring FRAND obligations), PAEs force manufacturers (including FSA members) to fund "the extreme expense of litigation defense" or license the PAEs' patents at inflated rates.  *Id.* ¶ 30.  Plaintiffs here allege that this is no choice at all, particularly where there is potential coordination among PAEs, *id.* ¶ 10, and PAEs may employ shell entities to obscure their identities and assets from litigation adversaries, *id.* ¶ 3.  The web of aggregation, obfuscation, and repetitive litigation by the PAE alleged in the AC, if confirmed, would clearly "impos[e] a tax on the electronics industry that increases prices, decreases output, and ultimately harms consumers," *id.* ¶ 10, and circumvent precisely the procompetitive goals that standard setting and the antitrust laws are designed to protect.  *See Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12-cv-7465, 2013 WL 2099227, at *5 (S.D.N.Y. May 14, 2013) ("[C]onduct that undermines the procompetitive benefits of private standard setting may . . . be deemed anticompetitive under antitrust law." (quotation omitted)), *aff'd*, 753 F.3d 395 (2d Cir. 2014); Melamed & Shapiro at 2112–15.

Faced with the type of conduct alleged in the AC, many of FSA's members, including small and medium-sized enterprises, face a no-win scenario: take the anticompetitive terms PAEs offer or defend against *seriatim* and cascading infringement claims at prohibitive cost.  This alleged conduct is anathema to the policies underlying standard setting and the antitrust laws, and FSA supports efforts to discourage and rebuke it.  Unduly pressuring innovative companies like FSA's members harms not only those companies and their industries, but innovation more broadly.  As companies consider entering industry areas where they may be exposed to aggressive coercion and insurmountable litigation expenses, they may balk, even if they believe they can provide superior technological solutions.  This deterrence inures ultimately to the detriment of consumers that rely on innovation coming to the market.  While FSA takes no position on the ultimate merits of the case, it believes the AC states a claim under the antitrust laws and raises issues that may be meaningfully informed by discovery, and respectfully urges the Court to deny Defendants' motion and permit the case to proceed.

III.   **THE COMPLAINT STATES A CLAIM UNDER THE ANTITRUST LAWS**

Under Section 1 of the Sherman Act, a plaintiff need only plead that a defendant entered into an agreement that unreasonably restrains trade in the relevant market, as determined by the rule of reason.[3]  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 885–86 (2007). Under Section 7 of the Clayton Act, a plaintiff must plead that, "in any line of commerce," a defendant acquired assets "where . . . the effect . . . may be substantially to lessen competition, or . . . tend[s] to create a monopoly." 15 U.S.C. § 18.[4]

The AC pleads with sufficient specificity all of the elements needed to make out antitrust claims: (i) relevant markets; (ii) unlawful restraints, including agreements and asset acquisitions; and (iii) anticompetitive effects, or a substantial lessening of competition.

A.   **The Relevant Markets Are Adequately Pleaded**

Thorough relevant market analysis generally determines the scope of competition and potential market power in an antitrust case.  But as this Court has previously held, "a 'full-blown market analysis' is not necessary where a plaintiff relies on direct evidence of anticompetitive effects, as opposed to indirect evidence of such." Doc. 190 at 12 (*quoting Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991)).  Where, as here, plaintiffs present significant and plausible evidence of actions taken to "extort supracompetitive royalties unrelated to the value (if any)" of the product in question, AC ¶ 48, that evidence "can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects," Doc. 190 at 12 (*quoting FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).  The plaintiffs' market analysis, therefore, need only "show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market."  Doc. 190 at 13 (*quoting Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004)).  It need not show "calculations of elusive market share figures." *In re Comp. of Managerial, Prof'l & Tech. Emps. Antitrust Litig.*, No. 02-CV-2924 (GEB), 2008 WL 3887619, at *7 (D.N.J. Aug. 20, 2008).  Rather, it should be sufficient

---

[3] "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).

[4] Plaintiffs also plead two claims under California's unfair competition law; this brief focuses on the federal claims.

1    for plaintiffs to approximate the "outer boundaries of a product market" by identifying "the

2    product itself and substitutes for it," as foundational antitrust case law suggests.  *See Brown Shoe*

3    *Co. v. United States*, 370 U.S. 294, 325 (1962).

4         These market definition principles are particularly important when considering technology

5    markets affected by standard setting, where patent essentiality and contract obligations (including

6    FRAND commitments) create an overlapping relationship between market ***definition*** and market

7    ***power***.  Both are created somewhat artificially by contours of the standard setting process.  *See*

8    *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at *9 (N.D.

9    Cal. Jan. 5, 2008) ("The purpose of standardization . . . is to pick one technology as a winner, and

10   most likely to confer 100% of the market to that technology.").  Courts and commentators

11   recognize that "creating a 'bright-line' market definition in innovative sectors of the economy is

12   often difficult and can be counterproductive," and that "market definition is least useful when

13   market shares would not be strongly probative of market power or anticompetitive effect, while

14   direct evidence as to market power or anticompetitive effect is available and convincing."  *Id*. at

15   *4 (quoting Michael L. Katz & Howard A. Shelanski, *Mergers and Innovation*, 74 ANTITRUST

16   L.J. 1, 33-34 (2007), & Jonathan B. Baker, *Market Definition: An Analytical Overview,* 74

17   ANTITRUST L.J. 129, 131 (2007)).  To the extent market definition illuminates anticompetitive

18   conduct in markets like those the AC alleges, "bright-line" boundaries and exhaustive specifics

19   are unlikely to have meaningful legal significance.

20        They are also unlikely to be discoverable, at least not without information on who controls

21   the rights to the technology at issue—information that rests solely in the possession of the

22   challenged party.  But they need not be known at the very outset of litigation.  Courts in this

23   circuit and others have held that

24        [e]ven under the more rigid pleading standard of Federal Rule of Civil Procedure
         9, . . . the pleader is not required to allege facts that are peculiarly within the
25       opposing party's knowledge, and allegations based on information and belief may
         suffice, so long as the allegations are accompanied by a statement of facts upon
26       which the belief is founded.

27   *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480 (9th Cir. 2019) (quotations omitted); *see*

28   *also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("The *Twombly* plausibility

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

1  standard, which applies to all civil actions . . . does not prevent a plaintiff from pleading facts

2  alleged upon information and belief where the facts are peculiarly within the possession and

3  control of the defendant") (quotations omitted).  Where a plaintiff's relevant market allegations

4  have limited specificity because defendants have and will not disclose the information needed to

5  fill them out, the plaintiff should not be required to show a market's precise boundaries—

6  particularly where he has alleged harm to competition stemming from the defendant's refusal.  *Cf.*

7  *Intellectual Ventures I LLC v. Symantec Corp.*, No. 13-cv-440-LPS, 2014 WL 4773954, at *3 (D.

8  Del. Sept. 24, 2014) (denying motion to dismiss where relevant market allegations were based in

9  part on tying to "a large and undisclosed number of . . . patents" and holding that a relevant

10  market analysis would "require additional factual information not in the record"); *see also Staley*

11  *v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 616 (N.D. Cal. 2020) (Chen, J.) ("[W]hat the

12  appropriate product market is depends on what anticompetitive harm is being claimed.").

13      Plaintiffs here plead everything they need to assert a relevant market.  They allege direct

14  evidence of anticompetitive effects—inflated patent license royalties—based on purported "patent

15  transfer agreements" that allowed the defendants "to aggregate substitute and complementary

16  patents to eliminate competition existing when those patents were held by PAEs that were

17  competing independently with one another and not under common Fortress control."  AC ¶¶ 49-

18  50.  They also allege the "rough contours" of several relevant patent markets, defined according

19  to "the function that competing technologies contained therein perform," Doc. 190 at 13; AC ¶

20  126, as well as various substitute patents that ostensibly cover similar functions, many of which

21  now sit under the defendants' control.  *See, e.g.*, AC ¶¶ 127-140 (describing the market for

22  patents covering network-based voice messaging and highlighting six patents from that market

23  that defendants control); *id.* ¶¶ 154-164 (describing the market for patents covering remote

24  software updates, wherein defendants allegedly control at least four patents).  They further allege

25  that, by aggregating patents through private agreements and acquisitions, the defendants "obscure

26  those patents from the market and reduce the availability of information" to licensees, making it

27  impossible to determine the exact boundaries of the markets the plaintiffs allege.  *Id.* ¶ 431.  And

28  they allege that the defendants' opaque relationship structure creates obstacles to identifying the

1   full scope of firms involved in the purported patent-aggregation enterprise.  *See id.* ¶ 43 (alleging

2   that "[a]fter aggregation, potential licensees lose the ability to decipher" ownership and

3   availability of substitutes and noting the emergence of "mysterious patterns" connecting Fortress

4   to a web of otherwise unaffiliated NPEs).  These allegations, taken together, present a cogent

5   relevant market theory that crosses the threshold "from conceivable to plausible."  *Bell Atl. Corp.*

6   *v. Twombly*, 550 U.S. 544, 570 (2007).

7           **B.      Unlawful Restraints Are Adequately Pleaded**

8           Agreements and acquisitions that raise prices and reduce output pose serious threats to

9   competition.  Where an agreement or acquisition eliminates direct substitutes or incentives to

10  offer lower prices, it is likely an unlawful restraint on competition.  *See, e.g., United States v. E.I.*

11  *du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956); *NCAA v. Bd. of Regents of Univ. of Okla.*,

12  468 U.S. 85, 112 (1984).

13          Plaintiffs allege potentially anticompetitive acquisitions and agreements by and among the

14  defendants.  *See* AC ¶ 49 (alleging "[t]hat Fortress and its PAEs have repeatedly entered patent

15  transfer agreements with no efficiency rationale and [that] those agreements have resulted in

16  inflated royalties").  FSA believes these alleged agreements and acquisitions, if proven, would

17  pose serious threats to competition and risk compromising FSA members' capacity to assess the

18  availability of essential technologies (and any substitutes) in the market.  They would also inhibit

19  FSA members' ability to reach agreements on FRAND licensing fees to use those technologies.

20  And, as explained below, the alleged agreements and acquisitions would pave the way for a

21  continued exercise of market power through the threat and institution of waves of infringement

22  litigation, forcing a no-win choice between inflated license fees and crushing litigation expenses.

23  Agreements and acquisitions that contemplate these results risk harm to competition and should

24  be subjected to antitrust scrutiny.

25          **C.      Anticompetitive Effects and Substantial Lessening of Competition**

26          Campaigns of repetitive, *seriatim* patent infringement suits pose serious risks to

27  competition by threatening to reduce output, stifle innovation and as the plaintiffs allege here,

28  raise prices.  These litigation campaigns are particularly concerning, where (again), as the

1  plaintiffs allege here, the contents of a PAE'S patent portfolio, coordination among PAEs, and

2  other imperative facts are obscured by shell entities, non-disclosure agreements, litigation funding

3  arrangements, and other cloaking devices.  In the realm of SEPs, these litigious onslaughts

4  undermine the commitments SEP holders make to SSOs to be transparent and fair in licensing

5  their SEPs.  Those commitments are vital to a well-functioning standard setting regime;

6  undercutting them compromises the procompetitive goals that SSOs and industry organizations

7  like FSA seek to promote.  *See supra* § II.  Where that undercutting occurs, supracompetitive

8  licensing rates are likely to follow, and may be used to support allegations of anticompetitive

9  effects stemming from improper use of market power.

10           1.   *SSO Undertakings*

11           SSO commitments (also called "undertakings") are obligations SEP holders make in

12  exchange for inclusion in technology standards.  As the plaintiffs here explain, one of the

13  undertakings SSOs require their members to take on is the timely disclosure of intellectual

14  property rights that a proposed standard purports to cover.  *See* AC ¶ 403 (The European

15  Telecommunications Standards Institute (ETSI) requires its members to use "reasonable

16  endeavours . . . to inform ETSI of ESSENTIAL [intellectual property rights] in a timely fashion,"

17  especially if a member submits "a technical proposal for a STANDARD or TECHNICAL

18  SPECIFICATION").  These disclosures are meant to reveal who controls the property rights that

19  a standard may implicate—a vital threshold concern for an SSO when it is formulating and

20  administering that standard.

21           But disclosure obligations are only part of the standard setting calculus.  Once a standard

22  is adopted, implementers begin to invest in efforts to incorporate it, effectively "locking-in" the

23  technology the standard covers.  *Id.* ¶¶ 412, 414.  Lock-in creates market power:  it increases

24  demand for the standardized essential technology and decreases it for alternative nonessential

25  technologies.  *See Allied Tube*, 486 U.S. at 500.  This is why a second set of undertakings—

26  FRAND commitments—are so important: they mitigate the extent to which an SEP holder can

27  use the market power it draws from standardization to charge supracompetitive prices.  *See supra*

28  § II, AC ¶ 398.  From an antitrust-law perspective, these commitments represent an equitable and

- 10 -

1  procompetitive trade-off: in exchange for market power, an entity must agree to license its

2  standardized technology to all comers on fair terms.  *Cf.* Hovenkamp at 32–33 ("A FRAND

3  obligation indicates that the patentee has made a prior voluntary commitment to share its

4  technology on FRAND terms.  In exchange it expects that others would rely on that commitment,

5  designing their own technology around the expectation that FRAND-encumbered patents would

6  be available to them for a FRAND royalty.").

7       SSO participants generally support the FRAND regime and often agree voluntarily to

8  grant SEP licenses on FRAND terms.  These voluntary agreements help to promote widespread

9  adoption of standardized technologies, which is, after all, the core objective of standardization.

10  AC ¶ 406 (ETSI requires its members to submit "an irrevocable undertaking in writing that it is

11  prepared to grant irrevocable licenses on [FRAND] terms and conditions under [essential

12  intellectual property rights]").  If, for whatever reason, a participant who controls potentially

13  essential technology rights refuses to commit to FRAND terms, SSOs generally try to incorporate

14  "viable alternative technolog[ies]" whose providers are willing to license on FRAND terms.  *See*

15  *id.* ¶ 408 (ETSI obligation to incorporate technologies that will be licensed on FRAND terms).

16      2.   *Undermining SSO Undertakings To Demand Supracompetitive Rates*

17       In order for standard setting and SSO undertakings to promote competition effectively, the

18  undertakings need to be reliable, which means they need to run with the technology they concern.

19  Courts have held (and SSOs have agreed) that an SEP holder's commitments to an SSO carry the

20  force of a contractual obligation.  *In re Qualcomm Litig.*, No. 3:17-cv-108-GPC-MDD, 2019 WL

21  7834768, at *1 (S.D. Cal. Mar. 20, 2019) ("The 'FRAND commitment' is a contractual obligation

22  between the SEP holder and the SSO."); *see also* AC ¶ 401 (ETSI Intellectual Property Rights

23  Policy is of a "contractual nature").[5]  Nevertheless, there are occasions where acquirers of SEPs

24  seek to evade FRAND obligations, or take the position that transferring the SEP nullifies them.

25  

26  [5] Any potential licensee can seek to enforce these obligations as a third-party beneficiary.  *See*
*Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012) ("As a

27  potential user of the standards at issue and a prospective licensee of essential patents, Apple is a
third party beneficiary of the agreements between Motorola and [SSOs]."); *see also* Hovenkamp

28  at 10 ("[T]he courts have had little difficulty concluding that participating members of the SSO
are third-party beneficiaries of FRAND commitments.") (collecting cases).

1   But those theories ignore SSO policies and long standing principles of contract law; FRAND

2   commitments cannot be breached without consequence, and if a FRAND-encumbered SEP is

3   transferred, the FRAND commitment should follow.  *See, e.g.,* ETSI Rule of Procedure 6.1

4   ("FRAND licensing undertakings made pursuant to Clause 6 shall be interpreted as encumbrances

5   that bind all successors-in-interest."); IEEE SA Standards Board Bylaws 6.2(b) (a FRAND

6   commitment "is intended to be binding upon any and all assignees and transferees of any

7   Essential Patent Claim covered by such [commitment]").[6]  Actions attempting to circumvent

8   these obligations are contract breaches.  *See* Hovenkamp at 9 ("A firm's violation of its FRAND

9   commitment is very likely a breach of contract, as several decisions have held.") (collecting

10   cases).  In appropriate circumstances like the SSO regime, a breach of contract can give rise to

11   antitrust liability.  *Id*. at 20-21.

12          According to the AC, this is precisely what the defendants are alleged to have done, and

13   their actions have purportedly generated anticompetitive effects evidenced by supracompetitive

14   (and in many cases, above-FRAND) licensing rates.  *See generally* AC ¶¶ 394–427.  Actions such

15   as these frustrate the entire purpose of standard setting.  As discussed above, the FRAND system

16   depends on robust disclosure of essential property rights.  But the "web of entities" alleged in the

17   AC could blur that disclosure, *e.g*., *id.* ¶ 10, making it difficult to discern who controls which

18   patents (essential or otherwise) and to identify possible substitutes.  Any effort to untangle this

19   web of ownership and negotiate lower licensing fees incurs transaction costs.  *Id.* ¶ 43–45.  And

20   even if the ownership landscape is eventually revealed, it may become apparent that patents once

21   considered substitutes are now owned by the same entity, or an affiliated entity, with no incentive

22   to compete on price.  *Id.* ¶¶ 31–32, 37–40.

23          SEP holders need not explicitly demand inflated royalties above and beyond the actual

24   value of the invention (the "hold-up value").  *Id.* ¶ 47; *see also supra* § II.  Sometimes these

25   demands are not, strictly speaking, for above-FRAND rates.  Instead, they may obscure

26   _____

27   [6] *See also* Fair Standards Alliance, An Introduction (Nov. 12, 2015), https://fair-
    standards.org/wp-content/uploads/2016/08/FSA-POSITION-PAPER-June2016.pdf  (warning that

28   FRAND obligations should transfer with an SEP to "ensure that patent assertion entities are not
    utilized as mere proxies to obscure behaviour that seeks to get around FRAND commitments").

supracompetitive pricing through bundling: that is, SEPs offered at FRAND rates but lumped together with other extraneous or overvalued patents at a total price that is far above market rates. Either way, once locked into essential technology covered by SEPs, implementers are left with no real choice—they must pay or negotiate inflated licensing fees or expend resources needlessly on legal action.  *See* Compl. ¶ 430.  An implementer could also choose to make the product without a license, but in that case, a patent infringement suit is almost sure to follow over the held-up SEP.  Resolving this dispute unnecessarily depletes time and money to resolve an easy question: that the SEP holder was, in fact, subject to a FRAND commitment.

But the harms alleged here go far beyond the risk of fighting a single SEP-infringement suit.  If an SEP owner engaging in hold-up has also aggregated a "stable" of other patents (essential or otherwise), *id.* ¶ 9, it can use these patents offensively to bring wave after wave of additional lawsuits.[7]  *See generally id.* ¶ 38.  In other words, although a disagreement may originate with the licensing fee for Patent A (an SEP), a patent assertion entity (PAE) with a book of other patents can threaten to also bring lawsuits with respect to Patents B–Z (which the PAE claims, notwithstanding the facts, are infringed by the implementer's product design).  Even worse, if that PAE coordinates with other PAEs or a coordinating entity, the number of possibly "infringed" patents skyrockets—as does the number of possible lawsuits.  *See e.g.*, *id.* ¶ 29 ("Fortress describes its investing approach as 'making control-oriented investments in cash flow generating assets.'").  And with little transparency as to which entity owns or controls a given patent, implementers cannot predict which patents may be exercised against them or whether a PAE asserting litigation claims may be in cahoots with another PAE or patent-controlling entity.

No matter which of these avenues of anticompetitive conduct is pursued, SEP licensing costs end up exceeding FRAND rates, undermining innovation and the development and promulgation of next-generation technologies.  The implementer either caves and pays a supracompetitive price, or invests significant legal fees into litigation to clarify its SEP rights.

---

[7] PAEs in possession of SEPs are not constrained by the same threat of retaliation or reputational harm as other SEP holders because PAEs do not supply their own products nor participate in SSOs.  *See* AC ¶ 424.  The same can be true for non-SEP holders.  *Id.* ¶ 49.  Without these constraints, there is nothing to stop an unchecked phalanx of lawsuits, unhindered by the externalities otherwise limiting abuse of the judicial process.

1    With these increased costs, implementers, including FSA members, must shift resources away

2    from procompetitive endeavors—including research and development, higher efficiency

3    technology, and talent retention efforts—that would increase output and innovation.  *Id.* ¶¶ 41-42.

4    These disincentives to act procompetitively are manifestly harmful to the market.  *Id.* ¶ 47.

5           **D.      Injury to Plaintiffs**

6           The AC adequately alleges injury resulting from the conduct described above.  *E.g.*, *id.* ¶

7    437 ("Intel and Apple have spent millions of dollars to date on outside resources (including

8    counsel, experts, and vendors) to defend against Fortress-backed demands and assertions."); *id.*

9    (explaining efforts undertaken to defend against Fortress-backed suits); *see also id.* ¶ 96 ("the

10   Uniloc Defendants have suggested that they are entitled to between $4.3 and $6.8 billion in

11   damages from just seven of its 25 cases against Apple"); *id.* ¶ 104 ("VLSI claims up to $7.1

12   billion in connection with eight patents in the VLSI California Action and multiple billions of

13   dollars in damages in the VLSI Delaware Action.").

14   **IV.     PATENT HOLDERS' REPRESENTATIONS ARE SUFFICIENT TO SHOW
            ESSENTIALITY**

15          As discussed above, one of the ways in which SEP owners can create competitive issues is

16   by leveraging the essentiality of SEPs to extract supracompetitive prices.  *See supra* § II.

17   Importantly, essentiality[8] need not be definitively established in order for this leverage to exist.

18   Rather, it is the patent holder's ***representation*** of essentiality that creates antitrust concerns,

19   because that representation suggests that the relevant patent is encumbered by FRAND

20   obligations, and should be licensed at FRAND rates.  To the extent the plaintiffs' theory of

21   anticompetitive harm is based on the charging of supracompetitive rates (including above-

22   FRAND rates for SEPs), plaintiffs may "simply allege that Defendants ***claim to own SEPs***

23   instead of alleging that Defendants own or control patents that ***actually are SEPs***."  Doc. 190 at

24   18 n.13 (emphasis added).

25          This reasoning comports with that of other courts in this circuit.  For example, in *TCL*

26   _____

27   [8] Evaluating essentiality is often the subject of debate, and in many cases, "the parties d[o] not
     agree on a single methodology to assess essentiality."  Robin Stitzing et al., *Over-Declaration of*

28   *Standard Essential Patents and Determinants of Essentiality* 3 (2018),
     https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2951617.

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

1    *Communications Technology Holdings Ltd v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-

2    00341 JVS (ANx), 2014 WL 12588293 (C.D. Cal. Sept. 30, 2014), the court rejected the

3    argument that a plaintiff's SEP-related allegations must concede the essentiality of the

4    defendant's patents in order to survive a motion to dismiss.  The court noted that the defendant,

5    Ericsson, had "represented that its patents are standard essential to ETSI and as such ha[d]

6    obligated itself to offering FRAND terms for such patents." *TCL*, 2014 WL 12588293, at *4.

7    The court went on to hold that TCL's allegations that Ericsson ***represented*** its ownership of SEPs

8    were "sufficient to establish Ericsson's FRAND obligations at the motion to dismiss stage." *Id*.

9    Finally, the court observed that there was "no reason why TCL cannot put forth the argument that

10   [Ericsson's] patents are not standard essential while reserving the right to pay the FRAND rate

11   should the Court ultimately determine otherwise." *Id*.  In rejecting Ericsson's argument, the court

12   in *TCL* made clear that the anticompetitive risk associated with SEPs begins not with the

13   perceptions of potential licensees, but with the breakdown of the commitments between an SSO

14   and an SEP holder.  *See Microsoft Mobile Inc. v. Interdigital, Inc.*, No. CV 15-723-RGA, 2016

15   WL 1464545, at *1 (D. Del. Apr. 13, 2016) ("in the context of 'a consensus-oriented private

16   standard-setting environment,' 'a patent holder's intentionally false promise to license essential

17   proprietary technology on FRAND terms, . . . coupled with [a standard-setting organization's]

18   reliance on that promise when including the technology in a standard, and . . . the patent holder's

19   subsequent breach of that promise, is actionable anticompetitive conduct.'") (*quoting Broadcom*,

20   501 F.3d at 314).

21   **V.    CONCLUSION**

22          Preventing patent abuse is particularly critical in today's technology economy, as

23   standardized technologies migrate from the telecommunications sector into hundreds of other

24   industries.  FSA members, comprising large and small companies and representing diverse

25   industry verticals, support application of existing antitrust jurisprudence to prevent the types of

26   patent abuses alleged in the AC.  For the reasons set forth above, FSA respectfully requests the

27   Court deny Defendants' motion to dismiss.

28

BRIEF FOR AMICI CURIAE
3:19-CV-07651-EMC

Dated:  October 27, 2020

Respectfully submitted,

By:    */s/ Anna T. Pletcher*

ANNA T. PLETCHER (Bar #239730)
apletcher@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
T: +1-415-984-8700
F: +1-415-984-8701

IAN SIMMONS (admitted *pro hac vice*)
isimmons@omm.com
MATT SCHOCK (admitted *pro hac vice*)
mschock@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
T: +1-202-383-5300
F: +1-202-383-5414

*Attorneys for* Amici Curiae
*Fair Standards Alliance*

- 16 -

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of October, 2020, I caused the foregoing document entitled Brief of Amici Curiae Fair Standards Alliance in Opposition to Defendants' Motion to Dismiss to be filed via the court's CM/ECF system, which shall send notice to the counsel of record for the parties.

Dated:  October 27, 2020                    BY:    */s/ Anna T. Pletcher*
                                                   Anna T. Pletcher (Bar #239730)
                                                   apletcher@omm.com
                                                   O'MELVENY & MYERS LLP
                                                   Two Embarcadero Center
                                                   28th Floor
                                                   San Francisco, CA 94111-3823
                                                   T: +1-415-984-8700
                                                   F: +1-415-984-8701

                                                   Ian Simmons (admitted *pro hac vice*)
                                                   isimmons@omm.com
                                                   Matt Schock (admitted *pro hac vice*)
                                                   mschock@omm.com
                                                   O'MELVENY & MYERS LLP
                                                   1625 Eye Street, NW
                                                   Washington, DC 20006
                                                   T: +1-202-383-5300
                                                   F: +1-202-383-5414

                                                   *Attorneys for* Amici Curiae
                                                   *Fair Standards Alliance*