JENKS IP LAW PLLC
William Jenks (SBN 212,609)
1629 K St NW, Suite 300
Washington DC 20016
Telephone: (202) 412-7964

Attorney for Amici Curiae

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTEL CORPORATION and APPLE INC., <br><br> Plaintiffs, <br><br> v. <br><br> FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., DSS TECHNOLOGY MANAGEMENT, INC., IXI IP, LLC, and SEVEN NETWORKS, LLC <br><br> Defendants. | Case No. 3:19-cv-07651-EMC <br><br> **AMICUS CURIAE BRIEF OF UNIFIED PATENTS, LLC AND CABLELABS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** <br><br> Hon. Edward M. Chen |

**Table of Contents**

I. Interests of Amici Curiae .................................................................................................... 1

II. Amici's Prior Brief ............................................................................................................ 2

III. The Amended Complaint Demonstrates that Weak Patents Dominate Defendants'
    Patent Portfolio ................................................................................................................. 2

   A.   There is a Robust and Growing Marketplace for Patent Litigation Financing and
    Patents ............................................................................................................................ 3

   B.   Defendants' Patents Had Little Appeal to the Market ............................................. 5

IV. The Weakness of Defendants' Patent Portfolios Supports Plaintiffs' Antitrust Claims ............. 6

V. Conclusion ......................................................................................................................... 8

**Table of Authorities**

**Cases**

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................. 3, 6

*Unified Patents Inc. v. Uniloc 2017 LLC*, IPR 2019-01126 (PTAB filed May 28, 2019) ................ 2

*Unified Patents, LLC. v. Uniloc USA, Inc. et al.*, IPR2018-00199 (PTAB May 31, 2019) .............. 2

**Other Authorities**

Burford Capital, Patents & IP, *available at* https://www.burfordcapital.com/how-we-work/expertise/patent-ip/ ............................................................................................................. 4

Burford Capital, Using legal finance to unlock university IP assets, *available at* https://www.burfordcapital.com/insights/insights-container/using-legal-finance-to-unlock-university-ip-assets/ ............................................................................................... 4

ICAP, Patent Valuation Options, *available at* https://icappatentbrokerage.com/valuation-service ............................................................................................................................................. 6

Jonathan Stroud, *Pulling Back the Curtain on Complex Funding of Patent Assertion Entities*, 12.2 Landslide 20 (Nov./Dec. 2019) ("Landslide") ....................................................... 1

Ocean Tomo, Intellectual Property Acquisitions, *available at* https://www.oceantomo.com/services/intellectual-property-acquisitions/ ............................... 5

Steve Brachman, *Marathon Patent restructuring will put Fortress subsidiary in charge of patent monetization*, IP Watchdog .............................................................................................. 7

The Litigation Funding Forum, The Agenda, *available at* https://litigationfundingforum.com/agenda/ (Mar. 26, 2020) ..................................................... 4

Third-Party Litigation Finance Conference, Agenda, *available at* https://www.law.gwu.edu/third-party-litigation-finance-conference (Nov. 2, 2018) ................ 5

U.S. Congressional Research Service, *An Overview of the "Patent Trolls" Debate* (Apr. 16, 2013) ("CRS Report") ......................................................................................................... 1, 2

Unified Patents, *2019 Litigation Annual Report* ............................................................................... 1

USPTO, Data Management Services, *available at* https://www.uspto.gov/patents-maintaining-patent/data-management-services#lpslog ............................................................ 5

**I. Interests of Amici Curiae**

Unified Patents, LLC is a membership organization dedicated to deterring patent assertion entities, or PAEs, from extracting nuisance settlements from operating companies based on patents that are likely invalid before the district courts and unpatentable before the U.S. Patent and Trademark Office ("PTO"). Unified's more than 3,000 members are Fortune 500 companies, start-ups, automakers, industry groups, cable companies, banks, open-source developers, manufacturers, and others dedicated to reducing the drain on the U.S. economy of now-routine baseless litigations asserting infringement of patents of dubious validity.

Unified studies the ever-evolving business models, financial backings, and practices of PAEs. *See, e.g.*, Jonathan Stroud, *Pulling Back the Curtain on Complex Funding of Patent Assertion Entities*, 12.2 Landslide 20 (Nov./Dec. 2019) ("Landslide") *available at* https://www.americanbar.org/groups/intellectual_property_law/publications/landslide/2019-20/november-december/. Unified monitors ownership data, secondary-market patent sales, demand letters, post-grant procedures, and patent litigation to track PAE activity. *See, e.g.*, Unified Patents, *2019 Litigation Annual Report available at* https://portal.unifiedpatents.com/litigation/annual-report. To better understand PAEs, Unified prepares annual patent litigation reports. *See* Unified Patents, *2019 Litigation Annual Report available at* https://portal.unifiedpatents.com/litigation/annual-report ("2019 Litigation Report"). The reports compile district court patent suits by party and distinguish between practicing companies, PAEs, and traditional plaintiffs—such as universities, small companies, and individual inventors—that patent inventions but do not market products. *Id.*; s*ee also* U.S. Congressional Research Service, *An Overview of the "Patent Trolls" Debate* 1, 4 (Apr. 16, 2013) ("CRS Report").

Unified also files post-grant administrative challenges to PAE patents it believes are unpatentable or invalid. Thus, Unified is a deterrence entity that seeks to deter the assertion of poor-quality patents. Unified acts independent of its members, including Apple, or any other company. *See, e.g.*, *Unified Patents, LLC. v. Uniloc USA, Inc. et al.*, IPR2018-00199 Paper No.

33, 10 (PTABMay 31, 2019) (collecting PTAB decisions). In 2019, Unified was the fifth most frequent petitioner before the PTO's Patent Trial and Appeal Board ("PTAB"), and it was by far the leading third-party filer. As part of this effort, Unified is and has been adverse to Defendant Uniloc. *See, e.g., Unified Patents Inc. v. Uniloc 2017 LLC*, IPR 2019-01126 (PTAB May 28, 2019). Unified has similarly been adverse to (1) Inventergy LBS, LLC, an entity apparently related to Defendant Inventergy Global, Inc., (2) entities controlled by Marathon, whose patents are now controlled by Defendants, and (3) Divx LLC, a Fortress affiliate. It is fair to say that Unified has been adverse to Fortress, given its control of the Uniloc Defendants and other entities. *See* Amended Complaint, Dkt. No. 192 ¶¶ 51-57 ("AC").

CableLabs is a non-profit non-stock company qualified under the National Cooperative Research and Production Act. CableLabs has over 60 member companies worldwide, including members who represent approximately 85% of U.S. cable subscribers. The cable industry supports over 2.9 million jobs and contributes $421 billion to the U.S. economy.

CableLabs' members have faced numerous PAE suits. They understand PAE litigation, the evolving PAE business model, and the uncertainty caused by the opaque use of third-party funds to establish and invigorate PAE shell companies.

**II. Amici's Prior Brief**

Unified and CableLabs, with others, filed a brief earlier in the proceedings that demonstrated how PAEs tax innovation and harm competition, discussed the PAE mass-aggregation business model, and explained how Defendants harmed competition through mass aggregation and serial nuisance suits. *See* Amicus Curiae Brief of Unified Patents et al., Dkt. No. 145-1; *see also* CRS Report at 1.

Amici do not propose to repeat prior arguments. Instead, this brief focuses on the objective weakness of the patents in Defendants' massive portfolio.

**III. The Amended Complaint Demonstrates that Weak Patents Dominate Defendants' Patent Portfolio**

The Amended Complaint demonstrates that weak patents with little intrinsic value dominate Defendants' patent portfolios. First, it recites facts showing that Fortress acquired

2

Amicus Brief of Unified Patents Supporting Pls' Opp. to Mot. to Dismiss (3:19-cv-07651-EMC)

control of most of its patents through needed loan-leads-to-acquisition deals that no holder of reasonably strong patents would accept. Implying that financing on better terms was unavailable. Second, it recites facts showing that at least one Defendant PAE's patents were exposed to the patent marketplace and received little interest.

Fortress argues that the Amended Complaint contains only "bare allegations that Defendants' patents are 'weak' and 'meritless.'" Def. Mot. To Dismiss at 25, Dkt. No 203 ("Motion"). But Plaintiffs' allegations contain sufficient facts to establish the weakness of the patent portfolios and support the inference that Defendants entered into their agreements with the idea of exploiting the benefits of mass aggregation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.") (internal citations removed).

Fortress thus is incorrect. The allegations are sufficient given the robust market for patents and the draconian terms—apparently the best available—that the other PAEs accepted before forfeiting control over their portfolios.

### A. There is a Robust and Growing Marketplace for Patent Litigation Financing and Patents

Patent litigation costs money. When a patent holder sees an opportunity to assert its patents, a robust marketplace stands ready to finance the lawsuit. That is, if, and only if, the invention claimed in the patent has an intrinsic value that justifies the risks of litigation.

Patent financiers typically give patent holders a good deal. After vigorous vetting of the patents and potential assertions, the typical legal finance company bankrolls the patent suit and shares in the upside while insulating the patent holder from the potential downsides. If litigation succeeds, the finance company shares in the proceeds with the patent owner. If the patent holder loses its suit, the finance company loses the lawyers' fees and associated litigation costs. Such financing is typically "non-recourse." Regardless of the outcome, the patent holder keeps its patent assets.

For example, Burford Capital advertises that its "finance is provided without recourse to

3
Amicus Brief of Unified Patents Supporting Pls' Opp. to Mot. to Dismiss (3:19-cv-07651-EMC)

the underlying assets." *See* Burford Capital, Using legal finance to unlock university IP assets, *available at* https://www.burfordcapital.com/insights/insights-container/using-legal-finance-to-unlock-university-ip-assets/; s*ee also, e.g.*, Omni Bridgeway, Litigation Funding *available at* https://omnibridgeway.com/litigation-funding ("Our litigation funding is non-recourse – if you lose your case, you owe us nothing.")

For meritorious assertions, Burford will:

> Fund fees and expenses for litigation
> Provide non-recourse financing for portfolios of matters
> Equip firm to build IP practice without increasing risk
> Shift and cost risk from client or firm to Burford

*See* Burford Capital, Patents & IP, *available at* https://www.burfordcapital.com/how-we-work/expertise/patent-ip/.

Burford, of course, is not the only financier interested in patent assertion. Omni Bridgeway (formerly Bentham IMF), Pravati Capital, and Woodsford Litigation Funding, among others, "invest" in patent litigation. Magnetar Capital, Soryn IP Group, Longford Capital, and Parabellum Capital are but a few other examples; there is a robust and growing market for both patent litigation funding and general litigation funding. *See generally* The Litigation Funding Forum, The Agenda, *available at* https://litigationfundingforum.com/agenda/ (Mar. 26, 2020); *see also* Third-Party Litigation Finance Conference, Agenda, *available at* https://www.law.gwu.edu/third-party-litigation-finance-conference (Nov. 2, 2018).

Patent litigation financiers can provide such generous terms because they vet intellectual property matters thoroughly. *See, e.g.*, Burford, Patents & IP; *see also* Omni Bridgeway, Litigation Funding, Intellectual Property, *available at* https://omnibridgeway.com/litigation-funding/litigation-financing/intellectual-property. When a patent fails the vetting, it is typically because an infringement analysis or validity analysis demonstrates that the patent's value is not worth the expense of litigation, the patent would not withstand a validity challenge, or both. *Id*. In other words, the typical patent litigation financier will not back a weak patent.

There is another market for patent holders that prefer to sell their patents for others to assert. The U.S. Patent Office provides one simple forum. It allows patent owners to list their

4
Amicus Brief of Unified Patents Supporting Pls' Opp. to Mot. to Dismiss (3:19-cv-07651-EMC)

patents for sale in the agency's Official Gazette. *See* USPTO, Data Management Services, *available at* https://www.uspto.gov/patents-maintaining-patent/data-management-services#lpslog. But far more sophisticated markets are found in the private sector. Ocean Tomo, ICAP Patent Brokerage, IP Trader, IAM Market are but a few of the brokerages and platforms whereby patents are bought and sold. The seller typically walks away with cash, and the new owner assumes title to the patents and controls assertions, though various hybrid agreements exist. These markets allow for—and sometimes facilitate—full vetting of patents by potential purchasers for value. *See, e.g.*, Ocean Tomo, Intellectual Property Acquisitions, *available at* https://www.oceantomo.com/services/intellectual-property-acquisitions/; *see also* ICAP, Patent Valuation Options, *available at* https://icappatentbrokerage.com/valuation-service.

### B. Defendants' Patents Had Little Appeal to the Market

Fortress works another way. As the Amended Complaint explains, Fortress lends money to other struggling PAEs and insists on a security interest in the patents and a hefty portion of any litigation proceeds to pay back the loan. If the planned assertions fall short, Fortress takes possession or control of the patents. *See* AC ¶ 79 ("As with Fortres's other loan deals, Crossroads risked losing its interests in the transferred patents" if it missed a loan payment.); *see also* ¶¶ 51-57 (Uniloc); ¶¶ 62-71 (Inventergy). "Fortress's model is to condition its investments in PAEs on terms so severe that the PAEs have no choice but to make aggressive and reckless patent assertions." AC ¶ 29; *see also* ¶ 69 (twenty percent interest among other terms); ¶¶ 51, 66 (strict default provisions).

Why would a patent holder accept such terms from Fortress when a robust market exists for patent litigation financing? Simple, the market does not want their patents, and they have few other options, if any. The Court may infer that the patents and portfolios in question cannot meet the criteria—including infringement and validity criteria—of the more discriminating financiers. The Defendant PAEs that lost control of their portfolios to Fortress were run by regular operators in the patents space. The likeliest inference is that those PAEs shopped around before entering into their deals with Fortress. They may have attempted to arrange conventional financing and

1  failed.  Likely, the objective criteria of other litigation finance operations led them to decline to
2  support these patent portfolios.  This failure—indicated by acceptance of Fortress's harsh
3  terms—supports the contention that the portfolios contain only weak patents of nuisance suit
4  value.  To be sure, it is possible that the Defendant PAEs did not seek litigation financiers other
5  than Fortress.  In that case, it is reasonable to infer that they realized their patents could not
6  survive the scrutiny required to receive non-recourse backing and that they had to accept
7  Fortress's terms.  This likewise supports Plaintiff's contention.

8  This inference is not limited to the patents provided by Fortress's codefendants.  As
9  explained earlier, Marathon Patent Group signed a similar series of agreements with Defendant
10  Fortress, including a "Fortress Purchase Agreement" and "Fortress Notes," which provided an
11  influx of cash, with Marathon's patents as collateral in case of default.  *See* Amicus Curiae brief
12  of Unified et al., Dkt. No. 145-1 at 8-9 (citing multiple annual reports of the Marathon Patent
13  Group Inc.); *see also* Steve Brachman, *Marathon Patent restructuring will put Fortress*
14  *subsidiary in charge of patent monetization*, IP Watchdog (Aug. 15, 2017) *available at*
15  https://www.ipwatchdog.com/2017/08/15/marathon-patent-restructuring-fortress-subsidiary-
16  patent-monetization/id=86737/.

17  Similarly, the Amended Complaint shows that at least one company, Seven Networks,
18  tested the patent-purchasing market for its patents but presumably could not find better terms.
19  AC ¶ 76.  Fortress gained control of Seven Networks only "after Seven Networks unsuccessfully
20  attempted to monetize its patent portfolio by offering its patents as well as its entire company for
21  evaluation and sale to a number of entities."  *Id*.  Seven Networks failure to find a better deal
22  than the one offered by Fortress supports Plaintiff's argument regarding the weakness of its
23  patent portfolio.

24  **IV.  The Weakness of Defendants' Patent Portfolios Supports Plaintiffs' Antitrust Claims**

25  Under *Twombly*, a complaint must contain "enough factual matter (taken as true) to
26  suggest that an agreement was made."  550 U.S. at 556.  Proof of an illegal agreement is not
27  required—that may await discovery—the court looks only for "plausible grounds to infer an

28

agreement." *Id.*

Here, the Amended Complaint demonstrates the weakness of the patents. If the patents were weak, why did Fortress offer better compensation than the market to acquire them? The Court may infer that it is because Fortress understood—as did the Defendant PAEs—that it could mass-aggregate substitute and complementary patents under common control and thus license them at supracompetitive rates. AC ¶ 50. Together they could create an expansive "patent thicket," whose value was derived from the threat of endless litigation rather than the intrinsic value of the inventions claimed in the patents.

The Court understands Plaintiffs' argument that weak patents may give rise to market power when mass aggregation leads to the ability to extract supracompetitive prices. *See* Order Granting Defendants' Motion to Dismiss with Leave to Amend, Dkt. #190 at 17 n. 12; *see also* AC ¶ 38; Amicus Brief of The R Street Initiative et al., Dkt. No. 133-1 at 10-12. Plaintiffs' showing that Defendants' portfolios consist of weak patents bolsters that argument.

The weakness of the patent portfolios also supports Plaintiffs' argument that each Defendant PAE "understood that the transactions would enable Fortress to aggregate substitute and complementary patents to eliminate competition existing when those patents were held by PAEs that were competing independently with one another." AC ¶ 50. Presumably, the most favorable terms they could get for their patents were from Fortress—else they would have accessed better terms for themselves from the marketplace. Each should have understood that they contributed to a mass aggregation scheme designed to spin the straw of weak patents into the gold of endless litigation. *See* AC ¶ 56, 71, 73.

Defendants' premise to the contrary—that weak patents can never convey market power—is incorrect given the mass-aggregation business model. *See* Motion at 19; *see also* Unified Amicus I at 7-8; R Street Institute Amicus I at 10-12. An individual patent's weakness is of no concern when a near-infinite supply of patents is available to sue productive companies that do the work of innovating and bringing those innovations to the consumer. In some cases, the weak patents will be invalid because they broadly claim nearly everything, including the prior

7
Amicus Brief of Unified Patents Supporting Pls' Opp. to Mot. to Dismiss (3:19-cv-07651-EMC)

art. In some cases, the weak patents will be narrow and easily avoided or designed around. But for every patent that fails, Fortress has another dozen to assert in a new suit against the same company addressing the same technology or product. *See, e.g.*, AC ¶ 83 (25 Uniloc suits against Apple); ¶ 87 (35 Uniloc suits against Google).

## V. Conclusion

The Amended Complaint demonstrates that the Court should examine Defendants' mass-aggregation and assertion scheme under the Sherman and Clayton Acts. In particular, it shows that Defendants' portfolio consists of patents not worth asserting absent their mass-aggregation strategy. The Court should deny the pending Motion to Dismiss.

Respectfully submitted,

Nov. 3, 2020

/s/   William Jenks
William Jenks (SBN 212,609)
JENKS IP LAW PLLC
1629 K St NW, Suite 300
Washington DC 20016
Telephone: (202) 412-7964

Attorney for Amici Curiae