1   IRELL & MANELLA LLP
    Morgan Chu (SBN 70446)
2   Benjamin W. Hattenbach (SBN 186455)
    Michael D. Harbour (SBN 298185)
3   1800 Avenue of the Stars, Suite 900
    Los Angeles, California 90067-4276
4   Telephone:   (310) 277-1010
    Facsimile:    (310) 203-7199
5   Email:  mchu@irell.com
    Email:  bhattenbach@irell.com
6   Email:  mharbour@irell.com

7   A. Matthew Ashley (SBN 198235)
    Olivia L. Weber (SBN 319918)
8   840 Newport Center Drive, Suite 400
    Newport Beach, California 92660-6324
9   Telephone:   (949) 760-0991
    Facsimile:    (949) 760-5200
10  Email:  mashley@irell.com
    Email:  oweber@irell.com

11

    *Counsel for Defendants*
12  FORTRESS INVESTMENT GROUP LLC,
    FORTRESS CREDIT CO. LLC,
13  VLSI TECHNOLOGY LLC

14  Additional counsel listed on signature page

15

16                  **UNITED STATES DISTRICT COURT**

17                 **NORTHERN DISTRICT OF CALIFORNIA**

18  INTEL CORPORATION and APPLE INC.,        Case No. 3:19-cv-07651-EMC

19              Plaintiffs,

20        v.                                  **DEFENDANTS' REPLY IN SUPPORT OF THEIR JOINT MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' AMENDED COMPLAINT**

21  FORTRESS INVESTMENT GROUP LLC,
    FORTRESS CREDIT CO. LLC, UNILOC
22  2017 LLC, UNILOC USA, INC., UNILOC       Hon. Edward M. Chen
    LUXEMBOURG S.A.R.L., VLSI
23  TECHNOLOGY LLC, INVT SPE LLC,            Date:   December 17, 2020
    INVENTERGY GLOBAL, INC., IXI IP, LLC,    Time:   1:30 p.m.
24  and SEVEN NETWORKS, LLC,                 Dept.:  Courtroom 5

25              Defendants.

26

27

28

10891464

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION .................................................................................................. 1

II.    THE AC DOES NOT ALLEGE A RELEVANT MARKET OR MARKET POWER ................................................................................................................ 4

     A.    Plaintiffs Have Not Alleged Facts Showing Anticompetitive Effects ................... 4

     B.    Plaintiffs' Proffered Excuses For Failing To Plead Facts Are Unavailing ...................................................................................................... 7

     C.    Plaintiffs' Market Allegations Fail Even Under A "Direct Evidence" Theory ......................................................................................................... 9

          1.    The AC Fails To Define The "Rough Contours" Of A Relevant Market ................................................................................... 9

          2.    The AC Fails To Allege Facts Showing A "Substantial" Market Share ................................................................................... 12

     D.    Apple's Input Technologies Markets Are Still Facially Deficient ....................... 13

III.   THE AC DOES NOT SUFFICIENTLY PLEAD ANTITRUST INJURY ...................... 13

     A.    Plaintiffs' Litigation Costs Are Not Antitrust Injury ........................................ 14

     B.    The Alleged Risk Of Supracompetitive Royalties Is Not Antitrust Injury ........................................................................................................ 16

IV.   THE AC FAILS TO ALLEGE EVIDENTIARY FACTS OF A CONSPIRACY ............................................................................................... 17

V.    THE AC FAILS TO ALLEGE A SECTION 7 CLAIM ............................................ 20

VI.   PLAINTIFFS' CLAIMS ARE BARRED UNDER *NOERR-PENNINGTON* ................. 22

VII.  ANTI-SLAPP LAW COMPELS THE STRIKING OF THE UCL CLAIMS ................ 22

VIII. CONCLUSION .............................................................................................. 24

10891464

DEFENDANTS' REPLY IN SUPPORT OF THEIR JOINT
MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' AC
Case No. 3:19-cv-07651-EMC

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*49er Chevrolet, Inc. v. Gen. Motors Corp.*,

5
    803 F.2d 1463 (9th Cir. 1986) .......................................................................................18

6

*Analogix Semiconductor, Inc. v. Silicon Image, Inc.*,
    No. C 08-2917 JF PVT, 2008 WL 8096149 (N.D. Cal. Oct. 28, 2008).....................................9

7

8

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999).............................................................................................6

9

*BE & K Const. Co. v. NLRB*,

10
    536 U.S. 516 (2002) ........................................................................................................23

11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... *passim*

12

*Bio-Rad Labs. v. 10X Genomics, Inc.*,

13
    2020 WL 5100291 (D. Mass. Aug. 31, 2020)..................................................................10

14

*Brown Shoe Co. v. United States*,

15
    370 U.S. 294 (1962) ................................................................................................21, 22

16

*Brullotte v. Thys Co.*,
    379 U.S. 29 (1964) .........................................................................................................16

17

*Carefusion Corp. v. Medtronic, Inc.*,

18
    No. 10-CV-01111-LHK, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ..................................15

19

*Conley v. Gibson*,
    355 U.S. 41 (1957) .........................................................................................................11

20

21

*DeHoog v. Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018)...........................................................................................21

22

*Eastman v. Quest Diagnostics Inc.*,

23
    108 F. Supp. 3d 827 (N.D. Cal. 2015) ...............................................................................5

24

*Edstrom v. Anheuser-Busch InBev SA/NV*,
    C 13-1309 MMC, 2013 WL 5124149 (N.D. Cal. Sept. 13, 2013), *aff'd*, 647

25
    Fed. Appx. 733 (9th Cir. 2016) .................................................................................19, 21

26

*Equilon Enterps. v. Consumer Cause, Inc.*,

27
    29 Cal. 4th 53 (2002)......................................................................................................23

28

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020).................................................................................... *passim*

*Flower v. Wachovia Mortg. FSB*,
    No. C 09-343 JF HRL, 2009 WL 975811 (N.D. Cal. Apr. 10, 2009)........................23

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ................................................................................................20

*FTC v. Lab. Corp. of Am*,
    2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) .........................................................21

*Golden Gate Pharm. Services, Inc. v. Pfizer, Inc.*,
    C-09-3854 MMC, 2009 WL 4723739 (N.D. Cal. Dec. 2, 2009) ..............................22

*Helix Milling Co. v. Terminal Flour Mills Co.*,
    523 F.2d 1317 (9th Cir. 1975)................................................................................19

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    17-CV-03301-EMC, 2020 WL 5408210 (N.D. Cal. Sept. 9, 2020) ...........................9

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    2008 WL 73689 (N.D. Cal. Jan. 5, 2008) .........................................................12, 22

*International Norcent Tech. v. Koninklijke Philips Elect.*,
    2007 WL 4976364 (C.D. Cal. Oct. 29, 2007), *aff'd*, 323 Fed. Appx. 571 (9th
    Cir. 2009) ...............................................................................................................19

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (2008) ..................................................................................17, 18, 19

*Lazo v. Bank of Am.*,
    No. C 12-00762 LB, 2012 WL 1831577 (N.D. Cal. May 18, 2012) ........................24

*In re Loestrin*,
    261 F. Supp. 3d 307, 328 (D.R.I. 2017)....................................................................7

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
    18-CV-02054-MMC, 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019), *aff'd*, 811
    Fed. Appx. 422 (9th Cir. 2020)...............................................................................22

*Mujica v. AirScan Inc.*,
    771 F.3d 580 (9th Cir. 2014)....................................................................................8

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015).................................................................................17

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993).........................................................................................8

*New Albany Tractor, Inc. v. Louisville Tractor, Inc.*,
   650 F.3d 1046 (6th Cir. 2011)...................................................................................................8

*Noe v. Fed. Deposit Ins. Corp. for Washington Mut. Bank, F.A.*,
   No. CV087140GHKFMOX, 2010 WL 11549438 (C.D. Cal. Jan. 15, 2010)...........................8

*NYNEX v. Discon, Inc.*,
   525 U.S. 128 (1998) ................................................................................................................16

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ...........................................................................................................21

*Optis Wireless v. Apple*,
   2:19-CV-66-JRG (E.D. Tex. Aug. 3, 2020), Dkt. 490 ...........................................................13

*PNY Techs., Inc. v. SanDisk Corp.*,
   No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ..................................12

*PNY Techs. v. SanDisk Corp.*,
   No. C-11-04689 YGR, 2012 WL 1380271 (N.D. Cal. Apr. 20, 2012)......................................4

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004)..........................................................................................4, 9, 12

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ..................................................................................................17

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013)..............................................................................................6, 11

*Staley v. Gilead*,
   No. 19-CV-02573-EMC, 2020 WL 5507555 (N.D. Cal. July 29, 2020)................................11

*Staley v. Gilead Scis., Inc.*,
   446 F. Supp. 3d 578 (N.D. Cal. 2020) ...................................................................................19

*Stewart v. Gogo, Inc.*,
   No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013)...................................4, 5

*U.S. v. LSL Biotechs.*,
   379 F.3d 672, 699 (9th Cir. 2004).........................................................................................10

*U.S. v. Singer Mfg.*,
   374 U.S. 174 (1963) ..............................................................................................................20

*United States v. E. I. du Pont de Nemours & Co.*,
   353 U.S. 586 (1957).........................................................................................................21, 22

*Vizio, Inc. v. Funai*,
   2010 WL 7762624 (C.D. Cal. Feb. 3, 2010) ...........................................................................7

*Wi-LAN Inc. v. LG Elecs., Inc.*,
  382 F. Supp. 3d 1012 (S.D. Cal. 2019) .......................................................................13

*Wilson v. Cable News Network, Inc.*,
  7 Cal. 5th 871, 892 (2019).........................................................................................22

*World Wide Rush, LLC v. City of L.A.*,
  606 F.3d 676 (9th Cir. 2010)......................................................................................24

*Yokohama Rubber Co. v. S. China Tire & Rubber Co.*,
  2004 WL 5569948 (C.D. Cal. Oct. 19, 2004) ...........................................................23

**Statutes**

Cal. Civ. Proc. Code § 425.16(c)(1)...............................................................................24

**Rules**

Fed. R. Civ. P. 9(b)..........................................................................................................8

1  **I.     INTRODUCTION**

2       The Opposition fails to address the key flaws in the Amended Complaint ("AC") that

3  Defendants' motion to dismiss ("Motion") exposed.  These are the same fatal flaws this Court

4  found in its Order dismissing the Complaint and that the AC failed to fix.  Rather than

5  meaningfully confront those flaws, the Opposition largely just parrots back assertions from the

6  AC.  But those inadequate assertions, no matter how many times they are repeated and how

7  liberally they are construed, cannot cure the AC's own fundamental deficiencies.  Plaintiffs'

8  approach underscores not only their failure to state a claim, but their inability to do so.  This Court

9  should, accordingly, grant Defendants' Motion, this time with prejudice.

10       <u>The Markets</u>.  Plaintiffs again incorrectly claim that their reliance on "direct evidence of

11  anticompetitive effects" excuses them from alleging a relevant antitrust market and market power.

12  But the AC (like the Complaint) just incants antitrust buzzwords like "supracompetitive prices"

13  and "reduced output."  No <u>facts</u> showing either are pleaded:  no actual prices in actual license

14  agreements; no actual license "output" numbers before or after the alleged anticompetitive

15  conduct.  The Opposition tries to excuse this deficiency by claiming that the information necessary

16  to plead actual facts is "confidential" and might be unearthed in discovery.  But Plaintiffs do not

17  plead any facts that would plausibly suggest that Defendants' license agreements are

18  supracompetitive, and the alleged confidentiality of Defendants' licensing terms does not relieve

19  Plaintiffs of their burden to plead the <u>facts</u> that *Twombly* mandates.  Regardless, even if a lesser

20  standard for pleading a market somehow applied here, Plaintiffs' proffered markets would still fail

21  as a matter of law.  There is no way to tell which patents or non-patented technologies are in or out

22  of the markets, or even whether the alleged markets are comprised of 10 or 100,000 patents and

23  non-patented technologies.  The Opposition does not contend otherwise.  Indeed, Plaintiffs'

24  "confidentiality" excuse rings particularly hollow given their inability to tender any allegations

25  regarding Defendants' market share, the number of competitors in the "markets," entry barriers,

26  licensing output, or whether the markets consist of 10 or 100,000 patents or non-patented

27  technologies—where Plaintiffs have ready access and opportunity to allege supporting facts.  This

28  deficiency dooms Plaintiffs' proffered "markets" under any standard.

1    <u>Market Power</u>.  As the Motion pointed out, and the Opposition does not dispute, Plaintiffs'

2    market power equations are all defective because they are missing the denominator—namely, <u>the</u>

3    <u>number of other "substitutes" that remain available to Plaintiffs in their supposed "markets."</u>  *See*

4    Mot. at 17:10-13; Opp. at 15:7-9.  Without this factual allegation, whether Defendants have one,

5    ten, or a hundred alleged "substitutes" shows nothing from a market power perspective.  Nor does

6    the AC ever identify any product or invention that the alleged "substitutes" play any role in

7    making, much less a critical one or one that cannot be designed around or accomplished via other

8    "substitute" methods.  This Court recognized this key problem repeatedly in its Order and at the

9    hearing on the last motion to dismiss, yet Plaintiffs did nothing to fix it.  *See* Order at 17:5-6 ("Nor

10   is there a description of the number and viability of substitutes still available, if any."); *id.* at

11   39:14-17 ("[A]lthough Plaintiffs claim direct anticompetitive effects, they have done so in a

12   conclusory fashion only – *e.g.*, they have not specified where Fortress and its PAEs have

13   aggregated so many patents on a specific technology that an alleged infringer is essentially

14   deprived of substitutes."); June 18, 2020 H.Tr. at 8:23-25 ("When there are substitutes, what about

15   the existence – are there a third and fourth or fifth substitutes?  Do we know anything about

16   that?"); *id.* at 14:18-21 ("How many other substitutes were there?  Did it really make whatever the

17   other invention was unattainable, or extremely difficult?  There had to be a huge design around?").

18       <u>Antitrust Injury</u>.  The AC does not allege that either Plaintiff has entered into any license

19   with any Defendant, much less a "supracompetitive" one, and the Opposition does not contend

20   otherwise.  Instead, the Opposition argues that Plaintiffs face litigation costs from "meritless"

21   litigation over "weak" patents.  But the Court held such allegations failed as a matter of law

22   because, even if facing litigation threats could constitute antitrust injury, these threats would still

23   have to be tied to the "elimination of substitutes"—*i.e.*, Plaintiffs would have to show that they

24   have nowhere else to turn because other substitutes are no longer available.  Only then could

25   Plaintiffs' alleged injury possibly be tied to injury <u>to competition</u>, which is what is required to

26   plead an antitrust injury.  The AC, like the failed Complaint, never alleges facts showing the

27   "elimination of substitutes," so there is no antitrust injury as a matter of law.

28       In addition to the above global deficiencies, there are additional claim-specific flaws—

most of which this Court already has recognized—that independently warrant dismissal as well:

    <u>Sherman Section 1 Claim</u>.  The Opposition admits that it is only asserting "separate" "bilateral conspiracies" between Fortress and several "PAE" Defendants.[1]  However, the AC pleads <u>the exact same</u> "bilateral" financial transactions that this Court already held were "consistent with rational, legal business behavior."  Order at 28:23-24 (internal quotation marks omitted).  All that the AC adds is a conclusory assertion that each Defendant "understood that the transaction would enable Fortress to aggregate substitute and complementary patents to eliminate competition" (AC ¶ 50), with none of the required <u>evidentiary facts</u> to demonstrate such an understanding (much less an agreement).  As this Court already held, "there are not sufficient allegations of an agreement between Fortress and each of the Defendant PAEs to aggregate weak patents for anti-competitive purposes."  Order at 40:1-3.  That was true for the Complaint, and it is true for the AC's virtually identical "conspiracy" allegations.

    <u>Clayton Section 7 Claim</u>.  The Opposition admits that the AC alleges no facts regarding the market concentration or Defendants' market share of any of the purported markets.  Plaintiffs argue that they are not required to plead any facts regarding market share because they are relying on a "direct evidence of anticompetitive effects" theory, but Plaintiffs are twice wrong.  First, as already noted, Plaintiffs have not pleaded <u>facts</u> showing direct evidence of anticompetitive effects.  Second, as both the Supreme Court and the Ninth Circuit instruct, Section 7 claims by their nature <u>require</u> an analysis of the market size and concentration and a defendant's alleged share of it.  That is why Plaintiffs cite no authority ever applying a "direct evidence" approach to a Section 7 claim.

    <u>UCL Claims</u>.  Plaintiffs' UCL claims must be struck under California's Anti-SLAPP statute.  First, the claims "arise from" protected activity because Defendants' protected infringement suits supply an essential element of Plaintiffs' UCL claims, specifically the "lost money or property" element.  The Opposition does not even address this point, and Plaintiffs therefore have conceded it.  Second, Plaintiffs' UCL claims fail as a matter of law.  Not only are they deficient for the same reasons as the federal antitrust claims, but the Opposition now admits

---

[1] Defined terms shall have the same meaning as in the Motion.

1   that the UCL claims seek to enjoin Defendants from filing infringement suits.  This contravenes

2   California's litigation privilege and is also an unconstitutional prior restraint.  In addition, Apple's

3   Count 4, which is predicated on Defendants' alleged breach of FRAND commitments, fails under

4   *Qualcomm*, which unequivocally held that the remedy for such breaches lies in contract or patent

5   law, not antitrust law.  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020).

6   **II.     THE AC DOES NOT ALLEGE A RELEVANT MARKET OR MARKET POWER**

7          Plaintiffs again argue that they are not required to plead facts supporting a relevant market

8   or market power because they are relying on "direct evidence of anticompetitive effects," namely

9   "reduced output" and "supracompetitive royalties."  But, as this Court held, to plead a direct

10  evidence theory, Plaintiffs must allege <u>facts</u>, not mere conclusions, showing supracompetitive

11  pricing and reduced output.  Order at 15:19-21; 17:11-14.  The AC contains no such facts.  It just

12  regurgitates the same bald conclusions this Court already rejected.  Moreover, even under a direct

13  evidence theory, Plaintiffs still must plead facts showing:  (1) "the rough contours of a relevant

14  market," and (2) "that the defendant commands a substantial share of the market."  *Id.* at 13:8-11

15  (quoting *Republic Tobacco Co. v. N. Atl. Trading Co*., 381 F.3d 717, 737 (7th Cir. 2004)).  The

16  AC fails to satisfy either requirement.

17          **A.     Plaintiffs Have Not Alleged Facts Showing Anticompetitive Effects**

18          To plead direct evidence of anticompetitive effects, a plaintiff must allege facts showing

19  <u>both</u> "supracompetitive prices" <u>and</u> "restricted output."  *Stewart v. Gogo, Inc*., No. C-12-5164

20  EMC, 2013 WL 1501484, at *4, n.3 (N.D. Cal. Apr. 10, 2013); *see also PNY Techs. v. SanDisk*

21  *Corp*., No. C-11-04689 YGR, 2012 WL 1380271, at *8 (N.D. Cal. Apr. 20, 2012) (dismissal for

22  "conclusory allegations" of direct evidence).  The AC fails to plead facts showing either.

23          <u>No Facts Showing Reduced Output</u>.  Plaintiffs assert that they have "sufficiently alleg[ed]

24  . . . that the challenged patent transfers have enabled Defendants to . . . reduce output below

25  competitive levels," Opp. at 21:13-21, yet the cited paragraphs (¶¶ 141, 165, 431) contain no <u>facts</u>

26  whatsoever.  Paragraphs 141 and 165 (like the deficient Complaint) assert just the bare conclusion

27  that there has been "decreased licensing output."  *Compare with* Cmplt. ¶¶ 9, 48, 164, 168.

28  Paragraph 431 repeats verbatim the same conclusory assertions from the Complaint and never

identifies a single instance in which licensing "output" has decreased, much less how much it has

decreased compared to supposedly competitive levels. *Compare* AC ¶ 431 *with* Cmplt. ¶ 164.

Under *Twombly,* a plaintiff must plead facts, not mere "labels and conclusions." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007). The AC still contains no facts showing a reduction in output

of patent licenses and fails for this reason alone. *Gogo*, 2013 WL 1501484, at *4, n.3.[2]

No Facts Showing Supracompetitive Prices. The AC, like the Complaint, relies on

Defendants' alleged: (i) licenses and settlements with third parties (Plaintiffs admit they have

entered into no licenses or settlements with any Defendant); and (ii) litigation "demands." As for

the third-party licenses and settlements, Plaintiffs concede (Opp. at 22:12-13) that they have not

identified what the alleged royalty rates are or "how they compare to competitive prices." Mot. at

22:9-11 (quoting *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 835 (N.D. Cal. 2015)).[3]

Nor have they alleged any other facts that would suggest that these rates were somehow

supracompetitive as opposed to fair, competitive, or even below market. As this Court has held,

absent such allegations, "there is no specific indication that the companies paid supracompetitive

prices for those licenses." Order at 17:9-10. The AC's unremarkable allegations that Defendants

have settled infringement suits with third parties are likewise insufficient. These allegations are

lifted from Plaintiffs' failed Complaint, and Plaintiffs still have not identified the amount of these

settlements or pleaded any other facts that would plausibly suggest that these settlements were

supracompetitive or supposedly "coerce[d]." Opp. at 6:11-14. Notably, none of these settling

parties, which include some of the largest and most powerful companies in the world, AC ¶¶ 144,

---

[2] Plaintiffs' proffered theory is that "Defendants have pursued numerous assertions and secured multiple settlements" for patents that the prior owners "never asserted." Opp. at 21:15-18 (quoting AC ¶ 142). This makes no sense for at least two reasons. If the patents were never previously "asserted," then there would be no previous licensing at all. Output cannot be "reduced" below zero. Moreover, if, as Plaintiffs allege, Defendants are licensing patents that were not previously available for licensing, they are increasing output, not decreasing it. Plaintiffs' theories thus also fail *Twombly*'s plausibility requirement.

[3] Plaintiffs attempt to distinguish *Eastman* by arguing that "the plaintiffs were complaining about **discounts** offered by the defendant." Opp. at 29, n.3 (emphasis in original). In fact, they were complaining about "monopoly prices" that the defendant had allegedly secured by giving discounts or kickbacks to medical providers. *Eastman*, 108 F. Supp. 3d at 835. These allegations failed as a matter of law because they did not identify what the alleged "monopoly prices" were or how they compared to the market price. *Id.* The AC fails for the same reason.

1  201, 310, 343, have sued Defendants for an antitrust violation.

2          As for litigation "demands," Plaintiffs made the exact same allegations in their failed

3  Complaint.  Mot. at 22:26-23:3.  Defendants' Motion cited authority holding that "the pertinent

4  inquiry is on the prices actually paid, the transaction prices," not on the prices that a defendant

5  "demands."  Mot. at 24:7-9 (quoting *In re Baby Food Antitrust Litig*., 166 F.3d 112, 129 (3d Cir.

6  1999)).  The Opposition ignores both this authority and basic common sense.  "Demanding" a

7  price does not mean one will actually receive it.  Regardless, the amount that Defendants recover

8  in litigation will necessarily be determined solely by the patents in suit (in litigations currently

9  ongoing), not on whether Defendants or other non-parties own or control other purported

10  "substitute" patents.  Mot. at 24:19-20 ("each PAE's alleged damages demand 'sounds in patent

11  law, not antitrust law.'" (quoting *Qualcomm*, 969 F.3d at 999)).  Consequently, any "price" that is

12  recovered in litigation will have nothing to do with the alleged aggregation of substitute patents.

13  The Opposition just ignores this as well.

14          Finally, one patent owner "demanding" (or for that matter receiving) more in royalties than

15  another patent owner previously sought does not render the "demand" or the amount received

16  supracompetitive.  Nor does the fact that a patent owner may choose to assert patents that the prior

17  owner did not.  "There are [] other 'obvious alternative explanation[s]'" for why a patent holder

18  might seek more in royalties than the previous owner—*e.g.*, greater knowledge about the patent's

19  worth, more resources to endure the rigorous defenses (including counter patent assertions) of

20  behemoths like Plaintiffs, technical developments in the field, or a different theory of

21  infringement, just to name a few.  *Somers v. Apple, Inc*., 729 F.3d 953, 965 (9th Cir. 2013)

22  (quoting *Twombly*, 550 U.S. at 567).  Moreover, as the Motion noted (Mot. at 23:14-24:4) and the

23  Opposition never disputes, the AC's only new allegations of litigation demands that were not

24  already in the failed Complaint are alleged instances in which Defendants have "demanded" more

25  for patents than a third party demanded for different patents, which has even less relevance.

26  Indeed, Plaintiffs' entire theory flatly contradicts the Ninth Circuit's recent admonishment not "to

27  assume that royalties are 'anticompetitive'[] in the antitrust sense" just because they do not

28  "precisely reflect a patent's current, intrinsic value and are in line with the rates other companies

1   charge for their own patent portfolios." *Qualcomm*, 969 F.3d at 999.

2         None of the remaining arguments in Plaintiffs' Opposition can save their direct evidence

3   theory.  First, Plaintiffs cite *Vizio, Inc. v. Funai* and *In re Loestrin*, but neither is apposite.  *Vizio*

4   involved <u>factual allegations of price fixing</u>, a classic example of direct evidence of anticompetitive

5   effects.  2010 WL 7762624, at *7 (C.D. Cal. Feb. 3, 2010).  The *Loestrin* plaintiffs provided

6   detailed facts regarding the defendants' profit margins ("at least 60%") and the single-drug

7   market, which had a "high cost of entry and expansion."  261 F. Supp. 3d 307, 328 (D.R.I. 2017).

8   That is precisely what is missing here.

9         Second, Plaintiffs argue that Defendants "intended" an "anticompetitive purpose."  Opp. at

10   21:3-11.[4]  Defendants' alleged intent is not enough to show "anticompetitive effects," and

11   Plaintiffs' allegations are conclusory in any event.  Indeed, there is not a single factual allegation

12   that any Defendant ever even attempted to leverage another Defendant's patents to secure any

13   license or settlement at a higher rate.[5]  Defendants made this point repeatedly in their moving brief

14   (Mot. at 2:23-26; 6:12-16; 24:12-19), and the Opposition just ignores it.

15      **B.**       **Plaintiffs' Proffered Excuses For Failing To Plead Facts Are Unavailing**

16         Plaintiffs argue that they are not required to plead facts—*e.g.*, actual licensing terms—

17   because this information is supposedly in Defendants' "possession" and is "confidential."  Opp. at

18   22:11-12.  But the problem is not just that Plaintiffs have failed to identify specific licensing

19   terms.  It is that they have not provided any factual allegations at all that would plausibly suggest

20   that these licenses were somehow supracompetitive.  *See also Twombly*, 550 U.S. at 555 ("Factual

21   allegations must be enough to raise a right to relief above the speculative level").  All they have

22

---

23        [4] When arguing "direct effects," the Opposition claims that Defendants "intended [] an anticompetitive purpose," Opp. at 21:3-11, but when arguing why they failed to plead evidentiary

24   facts of any such anticompetitive purpose, the Opposition claims the "intent" was just to enter into the very financial transactions that this Court already held were consistent with rational, legal

25   business behavior.  *Id.* at 32:4-7; 33:22-27; *see* Order at 28:22-24.

26        [5] For example, Plaintiffs allege that Defendants' alleged "aggregation" of Seven and Uniloc "remote software updates" patents has eliminated competition.  AC ¶ 165.  But there is no

27   allegation whatsoever that Defendants have used this alleged aggregation to extract higher licensing rates, *e.g.*, that Seven has somehow attempted to leverage the Uniloc patents to demand

28   higher royalties from Plaintiffs or that Uniloc engaged in similar conduct with respect to Seven's patents.

alleged is that Defendants obtained license agreements—something that happens thousands of times every year.  The mere fact that Defendants' licenses are confidential (again, as nearly all license agreements are) does not give Plaintiffs carte blanche to speculate that they are supracompetitive absent any supporting facts.  Indeed, *Twombly* requires an antitrust plaintiff to plead facts regarding a defendant's prices "even if those facts are only within the head or hands of the defendants."  *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011).  This is because "plaintiffs must satisfy the pleading requirements of Rule 8 before the discovery stage, not after it."  *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 (9th Cir. 2014).[6]

Plaintiffs also try to justify their failure to plead facts by claiming "obfuscation."  For instance, the AC includes a chart (the same one shown at oral argument on the prior motion) showing ownership via limited liability company structure.  AC ¶ 124.  But the AC still cites no facts showing concealment—nor is there any allegation that Plaintiffs did not know the ownership of any of the PAEs.  Moreover, Plaintiffs' claim of "obfuscation" is fundamentally inconsistent with their theory that Defendants' purported "aggregation" and "litigation" "strategy creates incentives for targets to settle with <u>Fortress-backed</u> PAEs."  AC ¶ 38 (emphasis added).  Plaintiffs never explain how those "incentives" could exist if the fact that a PAE is "Fortress-backed" is "obfuscated."  Regardless, Plaintiffs cite no authority that *Twombly*'s fact pleading requirement is excused by scattershot accusations of "obfuscation."  Indeed, *Twombly* would be meaningless if a plaintiff could avoid pleading "facts" simply by alleging that those facts are not publicly disclosed and therefore "obfuscated."

Finally, Plaintiffs bemoan that VLSI declined to grant Plaintiffs permission to publish expert damages reports that are confidential under protective orders in the *VLSI v. Intel* litigations.  Opp. at 22:17-22.  But Intel stipulated to the protective orders about which it now complains, and if Intel really felt it needed that information to state a claim, Intel should have sought relief from

---

[6] Plaintiffs rely on cases that "relaxed" Rule 9(b)'s particularity pleading requirement, Opp. at 22, 30, but none of these cases held that courts can similarly relax <u>Rule 8</u> or *Twombly*.  Moreover, even under a "relaxed" Rule 9(b) standard, a plaintiff cannot rely on speculation or bald conclusions but "must state the factual basis" for its allegations.  *Noe v. Fed. Deposit Ins. Corp. for Washington Mut. Bank, F.A.*, No. CV087140GHKFMOX, 2010 WL 11549438, at *3 (C.D. Cal. Jan. 15, 2010) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)).

the courts that issued the orders.[7]  In any event, for all of the reasons discussed above, VLSI's

damages report in a patent infringement case as a matter of law cannot constitute a

supracompetitive price:  (i) a damages report is not a "price"; (ii) and even if it is a "price," then it

is based on the strength of the patents in suit, not other patents supposedly "aggregated" with

them.  It therefore has nothing to do with the alleged anticompetitive conduct here—the

"aggregation" of patents from different sources and use of the combined patent holdings to

demand and extract supracompetitive royalties.

### C.      Plaintiffs' Market Allegations Fail Even Under A "Direct Evidence" Theory

Even under a "direct evidence of anticompetitive effects" theory, the AC still fails because

Plaintiffs have not alleged facts demonstrating either (1) "the rough contours of a relevant

market," or (2) "that the defendant commands a substantial share of the market."  Order at 13:8-11

(quoting *Republic Tobacco Co.*, 381 F.3d 717).

### 1.      The AC Fails To Define The "Rough Contours" Of A Relevant Market

The Motion demonstrated that, for each of the "markets," there is no way of telling

whether there are 10, 1,000, or 100,000 patents (and non-patented technology) in them.  Mot. at

9:6-8.  The Opposition does not dispute this.  This is the epitome of an overly "vague" market,

meaning it fails even under *Rebel Oil*'s direct evidence standard.  *See Analogix Semiconductor,*

*Inc. v. Silicon Image, Inc.*, No. C 08-2917 JF PVT, 2008 WL 8096149, at *6 (N.D. Cal. Oct. 28,

2008) (dismissing Section 1 claim); *see also* Mot. at 12:4-15.

Plaintiffs assert that they have alleged the boundaries of the market by identifying the

"function performed by technologies covered by patents" within each market.  Opp. at 17:6-7.

This is plainly not enough because Plaintiffs never identify the scope of the patents that make up

the market.  *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 17-CV-03301-EMC, 2020 WL 5408210,

at *6 (N.D. Cal. Sept. 9, 2020) (failure to plead market where "parameters . . . are vague" and it

was "not clear what substitutes there are").  And Plaintiffs' markets are not limited to one specific

---

[7] *See VLSI Tech., LLC v. Intel Corp.*, 5:17-cv-05671-BLF (N.D. Cal.), Dkt. 107, *VLSI Tech., LLC v. Intel Corp.*, 1:18-cv-00966-CFC-CJB (D. Del.), Dkt. 96, *VLSI Tech., LLC v. Intel Corp.*, No. 19-CV-00977-ADA (W.D. Tex.), Dkt. 75.

technology or "function."  Rather they encompass entire fields of technology.  For example, which patents and corresponding functions fall under "Health Monitoring," "Mobile Device-to-Device Communication," or "Digital Rights Management" markets?  Plaintiffs never say.

Moreover, it is not sufficient for Plaintiffs to describe the "functions" of the technologies in the alleged markets.  They must also allege that the various identified and unidentified patents and non-patented technologies in the "markets" are economic substitutes for each other, *i.e.*, that customers will substitute one patent for the other if there is a price change for one of the patents.  Mot. at 14:4-15:19.  The AC makes no attempt to do so and neither does the Opposition.  For instance, Plaintiffs fail to allege any facts plausibly showing that a patent that reads on a "suffocation prevention system" is interchangeable with one that reads on an "exercise monitoring system."  *See id.* at 13:1-25 (listing other examples).[8]  The Opposition ignores this deficiency, even though it concedes that a market fails if it includes products/technologies that "are ***never*** substitutes for one another."  Opp. at 19:26 (emphasis in original).

Plaintiffs also argue that their "13 exemplar patent markets are much narrower and more clearly defined than the Electronics Patents Market," that this Court rejected, which according to Plaintiffs, is sufficient to "put Defendants on notice regarding the contours of the markets."  Opp. at 10:23-11:5 (citing *U.S. v. LSL Biotechs.*, 379 F.3d 672, 699 (9th Cir. 2004)).  First, assuming the markets are somehow "narrower" than grotesquely overbroad, that is not the standard.  Second, Plaintiffs never explain what they mean by "exemplar," including whether there are a host of other unidentified "markets" that Defendants may be facing, or whether Plaintiffs are simply re-pleading the "Electronics Patents Market" disguised as various "exemplars."  Third, Plaintiffs' reliance on *LSL* is misplaced and misleading.  To begin with, Plaintiffs cited the dissent.  What's

---

[8] Thus, unlike the far narrower and more specific market in *Bio-Rad Labs. v. 10X Genomics, Inc.* (Opp. at 13:14-15), Plaintiffs' markets "cover[] numerous unrelated technologies." 2020 WL 5100291, at *9 (D. Mass. Aug. 31, 2020).  Plaintiffs argue that their "Health Monitoring" market "only" includes "patents covering technology in certain electronic devices such as 'wearable devices, smartphones, medical devices, or the like.'"  Opp. at 18:24-27 (emphasis added).  But this is not a meaningful limitation because both the AC and the Opposition offer these merely as non-limiting examples.  *Id.;* AC ¶ 290.  Even if Plaintiffs' definition were limited to such devices, Plaintiffs give no indication of how large this market might be, nor do they attempt to explain how all the technologies within it could plausibly be economic substitutes.

worse, the dissent was applying the standard in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), and "the U.S. Supreme Court in [] *Twombly*, . . . specifically abrogated the usual notice pleading rule under Rule 8(a)(2) and *Conley* . . . To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Somers*, 729 F.3d at 959.  Finally, the AC fails to give "notice" because it says nothing about the scope of the alleged market and the extent of remaining substitutes.  Indeed, the Opposition does not meaningfully dispute that the AC's "markets" likely contain tens of thousands of patents. *Compare* Opp. at 18:19-19:5 *with* Mot. at 18:3-17.

Having no real answer to these failings, Plaintiffs erect a straw man, arguing they are "not required to allege every patent that belongs in a relevant market."  Opp. at 13:12.  The problem is not that the AC fails to list "every" patent in the alleged markets—it is that it does not identify any of the patents in each market other than (conveniently) the handful owned by Defendants and gives no indication of the markets' alleged boundaries or scope, including whether they contain 10 or 100,000 patents.  Nor does the AC state how many substitutes other than those supposedly owned by Defendants remain in the markets.  In other words, the AC still fails to provide a "description of the number and viability of substitutes still available, if any."  Order at 17:5-6.

Plaintiffs also concede that their alleged markets include "complements" even though the Motion demonstrated that this is "economic nonsense."  Mot. at 16:8 (quoting Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 565(a)).  Plaintiffs rely on this Court's decision in *Staley v. Gilead*, No. 19-CV-02573-EMC, 2020 WL 5507555 (N.D. Cal. July 29, 2020).  *Staley,* however, involved a unique situation in which the plaintiffs alleged detailed facts showing that certain "cart drugs" could function as either substitutes or complements depending on the drug regimen that a patient was prescribed.  *Id.* at *7.  In contrast, the AC provides no factual explanation whatsoever as to how the supposed "complement patents" in the alleged markets could also function as substitutes and under what circumstances.  *See, e.g.*, AC ¶¶ 141, 198, 225, 271, 299 (just listing patents as supposed complements but failing to allege how they function as complements or substitutes).

Finally, Plaintiffs argue that "the sort of granular pleading that Defendants demand" is "inappropriate" for technology markets.  Opp. at 11:26-27.  However, pleading elementary facts

1    like the markets' scope and boundaries and whether additional substitutes remain is not

2    "granular," it is essential under *Twombly* and this Court's Order.  Plaintiffs cite *Hynix*

3    *Semiconductor Inc. v. Rambus Inc*. for the proposition that market definition requirements should

4    be "flexible" and less demanding with respect to "technology markets."  Opp. at 12:1-7 (quoting

5    2008 WL 73689, at *4 (N.D. Cal. Jan. 5, 2008).  But that statement, which was mere dicta in any

6    event, does not help Plaintiffs.  *Hynix* made clear that a plaintiff must show that the technologies

7    that "consumers would actually substitute between various technologies" make up the alleged

8    market.  2008 WL 73689, at *4.  Here, Plaintiffs have not shown how the technologies identified

9    in their alleged markets—*e.g.*, a "suffocation prevention system" and an "exercise monitoring

10   system"—are economic substitutes.  Moreover, the DOJ guidelines make clear that the approach

11   to technology markets "is conceptually analogous to the analytical approach to goods markets."

12   U.S. Dep't of Justice and Federal Trade Comm'n, Antitrust Guidelines for the Licensing of

13   Intellectual Property § 3.2.2, n.35.  Indeed, if anything, "technology markets" should receive

14   more, not less, scrutiny based on *Qualcomm*'s recent warning that the imposition of antitrust

15   liability in such markets can easily stifle innovation and competition.  969 F.3d at 990-991, 997

16            **2.      The AC Fails To Allege Facts Showing A "Substantial" Market Share**

17            Plaintiffs do not dispute their failure to plead any facts regarding Defendants' shares in the

18   alleged markets, let alone enough facts to show "substantial" market shares.  Opp. at 15:4-18.

19   Instead, Plaintiffs argue that they are not required to plead facts relating to Defendants' market

20   shares because they "rely" on a "direct evidence" theory.  *Id.* at 15:7-18.  This flatly contradicts

21   the Court's Order:  "<u>if a plaintiff can</u> show the rough contours of a relevant market, and <u>show that</u>

22   <u>the defendant commands a substantial share of the market</u>, then direct evidence of anticompetitive

23   effects can establish the defendant's market power."  Order at 13:8-11 (quoting *Republic Tobacco*

24   *Co*., 381 F.3d 717) (emphasis added).  Indeed, *Republic Tobacco* expressly rejected a "direct

25   evidence" theory because the plaintiff failed to demonstrate that the defendant controlled a

26   "substantial share" of the market.  *Republic Tobacco*, 381 F.3d 717; *see also PNY Techs., Inc. v.*

27   *SanDisk Corp*., No. 11-CV-04689-WHO, 2014 WL 2987322, at *10 (N.D. Cal. July 2, 2014)

28   (dismissing claim based on "direct evidence" theory because plaintiff had not "plead[ed]

1  substantial foreclosure of competition.").  Given that the AC did not even attempt to plead

2  Defendants' market shares, the AC fails on this basis alone.

3           **D.    Apple's Input Technologies Markets Are Still Facially Deficient**

4        The Input Technologies Markets (relevant only to Apple's Count 4) are facially deficient

5  because Apple still alleges that Defendants "*claim* to own SEPs instead of alleging that

6  Defendants own or control patents that actually are SEPs."  Order at 18, n.3 (emphasis in original).

7  "Claiming" or "declaring" something is an SEP does not make it so, and therefore cannot by itself

8  exclude substitutes.  *Id.*  As Apple just stated to another federal district court:

9        Does the fact that these patents, the five in this case and many others, were declared
      essential mean they're actually essential or even more used in an iPhone?  And the

10        answer is no.  It's just a declaration.  I could declare myself an NFL quarterback.  I
      wish it were true.  It's not. . . . just declaring something [an SEP], doesn't make it so.

11

12  *Optis Wireless v. Apple*, 2:19-CV-66-JRG (E.D. Tex. Aug. 3, 2020), Dkt. 490 at 232:25-233:12.

13        Apple cites authority permitting a party to assert inconsistent counts or defenses.  Opp. at

14  23:20-26 (citing *Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1021, n.1 (S.D. Cal.

15  2019)).  The problem here, however, is not that Apple's UCL count is inconsistent with some

16  other count or defense.  The problem is that, <u>even if accepted as true</u>, Apple's SEP allegations do

17  not state a claim because "claiming" that a patent is an SEP does not make that patent an SEP.

18  Moreover, as this Court noted, "[a]t the hearing, Apple indicated that, in the *Apple v. Samsung*

19  litigation, Judge Koh did not require Apple to plead the patents at issue were, in fact SEPs, but

20  Apple did not provide Judge Koh's reasoning on this point."  Order at 19, n.13.  The Opposition

21  still does not provide Judge Koh's reasoning for why a plaintiff can state an antitrust claim merely

22  by alleging that a defendant "claims" to own an SEP; nor does the Opposition provide Apple's

23  own reasoning on how a "claimed" or "declared" SEP could plausibly yield any lock-in effect.

24        In any event, the Court need not decide whether Apple has adequately pleaded the Input

25  Technologies Markets in light of the Ninth Circuit's explicit holding that a breach-of-FRAND

26  theory "lies in contract and patent law," not antitrust law.  *Qualcomm*, 969 F.3d at 1005.

27  **III.    THE AC DOES NOT SUFFICIENTLY PLEAD ANTITRUST INJURY**

28        Plaintiffs must plead facts showing an injury not just to themselves, but to competition,

1    and the injury must flow from that which makes Defendants' alleged conduct unlawful.  Mot. at

2    21:3-5.  In this case, the purportedly unlawful conduct is the "aggregation" of "substitute" patents.

3    Thus, as this Court held, Plaintiffs must show that they have been injured by "the elimination of

4    substitutes."  Order at 20:22-25; 21:5.  Plaintiffs allege two purported injuries: (1) litigation costs;

5    and (2) the risk that Plaintiffs may have to pay supracompetitive royalties some day in the future.

6    As the Motion demonstrated, neither of these purported injuries flows from the aggregation of

7    substitute patents, and nothing in the Opposition shows otherwise.

8            **A.    Plaintiffs' Litigation Costs Are Not Antitrust Injury**

9            With respect to litigation costs, nothing in either the AC or the Opposition explains how

10   such costs were caused by "the elimination of substitutes."  Order at 20:7-10; 21:4-5.  To do so,

11   Plaintiffs would at least need to allege that Defendants have aggregated a sufficient number of

12   substitute patents such that Plaintiffs have essentially no choice but to license patents from

13   Defendants or face an infringement suit.  Mot. at 26:23-27:16.  But as Defendants' moving brief

14   demonstrated, the AC has not identified a single product that Plaintiffs cannot make or a single

15   technology that Plaintiffs cannot practice without obtaining a license from Defendants.  Nor does

16   the AC allege that Plaintiffs will be in this position if they were to lose one (or even all) of the

17   patent infringement suits currently pending against them.  *Id.* at 27:14-16.

18           The Opposition does not dispute any of this but instead claims Plaintiffs were not required

19   to plead that Defendants have obtained all, most, or even a key subset of substitute patents that

20   read on a particular technology.  Yet the Court expressly held that this is what the Complaint was

21   lacking.  Order at 39:16-17 (Plaintiffs "have not specified where Fortress and its PAEs have

22   aggregated so many patents on a specific technology that an alleged infringer is <u>essentially</u>

23   <u>deprived of substitutes</u>."); *see also id.* at 16:7-11 ("But Plaintiffs do not give any concrete example

24   where Fortress and its PAEs have aggregated patents on a specific technology such that an alleged

25   infringer is essentially <u>deprived of substitutes</u> and is thus <u>forced</u> to take a license from Fortress

26   and/or its PAEs and pay a supracompetitive price for that license.") (emphasis added).

27           Plaintiffs also incorrectly contend that so long as they show "aggregation" of any

28   "substitute" patent at all—no matter how many substitutes still remain and regardless of whether

1    Plaintiffs even need the acquired "substitute" to build anything—then any litigation or licensing

2    demand over the acquired patent constitutes antitrust injury.  This is incorrect.  Defendants cited

3    numerous authorities, which the Opposition never addresses, holding that a plaintiff does not

4    suffer antitrust injury where there are still viable alternatives available, which is consistent with

5    this Court's Order.  Mot. at 27:1-16; Order at 16:7-11; 17:5-6; 39:15-17.  Indeed, all acquisitions

6    "'hav[e] the effect of reducing consumers' choices" to some degree, but this is "fully consistent

7    with a free, competitive market."  *Qualcomm,* 969 F.3d at 990 (internal quotation marks omitted).

8           Plaintiffs' own example illustrates this point.  The Opposition discusses two supposed

9    substitute patents that Defendants allegedly aggregated that were once owned by "different

10   entities" and argues that any infringement suit based on these patents necessarily gives rise to

11   antirust injury.  Opp. at 27:10-22.  Yet Plaintiffs never explain how this is so <u>if Plaintiffs still have</u>

12   <u>other substitutes to choose from</u> (either patents and/or non-patented technology).  For instance, in

13   discussing the example above, Plaintiffs never argue, and the AC does not allege, that:  (i) other

14   patents are not available to Plaintiffs in the "market"; (ii) other non-patented technologies are not

15   available to Plaintiffs in the "market"; or (iii) Plaintiffs actually need the patents (or any of their

16   substitutes in the "market") to produce anything.  Without these allegations, Plaintiffs have not

17   alleged an "<u>elimination</u> of substitutes."  They've just alleged a transfer of a patent from one entity

18   to another, which happens all of the time and "has no antitrust significance."  *Carefusion Corp. v.*

19   *Medtronic, Inc.*, No. 10-CV-01111-LHK, 2010 WL 4509821, at *7 (N.D. Cal. Nov. 1, 2010).

20   Such transfers do not present an antitrust injury any more than a car dealer buying a handful of

21   cars from another car dealer would even though the cars are "substitutes."

22          Plaintiffs argue that their injury allegations suffice because Defendants' alleged licensing

23   "demands leave Apple and Intel (and other targets) with a choice—capitulate and pay exorbitant

24   royalties or incur the costs of litigating."  Opp. at 25:26-26:1.  But this is true of <u>every</u> defendant

25   sued for patent infringement.  There are always two "choices"—pay or litigate.  The only way that

26   such demands could give rise to an injury <u>to competition</u> is if the choice between a lawsuit or

27   "supracompetitive" license was unavoidable as a result of Defendants' elimination of substitutes,

28   *i.e.*, Plaintiffs need the technology to manufacture their products, and do not have access to other

1    viable substitutes for it.  The AC, however, never alleges that Plaintiffs are faced with such a

2    predicament.  As such, their litigation costs do not constitute antitrust injury.

3        **B.    The Alleged Risk Of Supracompetitive Royalties Is Not Antitrust Injury**

4        The AC never alleges that Plaintiffs have paid for a license to any of Defendants' patents.

5    Instead, Plaintiffs argue that they face "an ongoing threat of Plaintiffs' [sic] future licensing

6    demands."  Opp. at 28:8.  This argument fails as a matter of law for several reasons.

7        Plaintiffs' allegations that Defendants are able to charge "supracompetitive" royalties are

8    conclusory, as demonstrated above in Section II.A.  Moreover, charging supposedly

9    supracompetitive prices is not unlawful.  *See Brullotte v. Thys Co*., 379 U.S. 29, 33 (1964) (a

10   patent "empowers the owner to exact royalties as high as he can negotiate."); *NYNEX v. Discon,

11   Inc*., 525 U.S. 128, 136-137 (1998) (an increase in price alone does not demonstrate harm to

12   competition).  Instead, to show antitrust injury from such pricing, the pricing would have to be the

13   result of anticompetitive conduct—here, the alleged aggregation of substitutes that leaves

14   Plaintiffs no choice but to use technology covered by Defendants' patents.  As demonstrated

15   above, the AC has not pleaded any facts showing this to be the case.

16       Even if Plaintiffs had alleged facts showing that Defendants' licenses with third parties

17   were inflated, Plaintiffs have not alleged any "real or immediate" (Order at 21:1) risk that <u>they</u>

18   will have to pay such rates.  For instance, Plaintiffs do not allege that they have any intention of

19   ever licensing Defendants' patent(s) because they need this technology to manufacture something

20   and do not have access to other substitutes.  Instead, Plaintiffs point to allegations vaguely

21   referencing negotiations with Inventergy and INVT.  Opp. at 28:21-25 (citing AC ¶¶ 107, 109).

22   Plaintiffs made these <u>exact same allegations</u> in their failed Complaint, and they offer no

23   explanation as to why they are now somehow sufficient to show the antitrust injury this Court

24   already found lacking.  *Compare* AC ¶¶ 107, 109 *with* Cmplt. ¶¶ 105, 107.  Moreover, the alleged

25   negotiations took place years ago, AC ¶¶ 107, 109, and thus do not show that Plaintiffs are likely

26   to be forced to pay supracompetitive royalty prices in the "immediate" future.  Order at 21:1.

27       Plaintiffs also attempt to circumvent the antitrust injury requirement altogether by asserting

28   that "[a]cquisitions that lessen competition are illegal even if the lessened competition has not

1   resulted in inflated prices."  Opp. at 26:23-24.  But the case that Plaintiffs rely upon simply stands

2   for the proposition that a plaintiff may challenge a merger that would result in a "highly

3   concentrated" market because such markets create "an appreciable danger" of inflated prices.

4   *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir.

5   2015).  Plaintiffs cannot rely on such a theory here because, as noted above, they have not pleaded

6   any facts regarding market concentration or Defendants' alleged market share.

7   **IV.    THE AC FAILS TO ALLEGE EVIDENTIARY FACTS OF A CONSPIRACY**

8          The Court held that:  "[e]ven if Plaintiffs are claiming separate conspiracies between

9   Fortress and each PAE defendant, there are not sufficient allegations of an agreement between

10  Fortress and each of the Defendant PAEs to aggregate weak patents for anti-competitive

11  purposes."  Order at 39:28-40:3.  The Court further held that:  "for the most part, Plaintiffs have

12  simply alleged that Fortress invested in a given PAE – which is consistent with 'rational, legal

13  business behavior.'"  *Id.* at 28:22-24.  The AC alleges the <u>exact same</u> bilateral written contracts

14  between Fortress and the "PAE" Defendants that were alleged in the Complaint.  Opp. at 31:5-9;

15  32:4-6; *also compare* AC ¶¶ 51-57, 62-77 *with* Cmplt. ¶¶ 51-56, 61-74.  All that is "new" in

16  Plaintiffs' conspiracy allegations is the repeated assertion that each Section 1 Defendant

17  "understood that the transaction would enable Fortress to aggregate substitute and complementary

18  patents to eliminate competition . . . ."  Opp. at 31:13-18; *see also* AC ¶¶ 50, 56, 71, 73.  But this

19  is merely a legal conclusion, not the evidentiary facts required to plead a Section 1 claim.

20         The Ninth Circuit has held that "[t]o state a claim under Section 1 of the Sherman Act . . .

21  claimants must plead not just ultimate facts (such as a conspiracy), but <u>evidentiary facts which, if</u>

22  <u>true, will prove a contract, combination or conspiracy . . . by which the persons or entities</u>

23  <u>intended to harm or restrain trade</u>."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (2008)

24  (emphasis added); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186,

25  1194, n.6 (9th Cir. 2015) (affirming dismissal for failure to plead "evidentiary facts" of an

26  agreement to restrain trade).  In other words, an antitrust plaintiff cannot just plead an ordinary

27  contract between two parties and then assert that this contract had an anticompetitive purpose.

28  Instead, the plaintiff must plead specific "<u>evidentiary facts which, if true, will prove</u>" that the

1  defendants specifically made an agreement to "harm or restrain trade."

2          This settled rule is consistent with this Court's Order and Supreme Court precedent.  Order

3  at 28:20-24 and 39:28-40:3.  In *Twombly*, the Supreme Court rejected as "conclusory" the

4  allegation that the defendants in that case "have entered into a contract, combination or conspiracy

5  to prevent competitive entry in their respective local telephone and/or high speed internet services

6  markets and have agreed not to compete with one another and otherwise allocated customers and

7  markets to one another."  *Twombly*, 550 U.S. at 551.  Plaintiffs have proffered the same type of

8  "conclusory" assertion that the Supreme Court flatly rejected; Plaintiffs just inserted the word

9  "understood" in place of the word "agreed."  *See* Mot. at 31:2-14 (citing authority rejecting

10  conclusory assertions of "knowledge," "agreement," "understanding").[9]

11          Having no viable response to this, Plaintiffs raise a host of irrelevancies.  For instance,

12  they argue that some of Defendants' cases involve hub-and-spoke conspiracies.  Opp. at 34:16-19.

13  However, nothing in *Twombly* or the Ninth Circuit law applying it allows plaintiffs alleging two-

14  party (as opposed to three-, four- or ten-party) conspiracies to skirt by with conclusions rather than

15  evidentiary facts.

16          Plaintiffs also argue that their allegations of written contracts between the parties is enough

17  (as opposed to evidentiary facts of an actual agreement to restrain trade—here, to aggregate weak

18  and substitute patents).  Opp. at 32:4-9.  However, this Court has already held that those written

19  contracts are "consistent with rational, legal business behavior" (Order at 28:20-24), and Plaintiffs

20  do not contend otherwise in their Opposition.  Consequently, those written contracts cannot be the

21  "bilateral agreements to restrain trade" (*see* Opp. at 31:6-8) or the "common illegal objective to

22  eliminate competition" (Opp. at 31:10-12) of which the Opposition vaguely speaks.  *See 49er*

23  *Chevrolet, Inc. v. Gen. Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986) ("Ordinary sales

24  contracts do not unlawfully restrain trade"); *Kendall*, 518 F.3d at 1049 ("allegations of facts that

25  could just as easily suggest rational, legal business behavior by the defendants as they could

26

27      [9] In the failed Complaint, Plaintiffs used "intended" where they now use "understood."
    Cmplt. ¶ 173 (Section 1 Defendants "intended that through their agreements they would extract
28  royalties from their targets—like Intel and Apple—beyond the royalties that could have been
    obtained but for aggregation by Fortress.").

1   suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws"); *Edstrom v.*

2   *Anheuser-Busch InBev SA/NV*, C 13-1309 MMC, 2013 WL 5124149, at *6 (N.D. Cal. Sept. 13,

3   2013) (no Section 1 claim where written contracts did not evince an "agreement and

4   understanding" to restrain trade and conclusory allegations beyond the contracts lacked "the

5   requisite specificity"), *aff'd*, 647 Fed. Appx. 733 (9th Cir. 2016); *see also International Norcent*

6   *Tech. v. Koninklijke Philips Elect.*, 2007 WL 4976364, at *10, n.68 (C.D. Cal. Oct. 29, 2007)

7   (dismissing Section 1 claim where written agreement was consistent with lawful behavior and

8   assertion that the "parties entered into an agreement to restrain trade" constituted "magic words"

9   not the required pleading of facts), *aff'd*, 323 Fed. Appx. 571 (9th Cir. 2009).  Consequently, the

10   Opposition's recounting of "evidentiary facts" <u>about the written agreements that this Court has</u>

11   <u>already held do not show a conspiracy to restrain trade</u> (Opp. at 32:4-7) is nonsensical.

12        Plaintiffs also argue that they are not required to plead "specific intent to violate the

13   antitrust laws" (Opp. at 33:23-26) despite asserting in conclusory fashion that "each Defendant

14   PAE shared a common illegal objective to eliminate competition" and that the AC's

15   "anticompetitive purpose" allegations supposedly show "direct evidence of anticompetitive

16   effect."  *Id.* at 21:3-11; 31:10-12.  Plaintiffs then spend two pages arguing (misleadingly) over the

17   purported scope of their "intent" pleading obligation, while ignoring the key issue:  Plaintiffs have

18   not even pleaded evidentiary facts of an agreement to aggregate "substitute" or "weak" patents at

19   all, much less one with any intent to act anticompetitively.[10]

20        Moreover, Plaintiffs never explain why the "PAE Defendants" would enter into such a

21   "conspiracy" with Fortress or how they stood to benefit.  Indeed, according to the AC, the PAE-

---

[10] In doing so, Plaintiffs ignore *Kendall*'s binding pronouncement that a plaintiff must allege "evidentiary facts which, if true, will prove a contract, combination or conspiracy . . . <u>by which the persons or entities intended to harm or restrain trade</u>."  *Kendall*, 518 F.3d at 1047 (emphasis added).  Plaintiffs also ignore this Court's holding that "there are not sufficient allegations of an agreement between Fortress and each of the Defendant PAEs <u>to aggregate weak patents for anti-competitive purposes.</u>"  Order at 39:28-40:1 (emphasis added); *see also Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 604-605 (N.D. Cal. 2020) (dismissing Section 1 claim where "there is no indication that [the defendants] agreed that the exclusive license would be used in an anticompetitive way").  Instead, Plaintiffs cite *Helix Milling Co. v. Terminal Flour Mills Co.*, 523 F.2d 1317 (9th Cir. 1975), which issued a "limited holding" based on an "unusual factual context" in which intent could be assumed from detailed allegations showing an obvious design to exclude a competitor.  *Id.* at 1320–21.

1    Fortress agreements imposed "terms so severe" (AC ¶ 29) that Fortress would eventually own or

2    control the PAEs' patents.  The AC apparently recognized this fundamental flaw in Plaintiffs'

3    conspiracy theory, so it added an allegation that the PAEs receive "favorable terms" (AC ¶ 50) in

4    their "conspiracies" with Fortress.  Yet the AC never identifies what these supposedly "favorable

5    terms" are, and this allegation is flatly inconsistent with the AC's assertion that the terms were

6    "severe."  Defendants' Motion pointed this out (Mot. at 33:1-14), but the Opposition never even

7    attempts to reconcile this dichotomy.  That is because Plaintiffs' conspiracy theory not only lacks

8    the required evidentiary facts to back it up; it also makes no sense.

9          Finally, as they did in connection with the last motion to dismiss, Plaintiffs again argue

10   that *U.S. v. Singer Mfg.*, 374 U.S. 174 (1963) excuses them from pleading evidentiary facts of an

11   actual agreement to harm or restrain trade.  *Compare* Opp. 33:13-15 *with* Dkt. 136 at 35:9-16.  It

12   still doesn't.  Unlike this case, *Singer* involved detailed communications by defendants showing a

13   "common design to exclude the Japanese machines in the United States," including by taking

14   coordinated dives on each other's patent validity challenges.  *Singer*, 374 U.S. at 195.  Likewise,

15   *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) involved far more than financial transactions "consistent

16   with 'rational, legal business behavior'" (Order at 28:23-24); it was a reverse payment settlement

17   that unlawfully protected a patentee's market from generic competition.  *Actavis,* 570 U.S. at 149.

18         In summary, the alleged restraint of trade in this case is the aggregation of "weak,"

19   "substitute" (and apparently "complement") patents for anti-competitive purposes.  As this Court

20   previously made clear, Plaintiffs were therefore required to plead facts which, if true, would prove

21   an agreement between Fortress and each of the Defendant PAEs to aggregate weak, substitute, and

22   complement patents.  *See* Order at 39:26-40:3.  The AC, like the Complaint before it, fails to plead

23   evidentiary facts of these purported agreements.  That compels dismissal of the Section 1 claim.

24   **V.     THE AC FAILS TO ALLEGE A SECTION 7 CLAIM**

25         The Motion demonstrated that the AC pleads no facts regarding market concentration or

26   Defendants' market share.  The Opposition does not contend otherwise.  Instead, Plaintiffs assert

27   that they are not required to plead such facts because they are relying on a "direct evidence"

28   theory.  *See* Opp. at 36:9-13.  Plaintiffs' position is contrary to settled law.

1     In a Clayton Section 7 claim, a plaintiff cannot rely on a direct evidence theory to avoid

2 pleading basic facts about the underlying market—*i.e.*, the market's size, its concentration, and

3 defendant's share.  As this Court explained in its Order, "determination of the relevant market is a

4 <u>necessary predicate</u> to a finding of a violation of the Clayton Act because the threatened monopoly

5 must be one which will <u>substantially lessen</u> competition within the area of effective competition.

6 <u>Substantiality can be determined only in terms of the market affected</u>." Order at 11:8-11 (quoting

7 *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (emphasis added)).  Indeed, in

8 *American Express,* even the four Justices who would have allowed plaintiffs to pursue their

9 Section 1 claim based on a direct evidence theory recognized that this approach is <u>not</u> viable for

10 Section 7 claims.  *See Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2291 (2018) ("It is important

11 here to understand that in cases under § 1 of the Sherman Act (<u>unlike in cases challenging a</u>

12 <u>merger under § 7 of the Clayton Act</u>, 15 U.S.C. § 18), it may well be unnecessary to undertake a

13 sometimes complex, market power inquiry.") (Breyer, J., dissenting) (emphasis added).

14 Consequently, as this District has held, "[t]o establish a § 7 violation, a party must show that the

15 merger would produce a firm controlling an <u>undue percentage share</u> of the relevant market, and

16 would result in a significant <u>increase in the concentration of firms</u> in that market." *Edstrom*, 2013

17 WL 5124149, at *3 (internal quotation marks omitted and emphasis added); *see also DeHoog v.*

18 *Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (Section 7 requires "adequately

19 alleging facts that an acquisition creates . . . a reasonable probability of anticompetitive effects in

20 the relevant market") (internal quotation marks omitted).[11]

21     Defendants' Motion cited numerous cases in which courts from the Ninth Circuit have

22 dismissed Section 7 claims because the plaintiff failed to allege facts regarding market

23 concentration or defendant's market share.  Mot. at 34:23-35:8.  Plaintiffs argue that these cases

24

---

25     [11] None of Plaintiffs' cited authority supports the contrary position.  Plaintiffs cite *FTC v. Lab. Corp. of Am*, 2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) for the proposition that there are

26 alternative ways of demonstrating a Section 7 violation.  However, the court engaged in extensive market share analysis, *id.* at *5-*6, and never explained what these other alternative ways are or

27 mentioned anything about "direct evidence."  Plaintiffs also rely on *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957), but, there was substantial evidence of market share

28 in that case, and the Court expressly noted that foreclosure of competition in a "substantial share" of a "relevant market" are <u>required</u> to show a Section 7 violation.  *Id.* at 593-595.

1   are inapposite because they "all involve the plaintiffs' attempts to rely on circumstantial evidence

2   of market power for ***unconsummated*** mergers—where there was necessarily no direct evidence of

3   anticompetitive effects to observe."  Opp. at 36:21-23 (emphasis in original).  That is incorrect.

4   Defendants' Section 7 cases involved <u>both</u> consummated and unconsummated mergers.[12]

5   Moreover, even in the context of consummated mergers, the Supreme Court has repeatedly held

6   that a proper market definition is a "necessary predicate" to examining an acquisition's effect on

7   competition, *Brown Shoe Co,* 370 U.S. at 335; *E. I. du Pont,* 353 U.S. at 594, and that there must

8   be a "substantial" share of the market affected.  *E.I. du Pont,* 353 U.S. at 595.  Plaintiffs' failure to

9   plead any facts regarding market share or concentration is thus fatal to their Section 7 claim.

10  **VI.   PLAINTIFFS' CLAIMS ARE BARRED UNDER *NOERR-PENNINGTON***

11        Because the AC fails to allege an antitrust violation that can stand independent of

12  Defendants' patent infringement litigations, then under the modified *Hynix* approach, the AC's

13  attacks on litigation conduct are inactionable and barred by *Noerr-Pennington*.  The Opposition

14  does not dispute this application of the modified *Hynix* approach but instead argues that "Plaintiffs

15  have alleged Section 1 and Section 7 violations independent of Defendants' patent assertions."

16  Opp. at 37:13-16.  As demonstrated in the Motion and herein, that is not the case.  However, given

17  the AC's multiple other failings, this Court need not even reach the *Noerr-Pennington* issue.

18  **VII.  ANTI-SLAPP LAW COMPELS THE STRIKING OF THE UCL CLAIMS**

19        California's Anti-SLAPP statute <u>compels</u> the striking of the UCL claims because they

20  (1) arise from protected activity and (2) fail as a matter of law.  Mot. at 35:11-40:3.  Plaintiffs'

21  UCL claims "arise from" protected activity because Defendants' protected litigation conduct

22  "supplies a necessary element" of Plaintiffs' UCL claims.  Mot. at 35:27-36:2 (quoting *Wilson v.*

23  *Cable News Network, Inc.*, 7 Cal. 5th 871, 892 (2019)).  This is because the only "lost money or

24  property" that Plaintiffs have allegedly suffered, which is an essential element of a UCL claim, is

25  the "litigation costs" they have incurred defending against Defendants' alleged "serial nuisance

---

[12] *See, e.g.*, *Golden Gate Pharm. Services, Inc. v. Pfizer, Inc.*, C-09-3854 MMC, 2009 WL 4723739, at *1 (N.D. Cal. Dec. 2, 2009) (noting that "defendants consummated [a] merger"); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 18-CV-02054-MMC, 2019 WL 1767335, at *1 (N.D. Cal. Apr. 22, 2019) (analyzing consummated merger), *aff'd*, 811 Fed. Appx. 422 (9th Cir. 2020).

1    suits." AC ¶¶ 452, 458; Mot. at 36:3-13.  Plaintiffs' Opposition does not even address this point

2    "and therefore concede[s] it."  *Flower v. Wachovia Mortg. FSB*, No. C 09-343 JF HRL, 2009 WL

3    975811, at *5 (N.D. Cal. Apr. 10, 2009).  Moreover, Plaintiffs now finally admit that their UCL

4    claims seek to enjoin Defendants from filing infringement suits (Opp. at 38:16-17), meaning these

5    claims necessarily target protected conduct.  *Equilon Enterps. v. Consumer Cause, Inc.*, 29 Cal.

6    4th 53, 68, n.4 (2002) ("arising from" prong satisfied where plaintiff "sought injunctive relief that

7    expressly would restrict [defendant's] exercise of petition rights," including the filing of lawsuits).

8        Plaintiffs' UCL claims fail as a matter of law.  Count 3, which is predicated on

9    Defendants' alleged antitrust violations, fails for all the same reasons their federal antitrust claims

10   fail.  Mot. at 36:21-37:3.  Moreover, neither of the UCL claims (Counts 3 and 4) seeks a remedy

11   available under the UCL.  Mot. at 37:4-38:9.  Plaintiffs attempt to avoid this result by finally

12   specifying that they are seeking to enjoin Defendants from filing lawsuits.  Opp. at 38:16-17.  But

13   that only digs Plaintiffs a deeper hole.  The First Amendment prohibits enjoining a lawsuit, which

14   constitutes a prior restraint on protected activity, unless the lawsuit is a "sham," which Plaintiffs

15   have not alleged here.  *See BE & K Const. Co. v. NLRB*, 536 U.S. 516, 526–27 (2002) (noting that

16   "prior restraints" are subject to the highest level of constitutional scrutiny).[13]  Likewise,

17   California's litigation privilege, which is absolute, bars UCL claims targeted at litigation.  Indeed,

18   Plaintiffs' own authority demonstrates as much.  Plaintiffs cite *Yokohama Rubber Co. v. S. China*

19   *Tire & Rubber Co.*, 2004 WL 5569948 (C.D. Cal. Oct. 19, 2004) in which the court held that there

20   was an available remedy under the UCL because the plaintiff could seek to enjoin the defendant

21   from "enforcing or attempting to enforce" its patent.  *Id.* at *4.  Plaintiffs fail to mention, however,

22   that the court also held that the UCL claim was barred as a matter of law because defendant's

23   patent lawsuit enjoyed "absolute privilege" under California law.  *Id.* at *5 (granting dismissal).

24       Count 4, which is predicated on Defendants' alleged breach of FRAND commitments, fails

25   as a matter of law under *Qualcomm.*, 969 F.3d at 997.  Apple's sole response to *Qualcomm* is a

26   single footnote contending that *Qualcomm* is inapplicable because it addressed "claims under

27   _____

28       **[13]** Plaintiffs have repeatedly disclaimed any attempt to allege sham litigation.  *See, e.g.*,
     Dkt. 136 at 29:10-13; 31:4-6.

1    Sections 1 and 2 of the Sherman Act, not Section 5 of the FTC Act or the UCL." Opp. at 39, n.5.

2    But the court's holding was not so limited. As the Ninth Circuit explained, the breach of a

3    FRAND commitment "does not amount to anticompetitive conduct," and any remedy for such a

4    breach "lies in contract and patent law." *Qualcomm*, 969 F.3d at 1005. This holding would be a

5    mere formality if the FTC and private plaintiffs could simply assert that FRAND violations were

6    anticompetitive under Section 5 of the FTC. Apple never explains why *Qualcomm*'s reasoning

7    would not apply to a Section 5 claim or a UCL claim, nor does Apple cite any court (either before

8    or after *Qualcomm*) that has ever held that breach of a FRAND commitment constitutes an FTC

9    Section 5 violation. Indeed, all of Plaintiffs' cited case law in support of their FRAND claim

10   involves alleged Sherman Act violations, not FTC Section 5. *See* Opp. at 39:17-19; 40:10-17,

11   Dkt. 136 at 41:10-15; *see also* Order at 17:19-18:4 (applying antitrust law to UCL claims as they

12   are based in part on "the spirit and policy of the antitrust laws" and Claim 4 invokes the FTCA).

13          Finally, Apple does not dispute that it has failed to plead any facts showing that any

14   Defendant has refused to offer a FRAND rate (*e.g.*, the price that Defendants have supposedly

15   charged for SEPs and how it compares to a FRAND rate). Mot. at 39:13-19. Instead, Apple

16   argues that it is not required to plead such facts. But Apple simply ignores Defendants' authority

17   holding that conclusory allegations of improper pricing are not sufficient to state a UCL claim.

18   Mot. at 39:15-17 (citing *Lazo v. Bank of Am.*, No. C 12-00762 LB, 2012 WL 1831577, at *12

19   (N.D. Cal. May 18, 2012)). In contrast, none of Plaintiffs' cited authorities holds that a plaintiff

20   can state a claim for breach of a FRAND commitment without alleging any supporting facts.

21   **VIII.   CONCLUSION**

22          Like the Opposition, the AC is long on rhetoric and short on facts and substance. The

23   Order clearly delineated the Complaint's numerous failings, and the AC failed to correct them.

24   Defendants' Motion should be granted without leave to amend. *World Wide Rush, LLC v. City of*

25   *L.A.*, 606 F.3d 676, 690 (9th Cir. 2010) ("The district court's discretion to deny leave to amend is

26   particularly broad where a plaintiff previously has amended the complaint.").[14]

27   _____

28          [14] If the Court grants the motion to strike, Defendants request briefing on the fee award
     pursuant to Cal. Civ. Proc. Code § 425.16(c)(1).

1   Dated:  November 17, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

IRELL & MANELLA LLP

By:*/s/ A. Matthew Ashley*
    A. Matthew Ashley
    *Counsel for Defendants*
    FORTRESS INVESTMENT GROUP LLC,
    FORTRESS CREDIT CO. LLC,
    VLSI TECHNOLOGY LLC

*/s/ Christopher A. Seidl*
Christopher A. Seidl (*pro hac vice*)
CSeidl@RobinsKaplan.com
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone:  612 349 8468
Facsimile:  612 339-4181
*Counsel for Defendants*
INVT SPE LLC
INVENTERGY GLOBAL, INC.

*/s/ Jason D. Cassady*
Jason D. Cassady (*pro hac vice*)
jcassady@caldwellcc.com
CALDWELL CASSADY & CURRY
2121 N. Pearl Street, Suite 1200
Dallas, TX 75201
Telephone: 214 888-4841
Facsimile:  214-888-4849
*Counsel for Defendant*
IXI IP, LLC

*/s/ James J. Foster*
James J. Foster
jfoster@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
Telephone:  617 456-8022
Facsimile:  617 456-8100
*Counsel for Defendant*
UNILOC 2017 LLC

*/s/ Daniel. R. Shulman*
Daniel R. Shulman (*pro hac vice*)
dan@shulmanbuske.com
SHULMAN & BUSKE PLLC
126 North Third Street, Suite 402
Minneapolis, MN 55401

Telephone: 612 870 7410
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC

*/s/ Dean C. Eyler*
Dean C. Eyler (*pro hac vice*)
dean.eyler@lathropgpm.com
LATHROP GPM LLP
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612 632-3335
Facsimile: 612 632-4000
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC

*/s/ Samuel F. Baxter*
Samuel F. Baxter (*pro hac vice*)
sbaxter@mckoolsmith.com
John Briody (*pro hac vice*)
jbriody@mckoolsmith.com
MCKOOL SMITH
104 East Houston, Suite 100
Marshall, TX 75670
Telephone:  903 923-9001
Facsimile:  903 923-9099
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001-8603
Telephone: 212.402.9438
*Counsel for Defendant*
SEVEN NETWORKS, LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### ECF ATTESTATION

I, Olivia Lauren Weber, am the ECF user whose ID and password are being used to file DEFENDANTS' REPLY IN SUPPORT OF THEIR JOINT MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' AMENDED COMPLAINT.  I hereby attest that I received authorization to insert the signatures indicated by a conformed signature (/s/) within this e-filed document.


By: */s/   Olivia Lauren Weber*
Olivia Lauren Weber