UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTEL CORPORATION, et al., | Case No. 19-cv-07651-EMC |
| Plaintiffs, | **PUBLIC/REDACTED VERSION** |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| FORTRESS INVESTMENT GROUP LLC, et al., | Docket No. 203 |
| Defendants. | |

Plaintiffs Intel Corporation and Apple Inc. have filed an antitrust suit against Fortress Investment Group LLC and affiliated entities. The Court previously granted Defendants' motion to dismiss but with leave to amend. *See* Docket No. 190 (order). After Plaintiffs filed their first amended complaint ("FAC"), Defendants moved to dismiss again. This is the motion currently pending before the Court. Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion to dismiss but with leave to amend, as provided for below.

## I.     FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs have sued the following entities:

(1)     Fortress Investment Group LLC and Fortress Credit Co. LLC ("Fortress");

(2)     Uniloc 2017 LLC; Uniloc USA, Inc.; and Uniloc Luxembourg S.A.R.L. ("Uniloc");

(3)     VLSI Technology LLC ("VLSI");

(4)     INVT SPE LLC and Inventergy Global, Inc. ("INVT");

(5)     IXI IP, LLC ("IXI"); and

1   (6)     Seven Networks, LLC ("Seven").[1]

2   Plaintiffs essentially bring antitrust claims against Defendants.  There are two basic factual

3   predicates underlying Plaintiffs' claims: (1) Defendants aggregated patents and then asserted or

4   threatened to assert those patents against Plaintiffs, including through litigation, and (2) third

5   parties transferred standard essential patents to Defendants, which then asserted or threatened to

6   assert those patents against Plaintiffs.  The first factual predicate shall hereinafter be referred to as

7   the Patent Aggregation Theory; the second factual predicate shall hereinafter be referred to as the

8   SEP Transfer Theory.  Below the Court briefly outlines the allegations in support of each theory.

9   A.      Patent Aggregation Theory

10          1.      General Theory of Liability

11          In their FAC, Plaintiffs allege as follows with respect to the Patent Aggregation Theory.

12          Patent assertion entities ("PAEs") are companies that "aggressively pursue meritless

13  [patent infringement] litigation."  FAC ¶ 2.  In recent years, "PAEs have evolved" by "partnering

14  with investment firms to fuel their litigation."  FAC ¶ 6.  Fortress is one such investment firm.  *See*

15  FAC ¶ 8.  Fortress owns or controls the PAEs identified in (2)-(6) above.  *See* FAC ¶¶ 9-10.

16  Through the PAEs, Fortress has "aggregate[d] a massive . . . portfolio of patents that purportedly

17  read on high-tech consumer and enterprise electronic devices and components or software therein

18  and processes used to manufacture them."  FAC ¶ 9.  The aggregated patents number "well over a

19  thousand."  FAC ¶ 29.

20          Before the patent aggregation by Fortress, the "diffuse" owners of the patents were

21  constrained from making patent assertions against others.  FAC ¶ 9.  For example:

22          •   A patent owner might not assert a patent because it is "weak" in the sense that the

23              patent is of questionable validity, that there is questionable infringement, and/or

24              that the patent can easily be designed around.  *See* FAC ¶ 34.

25          •   Also, even if a patent is not substantively weak, a patent owner might not assert the

26              patent because of "competitive constraints."  FAC ¶ 49; *see also* FAC ¶ 5

---

[1] Apple, but not Intel, has dismissed its claims against Seven.  *See* Docket Nos. 219-20 (stipulation and order).

United States District Court
Northern District of California

(indicating that "weak" patents also include "those that never would have been asserted by their former owners, which faced competitive constraints"). "For example, infringement actions by component or software suppliers against customers or potential customers will limit prospects for future sales. Suits by electronic device suppliers against suppliers or potential suppliers of components or software could jeopardize their ability to source essential components or software for their devices. Reputational and relational harm from filing repeated, baseless infringement suits will limit product companies' ability to participate effectively in collaborative industry initiatives, such as standard setting or other industry endeavors." FAC ¶ 49 (noting that PAEs are "companies that produce no products" and thus have "different incentives").

Furthermore, even if a patent owner would not be constrained from making patent assertions, the facts above – including but not limited to the fact that there were alternatives to the patent (*i.e.*, substitutes), *see* FAC ¶ 37 – would still constrain the royalties that the patent owner could demand. *See* FAC ¶ 9.

Fortress's aggregation scheme, however, changed matters. First, through aggregation, alternative sources of substitute patents were eliminated. *See* FAC ¶ 37. Aggregation in this regard is akin to a "merger or combination of competitors that lessens competition." FAC ¶ 40. Second, aggregation "elevate[d] the value of asserting weak patents." FAC ¶ 38. With a large number of patents, including weak ones, Defendants were able to make "endless patent assertions"

> in order to stretch the resources of their targets and increase the possibility that those weak patents will improperly be found valid and infringed or the prospect that a target (like Intel or Apple) will agree to a license to resolve the threat posed by Fortress and its PAEs.

FAC ¶ 10. Through "waves of lawsuits," Defendants "can deploy patent after patent in case after case against their targets with the threat of ever more patent assertions and ever more litigation." FAC ¶ 12. Accordingly, "assertion of weak patents as part of a wave of assertions against a target generates economic value even if many of those assertions are defeated in litigation." FAC ¶ 38.

United States District Court
Northern District of California

2.      Product Markets

Previously, the Court indicated that Plaintiffs' general theory of antitrust liability was not inherently implausible.  However, the Court held that Plaintiffs failed to state a plausible claim for relief because the product market they identified was vague and overbroad.  The product market that Plaintiffs had identified was the "Electronics Patents Market," which was expansively defined as the market for patents for high-tech consumer and enterprise electronic devices and components or software therein and processes used to manufacture them.  *See* Docket No. 190 (Order at 13-17).

In the FAC, Plaintiffs have now defined narrower product markets – 13 in total.[2]  The products in the 13 markets are all patents.  The markets cover patents related to the following technologies/functions:

(1)      Network-based voice messaging.  *See* FAC ¶ 127 *et seq.*

(2)      Remote software updates.  *See* FAC ¶ 154 *et seq.*

(3)      Mobile device-to-device communication.  *See* FAC ¶ 178 *et seq.*

(4)      Local cache management.  *See* FAC ¶ 211 *et seq.*

(5)      Shared memory access.  *See* FAC ¶ 234 *et seq.*

(6)      Device authorization.  *See* FAC ¶ 250 *et seq.*

(7)      Health monitoring.  *See* FAC ¶ 290 *et seq.*

(8)      MOSFET channel fabrication.  *See* FAC ¶ 319 *et seq.*

(9)      Digital rights management.  *See* FAC ¶ 339 *et seq.*

(10)     Cryptographic algorithms using modular multiplication.  *See* FAC ¶ 360 *et seq.*

(11)     DRAM refreshing.  *See* FAC ¶ 367 *et seq.*

(12)     Input/output pads.  *See* FAC ¶ 374 *et seq.*

(13)     Fingerprint authentication.  *See* FAC ¶ 381 *et seq.*

---

[2] In their opposition, Plaintiffs repeatedly assert that the 13 markets are "exemplar[s]."  Opp'n at 1.  Presumably, this is because Plaintiffs take the position that Defendants have "obscured information regarding their patent holdings."  Opp'n at 7.  Nevertheless, at this juncture, the Court shall not allow Plaintiffs to claim markets beyond the 13 specified.

United States District Court
Northern District of California

1    Thus, *e.g.*, for (1) above, Plaintiffs allege that the Network-based Voice Messaging Patents Market

2    consists of a market where Defendants and other patent holders have patents that read on

3    electronic devices that support network-based voice messaging.  According to Plaintiffs,

4    Defendants and the other patent holders "compete with one another [in this market] to license their

5    patents to suppliers of such devices and supporting software."  FAC ¶ 128.

6         With respect to the product markets in (10)-(13) above, Plaintiffs admit that Defendants

7    have not yet asserted patents in those markets but claim that there is an "ongoing threat that

8    Defendants will assert such patents."  FAC ¶ 359.

9         3.    Direct Evidence of Anticompetitive Effects

10        In any antitrust claim, a critical issue is whether the defendant's conduct has or will have

11   anticompetitive effects in a given product market.  As the Court noted in its prior order, there can

12   be direct evidence of anticompetitive effects or indirect evidence of anticompetitive effects.

13   "Direct evidence of anticompetitive effects would be proof of *actual* detrimental effects, such as

14   reduced output, increased prices, or decreased quality in the relevant market."  *Ohio v. Am.*

15   *Express Co.*, 138 S. Ct. 2274, 2284 (2018) (emphasis added).  "Indirect evidence would be proof

16   of market power plus some evidence that the challenged restraint harms competition."  *Id.*  Market

17   power is essentially a surrogate for detrimental effects.  *See FTC v. Ind. Fed'n of Dentists*, 476

18   U.S. 477, 460-61 (1986) (noting such; also stating that "the purpose of the inquiries into market

19   definition and market power is to determine whether an arrangement has the potential for genuine

20   adverse effects on competition"); *see also Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827 n.6 (6th

21   Cir. 2011) (noting that courts "have permitted an inference of adverse effects based on a showing

22   of market power and anticompetitive tendencies").  If a plaintiff can make a showing of actual

23   anticompetitive effects, then "[a] full-blown market analysis is not necessary."  *Bhan v. NME*

24   *Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).

25        In the instant case, Plaintiffs claim that Defendants' conduct has resulted in actual

26   anticompetitive effects – in particular, supracompetitive pricing in each of the relevant markets.

27   *See* FAC ¶ 436 (referring to "inflated licensing royalties – *i.e.*, higher prices").  Below are three

28   representative examples from the FAC.

United States District Court
Northern District of California

5

1                            a.            Market for Patents Covering Network-based Voice Messaging

2            According to Plaintiffs, for the Network-based Voice Messaging Patents Market,

3  Defendants have aggregated the following patents, which are all substitutes for one another.

4                    (1) The '252 patent.  This patent was originally held by Philips.  The patent was

5                         assigned several times from one company to another.  Uniloc obtained the patent

6                         from a company known as Pendragon Wireless.  *See* FAC ¶ 131.

7                    (2) The '5890, '723, '622, and '433 patents (all in the same patent family).  The patents

8                         were originally held by Ayalogic.  Uniloc obtained the patents from a company

9                         known as Empire.[3]  *See* FAC ¶¶ 133, 135.

10            Plaintiffs allege that the prior owners of the patents above "never asserted these patents

11  [against others] because of the competitive constraints they faced."  FAC ¶ 142 (emphasis added).

12  Plaintiffs do not identify what those competitive constraints were, but presumably they could

13  include the competitive constraints described in ¶ 49 of the FAC.  Uniloc, however, has not been

14  constrained and has instead filed a number of lawsuits asserting infringement of the patents.  *See,*

15  *e.g.*, FAC ¶¶ 143, 146.  According to Plaintiffs, Uniloc has sought supracompetitive royalties for

16  the patents.

17            For example, in a lawsuit that Uniloc brought against Apple, asserting infringement of the

18  '252 patent, Uniloc estimated its damages at over $489 million.  *See* FAC ¶ 151.  Plaintiffs allege

19  that

20                 [t]his damages demand is significantly more than the original owner

21                 of the '252 patent – Philips – has demanded for *other* of its patents.

22  ████████████████████████████████████████

23

24  [3] According to Plaintiffs, there are additional patents that are "complements to, and possibly substitutes for," the above five patents.  FAC ¶ 136; *see also* FAC ¶¶ 137-40 (referring to the '744

25  patent currently owned by Seven and the '579 patent originally owned by Huawei and currently owned by INVT).

26         For all 13 product markets, Plaintiffs suggest that they cannot detail all of the patents that

27  have been aggregated because Defendants have obfuscated ownership of patents.  *See* Opp'n at 16 (arguing that "Defendants' obfuscation – including failing to disclose PAEs' connections to

28  Fortress – impedes Plaintiffs, without discovery, form specifically identifying all substitute patents that are now controlled by Defendants").

United States District Court
Northern District of California

1

██████████

2 FAC ¶ 151 (emphasis added) **[filed under seal]**.

3        Plaintiffs also allege that Uniloc was able to license the above patents to some companies

4 (companies that Uniloc had sued for infringement but with whom Uniloc ultimately settled), *see*

5 FAC ¶ 152, but there is no indication as to how much these companies paid for their licenses.

6 Plaintiffs essentially concede such but argue that they cannot be blamed for not having "access to

7 the confidential terms of the settlements."  Opp'n at 6.

8        b.        Market for Patents Covering Local Cache Management

9        According to Plaintiffs, for the Local Cache Management Patents Market, Defendants have

10 aggregated the following patents, which are all substitutes for one another.

11        (1) The '641 patent.  This patent was originally held by Philips.  The patent was

12             assigned several times from one company to another.  Uniloc obtained the patent

13             from a company named Pendragon Wireless.  *See* FAC ¶ 215.

14        (2) The '437 patent.  This patent was originally held by ETRI.  The patent was

15             assigned several times from one company to another.  Uniloc obtained the patent

16             from a company named Pendragon Electronics.  *See* FAC ¶ 217.

17        (3) The '009 patent.  This patent was originally held by Freescale.  VLSI obtained the

18             patent from a company named NXP.  *See* FAC ¶ 219.

19        Plaintiffs also assert that there are additional patents that are "complements to, and

20 possibly substitutes for," the '641 and '009 patents; this includes the '014 patent.  FAC ¶ 220; *see*

21 *also* FAC ¶¶ 221-24 (referring to the '761 patent originally held by Freescale and currently owned

22 by VLSI; the '331 patent originally held by NXP and currently owned by VLSI; the '014 patent

23 originally held by Freescale and currently owned by VLSI; and the '357 patent originally held by

24 Freescale and currently owned by VLSI).

25        Plaintiffs allege that the prior owners of the latter category of patents – *i.e.*, the

26 complement/substitute patents identified above – "never asserted these patents because of the

27 competitive constraints they faced."  FAC ¶ 226 (emphasis added); *see also* FAC ¶ 232.  Plaintiffs

28 do not identify what those competitive constraints were, but presumably they could include the

United States District Court
Northern District of California

competitive constraints described in ¶ 49 of the FAC.  Defendants, however, have not been

constrained.  VLSI, for instance, has filed a number of lawsuits asserting infringement of its

patents.  *See, e.g.*, FAC ¶ 227.  According to Plaintiffs, VLSI has sought supracompetitive

royalties for its patents.

    For example, VLSI brought a lawsuit against Intel, asserting infringement of eight patents,

including the '014 patent.  VLSI estimated its damages for the eight patents, including the '014

patent, at approximately $7.1 billion.[4]  *See* FAC ¶¶ 100, 228.  Plaintiffs allege that

> [t]hat amount significantly exceeds what Freescale sought *for this
> very patent*. . . . Freescale offered Intel a license for ███████
> ████████████████████████████████████ – an offer that would have *included* the
> '014 patent if Intel had accepted.  VLSI's damages estimate is also
> significantly more than Freescale has sought for *other* of its patents
> containing microprocessor features.  Specifically, in December
> 2014, Intel purchased from Freescale for $3.5 million a total of 29
> patent families, including 13 U.S. patents . . . .

FAC ¶ 228 (emphasis added) **[filed under seal]**.

    Plaintiffs also allege that Uniloc and Seven were able to get some companies to license

their patents (including a company that Uniloc had sued for infringement), *see* FAC ¶ 176, but

there is no indication as to what these companies paid for their licenses.  Again, Plaintiffs maintain

that they cannot be blamed for not having access to confidential information.

        c.    <u>Market for Patents Covering Shared Memory Access</u>

    According to Plaintiffs, for the Shared Memory Access Patents Market, Defendants have

aggregated the following patents, which are all substitutes for one another.

        (1)  The '687 patent.  This patent was originally held by ETRI.  The patent was

            assigned several times from one company to another.  Uniloc obtained the patent

            from a company named Phoenicia.  *See* FAC ¶ 238.

        (2)  The '850 patent.  This patent was originally held by ETRI.  The patent was

            assigned several times from one company to another.  Uniloc obtained the patent

---

[4] According to Plaintiffs, they asked VLSI permission to disclose the specific damages estimate for alleged infringement of the '014 patent ("as well as the financial terms of [the] purchase of the patent from NXP (which had merged with Freescale)"), but VLSI refused to consent.  FAC ¶ 228.

United States District Court
Northern District of California

1    from a company named Pendragon Electronics.  *See* FAC ¶ 240.

2         (3) The '983 patent.  This patent was originally held by NXP.  NXP transferred the

3         patent to VLSI.  *See* FAC ¶ 219.

4    Plaintiffs allege that the prior owners of the patents "never asserted these patents because

5    of the competitive constraints they faced."  FAC ¶ 244; *see also* FAC ¶ 248.  Plaintiffs do not

6    identify what those competitive constraints were, but presumably they could include the

7    competitive constraints described in ¶ 49 of the FAC.  Defendants, however, have not been

8    constrained.

9         VLSI, for instance, has filed lawsuits against Intel based on the '983 patent and other

10   patents.  *See* FAC ¶ 246.  According to Plaintiffs, VLSI has sought supracompetitive royalties for

11   the '983 patent.  In support of this claim, Plaintiffs allege that

12        [t]he damages estimates VLSI has disclosed publicly in connection
         with its assertion of *other* patents obtained from the same prior
13        owner [NXP] against Intel have been exorbitant – as discussed
         above, VLSI disclosed that it would seek $7.1 billion in a suit
14        against Intel involving eight patents [as well as] billions in a suit
         against Intel involving five patents.  This amount is significantly
15        more than NXP has sought for *other* of its patents concerning
         microprocessor features.
16

17   FAC ¶ 247 (going on to provide specific examples of how much NXP offered to sell Intel certain

18   *other* patents).

19        Plaintiffs maintain that that, even if the above does not clearly establish supracompetitive

20   pricing here, there is other – stronger – evidence to support such, specifically, if one were to

21   compare the relatively low price that VLSI paid to acquire the '983 patent to the exorbitant

22   damages VLSI has claimed for Intel's alleged infringement of the '983 patent.  According to

23   Plaintiffs, they are privy to this specific information because of the lawsuits that VLSI filed

24   against Intel and would have made specific allegations containing this information in the FAC;

25   however, when Plaintiffs asked VLSI for permission to disclose the information in the instant

26   case, VLSI refused.  *See* FAC ¶ 247.

27   B.    SEP Transfer Theory

28        Although the bulk of Plaintiffs' FAC focuses on the Patent Aggregation Theory, Apple

9

1 also brings a claim based on independent conduct: the transfer of standard essential patents

2 ("SEPs") from third parties to Fortress and its PAEs.  For this theory, Plaintiffs allege as follows.

3    ETSI is a standard-setting organization ("SSO") that "produces globally-accepted

4 standards for the telecommunications industry."  FAC ¶ 399.  Each cellular standard that ETSI

5 adopts "consists of many different technologies that perform a variety of functions.  The

6 technologies that perform each of these functions are essential inputs into the manufacture and

7 supply of products and services that support the standards."  FAC ¶ 410.  "The functionality for

8 cellular standards associated with each input technology comprises its own relevant market . . . ."

9 FAC ¶ 414 (referring to the Input Technology Market(s)).

10    ETSI has a policy that "obligates members to disclose to ETSI and its members patents and

11 patent applications that a member believes are or may become essential to an ETSI standard,"[5]

12 and, "[o]nce such a disclosure is made, the member is requested to submit an irrevocable

13 undertaking confirming its willingness to license the IPRs [intellectual property rights] it has

14 disclosed on FRAND [fair, reasonable, and nondiscriminatory] terms and conditions."  FAC ¶

15 402.  Implicitly, ETSI has this policy because it recognizes that, "[o]nce a standard, like LTE, is

16 adopted, the viability of using alternative technologies that are not standardized to perform

17 functions included in the standard is constrained or eliminated.  That is, standardization constrains

18 or eliminates . . . substitutes."  FAC ¶ 412; *see also* FAC ¶ 395 (noting that, when a "standard is

19 set and technology to perform a particular functionality is incorporated in the standard, users of the

20 standard become 'locked in' to using that technology through their investment in products and

21 services that support the standard," which "creates a risk that patent holders claiming to have

22 essential patents will attempt to exploit their patents by demanding excessive royalties or seeking

23 to enjoin the use of their patents").

24    INVT and Uniloc acquired "declared essential SEPs" from Panasonic, Nokia, Huawei, and

25 Philips.  *See* FAC ¶¶ 418-422 (identifying specific patents by number).  "Transferring SEPs from

26 an operating company that supplies its own products and participates in SSOs to a PAE allows the

_____

[5] Plaintiffs indicate that "SSOs typically make no evaluation of whether a claimed-essential patent is actually essential."  FAC ¶ 396.

PAE to escape the protections for licensees to which licensors agree through making a FRAND

commitment." FAC ¶ 423. "Simply by *asserting* that they have large portfolios of essential

patents, INVT and Uniloc . . . can obtain royalties or other licensing terms for the patents above

what they could have obtained before ETSI . . . standardized the technology that INVT and Uniloc

. . . claims is covered by their patents." FAC ¶ 417 (emphasis added); FAC ¶ 429 (referring to

"*asserted* SEPs held by INVT and Uniloc [that] *claim* to cover essential technology") (emphasis

added).

　　　In their opposition brief, Plaintiffs state that they wish to amend their complaint to make

additional factual allegations in support of the SEP Transfer Theory. *See* Opp'n at 9 (asserting

that, in August 2020, shortly after the FAC was filed, VoiceAge EVS – a company affiliated with

Fortress – sued Apple, "asserting five patents claimed to be essential to the EVS codec in the LTE

cellular standard and subject to FRAND commitments").

C.　Causes of Action

　　　Based on, *inter alia*, the above allegations, Plaintiffs have asserted the following causes of

action.

　　　**(1) Violation of § 1 of the Sherman Act (against Fortress, Uniloc, INVT, and IXI).**

　　　　　Under § 1, "[e]very contract, combination in the form of trust of otherwise, or

　　　　　conspiracy, in restraint of trade or commerce among the several States, or with

　　　　　foreign nations, is declared to be illegal." 15 U.S.C. § 1. Here, Plaintiffs' § 1

　　　　　claim puts forward a Patent Aggregation Theory only. According to Plaintiffs,

　　　　　Fortress and each relevant PAE entered into a bilateral agreement "to aggregate

　　　　　patents under Fortress's control" and to use the aggregation to extract higher

　　　　　royalties.[6] FAC ¶ 440.

---

[6] In their opposition, Plaintiffs clarified that they are asserting only bilateral conspiracies between each PAE and Fortress (*i.e.*, not an overarching conspiracy involving all Defendants). However, the precise scope and nature of the bilateral conspiracies is still somewhat ill-defined. For example, are Plaintiffs claiming that each PAE worked with Fortress to aggregate the patents the PAE has? Or is that that PAE knew Fortress would aggregate the PAE's patents with another PAE's patents in the same market (*i.e.*, the PAE was just contributing to Fortress's "pot of patents," so to speak)? Or is it both? Whether antitrust injury is adequately alleged may turn in part on the nature of the asserted conspiracies.

United States District Court
Northern District of California

(2) **Violation of § 7 of the Clayton Act (against Fortress, Uniloc, VLSI, INVT, IXI, and Seven).**  Under § 7, "no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person also engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18; *see also St. Alphonsus Med. Ctr.-Nampa, Inc. v. Saint Luke's Health Sys.*, 778 F.3d 775, 783, 785 (9th Cir. 2015) (noting that "'§ 7 was intended to arrest anticompetitive tendencies in their incipiency'"; *e.g.*, "[a] prima facie case can be established simply by showing high market share").  Here, Plaintiffs' § 7 claim also asserts a Patent Aggregation Theory only.  According to Plaintiffs, Fortress and each relevant PAE have acquired patents, and the effect of the aggregation has been "to lessen competition substantially, and to tend to create market power."  FAC ¶ 445.

(3) **Unfair competition in violation of California Business & Professions Code § 17200 (against all Defendants).**  This claim is derivative of the two federal antitrust claims above.  *See* FAC ¶ 450 (alleging that "Defendants have engaged in illegal conduct by violating the Sherman and Clayton Acts"; also alleging that the conduct "is . . . unfair in that it violates the spirit and policy of the antitrust laws").

(4) **Unfair competition in violation of § 17200 (against Fortress, Uniloc, and INVT).**  This claim is brought by Apple only and is based on the SEP Transfer Theory.  According to Apple, SEPs have been transferred as a means of trying to get around FRAND commitments.  Plaintiffs allege that the relevant Defendants' conduct "violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45" and "is also unfair in that it violates the spirit and policy of the antitrust laws."  FAC ¶ 454; *see also* FAC ¶ 457 (alleging that "[t]he FTC has brought an action under Section 5 where, like here, an acquiring firm refused to abide by licensing commitments that its predecessor made in connection with industry standard-setting activities").  This claim is not

1    predicated on aggregation of patents.

2                                    **II.    <u>DISCUSSION</u>**

3    A.    <u>Legal Standard</u>

4          Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

5    statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

6    complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

7    Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

8    after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

9    *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must

10   . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765

11   F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true

12   and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

13   *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

14   complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

15   allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

16   effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).   "A claim has facial

17   plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

18   inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The

19   plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

20   possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

21   B.    <u>Counts One Through Three: Product Markets</u>

22         Plaintiffs' first three claims are all antitrust claims: a Sherman Act § 1 claim, a Clayton Act

23   § 7 claim, and a derivative § 17200 claim.  They are all based on the Patent Aggregation Theory.

24   Plaintiffs claim that Defendants' patent aggregation and patent assertion have had anticompetitive

25   effects and thus violate antitrust law.

26         As the Court noted in its prior order, in order to assess whether Defendants' conduct has

27   had anticompetitive effects, it must first have an understanding of what the relevant market is.  *See*

28   Docket No. 190 (Order at 11-12); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir.

United States District Court
Northern District of California

13

2020) (stating that "[a] threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition'"; without a definition of the market, "there is no way to measure [the defendant's] ability to lessen or destroy competition") (internal quotation marks omitted); *R.D. Imps. Ryno Indus., Inc. v. Mazda Distribs. (Gulf), Inc.*, 807 F.2d 1222, 1224 (5th Cir. 1987) (in a § 1 case, noting that "[m]arket considerations provide the objective benchmark for the measurement of competitive impact[;] [t]here can thus be no rational ascertainment of competitive injury without first defining the relevant market"); *cf. Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (stating that, for a Sherman Act § 2 claim, a market definition is necessary as, without such, "there is no way to measure [a defendant's] ability to lessen or destroy competition"). What the relevant market is generally a factual question rather than a legal one. *See Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

As noted above, Plaintiffs have identified 13 product markets. The products in the 13 markets are all patents – specifically, patents that relate to the following technologies/functions:

> (1)     Network-based voice messaging. *See* FAC ¶ 127 *et seq.*
>
> (2)     Remote software updates. *See* FAC ¶ 154 *et seq.*
>
> (3)     Mobile device-to-device communication. *See* FAC ¶ 178 *et seq.*
>
> (4)     Local cache management. *See* FAC ¶ 211 *et seq.*
>
> (5)     Shared memory access. *See* FAC ¶ 234 *et seq.*
>
> (6)     Device authorization. *See* FAC ¶ 250 *et seq.*
>
> (7)     Health monitoring. *See* FAC ¶ 290 *et seq.*
>
> (8)     MOSFET channel fabrication. *See* FAC ¶ 319 *et seq.*
>
> (9)     Digital rights management. *See* FAC ¶ 339 *et seq.*
>
> (10)    Cryptographic algorithms using modular multiplication. *See* FAC ¶ 360 *et seq.*
>
> (11)    DRAM refreshing. *See* FAC ¶ 367 *et seq.*
>
> (12)    Input/output pads. *See* FAC ¶ 374 *et seq.*
>
> (13)    Fingerprint authentication. *See* FAC ¶ 381 *et seq.*

1      1.      Product Markets (10)-(13)

2              As an initial matter, the Court considers the product markets in (10)-(13).  Plaintiffs admit

3      that Defendants have not yet asserted patents in those markets but claim that there is an "ongoing

4      threat that Defendants will assert such patents."  FAC ¶ 359.  However, Plaintiffs have not made

5      allegations explaining why there is a threat that Defendants will assert those patents – and against

6      Plaintiffs specifically.  Absent further allegations, Plaintiffs have not adequately established

7      standing to assert antitrust claims based on those product markets.  *See In re Zappos.com, Inc.*,

8      888 F.3d 1020, 1024 (9th Cir. 2018) (noting that, to have Article III standing, a plaintiff must

9      show, *inter alia*, an injury in fact that is "'concrete and particularized and (b) actual or imminent,

10     not conjectural or hypothetical'"; "[a] plaintiff threatened with future injury has standing to sue 'if

11     the threatened injury is "certainly impending," or there is a "substantial risk that the harm will

12     occur"'"); *cf. Asia Vital Components Co. v. Asetek Danmark A/S*, 837 F.3d 1249, 1253 (Fed. Cir.

13     2016) (in addressing whether there was subject matter jurisdiction over a declaratory judgment

14     suit seeking a declaration of no patent infringement and patent invalidity, stating that "'jurisdiction

15     generally will not arise merely on the basis that a party learns of the existence of a patent owned

16     by another or even perceives such a patent to pose a risk of infringement, without some

17     affirmative act by the patentee'"; there must be "'conduct that can be reasonably inferred as

18     demonstrating intent to enforce a patent'").

19             The Court therefore dismisses all antitrust claims based on the product markets identified

20     in (10)-(13).  The Court dismisses with prejudice as Plaintiffs have provided no indication that

21     they are capable of curing this deficiency on standing.  This ruling, however, does not bar

22     Plaintiffs from initiating a new suit (including but not limited to a suit for declaratory relief)

23     should circumstances change.

24     2.      Product Markets (1)-(9)

25             As noted above, whether a defendant's conduct has had anticompetitive effects depends on

26     what the product market is.  A product market "encompass[es] the product at issue as well as all

27     economic substitutes for the product."  *Newcal*, 513 F.3d at 1045.  "'The outer boundaries of a

28     product market are determined by the reasonable interchangeability of use or the cross-elasticity of

demand between the product itself and substitutes for it.'"  *Id.*  In the instant case, the product

markets are arguably better characterized as patent markets or technology markets.  *See* DOJ &

FTC, Antitrust Guidelines for the Licensing of Intellectual Property § 3.2.2 (Jan. 12, 2017)

("Technology markets consist of the intellectual property that is licensed . . . and its close

substitutes – that is, the technologies or goods that are close enough substitutes to constrain

significantly the exercise of market power with respect to the intellectual property that is

licensed."), available at

https://www.ftc.gov/system/files/documents/public_statements/1049793/ip_guidelines_2017.pdf

(last visited 11/13/2020); *see also Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905

RMW, 2008 U.S. Dist. LEXIS 123822, at *14-15 (N.D. Cal. Jan. 5, 2008) ("Traditional antitrust

theory focuses on product or goods markets. . . . Defining a technology market, as opposed to a

product market, makes sense where 'rights to intellectual property are marketed separately from

the products in which they are used.'").  According to Plaintiffs, each market consists of certain

patents held by Defendants and substitutes for those patents; substitutes are other patents that

provide the same function that Defendants' patents do.  *See* Opp'n at 10 (asserting that the "patent

markets [are] based on discrete technologies in which Defendants have aggregated patents

covering technologies that compete to perform a particular function included in electronic

devices.").

        In their motion to dismiss, Defendants argue that Plaintiffs have failed to adequately plead

product markets.  Although "market definition is a deeply fact-intensive inquiry, [and] courts

hesitate to grant motions to dismiss for failure to plead a relevant product market," *Todd v. Exxon

Corp.*, 275 F.3d 191, 200 (2d Cir. 2001), a product market must still be plausible.  *See Chapman v.

N.Y. State Div. for Youth*, 546 F.3d 230, 237-38 (2d Cir. 2008).  Here, the Court concludes that

many, although not all, of the markets claimed by Plaintiffs are not plausibly stated because,

facially, they are still overbroad.  Admittedly, Plaintiffs have provided more specificity in their

FAC compared to their original complaint.  *See* Docket No. 190 (Order at 13-17) (noting that, in

the original complaint, Plaintiffs asserted as the relevant product market the "Electronics Patents

Market," which was expansively defined as the market for patents for high-tech consumer and

United States District Court
Northern District of California

enterprise electronic devices and components or software therein and processes used to manufacture them").  Nevertheless, the narrowing is, in most cases, insufficient.  The Court addresses each of the product markets below.

(1) Network-based voice messaging.  For purposes of Rule 12(b)(6), the Court finds this product market sufficiently pled because Plaintiffs have not claimed that the market is network-based voice messaging – a broad technical field – but rather narrowed the market to a specific function within that field, *i.e.*, "techniques to enable multiple recipients to access a voice message."  FAC ¶ 129; *see also* FAC ¶ 127 (alleging that "[n]etwork-based voice messaging allows for multiple recipients to access the same voice message"); FAC ¶ 141 (alleging that "the '252 patent and the '5890 patent each purport to cover techniques that enable multiple recipients to access a shared voice message" – "the '252 describes a recipient-driven method in which the shared voice message is posted to a communal message board where recipients can access the message" while the '5890 patent describes a sender-driven method in which the sender selects the recipients and the message is delivered to the selected recipients").

(2) Remote software updates.  For purposes of Rule 12(b)(6), the Court finds this product market sufficiently pled because Plaintiffs have not claimed that the market is remote software updates but rather narrowed the market to "techniques for identifying devices that are eligible for remote software updates."  FAC ¶ 154; *see also* FAC ¶ 165 (alleging that "the '852 patent covers a method of providing software updates where a 'device identifier' is used to determine eligibility for an update" and that "the '088 patent covers a method of providing software updates in which a list of acceptable and unacceptable configurations is used to determine eligibility for an update").

(3) Mobile device-to-device communication.  The Court finds this product market facially overbroad and therefore, even at the 12(b)(6) phase, implausible.  As Defendants contend, here, Plaintiffs have effectively asserted as the product market a general technical field.  *See* FAC ¶ 178 ("Mobile device-to-device communication techniques enable two or more mobile devices to communicate over a network efficiently and

17

1   securely.").  Plaintiffs suggest they have pinpointed a specific function within the field,

2   but that claimed function – means for mobile devices to communicate – is ultimately

3   no different from the general technical field itself.

4   (4) Local cache management.  The Court finds this product market facially overbroad and

5   therefore, even at the 12(b)(6) phase, implausible.  Although Plaintiffs have framed the

6   market as techniques to "improv[e] local cache performance," FAC ¶ 225, that is

7   ultimately no different from the general technical field of local cache management.  *See*

8   FAC ¶ 211 ("Local cache management enables computer processors to store and

9   retrieve information more efficiently.").

10  (5) Shared memory access.  The Court finds this product market facially overbroad and

11  therefore, even at the 12(b)(6) phase, implausible.  As above, Plaintiffs have asserted as

12  the product market a general technical field – not any specific function within that

13  field.  *See* FAC ¶ 234 ("Shared memory access techniques provide a way for electronic

14  devices or components thereof in which memory is shared by multiple processors to

15  handle requests to access that share memory.").

16  (6) Device authorization.  The Court finds this product market facially overbroad and

17  therefore, even at the 12(b)(6) phase, implausible.  Again, Plaintiffs have asserted as

18  the product market a general technical field – not any specific function within that

19  field.  *See* FAC ¶ 250 ("Device authorization is a means to restrict access in a computer

20  network to only authorized, trusted devices.  Device authorization is commonly used in

21  computer networks to protect data integrity and security . . . .").

22  (7) Health monitoring.  The Court finds this product market facially overbroad and

23  therefore, even at the 12(b)(6) phase, implausible.  As above, Plaintiffs have asserted as

24  the product market a general technical field – not any specific function within that

25  field.  *See* FAC ¶ 290 ("Health monitoring enables certain electronic devices, such as

26  wearable devices, smartphones, medical devices, or the like, to monitor and process

27  patient data from sensors.").

28  (8) MOSFET channel fabrication.  For purposes of Rule 12(b)(6), the Court finds this

18

product market sufficiently pled because MOSFET channel fabrication does not, as a facial matter, appear to be a general technical field.  *See* FAC ¶ 319 ("This corresponds to a part of the semiconductor fabrication process in which nanoscale MOSFET channels are formed on a semiconductor substrate.  Modern digital processors include millions or billions of integrated MOSFET devices per chip, each of which includes a respective channel.").

(9) Digital rights management.  The Court finds this product market facially overbroad and therefore, even at the 12(b)(6) phase, implausible.  As Defendants assert, here, Plaintiffs have asserted as the product market a general technical field – not any specific function within that field.  *See* FAC ¶ 339 ("Digital rights management provides a way to protect digital files (*e.g.*, digital media, software, video games, and the like) from unauthorized use.  Techniques directed to digital rights management enable a content distributor to enforce software licenses and restrict a user's ability to access and copy the digital files.").

Accordingly, for most of the product markets in (1)-(9) above, the Court finds a fundamental deficiency and therefore grants the motion to dismiss.

C.      Counts One Through Three: Market Power

Even if all of the products markets in (1)-(9) were adequately pled, there is another fundamental problem with Plaintiffs' FAC; specifically, there are inadequate allegations that Defendants have market power in each of the product markets.

"Market power . . . is simply a way to assess whether the defendant's conduct has anticompetitive effects."  *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 616 (N.D. Cal. 2020) (Chen, J.); *see also In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 668 (D. Conn. 2016) (stating that "articulating a relevant market definition is not an end in itself, but is in the service of answering the question of market power, which in turn 'is but a surrogate for detrimental effects'").  For most of the product markets, Plaintiffs have identified fewer than ten patents held by the relevant defendants.  Without having an understanding of how many patents there are in a given product market, it is difficult to say that the relevant defendants' possession of their patents

1    constitutes market power – even more so when taking into account that Plaintiffs have claimed, as

2    a facial matter, product markets that are relatively broad in scope.

3            In their papers, Plaintiffs argue that they would only need to show market power if they

4    were relying on *indirect* evidence of anticompetitive effects.  As the Court noted in its prior order,

5    anticompetitive effects in a market may be shown through direct evidence or indirect evidence.

6                    "Direct evidence of anticompetitive effects would be proof of actual
                    detrimental effects [on competition], such as reduced output,
7                    increased prices, or decreased quality in the relevant market."  *Id.* at
                    2284; *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421,
8                    1434 (9th Cir. 1995) (noting that "[a] predator has sufficient market
                    power when, by restricting its own output, it can restrict marketwide
9                    output and, hence, increase marketwide prices[;] [p]rices increase
                    marketwide in response to the reduced output because consumers
10                   bid more in competing against one another to obtain the smaller
                    quantity available").  In contrast, "[i]ndirect evidence would be
11                   proof of market power plus some evidence that the challenged
                    restraint harms competition."  *Am. Express*, 138 S. Ct. at 2284.
12

13   Docket No. 190 (Order at 12).  A lesser market analysis is permissible where there is proof of

14   actual detrimental effects.  Plaintiffs argue that they have made allegations of actual detrimental

15   effects (*i.e.*, there is direct evidence of anticompetitive effects), and therefore they need not

16   provide information about, *e.g.*, market share.

17           1.      Section 1 v. Section 7

18           As an initial matter, the Court considers whether the § 1 and § 7 claims should be subject

19   to the same analysis.  According to Defendants, the direct/indirect evidence analysis applies to the

20   § 1 claim only: "A Clayton Section 7 claim always requires a relevant antitrust market, and the

21   degree of pleading required does not change by purporting to assert 'direct evidence' of market

22   power."  Mot. at 18.

23           Defendants are correct in noting that the direct/indirect evidence analysis appears in § 1

24   cases.  However, that does not mean that the analysis would never be appropriate in a § 7 case.

25           Admittedly, for a typical § 7 case, a plaintiff does not resort to direct evidence of

26   anticompetitive effects because a § 7 claim is viable simply where there is an appreciable danger

27   of anticompetitive effects.  *See* 15 U.S.C. § 18 (providing that "no person subject to the

28   jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of

United States District Court
Northern District of California

1   another person also engaged in commerce or in any activity affecting commerce, where in any line

2   of commerce or in any activity affecting commerce in any section of the country, the effect of such

3   acquisition may be substantially to lessen competition, or to tend to create a monopoly"); *see also*

4   *St. Alphonsus*, 778 F.3d at 788 (noting that "'Section 7 does not *require* proof that a merger or

5   other acquisition has caused higher prices in the affected market[;] [a]ll that is necessary is that the

6   merger create an appreciable danger of such consequences in the future'") (emphasis added).  To

7   show an appreciable danger of anticompetitive effects, a § 7 plaintiff can usually rely on indirect

8   evidence such as high market share.  *See id.* at 785 (noting that "[a] prima facie case [for a § 7

9   violation] can be established simply by showing high market share," but adding that "plaintiffs in

10  § 7 cases generally present other evidence as part of the prima facie case" because statistics

11  concerning market share and concentration are not conclusive indicators of anticompetitive

12  effects).

13          But in the instant case, Plaintiffs' § 7 claim is that there *are* in fact anticompetitive effects

14  – and not just an appreciable danger of such.  That being the case, if there is proof of actual

15  detrimental effects, then there is arguably no need for the more rigorous market analysis used

16  when only indirect evidence is at issue.  Defendants contend still that four Supreme Court Justices

17  in *American Express* indicated that "a direct evidence theory . . . is *not* viable for Section 7

18  claims," Reply at 21 (emphasis in original), but the language they cite from *American Express* is

19  not clearly dispositive.  *See Am. Express*, 138 S. Ct. at 2291 (Breyer, J., dissenting) ("It is

20  important here to understand that in cases under § 1 of the Sherman Act (unlike in cases

21  challenging a merger under § 7 of the Clayton Act), it may well be unnecessary to undertake a

22  sometimes complex, market power inquiry.").

23          For purposes of this order, however, the Court need not definitively rule on this issue and

24  instead assumes – in Plaintiffs' favor – that Plaintiffs' § 7 claims are subject to the same

25  direct/indirect evidence analysis that applies in § 1 claims.  As discussed below, even with this

26  assumption – and others – Plaintiffs' antitrust claims fail.

27          2.      Direct Evidence of Anticompetitive Effects

28          Because Plaintiffs are focusing on direct evidence of anticompetitive effects, the next

United States District Court
Northern District of California

question is what constitutes sufficient proof of actual anticompetitive effects.  The parties dispute whether supracompetitive pricing alone is sufficient to show anticompetitive effects (Plaintiffs' position), or whether a plaintiff must show both supracompetitive pricing *and* restricted output (Defendants' position).  The Supreme Court has not clearly addressed this issue.  In *American Express*, the Court noted that, if "'output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand,'" but, at another point, the Court used the disjunctive, stating "[t]his Court will 'not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted *or* prices were above a competitive level.'"  *Id.* at 2284, 2288 (emphasis added).  And although the Ninth Circuit has stated that "[e]vidence of restricted output *and* supracompetitive prices is direct evidence of market power," *Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1001 (9th Cir. 2008) (added); *see also Rebel Oil v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (stating that, "[i]f the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power"), the Ninth Circuit has not provided its take on the statements above in *American Express*; nor has it expressly addressed the question whether supracompetitive pricing alone can establish market power.  *Compare also In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246 (D. Conn. 2015) (stating that, "when direct evidence is available that a party profitably charges supracompetitive prices, the existence of market power can be established from that fact alone" – implicitly because charging supracompetitive prices reflects "'the power to control prices or exclude competition'"), *with Harrison Aire, Inc. v. Aerostar Int'l*, 423 F.3d 374, 381 (3d Cir. 2005) (noting that "[c]ompetitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product"), *and Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011) (Wilken, J.) (stating that "supracompetitive pricing, on its own, is not direct evidence of monopoly power[;] [t]o prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output").

    For purposes of this order, the Court assumes arguendo that supracompetitive pricing by

1   itself is enough to establish anticompetitive effects.[7]  But, even with this assumption, Plaintiffs'

2   antitrust claims still fail.

3            3.       Supracompetitive Pricing

4            The allegations in Plaintiffs' FAC arguably suggest that supracompetitive pricing is

5   possible; however, *Twombly* and *Iqbal* require plausibility and not just possibility.  The

6   plausibility threshold has not been met in the instant case.  Because Plaintiffs' allegations on

7   supracompetitive pricing are largely the same regardless of the product market at issue, the Court

8   focuses first on the Network-based Voice Messaging Patents Market as a representative example.

9            According to Plaintiffs, for the Network-based Voice Messaging Patents Market,

10  Defendants have aggregated the following patents, which are all substitutes for one another.

11                (1) The '252 patent.  This patent was originally held by Philips, then was assigned

12                     several times before Uniloc obtained the patent from a company known as

13                     Pendragon Wireless.  *See* FAC ¶ 131.

14                (2) The '5890, '723, '622, and '433 patents (all in the same patent family).  The patents

15                     were originally held by Ayalogic, and Uniloc ultimately obtained the patents from a

16                     company known as Empire.  *See* FAC ¶¶ 133, 135.

17           Plaintiffs allege that the prior owners of the patents above "never asserted these patents

18  [*i.e.*, against others] because of the competitive constraints they faced."  FAC ¶ 142.  Uniloc,

19  however, has not been constrained and has instead filed a number of lawsuits asserting

20  infringement of the patents.  *See, e.g.*, FAC ¶¶ 143, 146.  According to Plaintiffs, Uniloc has

21  sought supracompetitive royalties for the patents.

22           For example, in a lawsuit that Uniloc brought against Apple, asserting infringement of the

23  

24  _____

     [7] At the hearing, Plaintiffs seemed to admit that their allegations in the FAC of restricted output
25  were largely conclusory.  *See, e.g.*, FAC ¶ 141 (simply referring to "inflated royalties and
     decreased licensing output" without providing more information on how licensing output has
26  decreased).  Plaintiffs suggested, however, that there was restricted output because, through
     aggregation of patents, Defendants eliminated substitutes.  The Court has concerns about this
27  theory.  Even if Defendants' aggregation eliminated substitutes, *see* FAC ¶ 165 (alleging that,
     "because of Defendants' unlawful aggregation of patent rights, Defendants now control both
     substitute technologies, making such competition impossible"), that does not necessarily mean that
28  there was less licensing post-aggregation.  For example, a given defendant could have extended a
     license on a patent *plus* a license for all of the substitutes for that patent.

1    '252 patent, Uniloc estimated its damages at over $489 million.  *See* FAC ¶ 151.  Plaintiffs allege

2    that

3            [t]his damages demand is significantly more than the original owner
             of the '252 patent – Philips – has demanded for *other* of its patents.
4    ██████████████████████████████████████████████████████████
5    ██████████████████████████████████████████████████████████
6    ██████████████████████████

7    FAC ¶ 151 (emphasis added) **[filed under seal]**.

8            Plaintiffs add that Uniloc was able to license its patents to some companies (companies

9    that Uniloc had sued for infringement but with whom Uniloc ultimately settled), *see* FAC ¶ 152,

10   but there is no indication as to how much these companies paid for their licenses.

11           Plaintiffs have not plausibly shown that Defendants extracted supracompetitive royalties as

12   a result of their aggregation.  There are several shortcomings with Plaintiffs' allegations.  First,

13   although Plaintiffs assert that companies who licensed the above patents from Uniloc paid

14   supracompetitive prices, that is a conclusory allegation.  Plaintiffs have provided no information

15   about, *e.g.*, what these companies paid as part of their settlements with Uniloc.  While Plaintiffs

16   express frustration in their inability to access more specifics because the settlements between

17   Uniloc and those companies are confidential, that does not exempt them from the specificity

18   requirements of *Twombly* and *Iqbal*.

19           Second, although Plaintiffs suggest that the royalties were supracompetitive because prior

20   owners did not even assert the patents in the first place, that does not mean that the patents were

21   worthless.  The FAC alleges that prior owners had competitive constraints that kept them from

22   asserting the patents, *see* FAC ¶ 49, thus indicating their market value could have been substantial

23   but not asserted or exploited by the prior owners.

24           Third, what prior owners charged as royalties for *other* patents in the same field (*i.e.*,

25   patents different from the patents which are asserted herein as the basis of market power) is

26   immaterial absent some indication that those other patents are fair comparators for the patents at

27   issue in this case.  *Cf. Qualcomm*, 969 F.3d at 999 (criticizing district court for "assum[ing] that

28   royalties are 'anticompetitive' – in the antitrust sense – unless they precisely reflect a patent's

current, intrinsic value and are in line with the rates other companies charge for their own patent portfolios").

Fourth, what Uniloc has demanded in litigation – even if extremely high – with respect to the '252 patent or any of the other patents is of limited probative value.  A litigation demand may have some nexus to reasonable royalties if rationally based, but it is still only a demand; there is no indication that anyone has paid that demand or anything close to it.

Fifth, in this instance at least, it is noteworthy that four of the five patents at issue were already held by one owner.  The only aggregation by Defendants was to add the '252 patent to the portfolio.  The FAC does not explain why the addition of this one patent vastly improves the market power of the portfolio.  In other words, it is not obvious that supracompetitive royalties, if any, were based on the aggregation, the anti-competitive practice challenged herein.

Finally, and perhaps most fundamentally, even though Plaintiffs allege the five patents are substitutes and thus limit the options of technology companies in developing products, the FAC does not allege how many *other* substitute patents are available.  The Court has no idea whether these five patents represent the "crown jewels" of the field or just a small portion of a large field of substitutes.  The ability to extract a supracompetitive royalty is easier to infer if Defendants held the crown jewels, but no such allegation is made in the FAC.[8]

The above deficiencies apply to the majority of the product markets in (1)-(9).  To be sure, Plaintiffs' allegations are slightly stronger where they have alleged a prior owner offered to sell a portfolio containing a patent at issue for far less than the current demand in litigation which ensued after aggregation.  For example, for the Local Cache Management Patents Market, Plaintiffs were able to provide an example where they were able to compare a specific demand from a prior patent owner and a specific demand made by a defendant in this case.  According to Plaintiffs, the prior owner of the '014 patent – ███████████████████████████

---

[8] The Court acknowledges that Plaintiffs are not relying on indirect evidence of anticompetitive effects, for which they would have to show high market share (*e.g.*, that Defendants owned a significant number of patents in the relevant product market).  That does not mean, however, that information about the number of patents Defendants hold, or the "quality" of those patents, is insignificant where Plaintiffs are relying on a direct evidence theory.  Plaintiffs must still show that the supracompetitive pricing is due to the aggregation of patent substitutes.

██████████████████████████████████

███████████████████████████████ FAC ¶ 228 (emphasis added) **[filed under seal]**.  After VLSI obtained the '014 patent (and other patents) from Freescale, it brought suit against Intel, asserting infringement of eight patents, one of which was the '014 patent.  VLSI estimated its damages for the eight patents, including the '014 patent, at approximately $7.1 billion. *See* FAC ¶¶ 100, 228.  Plaintiffs essentially take the position that VLSI has engaged in supracompetitive pricing given that its litigation demand vastly exceeds the demand made by the prior owner.

But even this example is not enough to show that VLSI engaged in supracompetitive pricing.  First, demands, as noted above, are simply demands;  as such, by themselves, they have some, but limited, probative value.  Second, the comparison is, as a facial matter, not a fair one:  Plaintiffs are comparing a demand made for one group of patents with a later demand made for a different group of patents; the only overlap between the two groups appears to be the '014 patent.  There is no allegation attributing the value of the '014 to the prior offered portfolio or to the later portfolio asserted against Intel.  Thus, it is not clear whether *other* patents in the respective portfolios could account for the difference in the asserted values of the portfolios.  Third, even if it could reasonably be inferred that the '014 patent was the driving force for the increase in demand, there must still be a showing that the supracompetitive pricing was the result of the '014 patent's being aggregated with patents that provide the same function. The FAC lacks specific allegations in this regard.

A similar problem infects Plaintiffs' allegations for, *e.g.*, the Shared Memory Access Patents Market.  There, Plaintiffs have indicated that supracompetitive pricing can be inferred if one were to compare the relatively low price that VLSI paid to acquire the '983 patent compared to the exorbitant damages VLSI has claimed for Intel's alleged infringement of the '983 patent.  But even assuming this is true,[9] the differential must plausibly be attributable to the aggregation of

---

[9] The Court does not condone Plaintiffs' failure to provide this information to the Court.  Plaintiffs could have, but did not, asked the courts presiding over the VLSI infringement suits against Intel for relief from the protective order so that they could make a filing under seal in this case.

1  patent substitutes acquired by Defendants.  Plaintiffs have failed to make allegations tying the

2  pricing differential to aggregation of the patents at issue.

3        Accordingly, the Court finds that the antitrust claims as pled for product markets (1)-(9)

4  are deficient because Plaintiffs have failed to adequately allege that there was supracompetitive

5  pricing and/or that such pricing was attributable to the aggregation of patent substitutes.[10]

6  D.    Count Four: Apple's § 17200 Claim Based on SEP Transfer Theory

7        The remaining claim pled in the FAC is Apple's § 17200 claim based on the SEP Transfer

8  Theory.  Apple's § 17200 claim has two predicates: (1) the relevant defendants' conduct

9  constitutes an unlawful business practice because the conduct violates § 5 of the Federal Trade

10  Commission Act, *see generally* 15 U.S.C. § 45(a)(1) (providing that "[u]nfair methods of

11  competition in or affecting commerce and unfair or deceptive acts or practices in affecting

12  commerce, are hereby declared unlawful"); and (2) the relevant defendants' conduct constitutes an

13  *unfair* business practice because "it violates the spirit and policy of the antitrust laws."  FAC ¶

14  454.

15        In their papers, Defendants argue that the Ninth Circuit's decision in *Qualcomm* clearly

16  undercuts Apple's § 17200 claim to the extent it is based on an unfair business practice – *i.e.*, one

17  that violates the spirit and policy of the antitrust laws.  In *Qualcomm*, the Ninth Circuit held that,

18  as a general matter, a breach of an SSO commitment does not rise to the level of an antitrust

19  violation.  *See Qualcomm*, 969 F.3d at 996-97 (distinguishing one case because the plaintiff had

20  pled that the defendant intentionally falsely promised to license its SEP on FRAND terms;

21  characterizing the case as an "'intentional deception' exception to the general rule that breaches of

22  SSO commitments do not give rise to antitrust liability").  The court specifically noted that it

23

24  _____

   [10] Based on the Court's ruling above, it does not address Defendants' other arguments, such as
25  those on antitrust injury and those specific to the § 1 claim.  The Court, however, notes, that for
   the § 1 claim, Plaintiffs do not simply need to "allege that the [relevant] defendant *intended to*
26  *enter the agreement*, and the agreement was anticompetitive."  Opp'n at 33 (emphasis in original).
   Rather, Plaintiffs must allege that the agreement was intended to harm or restrain trade.  *See*
27  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (noting that a plaintiff must
   prove, *inter alia*, a contract or conspiracy by which the persons or entities "'intended to harm or
28  restrain trade'").  Furthermore, Plaintiffs must have nonconclusory allegations to support such an
   intention.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    found persuasive the policy argument that antitrust laws should not be used "to remedy what are

2    essentially contractual disputes between private parties engaged in the pursuit of technological

3    innovation." *Id.* at 997.  In light of *Qualcomm*, Apple's unfairness claim lacks merit.  And in its

4    opposition brief, Apple does not really dispute such, focusing on the fact that it has also predicated

5    its § 17200 claim on unlawfulness, *i.e.*, a violation of the FTCA.  *See* FAC ¶ 457 ("The FTC has

6    brought an action under Section 5 where, like here, an acquiring firm refused to abide by licensing

7    commitments that its predecessor made in connection with industry standard-setting activities.")

8    (citing *In the Matter of Negotiated Data Solutions*, File No. 051-0094, available at

9    https://www.ftc.gov/enforcement/cases-proceedings/051-0094/negotiated-data-solutions-llc-

10   matter) (last visited Dec. 16, 2020).

11          Defendants argue the unlawfulness claim must also be dismissed because the alleged § 5

12   violation essentially claims anticompetitive conduct and *Qualcomm* "would be a mere formality if

13   the FTC and private plaintiffs could simply assert that FRAND violations were anticompetitive

14   under Section 5 of the FTC [Act]."  Reply at 24.  *See generally* 15 U.S.C. § 45(a)(1) (providing

15   that "[u]nfair methods of competition in or affecting commerce and unfair or deceptive acts or

16   practices in affecting commerce, are hereby declared unlawful").  The Court agrees.  Apple's § 5-

17   based claim, as pled, is grounded in antitrust law and policy which would serve as the basis of any

18   FTC jurisdiction here.  *Cf. FTC v. Brown Shoe, Inc.*, 384 U.S. 316, 321 (1966) (stating that "[t]his

19   broad power of the [FTC] is particularly well established with regard to trade practices which

20   conflict with the basic policies of the Sherman and Clayton Acts even though such practices may

21   not actually violate these laws"); *see also* FTC, Statement of Enforcement Principles Regarding

22   "Unfair Methods of Competition" Under Section 5 of the FTC Act (Aug. 13, 2015) (stating that

23   "Section 5's ban on unfair methods of competition encompasses not only those acts and practices

24   that violate the Sherman or Clayton Act but also those that contravene the spirit of the antitrust

25   laws and those that, if allowed to mature or complete, could violate the Sherman or Clayton Act").

26   *Qualcomm* thus bars the SEP Transfer Theory.

27          Accordingly, the Court dismisses Apple's § 17200 claim based on the SEP Transfer

28   Theory with prejudice.

### III.   CONCLUSION

For the foregoing reasons, the Court dismisses all claims as pled in the FAC.  The Court dismisses with prejudice Counts 1-3 to the extent they are based on product markets (10)-(13). The Court also dismisses with prejudice Count 4.  To the extent Counts 1-3 are based on product markets (1)-(9), the Court dismisses without prejudice as it may be that Plaintiffs are able to cure the deficiencies identified above.  Plaintiffs shall have 30 days to file a second amended complaint ("SAC").

This order disposes of Docket No. 203.

**IT IS SO ORDERED**.

Dated: January 6, 2021

_____

EDWARD M. CHEN
United States District Judge