1  IRELL & MANELLA LLP
   Morgan Chu (SBN 70446)
2  Benjamin W. Hattenbach (SBN 186455)
   Michael D. Harbour (SBN 298185)
3  Lucas S. Oxenford (SBN 328152)
   1800 Avenue of the Stars, Suite 900
4  Los Angeles, California 90067-4276
   Telephone:   (310) 277-1010
5  Facsimile:    (310) 203-7199
   Email:  mchu@irell.com
6  Email:  bhattenbach@irell.com
   Email:  mharbour@irell.com
7  Email:  loxenford@irell.com

8  A. Matthew Ashley (SBN 198235)
   Olivia L. Weber (SBN 319918)
9  840 Newport Center Drive, Suite 400
   Newport Beach, California 92660-6324
10 Telephone:   (949) 760-0991
   Facsimile:    (949) 760-5200
11 Email:  mashley@irell.com
   Email:  oweber@irell.com

12
   *Counsel for Defendants*
13 FORTRESS INVESTMENT GROUP LLC,
   FORTRESS CREDIT CO. LLC,
14 VLSI TECHNOLOGY LLC

15 Additional counsel listed on signature page

16

17            **UNITED STATES DISTRICT COURT**

18            **NORTHERN DISTRICT OF CALIFORNIA**

19 INTEL CORPORATION and APPLE INC.,      Case No. 3:19-cv-07651-EMC

20            Plaintiffs,

21       v.                                **DEFENDANTS' JOINT NOTICE OF
                                           MOTION AND MOTION TO DISMISS
22 FORTRESS INVESTMENT GROUP LLC,         AND TO STRIKE PLAINTIFFS' SECOND
   FORTRESS CREDIT CO. LLC, UNILOC        AMENDED COMPLAINT**
23 2017 LLC, UNILOC USA, INC., UNILOC
   LUXEMBOURG S.A.R.L., VLSI              Hon. Edward M. Chen
24 TECHNOLOGY LLC, INVT SPE LLC,
   INVENTERGY GLOBAL, INC., and IXI IP,
25 LLC,

26            Defendants.

27

28

REDACTED DOCUMENT
SOUGHT TO BE SEALED

10936723

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE THAT**, at a hearing date to be determined, in Courtroom 5, 17th floor of 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Judge Edward M. Chen, Defendants Fortress Investment Group LLC ("Fortress"), Fortress Credit Co. LLC ("Fortress Credit"), Uniloc 2017 LLC ("Uniloc 2017"), Uniloc USA, Inc. ("Uniloc USA"), Uniloc Luxembourg S.a.r.l. ("Uniloc Luxembourg"), VLSI Technology LLC ("VLSI"), INVT SPE LLC ("INVT"), Inventergy Global, Inc. ("Inventergy"), and IXI IP, LLC ("IXI" and collectively, "Defendants") will appear and move to dismiss with prejudice and strike the Second Amended Complaint ("SAC") of Plaintiffs Apple Inc. ("Apple") and Intel Corporation ("Intel" and collectively, "Plaintiffs").  Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) and California Code of Civil Procedure § 425.16.  This motion is based on this Notice, the Memorandum of Points and Authorities, the Declaration of Lucas S. Oxenford, Defendants' Request for Judicial Notice, and any other filing, evidence, or argument presented in this matter.

If they prevail on their motion to strike, Defendants are entitled to an award of attorneys' fees and costs.  Cal. Civ. Proc. Code § 425.16(c)(1).  Should Defendants prevail, they request that the amount of the award be reserved for later briefing following the hearing.

**STATEMENT OF ISSUES TO BE DECIDED**

1.   Whether Plaintiffs have pled viable antitrust markets;

2.   Whether Plaintiffs have pled that Defendants have market power;

3.   Whether Plaintiffs have pled a cognizable antitrust injury;

4.   Whether Plaintiffs have pled a viable Sherman Act Section 1 claim, 15 U.S.C. § 1;

5.   Whether Plaintiffs have pled a viable Clayton Act Section 7 claim, 15 U.S.C. § 18; and

6.   Whether Plaintiffs' California state law claims should be stricken under California's Anti-SLAPP statute.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................................ 1

II.  THE SECOND AMENDED COMPLAINT ....................................................................... 3

    A.  The Alleged Conspiracy To "Aggregate Substitute" Patents And Seek Supracompetitive Prices Through "Meritless" Patent Litigations ............................................................................................................... 3

        1.  The Conspiracy Allegations ................................................................. 3

        2.  The "Meritless" Litigation Allegations ............................................... 6

    B.  Plaintiffs' Proposed Markets And Defendants' Alleged "Market Power" ........................................................................................................... 6

    C.  Alleged Anticompetitive Harm ....................................................................... 8

III.  PLAINTIFFS' REDEFINED MARKETS ARE STILL NOT PLAUSIBLY STATED ............................................................................................................................ 9

IV.  PLAINTIFFS AGAIN FAIL TO ALLEGE FACTS SHOWING MARKET POWER ........................................................................................................................... 15

    A.  The SAC Fails To Allege Supracompetitive Prices, Much Less Supracompetitive Prices Resulting From The Challenged "Aggregation" ................................................................................................. 15

        1.  Plaintiffs' "Supracompetitive Prices" Allegations Are Still Conclusory ......................................................................................... 16

        2.  The Fact That Prior Owners Did Not Assert The Patents Is Still Irrelevant ................................................................................... 17

        3.  What Prior Owners Charged For *Other* Patents Is Still Irrelevant ........................................................................................... 18

        4.  Defendants' Alleged "Demands" Still Have "Limited Probative Value" ................................................................................. 19

        5.  There Is Still No Connection Between The Alleged "Supracompetitive" Prices And The Alleged "Aggregation" ................ 21

        6.  The SAC Still Does Not Allege How Many Other Substitutes There Are Or That Defendants Possess The "Crown Jewels" ................ 23

    B.  The SAC Fails To Allege Facts Showing Reduced Output ........................... 25

V.  THE SAC FAILS TO ALLEGE FACTS SHOWING COGNIZABLE ANTITRUST INJURY ...................................................................................................... 28

**Page**

VI.    THE SAC STILL FAILS TO ALLEGE EVIDENTIARY FACTS OF AN
AGREEMENT THAT WAS INTENDED TO HARM OR RESTRAIN
TRADE........................................................................................................................31

    A.    Plaintiffs Still Fail To Define The Precise Scope And Nature Of The
Alleged Conspiracy .......................................................................................31

    B.    Plaintiffs Have Failed To Allege The Required Evidentiary Facts Of
"Separate Bilateral Agreements" That Were Intended To Restrain
Trade..............................................................................................................32

VII.   PLAINTIFFS' SECTION 7 CLAIM FAILS BECAUSE THE SAC
CONTAINS NO ALLEGATIONS OF MARKET SHARE OR
CONCENTRATION ....................................................................................................36

VIII.  THE UCL CLAIM SHOULD BE STRICKEN UNDER CALIFORNIA'S
ANTI-SLAPP STATUTE .............................................................................................39

    A.    Plaintiffs' UCL Claim "Arises From" Protected Activity.....................................39

    B.    Plaintiffs' UCL Claim Fails As A Matter Of Law ...............................................40

IX.    CONCLUSION ............................................................................................................41

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*In re 3dfx Interactive, Inc.*,
    389 B.R. 842 (Bankr. N.D. Cal. 2008), *aff'd*, 585 F. App'x 626 (9th Cir. 2014) ...................35

5

6

*Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*,
    744 F.3d 595 (9th Cir. 2014) ..............................................................................17, 34

7

8

*BanxCorp v. Bankrate, Inc.*,
    No. 19-1833, 2021 WL 733032 (3d Cir. Feb. 25, 2021) .........................................28

9

*Bauer v. Tacey Goss, P.S.*,
    No. C 12-00876 JSW, 2012 WL 2838834 (N.D. Cal. July 10, 2012) ..................17, 34

10

11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................18, 21

12

13

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
    142 F. Supp. 2d 296 (E.D. N.Y. 2001), *aff'd,* 35 F. App'x 29 (2d Cir. 2002) ..........30

14

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ........................................................................30, 33

15

16

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ..............................................................................................38

17

18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ..............................................................................................38

19

*Carefusion Corp. v. Medtronic, Inc.*,
    No. 10-CV-01111-LHK, 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ...................37

20

21

*Church & Dwight Co. v. Mayer Labs., Inc.*,
    No. C-10-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012) .....................26

22

23

*Church & Dwight Co. v. Mayer Labs., Inc.*,
    868 F. Supp. 2d 876 (N.D. Cal. 2012) ...................................................................26

24

*City of San Jose v. Office of Comm'r of Baseball*,
    No. C-13-02787 RMW, 2013 WL 5609346 (N.D. Cal. Oct. 11, 2013), *aff'd*,
    776 F.3d 686 (9th Cir. 2015)..................................................................................28

25

26

*Collins v. Allstate Indem. Co.*,
    428 F. App'x. 688 (9th Cir. 2011) ..........................................................................39

27

28

**Page(s)**

*Contractor Util. Sales Co. v. Certain-teed Prod. Corp.*,
    638 F.2d 1061 (7th Cir. 1981) ................................................................................34

*Dominick v. Collectors Universe, Inc.*,
    No. 2:12-CV-04782-ODW, 2012 WL 6618616 (C.D. Cal. Dec. 18, 2012) ..............27

*Eastman Kodak Co. v. Image Tech. Servs.*,
    504 U.S. 451 (1992) ..............................................................................................10

*Edstrom v. Anheuser-Busch Inbev SA/NV*,
    647 F. App'x 733 (9th Cir. 2016) ..........................................................................37

*Edstrom v. Anheuser-Busch InBev SA/NV*,
    No. C 13-1309 MMC, 2013 WL 5124149 (N.D. Cal. Sept. 13, 2013) ....................36

*Equilon Enterprises v. Consumer Cause, Inc.*,
    29 Cal. 4th 53 (2002) ............................................................................................40

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
    243 F.3d 980 (6th Cir. 2001) .................................................................................30

*F.T.C. v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ...............................................................................37

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ......................................................................... *passim*

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997), *aff'd*, 525 U.S. 299 (1999) ........................15, 26, 27

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
    386 F.3d 485 (2d Cir. 2004) ..................................................................................17

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*,
    433 F. App'x 598 (9th Cir. 2011) ..........................................................................14

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
    No. C-09-3854 MMC, 2009 WL 4723739 (N.D. Cal. Dec. 2, 2009) ......................37

*Gressett v. Contra Costa Cty.*,
    No. C-12-3798 EMC, 2013 WL 2156278 (N.D. Cal. May 17, 2013) ......................39

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ..........................................................................10, 19

*High Tech. Careers v. San Jose Mercury News*,
    No. CIV. 90-20579 SW, 1995 WL 115480 (N.D. Cal. Mar. 14, 1995), *aff'd*, 94
    F.3d 651 (9th Cir. 1996) ........................................................................................16

**Page(s)**

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) ...................................................................13

*Humana Inc. v. Mallinckrodt ARD LLC*,
    No. CV 19-06926 DSF, 2020 WL 3041309 (C.D. Cal. Mar. 9, 2020) ......................27

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    No. CV-00-20905 RMW, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ........................10

*Int'l Shoe Co. v. FTC*,
    280 U.S. 291 (1930) .................................................................................................37

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    No. 1:13-CV-00740 AJT, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) ...................29

*J. Edwards Jewelry Distrib., LLC v. Wells Fargo & Co.*,
    No. 18-CV-03886-YGR, 2019 WL 2329248 (N.D. Cal. May 31, 2019) ...................17

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .................................................................................33

*Kingray, Inc. v. NBA, Inc.*,
    188 F. Supp. 2d 1177 (S.D. Cal. 2002) ....................................................................26

*Lacey v. Maricopa Cnty.*,
    693 F.3d 896 (9th Cir. 2012) ...................................................................................15

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
    573 F. Supp. 2d 1125 (E.D. Ark. 2008), *aff'd*, 591 F.3d 591 (8th Cir. 2009)............14

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014)...............................................................................15, 32

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
    No. 18-CV-02054-MMC, 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019), *aff'd*,
    811 F. App'x 422 (9th Cir. 2020).......................................................................14, 37

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) ...................................................................................27

*Minebea Co. v. Papst*,
    444 F. Supp. 2d 68 (D.D.C. 2006) ..........................................................................25

*Mitchell v. Reg'l Serv. Corp.*,
    No. C 13-04212 JSW, 2014 WL 12607809 (N.D. Cal. Apr. 23, 2014) ....................41

*Moss Bros. Toy v. Ruiz*,
    27 Cal. App. 5th 424, 435 (2018)............................................................................40

**Page(s)**

*Mujica v. AirScan Inc.*,
 771 F.3d 580 (9th Cir. 2014) ....................................................................................21

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
 795 F.3d 1124 (9th Cir. 2015) ..............................................................................33, 34

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
 513 F.3d 1038 (9th Cir. 2008) ...................................................................................10

*NSS Labs, Inc. v. Symantec Corp.*,
 No. 18-CV-05711-BLF, 2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) ....................13

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018) ........................................................................................27, 38

*Openwave Messaging, Inc. v. Open-Xchange, Inc.*,
 No. 16-CV-00253-WHO, 2016 WL 6393503 (N.D. Cal. Oct. 28, 2016) ...................19

*Orion Elec. Co. v. Funai Elec. Co.*,
 No. 01 CV 3501 (AGS), 2002 WL 377541 (S.D.N.Y. Mar. 11, 2002) ......................25

*Planned Parenthood Fed'n v. Ctr. for Med. Progress*,
 890 F.3d 828 (9th Cir. 2018) ...............................................................................39, 40

*Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
 508 U.S. 49 (1993) .....................................................................................................6

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Companies, Inc.*,
 598 F. Supp. 694 (N.D. Cal. 1984) ......................................................................24, 32

*Ralph C. Wilson Indus., Inc. v. Chron. Broad. Co.*,
 794 F.2d 1359 (9th Cir. 1986) ...................................................................................24

*Ramachandran v. City of Los Altos*,
 359 F. Supp. 3d 801 (N.D. Cal. 2019) .................................................................39, 40

*Rebel Oil Co. v. Atl. Richfield Co.*,
 51 F.3d 1421 (9th Cir. 1995) ...............................................................................15, 27

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
 381 F.3d 717 (7th Cir. 2004) .....................................................................................24

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
 532 F.3d 963 (9th Cir. 2008) .....................................................................................15

*Safeway Inc. v. Abbott Labs.*,
 761 F. Supp. 2d 874 (N.D. Cal. 2011) ........................................................................26

*Sidibe v. Sutter Health*,
 No. 12-CV-04854-LB, 2021 WL 879875 (N.D. Cal. Mar. 9, 2021) .....................26, 27

**Page(s)**

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013)..................................................................................18, 31

*Soukup v. Law Offices of Herbert Hafif*,
    39 Cal. 4th 260 (2006)..........................................................................................40

*Staley v. Gilead Scis., Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) .................................................................14

*Staley v. Gilead Scis., Inc.*,
    No. 19-CV-02573-EMC, 2020 WL 5507555 (N.D. Cal. July 29, 2020) ............14, 31

*Stewart v. Gogo, Inc.*,
    No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013)......................26

*Synopsys, Inc. v. ATopTech, Inc.*,
    No. C 13-2965 MMC, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ......................38

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
    No. SACV 14-0341 JVS (DFMx), 2016 WL 7049263 (C.D. Cal. Aug. 9, 2016) ....40

*Traditional Cat Assn., Inc. v. Gilbreath*,
    118 Cal. App. 4th 392 (2004)................................................................................40

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .............................................................................................14

*United States v. Philadelphia Nat'l. Bank*,
    374 U.S. 321 (1963), *aff'd*, 647 F. App'x 733 (9th Cir. 2016) ................................37

*United States v. Westinghouse Elec. Corp.*,
    648 F.2d 642 (9th Cir. 1981)................................................................................28

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
    375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006) .......11

*In re Webkinz Antitrust Litig.*,
    695 F. Supp. 2d 987 (N.D. Cal. 2010) .................................................................26

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
    No. CV 15-07490, 2015 WL 9948723 (C.D. Cal. Dec. 7, 2015)............................11

*Wilson v. Cable News Network, Inc.*,
    7 Cal. 5th 871, 892 (2019)...................................................................................39

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018)..............................................................................28

*Zoslaw v. MCA Distrib. Corp.*,
    693 F.2d 870 (9th Cir. 1982)................................................................................35

**Page(s)**

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................................................15, 32, 41

**Statutes**

15 U.S.C. § 1 ................................................................................................ *passim*

15 U.S.C. § 18 ...............................................................................................36, 38

35 U.S.C. § 154 ...................................................................................................23

Cal. Bus. & Prof. Code § 17204 .........................................................................40

**Other Authorities**

2B Areeda & Hovenkamp, Antitrust Law ¶ 565(a) (5th ed. 2020) ...................15

Areeda & Hovenkamp, Fundamentals of Antitrust Law § 5.01[B] (4th ed. 2017) ........................27

10936723

1   I.      **INTRODUCTION**

2          In its prior two dismissal orders, the Court identified numerous fundamental flaws with

3   Plaintiffs' claims and explained what Plaintiffs would need to do to cure them.  Unable to do so,

4   the Second Amended Complaint ("SAC") instead repeats the same errors as the First Amended

5   Complaint ("FAC") and the Original Complaint ("Complaint") before it.  This time, dismissal

6   should be with prejudice.

7          **No Cognizable Antitrust Markets.**  In the last round of pleading, the Court rejected six of

8   Plaintiffs' alleged markets because they covered "technical fields" as opposed to "specific

9   functions" within those fields.  *See* Dkt. 229 (herein "2nd Order") at 16:19-19:16.  While the SAC

10  purports to redefine these markets, the changes are merely cosmetic and unavailing.  Indeed, the

11  new "markets" contain the exact same patents as the markets that the Court already rejected.  And

12  when the individual patents within the alleged "markets" are considered, it is apparent that many

13  do not fit Plaintiffs' new market definitions.  Moreover, Plaintiffs have pled no facts showing

14  economic interchangeability of any of the patents, which is a prerequisite to including them in the

15  same market.  The new "markets" are thus still non-cognizable as a matter of law.

16         **No Market Power.**  The Court's most recent dismissal order identified six core

17  deficiencies in Plaintiffs' "direct evidence" theory of market power allegations, *i.e.*, Plaintiffs'

18  contention that Defendants have both charged "supracompetitive prices" and "reduced output."

19  *See id.* at 23:3-27:5.  The SAC fails to cure <u>any</u> of the deficiencies.  It still does not identify a

20  single price—much less a "supracompetitive" one—that anyone has ever paid to license any of

21  Defendants' patents.  It still relies on litigation damages demands, even though the Court held that

22  such demands are of "limited probative value" because they are just demands, not prices.  *Id.* at

23  25:3-6.  And it still fails to allege that Defendants have "aggregated" all or even most of the

24  "substitutes" in the alleged markets, or that Defendants have aggregated the most important

25  substitutes—*i.e.*, the "crown jewels"—in any of the markets.  *Id.* at 25:12-17.  Indeed, the SAC

26  admits that there are "other" substitutes held by other patent owners in each alleged market.

27  Consequently, Plaintiffs have for a third time not linked their conclusory allegations of

28  "supracompetitive prices" to the purported elimination of substitutes, as the Court has repeatedly

held they must do.  *See id*. at 24:11-27:5; Dkt. 187 (herein "1st Order") at 20:7-21:6, 39:11-17.  Further, while the Court previously declined to rule on whether a plaintiff must demonstrate "restricted output" in addition to "supracompetitive prices" to show direct evidence of market power, Ninth Circuit precedent holds that both are required.  The SAC is entirely devoid of facts showing reduced output, which constitutes an independent basis for dismissal.

**No Antitrust Injury.**  Plaintiffs continue to allege the same two antitrust "injuries" as before:  supracompetitive prices and litigation costs.  The Court already held that both were insufficiently pled, s*ee* 1st Order at 20:21-21:6, and nothing in the SAC corrects the deficiencies.  With respect to prices, Plaintiffs still do not allege that they ever paid for a single license—let alone that they paid a "supracompetitive price" for one—nor does the SAC allege that there is an imminent risk that Plaintiffs will do so in the future.  With respect to litigation costs, Plaintiffs still do not tie them to "the elimination of substitutes," which is the purported harm to competition in this case.  *Id.*  The SAC never alleges that Plaintiffs are forced to choose between either a license or defending against an infringement suit because Defendants have cornered the "markets" by acquiring all or the most valuable substitutes.  Accordingly, Plaintiffs' litigation costs are the same "injury" that every litigant faces in any lawsuit.  They are not an injury to competition, which is what is required to plead an antitrust injury.

**No Agreement To Restrain Trade.**  The SAC still fails to plead the required evidentiary facts to support a Sherman Act Section 1 conspiracy claim.  Like its predecessors, the SAC alleges no evidentiary facts demonstrating that the Section 1 Defendants entered into an agreement with the intent to restrain trade.  Instead, the SAC relies on the exact same garden variety financial agreements that the Court already held are "consistent with rational, legal business behavior."  *Id*. at 28:20-24.  While the SAC adds some rank and illogical speculation, that speculation is no substitute for the required pleading of evidentiary facts.  Moreover, despite the Court's repeated directives, Plaintiffs still fail to delineate the precise nature and scope of the "conspiracy" they are alleging.

**No Anti-Competitive Acquisitions.**  To show that an acquisition challenged under Clayton Act Section 7 substantially lessens competition, a plaintiff must allege facts

1   demonstrating the concentration of firms and market shares pre- and post-acquisition.  The SAC

2   pleads no such facts.  Indeed, from what Plaintiffs have pled, Defendants' purported market shares

3   appear to be miniscule.  Consequently, even assuming Plaintiffs have properly pled "direct

4   evidence" of anticompetitive effects (and they have not), the SAC does not tie the alleged effects

5   to anything that Section 7 prohibits.

6        **California's Anti-SLAPP Statute.**  The Unfair Competition Law ("UCL") claim must be

7   stricken under California's anti-SLAPP statute.  This is true even if the Court again dismisses the

8   UCL claim under Rule 12(b)(6).  The anti-SLAPP analysis has two prongs.  The first prong is that

9   the claim "arises from" protected conduct.  That prong is satisfied here for two independent

10   reasons.  First, Defendants' patent infringement lawsuits provide a necessary element of Plaintiffs'

11   UCL claim, namely, the "lost money or property" element.  Under California law, if protected

12   conduct supplies a necessary element, then the claim "arises from" the protected conduct as a

13   matter of law.  Second, Plaintiffs already admitted that they seek to enjoin Defendants' patent

14   infringement lawsuits, which under binding California precedent, satisfies the "arises from" prong.

15   With respect to the second prong (the legal sufficiency prong), Plaintiffs' UCL claim fails as a

16   matter of law because, as the Court previously held, the UCL claim relies entirely on Plaintiffs'

17   deficient antitrust claims.

18        Plaintiffs have now had three chances to state a claim, and they clearly cannot do so.

19   Consequently, the Court should dismiss the SAC with prejudice and strike the UCL claim.

20   **II.**     **THE SECOND AMENDED COMPLAINT**

21        Much of the SAC tracks the FAC verbatim, which itself heavily overlapped with the

22   Original Complaint.  What is new does not cure the multiple core deficiencies the Court found in

23   the previous two complaints.

24        **A.**     **The Alleged Conspiracy To "Aggregate Substitute" Patents And Seek**

25             **Supracompetitive Prices Through "Meritless" Patent Litigations**

26             1.     <u>The Conspiracy Allegations</u>

27        The SAC's conspiracy theory remains the same:  namely, that Defendants allegedly

28   conspired to "aggregate substitute patents" and then pursue "meritless" litigation over "weak"

patents.  *Compare* SAC ¶¶ 10-15, 34, 42-43, 47, 54, 62, 102, 146, 442-444, 454-458, *with* FAC ¶¶ 10, 30, 34, 38-39, 43, 50, 56, 82, 125, 429-431, 439-443, *and* Complaint ¶¶ 9, 31-32, 38-41, 44, 163-164.  In its Order dismissing the FAC, the Court noted that "the precise scope and nature of the bilateral conspiracies is still somewhat ill-defined" and then posed a series of questions.  2nd Order at 11 n.6 ("For example, are Plaintiffs claiming that each PAE worked with Fortress to aggregate the patents the PAE has?  Or is [it] that [each] PAE knew Fortress would aggregate the PAE's patents with another PAE's patents in the same market (*i.e.*, the PAE was just contributing to Fortress's 'pot of patents,' so to speak)?  Or is it both?"); *see also* 1st Order at 27:12-18.  The SAC again fails to define the contours of the supposed conspiracy or to answer the Court's questions.

The SAC does not allege an overarching agreement of any kind.  Instead, every allegedly improper transaction is only between Fortress or Fortress Credit and a single other Defendant.  *See* SAC ¶¶ 55-64, 71, 80-94.  There are no alleged agreements among any of the PAEs themselves, and there are no allegations that any of the PAEs even knew the others existed or that Fortress did business with any other PAE.  The SAC still relies on the conclusory allegation that each PAE "understood that the transaction would enable Fortress to aggregate substitute and complementary patents across a web of PAEs to eliminate competition."  *Compare id*. ¶¶ 54, 62, 91, 93, *with* FAC ¶¶ 50, 56, 71, 73.  Yet no "specific allegations" are provided showing that each PAE "knew of the conspiracy's general scope and purpose."  1st Order at 27:21-28 (citation omitted).

As for the bilateral transactions the SAC attacks, they are the very same commercial transactions that the Complaint (and FAC) attacked and which the Court held were "consistent with rational, legal business behavior."  1st Order at 28:22-24.[1]  The SAC never identifies a single provision of any of these garden-variety commercial transactions that evinces anticompetitive intent or effect.  Instead, the SAC asserts:

> [W]hen Defendant PAEs entered into the agreements described below with Fortress and/or its affiliate Fortress Credit, they understood that the transaction would

---

[1] *Compare* SAC ¶¶ 55-64, 71, 80-94, *with* FAC ¶¶ 51-57, 62-74, *and* Complaint ¶¶ 51-56, 61-69, 73-74.  The transactions that Plaintiffs identify include arms-length commercial loan transactions that Fortress allegedly made with independent companies in exchange for patent licensing revenue, SAC ¶¶ 55, 58, 83-84, 88-90, and an assignment of security interests, *id.* ¶ 93.

1   enable Fortress to aggregate substitute and complementary patents across a web of
    PAEs to eliminate competition existing when those patents were held by PAEs that
2   were competing independently with one another and not under common Fortress
    control.  The PAEs received compensation in the form of favorable terms,
3   reflecting the fact that the PAEs were sharing in the supracompetitive royalties
    Defendants obtain by eliminating competition.  Thus, each of the Defendants
4   entered into separate agreements with Fortress with a common objective with
    Fortress to eliminate competition and reap the rewards from doing so.  Fortress is
5   thus at the center of a series of separate bilateral agreements between Fortress and
    each PAE to aggregate patents under Fortress's control to the benefit of Fortress
6   and each of the PAEs with which it contracted.

7   SAC ¶ 54.[2]  These are conclusions and speculation, not evidentiary facts.

8           For instance, there are no allegations that any PAE's purported "understanding" was part

9   of an <u>agreement</u> to restrain trade.  Nor does the SAC allege when any such agreement was

10  reached, how it was reached, which individuals reached it, whether and how it was memorialized,

11  or which "substitute" and/or "complementary" patents were the subject of each PAE's purported

12  "understanding."  The SAC never ties any PAE's purported "understanding" to any of the nine

13  markets alleged in the SAC—leaving Defendants and the Court to guess which market or markets

14  each PAE supposedly "understood" would suffer an "eliminat[ion]" of "competition."  *Id*.  There

15  is also no allegation that any PAE shared in the risk or the returns of any transaction between

16  Fortress and any other PAE, or that any PAE had an expectation that it would so share, or even

17  that any PAE knew or expected that Fortress had, or was going to have, dealings with any other

18  PAEs.  In fact, the SAC does not allege that any PAE ever did anything other than attempt to

19  enforce or license its <u>own patents</u>.  For example, Plaintiffs never allege facts showing that the

20  PAEs collectively (or Fortress and any one or more PAEs) attempted to package their so-called

21  substitute patents together or somehow use each other's patent portfolios to extract higher

22  licensing rates.  In other words, in a lawsuit that hinges on Defendants' "aggregation" of

23  "substitutes" to leverage supracompetitive royalties, Plaintiffs have failed to allege a single

24  instance of such behavior on what is now their third try.

25

26

27

28  [2] *Compare with* FAC ¶ 50.  Similar rote language is then mimicked for each transaction.  *See* SAC
    ¶¶ 62, 91, 93.

2.      The "Meritless" Litigation Allegations

Like the previous complaints, the SAC pleads only minimal facts about the allegedly "meritless" patent infringement suits through which Defendants allegedly carried out their purported anticompetitive scheme.  *Compare* SAC ¶¶ 10-15, 34, 42-43, 47, 102, 108-116, 126, 135, 380, 443-444, *with* FAC ¶¶ 10, 30, 38-39, 43, 88-96, 105, 114, 313, 430-431, *and* Complaint ¶¶ 9, 11, 31, 83-84, 88-93, 97-101, 103, 106-112, 115-118, 122-124.  For the majority of the lawsuits, the SAC makes no allegations at all regarding their merit.  The SAC does not identify any Rule 11 violation or other sanctions in any of the purportedly "meritless" cases.  Indeed, the SAC does not plead facts sufficient to show that even one, let alone all or a majority, of Defendants' suits were objectively baseless or brought for an improper purpose.  Moreover, the SAC once again fails to mention the numerous rulings in those cases that have been decided in Defendants' favor.  For instance, the SAC identifies a handful of claims that have been invalidated through *inter partes* review process but ignores Defendants' many patents that have survived such challenges from Plaintiffs.  *Compare* SAC ¶¶ 111, 113, 135; *with* Defendants' Request for Judicial Notice ("RJN") at 7-9 (listing Plaintiffs' numerous *inter partes* review petitions that have been denied institution or rejected in a Final Written Decision).  And many of the patents that the SAC alleges are invalid are not even included in any of the alleged "markets."  *See, e.g.*, SAC ¶¶ 109-113.  Consequently, they are just irrelevant, cherry-picked examples that have nothing to do with the alleged aggregation of substitutes at issue in this case.  Given these deficiencies and Plaintiffs' prior representations to the Court,[3] it is evident that the SAC does not even attempt to plead facts showing the presence of sham litigation.

**B.      Plaintiffs' Proposed Markets And Defendants' Alleged "Market Power"**

The SAC alleges nine purported antitrust markets and defines each of them as:  "an antitrust market for patents purporting to cover [insert technological functionality]."  *Id.* ¶¶ 149, 185, 213, 249, 284, 304, 358, 391, 415.  The nine technological functionalities making up the

---

[3] *See* Dkt. 136 at 29:9-13; 31:5-6 ("Plaintiffs are complaining about a pattern of anticompetitive patent transfers that led to supracompetitive royalties, not sham litigation.").  The *Noerr-Pennington* doctrine protects litigation conduct unless the litigation constitutes a "sham."  *See Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).

"markets" are:  network-based voice messaging, remote software updates, mobile device-to-device communication through a network-coupled intermediary device, preventing stalls for cache misses, arbitrating multiple requests to access a memory bus, third-party device authorization through limitation of information exchanged, generating alerts based on blood oxygen level, MOSFET channel fabrication, and remote enabling and disabling of software components.  *See id.*

The allegations for each of the nine alleged markets (set forth in Section III of the SAC) all follow the same flawed pattern.  First, the SAC describes the "technology" at issue and then admits that Defendants are not the only holders of alleged substitutes in the market by acknowledging that "other holders of patents claimed to read on [the technology]" are also part of the market.  *Id*.  The SAC also lists several patents that Plaintiffs contend certain Defendants own or control and which are purportedly either "substitutes" or "complements" for each other in the alleged market.[4]

However, for each of the nine alleged markets, there are no allegations setting forth:

(i)     the other purported "substitute" and "complement" patents, not to mention non-patented technology, making up each market;

(ii)    the total number of substitutes and complements (including substitutes for the complements) making up each market, and how many Defendants allegedly control;

(iii)   whether Defendants' patents constitute the "crown jewels" of each market;

(iv)    the characteristics that supposedly make a patent (or non-patented technology) a "substitute" or a "complement" in the market; or

(v)     which technologies cannot be practiced or products cannot be manufactured by Plaintiffs (or anyone for that matter) without the identified substitutes and complements.

In short, there are no allegations of any facts showing that Defendants own all, most, or even a substantial portion of the available substitutes (or complements, or substitutes for

---

[4] *See* SAC ¶¶ 150, 157, 162, 195, 214, 225, 232, 250, 255, 262, 284, 285, 293, 303, 305, 320, 341, 359, 366, 374, 390, 392, 403, 416, 423, 426, 431; SAC Ex. A.

complements) in any market, or that the purported substitutes and complements which Defendants have acquired are needed by Plaintiffs—or anyone for that matter—to make or do anything.  This is the same deficiency that the Court previously identified in both of Plaintiffs' prior complaints. *See* 1st Order at 16:7-11 ("Plaintiffs do not give any concrete example where Fortress and its PAEs have aggregated patents on a specific technology such that an alleged infringer is essentially deprived of substitutes and is thus forced to take a license from Fortress and/or its PAEs and pay a supracompetitive price for that license."); 2nd Order at 25:12-16 ("Finally, and perhaps most fundamentally, even though Plaintiffs allege the five patents are substitutes and thus limit the options of technology companies in developing products, the FAC does not allege how many *other* substitute patents are available.  The Court has no idea whether these five patents represent the 'crown jewels' of the field or just a small portion of a large field of substitutes.").

Like the FAC, the SAC again alleges that Fortress has a "massive but obscured portfolio of patents." *Compare* SAC ¶ 9, *with* FAC ¶ 9.  The SAC, however, contains no plausible allegations of "obfuscation."  Nor do Plaintiffs ever allege that they were unaware of Fortress's interests underlying the loans and investments that the SAC attacks.  In addition, the SAC's theory of "supracompetitive" pricing is that targets faced with a demand for a license by a PAE will submit and pay the price because they fear never-ending additional litigation funded by Fortress and other PAEs.  *See* SAC ¶ 42.  Yet the SAC never explains how these targets could possibly know about these other PAEs if Fortress's connection to the PAE is "obfuscated" to the market.  As for the "sheer size" of Fortress's alleged patent portfolio, SAC ¶ 443, the SAC never addresses the "size" of this alleged patent portfolio in comparison with any of the nine markets alleged in the SAC.

### C.     Alleged Anticompetitive Harm

Like the previously dismissed complaints, the SAC is replete with conclusory allegations about "supracompetitive" prices and "reduced output," yet it pleads no facts plausibly alleging either one.  *Compare, e.g.*, SAC ¶¶ 53-54, 62, 91, 93, 126, 146, 162, 195, 232, 262, 291, 341, 374, 403, 431, 448, *with* FAC ¶¶ 48, 50, 56, 71, 73, 105, 125, 141, 165, 198, 225, 239, 280, 307, 332, 354, 435.  Indeed, the SAC still does not identify a single royalty rate that anyone has allegedly ever paid to license one of Defendants' patents.  Instead, the SAC references nebulous third-party

license agreements and settlements with Defendants and also court proceedings that "possibly indicat[e] settlements."  SAC ¶¶ 169-170, 201-202, 418-419 (emphasis added); *see also id.* ¶¶ 172, 205, 238, 377 (referencing third-party settlements).  But the SAC pleads no evidentiary facts at all about those third-party licenses or settlements, such as their terms or how they are supracompetitive.  *See id.*

Instead, like the previous complaints, the SAC alleges that Defendants' royalty rates are supracompetitive because Defendants have allegedly sought substantially more in damages for their patents in litigation than the prior owners previously sought in licensing negotiations. *Compare id.* ¶¶ 176, 207, 271-274, 298, 387, 407, *with* FAC ¶¶ 151, 174, 228, 229, 247, 317, 335, *and* Complaint ¶¶ 9, 39, 102.  But the SAC adds nothing to these allegations, which the Court previously concluded were insufficient for multiple reasons.  *See* 2nd Order at 23:3-27:5; 1st Order at 15:7-17:14.  For instance, the SAC still does not explain how these damage demands, which will be adjudicated by the courts and juries in the underlying infringement cases, have anything to do with aggregation of substitutes.  It also still does not allege any facts showing that any PAE has ever attempted to leverage a purported substitute patent it holds with a purported "substitute" patent another PAE holds.

## III.   PLAINTIFFS' REDEFINED MARKETS ARE STILL NOT PLAUSIBLY STATED

This Court previously dismissed six of Plaintiffs' proposed "markets" as "not plausibly stated" because they encompassed entire "technical fields."  2nd Order at 16:23-25.  While the SAC purports to redefine those markets to cover purported "functions" within those fields, the changes are superficial.  Indeed, the new markets contain the exact same patents as the markets that the Court dismissed.[5]  Moreover, some of the patents do not fit the new market descriptions because they do not even perform the purported "function" at issue.  What these deficiencies and the others discussed below demonstrate is that Plaintiffs are not defining their "markets" based on governing antitrust principles, like economic substitutability and cross-elasticity of demand.

---

[5] Furthermore, even though Seven Networks, LLC ("Seven") is no longer a party to this action, the SAC still relies on Seven's patents and alleged conduct to argue that Defendants have market power in four of the purported markets.  *See* SAC ¶¶ 95-97, 139-141, 148-150, 184-186, 205, 210, 212-213, 240, 246, 303-304; SAC Ex. A.

Instead, Plaintiffs have defined their "markets" based on the patents that Defendants own and have dared assert against Plaintiffs in litigation.  But that is simply concocting "artificial" markets "to meet [Plaintiffs'] litigation needs," *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018), and it fails to address the core deficiencies the Court previously found.

For example, the Court dismissed Plaintiffs' alleged "health monitoring" patents market as overbroad.  *See* 2nd Order at 18:22-27.  The SAC purports to narrow this market to patents that relate to "generating alerts based on blood oxygen levels" (the "**Generating Alerts Based on Blood Oxygen Level**" market).  Yet the exact same patents are present in both the old and new "markets," including patents that have nothing to do with measuring blood oxygen.  *Compare* SAC ¶¶ 357-389, SAC Ex. A at 11-13, *with* FAC ¶¶ 290-318.  Indeed, five out of the eight patents in the new alleged market do not even mention the word "oxygen."  *See* RJN at 2.[6]  Moreover, the SAC alleges no facts showing that the patents are <u>economic</u> substitutes for each other, *i.e.*, that a price change for one will cause a demand change for the others.  *See* 2nd Order at 15:27-16:1 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.") (quoting *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)); 1st Order at 14:19-23; *see also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992) (cross-elasticity of demand is the extent to which "consumers will change their consumption of one product in response to a price change in another.").  For instance, among the three "substitute" patents in this alleged market, the SAC pleads no facts showing that a price change as to a "suffocation prevention system" patent (6,215,403; SAC ¶ 364) will cause a change in demand for an "exercise monitoring system" patent (7,220,220; *id.* ¶ 360), nor does the SAC allege any facts explaining why consumers would view these technologies as somehow interchangeable.  This is fatal to the proffered market definition.  *See Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at *4 (N.D. Cal. Jan. 5, 2008) ("[T]he inquiry is always focused on the

---

[6] For instance, U.S. Patent No. 7,690,556 relates to a "step counter system" that measures how many steps a person has taken over a given period of time, SAC ¶ 368, and U.S. Patent No. 8,872,646 relates to "waking up [a device in idle state] when the analysis of the motion indicates a change in" orientation or acceleration, SAC ¶ 371.

economic substitutability of the two technologies, not just whether the technologies accomplish a similar function."); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004) ("economic substitutability" and not "technological substitution" is what is "critical to market definition"), *rev'd on other grounds*, 546 U.S. 394 (2006); *Westlake Servs., LLC v. Credit Acceptance Corp.*, No. CV 15-07490, 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7, 2015) (granting dismissal because alleged markets "include[d] products that cannot plausibly be considered substitutes").

Similarly, the Court dismissed as overbroad the "mobile device-to-device communications" market. *See* 2nd Order at 17:24-18:3. The SAC purports to narrow it by tacking on the words "through network-coupled intermediary device" (the "**Mobile Device-to-Device Communication Through Network-Coupled Intermediary Device"** market). SAC ¶ 212. Yet this market includes the exact same patents as before. *Compare* SAC ¶¶ 214-231, SAC Ex. A at 3-5, *with* FAC ¶¶ 180-197. And it is still so broad that it includes, but is not limited to, all cellphone patents and technology (*e.g.*, handsets, cell towers, base stations, routers, switches, backhaul networks, etc.), given that cellphones communicate through networks. The mere fact that this alleged "market" excludes direct device-to-device communication technology (*e.g.*, walkie talkies) does not make it a viable market for antitrust purposes. The SAC also fails to plead facts showing economic substitutability. For instance, it pleads no facts showing that a price change for a patent directed at helping service providers who do not have their own cellular service network (such as mobile virtual network operators who buy bandwidth from national carriers) (Patent No. 9,712,986; *see* RJN at 3; SAC ¶ 223) will cause a change in demand for a patent focused on allowing multiple phones to connect to a "hands free car kit" via Bluetooth or Wi-Fi (Patent No. 7,299,008; *see* RJN at 3; SAC ¶ 219).

The four other revised "markets" suffer from the same defects: the SAC purports to narrow them by renaming them, yet they all contain the exact same patents as before, including patents that do not relate to the revised market name, and they allege no facts showing economic substitutability. As just a few examples:

- **"Preventing Stalls for Cache Misses" Market**—This alleged market contains the exact same patents as the previous "local cache management" market. *Compare* SAC ¶¶ 250-261, SAC Ex. A at 5-7, *with* FAC ¶¶ 213-224. It still includes, for example, Patent No. 7,523,331 (SAC ¶ 259) even though that patent says nothing about preventing stalls for cache misses; it is directed at a power saving method. *See* RJN at 3. Other patents within this alleged market are plainly not economic substitutes for one another. For example, the SAC pleads no facts showing that a price change for Patent No. 7,434,009 (which relates to writing data to a cache memory in "bursts" in order to handle multiple cache misses, *see* RJN at 3; SAC ¶ 253) will cause a change in demand for Patent No. 6,058,437 (which relates to the use of a "Translation Look-aside Buffer" that keeps track of data location in a shared memory and increases the efficiency of the cache, *see* RJN at 3; SAC ¶ 251).

- **"Third-party Device Authorization Through Limitation of Information Exchanged" Market**—This alleged market contains the exact same patents as the prior "device authorization" market, *compare* SAC ¶¶ 305-340, SAC Ex. A at 8-11, *with* FAC ¶¶ 252-279, even though it is apparent that several of these patents relate to different functionalities. For example, the SAC pleads no facts showing how Patent No. 6,856,616 (which "provides a way for users to make brand new telephones usable without having to wait for days while the telephone company programs an account," *see* RJN at 3; SAC ¶ 318) in any way relates to Patent No. 9,286,466 (which describes a system where, instead of a user entering a password to access a computer, the computer connects with an external electronic device (such as a cellphone, printer, or digital camera), that provides a "digital skeleton key" to authenticate the user and grant access to the computer, *see* RJN at 3-4; SAC ¶ 325).

- **"Arbitrating Multiple Requests to Access a Memory Bus" Market**—The SAC purports to narrow Plaintiffs' previous "Shared Memory Access" market by the artifice of using more words to say what shared memory accessory means, but it is the same "market." Just as before, the market allegedly consists of "patents purporting to cover shared memory access techniques," *compare* SAC ¶ 284, *with* FAC ¶ 235, and, just as before, it includes the exact same patents, *compare* SAC ¶¶ 285-292, SAC Ex. A at 7-8, *with* FAC ¶¶ 236-242. However,

the only two substitute patents in the alleged market are directed at solving <u>opposite</u> problems, and thus cannot be "substitutes."  Patent No. 7,606,983 is a specific method for determining when memory requests can be sent in different orders than when they were received ("The controller receives the access requests from each processor, determines a performance order for the requests, and provides the access requests to the memory in the performance order[,]" *see* RJN at 4; SAC ¶ 288), while Patent No. 5,659,687 is focused on ensuring that requests are accepted in the exact same order in which they arrived ("The queues are multi-staged in order to sequentially accept the memory request from the network . . . [,]" *see* RJN at 4; SAC ¶ 286).

- "**Remote Enabling and Disabling of Software Components" Market**—This alleged market contains the exact same patents as the "digital rights management" market, *compare* SAC ¶¶ 416, 423-424, 426-428, SAC Ex. A at 15-16, *with* FAC ¶¶ 341, 345-347, 349-350, even though several of these patents relate to different technologies.  For example, the SAC pleads no facts showing that a price change for Patent No. 8,769,296 (directed to detecting and preventing the spread of cracked computer software, which results from a hacker disabling copyright protection features, *see* RJN at 4; SAC ¶ 416) will cause a change in demand for Patent No. 5,579,222 (directed to a concurrent licensing system, which is where an entity purchases a license to a product with a limitation on the number of simultaneous users, *see* RJN at 4; SAC ¶ 416).[7]

Plaintiffs' alleged markets are also invalid because the SAC fails to address what <u>other</u> substitutes are contained within them.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1148 (N.D. Cal. 2020) (dismissal because it was "not clear what substitutes there are"); *NSS Labs, Inc. v. Symantec Corp.*, No. 18-CV-05711-BLF, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissal because plaintiff "fail[ed] to identify the economic substitutes for the product markets").  For example, a word search of the PTO database reveals that 219 patents have issued since 2000 with claims related to "stalls for cache misses," *see* RJN at 6, but the SAC only identifies seven patents in this market (and just two are alleged to be "substitutes"; the other five

---

[7] Not to mention the fact that the '222 patent expired over 7 years ago.  *See* RJN at 4.

are alleged to be "complements"). *See* SAC Ex. A at 5-6. It is not clear how many additional patents this "market" includes, especially since, as noted above, some of the seven patents that Plaintiffs have identified in this market have nothing to do with "cache stalls." In short, because it is impossible to tell which patents are in and which are out, Plaintiffs' alleged markets are facially deficient. *See Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 617 n.31 (N.D. Cal. 2020) (granting dismissal) (market deficient for failure to plead "which cART drugs are included and which are not"); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, No. 18-CV-02054-MMC, 2019 WL 1767335, at *4 (N.D. Cal. Apr. 22, 2019) (dismissal because "one cannot determine what types of products are encompassed"), *aff'd*, 811 F. App'x 422 (9th Cir. 2020).

This problem is exacerbated by Plaintiffs' inclusion of "complements" in their alleged markets. *See* SAC Ex. A (showing that "complements" are included in all but two of the proposed markets). The SAC offers no explanation for which complements are included in the markets and which are not. For example, if the "Generating Alerts Based on Blood Oxygen Level" market includes a "step counter system" (U.S. Patent No. 7,690,556), as Plaintiffs allege (SAC ¶ 368), then are patents related to counting swim laps and blood pressure alerts also part of the market, and if not, why not? There is no way of knowing from the SAC.

The SAC's arbitrary inclusion of "complements" within each market violates the basic antitrust principle that antitrust markets must be limited to goods that are economic substitutes and thus "reasonably interchangeable by consumers for the *same purposes*." *Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 598-99 (9th Cir. 2011) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)); *see also Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1144 (E.D. Ark. 2008) (when an alleged market includes "complements," "what follows is not that both sets of services are in the same product market but rather the opposite") (granting dismissal), *aff'd*, 591 F.3d 591 (8th Cir. 2009).[8] Indeed,

---

[8] *Staley v. Gilead Scis., Inc.* does not warrant a different result. No. 19-CV-02573-EMC, 2020 WL 5507555, at *6–7 (N.D. Cal. July 29, 2020). There, this Court recognized the general rule that markets do not include complements but held that the plaintiffs had pled facts "illustrat[ing] the interchangeability of use of different types of cART drugs" and showed that drugs could function as both substitutes and complements simultaneously depending upon which antiretroviral drug regimen was selected. *Id.* The SAC pleads no such facts or anything remotely like them.

1  as a leading treatise notes, "[g]rouping complementary goods into the same market is . . .

2  economic nonsense." 2B Areeda & Hovenkamp, Antitrust Law ¶ 565(a) (5th ed. 2020).  For

3  example, a car engine and a radiator are complementary goods, but they are not economically

4  interchangeable and thus are not in the same antitrust market.  The SAC's new markets are

5  similarly implausible.

6  **IV.  PLAINTIFFS AGAIN FAIL TO ALLEGE FACTS SHOWING MARKET POWER**

7  The Court dismissed the FAC because it contained "inadequate allegations that Defendants

8  have market power in each of the product markets." 2nd Order at 19:19-20.  The SAC fails for the

9  same reason.  To plead market power, a plaintiff must allege facts demonstrating that Defendants

10  have a "dominant share" of the market.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434

11  (9th Cir. 1995).  Yet the SAC, just like the FAC, does not allege any facts at all about Defendants'

12  market shares.  *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir.

13  2008) (affirming dismissal where complaint failed to allege the "percentage" of the alleged market

14  defendant controlled).  Because they are unable to plead market share, Plaintiffs likely will argue,

15  as they have twice before, that they are relying on "direct evidence" of anticompetitive effects.

16  *See* 2nd Order at 5:9-28.  However, under a "direct evidence" theory, Plaintiffs must allege <u>facts</u>

17  demonstrating <u>both</u> "restricted output and supracompetitive prices."  *Forsyth v. Humana, Inc.*, 114

18  F.3d 1467, 1475 (9th Cir. 1997), *aff'd*, 525 U.S. 299 (1999), *and overruled on other grounds by*

19  *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).  Like the FAC, the SAC fails to allege

20  facts showing that either, let alone both, of these requirements is met.

21  **A.  The SAC Fails To Allege Supracompetitive Prices, Much Less**

22  **Supracompetitive Prices Resulting From The Challenged "Aggregation"**

23  This Court's order dismissing the FAC identified six "shortcomings" of Plaintiffs'

24  supracompetitive price allegations.  *See* 2nd Order at 24:11-27:5.  The SAC cures <u>none</u> of those

25  shortcomings, much less all of them, and in fact adds additional deficiencies.[9]

26  _____

27  [9] Plaintiffs' failure to correct deficiencies that the Court explicitly identified warrants dismissal with prejudice.  *See Loos v. Immersion Corp.*, 762 F.3d 880, 890–91 (9th Cir. 2014) (affirming dismissal with prejudice where the "district court gave Plaintiff a detailed explanation of why his

28  original theory [] was deficient" but Plaintiff "persisted" and "'essentially re-pled the same facts and legal theories' in his amended complaint") (citation omitted); *Zucco Partners, LLC v.*

1              1.      Plaintiffs' "Supracompetitive Prices" Allegations Are Still Conclusory

2          The SAC's "supracompetitive" prices allegations are just as "conclusory" (*id.* at 24:11-18)

3   as the FAC's were.  Indeed, despite encompassing 160 pages and 467 paragraphs, the SAC still

4   does not identify a single royalty rate (much less a "supracompetitive" one) that anyone has

5   allegedly paid for any of the patents at issue.  Instead, Plaintiffs again baldly assert that

6   Defendants have "secured multiple settlements for substantial royalties," relying on the exact same

7   settlements as they did in the deficient FAC,[10] and they still provide "no information about, *e.g.*,

8   what these companies paid as part of their settlements."  2nd Order at 24:14-15.

9          To distract from this core failing, the SAC relies on a "2017 Auditor Report" containing

10  alleged revenue figures of just one Defendant, Uniloc Luxembourg, over a limited time period.

11  *See* SAC ¶ 169.  This allegation is not new.  Plaintiffs submitted these alleged revenue figures to

12  the Court in a "Statement of Recent Decision" (Dkt. 223) that they filed prior to the hearing on the

13  motion to dismiss the FAC.  The allegation fares no better this time.  First, earning licensing

14  revenue is not any evidence (let alone direct evidence) of supracompetitive pricing; otherwise, any

15  company that earned licensing revenue would be exposed to antitrust liability.  Second, the SAC

16  does not allege that the revenues in the 2017 Audit Report are attributable to the patents that

17  Uniloc allegedly "aggregated" or to the specific "markets" at issue in this case, so they are

18  irrelevant.  *See High Tech. Careers v. San Jose Mercury News*, No. CIV. 90-20579 SW, 1995 WL

19  115480, at *3 (N.D. Cal. Mar. 14, 1995) (evidence legally insufficient where profits were not

20  "from the relevant market" and plaintiff "also failed to make adequate comparisons with the profit

21  margins of comparable" companies), *aff'd*, 94 F.3d 651 (9th Cir. 1996).  Third, the SAC does not

22  identify Uniloc Luxembourg's pre-"aggregation" revenues, so there is no basis to infer that

23  revenues increased at all, much less that they increased due to alleged aggregation of substitutes.

24  Fourth, the SAC completely ignores Uniloc Luxembourg's costs; revenues alone say nothing

25  about whether a company is able to extract anticompetitive margins, especially here where the

26  _____

27  *Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (affirming dismissal with prejudice because the fact that the plaintiffs "failed to correct these deficiencies in its Second Amended Complaint is 'a strong indication that the plaintiffs have no additional facts to plead.'") (citation omitted).

28  [10] *Compare* SAC ¶¶ 163, 432, *with* FAC ¶¶ 142, 355.

alleged revenue—$7.3 million in one year and $14.6 million in the next—are hardly earth-shattering to begin with. *See* SAC ¶¶ 68, 169; *see also Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (rejecting direct evidence theory because "absent from plaintiffs' proffer is any analysis of [defendant's] costs.").

2.     The Fact That Prior Owners Did Not Assert The Patents Is Still Irrelevant

Like the FAC, the SAC alleges that any royalties that Defendants are able to obtain are "supracompetitive" because the prior owners never asserted the patents.[11]  As the Court held, however, the fact that the prior owners did not assert the patents "does not mean that the patents were worthless."  2nd Order at 24:20-21.  Indeed, the Court noted that "[t]he FAC alleges that prior owners had competitive constraints that kept them from asserting the patents, *see* FAC ¶ 49, thus indicating their market value could have been substantial but not asserted or exploited by the prior owners."  2nd Order at 24:21-23 (emphasis added).  For example, the FAC alleged that the patents' prior owners faced the "risk of patent countersuits from their targets" unlike Defendants who allegedly "produce no products."  FAC ¶ 49.  Indeed, this risk would be particularly acute when confronting companies with large patent portfolios and substantial resources like Intel and Apple.

The SAC attempts to cure this fundamental flaw by just deleting former FAC ¶ 49, but Plaintiffs cannot "avoid the implications of these factual allegations by omitting them."  *Bauer v. Tacey Goss, P.S.*, No. C 12-00876 JSW, 2012 WL 2838834, at *3 (N.D. Cal. July 10, 2012); *see also J. Edwards Jewelry Distrib., LLC v. Wells Fargo & Co.*, No. 18-CV-03886-YGR, 2019 WL 2329248, at *4 (N.D. Cal. May 31, 2019) (Plaintiff could not avoid dismissal "by simply deleting from its amended complaint" harmful prior allegations).  Nor can Plaintiffs amend their pleadings to "directly contradic[t] an earlier assertion made in the same proceeding."  *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014); *see also Bauer*, 2012 WL 2838834, at *3 (statement in prior complaint "serve[d] as a judicial admission").

The SAC now claims that the prior owners "brought many other patent cases against a

---

[11] *Compare* SAC ¶¶ 163, 196, 233, 263, 294, 342, 404, *with* FAC ¶¶ 142, 166, 199, 226, 244, 281, 333.

variety of defendants over the years, indicating that [they were] capable and willing to do so in the appropriate circumstances." *See, e.g.,* SAC ¶¶ 164-166. But even setting Plaintiffs' contrary and binding admissions aside, this allegation does not support Plaintiffs' direct evidence theory. There are many reasons why patent owners may choose not to assert some of their patents, especially large companies who likely own many thousands of patents such as the ones identified in the SAC. *See, e.g., id.* ¶¶ 164 (Philips), 165 (Huawei), 197 (IBM), 234 (HP). For example, the patents might fall outside their core areas of business or asserting them may be inconsistent with their business model. Similarly, there are numerous reasons why a patent owner might choose to assert a patent that the prior owners did not. For example, the subsequent owner might have a different assessment of the patent's value or a different theory of infringement, or further technical developments may have occurred that made the patent more valuable. Given these "obvious alternative explanation[s]," the SAC's allegations "stop[] short of the line between possibility and plausibility." *Somers v. Apple, Inc.,* 729 F.3d 953, 965 (9th Cir. 2013) (affirming dismissal) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 567 (2007)).

### 3.   What Prior Owners Charged For *Other* Patents Is Still Irrelevant

The Court rejected the FAC's assertion that "supracompetitive prices" were shown by Defendants "demanding" more in litigation than "what the prior owners charged as royalties for other patents in the same field." 2nd Order at 24:24-25. The Court held that such allegations are "immaterial absent some indication that those other patents are fair comparators for the patents at issue in this case." *Id.* at 24:26-27 (citing *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 999 (9th Cir. 2020)). Despite this ruling, the SAC repeats most of these allegations verbatim.[12]

Indeed, the SAC compounds the FAC's illogic. The SAC now contends that Defendants' "demands" for damages for certain patents are "supracompetitive" because they exceed the prices that previous owners have sought for alleged "complement" patents.[13] However, it is absurd to assume that all complementary goods should have the same price. To return to a prior example, although a car engine and radiator are "complementary" goods, no one would expect an engine to

---

[12] *Compare* SAC ¶¶ 273-274, 300, 388, *with* FAC ¶¶ 228-229, 246, 317.

[13] *See, e.g.,* SAC ¶¶ 180, 246, 279, 382.

1    cost the same as a radiator.

2          Even when Plaintiffs' purported "price" comparisons are limited to alleged "substitutes"

3    (*e.g.,* SAC ¶¶ 178, 409), they still make no sense. First, as demonstrated in Section III, *supra*, the

4    SAC never alleges facts showing that any of the patents at issue are <u>economic</u> substitutes. *See*

5    *Hicks*, 897 F.3d at 1120-21. Consequently, there is no basis for inferring that these supposed

6    "substitutes" would command similar prices in the market. Moreover, the Ninth Circuit has flatly

7    rejected the "erroneous[]" assumption that "royalties are 'anticompetitive'—in the antitrust

8    sense—unless they precisely reflect a patent's current, intrinsic value and are in line with the rates

9    other companies charge for their own patent portfolios." *Qualcomm*, 969 F.3d at 999. Thus, even

10   if litigation "demands" constituted prices, charging more for patents than other patent holders

11   charge for other patents still would not constitute direct evidence of anticompetitive effects.

12              4.    <u>Defendants' Alleged "Demands" Still Have "Limited Probative Value"</u>

13          Because Plaintiffs cannot identify any actual royalty rate that anyone has ever paid to

14   license one of the patents at issue, they again rely on Defendants' litigation demands just as they

15   have before. *See* 2nd Order at 25:3-6. The Court, however, held that a litigation damage demand

16   is of "limited probative value" because it "is still only a demand; there is no indication that anyone

17   has paid that demand or anything close to it." *Id.* In an attempt to overcome this, Plaintiffs now

18   allege that Defendants' damages demands are made in "good faith" (SAC ¶ 11), and that the

19   demands have proven to be accurate as demonstrated by VLSI's recent $2.175 billion jury verdict

20   against Intel (*id.*). But this is plainly insufficient. As the Court previously explained, even if a

21   damages demand is "rationally based," it is "still only a demand." 2nd Order at 25:3-6. In

22   addition, there are numerous other problems with Plaintiffs' assertions.

23          First, the SAC's new allegations of "good faith" and "accurate" damages demands cannot

24   be squared with the SAC's simultaneous assertion that Defendants' patents are invariably "weak"

25   and that Defendants' lawsuits are "meritless." *Id.* ¶¶ 2, 14-15, 34, 38, 42-43, 47, 108, 114, 126,

26   443-44. Such flatly inconsistent factual allegations are implausible as a matter of law. *See*

27   *Openwave Messaging, Inc. v. Open-Xchange, Inc.*, No. 16-CV-00253-WHO, 2016 WL 6393503,

28   at *5 (N.D. Cal. Oct. 28, 2016) ("Courts may dismiss a claim as not plausible where its supporting

1    factual allegations are contradictory.").

2         Second, Plaintiffs' theory is also implausible because it ignores the extensive risks and

3    costs of enforcing patents through litigation.  Each Defendant might profit if its infringement suits

4    prevail but will also suffer massive costs if it loses.  Seeking infringement damages in a lawsuit is

5    therefore a far cry from controlling prices as a monopolist would.  Consequently, when the SAC

6    compares acquisitions with subsequent litigation damages demands (*see, e.g.,* SAC ¶¶ 178, 208,

7    244, 271-79), there is no reason why the litigation damages demands—infused with litigation

8    costs and risks—should be below the acquisition prices.[14]  Third, for many of the patents at issue,

9    Plaintiffs' proffered "comparison is, as a facial matter, not a fair one."  2nd Order at 26:11-14.

10   This is because Plaintiffs are often still "comparing a demand made for one group of patents with

11   a later demand made for a different group of patents."  *Id.*  For example, the FAC alleged that

12   VLSI seeks $7.1 billion in damages for a group of patents that contained the '014 patent when the

13   ██████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████   *Id.* at 25:21-26:20 (citing FAC ¶ 228).  However, "the

15   only overlap between the two groups appears to be the '014 patent . . . .  Thus, it is not clear

16   whether *other* patents in the respective portfolios could account for the difference in the asserted

17   values of the portfolios."  *Id.*  The SAC repeats these exact same deficient allegations and then just

18   adds the same flawed apples-to-oranges comparison for other patents.  *Compare* SAC ¶¶ 271-72,

19   *with* FAC ¶ 228.[15]

20        Fourth, even when the SAC makes a slightly more direct comparison between an alleged

21   purchase price and a litigation demand, Plaintiffs' allegations still fail.  For example, the SAC

22   ██████████████████████████████████████████████████████████████████████████

23   ██████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████

---

[14] The SAC provides no details regarding the terms of the acquisitions, including potential liabilities incurred, profit participations, etc.  Consequently, the SAC's comparisons of the acquisitions with subsequent litigation demands are not just illogical; they are meaningless.
[15] *See* SAC ¶¶ 178, 208, 244.

1  ███████████████████████████████████████████████

2  ██████████████████████████████████████████████

3  ████████████████████████████████████████████

4  ████.[16]  Even setting aside Plaintiffs' misleading attempt to cherry pick from the PPCA, the mere

5  fact that VLSI is attempting to recoup more for its investment than it paid cannot possibly

6  constitute direct evidence of anticompetitive effects.  Buying low and selling high is what every

7  investor tries to do and is not an antitrust violation.  *See Qualcomm*, 969 F.3d at 1003 ("[P]rofit-

8  seeking behavior alone is insufficient to establish antitrust liability.").

9       Finally, having no facts to plead, Plaintiffs ask the Court to "infer" that they have stated a

10  claim just because other courts denied Plaintiffs' requests to contravene their stipulated protective

11  orders in those cases.  *See* SAC ¶¶ 179, 271, 276, 298, 350, 352, 407.  However, as the Court

12  already has held, Plaintiffs' proffered excuses are not a viable end-run around *Twombly* and *Iqbal*.

13  *See* 2nd Order at 24:15-18; *see also Mujica v. AirScan Inc.,* 771 F.3d 580, 593 (9th Cir. 2014)

14  (dismissal because "plaintiffs must satisfy the pleading requirements of Rule 8 *before* the

15  discovery stage, not after it").  Moreover, Plaintiffs' requests were denied because they failed to

16  show "the relevance of the materials requested for the antitrust case before Judge Chen."  *VLSI*

17  *Technology LLC v. Intel Corporation,* No. 5:17-cv-05671-BLF, Dkt. 297 (N.D. Cal. Feb. 5, 2021);

18  *see also Uniloc 2017 LLC v. Apple, Inc.,* No. 5:19-cv-01929-EJD, Dkt. 114 at 4:4-11 (N.D. Cal.

19  Feb. 12, 2021) ("[T]he documents at issue in this motion do not include a unique valuation for the

20  '252 patent . . . . It is not clear . . . [this] is the kind of information Judge Chen had in mind.").

21  Plaintiffs thus ask the Court to draw an "inference" that is not only baseless but which also flatly

22  contradicts the conclusions reached by the judges who actually reviewed the material at issue

23  when issuing their orders.  The Court should decline the invitation.

24       5.    There Is Still No Connection Between The Alleged "Supracompetitive"

25            Prices And The Alleged "Aggregation"

26       Even if litigation demands constituted supracompetitive prices, it is still "not obvious that

27  _____

28  [16] As discussed, *infra* at Section IV.A.5, the acquisition from NXP was disaggregation, not
aggregation, so it cannot support Plaintiffs' theory of the case anyway.

supracompetitive royalties, if any, were based on [] aggregation." 2nd Order at 25:10-11; *see also id.* at 26:16-20.  For example, Inventergy cannot seek more in litigation damages for its patents just because IXI allegedly controls other substitute patents, and vice versa.  Instead, the juries will assess the value of the patents-in-suit based on the merits of each PAE's patents alone, applying patent law principles.  The SAC never alleges a single instance in which a litigation damages "demand" (or even a licensing "demand") for one Defendant PAE's patent was based on ownership of a purported "substitute" patent owned by another Defendant PAE.  The SAC's invocation of VLSI's recent $2.175 billion judgment against Intel is a perfect example.  *See* SAC ¶ 11.  The SAC does <u>not</u> allege that the patents in that case are among the supposed "substitutes" that Defendants allegedly aggregated, nor does it allege that the $2.175 billion verdict had anything to do with the alleged ownership of "substitutes"—by either Defendant VLSI or by any of the other Defendants.  This case thus demonstrates that the inference Plaintiffs are asking the Court to draw—*i.e.*, Defendants' allegedly high damage demands <u>must</u> be attributable to aggregation—simply doesn't follow.  Furthermore, the SAC does not allege that any Defendant PAE ever did anything other than attempt to enforce or license its <u>own patents</u>.  For example, Plaintiffs never allege facts showing that the PAEs collectively (or Fortress and any one or more PAEs) attempted to package their so-called substitute patents together or somehow use each other's patent portfolios as leverage to extract higher licensing rates.  Anticompetitive impact through "aggregation" of patents has been the gravamen of all three of Plaintiffs' complaints, yet in three voluminous complaints, Plaintiffs have conspicuously never alleged a single action by any Defendant to leverage the "aggregated" patents to obtain settlements.

Similarly, as the Court previously stated with respect to the FAC, all but one of the alleged substitute patents in the "Network-based Voice Messaging" market (the '252 patent) was previously owned by the same entity.  *See* 2nd Order at 25:8-9.  The SAC alleges this exact same market consisting of the exact same "substitutes."  *See* SAC Ex. A at 2-3.  Plaintiffs, however, still "do[] not explain why the addition of this one patent vastly improves the market power of the portfolio." 2nd Order at 25:9-10.  This deficiency applies to other markets as well.  For example, all but one of the three alleged substitutes in the "Generating Alerts Based on Blood Oxygen

Level" market were previously owned by the same entity, Paragon Solutions LLC.  *See* SAC Ex.
A at 11-12.  All but one of the alleged substitutes in the "MOSFET Channel Fabrication Market"
were previously owned by Electronics & Telecommunication Research Institute.  *Id.* at 13-14.
And all but one of the alleged substitutes in the alleged "Remote Enabling and Disabling of
Software Components" market were already owned by Uniloc Luxembourg and Uniloc USA prior
to Fortress's alleged involvement.  *Id.* at 15-16.

Moreover, with respect to several of the markets, the alleged "aggregation" is minimal.
For example, in two of the alleged markets—"Preventing Stalls for Cache Misses" and
"Arbitrating Multiple Requests to Access a Memory Bus"—Defendants are alleged to control just
two substitute patents in total, and, for both of these markets, one of the alleged substitutes is now
<u>expired</u>.[17]  *Id.* at 5-8.  Similarly, all of the three alleged substitutes in the "Generating Alerts Based
on Blood Oxygen Level" market are expired.  *See* RJN at 5.

Finally, with respect to VLSI, which is the only Defendant who has allegedly sued Intel
(and VLSI has not sued Apple), there has been no alleged aggregation at all.  Instead, according to
the SAC, VLSI acquired all of its patents from the same prior owner, NXP.  *See* SAC ¶¶ 74-78.[18]
Consequently, VLSI's acquisition from NXP cannot possibly be anticompetitive under Plaintiffs'
"aggregation" theory.

6.      The SAC Still Does Not Allege How Many Other Substitutes There Are Or
        That Defendants Possess The "Crown Jewels"

Finally, and "perhaps most fundamentally," the SAC (like the FAC and the Complaint)
"does not allege how many *other* substitute patents are available" in each market, nor does it
allege that the handful of patents that Defendants allegedly control are somehow the "'crown

---

[17] It is clear from SAC Exhibit A that the twenty-year term, *see* 35 U.S.C. 154, of these alleged "substitutes" has now passed.  *See* SAC Ex. A at 5 (alleging that the '437 patent issued on 5/2/2000); *id.* at 7 (alleging that the '687 patent issued on 8/19/1997); RJN at 3-4.

[18] Intel previously alleged that the patents VLSI obtained were "only a fraction of the original patent portfolio owned by NXP" who previously owned "a patent portfolio of over 9,000 patent families."  *Intel Corp. v. Fortress Inv. Grp. LLC et al.*, No. 5:19-CV-06856-EJD, Dkt. 1 ¶¶ 86, 127 (N.D. Cal. Oct. 21, 2019).  So, if anything, VLSI's deal with NXP constituted a disaggregation of patents, not an aggregation of them.  When the Court confronted Plaintiffs with this issue at the last motion to dismiss hearing, Plaintiffs' only response was that VLSI's purchases from NXP occurred over multiple days.  *See* Dec. 15, 2020 H.Tr. (Dkt. 228) at 65:9-23.

jewels' of the field." 2nd Order at 25:12-17.  Indeed, the SAC, like the FAC, concedes that for each alleged market there are other substitute patents that compete with Defendants' technology.[19]  And, as noted above, there are dozens if not hundreds or thousands of other patents in each of these markets.  Yet, like the deficient FAC, the SAC never identifies even one of those other substitutes or alleges (even roughly) how many there are.  This alone is fatal to Plaintiffs' direct evidence theory.  As the Court previously explained, Plaintiffs' invocation of a direct evidence theory "does not mean [] that information about the number of patents Defendants hold, or the 'quality' of those patents, is insignificant."  *Id.* at 25 n.8.  This is because Plaintiffs "must still show that the supracompetitive pricing is due to the aggregation of patent substitutes."  *Id.; see also* 1st Order at 13:4-11 (noting that, even under a direct evidence theory, a plaintiff must still "show that the defendant <u>commands a substantial share</u> of the market") (emphasis added) (quoting *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004)).[20]

This failing is particularly problematic given that the alleged markets remain broad on their face, and Defendants are only alleged to own a handful of patents in each alleged market.  *See* SAC Ex. A.  For example, a word search for patents that read on "Network-based Voice-Messaging" reveals that 1,639 patents have issued since 2000 with claims that fit this description, *see* RJN at 6, yet Plaintiffs allege that Defendants own just seven of them (only five of which are alleged "substitutes," and four of those five substitutes are from the same patent family, *see id.* at 5).  Plaintiffs do not explain how Defendants' alleged control of at most just .05% of this alleged "market" could possibly give Defendants the power to control prices or the alleged markets for these technologies.

---

[19] *See, e.g.*, SAC ¶ 149 ("The Network-based Voice Messaging Patents Market constitutes a relevant antitrust market where [Defendants] . . . and <u>other holders of patents</u> claimed to read on electronic devices that support network-based voice messaging compete with one another.") (emphasis added); *see also id.* ¶¶ 185, 213, 249, 284, 304, 358, 391, 415.

[20] Plaintiffs have disclaimed the existence of "a single, overarching conspiracy involving all Defendants."  Dkt. 208 at 31; *see also infra* at Section VI.A.  Plaintiffs are thus precluded from aggregating the market share of the PAEs for a market power analysis.  *See Ralph C. Wilson Indus., Inc. v. Am. Broad. Companies, Inc.*, 598 F. Supp. 694, 704 n.10 (N.D. Cal. 1984) ("Absent a conspiracy among defendants, plaintiff may not aggregate the respective market shares of individual defendants to establish market power.") (dismissing Section 1 claim based on separate vertical agreements), *aff'd sub nom. Ralph C. Wilson Indus., Inc. v. Chron. Broad. Co.*, 794 F.2d 1359 (9th Cir. 1986).

1    Finally, as noted above, the SAC also still fails to allege that the few patents that

2 Defendants do own in these alleged markets are the "crown jewels" of any of the markets.

3 Instead, Plaintiffs repeatedly assert that Defendants' supposed "outsized" damages demands

4 "signal their belief" that each "patent represents a patent of significant importance."  SAC ¶ 178;

5 *see also id.* ¶¶ 208, 244, 271, 274, 276, 298, 346, 381, 382, 384, 407.  However, Defendants'

6 "claims about the scope of [their] patents . . . are not legally relevant" because they "do not have

7 any legal effect and cannot block anyone from entering the relevant markets."  *Orion Elec. Co. v.*

8 *Funai Elec. Co.*, No. 01 CV 3501 (AGS), 2002 WL 377541, at *6 (S.D.N.Y. Mar. 11, 2002); *see*

9 *also Minebea Co. v. Papst*, 444 F. Supp. 2d 68, 218-19 (D.D.C. 2006) (Defendants "views on the

10 scope of its own patents, however, are irrelevant to this Court's market power analysis.").

11    Ultimately, Plaintiffs' failure to allege that Defendants have cornered any market or own

12 the most important patents in any market is unsurprising, given that Plaintiffs are arguing the exact

13 opposite in the underlying patent litigations.  ███████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████████████

19 █████████████████████████████████████████  which is three times the number

20 of patents Defendants supposedly own in the particular "market" at issue.  This is flatly

21 inconsistent with Plaintiffs' conclusory allegations in the SAC that Defendants have market

22 power, which is why Plaintiffs cite what Defendants' purportedly "believe," as opposed to what

23 Plaintiffs contend is actually true.  It is the latter, however, that determines whether Plaintiffs'

24 antitrust claims are viable.

25    **B.    The SAC Fails To Allege Facts Showing Reduced Output**

26    The Court previously recognized that "Plaintiffs seemed to admit that their allegations in

27 the FAC of restricted output were largely conclusory."  2nd Order at 23 n.7.  <u>The SAC contains</u>

28 <u>the exact same conclusory allegations of "reduced output" as the FAC.</u>  *Compare* SAC ¶¶ 162,

195, 232, 262, 293, 341, 374, 403, 431, *with* FAC ¶¶ 141, 165, 198, 225, 243, 280, 307, 332, 354.[21]  Conclusory allegations, including of "reduced output," are deficient as a matter of law.  *See In re Webkinz Antitrust Litig*., 695 F. Supp. 2d 987, 996, n.1 (N.D. Cal. 2010) (dismissing antitrust complaint where reduced output assertions were "not actually supported by any facts currently alleged in the complaint"); *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1193-96 (S.D. Cal. 2002) (dismissing Section 1 claim because the "allegations regarding output restrictions [were] conclusory and unsupported by factual allegations" and the complaint merely stated that the defendant "was involved in a conspiracy to restrict output.").  Consequently, the only remaining question is whether Plaintiffs were required to plead facts of reduced output in order to plead direct evidence of market power.  The answer to that question is yes, and this is an independent basis to reject Plaintiffs' direct evidence theory as a matter of law.

The Ninth Circuit has expressly held that direct evidence of market power cannot be shown unless there is both supracompetitive pricing <u>and</u> reduced output:  "The plaintiffs submitted evidence that Sunrise Hospital routinely charged higher prices than other hospitals while reaping high profits.  <u>With no accompanying showing of restricted output, however, the plaintiffs have failed to present direct evidence of market power</u>."  *Forsyth*, 114 F.3d at 1475-76 (emphasis added); *see also Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 898 (N.D. Cal. 2012) (Chen, J.) ("[E]ven assuming C & D's 'high prices' are supracompetitive, they must also be accompanied by output restrictions in order to constitute direct evidence of market power."), *order vacated in part, on other grounds, on reconsideration*, No. C-10-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012).[22]  Indeed, it is the defendants' restriction of its own output that is

---

[21] If anything, given its allegation that the prior patent owners never licensed the patents at issue but that Defendants do license them (*e.g.,* SAC ¶ 12), the SAC pleads an <u>increase</u> in output.

[22] *See also Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2021 WL 879875, at *8 (N.D. Cal. Mar. 9, 2021) (dismissing complaint because "[t]he plaintiffs did not produce evidence of restricted output."); *Stewart v. Gogo, Inc.*, No. C-12-5164 EMC, 2013 WL 1501484, at *4 n.3 (N.D. Cal. Apr. 10, 2013) (dismissing direct evidence theory because "the complaint, while it contains allegations pointing to supracompetitive prices, does not contain accompanying allegations of restricted output."); *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011) ("[S]upracompetitive pricing, on its own, is not direct evidence of monopoly power . . . . To prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output.").

1   supposed to cause the supracompetitive pricing.  *See Rebel Oil*, 51 F.3d at 1434 ("A predator has

2   sufficient market power when, <u>by restricting its own output</u>, it can restrict marketwide output and,

3   hence, increase marketwide prices.") (emphasis added); *Dominick v. Collectors Universe, Inc.*,

4   No. 2:12-CV-04782-ODW, 2012 WL 6618616, at *4 (C.D. Cal. Dec. 18, 2012) (dismissing

5   plaintiffs' direct evidence theory because the complaint failed to illustrate defendants' ability to

6   affect the market by reducing their own output).

7        The Court previously stated that it was unclear whether allegations of restricted output

8   were always required given the Supreme Court's use of the disjunctive "or" in *American Express*:

9   "[t]his Court will 'not infer competitive injury from price and output data absent some evidence

10  that tends to prove that output was restricted *or* prices were above a competitive level.'"  2nd

11  Order at 22:4-9 (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018)).  However, there

12  is no reason to treat this quotation as overruling long-standing Ninth Circuit precedent.  The

13  *American Express* Court was not faced with a situation in which supracompetitive pricing was

14  present but reduced output was not, or vice versa.  Instead, it was faced with a situation in which

15  both were not present.  *See Am. Express Co.*, 138 S. Ct. at 2288.  Consequently, the Supreme

16  Court's use of the disjunctive was simply an acknowledgment of the lack of either

17  supracompetitive prices or reduced output in the case before it.  Indeed, the Supreme Court

18  emphasized that "[m]arket power is the ability to raise price profitably *by restricting output*."  *Id.*

19  (quoting Areeda & Hovenkamp, Fundamentals of Antitrust Law § 5.01[B] (4th ed. 2017)).  As

20  such, *American Express* is consistent with *Forsyth*.  And it most certainly is not "clearly

21  irreconcilab[le] with *Forsyth,* which would be the only basis for treating *Forsyth* as having been

22  effectively overruled by *American Express.  See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir.

23  2003) (only in cases of "clear irreconcilability" can district courts "consider themselves bound by

24  the intervening higher authority and reject the prior opinion of [the Ninth Circuit] as having been

25  effectively overruled").[23]

26  ─────────────────

27  [23] After *American Express*, courts within the Ninth Circuit have continued to require allegations of
    restricted output to plead a direct evidence theory.  *See, e.g., Sidibe*, 2021 WL 879875, at *8;
    *Humana Inc. v. Mallinckrodt ARD LLC*, No. CV 19-06926 DSF, 2020 WL 3041309, at *6 (C.D.

28  Cal. Mar. 9, 2020) (dismissing direct evidence theory because, while "Plaintiff has certainly
    alleged that Defendant charges supracompetitive prices . . . . it fails to allege Defendant restricted

10936723

1    In short, because the SAC fails to plead any facts showing reduced output, the SAC fails as

2    a matter of law to plead direct evidence of anticompetitive effects.

3    **V.      THE SAC FAILS TO ALLEGE FACTS SHOWING COGNIZABLE ANTITRUST**

4    **INJURY**

5    The original Complaint "suggest[ed] two possibilities for antitrust injury:  (1) the payment

6    of inflated royalties to Defendants (*i.e.*, supracompetitive prices for licenses)" and "(2) the

7    payment of litigation costs for defending against Defendants' patent infringement suits."  1st

8    Order at 20:7-10.  The Court concluded that (1) the first theory was deficient because Plaintiffs did

9    not allege that they had purchased a license from Defendants or "paid inflated royalties"; and

10   (2) the second theory was deficient because, "it [was] not clear that those lawsuits came about

11   *because of the elimination of substitutes.*"  *Id.* at 20:25-21:6.  The SAC alleges the same purported

12   injuries as the Complaint and suffers from the same fatal defects.

13   With respect to "supracompetitive" royalties, the SAC still fails to allege that Plaintiffs

14   have ever purchased any license from any Defendant, let alone at supracompetitive rates.  Nor do

15   Plaintiffs allege that they have any intention of purchasing any license from any Defendant.  *See*

16   1st Order at 20:25-21:2 (the alleged risk must be "real or immediate"); 2nd Order at 15:7-12 (an

17   alleged future injury must be "certainly impending") (quoting *In re Zappos.com, Inc.*, 888 F.3d

18   1020, 1024 (9th Cir. 2018)); *see also City of San Jose v. Office of Comm'r of Baseball*, No. C-13-

19   02787 RMW, 2013 WL 5609346, at *11 (N.D. Cal. Oct. 11, 2013) ("Injury that has not yet

20   occurred, indirect, or merely speculative is generally insufficient to give rise" to a cognizable

21   antitrust injury), *aff'd*, 776 F.3d 686 (9th Cir. 2015).[24]

22   The SAC's allegations regarding litigation costs also fail as a matter of law.  Under some

23   circumstances, an "attempt to monopolize an industry by acquiring <u>all</u> present and future patents

24   relevant to that industry" might possibly constitute an antitrust violation.  *United States v.*

25   _____

26   output"); *see also BanxCorp v. Bankrate, Inc.*, No. 19-1833, 2021 WL 733032, at *2 (3d Cir. Feb.
     25, 2021) ("Even assuming the prices were supracompetitive, [Plaintiff] admits [Defendant] did

27   not restrict output during the challenged period—it increased it.") (affirming dismissal).

28   [24] While the SAC claims that other companies have supposedly paid supracompetitive royalties,
     that does not constitute an injury to Plaintiffs.

*Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981) (emphasis added).  In that scenario, any company that wants to remain in the relevant market must either reach a settlement with the monopolist by agreeing to pay whatever royalties the monopolist demands or else be subject to a patent infringement suit that could foreclose the company from operating in the market because all substitute patents have been aggregated.  The SAC does not allege that Plaintiffs face such a predicament or anything remotely close to it.

Plaintiffs never allege that they cannot escape Defendants' infringement suits because Defendants have aggregated all, most, or even a key subset of substitute patents to such an extent that Plaintiffs are forced to take a license.  Just like the Complaint and FAC, the SAC still does "not give any concrete example where Fortress and its PAEs have aggregated patents on a specific technology such that an alleged infringer is essentially deprived of substitutes," 1st Order at 16:7-11, nor does it allege that Defendants' patents "represent the 'crown jewels'" of any market as discussed above, 2nd Order at 25:14-17, even after being pressed by the Court on this very issue.[25] *See also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13-CV-00740 AJT, 2013 WL 6682981, at *9 (E.D. Va. Dec. 18, 2013) (dismissing antitrust claims because there was no allegation that defendant "had acquired all substitutes or competing technologies") (emphasis added).  For example, the SAC does not identify a single product that Plaintiffs cannot make or a single technology that they cannot practice without infringing one of Defendants' patents.  Nor does the SAC allege that if Plaintiffs were to lose one of the referenced lawsuits then Plaintiffs would have no substitutes (including other patents or a design-around) to use in lieu of the litigated patents.[26]

---

[25] *See* Dec. 15, 2020 H.Tr. (Dkt. 228) at 27:4-7 (The Court: "Well, but isn't it relevant, how many other alternatives?  Yes, they've taken out two, but there's a big difference between taking two out of two versus taking two out of 50."), 27:24-28:6 (The Court: "Are these the crown jewels?  I don't see that.  You said: Well, here are three of them . . . How do I know that these are the crown jewels or a good part of the crown jewels that once you monopolize and aggregate those, you've got people over a barrel?"), 59:16-19 (Mr. Lee: "Is there some reason we have to allege that the precise patents that we've identified as substitutes are the crown jewels?  I think the answer is -- and I say this respectfully.  The answer is we didn't think we had to.").  The Court ruled otherwise, *see* 2nd Order at 25:12-17, 25 n.8, but Plaintiffs have elected not to so allege.

[26] Even assuming that Plaintiffs' conclusory allegations were sufficient to demonstrate that Defendants aggregated some purported "substitutes," that would only show that Defendants have aggregated some substitute patents that were previously in the hands of different owners, thereby

Plaintiffs' repeated failure to allege that Defendants' purported "aggregation" has deprived Plaintiffs of substitutes is fatal to their antitrust claims.  Where alternatives remain available, there can be no antitrust injury.  *See* 1st Order at 20:21-28; *see also Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,* 142 F. Supp. 2d 296, 303–04 (E.D. N.Y. 2001) (finding insufficient allegations of "injury . . . to competition" because the possibility of "alternative[s]" necessarily "lessen[s] the anti-competitive impact"), *aff'd,* 35 F. App'x 29 (2d Cir. 2002); *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 990 (6th Cir. 2001) ("[A]n essential element in attempting to establish the fact of damage because of exclusion from a specified source of supply is the lack of an alternative comparable substitute for the desired merchandise.") (internal quotations omitted).

Finally, in some instances, Plaintiffs do not even allege that Defendants have asserted any unlawfully aggregated patents against them at all.  For example, the SAC does not allege that Defendants have asserted <u>any</u> of the alleged "substitutes" in the "Remote Enabling and Disabling of Software Components" market against Intel or Apple.  *See* SAC Ex. A at 15-16 (identifying only one "complement" in this market that Defendants have asserted); *see also* 2nd Order at 15:2-12 (finding lack of Article III injury in "markets" with no lawsuits).  And with respect to Intel, the hole in Plaintiffs' antitrust injury allegations is even more gaping.  The only Defendant alleged to have sued Intel is VLSI, and under Plaintiffs' own admissions, <u>VLSI did not "aggregate" any patents</u> since it acquired <u>all</u> of its patents from the same prior owner.  *See, supra*, Section IV.A.5.  Thus, Intel cannot plausibly allege that the litigation costs it has supposedly incurred from its suits against VLSI somehow stem from aggregation of substitute patents.

The numerous fundamental defects addressed above make it clear that Plaintiffs' real protest is not about deprivation of substitutes at all.  It is about being sued over patents that are "weak" (according to Plaintiffs) and "the likelihood that a weak patent will slip through litigation and be found infringed, valid, and enforceable when it should not be."  *See, e.g.* SAC ¶¶ 2, 14, 42. Even if this purported future risk could be called "injury," it most certainly is not "the type [of

---

limiting Plaintiffs' choice of licensing partners.  But mere "allegations that conduct 'has the effect of reducing consumers' choices . . . do[] not sufficiently allege an injury to competition" because this effect is "'fully consistent with a free, competitive market.'"  *See Qualcomm,* 969 F.3d at 990 (quoting *Brantley v. NBC Universal, Inc*., 675 F.3d 1192, 1202 (9th Cir. 2012)).

1  injury] the antitrust laws were intended to prevent."  *Somers*, 729 F.3d at 963.

2  **VI.   THE SAC STILL FAILS TO ALLEGE EVIDENTIARY FACTS OF AN**

3  **AGREEMENT THAT WAS INTENDED TO HARM OR RESTRAIN TRADE**

4  In its 1st Order, the Court held that Plaintiffs' Section 1 claim contained "insufficient

5  allegations of an agreement by both Fortress and each PAE to aggregate weak patents" for an

6  anticompetitive purpose.  1st Order at 28:20-22.  The Court also noted that it was "not clear" what

7  the nature and scope of the alleged conspiracy was, and that "this should be clarified because it

8  will likely have an impact on the merits of Plaintiffs' case."  *Id.* at 27:12-18.  In its 2nd Order, the

9  Court held that:  (1) the "precise scope and nature" of the alleged conspiracies were still "ill-

10  defined;" (2) "Plaintiffs must allege that the agreement was intended to harm or restrain trade";

11  and (3) "Plaintiffs must have nonconclusory allegations to support such an intention."  2nd Order

12  at 11 n.6, 27 n.10.  The SAC has addressed none of these deficiencies.  Consequently, in addition

13  to the global failings discussed above (lack of a cognizable market, market power, and antitrust

14  injury), Plaintiffs' Section 1 claim fails for lack of a properly alleged agreement to restrain trade.

15  **A.   Plaintiffs Still Fail To Define The Precise Scope And Nature Of The Alleged**

16  **Conspiracy**

17  Plaintiffs again state that they are asserting a series of "separate bilateral agreements."

18  *Compare* SAC ¶ 54, *with* Dkt. 208 at 31:1-9.  Yet, like the FAC, the SAC still alleges in

19  conclusory fashion that each PAE "understood that the transaction would enable Fortress to

20  aggregate substitute and complementary patents across a web of PAEs to eliminate competition."

21  *Compare* SAC ¶ 54, 62, 91, 93, *with* FAC ¶¶ 50, 56, 71, 73.  Despite this conclusory assertion,

22  Plaintiffs allege no facts showing any agreement between any of the PAE defendants.  Nor do

23  Plaintiffs provide "specific allegations" demonstrating that each PAE "knew of the conspiracy's

24  general scope and purpose."  1st Order at 27:21-28 (citation omitted).  Nor do Plaintiffs allege

25  facts showing that any of the PAEs even knew "that there was another co-conspirator."  *Staley*,

26  2020 WL 5507555, at *7.  Instead, when Plaintiffs actually have to plead evidentiary facts of an

27  unlawful agreement, they focus on each individual PAE in isolation and retreat to alleged

28  "separate bilateral agreements" with Fortress (which, as discussed below, are also insufficiently

1   pled).  Plaintiffs' vacillation between inconsistent conspiracy theories therefore continues to beg

2   the questions that this Court repeatedly has posed to Plaintiffs:

3        Are Plaintiffs claiming that each PAE worked with Fortress to aggregate the
         patents the PAE has?  Or is [it] that [each] PAE knew Fortress would aggregate the
4        PAE's patents with another PAE's patents in the same market (*i.e.*, the PAE was
         just contributing to Fortress's 'pot of patents,' so to speak)?  Or is it both?

5

6   2nd Order at 11 n.6; *see also* 1st Order at 27:16-18.

7        Plaintiffs' repeated refusal to provide the clarity the Court has requested is no mere

8   oversight.  It is strategic.  *See Loos*, 762 F.3d at 890–91 (affirming dismissal with prejudice for

9   repeated failure to correct noted deficiencies); *Zucco*, 552 F.3d at 1007 (same).  In order to allege

10  that Defendants have "aggregated" patents across the various "markets," Plaintiffs must combine

11  the patent portfolio of each PAE defendant with the other PAE defendants.  But to accomplish that

12  goal, Plaintiffs need a conspiracy among the PAEs themselves, not just each PAE with Fortress.

13  *See Ralph C. Wilson*, 598 F. Supp. at 704 n.10 ("Absent a conspiracy among defendants, plaintiff

14  may not aggregate the respective market shares of individual defendants to establish market

15  power.").  So when asserting "aggregation," Plaintiffs pretend that they have linked the PAEs

16  together through some broad purported "understanding"; and when asserting the purportedly

17  unlawful "agreement," Plaintiffs retreat to attacking garden variety loan or acquisition deals

18  between Fortress and specific PAEs that reflect nothing about purported aggregation.  But as the

19  Court has repeatedly recognized, Plaintiffs cannot have it both ways—which is exactly what the

20  SAC continues to attempt to do.  *See* 1st Order at 27:16-18 (The scope of the conspiracy "should

21  be clarified because it will likely have an impact on the merits of Plaintiffs' case; for example, the

22  more defendants there are in one big conspiracy, the greater the likelihood that aggregation of

23  patents has resulted in the elimination of substitutes."); 2nd Order at 11 n.6 ("Whether antitrust

24  injury is adequately alleged may turn in part on the nature of the asserted conspiracies.").  For this

25  reason alone, Plaintiffs' Section 1 claim fails as a matter of law.

26      **B.      Plaintiffs Have Failed To Allege The Required Evidentiary Facts Of "Separate**

27              **Bilateral Agreements" That Were Intended To Restrain Trade**

28      Plaintiffs' Section 1 claim fails as a matter of law because Plaintiffs allege no

"nonconclusory" facts to suggest that the "separate bilateral agreements" Plaintiffs attack were "intended to harm or restrain trade." *See* 2nd Order at 27 n.10 (citing *Brantley*, 675 F.3d at 1197); *see also Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042, 1047 (9th Cir. 2008) ("To state a claim under Section 1 of the Sherman Act . . . claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy . . . (2) by which the persons or entities intended to harm or restrain trade.") (affirming dismissal because the plaintiff offered no evidentiary facts beyond the conclusory legal conclusion that the defendants "knowingly, intentionally and actively participated in an individual capacity in the alleged scheme").

Indeed, Plaintiffs rely on the identical bilateral written contracts that this Court already found were insufficient to state a Section 1 claim. *Compare* SAC ¶¶ 55-73, 80-97, *with* FAC ¶¶ 51-57, 62-77, *and* Complaint ¶¶ 51-56, 61-74; *see* 1st Order at 28:20-24. Specifically, the SAC again attacks the following agreements (1) a "Revenue Sharing" and "Patent License Agreement" with Uniloc USA and Uniloc Luxembourg (herein collectively "Uniloc"), SAC ¶¶ 56-57; (2) a 2014 Revenue Sharing/Note Purchase Agreement and 2016 Restructuring Agreement with Inventergy, SAC ¶¶ 83, 91; and (3) an "agreement that gave rise to an assignment of a security interest" with IXI IP, SAC ¶ 93. As the Court previously held, all that these agreements show is that "Fortress invested in a given PAE – which is consistent with 'rational, legal business behavior.'" 1st Order at 28:22-24 (emphasis added); *see also Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015) ("We cannot, however, infer an anticompetitive agreement when factual allegations just as easily suggest rational, legal business behavior.") (internal quotation marks omitted). Nothing in the SAC compels a different result.

Plaintiffs now allege that the PAEs must have known that these contracts were intended for an anticompetitive purpose because they allegedly contain "favorable terms" in the form of higher prices from Fortress than others were willing to invest in their patents. SAC ¶ 54. This is not a plausible inference for at least three reasons. First, this allegation flatly contradicts Plaintiffs' contention in the FAC and Complaint that Fortress supposedly imposed "terms so severe that the

1    PAEs have no choice but to make aggressive and reckless patent assertions to attempt to generate

2    the revenue required to meet their obligations to Fortress."  FAC ¶ 29 (emphasis added);

3    Complaint ¶ 30.  Plaintiffs cannot reconcile how terms could somehow be both "favorable" and

4    "severe" at the same time, so Plaintiffs have simply deleted this allegation from the SAC.  As

5    demonstrated above, however, Plaintiffs cannot escape prior admissions by just deleting them, *see*

6    *Bauer,* 2012 WL 2838834, at *3, nor can they contradict their prior complaints, *see Airs*

7    *Aromatics*, 744 F.3d at 600.

8         Second, Plaintiffs' allegations of "favorable" terms are all either conclusory, incoherent or

9    both.  Plaintiffs do not even attempt to explain what was supposedly "favorable" to IXI with

10   respect to its agreement with Fortress.  SAC ¶¶ 92-94.  And while Plaintiffs baldly assert that

11   Inventergy "receiv[ed] handsome consideration" for "vesting Fortress with full control of

12   Inventergy's patent monetization" (SAC ¶ 88), Plaintiffs never identify what this "handsome

13   consideration" was.  Plaintiffs allege that the revenue sharing agreement between Uniloc and

14   Fortress was a "favorable" deal for Uniloc, SAC ¶¶ 65-68, but they then allege that Uniloc has

15   suffered revenue shortfalls causing it to default on this agreement, which according to Plaintiffs,

16   has deprived Uniloc of standing to even assert these patents, SAC ¶ 69.  Consequently, Plaintiffs'

17   "favorable" conclusion cannot even be squared with Plaintiffs' own assertions about the alleged

18   Uniloc deal.  Plaintiffs also allege that Fortress's supposed "willingness to overlook" Uniloc's

19   alleged "default" on a revenue sharing agreement somehow shows that Uniloc and Fortress have

20   "found common cause in exploiting the benefits of aggregation."  SAC ¶ 70.  Actually, at most, it

21   shows that Fortress—which is alleged to have a financial interest in Uniloc's assertion of the

22   patents—did not benefit from a default that would deprive Uniloc from being able to assert the

23   patents in the first place.  Not declaring a default in such circumstances is "rational, legal business

24   behavior," *Name.Space*, 795 F.3d at 1130, and says/implies nothing about purported aggregation

25   of substitute patents.

26        Third, even assuming that the SAC's allegations of "favorable" terms for the PAEs had

27   any basis in fact and did not flatly contradict Plaintiffs' prior assertions, merely "benefit[ting]

28   from [] preferential business terms does not establish [the PAEs] as a co-conspirator."  *Contractor*

1   *Util. Sales Co. v. Certain-teed Prod. Corp.*, 638 F.2d 1061, 1076 (7th Cir. 1981); *see also Zoslaw*

2   *v. MCA Distrib. Corp.*, 693 F.2d 870, 888 (9th Cir. 1982) (affirming dismissal because

3   successfully negotiating "favorable sales terms" is not a Sherman Act violation).  For the same

4   reason, Plaintiffs' comparison of the alleged price Uniloc Luxembourg paid for patents with the

5   alleged higher price it subsequently sold them for is also unavailing.  *See* SAC ¶¶ 64-67, 71.  A

6   company selling its assets for a profit in no way creates an inference that the company has agreed

7   to restrain trade.  It is basic economics to attempt to buy low and sell high.  *See Qualcomm*, 969

8   F.3d at 1003 ("[P]rofit-seeking behavior alone is insufficient to establish antitrust liability.").

9   Furthermore, it is not a justifiable inference to assume illegal anticompetitive pricing anytime

10  there is a difference between an accounting value on a company's books and a subsequent price

11  paid for the asset in question.  *See In re 3dfx Interactive, Inc.*, 389 B.R. 842, 883 (Bankr. N.D. Cal.

12  2008) (noting that internal valuations are not necessarily equivalent to fair market valuations),

13  *aff'd*, 585 F. App'x 626 (9th Cir. 2014).

14          Plaintiffs' other allegations in support of their Section 1 claim are all either recycled from

15  the prior failed complaints, plainly insufficient, or both.  For instance, Plaintiffs rely on a

16  purported statement that Inventergy's CEO allegedly made to another company, Sonus Networks,

17  that "Fortress[,] does not settle" and that declining a license would result in an "IP bloodbath."

18  SAC ¶ 85.  However, this exact same allegation was in Plaintiffs' original Complaint (¶ 66), which

19  the Court held failed to state a Section 1 claim.  *See* 1st Order at 26:26-28:24.  Regardless, the

20  alleged statement says or implies nothing about aggregating substitute patents, nor do Plaintiffs

21  allege that Inventergy ever sued or threatened to sue Sonus based on substitute patents.  At most,

22  the SAC alleges that Inventergy threatened Sonus with aggressive patent litigation, but that is not

23  an illegal restraint of a trade.

24          Plaintiffs also attempt to paint Uniloc and Fortress as co-conspirators based on a series of

25  nonsensical inferences.  Plaintiffs primarily rely on a Management Report from June 30, 2017,

26  which allegedly states that "opportunities may exist for consolidation among companies with

27  complementary operations or competitive advantages."  SAC ¶ 64.  Plaintiffs also cite a purported

28  statement by Uniloc Luxemburg's CEO describing its alleged strategy of "acquir[ing] patents at

1   low cost and 'then [] augment their value through internal development of additional

2   complementary patents." *Id.* ¶ 73 (emphasis added).  However, acquiring or developing

3   "complements" is not anticompetitive because complementary patents perform different functions

4   and are thus not interchangeable as discussed above.  It is why, for example, Apple does not just

5   make iPads, iPhones, and iMac computers, but also makes other goods that complement these

6   products, such as headphones, covers, chargers, and streaming music.

7         Finally, <u>none</u> of the alleged statements that Plaintiffs point to say or imply anything about

8   aggregating substitute patents.  Indeed, in now three attempts at stating a conspiracy claim,

9   Plaintiffs have never alleged a single fact showing that any PAE defendant or Fortress ever even

10   attempted to leverage the patents of another PAE defendant ("substitute," "complement," or

11   otherwise) either in licensing negotiations or during litigation.  And this is true despite the fact that

12   each of the alleged "conspiracies" to "aggregate substitute patents" across PAEs has supposedly

13   been in place for half a decade or more.

14         The Court should dismiss the Section 1 claim with prejudice.

15   **VII.    PLAINTIFFS' SECTION 7 CLAIM FAILS BECAUSE THE SAC CONTAINS NO**

16                  **ALLEGATIONS OF MARKET SHARE OR CONCENTRATION**

17         Section 7 of the Clayton Act prohibits an acquisition where "the effect of such acquisition

18   may be substantially to lessen competition, or to tend to create a monopoly."  1st Order at 29:1-4

19   (quoting 15 U.S.C. § 18).  The Court previously held that the Complaint did not "adequately

20   allege[] that there has been such an aggregation of patents" to satisfy this standard.  *Id.* at 29:26-

21   30:4.  The SAC does not cure this fatal defect.  Consequently, in addition to the global failings

22   discussed above (lack of a cognizable market, market power, and antitrust injury), the Section 7

23   claim also fails because it does not allege acquisitions sufficient in scope to trigger Section 7.

24         The essence of a Section 7 claim is undue market share and concentration.  Consequently,

25   "[t]o establish a § 7 violation, a party 'must show that the merger would produce 'a firm

26   controlling an <u>undue percentage</u> share of the relevant market, and would result in a significant

27   <u>increase in the concentration</u> of firms in that market.'"  *Edstrom v. Anheuser-Busch InBev SA/NV*,

28   No. C 13-1309 MMC, 2013 WL 5124149, at *3 (N.D. Cal. Sept. 13, 2013) (emphasis added)

1   (quoting *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001) and *United States v.*

2   *Philadelphia Nat'l. Bank*, 374 U.S. 321, 363 (1963)) (granting dismissal), *aff'd*, 647 F. App'x 733

3   (9th Cir. 2016).  The SAC fails this test because it never alleges facts showing Defendants'

4   purported share of "substitute" patents nor the alleged change in concentration of the competing

5   licensors in any of Plaintiffs' proposed "markets" either before or after the challenged

6   acquisitions.

7        Indeed, for several of the alleged "markets," Plaintiffs have failed to allege that there has

8   been any aggregation or increase in market concentration at all.  For example, Uniloc 2017 is the

9   only Section 7 Defendant who is alleged to own a substitute patent in the Network-based Voice

10  Messaging, Remote Software Updates, Generating Alerts Based on Blood Oxygen Level, and

11  Remote Enabling and Disabling of Software Components "markets."  *See* SAC Ex. A.  The SAC

12  however, alleges that <u>all</u> of these patents came from Uniloc Luxembourg.  "As a result, [this]

13  challenged transaction does not increase . . . the concentration of [these markets]" and therefore

14  cannot be anticompetitive.  *Edstrom v. Anheuser-Busch Inbev SA/NV*, 647 F. App'x 733, 735 (9th

15  Cir. 2016).  It is for this reason that courts in this district routinely dismiss Section 7 claims that

16  fail to contain factual allegations showing a merger's effect on market concentration and market

17  share.[27]  This Court should do the same.

18        At most, the SAC alleges that Defendants have acquired a handful of supposedly substitute

19  patents in various purported markets.  That is plainly insufficient.  Every acquisition decreases

20  competition to some degree, but that does not mean that all acquisitions give rise to a Section 7

21  claim.  *See Int'l Shoe Co. v. FTC*, 280 U.S. 291, 298 (1930) ("Mere acquisition by one corporation

22  of the stock of a competitor, even though it result[s] in some lessening of competition, is not

23

24  ―――――――――――
    [27] *See, e.g.*, *Med Vets*, 2019 WL 1767335, at *6 (dismissing Section 7 claim where complaint had

25  not "provided any figures as to what share of the market either defendant possessed prior to the
    merger."), *aff'd*, 811 Fed. App'x. 422 (9th Cir. 2020); *Golden Gate Pharmacy Servs., Inc. v.*

26  *Pfizer, Inc.*, No. C-09-3854 MMC, 2009 WL 4723739, at *5 (N.D. Cal. Dec. 2, 2009) (dismissing
    Section 7 claim because complaint failed to contain facts about the "number of suppliers" in the

27  market pre and post-merger); *Carefusion Corp. v. Medtronic, Inc.*, No. 10-CV-01111-LHK, 2010
    WL 4509821, at *8 (N.D. Cal. Nov. 1, 2010) (dismissal appropriate where the "Complaint

28  includes no allegations as to the state of the relevant markets, and specifically no allegations as to
    [plaintiff's] position in those markets, before [the] acquisition.").

1  forbidden."); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 487 (1977) ("Every

2  merger of two existing entities into one, whether lawful or unlawful, has the potential for

3  producing economic readjustments that adversely affect some persons."). Rather, Section 7

4  prohibits "only those whose effect may be <u>substantially</u> to lessen competition, or to <u>tend to create</u>

5  <u>a monopoly</u>." *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (emphasis added)

6  (internal quotation marks omitted). A plaintiff cannot make this showing without pleading facts

7  demonstrating market share and concentration both before and after the acquisition.

8        Plaintiffs also cannot circumvent this fundamental pleading requirement by appealing to a

9  "direct evidence of anticompetitive effects" theory. First, as demonstrated in Section IV above,

10  Plaintiffs' "direct evidence" theory fails as a matter of law. Second, while the Court declined to

11  decide this issue in its latest dismissal order, there is a sound reason why there is abundant case

12  law applying "direct evidence" to Section 1 claims but <u>not</u> applying it to Section 7 claims. *See*

13  2nd Order at 20:23-24.[28] It is because the very essence of a Section 7 claim is acquisition of

14  undue market share and market concentration. In other words, it is the acquisition of undue

15  market share and concentration that is the prohibited conduct in a Section 7 claim, just as it is the

16  unlawful agreement to restrain trade that is the prohibited conduct in a Section 1 claim. Just as a

17  Section 1 plaintiff cannot dodge its obligation to plead facts of an unlawful conspiracy by alleging

18  "direct evidence of anticompetitive effects," a Section 7 plaintiff cannot dodge its obligation to

19  plead facts showing acquisition of undue market share and increased market concentration by

20  alleging "direct evidence of anticompetitive effects." Otherwise, there would be no way to link

21  the supposed "direct evidence of anticompetitive effects" to the allegedly unlawful act. *See, e.g.*,

22  *Synopsys, Inc. v. ATopTech, Inc.*, No. C 13-2965 MMC, 2015 WL 4719048, at *6 (N.D. Cal.

23  Aug. 7, 2015) (dismissing Section 7 claim despite allegations of "increased prices for consumers"

24  for lack of "any facts showing the state of the market before the challenged acquisitions").

25  _____

26  [28] *See also Am. Express Co.,* 138 S. Ct. at 2291 (Breyer, J., dissenting) ("It is important here to understand that in cases under § 1 of the Sherman Act (unlike in cases challenging a merger under

27  § 7 of the Clayton Act, 15 U.S.C. § 18), it may well be unnecessary to undertake a sometimes complex, market power inquiry.") (emphasis added). The majority in *American Express* did not

28  address this issue because they held that the plaintiff had failed to produce direct evidence of anticompetitive effects. *Id*. at 2288.

1    For all of these reasons, the Court's prior holding that the Complaint failed to state a

2    Section 7 claim applies with equal force to the SAC.

3    **VIII.   THE UCL CLAIM SHOULD BE STRICKEN UNDER CALIFORNIA'S ANTI-**

4    **SLAPP STATUTE**

5    While the Court has dismissed Plaintiffs' UCL claim twice for failure to state a claim, it

6    has not yet ruled on Defendants' Anti-SLAPP motion.  As the Court has previously recognized, "a

7    court <u>must</u> consider an anti-SLAPP motion even if it dismisses the underlying claim without leave

8    to amend, as a successful anti-SLAPP motion results in the award of fees."  *Gressett v. Contra*

9    *Costa Cty.*, No. C-12-3798 EMC, 2013 WL 2156278, at *33 (N.D. Cal. May 17, 2013); *Collins v.*

10   *Allstate Indem. Co.*, 428 F. App'x. 688, 690 (9th Cir. 2011) ("[T]he district court erred in denying

11   Allstate's motion to strike under California's anti-SLAPP statute" because "[r]esolution of the

12   underlying action did not moot the anti-SLAPP motion.").  Defendants accordingly renew their

13   motion to strike.

14   California's anti-SLAPP law applies to state law claims brought in federal court, and the

15   analysis proceeds in two steps:

16   At step one, the court decides whether the defendant has made a threshold showing
     that the challenged cause of action is one arising from the protected activity . . . .

17   At step two, the burden shifts to the plaintiff to demonstrate that each challenged
     claim based on protected activity is legally sufficient and factually substantiated.

18

19   *Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 810 (N.D. Cal. 2019) (internal quotation

20   marks and citations omitted); *see also Planned Parenthood Fed'n v. Ctr. for Med. Progress*, 890

21   F.3d 828, 834 (9th Cir. 2018) (anti-SLAPP law applies to state law claims in federal court).

22   Plaintiffs' UCL claim should be stricken because (i) it arises from protected activity and

23   (ii) Plaintiffs cannot meet their burden of demonstrating a legally sufficient and factually

24   substantiated claim.

25   **A.    Plaintiffs' UCL Claim "Arises From" Protected Activity**

26   Plaintiffs' UCL claim "arises from" protected activity for at least two independent reasons.

27   <u>First</u>, when a defendant's protected conduct "supplies a necessary element" of a claim, "the

28   defendant's burden at the first step of the anti-SLAPP analysis has been carried."  *Wilson v. Cable*

1   *News Network, Inc*., 7 Cal. 5th 871, 892 (2019).  One necessary element of a UCL claim is that the

2   plaintiff "lost money or property" as a result of defendant's allegedly unfair conduct.  *TCL*

3   *Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV 14-0341 JVS

4   (DFMx), 2016 WL 7049263, at *2 (C.D. Cal. Aug. 9, 2016) (quoting Cal. Bus. & Prof. Code

5   § 17204).  Here, the UCL claim's only allegation of lost money or property is the "litigation costs"

6   Plaintiffs have incurred in defending against Defendants' patent infringement lawsuits, SAC

7   ¶ 467, which are by definition "protected activity."  *See Soukup v. Law Offices of Herbert Hafif*,

8   39 Cal. 4th 260, 291 (2006) ("The filing of lawsuits is an aspect of the First Amendment right of

9   petition."); *Moss Bros. Toy v. Ruiz*, 27 Cal. App. 5th 424, 435 (2018) (arising from prong satisfied

10  because "[b]ut for [defendant's] filing of the complaint, . . . [plaintiff] would not have incurred any

11  . . . damages.").  Consequently, Plaintiffs' UCL claim necessarily "arises from" protected

12  conduct.

13          <u>Second</u>, the California Supreme Court has held that the "arises from" prong is satisfied

14  where the plaintiff seeks "injunctive relief that expressly would restrict [defendant's] exercise of

15  petition rights," including the filing of lawsuits.  *Equilon Enterprises v. Consumer Cause, Inc*., 29

16  Cal. 4th 53, 68 n.4 (2002).  Here, Plaintiffs seek to enjoin Defendants from pursuing their patent

17  infringement claims.  *See* SAC ¶ 466; Dkt. 208 at 38:15-18 (Plaintiffs seek to enjoin "patent

18  assertions").  Consequently, the "arises from" prong is satisfied for this reason as well.

19          **B.      Plaintiffs' UCL Claim Fails As A Matter Of Law**

20          The second prong of California's anti-SLAPP statute is satisfied because Plaintiffs' UCL

21  claim fails as a matter of the law.  *See Ramachandran*, 359 F. Supp. 3d at 810.[29]  The analysis at

22  step 2 is not limited to whether the Defendants' conduct is constitutionally protected.  Rather, this

23  step is satisfied if Plaintiffs' UCL claims fails for <u>any</u> reason.  *See Traditional Cat Assn., Inc. v.*

24  *Gilbreath*, 118 Cal. App. 4th 392, 398 (2004) (rejecting the proposition that "the only defense at

25  issue in anti-SLAPP motion is the constitutional defenses involving the right to petition and free

26  speech" and holding that the second prong was satisfied because plaintiff's claims were time

27  _____

28  [29] Defendants' motion to strike is based solely on the legal insufficiency of Plaintiffs' UCL claims, and the Rule 12(b)(6) standard thus applies.  *See Planned Parenthood*, 890 F.3d at 834.

barred).  Here, the SAC's UCL claim is predicated solely on Defendants' alleged violations of federal antitrust law.  *See* SAC ¶ 465 (alleging that Defendants acted unlawfully under the UCL by "violating the Sherman and Clayton Acts.").  Because the federal antitrust claims fail for the reasons discussed above, Plaintiffs' UCL claim necessarily fails as well.  *See Mitchell v. Reg'l Serv. Corp.*, No. C 13-04212 JSW, 2014 WL 12607809, at *5 (N.D. Cal. Apr. 23, 2014) ("If the underlying claim that the UCL claim is predicated upon fails then the UCL claim fails as well."); *see also* 1st Order at 34:10-11.

## IX.     CONCLUSION

This is Plaintiffs' third bite at the apple, but they still have not cured the multiple deficiencies the Court previously found.  The SAC should be dismissed with prejudice, and the Court should strike Plaintiffs' California's state law claim.  *See Zucco*, 552 F.3d at 1007 (affirming dismissal of SAC with prejudice because "it was clear that the plaintiffs had made their best case and had been found wanting").

Dated:  April 26, 2021                          Respectfully submitted,

                                                IRELL & MANELLA LLP


                                                By:*/s/ A. Matthew Ashley*
                                                   A. Matthew Ashley
                                                   *Counsel for Defendants*
                                                   FORTRESS INVESTMENT GROUP LLC,
                                                   FORTRESS CREDIT CO. LLC,
                                                   VLSI TECHNOLOGY LLC


                                                   */s/ Christopher A. Seidl*
                                                   Christopher A. Seidl (*pro hac vice*)
                                                   CSeidl@RobinsKaplan.com
                                                   ROBINS KAPLAN LLP
                                                   800 LaSalle Avenue, Suite 2800
                                                   Minneapolis, MN 55402
                                                   Telephone:  612 349 8468
                                                   Facsimile:  612 339-4181
                                                   *Counsel for Defendants*
                                                   INVT SPE LLC
                                                   INVENTERGY GLOBAL, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Jason D. Cassady*
Jason D. Cassady (*pro hac vice*)
jcassady@caldwellcc.com
CALDWELL CASSADY & CURRY
2121 N. Pearl Street, Suite 1200
Dallas, TX 75201
Telephone: 214 888-4841
Facsimile: 214-888-4849
*Counsel for Defendant*
IXI IP, LLC

*/s/ James J. Foster*
James J. Foster
jfoster@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
Telephone: 617 456-8022
Facsimile: 617 456-8100
*Counsel for Defendant*
UNILOC 2017 LLC

*/s/ Daniel. R. Shulman*
Daniel R. Shulman (*pro hac vice*)
dan@shulmanbuske.com
SHULMAN & BUSKE PLLC
126 North Third Street, Suite 402
Minneapolis, MN 55401
Telephone: 612 870 7410
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC

*/s/ Dean C. Eyler*
Dean C. Eyler (*pro hac vice*)
dean.eyler@lathropgpm.com
LATHROP GPM LLP
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612 632-3335
Facsimile: 612 632-4000
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC

1

## **ECF ATTESTATION**

2          I, Lucas S. Oxenford, am the ECF user whose ID and password are being used to file

3    DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DISMISS AND TO

4    STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT.  I hereby attest that I received

5    authorization to insert the signatures indicated by a conformed signature (/s/) within this e-filed

6    document.

7

8

9                              By: */s/ Lucas S. Oxenford*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28