*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Mark D. Selwyn (SBN 244180)
mark.selwyn@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Fax: (650) 858-6100

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Leon B. Greenfield (admitted *pro hac vice*)
leon.greenfield@wilmerhale.com
Amanda L. Major (admitted *pro hac vice*)
amanda.major@wilmerhale.com
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 663-6000
Fax: (202) 663-6363

WILMER CUTLER PICKERING
  HALE AND DORR LLP
William F. Lee (admitted *pro hac vice*)
william.lee@wilmerhale.com
Joseph J. Mueller (admitted *pro hac vice*)
joseph.mueller@wilmerhale.com
Timothy D. Syrett (admitted *pro hac vice*)
timothy.syrett@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

*Attorneys for Plaintiffs*
*Intel Corporation, Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| INTEL CORPORATION, APPLE INC.,<br><br>                    Plaintiffs,<br><br>     v.<br><br>FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL, INC., and IXI IP, LLC,<br><br>                    Defendants. | Case No. 3:19-cv-07651-EMC<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT** |

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

**TABLE OF CONTENTS**

I. Introduction ............................................................................................................. 1

II. The Second Amended Complaint ............................................................................. 2

 A. New Allegations Regarding Patent Markets .................................................. 3

 B. New Allegations of Direct Evidence of Anticompetitive Effects ............... 5

  1. Non-Assertion by Prior Owners of Aggregated Patents Because of Competitive Constraints .......................................... 5

  2. Low Pre-Aggregation Acquisition Prices or Valuations of Aggregated Patents ............................................................ 6

  3. Defendants Have Demanded or Obtained Supracompetitive Royalties ..... 8

  4. Defendants Objected to Allowing Plaintiffs to Use Relevant Evidence under Seal from the Patent Litigations ...................................... 10

 C. New Allegations of Agreements in Restraint of Trade .......................... 10

 D. Additional Allegations of Competitive Harms .................................... 12

III. The Legal Standard ............................................................................................. 12

IV. Argument ............................................................................................................. 13

 A. Plaintiffs Have Adequately Alleged Nine Relevant Patent Markets ................... 13

  1. The SAC Alleges Direct Evidence of Anticompetitive Effects Based on Supracompetitive Pricing .............................................. 17

  2. Direct Evidence of Anticompetitive Effects Obviates Any Requirement to Allege Market Shares ......................................... 30

 B. Plaintiffs Have Adequately Pled Antitrust Injury ................................. 30

  1. Plaintiffs Have Alleged that Defendants' Anticompetitive Conduct Resulted in Supracompetitive Royalties ................................. 31

  2. Plaintiffs' Litigation Costs Constitute Antitrust Injury ..................... 32

 C. Plaintiffs Have Adequately Alleged a Section 1 Claim .......................... 33

 D. Plaintiffs Have Adequately Alleged a Section 7 Claim ......................... 38

 E. Plaintiffs Have Adequately Alleged UCL Claims ................................ 39

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

V.      Conclusion ....................................................................................................... 40

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
5
 190 F.3d 1051 (9th Cir. 1999) ...............................................................30

6

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
 92 F.3d 781 (9th Cir. 1996) ...................................................................31

7

*Apple, Inc. v. Samsung Elecs.*,
8
 No. 11-CV-01846-LHK, 2012 WL 2571719 (N.D. Cal. June 30, 2012) ...............................32

9

*Barry v. State Bar of Cal.*,
10
 386 P.3d 788 (Cal. 2017) .......................................................................39

11

*Bhan v. NME Hosps., Inc.*,
 929 F.2d 1404 (9th Cir.1991) .................................................................38

12

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
13
 483 F. Supp. 3d 38 (D. Mass. 2020) .......................................................27

14

*Byars v. Bluff City News Co.*,
15
 609 F.2d 843 (6th Cir. 1979) .................................................................19

16

*Cal. Dental Ass'n v. F.T.C.*,
 224 F.3d 942 (9th Cir. 2000) .................................................................34

17

*Cargill Inc. v. Budine*,
18
 No. 07-349, 2007 WL 2506451 (E.D. Cal. Aug. 30, 2007).....................................14

19

*Ctr. for Envtl. Health v. Vilsack*,
20
 2015 U.S. Dist. LEXIS 131773 (N.D. Cal. Sept. 29, 2015) ..................................15

21

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*,
 611 F.3d 495 (9th Cir. 2010) ..............................................12, 13, 31, 36

22

*Dunn v. Phx. Newspapers, Inc.*,
23
 735 F.2d 1184 (9th Cir. 1984) ...............................................................34

24

*E & E Co., Ltd. v. Kam Hing Enter., Inc.*,
 429 Fed. Appx. 632 (9th Cir. 2010)....................................................19, 20

25

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
26
 637 F.3d 435 (4th Cir. 2011) .................................................................13

27

28

1

2

3

4
*Equilon Enter. v. Consumer Cause, Inc.*,
    29 Cal. 4th 53 (2002) ............................................................................................40

5
*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ....................................................................28, 29

6

7
*F.T.C. v. Actavis, Inc.*,
    570 U.S. 136 (2013)...........................................................................................36

8

9
*F.T.C. v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)...........................................................................................38

10
*F.T.C. v. Lab. Corp. of Am.*,
    No. CV 10-1873-AG, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) ...................38

11

12
*F.T.C. v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008)........................................................................38

13

14
*Helix Milling Co. v. Terminal Flour Mills Co.*,
    523 F.2d 1317 (9th Cir. 1975) ...........................................................................35

15
*Hurricane Shooters, LLC v. Emi Yoshi, Inc.*,
    No. 8:10-CV-762-T-30AEP, 2010 WL 4983673 (M.D. Fla. Dec. 2, 2010)..........................36

16

17
*Hynix Semiconductor Inc. v. Rambus, Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) ......................................................32, 33

18

19
*In re Abbott Labs. Norvir Anti-Tr. Litig.*,
    562 F. Supp. 2d 1080 (N.D. Cal. 2008), *rev'd sub nom. John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009).................................................................28

20

21
*In re Aggrenox Antitrust Litig.*,
    94 F. Supp. 3d 224 (D. Conn. 2015)..................................................................28

22

23
*In re Ciba-Geigy Ltd.*,
    123 F.T.C. 842, 1997 FTC LEXIS 85 (Mar. 24, 1997) ......................................26

24
*In re Mercedes-Benz*,
    No. 99-4311(WHW), 2006 WL 2129100 (D.N.J. July 26, 2006) .........................31

25

26
*In re Union Oil Co. of Calif.*,
    2005 WL 906396 (Mar. 9, 2005) .......................................................................27

27

28

*In re Union Oil Co. of Calif.*,
    138 F.T.C. 1 (July 7, 2004) ............................................................................18

*In re: Zinc Antitrust Litig.*,
    No. 14-CV-3728 (KBF), 2016 WL 3167192 (S.D.N.Y. June 6, 2016) .................................28

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    99 F. Supp. 3d 610 (D. Md. 2015) ....................................................................39

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2009) .......................................................................13

*McLain v. Real Est. Bd. of New Orleans, Inc.*,
    444 U.S. 232 (1980) ................................................................................34

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) .......................................................................13

*Oltz v. St. Peter's Cmty. Hosp.*,
    861 F.2d 1440 (9th Cir. 1988) .......................................................................38

*PNY Techs., Inc. v. SanDisk Corp.*,
    No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ....................................34

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos., Inc.*,
    598 F. Supp. 694 (N.D. Cal. 1984) ...................................................................36

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ........................................................................38

*ResQNet.com, Inc. v. Lansa*, Inc.,
    594 F.3d 860 (Fed. Cir. 2010) .......................................................................25

*Reyes v. United States*,
    No. CV F 09-319 LJO SMS, 2010 U.S. Dist. LEXIS 3447 (E.D. Cal. Jan. 19,
    2010) ..................................................................................15, 18, 24, 25

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    622 F.3d 1035 (9th Cir. 2010) .......................................................................13

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001) ........................................................................35

*TransWeb, LLC v. 3M Innovative Props. Co.*,
    812 F.3d 1295 (Fed. Cir. 2016) ......................................................................32

*TwoRivers v. Lewis*,
  174 F.3d 987 (9th Cir. 1999) ..................................................................................15

*United States v. E.I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957)............................................................................................38

*United States v. LSL Biotechnologies*,
  379 F.3d 672 (9th Cir. 2004) .........................................................12, 14, 15, 27

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)............................................................................19

*United States v. Singer Mfg.*,
  374 U.S. 174 (1963).........................................................................................36

*United States ex rel. Fryberger v. Kiewit Pac. Co.*,
  41 F. Supp. 3d 796 (N.D. Cal. 2014) ..............................................................13

*Vizio, Inc. v. Funai Elec. Co.*,
  No. CV 09-0174 (AHM), 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010)................19

*VLSI Tech. LLC v. Intel Corp.*,
  No. 6:21-cv-00299-ADA (W.D. Tex.), ECF Nos. 592, 593................................25


**Federal Rules**

Federal Rule of Civil Procedure 8(a)(2) .....................................................................12

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

## I.   INTRODUCTION

Plaintiffs' Second Amended Complaint ("SAC") describes in great detail Defendants' ongoing anticompetitive patent aggregation scheme.  In response to this Court's Order on the Motion to Dismiss Plaintiffs' Amended Complaint ("Order on 2d MTD"), Plaintiffs have added significant new and more specific allegations.  Those include many details regarding the purchase prices for the relevant patents and how, by eliminating competitive alternatives through their patent aggregation scheme, Defendants have been able to seek supracompetitive royalties, ones far higher than the purchase prices would suggest are possible.  The SAC details how Defendants' conduct has anticompetitively inflated royalties, reduced licensing output and innovation, and imposed substantial litigation costs on Plaintiffs.  These allegations plainly and more than sufficiently state Sherman Act and California Unfair Competition Law ("UCL") claims.

Defendants make meritless arguments that disregard the new allegations, wrongly calling them "cosmetic and unavailing."  *See* Defendants' Joint Motion to Dismiss and to Strike Plaintiffs' Second Amended Complaint ("MTD SAC"), Dkt. No. 244 at 1.  They also fail to acknowledge that the Court already found certain of Plaintiffs' allegations (and relevant antitrust markets) sufficiently pleaded.  *Id.* at 9-15.  Defendants once again seek to hold Plaintiffs to a pleading standard that is inappropriate for a motion to dismiss, demanding that Plaintiffs present evidentiary proof that would be required only at summary judgment and could only be adduced during discovery, and urging the Court to deny Plaintiffs the benefit of inferences to which they are entitled at this stage.  Further, when Plaintiffs filed motions in other litigations to gain access to the very facts that Defendants say are lacking in the SAC—and that the Court indicated were relevant during oral argument—Defendants opposed those motions only to now argue that the absence of those facts is fatal to Plaintiffs' complaint.  MTD SAC at 21.  Defendants' obstruction should not be rewarded.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

When evaluated against the proper standard, Plaintiffs have adequately pleaded Section 1, Section 7, and UCL claims. The Court should reject Defendants' attempt to avoid liability for their ongoing wrongdoing, and deny the motion.

## II.   THE SECOND AMENDED COMPLAINT

The Court granted Defendants' motion to dismiss the First Amended Complaint ("FAC") without prejudice, stating that "it may be that Plaintiffs are able to cure the deficiencies" identified in the Order. Order on 2d MTD at 29. The Court identified several areas in which Plaintiffs should allege more specifics in an amended complaint. *Id.* On March 8, 2021, Plaintiffs filed their SAC, adding 27 pages of extraordinary detail beyond that in the Amended Complaint. As described below, the SAC cures each of the pleading deficiencies the Court identified:

- *Narrowed market definitions.* The Court found three of Plaintiffs' patent markets in the Amended Complaint to be sufficiently pleaded, Order on 2d MTD at 17-19, but found that the remaining six were "facially overbroad" because they described markets the Court concluded were "ultimately no different from the general technical field." *Id.* at 15-19. To address that concern, the SAC alleges six narrowed markets based on specific functions within technical fields. SAC ¶¶ 212-389, 414-36.

- *Direct evidence of anticompetitive effects.* The Court determined that the Amended Complaint "suggest[ed] that supracompetitive pricing is possible," but did not rise to the level of plausibility required under *Twombly* and *Iqbal*. *See* Order on 2d MTD at 23-27. Plaintiffs have added to the SAC specific allegations regarding how Defendants acquired at low cost patents that were never asserted by their prior owners and have now, with the benefit of the elimination of competition as a result of the patent aggregation, sought and obtained supracompetitive royalties. *See* SAC ¶¶ 164-67, 169, 177-80, 197-99, 208, 234-36, 243-44, 246, 264-72, 276-79, 295, 298-99, 343-46, 381-82, 384, 404-05, 407, 409-10. In other words, Plaintiffs have demonstrated clear

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

before-and-after effects of patent aggregation that show supracompetitive royalties enabled by the challenged acquisitions and address the Court's stated concerns.

- ***Clarifying the agreements under the Section 1 claim.***  The Court indicated that it is unclear whether Plaintiffs are "claiming that each PAE worked with Fortress to aggregate the patents the PAE has" or are claiming that each "PAE knew Fortress would aggregate the PAE's patents with another PAE's patents in the same market (i.e., the PAE was just contributing to Fortress's 'pot of patents,' so to speak)."  Order on 2d MTD at 11 n.6.  The SAC makes clear that it is the latter.  SAC ¶¶ 55-56, 76-77.

## A.    New Allegations Regarding Patent Markets

The Court ruled that three of Plaintiffs' patent markets are sufficiently pleaded: the Network-Based Voice Messaging Patents Market, the Remote Software Updates Patents Market, and the MOSFET Channel Fabrication Patents Market.  *See* Order on 2d MTD at 17-19.  In the SAC, Plaintiffs allege six additional markets consisting of patents covering substitute technologies to perform specific functions in discrete technological fields—the same type of allegations the Court found sufficient to allege cognizable patent markets in the Amended Complaint.  *See* SAC ¶¶ 145-435; *see also* Order on Am. Compl. at 17-19.  Those six additional patent markets are (1) the Mobile Device-to-Device Communication Through a Network-Coupled Intermediary Device Patents Market, (2) the Preventing Stalls for Cache Misses Patents Market, (3) the Arbitrating Multiple Requests to Access a Memory Bus Patents Market, (4) the Third-party Device Authorization Through Limitation of Information Exchanged Patents Market, (5) the Generating Alerts Based on Blood Oxygen Level Patents Market, and (6) the Remote Enabling and Disabling of Software Components Patents Market.

For each patent market, Plaintiffs have alleged in detail how the market is comprised of patents covering substitute technologies to perform a specific function within a technology field and identified details regarding the patents Defendants have aggregated.  For example:

- Mobile device-to-device communication techniques enable two or more mobile devices to communicate over a network efficiently and securely.  The Mobile Device-to-Device Communication Through a Network-Coupled Intermediary Device Patents Market includes patents claiming technologies that use a network-

---

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

coupled intermediary device to enable the mobile device, once connected to the network-coupled intermediary device, to communicate with other devices over the network through the intermediary device.  Such communications between devices through a network-coupled intermediary device are distinguished from two devices communicating directly with each other without a network-coupled intermediary device, e.g., two devices communicating directly through Bluetooth, or two devices communicating over networks to which they each have native access.  These techniques avoid the limitations on communications faced by direct device-to-device communications.  SAC ¶ 212.

- Cache memories are higher performance memories used to store data likely to be requested by the processor and there are many cache management techniques aimed at preventing cache misses, i.e., to ensure the information likely to be requested exists in the cache memory.  *Id.* ¶ 248.  The Preventing Stalls for Cache Misses Patents Market includes patents that claim techniques attempting to minimize the effects of a cache miss to prevent a stall or prolonged delay.  *Id.*

- Electronic devices commonly have multiple processors or components that share memory.  The Arbitrating Multiple Requests to Access a Memory Bus Patents Market includes patents that cover techniques comprising algorithms for resolving contentions among multiple concurrently pending requests to access a memory bus, i.e., techniques that determine the order in which the requests are processed.  These techniques comprise algorithms for resolving contentions among multiple concurrently pending requests to access the memory bus.  *Id.* ¶ 282.

- Device authorization is a means to restrict access in a computer network to only authorized, trusted devices to protect data security.  The Third-party Device Authorization Through Limitation of Information Exchanged Patents Market includes patents that cover techniques for securely communicating with a third-party authorizer when requesting authorization to access a network resource by limiting the type and format of information exchanged with the third-party authorizer, which reduces the likelihood of another entity discovering or spoofing the authorization request.  These limitations often include requirements that the information exchange be limited to particular user or device identifiers, which may be transmitted in specifically formatted messages (e.g., challenge/response messages).  *Id.* ¶¶ 302-03.

- Health monitoring enables certain types of electronic devices (e.g., smartphones, medical devices) to monitor and process patient data from sensors.  There are an increasing number of tasks that electronic devices can perform to track a wearer's movement and physical condition.  The Generating Alerts Based on Blood Oxygen Level Patents Market includes patents claiming technologies that generate alerts when a user's blood oxygen level is determined to be irregular (e.g., outside of a target range).  *Id.* ¶ 356.

- The field of digital rights management addresses the need for license holders (such as software providers) to implement security features to limit content to authorized users.  The Remote Enabling and Disabling of Software Components Patents Market includes patents covering techniques for remotely enabling and disabling the use of software components on a computing device.  Using these techniques enables a remote server to manage and enforce a set of pre-negotiated privileges for a user, the privileges indicating whether the user is entitled to use specified portions of a software program.  *Id.* ¶ 413.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The SAC explains how these narrower patent markets include only alternative technologies used for specific functions within a general technical field, rather than a general technical field itself.  Plaintiffs also submitted, as Exhibit A, a table that summarizes salient facts regarding the patents aggregated by Defendants in the Relevant Patents Markets.

### B.    New Allegations of Direct Evidence of Anticompetitive Effects

The Court identified six concerns with Plaintiffs' allegations of direct evidence of anticompetitive effects in the FAC and concluded that Plaintiffs' allegations, while possible, did not rise to the level of plausibility required under *Twombly*.  Order on 2d MTD at 23-25.  Plaintiffs have addressed each of these concerns.  The SAC includes new, detailed allegations of direct evidence of anticompetitive effects.  Specifically, the SAC details how prior owners of patents in the relevant markets did not previously assert those patents, despite having asserted many other patents; how Defendants acquired (or valued) aggregated patents for low amounts that reflected their value before they were aggregated with alternative patents; and how Defendants then asserted the aggregated patents seeking or obtaining supracompetitive royalties because they no longer faced competitive constraints that the aggregation of substitutes eliminated.  Each of these is discussed within this Section B, as well as Defendants' objections to allowing Plaintiffs to use relevant evidence that was subject to protective orders in patent cases.  As discussed in Section D, the SAC contains additional details about how Defendants' aggregation has harmed competition and innovation.

### 1.    Non-Assertion by Prior Owners of Aggregated Patents Because of Competitive Constraints.

As the SAC explains, "almost all of the patents that Defendants have aggregated and asserted against Intel and Apple were not previously asserted by their prior owners—sophisticated companies, many of which had experience asserting patents.  The prior owners' behavior indicated a willingness to litigate when that litigation was in their profit-maximizing interests.  But until competition was eliminated as a result of aggregation, assertions of the patents that were ultimately

asserted against Apple and Intel had insufficient expected value to make the assertions worth the costs to those prior owners." SAC ¶ 12.

The SAC details how the former owners of patents Defendants have frequently asserted other patents but not those aggregated by Defendants:

- For example, Koninklijke Philips Electronics N.V. ("Philips"), the former owner of the '252 and '008 patents, had brought at least 79 patent enforcement actions, including against Intel. SAC ¶¶ 163-64. Further, when Philips owned the '252 patent, it (along with other prior owners) "never pursued infringement claims against Apple for functionality that then existed in Apple products and that Uniloc 2017 has later accused of infringement." *Id.* ¶ 165.

- Likewise, Freescale, the former owner of the '009, '761, '014, '303, and '357 patents, "asserted numerous patents in cases against a variety of defendants over the years, indicating that it was capable and willing to do so in the appropriate circumstances," but never asserted any of those patents. *Id.* ¶ 263. Indeed, Freescale publicly disclosed that "[i]n situations where we believe that a third party has infringed on our intellectual property, we enforce our rights through appropriate legal means to the extent that we determine the potential benefits of such actions outweigh any costs involved." *Id.* ¶ 265.

- Huawei, the former owner of the '579 patent, has a history of patent assertions, including at least 9 patent enforcement actions. *Id.* ¶¶ 165-66.

- IBM, the former owner of the '228 patent, has a history of patent assertions, including at least 12 patent enforcement actions. *Id.* ¶¶ 197-98.

- Hewlett-Packard and HP Development, the former owners of the '127 and '134 patents, have a history of patent assertions, including at least 17 patent enforcement actions brought by Hewlett-Packard and 4 patent enforcement actions brought by HP Development. *Id.* ¶¶ 234-35.

- NXP and Breakwaters held the '331 patent when Intel products existed that VLSI has since accused of infringement, yet NXP and Breakwaters did not enforce the patent at the time, though NXP has a history of patent assertions, including at least eight patent enforcement actions. *Id.* ¶¶ 266-67; *see also id.* ¶¶ 277-78, 294, 342-45, 403-04.

     2.     **Low Pre-Aggregation Acquisition Prices or Valuations of Aggregated Patents.**

The SAC also explains in detail that patents Defendants aggregated were either acquired or valued at low amounts before aggregation and the resulting elimination of competition enabled Defendants to seek or obtain supracompetitive royalties. SAC ¶ 13 ("The prior owners were willing to sell the patents to Defendants at prices that are far below the post-aggregation amounts

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

Defendants have sought because they could not seek such amounts without the benefit of eliminating competition through aggregation.").  For example, the SAC alleges:

- In March 2018, Fortress paid $33.6 million to purchase nearly 600 patents from Uniloc Luxembourg, including the '252, '890, '723, '622, '433, '852, '088, '228, '127, '134, '999, '877, '437, '641, '687, '850, '976, '907, '616, '421, '362, '466, '250, '502, '068, '496, '280, '220, '759, '403, '508, '556, '902, '723, '646, '452, '319, '232, and '149 patents in relevant patent markets.  SAC ¶¶ 60-65, 178, 208, 244, 246, 278, 299, 381, 382, 384, 409.  Although the $33.6 million Fortress paid is far less than what the Uniloc Defendants—under Fortress's control—later sought for certain of the acquired patents, it was far more than a June 30, 2017 valuation of $6.25 million for Uniloc's patent portfolio prepared for the Uniloc Board of Directors.  *Id.* ¶¶ 66-67.  As the SAC explains, "Fortress subsequently paid $33.6 million to acquire Uniloc Luxembourg's assets (including its patents), which had been valued at only $6.25 million, because it recognized that those patents would continue to provide multiples of value when Fortress solidified its control over them along with other substitute patents already under Fortress's control, thus eliminating competition that had constrained Uniloc Luxembourg from asserting the patents and enabling Fortress and Uniloc Luxembourg to extract supracompetitive royalties." *Id.* ¶ 71.

- VLSI purchased the '331 and '633 patents, 

  Plaintiffs were able to utilize this information only because the court overseeing the patent litigation granted Intel's request to do so over VLSI's objection.[1]  *Id.* ¶ 76 & n.29.

-   .

- Inventergy paid a total of $30 million (consisting of $10 million up front and $20 in minimum royalty payments) for its acquisition of 760 patents, including the '579, '242, and '620 patents.  *Id.* ¶¶ 86, 180, 346.  Following those acquisitions, Inventergy had a market capitalization of $15 million and contended that "'80% of the Value of Most Companies is their Intellectual Property,' a claim that would apply particularly to a company like Inventergy, which was solely in the business

---

[1] Indeed, VLSI takes the view that the information should remain confidential even if used or disclosed during trial, effectively keeping secret what it paid indefinitely.  This would prevent any party from ever gathering enough information to provide the type of details requested by this Court.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

of licensing its intellectual property and that boasted having a 'World Class Team' to license its patents." *Id.*

*See generally* SAC Ex. A.

### 3. Defendants Have Demanded or Obtained Supracompetitive Royalties.

The SAC also explains in detail how Defendants have demanded or obtained supracompetitive royalties well above what would have been expected based on the acquisition prices or pre-aggregation valuations for those patents.

To start, the SAC explains how litigation demands—even if they have not yet actually been paid—"should reflect the patent holder's good faith valuation of its patent in the market" and that they "are submitted as part of court-ordered exchanges of information between parties where the lawyers acting for Defendants are under ethical and professional obligations to litigate with candor." *Id.* ¶ 11. "Accordingly, Defendants' damages demands should represent their good faith estimate of the perceived value of their patents in the relevant markets and the amounts they genuinely expect to receive from Apple or Intel if they prevail in litigation. Even if Intel and Apple dispute these figures (and liability for the asserted patents), they must take them seriously because Defendants have indicated they will pursue them." *Id.* Indeed, given the seriousness with which it views these demands, Intel "has disclosed to investors in its securities filings VLSI's damages demands in various cases." *Id.* Moreover, the SAC explains that a recent damages award to VLSI against Intel of $2.175 billion where the "jury awarded VLSI close to what it sought from Intel, demonstrat[es] that damages demands are not just requests." *Id.*

The SAC then details how Defendants have demanded supracompetitive royalties, and how those demands demonstrate that Defendants view the aggregated patents as extraordinarily valuable given the potential licensees' alternatives, including, for example:

- Uniloc USA and Uniloc Luxembourg disclosed in the 2018 Rule 3-8 Damages Contentions "that based on their 'current knowledge, understanding, and belief as to the facts and information available to them as of the date of these Contentions, Plaintiffs identify the following categories of damages that they are seeking' and indicated that damages for Apple's infringement of the '852 patent are between $756,709,869 and $1,475,852,582. This demand far exceeds the $33.6 million paid by Fortress in March 2018 for the entire Uniloc Luxembourg portfolio (including the '852 patent). Further, this amount far exceeds the $6.25 million valuation of

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

Uniloc Luxembourg's patent portfolio, at a time when Uniloc Luxembourg held the '852 patent. The value of the '852 patent had not changed in the interim, but what had changed was that the '852 patent was now aggregated under Fortress's control with other substitute patents as well as with complementary patents, providing Uniloc 2017 with the ability to pursue supracompetitive royalties. By seeking such outsized damages, the Uniloc Defendants signal their belief that the '852 patent represents a patent of significant importance in this market such that it would enable them to extract such supracompetitive royalties." *Id.* ¶ 208.

- Similarly, Uniloc 2017 demanded $489.6 million in royalties from Apple for the '252 patent in its Rule 3-8 Damages Contentions—an amount that greatly exceeds the $33.6 million purchase for the '252 patent and around 600 other patents. *Id.* ¶¶ 177-78; *see also id.* ¶¶ 243 ($162 million demand for '999 patent far exceeds $33.6 million paid to acquire Uniloc portfolio, including that patent); 381 (demand for $375 to $731 million for '556 patent far exceeds $33.6 million paid to acquire Uniloc portfolio, including that patent), 384 (same for '556,'646, '508, '2723, and '902 patents).

- For the '331 patent, which ███████████████████████████████████
  ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████
  ████████████████████████████████ *Id.* ¶ 274 ("by seeking such outsized damages, VLSI signals its belief that the '331 patent represents a patent of significant importance in this market such that it would enable it to extract such supracompetitive royalties"); *see also, e.g., id.* ¶¶ 276-77 (VLSI sought approximately $11 billion across three cases asserting eight patents, including '357 patent, an amount that significantly exceeds ██████████████████████████████████████████████); 125, 271-72, 407-08 (VLSI made damages demand of $7.1 billion for infringement of eight patents, including '014 and '303 patents, an amount that significantly exceeds ██████████████████████████████████████████).

In addition, the SAC adds allegations showing that Uniloc Luxembourg generated revenues of $7.3 million for the fiscal year ended June 30, 2016 and $14.6 million for the fiscal year ended June 30, 2017; that its "revenue was 'achieved mainly through enforcement activities in the form of litigation'"; and that Uniloc Luxembourg and Uniloc USA settled cases in which aggregated patents were asserted, including the '5890, '433, '723, and '622 patents, during this period. *Id.* ¶¶ 68, 168-69. "The benefits of aggregating the Uniloc patents with others controlled by Fortress thus enabled Uniloc to obtain supracompetitive royalties—royalties in one year that were twice the amount that Uniloc Luxembourg paid for the patents"—i.e., the $6.2 million figure based on what Uniloc Luxembourg paid to acquire or develop the patents. *Id.* ¶¶ 66, 68.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

    **4.**    **Defendants Objected to Allowing Plaintiffs to Use Relevant Evidence under Seal from the Patent Litigations.**

As the SAC details, Defendants opposed each of Plaintiffs' requests to modify the protective orders in Defendants' patent cases to allow Plaintiffs to submit under seal further information about the prices for which Defendants obtained aggregated patents and their damages demands. *See, e.g.*, SAC ¶ 179 (Apple's request to modify protective order in litigation between Uniloc 2017 and Apple in Northern District of California); ¶ 270 (Intel's request to modify protective order in litigation between VLSI and Intel in Northern District of California); ¶ 276 (Intel's request to modify protective order in litigation between VLSI and Intel in Western District of Texas); *see also id.* ¶¶ 298, 350, 352, 407.

As described above, Intel succeeded in its request in one case, allowing Plaintiffs to submit information regarding ███████████████████████████████████████████████████████████████████████████████████ *Id.* ¶ 274. ██████████████████████████████████████████████ In the other cases in which Plaintiffs did not succeed, Defendant's "refusal and its opposition to [the] request support an inference that the information at issue would be helpful in showing a significant disparity between the terms on which [Defendant] acquired the [aggregated patent] patent and the damages it now seeks for that patent." *Id.* ¶ 407 (for the '303 patent); *see also id.* ¶¶ 179 ('252 patent), 271 ('014 patent), 276 ('357 patent), 298 ('983 patent), 350 ('616 patent), 352 ('033 and '532 patents).

    **C.**    **New Allegations of Agreements in Restraint of Trade.**

In the SAC, Plaintiffs also added new allegations regarding the nature of agreements between Fortress and other Defendants.

The SAC clarifies the nature of the agreements that Plaintiffs allege here, making clear they do not allege an overarching conspiracy among all Defendants: "Fortress is . . . at the center of a series of separate bilateral agreements between Fortress and each PAE to aggregate patents under Fortress's control to the benefit of Fortress and each of the PAEs with which it has contracted." *Id.* ¶ 54.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

The SAC also provides more details on these bilateral agreements.  For example, the SAC details that "the Uniloc Defendants and Fortress understood that the Uniloc Defendants' monetization scheme would not be profitable absent the enhanced market power obtained by aggregating Uniloc patents with others controlled by Fortress."  *Id.* ¶ 63.  In particular, a Uniloc Management Report for the fiscal year ended 2017 "explained that '[a] material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern as at [*sic*] 30 June 2017.  The Company has resolved this going concern issue by entering into the Fortress transaction, as described below.'  In particular, given the 'overall chill in the environment for companies operating in the patent enforcement space,' the Management Report observed that 'opportunities may exist for consolidation among companies with complementary operations or competitive advantages.'"  *Id.* ¶ 64.  Further, in addition to the purchase price, "Uniloc Luxembourg received an entitlement 'to receive additional payments of up to USD 25,000,000 upon the accomplishment of certain revenue milestones by Uniloc 2017 over the subsequent five years.'  Uniloc Luxembourg thus intended to profit from Fortress's use of Uniloc 2017 in its aggregation scheme to generate supracompetitive royalties."  *Id.*; *see also id.* ¶¶ 55-56 (providing additional details regarding Uniloc-Fortress agreements).

Moreover, the SAC details how even though Uniloc later defaulted on its obligations through a revenue shortfall, Fortress was willing "to overlook and abrogate its rights under its agreements with Uniloc USA and Uniloc Luxembourg further demonstrat[ing] that Fortress and Uniloc USA and Uniloc Luxembourg have not simply engaged in an arms' length transaction, but instead have found common cause in exploiting the benefits of aggregation—a path that Fortress deemed more beneficial than obtaining its full rights under the agreements with Uniloc Luxembourg and Uniloc USA."  *Id.* ¶ 70.

Similarly, the SAC describes that a threat by Inventergy's CEO to a litigation target that "Fortress[,] does not settle" and that if the target would not take a license, it would face "an IP bloodbath" "demonstrates that Inventergy understood that it was one of a number of PAEs acting at Fortress's direction and as part of Fortress's anticompetitive aggregation strategy to obtain

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

supracompetitive royalties by aggregating patents and eliminating competition that existed pre-aggregation." *Id.* ¶ 85.

### D.   Additional Allegations of Competitive Harms

Finally, in addition to the detailed allegations of supracompetitive prices resulting from the aggregation of competing patents, the SAC amplifies the anticompetitive harms Defendants have caused:  "The costs of Defendants' serial assertions are made vivid in the example of the lawsuit against Laminar described above, where the time and expense of defending against the meritless assertion diverted the resources of a small business from developing innovative products.  While Intel, Apple, and other large companies have more employees and more resources than a company like Laminar, the time of their employees and their resources are finite.  Hours of an engineer's time spent in a deposition or dollars spent defending meritless claims are gone and cannot be allocated to innovation and product development.  The huge volume of litigation that Defendants have directed at Intel, Apple, and other companies based on its anticompetitive aggregation strategy thus exacts a toll on innovation."  *Id.* ¶ 451; *see also id.* ¶ 452 (describing how Intel and Apple are impacted by litigation).

## III.   THE LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  The purpose of that short and plain statement is to put the defendant on notice of the claim against it. *See, e.g.*, *United States v. LSL Biotechnologies*, 379 F.3d 672, 699 (9th Cir. 2004) (explaining plaintiffs' "short and plain statement" defining relevant market "was more than sufficient to put the defendants on fair notice of the claim and relevant market and enable them to frame responsive pleadings"); *see also Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501–03 (9th Cir. 2010) (reversing district court dismissal of complaint alleging Sherman Act claims where the district court required allegations and showings in the complaint beyond those required for notice pleading) (hereafter "*ICANN*").

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1    In deciding a motion to dismiss, a court must "accept factual allegations in the complaint

2    as true" and draw all inferences in favor of the nonmoving party.  *Manzarek v. St. Paul Fire &*

3    *Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2009).  When a complaint presents a cognizable

4    legal theory, the court may only grant the motion if the complaint lacks "sufficient factual matter

5    to state a facially plausible claim to relief."  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622

6    F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  A claim has facial

7    plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable

8    inference that the defendant is liable for the misconduct alleged."  *United States ex rel.*

9    *Fryberger v. Kiewit Pac. Co.*, 41 F. Supp. 3d 796, 801 (N.D. Cal. 2014).  Plausibility "does not

10   mean probability, but it requires 'more than a sheer possibility that a defendant has acted

11   unlawfully.'"  *Id.* (citing *Iqbal*, 556 U.S. at 687).  "On a motion to dismiss in an antitrust case, a

12   court must determine whether an antitrust claim is 'plausible' in light of basic economic

13   principles."  *ICANN*, 611 F.3d at 501.

14   **IV.    ARGUMENT**

15       The SAC addresses each of the Court's concerns with the FAC, redefining narrower

16   markets, adding detailed assertions regarding the assertion history of prior owners of the patents

17   at issue, and further demonstrating the nature and impact of Defendants' anticompetitive

18   aggregation scheme.

19       **A.    Plaintiffs Have Adequately Alleged Nine Relevant Patent Markets**

20       Market definition is generally inappropriate for resolution on a motion to dismiss.  *Newcal*

21   *Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  There is no heightened

22   pleading standard for antitrust cases, or for market definition.  *Id.* ("There is no requirement that

23   [relevant markets] be pled with specificity.").  And a motion to dismiss is not the appropriate

24   mechanism to test facts relevant to market definition that will be the subject of discovery.  *Id.*

25   ("[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal

26   element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by

27   summary judgment or trial."); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

F.3d 435, 443 (4th Cir. 2011) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."); *Cargill Inc. v. Budine,* No. 07-349, 2007 WL 2506451, at *8 (E.D. Cal. Aug. 30, 2007) ("Questions pertaining to proper market definitions are best answered after the benefit of discovery."). All that is required is that Plaintiffs put Defendants on notice of the allegations against them, and the relevant markets in which anticompetitive effects occur. *See LSL Biotechnologies*, 379 F.3d at 699 (finding plaintiffs' "short and plain statement" defining relevant market "was more than sufficient to put the defendants on fair notice of the claim and relevant market and enable them to frame responsive pleadings"). Plaintiffs have met that standard for all nine patent markets.

The Court has already found that three of Plaintiffs' relevant patent markets—the Network-Based Voice Messaging Patents Market, the Remote Software Updates Patents Market, and the MOSFET Channel Fabrication Patents Market—were sufficiently pled. *See* Order on 2d MTD at 17-19. Plaintiffs have added new allegations regarding the six additional relevant patent markets, and those market are now pled to the same standard that the Court has already determined is sufficient for the other three.

For example, in response to the Court's concern that the "Local Cache Management" product market described a specific function that was "ultimately no different from the general technical field of local cache management," Order on 2d MTD at 18, Plaintiffs have now alleged a narrowed product market consisting of patents covering technologies for preventing stalls in the event of a cache miss. SAC ¶ 247. This market is defined with reference to the specific function of preventing cache misses to minimize the effects of the miss and is narrower than the general technical field of local cache management. *Id.* Similarly, the SAC addresses the Court's concerns that the "Shared Memory Access" market was overbroad and now alleges a market based on a specific function—Arbitrating Multiple Requests to Access a Memory Bus. *Id.* ¶ 282. This technology is narrower than shared memory access generally—the included patents all claim to cover technologies that perform the specific function of resolving contentions among multiple concurrently pending requests to access the memory bus. *Id.* Plaintiffs have similarly narrowed

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

each of the four other patent markets regarding which the Court had concerns.  *See* Section II.B, *supra*.

Defendants make two arguments regarding the patent markets Plaintiffs have alleged.  ***First***, Defendants claim that the SAC's changes are merely cosmetic, and that the new markets allege the same patents as the previously-pleaded markets.  MTD SAC at 11.  But that is not the case.  In narrowing the markets to meet the standard set by the Court in the Order on the Second Motion to Dismiss, Plaintiffs have also revised the patents included as substitutes in the markets to include only those that address the more narrowly-defined functionality.  For example, the Third-party Device Authorization Through Limitation of Information Exchanged patent market does not include as substitutes the '033 or the '532 patents that were included in the prior, broader "Device Authorization" market.  *Compare* FAC ¶ 252*, with* SAC ¶ 304.  The SAC alleges that those patents are complements to—rather than substitutes for—the patents included in the newly-pleaded market.  *Id*.  Similarly, the Mobile Device-to-Device Communication Through a Network-Coupled Intermediary Device Patents Market does not include as substitutes the '999, the '986, or the '877 patents that were previously included in the Mobile Device-to-Device Communication Patents market.  *Compare* FAC ¶ 180*, with* SAC ¶ 214.  In the Preventing Stalls for Cache Misses Patents Market, the '641 patent is no longer listed as a substitute within that market.  SAC ¶¶ 255-56.

***Second***, Defendants make conclusory assertions that certain patents in each market are not actually substitutes based on supposed facts outside the SAC and ask the Court to accept Defendants' assertions as true for purposes of the motion to dismiss.  *See, e.g.*, MTD SAC at 12-13.  Defendants have it precisely backwards:  the Court must accept Plaintiffs' SAC allegations as true, not ***Defendants'*** assertions about supposed extra-SAC facts.  *See Reyes v. United States*, No. CV F 09-319 LJO SMS, 2010 U.S. Dist. LEXIS 3447, at *15 (E.D. Cal. Jan. 19, 2010) (refusing to draw inferences in favor of moving party); *Ctr. for Envtl. Health*, 2015 U.S. Dist. LEXIS 131773, at *20 (rejecting defendants' proffered alternative factual argument); *see also TwoRivers*

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1   *v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999) (court must draw all reasonable inferences in favor of

2   non-moving party).

3            For instance, Defendants argue that the '983 patent is not an economic substitute for the

4   '687 patent in the Arbitrating Multiple Requests to Access a Memory Bus Patents Market, based

5   on Defendants' bald assertion that those patents are "directed at solving opposite problems."  MTD

6   SAC at 12-13.   That argument disregards the SAC's allegations that those patents cover

7   technologies that are substitutes for one another to accomplish a specific function—Arbitrating

8   Multiple Requests to Access A Memory Bus Patents Market.  *See* SAC ¶ 292 (alleging in detail

9   how '983, '687 and '850 patents are substitutes).  Defendants are free to make factual challenges

10  to Plaintiffs' market definition after discovery, but are not entitled to a dismissal based on

11  assertions Defendants make at this stage.

12           Defendants moreover repeatedly ignore Plaintiffs' well-pleaded allegations.  For example,

13  they argue that Plaintiffs have not alleged how the '009 patent and the '437 patent are economic

14  substitutes and claim that those patents are "plainly not economic substitutes."   Putting aside

15  Defendants' improper attempt to rely on supposed facts outside the SAC, Plaintiffs allege in detail

16  why the two patents are substitutes for each other.  *See* SAC ¶ 262 ("For example, the '437 patent

17  and the '009 patent both purport to cover techniques for preventing stalls for cache misses.

18  Whereas the '437 patent describes achieving the improvement by handling cache misses using an

19  accelerated operation of the [background][2] processor, the '009 patent describes preventing stalls

20  by using an accelerated operation of the main processor.  Accordingly, the background processor

21  of the '437 patent is a substitute for the accelerated operation of the main processor of the '009

22  patent, and vice versa.").   Indeed, the Court has already found three of Plaintiffs' markets

23  sufficiently pleaded where—as with the six new markets—Plaintiffs alleged substitute patents

24  within a narrowly-defined patent market.  Order on 2d MTD at 15-19.

25

26  _____
    [2] The SAC contains a typographical error and should read "background processor" instead of

27  "main processor," as is evident from the next sentence's reference to the "background processor"
    in the '437 patent.

28

## B.      Plaintiffs Have Adequately Alleged Direct Evidence of Anticompetitive Effects

The SAC addresses each of the Court's concerns regarding Plaintiffs' allegations of direct evidence of anticompetitive effects from Defendants' patent aggregation scheme.  Defendants' arguments to the contrary are meritless.  First, for each market, Plaintiffs have alleged direct evidence of anticompetitive effects based on supracompetitive pricing (and, although not required where there is evidence of supracompetitive pricing, have also added allegations of reduced output and harm to innovation).  Second, as the Court has already found, because Plaintiffs have alleged direct evidence of anticompetitive effects, they need not allege detailed market shares in the patent markets.  Order on 1st MTD at 12 ("a 'full-blown market analysis' is not necessary where a plaintiff relies on direct evidence of anticompetitive effects").

### 1.      The SAC Alleges Direct Evidence of Anticompetitive Effects Based on Supracompetitive Pricing.

The Court identified six deficiencies in the FAC's allegations regarding direct evidence of anticompetitive effects.  Order on 2d MTD at 23-25.  Plaintiffs have remedied each of these deficiencies in the SAC.  Plaintiffs allege that Defendants aggregated substitute patents in the relevant markets, thereby eliminating competition and enabling Defendants to demand supracompetitive royalties for those patents.  SAC ¶¶ 1-10.  The SAC alleges facts showing that Defendants' prices are supracompetitive because the challenged acquisitions eliminated competitive constraints: (1) Defendants' current demands are greatly disproportionate to the prices they paid for the patents or to their valuations before aggregation eliminated competition; (2) sophisticated prior patent owners did not assert the same patents because before competitive constraints were eliminated through the challenged patent acquisitions, the costs of patent assertions outweighed the potential benefits; and (3) the elimination of competitive constraints enabled defendants to present potential licensees with a "pick your poison" choice: pay supracompetitive royalties or litigate expensive cases.  SAC ¶ 442 ("Accordingly, the targets of Defendants' assertions have no choice but to buy licenses from Defendants or to face endless, meritless litigation.").

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1    ***First***, the Court determined that the allegations in the FAC "arguably suggest that

2    supracompetitive pricing is possible" but did not reach the level of "plausibility" required under

3    *Twombly* and *Iqbal*.  Order on 2d MTD at 24.  Plaintiffs have added specific allegations regarding

4    licensing revenues associated with aggregated patents.  For example, for litigation settlements

5    Uniloc Luxembourg entered in 2016 and 2017 based on the '5890, the '433, the '723 and the '622

6    patents, Plaintiffs added allegations regarding Uniloc Luxembourg's revenue in 2016 and 2017,

7    almost $22 million of which was attributed to "litigation."  SAC ¶ 169; *see also* Section II.B.  This

8    is a plausible allegation that Defendants amassed significant revenues based on settlements of

9    assertions of patents that the former owners determined were not economically viable to assert.

10    These revenues, moreover, stand in stark contrast to the 2017 valuation of Uniloc Luxembourg's

11    assets at just $6.25 million—a valuation that included the '5890, the '433, the '723, and the '622

12    patents that Uniloc Luxembourg asserted, along with the rest of Uniloc's portfolio.  *See* SAC ¶¶ 66,

13    71; *see also* Exhibit A.

14    The detailed allegations of increased royalty demands post-aggregation relative to pre-

15    aggregation are sufficient to allege direct evidence of anticompetitive effects.  *See, e.g.*, *In re Union*

16    *Oil Co. of Calif.*, 138 F.T.C. 1 (July 7, 2004) ("The direct evidence of monopoly power can be

17    measured by comparing the actual royalty rates to a competitive benchmark.  The proper

18    competitive benchmark is the royalty-free representation that Unocal made to CARB.  Since

19    Unocal is seeking royalties significantly above that level, and has received or is likely to receive

20    these royalties, Unocal has monopoly power.  Supra-competitive royalty prices are direct evidence

21    of Unocal's monopoly power.").  Insofar as Defendants contend there is an alternative explanation

22    for this divergence (MTD at 12-13), Defendants can attempt to show that explanation after

23    discovery.  But a posited alternative explanation is not grounds for dismissal.  *See Reyes*, 2010

24    U.S. Dist. LEXIS 3447, at *15.

25    Additionally, the very fact that, post-aggregation, Defendants were able to force Plaintiffs

26    to choose between supracompetitive royalties or incurring substantial litigation costs when prior

27    patent owners lacked the market power to do so ***is*** direct evidence of anticompetitive effects from

28

the patent aggregation scheme.  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 56-58, 77-78 (D.C. Cir. 2001) ("[E]vidence that a supplier has been able to force customers to do something they would not have been forced to do in a competitive market is 'the sort of direct evidence that plausibly supports a monopolization claim, particularly when taken in combination with other allegations in the amended complaint suggesting Defendants' monopoly power."). Absent Defendants' anticompetitive patent aggregation scheme, Plaintiffs would have been able to defeat Defendants' demands by licensing technology from a third party at a lower cost, and Defendants would not have been able to force Plaintiffs into either taking licenses at supracompetitive rates or litigating.  *See, e.g.*, *Byars v. Bluff City News Co.*, 609 F.2d 843, 853 (6th Cir. 1979) (finding evidence of market power where retailer was able to raise prices without a corresponding increase in quality because customers had nowhere else to turn); *see also Vizio, Inc. v. Funai Elec. Co.*, No. CV 09-0174 (AHM), 2010 WL 7762624, at *7 (C.D. Cal. Feb. 3, 2010) ("Because Vizio alleges that Funai has increased prices to supracompetitive levels and has excluded other companies from using A/65–compatible technology through blocking importation of competing products, its allegations are sufficient to plead market power.").

Further, information necessary for Plaintiffs to make additional allegations regarding supracompetitive pricing is in the hands of Defendants, including confidential licensing negotiations and settlement agreements.  At the pleading stage, Plaintiffs have no obligation to allege facts that are uniquely within Defendants' control.  *See E & E Co., Ltd. v. Kam Hing Enter., Inc.*, 429 Fed. Appx. 632, 633 (9th Cir. 2010) (even in fraud cases, pleading standards "may be relaxed as to matters within the opposing party's knowledge").  At oral argument, the Court asked whether, to support their claims, Plaintiffs could provide information they learned in the many lawsuits Defendants have brought against them.  In response to this request, Plaintiffs filed multiple requests to modify the protective orders in those litigations, so that they could allege that information under seal in this case.  *See* SAC ¶ 179 (Apple's request to modify protective order in litigation between Uniloc 2017 and Apple in Northern District of California); ¶ 270 (Intel's request to modify protective order in litigation between VLSI and Intel in Northern District of California);

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

¶ 276 (Intel's request to modify protective order in litigation between VLSI and Intel in Western District of Texas); *see also id.* ¶¶ 298, 350, 352, 407.  Defendants strenuously resisted every request Plaintiffs made.  *See*, *e.g.*, *id.* ¶ 179 (Uniloc refused consent to modify protective order in litigation in Northern District of California); ¶ 270 (VLSI refused consent to modify protective order in litigation in Northern District of California); ¶ 276 (VLSI refused consent to modify protective order in litigation in Western District of Texas); *see also id.* ¶¶ 298, 350, 352, 407.  That is not surprising:  Defendants know that the information Plaintiffs seek supports Plaintiffs' claims that the challenged patent acquisitions have harmed competition by eliminating competition and enabling Defendants to demand and receive supracompetitive royalties.  Having objected to Plaintiffs' efforts to obtain this information, Defendants cannot now be heard to complain that Plaintiffs have failed to sufficiently allege direct evidence of anticompetitive effects.  MTD SAC at 21.

Given Plaintiffs' willingness to file the requested information under seal, Defendants' reason for objecting to modifying the protective orders in other cases can only be to keep Plaintiffs from using that information to allege more details regarding supracompetitive royalties—as the Court has requested.  Accordingly, the Court should draw an inference that the evidence Plaintiffs sought would reinforce Plaintiffs' allegations regarding direct evidence of anticompetitive effects.  Defendants argue that this Court cannot draw such an inference because the judges who decided the protective order requests made a relevance determination.  *Id.*  In fact, many of the decisions on Plaintiffs' attempts to modify the protective orders in the other litigations were grounded principally in the terms of the relevant protective order and made no determination regarding the relevance of the information for this litigation.  *See*, *e.g.*, Order Denying Plaintiff's Administrative Motion for Relief from Protective Order, Dkt. 109, 4-19-cv-04769 (N.D. Cal.) ("The Court finds that Plaintiff has not established good cause for relief.  Moreover, the Court finds that Defendants relied on the protective order, and it would be unfair to grant the relief requested by Plaintiff at this time."); Order Denying Motion for Relief from Protective Order, Dkt. No. 174, 3:19-cv-01905 (N.D. Cal.) ("Apple did not demonstrate a good reason for relief from the protective order.  Apple

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1   and Uniloc agreed to the terms of the protective order, and it would be unfair to change that

2   bargained-for arrangement now to suit Apple's litigation interests in an unrelated matter."); *see*

3   *also* Transcript of Discovery Hearing, February 1, 2021, Dkt. No. 422, 1:19-cv-00977 (W.D. Tex.)

4   (denying Intel's motion for relief from the protective order based on the parties' reliance on the

5   protective order).  More importantly, where Intel succeeded in its request in the Delaware case,

6   Plaintiffs were able to add allegations regarding ████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████████████████████

8   ███████████████ *Id.* ¶ 274.  The relevance of that information supports the inference that the other

9   information Plaintiffs sought—and to which Defendants objected—would also support Plaintiffs'

10   allegations.

11       In any event, ***this Court*** has made clear that the information Defendants have sought to

12   shield is relevant here.  *See, e.g.,* Dec 15, 2020 Hr'ing Tr. at 32-34; *see also* Order on 2d MTD at

13   26, n. 9.  This Court, of course, is free to make its own relevance determinations based on the well-

14   pleaded facts in the SAC and the reasonable inferences that flow therefrom.  An inference that

15   information Defendants have fought to keep out of the SAC would bolster Plaintiffs' allegations

16   of direct evidence of anticompetitive effects is appropriate here.  And that information will be

17   available in discovery in this case if the motion to dismiss is denied.

18       ***Second,*** the Court was not convinced that the FAC's allegations that Defendants asserted

19   the patents when prior patent owners did not meant that Defendants had gained market power

20   through the challenged aggregations.  Order on 2d MTD at 24.  The SAC addresses this concern

21   by alleging new details regarding the prior owners of the aggregated patents.  These allegations

22   establish that the prior owners were sophisticated entities capable of enforcing their patent rights.

23   Indeed, as the SAC alleges, former patent owners were vigorous enforcers of their patents—

24   including against Plaintiffs.  For example, the SAC describes the patent enforcement history and

25   behavior of Philips, the prior owner of the '252 and '008 patents, including examples of ***seventy-***

26   ***nine*** patent enforcement actions Philips brought.  *See* SAC ¶¶ 163-64.  But notwithstanding

27   Philips's history of aggressive patent enforcement, it never brought an enforcement action based

28

on the '008 or '252 patents. *Id.* As described in the SAC, that is because the economics of assertion changed ***after*** aggregation. Once Defendants held the aggregated patents, Plaintiffs and other potential licensors had fewer competitive alternatives. *Id.* Defendants could thus demand supracompetitive royalties because they had market power as a result of the elimination of competition. *Id.* Plaintiffs also allege that NXP, which had engaged in prior patent litigation and stated its willingness to "enforce our rights through all available legal means to the extent we determine the benefits of such actions to outweigh any costs and risks involved," never asserted the '331 patent when it was the owner. *Id.* ¶¶ 266-67. Post aggregation, VLSI asserted the patent against Intel—based on accused functionality that existed in Intel products when NXP held the patent. *Id.* ¶ 266. While the cost of the patent to Intel pre-aggregation was zero, post-aggregation VLSI asserted the patent and sought exorbitant damages. *Id.* The only thing that had changed was that the patent was part of Defendants' aggregated portfolio. *Id.* The SAC alleges that the prior owners of the patents are sophisticated entities capable of bringing infringement suits, even against entities like Plaintiffs. *See*, *e.g.*, *id.* ¶¶ 164-66. That the prior owners failed to assert the patents aggregated by Defendants—at the very least—creates a plausible implication that, by eliminating competition, the challenged patent aggregations made post-acquisition assertions profitable where they would not have been pre-acquisition. *Id.* ¶¶ 12-13.

Defendants make two arguments that the SAC's additional allegations about the prior owners are insufficient: (1) Plaintiffs' new allegations contradict allegations made in earlier pleadings, and (2) there are competing explanations for the prior owners' behavior. MTD SAC at 19-21. Both arguments are meritless.

Contrary to Defendants' argument, Plaintiffs' new allegations do not contradict any prior "admission" or allegation. Rather, the new allegations develop and expand on the allegations in the original Complaint and the FAC. For instance, paragraph 49 of the FAC alleged that competitive constraints on the prior owners made it economically non-viable for them to assert the relevant patents. FAC ¶ 49 ("Because transfers of patents from product companies to Fortress and its PAEs lessen or eliminate these and other constraints and place the patents with a party with

different incentives, those transfers result in inflated royalties or other less favorable licensing terms.  Transfers to Fortress and its PAEs—companies that produce no products and thus face no risk of patent countersuits from their targets—place patents in the hands of entities that face no such competitive constraints and that are thus free to maximize their profits through aggressive litigation campaigns.").  The SAC expands on that allegation and provides more details regarding the prior owners' conduct and the reasonable inferences that can be drawn from that conduct.  SAC ¶ 50.  Those allegations directly respond to this Court's concerns regarding the FAC.  Order on 2d MTD at 24.  There is no contradiction with the FAC.

Defendants next argue that Plaintiffs' allegations that ***some*** of the transferred patents were weak patents conflicts with the allegation that Defendants have harmed competition through their patent aggregation scheme.  The Court has already rejected that argument.  Order on 1st MTD at 17, n. 12.  Moreover, the SAC alleges in detail that aggregating weak patents can harm competition by eliminating alternatives for potential licensees.  SAC ¶¶ 36-40 ("When patents are aggregated as Fortress has done, the dynamics for determining whether to assert a patent change and the options available to the target of the assertion also change—which have harmful impacts on competition").  That some transferred patents were weak is irrelevant to whether the challenged transactions anticompetitively inflated royalty rates for those patents.

Plaintiffs allege that the prior patent owners did not assert the aggregated patents because, before challenged aggregations eliminated competitive constraints, the expected returns from patent assertions did not justify the costs.  *See, e.g.*, SAC ¶¶ 165-66 (allegations regarding prior owner Huawei's conduct pre-aggregation in contrast with its overall patent assertion conduct).  Defendants argue that the Court should disregard these allegations because there are supposedly "obvious alternative explanations" for the prior owners' failure to assert the patents.  MTD SAC at 18.  But on a motion to dismiss, the Court must determine whether Plaintiffs' allegations raise a plausible inference that Defendants can charge supracompetitive prices because of the challenged acquisitions eliminated competitive constraints.  If Defendants have alternative explanations based on facts outside the SAC, they are free to argue those on a motion for summary judgment or at

1   trial, but not on a motion to dismiss.  *See Reyes*, 2010 U.S. Dist. LEXIS 3447, at *15 (refusing to

2   draw inferences in favor of moving party).

3          ***Third***, the Court questioned the probative value of the royalties the prior owners charged

4   for ***other*** patents in the same field.  Order on 2d MTD at 24.  As explained above, Plaintiffs added

5   specific allegations regarding how much the prior owners charged for the ***same*** patents or how the

6   prior owners valued substitute or complementary patents that are in the same relevant markets

7   alleged in the SAC.  SAC ¶ 178 (allegations regarding Uniloc Luxembourg's $489 million

8   damages demand for alleged infringement of '252 patent and contrasting that supracompetitive

9   amount with Uniloc's pre-aggregation valuation of four substitute patents in same relevant market,

10  which Plaintiffs allege serves as a reliable proxy for pre-aggregation value of '252 patent); *see*

11  *also id.* ¶¶ 180, 246, 279, 382, 409; Section II.B, *supra*.  In response to these new, detailed

12  allegations, Defendants only reassert their baseless arguments that Plaintiffs have not alleged that

13  patents in the relevant markets are economic substitutes.  That argument is not responsive to the

14  new allegations.  For the reasons stated in Section IV.A, *supra*, Defendants' argument fails in any

15  event.

16         ***Fourth***, the Court expressed concern regarding the probative value of "litigation demands"

17  as evidence of supracompetitive prices.  Order on 2d MTD at 25.  To address this concern,

18  Plaintiffs have added new allegations highlighting why Defendants' litigation demands are direct

19  evidence of anticompetitive effects from the challenged acquisitions.  SAC ¶ 11.

20

21                                                                             SAC ¶¶ 76-77,

22  274-75.  Defendants admit this allegation supports the conclusion that VLSI was "[b]uying low

23  and selling high"—they admit, in other words, that VLSI was in fact selling at higher prices, as

24  indicated by their litigation demands.  Defendants nevertheless argue that, without more, buying

25  low and selling high is not unlawful.  MTD SAC at 21.  But Plaintiffs allege ***far more*** than that

26  Defendants simply bought low and sold high.  They allege an anticompetitive scheme to eliminate

27  competition from substitutes in relevant patent markets that enabled the defendants to sell or

28

license patents at supracompetitive prices.  That is why VLSI's exorbitant royalty demands—far in excess of the value of the patent pre-aggregation—are direct evidence of the anticompetitive effects of Defendants' conduct.

Moreover, Defendants wrongly argue that high litigation damages demands are not probative of actual pricing power.  MTD SAC at 22-23.  As the SAC alleges, however, those damages demands "reflect the patent holder's good faith valuation of its patent in the market" and, indeed, patentees are required by the Federal Circuit to "carefully tie proof of damages to the claimed invention's footprint in the market place."  SAC ¶ 11 (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).  Further, Defendants' damages demands "are submitted as part of court-ordered exchanges of information between parties where the lawyers acting for Defendants are under ethical and professional obligations to litigate with candor."  *Id.*  Accordingly, Defendants cannot in good faith pursue damages demands that they do not believe are related to the value of the patents at issue in each litigation.  Those demands thus necessarily reflect Defendants' assessment of the value of the patents in light of competitive alternatives post-acquisition and are not just a shot in the dark.  The VLSI jury verdict is a prime example of the relationship between a litigation demand and an award of reasonable royalties:  earlier this year, a jury awarded VLSI $2.175 billion in damages—remarkably close to the litigation demand VLSI made on Intel.  *Id.*[3]  As alleged in the SAC, Intel considers damages demands sufficiently probative of potential exposure that it disclosed VLSI's damages demand to investors in its securities filings. *Id.* ¶ 11.

***Fifth***, as to the patents in the Network-based Voice Messaging Patents Market, the Court observed that four of the five patents at issue were already held by one owner and the only alleged aggregation was the addition of the '252 patent.  Order on 2d MTD at 25.  The SAC includes additional specific allegations regarding the '252 patent and how aggregating that patent with other

---

[3] While Intel was found *not* to infringe VLSI's patents in a Western District of Texas case, VLSI is challenging that verdict in post-trial motions.  *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-cv-00299-ADA (W.D. Tex.), ECF Nos. 592, 593.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1    patents Defendants already controlled eliminated competition between the '252 and the other

2    patents and enabled Defendants to demand supracompetitive royalties.   Plaintiffs allege that

3    Philips, the prior owner, is an experienced patent asserter that has brought many other patent

4    enforcement actions.   SAC ¶ 164.   The SAC also includes similar new allegations regarding the

5    '579 patent, *id*. ¶ 180, including that the prior owner of the '579 patent, Huawei, is a frequent

6    patent asserter but still never asserted the '579 patent. *Id*. ¶¶ 165-66.  Plaintiffs' allegations support

7    the plausible inference that the prior owners of the '252 and '579 patents did not deem the patents

8    to be worth the cost of assertion before aggregation, but that the challenged patent acquisitions

9    removed competitive constraints and made it profitable to assert the patents.  *See id.* ¶ 166 ("In

10   particular, when Philips, IPG Electronics 503, and Pendragon Wireless owned the '252 patent,

11   they never pursued infringement claims against Apple for functionality that then existed in Apple

12   products and that Uniloc 2017 has later accused of infringement.   Uniloc 2017 and Uniloc

13   Licensing USA, LLC filed suit against Apple asserting the '252 patent on November 17, 2018.").

14   After aggregation, Defendants demanded supracompetitive royalties on both patents. *Id.* ¶¶ 178-

15   80.   The only thing that had changed was that Defendants' aggregation scheme had eliminated

16   competition and enabled Defendants to demand supracompetitive prices.

17        ***Sixth***, the Court concluded that it could not determine whether the aggregated patents in

18   the relevant markets "represent the 'crown jewels' of the field or just a small portion of a large

19   field of substitutes" and therefore could not conclude that Defendants can extract supracompetitive

20   royalties as result of the challenged patent acquisitions.  Order on 2d MTD at 25.   To begin,

21   supracompetitive royalties post-aggregation are evidence of anticompetitive effects and are a

22   competitive concern even absent evidence that the aggregated patents were the most valuable

23   patents within their relevant markets. *See, e.g.*, *In re Ciba-Geigy Ltd.*, 123 F.T.C. 842, 1997 FTC

24   LEXIS 85 (Mar. 24, 1997) (Federal Trade Commission ("FTC") complaint listing among effects

25   of proposed merger the "combination of portfolios of patents… of uncertain breadth and validity").

26   Further, under notice pleading, Plaintiffs are ***not*** required to allege further details regarding the

27   strength or weakness of the specific patents in the relevant markets before discovery—all that is

28

1    required is that Plaintiffs put Defendants on notice of the claims and allegations against which they

2    must defend.  For example, in *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 57

3    (D. Mass. 2020), the court concluded plaintiff had adequately alleged a technology market even

4    where it had not pleaded defendant's market share and had "not specified the applicable patents or

5    intellectual property . . ., as a technology market may be defined by the economic cross-elasticity

6    of substitute technologies rather than by reference to specific intellectual property."  *See also, e.g.*,

7    *United States v. LSL Biotechnologies*, 379 F.3d 672, 699 (9th Cir. 2004) (plaintiffs' "short and

8    plain statement" defining relevant market "was more than sufficient to put the defendants on fair

9    notice of the claim and relevant market and enable them to frame responsive pleadings").  Plaintiffs

10   have clearly met that standard.

11        The SAC alleges in greater detail Defendants' ability to and history of demanding and

12   obtaining supracompetitive royalties.  SAC ¶ 71; *see also* Section II.B, *supra*.  To the extent the

13   Court is requiring allegations that the patents are "crown jewels" as evidence that Defendants can

14   charge supracompetitive royalties, the supracompetitive royalties ***themselves*** are evidence that by

15   eliminating competitive constraints, the challenged patent aggregations actually did enable

16   Defendants to demand supracompetitive royalties.  *See, e.g.*, *Bio-Rad*, 483 F. Supp. 3d at 61

17   ("allegation that Bio-Rad raised royalty prices due to the reduction in competition when it acquired

18   RainDance . . . does, however, provide some indication of newly-acquired market power"); *In re*

19   *Union Oil*, 2005 WL 906396, at *282 ("Supra-competitive royalty prices are direct evidence of

20   Unocal's monopoly power.").  If the challenged patent acquisitions had not eliminated meaningful

21   competition from substitute patents, Defendants would not have been in a position to make such

22   demands.  The SAC includes sufficient new, specific details regarding the patents, their role in the

23   relevant patent market, the competitive conditions within that market pre-aggregation, the

24   activities of the prior owners with respect to the patents including enforcement and royalties

25   sought, and the post-aggregation conduct of Defendants to create a plausible implication that the

26   challenged patent transfers led to supracompetitive royalty levels by eliminating competition.  *See*

27   Section II.B, *supra*.  Simply put, "in sum, read in its totality, the [SAC] tells a plausible story of

28

market control leading to increased price." *In re: Zinc Antitrust Litig.*, No. 14-CV-3728 (KBF), 2016 WL 3167192, at *2 (S.D.N.Y. June 6, 2016) (denying motion to dismiss where plaintiffs "allege that defendants had an actual ability to control [price]" supported "with a number of plausible factual allegations").

Further, as the SAC alleges, the ***size*** of Defendants' demands show that Defendants regard these patents as particularly important in the context of the alternatives in the relevant patent market. *See*, *e.g.*, SAC ¶ 178 ("Further, by seeking such outsized damages, the Uniloc Defendants signal their belief that the '252 patent represents a patent of significant importance in this market such that it would enable them to extract such supracompetitive royalties."). While no allegations of "crown jewels" is necessary, this is evidence that Defendants certainly consider these patents to be the crown jewels of each market.

Defendants argue that Plaintiffs must allege direct evidence of both supracompetitive pricing ***and*** reduced output. This is incorrect. *See In re Abbott Labs. Norvir Anti-Tr. Litig.*, 562 F. Supp. 2d 1080, 1085–86 (N.D. Cal. 2008), *rev'd sub nom. John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009) (holding that supracompetitive pricing ***and*** restricted output are not necessary for direct evidence of anticompetitive effects in markets where such an analysis would have "little application"); *see also In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246 (D. Conn. 2015) ("[W]hen direct evidence is available that a party profitably charges supracompetitive prices, the existence of market power can be established ***from that fact alone***.") (emphasis added).

In support of their argument that allegations of supracompetitive prices are not sufficient absent allegations of reduced output, Defendants rely entirely on *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997), which was decided long before the cases cited above. *Forsyth* is also very different from this case. In the first place, *Forsyth* addressed the sufficiency of the evidence on summary judgment, not whether specific allegations of supracompetitive prices were sufficient to withstand a motion to dismiss. Moreover, the plaintiffs in *Forsyth* offered evidence only that the defendant "charged higher prices than other hospitals." The market dynamics of the *Forsyth* case are distinct from this litigation. There, plaintiffs were alleging higher prices charged by

defendants where it was possible that plaintiffs might have been comparing different services or different levels of care between the hospital). *See id.* at 1476. The SAC, by contrast, alleges that the prices of the ***very same patents*** increased after they were aggregated with substitute patents and that the aggregation gave defendants the ability to increase the prices.

Second, this case involves patents and patent markets, which are very different from the hospital markets at issue in *Forsyth*. While reduced output may be a useful tool in other circumstances to avoid false positives caused by focusing on absolute prices alone (where increased price could be accompanied by increased quality), that concern is ***not*** present in a patent market (where increased price cannot be accompanied by increased quality because the patent is unchanged). As leading antitrust scholars have observed, in the intellectual property context, supracompetitive prices ***alone*** constitute direct evidence of anticompetitive effects. *See* Herbert Hovenkamp, Mark D. Janis, Mark A. Lemley, Christopher R. Leslie & Michael A. Carrier, *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 4.03 (3d Ed., 2019 Supp. 2016) ("Some articulations of the legal test for finding monopoly power through direct evidence do not map well to some scenarios involving intellectual property portfolios. While some courts have suggested that proof of profitable monopoly pricing is sufficient evidence to prove monopoly power directly, other courts have suggested that proving monopoly power through direct evidence also requires evidence of reduced output. Courts, however, should not require reduced output in the context of IP.").

In any event, contrary to Defendants' argument, Plaintiffs ***do*** allege that Defendants' anticompetitive conduct has resulted in reduced innovation and reduced output in the form of licenses that would have been taken if royalties were offered at competitive levels. Plaintiffs also added new allegations detailing how Defendants' serial assertions of patents harm innovation more broadly by tying up resources that would otherwise be spent on research and development. SAC ¶ 451 (describing cost of defending against Defendants' serial litigation campaign on resources for research and development for innovator company Laminar); *see also id.* ¶ 452 (describing how Intel and Apple are impacted by litigation). Plaintiffs allege how Fortress's aggregation of patents

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

also decreases access to any patents that Fortress controls for which a licensee might actually want a license to use the technology in the patent.  *Id.* ¶ 443.  Plaintiffs allege that but for Defendants' aggregation scheme, the aggregated patents could have been the subject of licensing discussions focusing on the merits of the patents and that would have promoted use of the technology, and could have resulted in increased licenses for those products.  *Id.*  Therefore, Defendants' aggregation scheme has reduced output in the relevant patent markets.

### 2. Direct Evidence of Anticompetitive Effects Obviates Any Requirement to Allege Market Shares.

Defendants wrongly argue that Plaintiffs have failed to allege cognizable markets because they have not identified every patent that belongs in each relevant market.  MTD SAC at 13.  But Defendants ignore that Plaintiffs allege direct evidence of anticompetitive effects—not circumstantial evidence of market power based on market shares.  As the Court has found, because Plaintiffs are relying on direct evidence of anticompetitive effects, they need not allege market shares in a relevant market.  Order on 2d MTD at 20 ("A lesser market analysis is permissible where there is proof of actual detrimental effects."), 25 n.8 ("The Court acknowledges that Plaintiffs are not relying on indirect evidence of anticompetitive effects, for which they would have to show high market share (e.g., that Defendants owned a significant number of patents in the relevant market).").  Plaintiffs have sufficiently alleged the broad contours of the relevant patent markets and direct evidence of anticompetitive effects in those markets.

### B. Plaintiffs Have Adequately Pled Antitrust Injury

In the Order dismissing the Complaint, the Court made clear that an injury that arises from eliminating substitutes through patent aggregation is a cognizable antitrust injury.  Order on 1st MTD at 20 ("Plaintiffs' basic theory, as indicated above, is that aggregation of patents by Defendants has led to the elimination of substitutes – and the elimination of substitutes constitutes the elimination of competition.  If proven, there could well be antitrust injury suffered as a result of the elimination of competition.").  It is thus settled that Plaintiffs' theory of antitrust injury is sound.  *See Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (an

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

antitrust injury is one that "flows from that which makes defendants' acts unlawful"). Therefore, the only question remaining is whether the SAC contains sufficient allegations that Defendants' elimination of substitutes "has actually impacted Plaintiffs" or "will likely impact Plaintiffs in the future." Order on 1st MTD at 20-21. The answer is yes.

### 1. Plaintiffs Have Alleged that Defendants' Anticompetitive Conduct Resulted in Supracompetitive Royalties

Defendants again insist that Plaintiffs cannot have suffered antitrust injury because the SAC does not allege that Plaintiffs actually have taken a license from Defendants, or that Plaintiffs have an "intention of ever purchasing any license from any Defendant in the future." MTD at 28. This is both wrong and irrelevant. *First,* the SAC alleges that Plaintiffs have "engaged in licensing negotiations" with Defendants. *See, e.g.*, SAC ¶¶ 128, 130 (Apple and Inventergy); *accord id.* ¶ 452 ("Intel and Apple have also each been harmed by the enormous amounts of time their employees have been forced to spend on these matters, including negotiating with Defendants . . . .").

*Second,* Defendants' exorbitant licensing demands present Plaintiffs with a Hobson's choice: pay supracompetitive royalties or litigate. Inflated prices and litigation costs are both recognized forms of antitrust injury. *See, e.g.*, *ICANN*, 611 F.3d at 504 ("Harm to consumers in the form of higher prices resulting from competitive restraints has long been held to constitute an actual injury to competition."). Indeed, "it is difficult to imagine a more typical example of anti-competitive effect than higher prices." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996); *see also In re Mercedes-Benz*, No. 99-4311(WHW), 2006 WL 2129100, at *22 (D.N.J. July 26, 2006) (denying summary judgment as to claim for equitable relief, based on possibility that defendants' alleged anticompetitive conduct would enable them to charge supracompetitive prices in future). Plaintiffs need not have actually paid inflated royalties to have suffered antitrust injury; it is enough that they have been forced to litigate repeatedly to avoid paying inflated royalties resulting from anticompetitive patent aggregation and that they face an ongoing threat of Plaintiffs' future licensing demands.

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1    Defendants' remaining arguments conflate the issue of injury with the separate issue of

2    whether Defendants have violated the antitrust laws in the first place.  For example, Defendants

3    make a "slippery slope" argument, contending that "[i]f the mere allegation that a patent holder

4    has demanded more than a prior owner were sufficient to state an antitrust claim, this would expose

5    a patent holder to antitrust liability any time it had a different opinion of value, a different theory

6    of infringement, or just more resources to overcome a recalcitrant defendant than the prior owner

7    had."  MTD SAC at 16, 30.  That argument, however, merely begs the question of whether the

8    SAC plausibly alleges that the reason Defendants have been able to demand supracompetitive

9    royalties post-aggregation is because the challenged patent acquisitions have eliminated

10   competitive constraints.  Plaintiffs have made such plausible allegations.  *See, e.g.*, SAC ¶ 163.

11   To be sure, Defendants will have ample opportunity—post-discovery—to attempt to show that

12   their royalty demands are attributable to something other than elimination of competition, and that

13   Plaintiffs therefore cannot prove antitrust injury.  But such fact-based arguments are premature on

14   a motion to dismiss.

15          **2.    Plaintiffs' Litigation Costs Constitute Antitrust Injury**

16          Plaintiffs' litigation costs stem directly from Defendants' unlawful aggregation of

17   substitute patents and thus constitute antitrust injury.  *Hynix Semiconductor Inc. v. Rambus, Inc.*,

18   527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (litigation expenses can be recovered "where the

19   patent litigation is used to further the harm caused under a 'more traditional antitrust theory'");

20   *see, e.g.*, *Apple, Inc. v. Samsung Elecs.*, No. 11-CV-01846-LHK, 2012 WL 2571719, at *27 (N.D.

21   Cal. June 30, 2012) ("[B]ecause Apple's litigation costs stem directly from Samsung's alleged

22   anticompetitive behavior, these litigation costs are a sufficient basis for a potential award of

23   antitrust damages."); *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1310 (Fed. Cir.

24   2016) (upholding award of treble damages in attorneys' fees as antitrust injury even though

25   antitrust scheme was unsuccessful where "[t]he 'competition-reducing aspect,' of 3M's behavior

26   was its attempt at achieving a monopoly by bringing the subject lawsuit").  Plaintiffs directly link

27   Defendants' patent aggregation scheme to the injuries that Plaintiffs have suffered in the form of

28

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

litigation costs. *See, e.g.*, SAC ¶¶ 149, 173, 204, 231, 245, 287, 312, 334, 356.  Specifically, the new allegations explain that Defendants have sued Apple on the very patents they have unlawfully aggregated "*[b]ecause* it has refused to capitulate to exorbitant royalty demands" for those patents. SAC ¶ 149; *see also id.* ¶ 231 (parallel allegation as to litigation against Intel).  In other words, according to the SAC, Defendants first (1) aggregate patents, including substitutes, then (2) take advantage of the fact that the patent transfers have eliminated alternatives by demanding supracompetitive royalties from Plaintiffs and other potential licensees.  *See, e.g.*, SAC ¶ 437. Plaintiffs have already been harmed as a result of litigation costs incurred in contesting Defendants' exorbitant royalty demands and face an ongoing threat of future exorbitant demands or litigation that have been made possible through elimination of competition from the challenged patent transfers.

        The Court already determined that Plaintiffs' allegations are sufficient to plead antitrust injury.  Order on 1st MTD at 20.  And that determination is consistent with precedent.  For example, in *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007), a court in this District held that litigation expenses can be recovered in an antitrust claim "where the patent litigation is used to further the harm caused under a 'more traditional antitrust theory.'"  That is precisely what Plaintiffs have alleged here.  Defendants' anticompetitive conduct consists of the unlawful mass aggregation of patents, including substitutes, thereby eliminating competitive constraints that existed before the aggregations.  That conduct harms competition.  In demanding supracompetitive licensing rates for those patents, and then suing if Plaintiffs refuse to pay them, Defendants are "further[ing] the harm" and directly injuring Plaintiffs.

    **C.**    **Plaintiffs Have Adequately Alleged a Section 1 Claim**

        In its Order on the Motion to Dismiss the First Amended Complaint, the Court determined that it was unclear whether Plaintiffs were "claiming that each PAE worked with Fortress to aggregate the patents the PAE has" or were claiming that each "PAE knew Fortress would aggregate the PAE's patents with another PAE's patents in the same market (i.e., the PAE was just contributing to Fortress's 'pot of patents,' so to speak)."  Order on 2d MTD at 11 n.6.  The SAC

1  makes clear that it is the latter:  "each of the Defendants entered into separate agreements with

2  Fortress with a common objective with Fortress to eliminate competition and reap the rewards

3  from doing so.  Fortress is thus at the center of a series of separate bilateral agreements between

4  Fortress and each PAE to aggregate patents under Fortress's control to the benefit of Fortress and

5  each of the PAEs with which it has contracted." SAC ¶ 54.

6        The Court also stated that "Plaintiffs must allege that the agreement was intended to harm

7  or restrain trade." Dkt. 229 (Order on 2d MTD) at 27 n.10.  However, allegations of specific intent

8  are ***not*** required to state a claim under Section 1 of the Sherman Act where there is evidence that

9  the relevant agreement harmed competition.  As the Supreme Court has described, "in a civil action

10  under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an

11  anticompetitive effect."  *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 243 (1980)

12  (emphasis in original); *see also, e.g.*, *Cal. Dental Ass'n v. F.T.C.*, 224 F.3d 942, 949 (9th Cir. 2000)

13  (discussing well-established Supreme Court practice to examine intent ***only in*** those close cases

14  where plaintiff falls short of proving that defendant's actions were anticompetitive) (citing *Times*

15  *Picayune Publ'g Co. v. United States*, 345 U.S. 594, 614 (1953), and *United States v. Griffith*, 334

16  U.S. 100, 105 (1948)); *Dunn v. Phx. Newspapers, Inc.*, 735 F.2d 1184, 1189 (9th Cir. 1984) ("the

17  carriers must show either that the purpose of the newspapers' direct dealings with subscribers was

18  to restrain trade or that it actually injured competition"); *PNY Techs., Inc. v. SanDisk Corp.*, No.

19  11-CV-04689-WHO, 2014 WL 2987322, at *10 (N.D. Cal. July 2, 2014).  While "'smoking gun'

20  evidence of an intent to restrain competition" is relevant to the court's task of discerning the

21  anticompetitive effects of the alleged scheme, "ambiguous indications of intent… [are] of no value

22  to a court analyzing a restraint under the rule of reason."  *Calif. Dental Ass'n v. F.T.C.*, 224 F.3d

23  942, 949 (9th Cir. 2000) (citing *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410, 1412-13 (9th

24  Cir.1991)).  Therefore, when analyzing Section 1 conduct under the rule of reason, courts do not

25  engage in a "relatively fruitless inquiry into a defendant's intent."  *Id.*; *see also* Phillip E. Areeda

26  & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*

27  ¶ 1506. (4th and 5th Ed. 2013-2020) ("To focus on an unreasonable intent that is inferred from

28

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1   undesirable conduct is simply to add an unnecessary step to the analysis of conduct.").

2           More specifically, an anticompetitive agreement is illegal, even if only one party thereto

3   intended an anticompetitive result.  *See*, *e.g.*, *Spectators' Commc'n Network Inc. v. Colonial*

4   *Country Club*, 253 F.3d 215, 222 (5th Cir. 2001) ("[T]here can be sufficient evidence of a

5   combination or conspiracy when one conspirator lacks a direct interest in precluding competition,

6   but is enticed or coerced into knowingly curtailing competition by another conspirator who has an

7   anticompetitive motive.  So even though it was not directly in Anheuser–Busch's interest to

8   eliminate competition in the market for on-site advertising at tournaments, other facts in this record

9   made it economically plausible for Anheuser–Busch to participate in a combination fomented by

10  the PGA.").  Indeed, a defendant may be liable even if it had no intent to restrain trade.  *See*, *e.g.*,

11  *Helix Milling Co. v. Terminal Flour Mills Co.*, 523 F.2d 1317, 1321 (9th Cir. 1975) ("A jury could

12  find here such anticompetitive intent from defendants' action in agreeing to a course of action

13  which would necessarily exclude [the plaintiff] from the market, . . . and whose successful

14  attainment would result in an acquisition which could be found to involve a violation of [Section

15  1.") (citations omitted).  Plaintiffs thus need ***not*** plead that each defendant ***intended*** to harm

16  competition when they entered into the challenged agreements.  They need only allege that

17  Defendants entered into the agreements that harmed competition.  Plaintiffs are thus alleging more

18  than that the Defendant PAEs that received favorable terms simply benefitted from preferential

19  business treatment.  *See* MTD SAC at 34-35.

20          Defendants argue that "Plaintiffs allege no facts showing any agreement between any of

21  the PAE defendants."  MTD SAC at 31.  In fact, Plaintiffs have specifically identified the written

22  agreements among various Defendants and have pleaded details showing that the PAE Defendants

23  knew about Fortress's pattern of aggregations and sought to benefit from those efforts.  For

24  example, Plaintiffs plead that Inventergy's CEO told a litigation target that "Fortress[,] does not

25  settle" and that if the target declined to take a license, it would face "an IP bloodbath," plainly

26  demonstrating that Inventergy considered itself to be operating under Fortress's command in its

27  assertion efforts.  SAC ¶ 85; *see also*, *e.g.*, *id.* ¶¶ 68-72 (allegations regarding agreements between

28

1  Uniloc and Fortress where Uniloc benefits from patent aggregation scheme), ¶ 88 (alleging that

2  Inventergy "understood and intended that its patents would be deployed as part of Fortress's

3  aggregation strategy to obtain supracompetitive royalties").  It does not matter that the agreements

4  between Fortress and Defendants appeared ordinary on their face or that licensing or patent transfer

5  agreements ***in general*** are commonplace.  Business agreements that take an ordinary form are not

6  immune from antitrust scrutiny if they harm competition.  *See, e.g., F.T.C. v. Actavis, Inc.*, 570

7  U.S. 136, 149 (2013) ("[P]atent-related settlement agreements can sometimes violate the antitrust

8  laws."); *United States v. Singer Mfg.*, 374 U.S. 174, 194-95 (1963) (holding cross-license and

9  assignment agreement violated antitrust laws where there was "concerted action to restrain trade,

10  clearly established by the course of dealings"); *ICANN*, 611 F.3d at 502 (holding that allegations

11  regarding a contract for renewals of .com website addresses were sufficient to state Section 1

12  claim); *Hurricane Shooters, LLC v. Emi Yoshi, Inc.*, No. 8:10-CV-762-T-30AEP, 2010 WL

13  4983673, at *2 (M.D. Fla. Dec. 2, 2010) (allegations that patent owner "acquired title to a

14  competitor's patent . . . in order to restrain commerce in the relevant market, by requiring other

15  competitors, like Defendant, to take a license from Plaintiff at an exorbitant royalty" were

16  sufficient to state Section 1 claim).

17      Additionally, contrary to Defendants' assertion, Plaintiffs need only allege an agreement

18  between each of the PAEs and Fortress to aggregate patents under Fortress' control, rather than an

19  overarching conspiracy among the PAEs.  MTD SAC at 32.  The case on which Defendants rely—

20  *Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos., Inc.*, 598 F. Supp. 694 (N.D. Cal. 1984)—is

21  inapposite.  In that case, the plaintiff did not even allege that the defendants engaged in ***any***

22  collusive conduct; rather, the plaintiff was merely challenging ***uncoordinated*** vertical contracts

23  entered by the defendants.  *E.g., id.* at 701 ("Rather than argue that exclusive licenses automatically

24  violate Section 1 of the Sherman Act, plaintiff contends that they constitute an unreasonable

25  restraint of trade when enforced by the station defendants against plaintiff.  [P]laintiff argues that

26  the exclusive licenses violate the antitrust laws because they are overbroad in geographic scope,

27  are unreasonably long in duration and incorporate unreasonable rights of first refusal.").  Here,

28

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1  Plaintiffs have plainly alleged unlawful agreements between the PAE Defendants and Fortress that

2  harmed competition.

3  Defendants argue that Plaintiffs' allegations are contradictory because they assert that the

4  agreements contain both "favorable terms" and "terms so severe that the PAEs have no choice but

5  to make aggressive and reckless patent assertions to attempt to generate the revenue required to

6  meet their obligations to Fortress." MTD SAC at 33-34. But Defendants suggest a contradiction

7  that does not exist: there is nothing contradictory between the allegations in the SAC and

8  paragraph 29 of the FAC. Plaintiffs allege in the SAC that "[t]he PAEs received compensation in

9  the form of favorable terms, reflecting the fact that the PAEs were sharing in the supracompetitive

10  royalties Defendants obtain by eliminating competition." SAC ¶ 54. In paragraph 29 of the FAC,

11  Plaintiffs also allege that Fortress "*condition[s]* its investments in PAEs on terms so severe that

12  the PAEs have no choice but to make aggressive and reckless patent assertions to attempt to

13  generate the revenue required to meet their obligations to Fortress." FAC ¶ 29 (emphasis added).

14  Thus, Plaintiffs have alleged that the PAEs have entered agreements with Fortress that give PAEs

15  opportunities to share in supracompetitive royalties resulting from the patent aggregation scheme's

16  elimination of competition from substitute patents. At the same time, however, Plaintiffs allege

17  that those agreements include terms under which Fortress can exert control over the PAEs if they

18  fail to generate sufficient royalties from patents in their portfolio. There is nothing contradictory

19  about Plaintiffs' allegations: they are merely referring to two distinct aspects of Fortress's

20  agreements with PAEs—one that is a carrot and one that is a stick. The same is true regarding

21  Plaintiffs' allegations that the revenue-sharing agreement between Uniloc and Fortress was a

22  "favorable" deal for Uniloc even though it defaulted on the agreement and now lacks standing to

23  assert those patents. *See* MTD SAC at 34.

24  Defendants also accuse Plaintiffs of alleging that Inventergy received "handsome

25  consideration" from Fortress without identifying what the handsome consideration was. MTD

26  SAC at 34. First, the precise amount of consideration that Inventergy received is information that

27  is within Fortress's control and can be obtained through discovery. Second, Plaintiffs did provide

28

allegations regarding the magnitude of the consideration, in that it was sufficiently large for Inventergy to turn over "sole discretion" regarding monetization efforts to Fortress.  SAC ¶ 88.

### D.    Plaintiffs Have Adequately Alleged a Section 7 Claim

Defendants return to their same argument that market share allegations are required for a Section 7 claim.  They ignore the fundamental distinction between a pre-consummation Section 7 claim and a Section 7 claim, like those in the SAC, based on a consummated transaction.  In the pre-consummation case, there can be no direct evidence of how the merger harmed competition, so the courts are required to rely on circumstantial evidence, usually market share data, to assess the ***potential*** of the merger to cause anticompetitive harm in the future.  There is no need for such indirect evidence in the case of a consummated merger, like the acquisitions at issue here, where Defendants' post-merger conduct provides direct evidence of the anticompetitive effects of the merger.

In the Order on the Motion to Dismiss the Complaint, the Court acknowledged that direct evidence of anticompetitive effects could be relevant to a Section 7 analysis.  Order on 1st MTD at 29-30.  Contrary to Defendants' position, an antitrust plaintiff need not plead circumstantial evidence of market power instead of direct evidence of anticompetitive effects.  *See, e.g.*, *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988).  This is true not only for Plaintiffs' claim under Section 1 of the Sherman Act but also for their claim under Section 7 of the Clayton Act.  *See F.T.C. v. Lab. Corp. of Am.*, No. CV 10-1873-AG, 2011 WL 3100372, at *14 (C.D. Cal. Mar. 11, 2011) (inquiry based on product market, geographic market, and merger's probable effect "does not exhaust the possible ways to prove a § 7 violation on the merits, much less the ways to demonstrate a likelihood of success on the merits in a preliminary proceeding." (quoting *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008))); *see also, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) (determining that acquisition violated Section 7 based on evidence of post-acquisition anticompetitive effects); *Intellectual Ventures I LLC v.*

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1   *Capital One Fin. Corp.*, 99 F. Supp. 3d 610, 630 (D. Md. 2015) (determining that although party's

2   initial patent acquisitions may not have violated Section 7, "at some point, the acquisitions, as

3   alleged, created a monopoly and crossed the line to actionable under § 7").

4        Defendants' reliance on *Synopsys, Inc. v. ATopTech, Inc.* is misplaced.  No. C 13-2965

5   MMC, 2015 WL 4719048, at *6 (N.D. Cal. Aug. 7, 2015); *see also* MTD SAC at 38.  There, the

6   court relied on the fact that the plaintiff did not allege anything about the market or the conduct of

7   the merging parties before the merger that would enable the court to compare them to the market

8   and conduct after the merger and thus to conclude that the merger had harmed competition.

9   *Synopsys*, 2015 WL 4719048, at *16 ("ATopTech has not alleged any facts showing the state of

10  the market before the challenged acquisitions").  That stands in stark contrast to the SAC, where

11  Plaintiffs have not simply alleged that the royalties Defendants demand and receive are

12  supracompetitive, Plaintiffs have alleged how the royalties are supracompetitive ***as compared to***

13  the pre-aggregation world.  *See, e.g.*, SAC ¶ 71, 165.  Further, *Synopsis* does not address the

14  Section 7 analysis in the context of direct evidence of anticompetitive effects.

15        **E.   Plaintiffs Have Adequately Alleged UCL Claims**

16        Defendants wrongly argue that Plaintiffs' UCL claims are barred by California's anti-

17  SLAPP statute.  "The analysis of an anti-SLAPP motion proceeds in two steps: First, the court

18  decides whether the defendant has made a threshold showing that the challenged cause of action

19  is one 'arising from' protected activity.  If the court finds such a showing has been made, it then

20  must consider whether the plaintiff has demonstrated a probability of prevailing on the claim."

21  *Barry v. State Bar of Cal.*, 386 P.3d 788, 790 (Cal. 2017) (internal quotation marks omitted).

22  Defendants' anti-SLAPP motion fails at both steps.

23        ***First,*** Plaintiffs' UCL claim is not based on protected activity because their claim arises

24  from Defendants' patent transfer scheme and the resulting elimination of competition that has

25  enabled Defendants' supracompetitive royalty demands on Plaintiffs and others.  The Court has

26  already recognized this distinction in holding that *Noerr-Pennington* does not bar Plaintiffs'

27  claims.  Order on 1st MTD at 29-30.  Contrary to Defendants' representation, the court in *Equilon*

28

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

*Enter. v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 68 n.4 (2002), did ***not*** determine that the form of relief sought determines whether the action arises from protected activity.  Rather, in that case, the court referenced the injunctive relief sought to support its statement that the party's purported "pure intentions" in the suit were beside the point.  *Id.* at 67 & n.4.  Common Cause served Equilon with a notice of an intent to sue for health and safety violations under Proposition 65, and Equilon responded with an action seeking, among other things, an injunction barring Common Cause from filing a Proposition 65 enforcement action.  The court determined that "Equilon's action for declaratory and injunctive relief ***expressly was based on*** Consumer Cause's activity in furtherance of its petition rights."  *Id.* at 67-68 (emphasis added).  That is in contrast to this case, where the relief Plaintiffs seek is based on Defendants' patent aggregation and assertion scheme.

  ***Second,*** Plaintiffs' UCL claim does not fail as a matter of law for the same reasons the federal antitrust claims survive a motion to dismiss, as discussed above.

**V.   CONCLUSION**

  For the reasons set forth above, the Court should deny Defendants' Motion to Dismiss and to Strike the Plaintiffs' Second Amended Complaint.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

DATED: June 14, 2021

Respectfully submitted,

By: */s/ Mark D. Selwyn*

Mark D. Selwyn (SBN: 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER
  PICKERING HALE AND
  DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: +1 650 858 6000
Facsimile:  +1 650 858 6100

William F. Lee
william.lee@wilmerhale.com
Joseph J. Mueller
joseph.mueller@wilmerhale.com
Timothy Syrett
timothy.syrett@wilmerhale.com
WILMER CUTLER
  PICKERING HALE AND
  DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile:  +1 617 526 5000

Leon B. Greenfield
leon.greenfield@wilmerhale.com
Amanda L. Major (admitted *pro hac vice*)
amanda.major@wilmerhale.com
WILMER CUTLER
  PICKERING HALE AND
  DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile:  +1 202 663 6363

*Attorneys for Plaintiffs*
INTEL CORPORATION, APPLE INC.

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2021, I electronically filed the foregoing documents using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

DATED: June 14, 2021                      */s/ Mark D. Selwyn*                      
                                                         Mark D. Selwyn