**Brian Scarpelli (*pro hac vice*)**
bscarpelli@actonline.org
**ACT | THE APP ASSOCIATION**
**1401 K Street NW**
**Washington, DC 20005**
**Telephone: + 1 202 331-2130**
**Facsimile: +1 202 331-2130**

Attorney for *Amicus Curiae* ACT | The App Association

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| INTEL CORPORATION, APPLE INC., <br><br>Plaintiffs, <br><br>v. <br><br>FORTRESS INVESTMENT GROUP LLC, FORTRESS CREDIT UNION CO. LLC, UNILOC 2017 LLC, UNILOC USA, INC., UNILOC LUXEMBOURG S.A.R.L., VLSI TECHNOLOGY LLC, INVT SPE LLC, INVENTERGY GLOBAL INC., DSS TECHNOLOGY MANAGEMENT, INC., and IXI IP, LLC <br><br>Defendants. | Case No. 3:19-cv-07651-EMC <br><br> **BRIEF OF *AMICUS CURIAE* ACT | The APP ASSOCIATION IN SUPPORT OF INTEL AND APPLE RESPECTING DEFENDANT'S MOTION TO DISMISS** <br><br> Date: September 16, 2021 <br> Time: 1:30 p.m. <br> Judge: Hon. Edward M. Chen |

# TABLE OF CONTENTS

**Page**

I.     **STATEMENT OF INTEREST** ............................................................................................... 1

II.    **PRELIMINARY STATEMENT** ........................................................................................... 2

III.   **ARGUMENT** .......................................................................................................................... 2

    A.  U.S. Small Business Technology Firms Rely on a Fair and Consistent Patent Framework to Invest and Innovate ................................................................................... 2

    B.  Abuse of the Court System Threatens Small Businesses, Such as the Tactics Raised in the Complaint, Undermines Confidence on the U.S. Patent System, and Discourages Innovation .......................................................................................................................... 4

    C.  Plaintiff's Complaint Exceeds Notice Pleading Requirements, and Should Proceed .... 7

IV.   **CONCLUSION** ...................................................................................................................... 8

**TABLE OF AUTHORITIES**

**Cases**

*Conley v. Gibson*, 355 U.S. 47 (1957) .................................................................................. 7

*Haines v. Kerner*, 404 U.S. 519, 520 (1972) ........................................................................ 7

*Oil States Energy Servs. v. Greene's Energy Grp*, 138 S. Ct. 1365 (2018) ..................................... 7

*Scheuer v. Rhodes*, 416 U.S. 236 (1974) ............................................................................... 7

*TC Heartland v. Kraft Foods Brand*, 137 S. Ct. 1514 (2017) ......................................................... 7

**Other Authorities**

App Annie, *State of the App Economy 2020* (Jan. 2020), *available at* https://www.appannie.com/en/go/state-of-mobile-2019. ........................................................... 3

Christine Godt, Scientific Competition: The Role of Patents in Scientific Competition: A Closer Look at the Phenomenon of Royalty Stacking 151-172 (Max Albert et al. eds., 2008). ...................................................................................................... 5

Commissioner Terrell McSweeny, *Holding the Line on Patent Holdup: Why Antitrust Enforcement Matters*, Mar. 21, 2018. .......................................................................... 6

*Innovation in Small Businesses' Drivers of Change and Value Use*, SMALL BUSINESS ADMINISTRATION, *available at* https://www.sba.gov/sites/default/files/rs342tot_0.pdf. ............................................................. 3

Kristin Garr, *IP Protection For Startups: The Role of Legislation Stopping Patent Trolls and Encouraging Innovation*, B.C. INTELL. PROP. & TECH. F. 1(2018) ........................ 4

Mark Lemley & Carl Shapiro, *Patent Hold Up and Royalty Stacking*, 85 Tex. L. Rev. 1991 (2007) ......................................................................................................................... 5

Mark Lemley & Carl Shapiro, *The Role of Antitrust in Preventing Patent Holdup*, University of Pennsylvania Law Review (publication forthcoming), *available at* https://faculty.haas.berkeley.edu/shapiro/patentholdup.pdfark Lemley & Carl Shapiro, *Patent Hold Up and Royalty Stacking*, 85 Tex. L. Rev. 1991 (2007) ......................................................................................................................... 5

Minda Zetlin, *Patent Trolls Target Small Businesses With Lawsuit Threats. Here's How One Startup Fought Back*, INC., (Feb. 2018), *available at* https://www.inc.com/minda-zetlin/patent-trolls-target-small-businesses-with-lawsuit-threats-heres-how-one-startup-fought-back.html. .......................................... 4

*Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the H. Subcomm. on Antitrust, Commercial, and*

*Administrative Law*, 116th Cong. 2 (2019) (statement of Morgan Reed, President, ACT | The App Association) *available at* https://actonline.org/wp-content/uploads/Online-Platforms-and-Market-Power-Part-2-Innovation-and-Entrepreneurship-1.pdf.................................................................................................................. 1

**Page(s)**

## I. STATEMENT OF INTEREST

*Amicus curiae* ACT | The App Association ("App Association") respectfully submits its perspective regarding the important issues presented in this action, and encourages a full adjudication on the facts and merits of Intel Corporation's ("Intel") and Apple Inc.'s ("Apple") claims against Fortress Investment Group LLC, Fortress Credit Co. LLC, Uniloc 2017 LLC, Uniloc USA, Inc., Uniloc Luxembourg S.A.R.L., VSLI Technology LLC, INVT SPE LLC, Inventergy Global, Inc., DSS Technology Management, Inc., and IXI IP LLC ("Fortress IP").

The App Association is a not-for-profit grassroots advocacy and education organization representing more than 5,000 small business software application developers and technology firms that create the technology innovations used on consumer mobile devices and in enterprise systems around the globe. Today, the ecosystem the App Association represents is valued at approximately $1.7 trillion and is responsible for 5.9 million American jobs.[1] Our members lead in developing innovative applications and products across consumer and enterprise use cases, driving the adoption of the internet of things ("IoT").[2]

The App Association has a keen interest in the U.S. patent system functioning predictably and fairly while continuously rewarding innovation. Our members include companies that own patents as well as those who license patents, all of which are directly impacted by the courts' approaches to patent rights and litigation. Systematic and systemic patent system abuse is a primary concern for the App Association's thousands of member companies that innovate across electronic consumer and enterprise verticals. Further information about the App Association and its activities is available on our website at http://actonline.org.

---

[1] *Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the H. Subcomm. on Antitrust, Commercial, and Administrative Law*, 116th Cong. 2 (2019) (statement of Morgan Reed, President, ACT | The App Association) *available at* https://actonline.org/wp-content/uploads/Online-Platforms-and-Market-Power-Part-2-Innovation-and-Entrepreneurship-1.pdf.

[2] The IoT will involve everyday products using the internet to communicate real-time analysis of data collected through sensors. IoT is expected to enable improved efficiencies in processes, products, and services across every sector, both consumer and enterprise. In key segments of the U.S. economy, from agriculture to retail to healthcare and beyond, the rise of IoT is demonstrating efficiencies unheard of even a few years ago. See Department of Commerce Internet Policy Task Force and Digital Leadership Team (Jan. 2017), *available at* https://www.ntia.doc.gov/files/ntia/publications/iot_green_paper_01122017.pdf.

## II. PRELIMINARY STATEMENT

The App Association and its members rely on a strong, fair, and predictable legal framework to protect and enforce intellectual property rights. Our members develop and utilize a variety of patented technologies to bring next-generation IoT technologies to consumer and enterprise verticals. Driven by the small business community the App Association represents, new IoT innovations will generate advancements in countless sectors of the economy including financial, agricultural, consumer entertainment, healthcare (and others), creating millions of American jobs. Realizing the potential of IoT, however, requires a fair and predictable legal environment, particularly with respect to intellectual property. The App Association's small business members are directly impacted by new and novel forms of abuse with respect to patents, as well as by tactics that jeopardize confidence in the U.S. patent system.

Below, we address the important role our members play in the growing IoT world and how a fair and predictable patent system is crucial to our members' growth and job creation. We then discuss how our members are impacted by the new patent licensing tactics at issue in this case, which are described by the Complaint.

We conclude by urging this Court to deny the Motion to Dismiss because we firmly believe it is important that the complaint be fully considered and adjudicated to ensure that the innovation economy is not suppressed. The revised complaint is responsive to concerns raised earlier in the case with respect to market definition and raising direct harms based on the abusive conduct at issue, and merits exploration through discovery.

## III. ARGUMENT

### A. U.S. Small Business Technology Firms Rely on a Fair and Consistent Patent Framework to Invest and Innovate

The small business software and hardware technology industry is a driving force behind the growth of the IoT revolution. IoT is an all-encompassing concept capturing how everyday consumer and enterprise products begin to use the internet to communicate data collected through sensors, and act on the data in a timely way. IoT is predicted to improve efficiencies in processes,

products, and services across every sector of the economy. For example, IoT will soon play a major role in how we irrigate our crops, provide medical treatment, and purchase everyday items.

Additionally, the app economy's success – and the growth of IoT – relies on continuous innovation and investment in connected devices, which in turn requires a strong and consistent legal framework for intellectual property rights. Small businesses can obtain their competitive edge in the large electronic hardware and software market through their patented technologies. Patents allow small business developers to protect their investments, attract venture capital, create and maintain a competitive marketplace, and level the playing field with larger and more established companies/competitors. Small businesses produce sixteen times more patents per employee than large patenting firms.[3] Furthermore, over half of the App Association's members who hold patents have experience with patent infringement litigation.[4]

The limits are undefined and endless when it comes to how IoT devices will change all Americans' lives, with a predicted 25.2 billion connected devices deployed by 2025, almost every sector of the U.S. economy will be impacted ranging from finance and health to gaming and the global digital ecosystem.[5]

The App Association's members' ability to take part in the booming cross-sectoral IoT ecosystem, creating millions of further American jobs in the process, heavily depends on the ability to rely on and plan according to legal and business norms and policymaking that appropriately balances creating a pro-innovation environment with the public interest. A core ignitor of the growth and ingenuity for small businesses in emerging IoT sectors is, and must continue to be a fair, reliable, and predictable intellectual property rights system, particularly with respect to patents. According to a recent focus group survey, more than half of our members have dealt with some type of patent infringement claim. Attempts to abuse the patent system, however

---

[3] *Innovation in Small Businesses' Drivers of Change and Value Use*, SMALL BUSINESS ADMINISTRATION, *available at* https://www.sba.gov/sites/default/files/rs342tot_0.pdf.

[4] *The Results are in: Intellectual Property is Still in Style, Holds Value for App Developers*, ACT | THE APP ASSOCIATION ONLINE BLOG, (March 27th, 2018), *available at* https://actonline.org/2018/03/27/the-results-are-in-intellectual-property-is-still-in-style-holds-value-for-app-developers/.

[5] *See* App Annie, *State of the App Economy 2020* (Jan. 2020), *available at* https://www.appannie.com/en/go/state-of-mobile-2019.

unique they may be, must be adjudicated and addressed by the courts to ensure that the patent system can still be relied upon.

### B. Abuse of the Court System Threatens Small Businesses, Such as the Tactics Raised in the Complaint, Undermines Confidence on the U.S. Patent System, and Discourages Innovation

Patent system abuse undermines the confidence of the entire intellectual property system and negatively impacts both large and small companies, syphoning off resources that would otherwise be committed to research and development.[6] Small companies that the App Association represents, in particular, often do not have the resources or time to engage in lengthy and expensive litigation, and abusers of the patent system know this, banking on a quick settlement with little or no protest.[7] Startups and small businesses needlessly pulled into patent litigation often have two choices: (1) fold their entire business due to cost of litigation; or (2) pay exorbitant royalty rates for use of (often questionable) patents in order to keep their doors open.

Further, a healthy patent system must avoid high licensing fees and royalty stacking. Traditionally, devices have been developed to provide a single solution (e.g., a dedicated device to measure blood glucose levels). More recently, however, a multi-functional technology product can easily have hundreds, and sometimes thousands, of pieces of patented technologies contained in it (such as a smartphone), requiring many licenses to be negotiated before production, sale, and use. Cutting-edge healthcare devices that utilize internet connectivity and sensors (the capabilities of a smartphone) to enable real-time analytics for improved treatment decisions, for example, will include numerous patented technologies to enable the medical functionality (e.g., blood glucose reading technology), along with a high number of patented technologies that enable internet connectivity (antennae, processing, etc.). Developers of these new multi-function devices face the very real possibility of the demands for licenses to so many patented technologies "stacking" up

---

[6] *See* Kristin Garr, *IP Protection For Startups: The Role of Legislation Stopping Patent Trolls and Encouraging Innovation*, B.C. INTELL. PROP. & TECH. F. 1, 3-4 (2018) (noting the financial challenges small startups endure when faced with bad faith patent infringement claims).

[7] *E.g.*, Minda Zetlin, *Patent Trolls Target Small Businesses With Lawsuit Threats. Here's How One Startup Fought Back*, INC., (Feb. 2018), *available at* https://www.inc.com/minda-zetlin/patent-trolls-target-small-businesses-with-lawsuit-threats-heres-how-one-startup-fought-back.html.

to exceed the cost of developing and getting a product to market. In this way, royalty stacking can tax innovation and prevent technological progress.

Royalty stacking and its negative effects are well-documented and widely acknowledged. Royalty stacking effectively consumes a commercial product developer's profit margins, significantly diminishing the incentives to research and develop.[8] Royalty stacking can also constrain technology transfers from universities and research institutes to industry.[9] Further, royalty stacking exacerbates patent holdup, when the bargaining position of a patent holder increases considerably after a patent is included in a technical standard, enabling the patent holder to act unreasonably in leveraging its position.[10]

The case before this Court presents a unique, expansive, and multi-pronged approach to patent assertion involving many parties. The Complaint filed in this case discusses how Fortress IP and its affiliated assertion entities have aggregated a high number of patents and have systematically used threats of litigation to seek royalties for those patents that exceed the value of the patents under its "Privateering Option" approach, even for, in some cases, invalidated patents. We are particularly troubled by the dynamic of excessive royalties being sought on patents through holdup tactics and abuse of holdup power due to the expectations of investors, representing a predatory approach to patent portfolio management unlike any encountered before. Each of the new markets defined in the revised Complaint are ones that App Association members are part of and are therefore affected by the abusive behavior at issue. We strongly encourage this Court to allow this case to move to the discovery phase to assess the defendants' unique "business model" and its impact on the electronic patent industry at large. Small businesses are often overlooked in cases, such as the current dispute, but the Defendants' tactics at issue in this case would have devastating effects on small businesses when it comes to

---

[8] *E.g.*, Mark Lemley & Carl Shapiro, *Patent Hold Up and Royalty Stacking*, 85 Tex. L. Rev. 1991, 1993 (2007) (Lemley & Shapiro); Mark Lemley & Carl Shapiro, *The Role of Antitrust in Preventing Patent Holdup*, University of Pennsylvania Law Review (publication forthcoming), *available at* https://faculty.haas.berkeley.edu/shapiro/patentholdup.pdf.
[9] Christine Godt, Scientific Competition: The Role of Patents in Scientific Competition: A Closer Look at the Phenomenon of Royalty Stacking 151-172 (Max Albert et al. eds., 2008).
[10] Commissioner Terrell McSweeny, *Holding the Line on Patent Holdup: Why Antitrust Enforcement Matters*, Mar. 21, 2018.

licensing and litigation, even more so than patent holdup abuse typically faced would.

For example, in healthcare, a miniaturized and embedded connected medical device must be able to automatically communicate bi-directionally in real-time. This capability enables a healthcare practitioner to monitor a patient's biometric data as well as for the patient to be able to communicate with a caregiver in the event of a medical emergency. Other uses, such as sensors deployed to alert security of an unauthorized presence, may only require the ability to send data to security professionals with minimal (or even no) capability to receive communications. Cutting-edge healthcare devices that utilize internet connectivity and sensors to enable real-time analytics for improved treatment decisions, for example, will include numerous patented technologies to enable the medical functionality (e.g., blood glucose reading technology), along with a high number of patented technologies that enable internet connectivity (antennae, processing, etc.). Developers of these new multi-function devices face the very real possibility that abusive behavior per the scheme detailed in the Complaint would prevent such products from ever reaching the market and saving countless lives. Small businesses facing aggressive and convoluted schemes such as the one at issue in this case where, for example, patents are aggregated into a portfolio for serial and baseless assertions to obtain patent royalties greatly exceeding the value of the inventive contributions (if any) of, and competitive prices for, the patents, have little to no practical chance to defend their good faith efforts to develop new innovations.

Both the law and public policy interests demand that courts act to avoid anticompetitive and abusive behavior that undermines the U.S. patent system. In recent years, the Supreme Court has demonstrated its commitment to creating a more reliable patent litigation system. For example, in *TC Heartland v. Kraft Foods Brand*, 137 S. Ct. 1514, 1520 (2017) ("TC Heartland"),[11] the Supreme Court ruled that good-faith innovators can avoid surprise patent suits in unknown jurisdictions where they have no meaningful contacts. 137 S. Ct. 1514, 1520 (2017). Furthermore, in *Oil States Energy Servs. v. Greene's Energy Grp*, 138 S. Ct. 1365, 1373 (2018)[12]

---

[11] 137 S. Ct. 1514, 1520 (2017).
[12] 138 S. Ct. 1365, 1373 (2018).

the Supreme Court affirmed the constitutionality of the United States Patent and Trademark Office's use of the *inter partes* review process. 138 S. Ct. 1365, 1373 (2018). These decisions, among others, demonstrate the U.S. legal system's commitment to ensuring the U.S. patent system's fairness and reliability. The App Association opposes the Defendants' motion to dismiss and requests that this case be adjudicated on the merits. The App Association's thousands of small business members face harm across each of the markets defined in Plaintiffs' revised complaint.

### C. Plaintiff's Complaint Exceeds Notice Pleading Requirements, and Should Proceed

Because the test for the sufficiency of a complaint at the pleading stage is one of notification, a complaint suffices under Rule 8(a) if it provides the defendant with "fair notice" of what the plaintiff's "claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 47 (1957). At the pleading stage, the appropriate question is whether the plaintiff has identified a claim of relief under which they are able to move forward and offer evidence to support the claim. *Scheuer v. Rhodes*, 416 U.S. 236 (1974); see also Haines v. Kerner, 404 U.S. 519, 520 (1972) (question at motion to dismiss stage is whether the allegations in the complaint "are sufficient to call for the opportunity to offer supporting evidence").

Here, plaintiffs have clearly surpassed that standard in their amended complaint. Plaintiffs' complaint provides an ample amount of specificity detailing how defendants, venture capital-backed patent assertion entities, have engaged in a campaign of anticompetitive patent aggregation by Fortress and a complex network of PAEs that Fortress controls. The amended complaint accurately defines antitrust markets consisting of patents that perform specific functions in electronic products where defendants have clear market power, and comprehensively describes how defendants have acted together to eliminate competition within those markets in order to enjoy inflated royalties from licensees who have no alternatives. For example, Plaintiffs have provided evidence capturing how Fortress paid $33.6 million to acquire Uniloc Luxembourg's patents (even when Uniloc Luxembourg had been valued at only $6.25 million)

because Uniloc recognized that those patents would continue to provide exponentially more than the actual value of those patents through royalties once Fortress had aggregated its control of relevant patents markets; after which Fortress systematically sought royalties for such patents at rates multiple times higher than their actual valuation.

## IV.     CONCLUSION

The Plaintiffs' amended complaint is responsive to issues raised by the court, responsibly scoping the markets at issue and alleging direct effects of the Defendants' patent aggregation scheme. Because the Plaintiffs' improved complaint raises novel issues supported by a complete and viable factual allegation about abuse of the patent system is a competition law problem impacting companies throughout the consumer and enterprise industries, particularly for small businesses such as the App Association's members, we oppose the Defendants' motion to dismiss.

Respectfully submitted

Dated: June 15, 2021

ACT | The App Association
Brian Scarpelli (*pro hac vice*)


By:   *Brian Scarpelli*

Brian Scarpelli
Attorney for *Amicus Curiae*
ACT | The App Association