JENKS IP LAW PLLC
William Jenks (SBN 212,609)
1629 K St NW, Suite 300
Washington DC 20016
Telephone: (202) 412-7964

Attorney for Amicus Curiae

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

INTEL CORPORATION and APPLE INC.,

                       Plaintiffs,

      v.

FORTRESS INVESTMENT GROUP LLC,
FORTRESS CREDIT CO. LLC,
UNILOC 2017 LLC,
UNILOC USA, INC.,
UNILOC LUXEMBOURG S.A.R.L.,
VLSI TECHNOLOGY LLC,
INVT SPE LLC,
INVENTERGY GLOBAL, INC., and
IXI IP, LLC

                      Defendants.

Case No. 3:19-cv-07651-EMC

**AMICUS CURIAE BRIEF OF
UNIFIED PATENTS, LLC
IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE
SECOND AMENDED COMPLAINT**

Hon. Edward M. Chen

## **Table of Contents**

I. Interests of Amicus Curiae ................................................................................................ 1

II. Amicus's Prior Briefs ...................................................................................................... 2

III. Fortress Plans to Double Its Investment in Mass Aggregation ..................................... 3

IV. Other Mass Aggregators Are Likewise Surging in Size ................................................ 4

V. The Second Amended Complaint Exceeds the Requirements of *Iqbal* and *Twombly* ................ 6

VI. Plaintiffs Have Satisfied a Much Higher Bar Than Defendants Face When Pleading
      Patent Infringement ................................................................................................... 9

VII. Conclusion ................................................................................................................. 11

## Table of Authorities

**Cases**

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246 (Fed. Cir. 2011) ........................ 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................... 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 7, 10

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256 (Fed. Cir. 2018) ................................. 10

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370  (1996) ........................................... 8

*Unified Patents Inc. v. Uniloc 2017 LLC*, IPR 2019-01126 (PTAB filed May 28, 2019) ............... 2

*Unified Patents, LLC. v. Uniloc USA, Inc. et al.*, IPR2018-00199 (PTAB May 31, 2019) ............. 2

*Windy City Innovations, LLC v. Microsoft Corp.*, 193 F. Supp. 3d 1109 (N.D. Cal. 2016) ........... 10


**Other Authorities**

AIPLA, Report of the Economic Survey (Sep. 2019) ........................................................ 10

Britain Eakin, *Huawei Gets PTAB To Eye 2 Patents Involved In WDTX Suits*, Law360
 (Jun. 11, 2021) ........................................................................................ 5

Gene Quinn, *Debt vs. Equity – The Financing of Patent Monetization*, IP Watchdog (Nov.
 18, 2014) *available at* https://www.ipwatchdog.com/2014/11/18/debt-vs-equity-the-
 financing-of-patent-monetization/id=52210/ ........................................................ 4

Giles S. Rich, *The Extent of the Protection and Interpretation of Claims–American
 Perspectives,* 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499, 501 (1990) ........................ 8

James Bessen and Michael J. Meurer, *The Direct Costs from NPE Disputes*, 99 Cornell L.
 Rev. 387 (2014) ...................................................................................... 6

Jonathan Stroud, *Patent Filings Roundup: Disney Displeasure Cruise; WSOU Investments'
 Recordation Problems; and Chinese Company Targets Chinese Counterfeiters in U.S.
 Court*, IP Watchdog (Apr. 16, 2021) *available at*
 https://www.ipwatchdog.com/2021/04/16/patent-filings-roundup-disney-displeasure-
 cruise-wsou-investments-recordation-problems/id=132 376/ .......................................... 5

Jonathan Stroud, *Patent Filings Roundup: No Fracking IPRs; New Magnetar NPE
 Identified; Board Rules on Scope of Adverse Judgment*, IP Watchdog (Apr. 1, 2021) ............... 6

Jonathan Stroud, *Pulling Back the Curtain on Complex Funding of Patent Assertion Entities*, 12.2 Landslide 20 (Nov./Dec. 2019) *available at* https://www.americanbar.org/groups/intellectual_property_law/publications/landslide/2019-20/november-december/ ........................................................................................................ 1

Josh Kosman, *Softbank unit launches $400 M' patent troll' fund*, N.Y. Post (May 21, 2018) ....................................................................................................................................... 3

Kirsten Errick, *Analytics: The Most Litigious District Court Patent Plaintiffs*, Law Street (Nov. 29, 2020) *available at* https://lawstreetmedia.com/tech/analytics-the-most-litigious-district-court-patent-plaintiffs/ ("Errick") ................................................................ 4, 5

Richard Lloyd, *Acacia announces acquisition of former Yahoo! patents in massive expansion of its holdings*, IAM (May 11, 2020) *available at* https://www.iam-media.com/litigation/after-licensing-agreement-rpx-deal-former-yahoo-portfolio-finally-materialises .................................................................................................................. 6

Richard Lloyd, *Acacia goes hunting for patents and more bolstered by new Starboard cash*, IAM (Nov. 25, 2019) *available at* https://www.iam-media.com/finance/armed-starboards-cash-and-multi-eight-figure-deals-mind-acacia-goes-hunt-assets ........................... 6

Richard Lloyd, *Fortress's latest patent fund could top $900 million*, IAM (Apr. 9, 2021) *available at* https://www.iam-media.com/index.php/finance/fortresss-latest-patent-fund-could-top-900-million ("IAM April 2021") ................................................................ 3

RPX Corporation, *Salesforce Gets The WSOU Treatment* (Jan. 7, 2021) *available at* https://www.mondaq.com/unitedstates/patent/1022726/salesforce-gets-the-wsou-treatment? ........................................................................................................................... 5

RPX Insight, *Amid its Barrage of Networking Cases, WSOU Records Another Acquisition from Nokia* (Apr. 24, 2020) *available at* https://insight.rpxcorp.com/news/61758-amid-its-barrage-of-networking-cases-wsou-records-another-acquisition-from-nokia ...................... 5

RPX Insight, *More Hedge Fund-Backed Irish NPEs Launch US Litigation* (Feb. 26, 2021) *available at* https://insight.rpxcorp.com/news/65543-more-hedge-fund-backed-irish-npes-launch-us-litigation ......................................................................................................... 5

Supreet Saini, Lyubomir Uzunov, and Mitch Rosenfeld, *Patents as an Alternative Asset Class: A Financial Sponsor Perspective*, Middle Market Growth (May 25, 2021) *available at* https://middlemarketgrowth.org/patents-as-an-alternative-asset-class-a-financial-sponsor-perspective/ ("Saini, Uzunov, and Rosenfeld") .................................... 3, 4, 5

U.S. Congressional Research Service, *An Overview of the "Patent Trolls" Debate* (Apr.

16, 2013) ("CRS Report") ............................................................................................ 1

Unified Patents, *2020 Patent Dispute Report: Year in Review available at*
https://www.unifiedpatents.com/insights/2020-patent-dispute-report-year-in-review
("2020 Patent Dispute Report") ........................................................................... 1, 2, 5

Unified Patents, *2021 Litigation Annual Report available at*
https://portal.unifiedpatents.com/litigation/annual-report?year=2021 ("2021 Patent
Litigation Report") ...................................................................................................... 1

Unified Patents, *The Rise of the Super NPE and the Western District of Texas* (Jul. 13,
2020) *available at*  https://www.unifiedpatents.com/insights/2020/7/13/the-rise-of-the-
super-npe ..................................................................................................................... 4

**Rules**

Fed. R. Civ. Pro. 56(c)(4) ................................................................................................. 8

Fed. R. Civ. Pro. 8(a)(2) .................................................................................................. 6

Patent L.R. 3-1 ............................................................................................................... 11

United States District Court
Northern District of California

**I.  Interests of Amicus Curiae**

Unified Patents, LLC is a membership organization dedicated to deterring patent assertion entities ("PAEs") from extracting nuisance settlements from operating companies based on patents that are likely invalid before the district courts and unpatentable before the U.S. Patent and Trademark Office ("PTO").  Unified's more than 3,000 members are Fortune 500 companies, start-ups, automakers, industry groups, cable companies, banks, open-source developers, manufacturers, and others dedicated to reducing the drain on the U.S. economy of now-routine baseless litigations asserting infringement of patents of dubious validity.

Unified studies the ever-evolving business models, financial backings, and practices of PAEs.  *See, e.g.*, Jonathan Stroud, *Pulling Back the Curtain on Complex Funding of Patent Assertion Entities*, 12.2 Landslide 20 (Nov./Dec. 2019) *available at* https://www.americanbar.org/groups/intellectual_property_law/publications/landslide/2019-20/november-december/.  Unified monitors ownership data, secondary-market patent sales, demand letters, post-grant procedures, and patent litigation to track PAE activity.  To better understand PAEs, Unified prepares annual patent litigation and patent dispute reports.  *See, e.g.*, Unified Patents, *2020 Patent Dispute Report: Year in Review available at* https://www.unifiedpatents.com/insights/2020-patent-dispute-report-year-in-review ("2020 Patent Dispute Report").  The reports compile district court patent suits by party and distinguish between operating companies, PAEs, and traditional plaintiffs—such as universities, small companies, and individual inventors—that innovate and patent their own inventions but do not market products.  *See* Unified Patents, *2021 Litigation Annual Report available at* https://portal.unifiedpatents.com/litigation/annual-report?year=2021 ("2021 Patent Litigation Report"); s*ee also* U.S. Congressional Research Service, *An Overview of the "Patent Trolls" Debate* 1, 4 (Apr. 16, 2013) ("CRS Report").  This data shows that PAEs and PAE litigation are ensconced in our system and are the most frequent filers of infringement suits.  *See* 2021 Patent Litigation Report.

Unified also files post-grant administrative challenges to PAE patents it believes are

1

unpatentable or invalid.  Thus, Unified is a deterrence entity that seeks to deter the assertion of poor-quality patents.  Unified acts and litigates independent of its members, including Apple or any other company.  *See, e.g.*, *Unified Patents, LLC. v. Uniloc USA, Inc. et al.*, IPR2018-00199 Paper No. 33, 10 (PTAB May 31, 2019) (collecting PTAB decisions).

In 2020, Unified was the fourth most frequent petitioner before the PTO's Patent Trial and Appeal Board ("PTAB"), and remains the leading third-party filer.  *See* 2020 Patent Dispute Report, Fig. 18.  As part of this effort, Unified is and has been adverse to Defendant Uniloc.  *See, e.g., Unified Patents Inc. v. Uniloc 2017 LLC*, IPR 2019-01126 (PTAB May 28, 2019).  Unified has similarly been adverse to (1) Inventergy LBS, LLC, an entity apparently related to Defendant Inventergy Global, Inc., (2) entities controlled by Marathon, whose patents are now controlled by Defendants, and (3) Divx LLC, a Fortress affiliate.  It is fair to say that Unified has been adverse to Fortress, given its control of the Uniloc Defendants and other entities.  *See, e.g.*, Second Amended Complaint, Dkt. No. 236 ("SAC") ¶¶ 55-73.

Amicus is concerned with the increasingly prominent role patent aggregators like Fortress have taken in extending the PAE model through the mass aggregation of low-quality patents and virtually never-ending assertion campaigns under dubious infringement theories.

## II.  Amicus's Prior Briefs

Unified, with others, filed two briefs earlier in these proceedings.  The first details how PAEs tax innovation and harm competition, discusses Fortress's mass-aggregation business model, and explains how Defendants harm competition through mass aggregation and serial nuisance suits.  *See* Amicus Curiae Brief of Unified Patents *et al.*, Dkt. No. 145-1 ("First Amicus Brief").  The second amicus brief focuses on the objective weakness of the patents in Defendants' massive portfolio.  *See* Amicus Curiae Brief of Unified Patents *et al.*, Dkt. No. 211-1 ("Second Amicus Brief").

Amicus does not propose to repeat prior arguments.  Instead, this brief updates the status of mass patent aggregation so the Court may better understand the overall anticompetitive

environment being created.  It then explains how the Second Amended Complaint meets the pleading standards of *Iqbal* and *Twombly* and goes beyond the detail required of Defendants when pleading patent infringement.

### III.  Fortress Plans to Double Its Investment in Mass Aggregation

Fortress controls "well over a thousand U.S. patents" though it "conceals the true scope of its patent portfolio."  SAC ¶ 33.  It acquired control over these patents after initially raising $400 million to invest in patent acquisition and assertions.  *See* Amicus Brief of Unified *et al.*, Dkt. No. 145-1 at 10, 11; *see also* Josh Kosman, *Softbank unit launches $400 M' patent troll' fund*, N.Y. Post (May 21, 2018).  That number eventually grew, with subsequent investment, to $900 million.  *See* Richard Lloyd, *Fortress's latest patent fund could top $900 million*, IAM (Apr. 9, 2021) *available at* https://www.iam-media.com/index.php/finance/fortresss-latest-patent-fund-could-top-900-million ("IAM April 2021").

In April, the news broke that "Fortress's IP group has been pitching investors on a new $400 million fund."  *See* IAM April 2021.  Analysts expect this fund "should easily match the $900 million that the investment giant raised in 2018 for fund one."  *Id.*; *see also* Supreet Saini, Lyubomir Uzunov, and Mitch Rosenfeld, *Patents as an Alternative Asset Class: A Financial Sponsor Perspective*, Middle Market Growth (May 25, 2021) *available at* https://middlemarketgrowth.org/patents-as-an-alternative-asset-class-a-financial-sponsor-perspective/ ("Saini, Uzunov, and Rosenfeld") (market trends "have significantly increased the availability and attractiveness of patents as an alternative asset class for investors looking to diversify and generate meaningful non-correlated returns").  This new fund would allow Fortress roughly to double the already massive aggregation of patents it holds.

Fortress's latest investment pitch includes "debt financing."  IAM April 2021.  As previously explained, this strategy allows Fortress to mass aggregate weak patents—those others would not invest in—by lending money to smaller PAEs with the patents as security.  Second Amicus at 5-6.

Defendants characterized that argument as "pure speculation" and "irrelevant."
Defendants' Response to Briefs of Amicus Curiae, Dkt. No. 214 at 4, 5.  But Eran Zur, Fortress's
Head of IP Finance of Fortress Investment Group, sitting on a panel entitled Debt vs. Equity at
the 2014 IP Dealmakers Forum, explained publicly:  "The companies that we look at most of the
time are companies that cannot get equity investment."  Gene Quinn, *Debt vs. Equity – The
Financing of Patent Monetization*, IP Watchdog (Nov. 18, 2014) *available at*
https://www.ipwatchdog.com/2014/11/18/debt-vs-equity-the-financing-of-patent-
monetization/id=52210/.  And this Court has acknowledged that the quality of patents plays a
role in the antitrust analysis.  *See* Order Granting Defendants' Motion to Dismiss Plaintiffs'
Amended Complaint Dkt. No. 230 ("Order on 2d MTD") at 25 n.8 ("That does not mean,
however, that information about the number of patents Defendants hold, or the 'quality' of those
patents, is insignificant where Plaintiffs are relying on a direct evidence theory."); *id.* at 26.

## IV.  Other Mass Aggregators Are Likewise Surging in Size

Mass aggregation by other patent assertion entities has continued apace during the
pendency of this case.  *See generally*, Unified Patents, *The Rise of the Super NPE and the
Western District of Texas* (Jul. 13, 2020) *available at*
https://www.unifiedpatents.com/insights/2020/7/13/the-rise-of-the-super-npe.  "[T]he patent
monetization market has grown to almost $10 billion annually, attracting interest from several
major financial sponsors, such as hedge funds, private equity firms, and fund of funds managers."
Saini, Uzunov, and Rosenfeld.

WSOU Investments (d/b/a Brazos Licensing and Development), run by former Uniloc
head Craig Etchegoyen, has acquired thousands of patents.  *See* Kirsten Errick, *Analytics: The
Most Litigious District Court Patent Plaintiffs*, Law Street (Nov. 29, 2020) *available at*
https://lawstreetmedia.com/tech/analytics-the-most-litigious-district-court-patent-plaintiffs/
("Errick") (noting WSOU's acquisition of approximately 4,000 patents previously owned by
Nokia and Alcatel-Lucent in 2017); *see also* RPX Insight, *Amid its Barrage of Networking*

*Cases, WSOU Records Another Acquisition from Nokia* (Apr. 24, 2020) *available at* https://insight.rpxcorp.com/news/61758-amid-its-barrage-of-networking-cases-wsou-records-another-acquisition-from-nokia (noting WSOU's acquisition of "hundreds of more assets" at the end of 2019).

In 2020, WSOU began an enforcement campaign targeting multiple productive companies.  *See* Errick (WSOU's widespread litigation campaign started March 2020).  During 2020, WSOU Investments accounted for 5% of all new patent litigation in the United States and was the most active assertor with 187 district-court cases.  *See* 2020 Patent Dispute Report.  By April 2021, WSOU had filed roughly 200 lawsuits, mainly in the Western District of Texas, a hotbed of NPE litigation.  *See* Errick ("[M]ost of WSOU Investments' lawsuits have been filed in the Western District of Texas."); Jonathan Stroud, *Patent Filings Roundup: Disney Displeasure Cruise; WSOU Investments' Recordation Problems; and Chinese Company Targets Chinese Counterfeiters in U.S. Court*, IP Watchdog (Apr. 16, 2021) *available at* https://www.ipwatchdog.com/2021/04/16/patent-filings-roundup-disney-displeasure-cruise-wsou-investments-recordation-problems/id=132 376/.  This tally includes 10 suits against Salesforce, 12 suits against Huawei Technologies, 11 suits against ZTE, 12 suits against Microsoft, 12 suits against Dell, 15 suits against Google, and many others.  *See, e.g.*, RPX Corporation, *Salesforce Gets The WSOU Treatment* (Jan. 7, 2021) *available at* https://www.mondaq.com/unitedstates/patent/1022726/salesforce-gets-the-wsou-treatment?; Britain Eakin, *Huawei Gets PTAB To Eye 2 Patents Involved In WDTX Suits*, Law360 (Jun. 11, 2021).

Magnetar Capital—a hedge fund managing over $12 billion in assets—has apparently been funding patent acquisition through multiple campaigns via "a growing web of Irish NPEs."  *See* RPX Insight, *More Hedge Fund-Backed Irish NPEs Launch US Litigation* (Feb. 26, 2021) *available at* https://insight.rpxcorp.com/news/65543-more-hedge-fund-backed-irish-npes-launch-us-litigation; *see also* Saini, Uzunov, and Rosenfeld.  And Magnetar's patent acquisition spree

"shows no sign of slowing down."  Jonathan Stroud, *Patent Filings Roundup: No Fracking IPRs; New Magnetar NPE Identified; Board Rules on Scope of Adverse Judgment*, IP Watchdog (Apr. 1, 2021).  One of their entities recently acquired another 120 patents.  *Id.*

Acacia, a well-known PAE, has likewise "significantly bolstered its asset base" by acquiring the former Yahoo! patent portfolio, consisting of 2,500+ IP "assets."  Richard Lloyd, *Acacia announces acquisition of former Yahoo! patents in massive expansion of its holdings*, IAM (May 11, 2020) *available at* https://www.iam-media.com/litigation/after-licensing-agreement-rpx-deal-former-yahoo-portfolio-finally-materialises.  "Assets" typically include issued patents and pending patent applications.  Around the same time, Acacia revealed that it had acquired an additional 150 "assets" from L3Harris.  *Id.*  This massive acquisition is driven by Starboard Value, an investment fund that provided Acacia with "up to $400 million" to acquire patents.  *See* Richard Lloyd, *Acacia goes hunting for patents and more bolstered by new Starboard cash*, IAM (Nov. 25, 2019) *available at* https://www.iam-media.com/finance/armed-starboards-cash-and-multi-eight-figure-deals-mind-acacia-goes-hunt-assets.

From the available examples and other sources (much of the funding of acquisition and litigation is private), Amicus sees a significant trend toward ever-larger PAEs reliant on mass aggregation that will raise the already considerable tax on innovation caused by PAE litigation.  *See* First Amicus at 3 (citing James Bessen and Michael J. Meurer, *The Direct Costs from NPE Disputes*, 99 Cornell L. Rev. 387, 416 (2014)); *see also* SAC ¶¶ 451-52 (explaining the "toll on innovation" caused by Defendants' "huge volume of litigation.").  There appears to be little outside the antitrust laws to keep these patent behemoths from doubling in size, doubling in assertions, and at least doubling the tax productive U.S. companies pay to the aggregators

## V.  The Second Amended Complaint Exceeds the Requirements of *Iqbal* and *Twombly*

The Courts of the United States require notice pleading.  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain only a 'short and plain statement of the claim showing

1    that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  In

2    considering a motion to dismiss, the Court must take as true the factual allegations in the

3    complaint.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  Under *Iqbal* and *Twombly*, the

4    Second Amended Complaint properly pleads that Defendants violated the antitrust laws.

5           • The SAC alleges agreements in restraint of trade among the Defendants.

6           *See, e.g.*, SAC ¶¶ 55-73; *see also* Plaintiffs' Opposition, Dkt. No. 254 at 10-12.

7           • The SAC defines appropriate markets.  *See, e.g.*, SAC ¶¶ 212-214; *see also*

8           Plaintiffs' Opposition at 3-4.

9           • The SAC identifies substitutes and complementary patents within each

10          market that Fortress acquired through its mass-aggregation scheme.  *See, e.g.*,

11          SAC ¶¶ 215-231; *see also* Plaintiffs' Opposition at 13-16.

12          • The SAC demonstrates that Fortress and its co-Defendants have received

13          and are seeking supracompetitive prices.  SAC ¶¶ 243-247; *see also* Plaintiffs'

14          Opposition at 6-9.

15         At the least, Plaintiffs have satisfied *Iqbal* and *Twombly*.  Defendant's Joint Motion to

16   Dismiss and to Strike Plaintiffs' Second Amended Complaint, Dkt. No. 244 ("MTD SAC")

17   appears to acknowledge this by quarreling with the facts alleged.

18         Regarding substitutes, Defendants ask for judicial notice of twenty patents. Defendants'

19   Request for Judicial Notice, Dkt. No. 244-1 ("RJN") at 2-5.  But they don't request the Court

20   notice the mere existence of those patents.  Instead, Defendants ask the Court to notice particular

21   facts about those patents or the technology involved.  *See, e.g.*, RJN at 4 ("The patent

22   [No. 8,769,296] is directed to detecting and preventing the spread of cracked computer software,

23   which results from a hacker disabling copyright protection features.").  Defendants then argue

24   that Plaintiffs have failed to demonstrate the patents are substitutes for one another based on

25   Defendant's reading of the patents.  *See, e.g.*, MTD SAC at 13.

26         But the fact alleged is that the patents are substitutes for each other.  Whether a patent

27

28
                                        7

may substitute for another is a question of fact, analogous to whether a product infringes a patent. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384–85 (1996) (claim construction is a question of law; "whether infringement occurred" is a question of fact).  In infringement analysis, the fact-finder compares the scope of one patent to the technology accused.  To determine substitutes, the fact-finder compares the scope of two patents to the technology in the market.

Sometimes infringement is not possible due to the construction of the patent claims.  But Defendants never rely on claim construction to put the plausibility of Plaintiffs' asserted facts into issue.  Defendants never tell the Court what the claims of their patents mean and why the proper construction of those claims requires a finding that the patents are not substitutes.  Instead, Defendants rely on their own brief characterizations to argue that the patents are not substitutes. Defendants at most tell the Court what they think a patent is "directed at," "relates to," "provides," "describes," or "is focused on."  *See* RJN at 3-5.  But that hardly defines the scope of any patent.  In patent law, "*the name of the game is the claim.*"  *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1256 n.2 (Fed. Cir. 2011) (quoting Giles S. Rich, *The Extent of the Protection and Interpretation of Claims–American Perspectives,* 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499, 501 (1990)).  Defendants often tell the Court only whether a single word appears in the patent and rely on that to rebut the allegations in the complaint. *Compare* RJN at 2 ("The word 'oxygen' does not appear anywhere in the patent.") *with* MTD SAC at 10 ("Indeed, five out of the eight patents in the new alleged market do not even mention the word 'oxygen.'").

But that sort of argument—characterizing a patent without defining its scope—is not appropriate when disputing whether that patent may substitute for another.  And, where appropriate, any argument describing a patent's scope should be specific to the claims and typically supported by a detailed expert affidavit as in a claim construction brief or on a motion for summary judgment.  *See* Fed. R. Civ. Pro. 56(c)(4).  Incomplete attorney argument regarding

a patent's scope should not be relied on to undo the deference owed Plaintiffs' factual assertions. And here, Defendants' limited characterizations regarding the patents fail to render implausible Plaintiffs' allegations that certain patents are substitutes.

Regarding supracompetitive pricing, Defendants argue that they merely "attempt to buy low and sell high." MTD SAC at 35. Arbitrage exists in many markets, but when the difference between acquisition costs and the selling price exceeds all reasonable bounds, it is fair for the Court to infer a supracompetitive price.

Regardless, Defendant is generally licensing, not "selling" its patents. The demand price in patent litigation, if paid, results in a non-exclusive license to the invention claimed. Plaintiffs maintain ownership and control of the licensed patents and may assert them again and again against other productive companies. And this demand is something stronger than the "offer price" of a non-exclusive license to the patents; it is the offer price combined with the threat of costly litigation seeking the offer price.

Second, licensing demands may, as the Court says, be of "limited probative value." Order on 2d MTD at 25. But "limited" is not "zero." *See* Order on 2d MTD at 26 (demands have "some, but limited, probative value"). Defendants' demands are the best evidence Plaintiffs and the public have regarding the "price" of their patents. This is particularly true here, where Defendants possess and zealously guard other private pricing evidence from the Court. *See, e.g.*, SAC ¶¶ 179, 271, 274, 350.

Courts rightly decline to resolve factual disputes at the motion-to-dismiss stage. But that is all Defendants have left.

## VI.  Plaintiffs Have Satisfied a Much Higher Bar Than Defendants Face When Pleading Patent Infringement

Plaintiffs have explained how their complaint meets the Ninth Circuit and Supreme Court standards for a well-pled antitrust complaint. *See, e.g.*, Plaintiffs' Opposition at 12-13.

Amicus invites the Court to compare the standard faced by Defendant when asserting infringement as patent holders to the standard they ask the Court to impose on Plaintiffs.

9

In *Disc Disease*, for example, the patent holder's complaint "identified the three accused products" and "alleged that the accused products meet 'each and every element of at least one claim of the '113 [or '509] Patent, either literally or equivalently.'" *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 1260 (Fed. Cir. 2018). The district court dismissed the complaint, but the Federal Circuit reversed and held that—for the patents in issue—the allegations were "sufficient under the plausibility standard of *Iqbal/Twombly*." *Id.* The Federal Circuit did not require that the patent holder present its infringement theory, allege which claims were infringed, or describe how the accused products met each element of a particular claim. *See id.* It was sufficient to allege that "at least one claim" of each patent was infringed. *Id.* Nor was the patentee required to settle on a theory—literal infringement or infringement by equivalence—it was enough to allege infringement "literally or equivalently." *Id.*

Similarly, Courts in the Northern District have not required patentees to specify which accused products directly infringe which claims or even which patents in their complaints. *See Windy City Innovations, LLC v. Microsoft Corp.*, 193 F. Supp. 3d 1109, 1113-15 (N.D. Cal. 2016). This is true even where plaintiffs assert multiple patents that contain over 800 claims. *Id.* To be sure, the *Windy City* court dismissed similar claims to contributory and willful infringement. *Id.* at 1116-17. But only where the plaintiff relied on "boilerplate language stating the legal conclusion to be proved" (contributory) or premised defendant's knowledge of a patent on its knowledge of the antecedent patent application (willful). *Id.*

Here, Plaintiffs have defined the antitrust markets, identified substitute patents within the markets, and shown supracompetitive pricing for identified patents in those markets. That exceeds the factual detail Defendants would have to provide in a typical patent assertion. And while the Supreme Court has noted the high expense of defending antitrust suits, *Twombly*, 550 U.S. at 558, patent suits are likewise expensive with perhaps even more cumbersome discovery. *See* AIPLA, Report of the Economic Survey I-163 (Sep. 2019) (Defendants spend median $2.5 million through discovery/claim construction in patent suits by non-practicing entities demanding

10

1    more than $25M.)

2         Defendants have responded by demanding additional factual details.  *See, e.g.*, MTD SAC

3    at 10 (faulting Plaintiffs for not showing in the complaint "that a price change for one [patent]

4    will cause a demand change for the others.").  If Plaintiffs were even required to prove that,

5    which is not clear, it would not be at this stage.  The close analysis required by Defendants'

6    argument is akin to a requirement that patentees provide full infringement contentions rather than

7    allege infringement when filing complaints.  No such requirement exists in patent law, nor should

8    it exist in antitrust law.  *See, e.g.*, Patent L.R. 3-1 ("Not later than 14 days after the Initial Case

9    Management Conference, a party claiming patent infringement shall serve on all parties a

10   'Disclosure of Asserted Claims and Infringement Contentions.'")

11        Defendants also ask the Court to accept their characterizations of the patents in issue.  But

12   when acting as plaintiffs in a patent suit, Defendants would never accept the accused infringer's

13   interpretation of a patent claim at the pleading stage.  Nor are patent plaintiffs required to plead a

14   particular claim interpretation that shows infringement in their pleadings.  They need only allege

15   infringement.

16   **VII.  Conclusion**

17        Plaintiffs' Second Amended Complaint presents a compelling case that Defendants

18   violated the antitrust laws.  At a minimum, the Court should allow discovery and examine

19   Defendants' patent aggregation and assertion scheme under the Sherman and Clayton Acts.

20   Accordingly, the Court should deny Defendants' Motion to Dismiss.

21

22    Respectfully submitted,

23    June 21, 2021

/s/   William Jenks
William Jenks (SBN 212,609)
JENKS IP LAW PLLC
1629 K St NW, Suite 300
Washington DC 20016
Telephone: (202) 412-7964

Attorney for Amicus Curiae