1  IRELL & MANELLA LLP
   Morgan Chu (SBN 70446)
2  Benjamin W. Hattenbach (SBN 186455)
   Michael D. Harbour (SBN 298185)
3  Lucas S. Oxenford (SBN 328152)
   1800 Avenue of the Stars, Suite 900
4  Los Angeles, California 90067-4276
   Telephone:  (310) 277-1010
5  Facsimile:  (310) 203-7199
   Email:  mchu@irell.com
6  Email:  bhattenbach@irell.com
   Email:  mharbour@irell.com
7  Email:  loxenford@irell.com

8  A. Matthew Ashley (SBN 198235)
   Olivia Weber (SBN 319918)
9  840 Newport Center Drive, Suite 400
   Newport Beach, California 92660-6324
10 Telephone:  (949) 760-0991
   Facsimile:  (949) 760-5200
11 Email:  mashley@irell.com
   Email:  oweber@irell.com

12
   *Counsel for Defendants*
13 FORTRESS INVESTMENT GROUP LLC,
   FORTRESS CREDIT CO. LLC,
14 VLSI TECHNOLOGY LLC

15 Additional counsel listed on signature page

16

17                **UNITED STATES DISTRICT COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19 INTEL CORPORATION,                    Case No. 3:19-cv-07651-EMC

20            Plaintiff,

21      v.                               **DEFENDANTS' JOINT REPLY IN
                                         SUPPORT OF JOINT MOTION TO
22 FORTRESS INVESTMENT GROUP LLC,        DISMISS AND TO STRIKE INTEL'S
   FORTRESS CREDIT CO. LLC, UNILOC       SECOND AMENDED COMPLAINT**
23 2017 LLC, UNILOC USA, INC., UNILOC
   LUXEMBOURG S.A.R.L., VLSI             Hon. Edward M. Chen
24 TECHNOLOGY LLC, INVT SPE LLC,
   INVENTERGY GLOBAL, INC., and IXI IP,  Date:    September 16, 2021
25 LLC,                                  Time:    1:30 p.m.
                                         Dept.:   Courtroom 5
26            Defendants.

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION.................................................................................................... 1

II.    INTEL'S REDEFINED MARKETS ARE STILL NOT PLAUSIBLY
       STATED.................................................................................................................. 3

III.   INTEL FAILS TO ALLEGE FACTS SHOWING MARKET POWER ........................... 6

       A.     Intel Fails To Allege Facts Showing Aggregation Of "Crown Jewel"
              Patents ......................................................................................................... 6

       B.     Intel Fails To Cure Any Of The Other Five Deficiencies Identified
              By The Court ................................................................................................ 8

       C.     Intel Fails To Allege Facts Of Reduced Output ........................................... 13

IV.    INTEL HAS NOT SUFFERED AN ANTITRUST INJURY .......................................... 15

V.     THE SAC STILL FAILS TO ALLEGE AN UNLAWFUL AGREEMENT.................... 18

VI.    THE SECTION 7 CLAIM FAILS AS A MATTER OF LAW BECAUSE
       INTEL FAILS TO PLEAD MARKET SHARE .......................................................... 22

VII.   INTEL'S UCL CLAIM MUST BE STRICKEN UNDER THE ANTI-
       SLAPP LAW EVEN IF THIS COURT DISMISSES THE CLAIM ............................... 23

VIII.  CONCLUSION .................................................................................................... 25

3

**Cases**

*In re Abbott Labs. Norvir Anti-Tr. Litig.*,
562 F. Supp. 2d 1080 (N.D. Cal. 2008) ................................................................14

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224 (D. Conn. 2015) ....................................................................14

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996) .................................................................................17

*BanxCorp v. Bankrate, Inc.*,
847 F. App'x 116 (3d Cir. 2021) .........................................................................14

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
483 F. Supp. 3d 38 (D. Mass. 2020) ......................................................................7

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .............................................................................20

*California Dental Ass'n v. FTC*,
224 F.3d 942 (9th Cir. 2000) ...............................................................................21

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .............................................................................10

*Church & Dwight Co. v. Mayer Labs., Inc.*,
868 F. Supp. 2d 876 (N.D. Cal. 2012) (Chen, J.), *order vacated on other
grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012) ...............................14, 16

*Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*,
611 F.3d 495 (9th Cir. 2010) .....................................................................16, 19, 20

*Conley v. Gibson*,
355 U.S. 41 (1957) .................................................................................................6

*Dominick v. Collectors Universe, Inc.*,
No. 2:12-CV-04782-ODW, 2012 WL 6618616 (C.D. Cal. Dec. 18, 2012) .................14, 15, 16

*Dunn v. Phoenix Newspapers, Inc.*,
735 F.2d 1184 (9th Cir. 1984) .............................................................................21

*Equilon Enterprises v. Consumer Cause, Inc.*,
29 Cal. 4th 53 (2002) ...........................................................................................25

28

*FTC v. Lab'y Corp. of Am.*,
   2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) .......................................................................24

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020).................................................................................................10

*Forsyth v. Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997), *aff'd*, 525 U.S. 299 (1999) .........................................13, 14, 15

*FTC v. Actavis, Inc.*,
   570 U.S. 136 (2013) ...............................................................................................................19

*GeoVector Corp. v. Samsung Elecs. Co.*,
   234 F. Supp. 3d 1009 (N.D. Cal. 2017) ..................................................................................5

*Golden Gate Pharm. Services, Inc. v. Pfizer, Inc.*,
   C-09-3854 MMC, 2009 WL 4723739 (N.D. Cal. Dec. 2, 2009) ................................................23

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*,
   433 F. App'x 598 (9th Cir. 2011)............................................................................................4

*Gray v. Ocwen Mortg. Servicing, Inc.*,
   No. 18-CV-01864-JD, 2020 WL 1503688 (N.D. Cal. Mar. 30, 2020), *aff'd*, 840
   F. App'x 185 (9th Cir. 2021)...........................................................................................8, 20

*Gressett v. Contra Costa Cty.*,
   No. C-12-3798 EMC, 2013 WL 2156278 (N.D. Cal. May 17, 2013) ....................................24

*Helix Milling Co. v. Terminal Flour Mills Co.*
   523 F.2d 1317 (9th Cir. 1975).................................................................................................21

*Humana Inc. v. Mallinckrodt ARD LLC*,
   No. CV1906926DSFMRW, 2020 WL 3041309 (C.D. Cal. Mar. 9, 2020) ........................14, 15

*Hurricane Shooters, LLC v. Emi Yoshi, Inc.*,
   2010 WL 4983673 (M.D. Fla. Dec. 2, 2010) .........................................................................19

*Indus. Waste & Debris Box Serv., Inc. v. Murphy*,
   4 Cal. App. 5th 1135 (2016)....................................................................................................25

*Intel Corp. v. Fortress Investment Group LLC*,
   No. 5:19-cv-06856, Dkt. 1 (N.D. Cal. Oct. 21, 2019)............................................................22

*Intellectual Ventures I LLC v. Cap. One Fin. Corp.*,
   2013 WL 6682981 (E.D. Va. Dec. 18, 2013), 99 F. Supp. 3d 610 (D. Md. 2015) .............15, 23

*John Doe 1 v. Abbott Labs.*,
   571 F.3d 930 (9th Cir. 2009)...................................................................................................14

*Kelsey K. v. NFL Enterprises, LLC,*
  757 F. App'x 524 (9th Cir. 2018) ............................................................................21

*Kendall v. Visa U.S.A., Inc.,*
  518 F.3d 1042 (9th Cir. 2008) .........................................................................19, 20

*Kingray, Inc. v. NBA, Inc.,*
  188 F. Supp. 2d 1177 (S.D. Cal. 2002) .....................................................................13

*Lacey v. Maricopa Cty.,*
  693 F.3d 896 (9th Cir. 2012) ....................................................................................13

*Loos v. Immersion Corp.,*
  762 F.3d 880 (9th Cir. 2014) ......................................................................................8

*McLain v. Real Est. Bd. of New Orleans, Inc.,*
  444 U.S. 232 (1980) .................................................................................................21

*Med Vets Inc. v. VIP Petcare Holdings, Inc.,*
  18-CV-02054-MMC, 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019), *aff'd,* 811
  Fed. Appx. 422 (9th Cir. 2020) ................................................................................23

*In re Mercedes-Benz,*
  No. 99-4311(WHW), 2006 WL 2129100 (D.N.J. July 26, 2006)..............................17

*Moss Bros. Toy v. Ruiz,*
  27 Cal. App. 5th 424, 435 (2018).............................................................................25

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers,*
  795 F.3d 1124 (9th Cir. 2015) ..................................................................................21

*Nationwide Power Sols. Inc. v. Eaton Elec. Inc.,*
  No. SACV07883JVSFFMX, 2008 WL 11408997 (C.D. Cal. Oct. 10, 2008) .........16

*PNY Techs., Inc. v. SanDisk Corp.,*
  No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ...................21

*Rebel Oil Co. v. Atl. Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995)...............................................................................14, 16

*ResQNet.com, Inc. v. Lansa, Inc.,*
  594 F.3d 860 (Fed. Cir. 2010) ..................................................................................12

*Rutman Wine Co. v. E. & J. Gallo Winery,*
  829 F.2d 729 (9th Cir. 1987).....................................................................................21

*Safeway Inc. v. Abbott Labs.,*
  761 F. Supp. 2d 874 (N.D. Cal. 2011) .....................................................................14

*Sidibe v. Sutter Health*,
No. 12-CV-04854-LB, 2021 WL 879875 (N.D. Cal. Mar. 9, 2021) ........................................14

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013)...........................................................................................6, 10

*Stewart v. Gogo, Inc.*,
No. C-12-5164 EMC, 2013 WL 1501484 (N.D. Cal. Apr. 10, 2013)...............................14, 15

*Synopsys, Inc. v. ATopTech, Inc.*,
2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ...................................................................23

*Times-Picayune Pub. Co. v. United States*,
345 U.S. 594 (1953) .........................................................................................................21

*U.S. v. LSL Biotechnologies*,
379 F.3d 672 (9th Cir. 2004)..........................................................................................5, 6

*United States v. E. I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957).....................................................................................................23, 24

*United States v. Griffith*,
334 U.S. 100 (1948) .........................................................................................................21

*United States v. Singer Mfg.*,
374 U.S. 174 (1963) .........................................................................................................19

*In re Webkinz Antitrust Litig.*,
695 F. Supp. 2d 987 (N.D. Cal. 2010) ............................................................................13

*Wilson v. News Network, Inc.*,
7 Cal. 5th 871, 892 (2019)...............................................................................................24

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)..........................................................................................8, 26

**Statutes**

Cal. Bus. & Prof. Code § 17204....................................................................................25

Clayton Act Section 7 ...........................................................................................3, 22, 23, 24

Sherman Act Section 1 ...........................................................................................2, 20, 21, 22

**Other Authorities**

2B Areeda & Hovenkamp, Antitrust Law ¶ 565(a) (5th ed. 2020) ....................................4

Hovenkamp, *Antitrust Law* ¶ 1506 ..................................................................................20

Hovenkamp, et al, *IP and Antitrust* § 4.03 (3d Ed., 2019 Supp. 2016) ....................14, 15

# I.    INTRODUCTION

Intel's Opposition brief (Dkt. 254, "Opp.") only serves to highlight the SAC's many deficiencies.  Instead of demonstrating that the Second Amended Complaint (Dkt. 236, "SAC") cures any of the prior two complaints' failings, Intel (who is now the only plaintiff in this case, *see* Dkt. 263) either (1) recycles allegations that this Court already held are deficient, or (2) argues that the SAC need not allege facts that this Court has repeatedly held are necessary.  It is thus apparent that Intel has not only failed to state an antitrust claim but is also incapable of doing so.  The Court should dismiss the SAC with prejudice and grant Defendants' Motion to Dismiss (Dkt. 244, "Mot.") for the following independent reasons.

<u>The Markets</u>.  While Intel claims that it has "narrowed" the alleged markets "based on specific functions" (Opp. at 2:16-17), this is illusory.  Intel does not dispute that these "markets" contain the <u>exact same patents as before</u>, and Intel still fails to explain how these patents are plausibly interchangeable.  For example, Intel alleges no facts showing that a patent on a suffocation prevention system is an economic substitute for a patent on an exercise monitoring system.  Moreover, it is clear from the face of the patents that many of them do not even fit within the SAC's new market descriptions.  Intel tries to dismiss the discrepancy by arguing that it has relabeled some patents as "complements," but, as the Motion demonstrated, including "substitutes" and "complements" within the same market is economic nonsense.  By including complements, Intel is improperly trying to inflate the alleged number of patents owned by Defendants in each market to support its flawed theory that Defendants have somehow aggregated a "massive" patent portfolio.  Intel's illogical markets however, fail as a matter of law.

<u>Market Power</u>.  The SAC fails to cure any of the six deficiencies that the Court identified regarding the FAC's "direct evidence" theory of market power, the "most fundamental[]" of which was the FAC's failure to allege "how many <u>other</u> substitute patents are available" in each market and whether Defendants' patents constitute the "crown jewels."  Dkt. 230 ("2nd Order") at 25:12-17.  Intel does not even attempt to show that it has cured this defect.  Instead, it argues that it does not have to, despite this Court's clear ruling to the contrary.  As to the other deficiencies, Intel repeats the same arguments that this Court already rejected.  For example, because the SAC still

has no allegations of actual royalty rates or settlement amounts, Intel again relies on the same allegedly "supracompetitive" demands that this Court held have "limited[] probative value" because they are "simply demands." 2nd Order at 26:10-11. Intel also complains that facts regarding royalties and settlements are within Defendants' exclusive control even though the Court has held that this excuse did not relieve Plaintiffs of their pleading burdens. *Id.* at 24:15-18. In short, the Court has heard this all before, and Intel's flawed arguments fare no better this time.

Antitrust Injury. The Opposition erroneously asserts that "[t]he Court already determined that Plaintiffs' allegations are sufficient to plead antitrust injury." Opp. at 33:12-13 (citing Dkt. 190 ("1st Order") at 20). The Court held the opposite. 1st Order at 21:2-6 ("Thus, as presently pled, Plaintiffs' complaint is deficient in alleging antitrust injury"). Specifically, the Court held that Plaintiffs' allegations of antitrust injury were "deficient" because they had not alleged (1) that they had ever purchased a license from Defendants or intended to do so or (2) that the litigation costs that they had incurred were caused by Defendants' alleged aggregation of patents. The SAC suffers from the same defects. Intel still has not alleged that it has purchased a license or is likely to in the future, and it still fails to allege that Defendants have eliminated all, most, or even an important subset of the substitutes available in each market. Thus, the requisite causal connection between Defendants' alleged "aggregation" scheme and Intel's litigation costs is still missing.

Section 1. Instead of showing that the SAC has cured any of the deficiencies with the FAC's Sherman Act Section 1 allegations, the Opposition again argues that this Court got it wrong. Specifically, Intel argues that it need not allege that "each defendant intended to harm competition." Opp. at 35:15-16. But this flatly contradicts this Court's order (2nd Order at 27 n.10) and settled Ninth Circuit precedent. It also contradicts Intel's own theory, which Intel now "clarifies" is that "each 'PAE knew Fortress would aggregate the PAE's patents with another PAE's patents in the same market,'" (Opp. at 33:25-27 (quoting 2nd Order at 11 n.6)), or in other words, that "each of the Defendants entered into separate agreements with Fortress with a common objective with Fortress to eliminate competition." Opp. at 34:1-3 (emphasis added). Even setting this inconsistency aside, Intel's assertion remains as conclusory as ever. Intel continues to rely solely on the bilateral commercial agreements that this Court has already agreed

are "consistent with 'rational, legal business behavior,'" 1st Order at 28:23-24, and the SAC still contains no evidentiary facts demonstrating that Fortress and any other Defendant had a "common objective" to aggregate patents or do anything anticompetitive.

Section 7. As the Motion demonstrated, the essence of a Clayton Act Section 7 violation is that the acquisition at issue has given the defendant an <u>undue percentage</u> share of the market. The Opposition, however, does not dispute that the SAC contains no allegations regarding Defendants' alleged market share at all or market concentration. The Opposition cites no authority holding that a plaintiff can escape its burden of pleading the basic elements of a Section 7 claim by relying on a direct evidence theory (particularly when that theory, too, is pled in conclusory fashion). Intel also does not dispute that, for many of the alleged markets, there has been no alleged aggregation since all of the supposedly aggregated patents were previously owned by the same entity.

UCL. Finally, Intel's California UCL claim, which is predicated on the same flawed allegations as its federal claims, must be stricken because it necessarily arises from protected activity under the anti-SLAPP law. The Motion cited on-point California authority holding that where, as here, the plaintiff would not have suffered damages absent the defendants' protected petitioning conduct, the "arising from" prong of the anti-SLAPP test is satisfied. The Opposition just ignores this authority. Accordingly, Defendants are statutorily entitled to attorneys' fees.

## II. INTEL'S REDEFINED MARKETS ARE STILL NOT PLAUSIBLY STATED

Intel claims it has cured the "facially overbroad" (2nd Order at 17:4-19:14) markets that this Court previously dismissed by redefining them "based on specific functions within technical fields" (Opp. at 2:15-17). But these redefined markets remain non-cognizable for several reasons.

First, Intel still fails to allege that the purported "substitutes" within the redefined markets are economically interchangeable. As the Motion demonstrated, these supposedly "narrower" markets still contain patents that on their face relate to different technologies and functionalities. Mot. at 10:5-13:18. For example, Intel does not explain why consumers would treat a patent covering a "suffocation prevention system" as interchangeable with one covering an "exercise monitoring system." *Id.* at 10:20-23. Intel also does not explain why consumers would treat a patent directed at establishing virtual cellular networks as a substitute for a patent focused on

allowing multiple phones to connect to a "hands free car kit" via Bluetooth or Wi-Fi. *Id*. at 11:17-23. These are just some of the Motion's examples that Intel ignores. *See also id*. at 12:1-13:18.

Intel objects that Defendants' arguments rely on "facts outside the SAC," Opp. at 15:19-20, but they do not. Defendants are not asking this Court to make any factual findings or inferences. Defendants' Motion simply relied on Intel's <u>own description</u> of the patents and the plain text of the patents themselves, neither of which are "outside the SAC," to highlight the conclusory nature and implausibility of Intel's allegations that the patents are interchangeable. *See* Mot. at 13:2-8. Indeed, Intel does not dispute that the patents are incorporated by reference into the SAC (in addition to being a proper subject of judicial notice). *See GeoVector Corp. v. Samsung Elecs. Co.*, 234 F. Supp. 3d 1009, 1016 n.2 (N.D. Cal. 2017); RJN at 1:11-25, 5:18-24. Regardless, it is Intel's burden to plead facts plausibly demonstrating that the alleged patents in each market are economically interchangeable. It has failed to do so.

Second, Intel's alleged markets are also non-cognizable because they expressly contain both "substitutes" and "complements" even though "[g]rouping complementary goods into the same market is economic nonsense." Mot. at 14:19-15:2 (quoting 2B Areeda & Hovenkamp, Antitrust Law ¶ 565(a) (5th ed. 2020)). Indeed, instead of "narrowing" the alleged markets in any meaningful sense, all Intel has done is relabel some of the patents as "complements" instead of "substitutes" while continuing to insist that these "complement" patents are still part of the alleged "market." Opp. at 15:7-18 (explaining that the alleged "substitutes" "include only those that address the more narrowly-defined functionality" whereas the other patents have been reclassified as "complements.").[1] This allows Intel to artificially inflate the number of patents that Defendants have supposedly aggregated in each market. To take just two examples, while Intel alleges Defendants have aggregated seven patents in the "Preventing Stalls for Cache Misses" market, only two of these patents are alleged "substitutes" (one of which is expired). Mot. at 23:8-11.

---

[1] *Compare* FAC ¶ 180, *with* SAC ¶¶ 225-29, *and* SAC Ex. A at 4-5 (swapping the '999 and '877 patents from substitutes to complements); *compare* FAC ¶ 213, *with* SAC ¶¶ 255-57, *and* SAC Ex. A at 6 (doing the same for the '641 patent); *compare* FAC ¶ 236, *with* SAC ¶¶ 285, 290-91, *and* SAC Ex. A at 8 (doing the same for the '850 patent); *compare* FAC ¶ 252, *with* SAC ¶¶ 320, 337-40, *and* SAC Ex. A at 11 (doing the same for the '033 and '532 patents).

1    Similarly, only three of the eight patents in the alleged "Generating Alerts Based on Blood

2 Oxygen Level" market are supposedly substitutes (all of which have expired), and the remaining

3 five patents do not even mention the word "oxygen" at all.  Mot. at 10:6-11.

4       In other words, Intel is trying to have it both ways.  It claims to have "narrowed" each

5 market definition to a specific technological function while also including "complementary"

6 patents that do not fit the supposedly narrower definition.  This renders the markets legally non-

7 cognizable.  As this Court explained, "[t]he outer boundaries of a product market are determined

8 by the reasonable interchangeability of use or the cross-elasticity of demand between the product

9 itself and substitutes for it."  *Id.* at 10:11-15 (quoting 2nd Order at 15:27-16:1).  Complementary

10 goods, like car engines and radiators for example, are "not reasonably interchangeable for the

11 same purpose," nor would they exhibit cross-elasticity of demand.  *Id*. at 14:19-15:2 (quoting

12 *Golden Gate Pharm. v. Pfizer*, 433 F. App'x 598, 598-99 (9th Cir. 2011)).[2]

13       Finally, Intel's redefined markets are non-cognizable because it has still failed to address

14 what other substitutes are in these "markets," even though it is required to do so.  Mot. at 13:19-

15 14:9 (citing cases).  For example, Intel does not dispute there are at least 219 patents relating to

16 prevention of cache stalls, yet it only identifies two alleged substitutes within the so-called

17 "Preventing Stalls for Cache Misses" market.  *Id.* at 13:24-14:1.  It is thus unclear from the SAC

18 what other patents are included in this market and on what basis.  This is especially true once one

19 adds the potentially countless "complements" that could be included in each market.  The SAC

20 alleges no facts showing which complements are included and why.  As such, the redefined

21 markets are not cognizable because their contours are impossible to discern.  Mot. at 14:1-9.

22       Intel nonetheless argues that its alleged market definitions are sufficient to "put Defendants

23 on notice of the allegations against them, and the relevant markets in which anticompetitive effects

24 occur."  Opp. at 14:4-9 (citing *United States v. LSL Biotechnologies*, 379 F.3d 672, 699 (9th Cir.

25

26 [2] Notably, Intel itself cannot seem to keep straight which patents are supposedly complements
versus substitutes.  For example, according to Intel, the SAC "alleg[es] in detail how '983, '687
27 and '850 patents are substitutes," Opp. at 16:8-9, yet the '850 patent was supposedly re-
categorized as a complement patent in the SAC.  *Compare* FAC ¶ 236, *with* SAC ¶¶ 285, 290-91,
*and* SAC Ex. A at 8.  Additionally, the '648 Patent is sometimes claimed as a substitute patent and
28 sometimes as a complement patent.  *Compare* SAC ¶¶ 426-27, *with* SAC Ex. A at 16.

1  2004)).  But Intel's reliance on *LSL Biotechnologies* is highly misleading.  To begin with, Intel is

2  relying on the <u>dissent</u> in that case.  *See LSL Biotechnologies*, 379 F.3d at 699 (<u>Aldisert, J.,</u>

3  <u>dissenting</u>).  This is not the first time it has cited the dissent from *LSL Biotechnologies* without

4  acknowledging it.  *See* Dkt. 216 at 1 (Plaintiffs' Notice of Errata).  Even worse, the dissent in *LSL*

5  *Biotechnologies* was applying the standard from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957),

6  which the Supreme Court "specifically abrogated" in *Twombly*.  *See Somers v. Apple, Inc.,* 729

7  F.3d 953, 959 (9th Cir. 2013).  After *Twombly*, "[t]o survive a motion to dismiss, a complaint must

8  contain sufficient factual matter, accepted as true, 'to state a claim to relief that is <u>plausible on its</u>

9  <u>face</u>.'"  *Id.* (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Indeed, Intel

10  repeatedly invokes the abrogated *Conley* standard throughout its brief.  Opp. at 12:17-23, 14:2-9,

11  26:26-27:9.[3]  Regardless, the SAC fails to give Defendants "notice" of the alleged markets

12  because, as explained above, the boundaries of these "markets" are entirely unclear.

13  **III.    INTEL FAILS TO ALLEGE FACTS SHOWING MARKET POWER**

14          As the Motion demonstrated, Intel's direct evidence theory of market power fails because

15  (1) Intel has not cured any of the six deficiencies the Court previously identified, and (2) Intel has

16  not alleged facts showing reduced output.  Nothing in the Opposition demonstrates otherwise.

17          **A.    Intel Fails To Allege Facts Showing Aggregation Of "Crown Jewel" Patents**

18          Instead of arguing that the SAC has added any of the necessary factual allegations that this

19  Court held were missing from both the Complaint and FAC, Intel argues that these allegations are

20  not required.  Most notably, Intel admits that, despite this Court's repeated instructions, Intel has

21  not alleged any facts showing that "the aggregated patents in the relevant markets 'represent the

22  'crown jewels' of the field'" as opposed to "just a small portion of a large field of substitutes."

23  Opp. at 26:17-19 (quoting 2nd Order at 25:12-16); *see also* 1st Order at 16:7-11, 17:5-6.  Intel

24  protests that, "under notice pleading, [it is] <u>not</u> required to allege" such facts because its

25  allegations of "supracompetitive royalties <u>themselves</u>" constitute sufficient evidence of

26  anticompetitive effects.  Opp. at 26:26-27:16 (citing, *inter alia*, the dissent in *LSL*

27  ───────────────────

28  [3] Intel relies on the same misleading passage from *LSL Biotechnologies* <u>three times</u> in the
Opposition.  *See* Opp. at 12:20-23, 14:6-9, 27:6-9.

1 | *Biotechnologies*, 379 F.3d at 699).

2 | But this Court already considered and rejected these <u>exact arguments</u>.  *See* Mot. at 29 n.25.

3 | As the Court previously explained, the allegations of supracompetitive prices (which are

4 | conclusory in any event as explained further below) are insufficient because, even under a "direct

5 | evidence" theory, Intel "must still show that the supracompetitive pricing <u>is due to the aggregation</u>

6 | <u>of patent substitutes</u>."  2nd Order at 25, n.8 (emphasis added).  Intel cannot make such a showing

7 | absent any allegations regarding "the number of patents Defendants hold" relative to the market as

8 | a whole or the "'quality' of those patents."  *Id.*; *see also* Mot. at 24:6-12.

9 | Intel relies on *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38 (D. Mass.

10 | 2020), but there, the defendant/counter-claimant <u>did</u> allege that the plaintiff's patents constituted

11 | the crown jewels because "there [were] no reasonable substitutes" in light of the fact that the

12 | "available technological alternatives [were] inferior."  *Id.* at 56-57.  This is the exact allegation

13 | that this Court has repeatedly held is missing here.  *See* 2nd Order at 25:12-16 ("The Court has no

14 | idea whether these five patents represent the "crown jewels" of the field or just a small portion of a

15 | large field of substitutes."); 1st Order at 16:7-11 ("Plaintiffs do not give any concrete example

16 | where Fortress and its PAEs have aggregated patents on a specific technology such that an alleged

17 | infringer is essentially deprived of substitutes.").  In contrast to *Bio-Rad*, the SAC expressly

18 | admits that each of the "markets" contain patents held by other entities besides Defendants.  Mot.

19 | at 24 n.19 (citing SAC ¶¶ 149, 185, 213, 249, 284, 304, 358, 391, and 415).  And Intel does not

20 | dispute that Defendants, at best, only own a small fraction of the potential number of patents

21 | within these "markets" given their broad scope.  *See* Mot. at 13:24-14:1; *id.* at 24:13-21.

22 | Finally, Intel argues that "the <u>size</u> of Defendants' demands show that Defendants regard

23 | [their] patents as particularly important."  Opp. at 28:5-11.  The Motion, however, cited multiple

24 | authorities (which the Opposition ignores) holding that a defendant's <u>claims</u> about the strength of

25 | its patents cannot establish market power.  Mot. at 25:1-10.  Rather, Intel must allege <u>facts</u>

26 | showing that Defendants have aggregated patents of such importance that there are no meaningful

27 | alternatives available.  *Id.*  Intel has not—and indeed cannot—allege this because it is arguing the

28 | exact opposite in the underlying patent litigations—that VLSI's patents are worthless and that

█████████████████████. Mot. at 25:11-24. In sum, the SAC does not allege any new facts to address what this Court has repeatedly held is a core deficiency. Instead, it is essentially just an "improper request[] for reconsideration" that has no merit in any event. *Gray v. Ocwen Mortg. Servicing, Inc.*, No. 18-CV-01864-JD, 2020 WL 1503688, at *1 (N.D. Cal. Mar. 30, 2020) (granting dismissal with prejudice), *aff'd*, 840 F. App'x 185 (9th Cir. 2021).[4]

## B. Intel Fails To Cure The Other Five Deficiencies Identified By The Court

Beyond the above pleading problems, the SAC also fails to cure any of the five other deficiencies the Court identified with respect to Intel's direct evidence theory.

***First, Intel's allegations of "supracompetitive royalties" are conclusory.*** Intel attempts to deflect from the fact that it still has not identified a single royalty or settlement that anyone has ever paid to license Defendants' patents (2nd Order at 22:11-18) by citing the alleged (and, in any case, unremarkable) revenue of just one Defendant ("Uniloc Luxembourg") of $22 million over a two-year period. Opp. at 18:1-13. Crucially, the SAC does not allege that Uniloc Luxembourg has ever sued Intel or even approached it about licensing. SAC ¶¶ 103-120. Moreover, Intel does not dispute that it presented these alleged figures to the Court in connection with the motion to dismiss the FAC, Mot. at 16:11-13 (citing Dkt. 223), nor does it explain how these same figures and argument warrant a different result now. As the Motion demonstrated, the SAC fails to allege what portion (if any) of these total revenues were attributable to the patents at issue. *Id.* at 16:15-21. The SAC also fails to compare these alleged revenues to Uniloc Luxembourg's <u>pre-aggregation</u> earnings or account for its <u>costs</u>, both of which are needed to determine whether these revenues were somehow "supracompetitive." *Id.* at 16:21-17:4. Intel just ignores these problems.

Intel also argues (as it has before) that it should not be required to identify actual royalty rates or settlement amounts because this information is "in the hands of Defendants." Opp. at 19:16-18. But this Court has already held that Intel's inability to access this information does not

---

[4] *See also Loos v. Immersion Corp.*, 762 F.3d 880, 890–91 (9th Cir. 2014) (affirming dismissal with prejudice where the "district court gave Plaintiff a detailed explanation of why his original theory [] was deficient" but Plaintiff "essentially re-pled the same facts and legal theories.") (citation omitted); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (Plaintiffs' "fail[ure] to correct these deficiencies in its Second Amended Complaint is 'a strong indication that the plaintiffs have no additional facts to plead.'") (citation omitted).

"exempt [it] from the specificity requirements of *Twombly* and *Iqbal*." 2nd Order at 24:15-18. Citing no authority, Intel asks the Court to draw a negative inference from Defendants' successful opposition to Intel's attempt to unseal certain information in the underlying infringement cases despite the fact that two of the presiding judges concluded that this information was <u>irrelevant</u> to the antitrust claims. Mot. at 21:15-20.[5] Moreover, the only information that Intel has succeeded in unsealing (Opp. at 21:5-8) is another irrelevant damages demand—not an actual royalty rate or settlement amount. SAC ¶ 274. The Court should thus reject Intel's speculation that unidentified sealed records in other cases would somehow resuscitate the legally deficient claims in this case.

*Second, non-assertion by prior owners is irrelevant.* According to Intel, the SAC now explains how the failure of the prior owners demonstrates that these patents had little value prior to aggregation. Opp. at 21:26-22:17. But Intel does not dispute that it is bound by its prior allegation that these prior owners faced "competitive constraints" that Defendants allegedly do not. Mot. at 17:5-18:14; 2nd Order at 24:21-23 (citing FAC ¶ 49). These include, for example, the risk that patent assertion could endanger "prospects for future sales," "jeopardize[]" access to "essential components," prevent participation in "industry initiatives," or provoke countersuits from behemoths like Apple and Intel. FAC ¶ 49; 2nd Order at 2:25-3:11.

Moreover, the Opposition also ignores the numerous other "obvious alternative explanations" for why a patent owner might choose to assert a patent when the prior owner did not (especially when those prior owners were huge technology companies with tens of thousands of patents, very few of which they have ever enforced). Mot. at 18:3-14. To take just two examples, the patents may have fallen outside the prior owner's core area of business, or subsequent technical developments may have made the patents more valuable. *Id.* (listing obvious alternative explanations). Intel claims that such "alternative explanations" are not relevant at the motion to dismiss stage, Opp. at 23:26-24:2, but the Ninth Circuit has repeatedly held otherwise. *See, e.g.*, *Somers,* 729 F.3d at 965 (affirming dismissal of antitrust claim where there were "'obvious alternative explanation[s]' for [Apple's] music pricing"); *In re Century Aluminum Co. Sec. Litig.*,

---

[5] Also, the mere fact that the other judges did not reach the issue of relevance does not somehow support Intel's request for an adverse inference. Opp. at 20:19-22.

729 F.3d 1104, 1108 (9th Cir. 2013) ("[P]laintiffs cannot offer allegations that are 'merely consistent with' their favored explanation. . . . Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true.") (citing *Iqbal* and *Twombly*). Given these alternative explanations, Intel's allegations are nothing more than pure speculation.

*Third, what prior owners charged for different patents is irrelevant.* As the Motion demonstrated, the SAC continues to rely on many of the same apples-to-oranges comparisons between Defendants' alleged damages demands and what other patent holders have charged for <u>different</u> patents. Mot. at 18:15-19:11. Intel attempts to deflect from this by pointing to the SAC's supposedly "new" allegations regarding the value (or lack thereof) that prior owners placed on purported "substitute or complementary patents." Opp. at 24:4-11. But these allegations fare no better. As noted above, complements are wholly irrelevant because there is no reason to expect complementary products (such as different auto parts) to have the same or similar prices. Mot. at 14:17-15:5. Similarly, as noted above, the SAC fails to allege that any of the alleged "substitutes" are <u>economically</u> interchangeable or that they exhibit cross-elasticity of demand. *Id.* at 10:11-11:7. More fundamentally, Intel continues to ignore the Ninth Circuit's admonition that courts should not infer that royalties are "anticompetitive" just because they are not "in line with the rates other companies charge for their own patent portfolios." *FTC v. Qualcomm Inc.,* 969 F.3d 974, 999 (9th Cir. 2020). That is exactly what Intel is asking this Court to do.

*Fourth, damages demands have little probative value.* The SAC fails to allege facts showing that Defendants' "demands" are anything more than "of limited probative value," as this Court previously ruled. 2nd Order at 25:3-6. A litigation "demand" is not a market price. Intel (like the SAC) ignores that enforcing patents entails huge risks and costs. Mot. at 20:2-5. Patent holders must spend significant resources litigating their claims and risk recovering nothing if they lose. It thus makes no sense to allege that a litigation demand is direct evidence of market power.[6]

---

[6] The sole authority that Intel cites for its position is an FTC order. Opp. at 18:14-21 (quoting *In re Union Oil Co. of Calif.,* 138 F.T.C. 1 (July 7, 2004)). But the actual quote appears to come from a single paragraph of a more than 500-page <u>proposed</u> order filed by Complaint's Counsel in that case. *See In re Union Oil Co. of Calif.,* 2005 WL 906396, at *282 (F.T.C. Mar. 9, 2005). There is no indication the FTC ever entered this order, and, even if it had, it would not bind this court. *See Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.,* No. CV 15-634-SLR-

Intel repeats its allegation that "damages demands 'reflect the patent holder's good faith valuation of its patent in the market.'" Opp. at 25:4-9 (citing SAC ¶ 11). But Intel cannot plausibly allege that these demands reflect the true market price of the patents given Intel's flatly contradictory contention—both in the SAC and in the underlying patent litigations—that Defendants' patents are "weak" and their infringement claims are "meritless."[7] Mot. at 3:27-4:3, 19:23-26. Moreover, as noted above, what Defendants claim about the value of their patents is irrelevant for purposes of a market power analysis. Intel points to the jury award that VLSI recently obtained against Intel as "a prime example of the relationship between a litigation demand and an award of reasonable royalties." Opp. at 25:15-20. But as the Motion demonstrated, and the Opposition ignores, the SAC does not allege that the patents at issue in that case were part of Defendants' alleged "aggregation" scheme. Mot. at 22:5-14. Thus, this verdict just shows that the inference that Intel is asking the Court to draw—*i.e.*, that Defendants' large damages demands can only be explained by "aggregation"—does not follow. *Id.* at 22:12-21.

Finally, even if damages demands in litigation had any relevance (and they do not), the SAC's characterization of Defendants' damages demands are misleading. Intel does not dispute that, like the FAC, the SAC still relies on many of the same flawed comparisons between a "demand made for one group of patents with a later demand made for a different group of patents." Mot. at 20:8-11 (quoting 2nd Order at 26:11-14). ███████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████.

---

SRF, 2017 WL 750700, at *7 (D. Del. Feb. 27, 2017), *recommendation adopted*, 2017 WL 1055958 (D. Del. Mar. 20, 2017).

[7] Intel argues that there is no contradiction because the Court has "already rejected the argument" that aggregating "weak patents" cannot harm competition. Opp. at 22:9-16. But the issue is not whether aggregating "weak" patents is anticompetitive as a general matter. It is whether Intel's allegation that Defendants' patents are "weak" contradicts Intel's allegation that Defendants' damages demands reflect the true market value of the patents, which it plainly does.

1          ***Fifth, there is no alleged connection between alleged supracompetitive prices and***

2  ***aggregation.***  Finally, the SAC still does not plausibly allege that Defendants' alleged damages

3  demands have anything to do with aggregation.  As repeatedly noted, the damages in each of the

4  underlying infringement cases will be determined solely by the patents-in-suit.  Mot. at 22:2-14.

5  There is no way for any Defendant to leverage patents held by a third party (or its own patents that

6  are not at issue) to seek higher damages.  *Id.*  Intel does not attempt to argue otherwise.  Indeed, its

7  own proffered authority explains that "[a]ny evidence <u>unrelated to the claimed invention</u> does not

8  support compensation for infringement."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869

9  (Fed. Cir. 2010) (emphasis added).  In short, the basic premise of Intel's theory is illogical.

10          Beyond that, Intel does not dispute that the alleged aggregation in this case is minimal.  As

11  the Motion pointed out, for several of the markets, the alleged aggregation consists of the

12  acquisition of a <u>single substitute patent</u>.  Mot. at 22:22-23:6.  For others, Defendants allegedly

13  control just <u>two</u> substitute patents total, one of which has now expired.  *Id.* at 23:7-12.  Finally, as

14  to VLSI (which is the only Defendant who is alleged to have ever sued Intel), there has been no

15  aggregation at all because VLSI allegedly acquired all of its patents from a single entity, which

16  shows that, if anything, there has been <u>disaggregation</u>.  *Id.* at 23:13-17.

17          The Opposition largely ignores all of this.  Instead, Intel focuses solely on the Network-

18  based Voice Messaging "market," Opp. at 25:21-26:4, which purportedly includes patents from

19  Uniloc 2017, Seven Networks, and INVT—none of which are alleged to have sued or threatened

20  <u>Intel, the sole remaining plaintiff in this case</u>.  Regardless, Intel claims that the addition of a single

21  substitute (the '252 patent) in this "market" gave Defendants market power as demonstrated by the

22  fact that the prior owner never asserted this patent.  But that inference is not plausible for all of the

23  reasons explained above, and it is especially implausible given that Intel does not dispute that a

24  simple word search for patents reading on "Network-based Voice-Messaging" reveals that 1,639

25  patents have issued since 2000 with claims that fit this description.  Mot. at 24:13-21 (citing RJN

26  at 5).  Intel also highlights the alleged acquisition of the '579 patent in this "market," Opp. at 26:4-

27  6, but that patent is an alleged "complement" (not a "substitute"), SAC Ex. A at 2, so it could not

28  give rise to market power.  Moreover, Intel's myopic focus on the Network-based Voice

Messaging market ignores that the alleged aggregation in the other "markets" is similarly minimal. The Court used the Network-based Voice Messaging market as a "representative example" of the failings of the problems with the FAC's alleged markets. 2nd Order at 23:6-8, 25:18. As the Motion demonstrated, these same problems infect the SAC's other alleged markets as well.

## C. Intel Fails To Allege Facts Of Reduced Output

Intel already conceded that its allegations of "reduced output" are conclusory, and the SAC's allegations are the same as the FAC's allegations. Dkt. 228 at 55:2-7 (Court: "Is there an assertion here of an actual output diminution?" Intel: "Your Honor, I think the focus of the specific allegations of anti-competitive effect are the supracompetitive royalties and supracompetitive royalty demands. We do say that it reduces output, but we haven't given you specific examples of the reduced output.").[8] But conclusory allegations of "reduced output" fail as a matter of law. *See* Mot. at 26:2-8 (citing *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 996, n.1 (N.D. Cal. 2010); *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1193-96 (S.D. Cal. 2002)). Having alleged no facts of "reduced output," Intel instead argues that such allegations are not required to plead a direct evidence theory (never explaining why, if they are not necessary, the SAC includes conclusory allegations of reduced output in the first place). Opp. at 28:12-13; SAC ¶¶ 9, 15, 44, 52, 162, 195, 232, 262, 293, 341, 374, 403, 431, 443-44, 448. As the Motion demonstrated, however, this flatly contradicts Ninth Circuit precedent. Mot. at 26:12-21 (citing *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997), *aff'd*, 525 U.S. 299 (1999), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012)). While Intel argues that this binding precedent somehow does not apply, none of its arguments are availing.

First, Intel argues that *Forsyth* was somehow overturned by (1) a Northern District of California case that the Ninth Circuit subsequently reversed on appeal and (2) an out-of-circuit case from the District of Connecticut. Opp. at 28:12-19 (citing *In re Abbott Labs. Norvir Anti-Tr. Litig.*, 562 F. Supp. 2d 1080, 1085–86 (N.D. Cal. 2008), *rev'd sub nom. John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009) and *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246

---

[8] *Compare* FAC ¶¶ 9-10, 40, 47, 141, 165, 198, 225, 243, 280, 307, 332, 354, 431, 435, *with* SAC ¶¶ 9, 15, 44, 52, 162, 195, 232, 262, 293, 341, 374, 403, 431, 443-44, 448.

(D. Conn. 2015)).  Neither of these cases could have overruled binding Ninth Circuit law.  Intel also ignores the many other cases from courts in this Circuit and throughout the country requiring allegations of reduced output.  *See* Mot. at 26:12-27:6; n.22-23.[9]  These include a decision of this Court as well as a case <u>decided just a few months ago</u>, *i.e.*, well after Intel's proffered authorities.

Second, Intel misrepresents the holding of *Forsyth*.  On Intel's telling, the direct evidence theory in *Forsyth* failed due to an insufficient showing of supracompetitive pricing.  Opp. at 28:23-26.  The Ninth Circuit's opinion, however, makes clear that the plaintiffs had demonstrated inflated prices.  They had not, however, shown reduced output.  *Forsyth*, 114 F.3d at 1476 ("With no accompanying showing of restricted output, however, the plaintiffs have failed to present direct evidence of market power.").  Intel also argues that *Forsyth* involved a motion for summary judgment, but the Motion cited many cases dismissing antitrust complaints predicated on a direct evidence theory for failure to allege reduced output.[10]  Mot. at 26:12-27:6; n.22-23.

Third, Intel asks this Court to create a new exception to the reduced output pleading requirement for "patents and patent markets."  Opp. at 29:5-6.  Intel's sole authority for this argument—the Hovenkamp IP treatise—expressly acknowledges that the Ninth Circuit "requires evidence of reduced output" to show "monopoly power through direct evidence."  Hovenkamp, et al., *IP and Antitrust* § 4.03 (3d Ed., 2019 Supp. 2016) (citing *Forsyth*).  In addition, Intel's reasoning is flawed.  Intel claims that reduced output is irrelevant in the patent context because "increased price cannot be accompanied by increased quality."  Opp. at 29:5-19.  This is wrong.  For example, subsequent technological developments could make a patent more valuable than it was before, *see* Dkt. 184 at 17:24-18:1, meaning more individuals would seek to license the patent

---

[9] Citing, in addition to *Forsyth*:  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011); *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 898 (N.D. Cal. 2012) (Chen, J.), *order vacated on other grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012); *Dominick v. Collectors Universe, Inc.*, No. 2:12-CV-04782-ODW, 2012 WL 6618616, at *4 (C.D. Cal. Dec. 18, 2012); *Stewart v. Gogo, Inc.*, No. C-12-5164 EMC, 2013 WL 1501484, at *4 n.3 (N.D. Cal. Apr. 10, 2013); *Humana Inc. v. Mallinckrodt ARD LLC*, No. CV1906926DSFMRW, 2020 WL 3041309, at *6 (C.D. Cal. Mar. 9, 2020); *Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2021 WL 879875, at *8 (N.D. Cal. Mar. 9, 2021); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021).

[10] *See Dominick*, 2012 WL 6618616, at *4; *Stewart,* 2013 WL 1501484, at *4 n.3; *Humana*, 2020 WL 3041309, at *6.

1  and its price would increase accordingly. In other words, there would be an increase in price, but

2  <u>not</u> an accompanying decrease in output. That is why allegations of reduced output are essential

3  even in the patent context—to show that the price increase is due to anticompetitive conduct, not

4  the inherent value of the patent. *See, e.g.*, *Intellectual Ventures I LLC v. Cap. One Fin. Corp.,* No.

5  1:13-cv-00740, 2013 WL 6682981, at *6 (E.D. Va. Dec. 18, 2013) (requiring allegations of both

6  "supracompetitive prices and restricted output" in the context of a patent market).

7  Finally, Intel argues that it has adequately alleged a reduction of output. But this Court

8  held that the FAC's allegations of reduced output "were largely conclusory," Mot. at 25:26-26:2

9  (quoting 2nd Order at 23 n.7), and the SAC relies on the exact same conclusory allegations, *see*

10  *supra* n.8. Intel points to three paragraphs specifically: SAC ¶¶ 443, 451-52. Opp. at 29:22-30:6.

11  One of these is plucked directly from the failed FAC verbatim. *Compare* SAC ¶ 443, *with* FAC

12  ¶ 430. The other two repeat the same allegation from the FAC that Defendants' enforcement

13  efforts have supposedly drained resources that Intel otherwise would have spent on "innovation."

14  *Compare* SAC ¶¶ 451-52, *with* FAC ¶ 436. These allegations are not only conclusory, they also

15  have nothing to do with reduced output. To plead reduced output, a plaintiff must allege that the

16  defendant has "restrict[ed] its <u>own</u> output," not that the defendant has caused <u>other</u> companies to

17  reduce their output. *Church*, 868 F. Supp. 2d at 896–97 (quoting *Rebel Oil*, 51 F.3d at 1434); *see*

18  *also Dominick*, 2012 WL 6618616, at *4; *Nationwide Power Sols. Inc. v. Eaton Elec. Inc.*, No.

19  SACV07883JVSFFMX, 2008 WL 11408997, at *8 (C.D. Cal. Oct. 10, 2008).[11] Intel's conclusory

20  allegations of decreased output accordingly fail as a matter of law.

21  **IV.  INTEL HAS NOT SUFFERED AN ANTITRUST INJURY**

22  As noted above, the Opposition wrongly claims that "[t]he Court already determined that

23  Plaintiffs' allegations are sufficient to plead antitrust injury." Opp. at 33:12-13 (citing 1st Order at

24  20). This is false. 1st Order at 21:2-6 ("Plaintiffs' complaint is deficient in alleging antitrust

25  injury."). As the Court explained, "Plaintiffs have not clearly alleged with sufficient specificity

26  that Defendants' aggregation has in fact eliminated substitutes [] which has <u>actually impacted</u>

---

27

28  [11] As the Motion pointed out, if anything, the SAC has alleged that output has actually <u>increased</u> post-aggregation. Mot. at 26 n.21. The Opposition fails to address this.

1  Plaintiffs." *Id.* at 20:25-21:2 (emphasis added). The SAC suffers from this same defect. Mot. at

2  28:5-31:1.

3      First, to the extent Intel's alleged injury consists of supposed "supracompetitive royalties,"

4  Opp. at 31:5-32:14, Intel does not dispute there is no allegation that it has ever paid any royalties

5  to any Defendant ("supracompetitive" or otherwise). Intel states that "Plaintiffs have 'engaged in

6  licensing negotiations' with Defendants," *id.* at 31:9-13 (citing SAC ¶¶ 128, 130), but the only

7  "negotiations" alleged in the SAC occurred between Inventergy, INVT, and Apple, who is no

8  longer a plaintiff in this case. SAC ¶¶ 128, 130. There are no allegations that Intel has been

9  involved in any licensing negotiations with any Defendant, let alone any that would be likely to

10 result in a deal.[12]

11     Second, to the extent Intel's alleged injury consists of the litigation costs that it has

12 incurred defending against VLSI's infringement suits, Opp. at 32:16-33:21, Intel still has not

13 sufficiently alleged "that those lawsuits came about because of the elimination of substitutes." 1st

14 Order at 21:2-6. Intel claims that it faces a "Hobson's choice: pay supracompetitive royalties or

15 litigate." Opp. at 31:14-15. As noted above, however, the SAC still fails to allege that Intel has

16 been "essentially deprived of substitutes" in any of the alleged markets, 1st Order at 16:7-11, or

17 that Defendants' patents constitute the "crown jewels" of any alleged market, 2nd Order at 25:14-

18 17. Intel cannot plausibly allege that it faces a "Hobson's choice" if there are other alternative

19 patented or non-patented technologies available to it ████████████████████████████

20 ██████████████████████████. Mot. at 25:11-24. The Motion cited law holding

21 that there can be no antitrust injury where a plaintiff fails to allege a lack of alternatives in the

22 market, but Intel ignores this fatal problem with the SAC. *See* Mot. at 29:7-30:9 (citing cases).

23     Intel claims that the SAC added "new" allegations "directly link[ing] Defendants' patent

24

25 ────────────────
[12] All of Intel's cases involved plaintiffs that had actually purchased from defendants. *See* Opp. at
26 31:14-26; *Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 499 (9th Cir.
   2010) (organizational plaintiff composed of website owners who had purchased domain names
27 from defendant); *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 783 (9th Cir. 1996) (plaintiffs
   purchased advertising space from defendants); *In re Mercedes-Benz*, No. 99-4311(WHW), 2006
28 WL 2129100, at *21 (D.N.J. July 26, 2006) (class action lawsuit brought against Mercedes-Benz
   by Mercedes-Benz owners). Consequently, these cases have no relevance here.

1    aggregation scheme to the injuries that Plaintiffs have suffered in the form of litigation costs."

2    Opp. at 32:26-33:1 (citing SAC ¶¶ 149, 173, 204, 231, 245, 287, 312, 334, 356).  But none of the

3    cited paragraphs say anything about "litigation costs," and it appears that these citations refer to

4    the FAC instead.[13]  These allegations are thus in no sense "new," nor does Intel explain how they

5    cure any of the numerous deficiencies with the injury allegations that the Motion identified.

6          Finally, Intel also accuses Defendants of "conflat[ing] the issue of injury with the separate

7    issue of whether Defendants have violated the antitrust laws in the first place."  Opp. at 32:1-2.

8    This is wrong.  Even if Defendants had violated antitrust laws by aggregating substitute patents,

9    which they have not, Intel must allege that it has "actually [been] impacted" by such aggregation.

10   1st Order at 20:25-21:2.  For the reasons explained above and in the Motion, Intel has not.[14]

11         Moreover, Intel cannot plausibly allege that the costs it has incurred in its litigation against

12   VLSI are somehow attributable to aggregation of substitute patents since the SAC does not allege

13   that VLSI (which is the only entity that has ever sued Intel) has ever aggregated any patents.  As

14   the Motion pointed out and the Opposition does not dispute, VLSI acquired all of its patents from

15   a single entity (NXP).[15]  Mot. at 23:14-15 (citing SAC ¶¶ 74-78).  Intel also cannot plausibly

16   allege that it has been injured by the other Defendants' alleged aggregation of substitute patents

17   since the SAC never alleges that any of these Defendants have sued Intel or even threatened to do

18   so.  The Opposition does not address this issue, and Apple's recent voluntary dismissal from the

19   case makes it more glaring.  Indeed, five out of the nine alleged "markets" now contain no

20   Defendants or patents that have ever been involved in a lawsuit against Intel, who is now the only

21

22

23

---

[13] For example, the Opposition states that paragraph 149 of the SAC states that Apple "'has
refused to capitulate to exorbitant royalty demands' for [certain] patents."  Opp. at 33:2-4.  But the
quoted language actually appears in FAC ¶ 149.

[14] Intel accuses Defendants of making a "slippery slope" argument with respect to the SAC's
allegations regarding Defendants' supposed litigation demands, but the quote it attributes to
Defendants appears nowhere in the Motion.  Opp. 32:2-7 (citing Mot. at 16, 30).  Regardless, as
explained above, these allegations cannot possibly show direct evidence of market power.

[15] As noted above, VLSI's purchase of patents from NXP actually resulted in disaggregation, by
dividing up a portion of NXP's portfolio among two different entities.

remaining Plaintiff.[16]  *See also* 2nd Order at 15:2-12 (finding lack of Article III injury in alleged

markets involving no lawsuits against Plaintiffs).  Regardless, even before Apple's exit, the SAC's

failure to allege antitrust injury was apparent, and it should thus be dismissed with prejudice.

## V.  THE SAC STILL FAILS TO ALLEGE AN UNLAWFUL AGREEMENT

According to Intel, "each of the Defendants entered into separate agreements with Fortress

with a common objective with Fortress to eliminate competition and reap the rewards from doing

so."  Opp. at 34:1-3.  However, the SAC contains no "evidentiary facts" that Fortress and each

alleged PAE Defendant[17] shared the "common objective" of aggregating patents under Fortress's

control or any other "common objective" that could be considered anticompetitive.  Mot. at 33:3-9

(quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).

While Intel asserts that "each PAE knew Fortress would aggregate the PAE's patents with

another PAE's patents in the same market" (Opp. at 33:25-26 (quoting 2nd Order at 11 n.6)), this

assertion, like the allegations in the SAC, is completely conclusory.  Intel does not dispute that the

only alleged agreements identified in the SAC are the same "separate bilateral" contracts (Opp. at

34:3-5) between Fortress and each PAE Defendant that this Court has already held evince nothing

more than "rational, legal business behavior."  1st Order at 28:22-24.[18]  The SAC does not allege

that these garden-variety loans and agreements say anything about aggregating substitute patents

or bringing infringement claims against Intel.  1st Order at 28:20-22 ("[T]here are still insufficient

allegations of an agreement by both Fortress and each PAE to aggregate weak patents.").  Nor

does the SAC allege evidentiary facts that any of the PAE Defendants have ever attempted to

---

[16] These are the Network-based Voice Messaging; Remote Software Updates; Mobile Device-to-Device Communication Through Network-Coupled Intermediary Device; Generating Alerts Based on Blood Oxygen Level; Remote Enabling and Disabling of Software Components. SAC Ex. A.

[17] For consistency and purposes of this briefing only, Defendants use the term "PAE" in the same way that the SAC employs it.

[18] Intel argues that routine business agreements can still violate antitrust laws (Opp. at 36:3-16), but its cases—all of which Intel cited previously—only highlight the allegations missing here.  *See ICANN*, 611 F.3d at 503 (express contract terms effectively eliminating competitive bidding plus "[allegations showing] intent to restrain competition"); *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) (reverse payment settlement protecting patentee's market); *United States v. Singer Mfg.*, 374 U.S. 174 (1963) (coordinated dives on patent validity challenges to exclude competitor); *Hurricane Shooters, LLC v. Emi Yoshi, Inc.*, 2010 WL 4983673 (M.D. Fla. Dec. 2, 2010) (aggregating over ten patents covering a specific cup invention to obtain exorbitant licenses from competitors).

leverage each other's patents to obtain higher royalties. Indeed, there are still no evidentiary facts pled that the PAE Defendants even knew of each other's existence.

Intel points to an alleged statement by Inventergy's CEO that a non-party to this suit (Sonus) would face an "IP bloodbath" if it did not settle. Opp. at 35:23-27. But Intel does not dispute that (1) this is just a recycled allegation from the two failed complaints and (2) the alleged statement says nothing about substitute patents or other PAE Defendants or their patents. Mot. at 35:14-23. Intel also never alleges that any other PAE Defendant has ever sued or threatened to sue Sonus, or that any such allegation has ever been made against Intel. Mot. at 35:19-21. Similarly, Intel cannot rely on the bare allegation that Inventergy received "handsome consideration" for its patents. As the Motion demonstrated, this allegation is immaterial _and_ speculative because, as Intel acknowledges, it does not know what this consideration actually was. Opp. at 37:24-27.[19]

Recognizing that it cannot plead evidentiary facts of a "common objective" among Fortress and each PAE Defendant "to eliminate competition," Intel contends that it does not have to. Opp. at 35:15-16 ("Plaintiffs thus need not plead that each defendant intended to harm competition when they entered into the challenged agreements."). Instead, according to Intel, it just needs to plead that the alleged agreements had the result of harming competition. _Id._ As Intel acknowledges, its position—the same one it unsuccessfully advanced in its prior brief (_see_ Dkt. 208 at 33:26-27)—flatly contradicts this Court's Order. Opp. at 34:6-9, 35:15-19; _see also_ 2nd Order at 27 n.10 ("Plaintiffs do not simply need to 'allege that the [relevant] defendant intended to enter the agreement, and the agreement was anticompetitive.' . . . Rather, Plaintiffs must allege that the agreement was _intended_ to harm or restrain trade.") (emphasis added). Thus, this argument is just another improper and untimely motion for reconsideration. _See Gray_, 2020 WL 1503688, at *1. Regardless, Intel's disguised request for reconsideration lacks merit.

The Ninth Circuit has consistently and repeatedly held that, "to state a Section 1 claim," a plaintiff must plead that the defendants' alleged agreement or conspiracy was "_intended_ to harm or

---

[19] Intel also claims the allegations that the PAE Defendants received both "favorable" terms and that these terms were "severe" are not contradictory. Opp. at 37:3-23. But regardless of whether this could be true as a theoretical matter, Intel must allege non-conclusory facts about what these terms were. It cannot just speculate about these terms to fit its theory.

restrain trade." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (emphasis added); *see also Kendall*, 518 F.3d at 1047. Indeed, Intel's own proffered authority demonstrates that intent is required. Intel repeatedly relies on *ICANN*, where the Ninth Circuit expressly held that "restraint of trade claims under Section 1 do require the showing of a conspiracy whose members intended to restrain trade." 611 F.3d at 503. Intel simply ignores this <u>binding</u> precedent.

Instead, Intel relies on authorities—all but one of which predate the Ninth Circuit cases cited above—that hold only that specific evidence of intent is not required where such intent can be inferred from the obviously anticompetitive nature of the agreement or conduct itself.[20] *See, e.g.*, *Helix Milling Co. v. Terminal Flour Mills Co.* 523 F.2d 1317, 1321 (9th Cir. 1975) (holding that, in the "unusual factual context" before it, "[a] jury could find [] such anticompetitive intent" because defendant's conduct "would necessarily exclude [a competitor] from the market"); *United States v. Griffith*, 334 U.S. 100, 108 (1948) (a "purpose" to restrain trade may be "chargeable" to a defendant where this was a "necessary and direct consequence" of the agreement).[21] In contrast, where, as here, the alleged agreements consist of ordinary business arrangements (something this Court has already expressly recognized, 1st Order at 28:22-24), no such inference of intent is warranted. *See, e.g.*, *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015) ("We cannot, however, infer an anticompetitive agreement when factual allegations just as easily suggest rational, legal business behavior.") (affirming dismissal)

---

[20] The sole exception is a district court case: *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014). But the court in that case incorrectly held that the intent requirement only applies to Section 2 cases without addressing any of the Ninth Circuit authorities cited above.

[21] The other authorities cited in the Opposition are equally inapposite. First, Intel cites *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232 (1980), but that case addressed the scope of Commerce Clause jurisdiction, not the requirements for pleading a Section 1 claim, and it also involved an obviously anticompetitive "price-fixing" agreement. *Id.* at 232. Intel also cites *California Dental Ass'n v. FTC*, 224 F.3d 942 (9th Cir. 2000), but that case was not about Section 1 at all. Rather, it analyzed Section 5 of the FTC and merely held that "good motives will not validate an otherwise anticompetitive practice," where "the point of the [practice] was clearly to limit" commercial conduct. *Id.* at 948 (citing Hovenkamp, *Antitrust Law* ¶ 1506). Finally, *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953) and *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1189 (9th Cir. 1984) are of no help to Intel because, in both of those cases, the court held that there was no Section 1 violation. *Times-Picayune*, 345 U.S. at 621; *Dunn*, 735 F.2d at 1190 (holding carriers "failed to prove damages"). Moreover, each of these cases predate the more recent Ninth Circuit authority holding that intent is required thus belying Intel's claim that they somehow stand for the contrary proposition.

(internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)

("[W]ithout that further circumstance pointing toward a meeting of the minds" that is necessary to

plead a Section 1 claim, "an account of a defendant's commercial efforts stays in neutral

territory."); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) ("[A]n

exclusive distributorship, even with the knowledge that harm to competition will ensue, does not

create an inference that harm to competition is intended") (affirming dismissal).  In such cases, a

plaintiff must allege evidentiary facts demonstrating that the parties entered into the agreement

with an "intent to harm competition."  *Rutman Wine Co.,* 829 F.2d at 736; *see also Kelsey K. v.*

*NFL Enterprises, LLC*, 757 F. App'x 524, 526 (9th Cir. 2018) ("Kelsey failed to allege any facts

showing that the NFL Member Teams intended to harm or restrain trade.") (affirming dismissal).

Such evidentiary facts are wholly absent here.[22]

Finally, even if evidentiary facts of intent were not required as a matter of law, they are

required under Intel's own proffered theory.  The only way for Intel's alleged "conspiracy" to

work is if each PAE Defendant intentionally sought to leverage the substitute patents held by the

other PAE Defendants to obtain inflated royalties.  Otherwise there would be no way for the PAE

Defendants to "reap the rewards" of their supposed "common objective with Fortress to eliminate

competition." Opp. at 34:1-3.  The SAC, however, does not allege a single evidentiary fact

showing that this has ever occurred even though the alleged conspiracy dates back a half a decade

or more.  Mot. at 36:7-13.  For instance, there is no fact allegation that Uniloc ever tried to

leverage a VLSI patent, or vice versa.  Moreover, Intel in particular cannot plausibly allege that it

has been the victim of such a conspiracy given that, as noted above, it has only been sued by one

Defendant (VLSI), and that Defendant is not even named in the SAC's Section 1 count.  It makes

no sense to allege that the Section 1 Defendants somehow conspired to aggregate patents and

---

[22] Intel also cites the out-of-circuit case of *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001) for the proposition that is sufficient if only one party to an agreement "intended an anticompetitive result."  Opp. at 35:2-19.  *Spectators* says no such thing. It held only that the mere fact that a "competitor lacks a direct interest in precluding competition" is irrelevant where the competitor has been "enticed or coerced into knowingly curtailing competition."  *Spectators*, 253 F.3d at 222 (emphasis added).  Intel fails to allege any facts demonstrating that any of PAE defendants "knowingly" curtailed competition.

1   bring suit against Intel given that none of these Defendants has ever done so despite the over half-

2   decade long existence (according to Intel) of the purported conspiracy.[23]

3 **VI.**     **THE SECTION 7 CLAIM FAILS AS A MATTER OF LAW BECAUSE INTEL**

4           **FAILS TO PLEAD MARKET SHARE**

5        In addition to the SAC's independent failures to plead cognizable markets, market power,

6   or antitrust injury, Intel's Clayton Act Section 7 claim also necessarily fails as a matter of law

7   because the SAC is devoid of <u>any</u> facts regarding market concentration or Defendants' market

8   share, either before or after each of the challenged acquisitions.

9        Intel's primary response is that such allegations are not required in cases dealing with

10   mergers or acquisitions that have already happened, and where the plaintiff is relying on a direct

11   evidence theory.  Opp. at 38:4-12.  Even if Intel had adequately alleged direct evidence (which it

12   has not), this is wrong.  The Motion cited multiple authorities from this district dealing with

13   consummated mergers in which the court still held that a defendant was required to plead facts of

14   market share and concentration.  Mot. at 36:24-38:24.[24]  In *Synopsys, Inc. v. ATopTech, Inc.*, the

15   court held that allegations of "increased prices for consumers" post-merger were not sufficient to

16   state a Section 7 claim where the plaintiff had "not alleged any facts" regarding "the market share

17   attributable" to any of the acquired or acquiring parties "prior to [the] merger."  2015 WL

18   4719048, at *6 (N.D. Cal. Aug. 7, 2015).  While Intel attempts to distinguish *Synopsis,* Intel is

19   advancing the <u>exact same flawed theory</u>, *i.e.*, that it does not have to plead facts of market share or

20   concentration because it has alleged that Defendants' royalty rates increased post-aggregation.

21

22 [23] Notably, Intel's first case that it voluntarily dismissed prior to adding Apple as a plaintiff did not name any of the current Section 1 Defendants except Fortress.  *See Intel Corp. v. Fortress*

23 *Investment Group LLC*, No. 5:19-cv-06856, Dkt. 1 (N.D. Cal. Oct. 21, 2019).  Intel's Section 1 claim was limited to a purported agreement between Fortress and DSS (which this Court already

24 dismissed with prejudice, 1st Order at 41:2-7).  Intel's prior pleadings demonstrate that it knows full well it has no facts to show that the PAE Defendants, who are never alleged to have sued or

25 threatened Intel, could plausibly be part of a "conspiracy" against it.

26 [24] *See, e.g.*, *Golden Gate Pharm. Services, Inc. v. Pfizer, Inc.*, C-09-3854 MMC, 2009 WL 4723739, at *5 (N.D. Cal. Dec. 2, 2009) (dismissing a Section 7 claim against a consummated

27 merger because there were no allegations about "number of suppliers" in the market); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 18-CV-02054-MMC, 2019 WL 1767335, at *6 (N.D. Cal. Apr.

28 22, 2019) (doing the same because there were no allegations related to defendants' market share), *aff'd*, 811 Fed. Appx. 422 (9th Cir. 2020).  The Opposition fails to address these authorities.

1  Opp. at 39:12-13 ("Plaintiffs have alleged how the royalties are supracompetitive as compared to

2  the pre-aggregation world."). And even in the context of consummated mergers, the Supreme

3  Court has held that a plaintiff must show that competition has been "foreclosed in a substantial

4  share" of the market. *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957).

5      Intel fails to cite <u>a single case</u> where a Section 7 claim was allowed to proceed where there

6  were no factual allegations of market share as is the case here. Moreover, none of the cases that

7  Intel cites hold that such allegations are not required. *See* Opp. at 38:19-39:3. The opposite is

8  true. For example, in *Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, the plaintiffs alleged

9  that the defendant owned "a 100 percent share of the relevant market." 99 F. Supp. 3d 610, 625

10  (D. Md. 2015) ("Counterclaimants sufficiently have alleged a significant market share—the entire

11  market."); *see also E. I. du Pont de Nemours & Co.*, 353 U.S. at 593–96 (allowing Section 7 claim

12  where "the record clearly shows . . . that [defendant] has a substantial share of the relevant

13  market"). Meanwhile, in *FTC v. Lab'y Corp. of Am.*, the court denied a preliminary injunction

14  against a prospective acquisition because the government failed to show it would violate Section

15  7. No. SACV 10-1873 AG MLGX, 2011 WL 3100372, at *21 (C.D. Cal. Feb. 22, 2011).

16      Finally and independently, Intel's Section 7 claim fails because, for many of the "markets,"

17  there has been no alleged aggregation at all. Mot. at 37:7-17. For example, the Motion pointed

18  out that Uniloc 2017 is the only Section 7 Defendant who is alleged to own a substitute patent in

19  four of the alleged "markets," but Uniloc 2017 allegedly acquired all of these patents from the

20  same entity (Uniloc Luxembourg). When there has been no increase in market concentration,

21  there can be no Section 7 violation. *Id.* The Opposition does not even address this argument.

22  **VII.  INTEL'S UCL CLAIM MUST BE STRICKEN UNDER THE ANTI-SLAPP LAW**

23  **EVEN IF THIS COURT DISMISSES THE CLAIM**

24      The SAC's UCL claim must be stricken under California's Anti-SLAPP statute because

25  these claims (1) "arise[] from protected activity" and (2) fail as a matter of law. Mot. at 39:26-

26  40:7. As such, the Court <u>must</u> strike the UCL claim "even if it dismisses the underlying claim

27  without leave to amend, as a successful anti-SLAPP motion results in the award of fees." *Gressett*

28  *v. Contra Costa Cty.*, No. C-12-3798 EMC, 2013 WL 2156278, at *33 (N.D. Cal. May 17, 2013).

1       The Motion set forth two independent reasons why Intel's UCL claim satisfies the "arising

2  from" prong of the Anti-SLAPP test, one of which the Opposition just ignores.  First, a claim

3  necessarily arises from "protected activity" where the activity "supplies a necessary element" of

4  that claim.  Mot. at 39:27-40:1 (quoting *Wilson v. News Network, Inc.*, 7 Cal. 5th 871, 892

5  (2019)).  Here, there is no dispute that Defendants' infringement suits constitute "protected

6  activity" under California law.  Mot. at 40:5-12.  There is also no dispute that these suits supply a

7  "necessary element" of Intel's UCL claim, *i.e.*, the "lost money or property" element.  Mot. at

8  40:2-5 (quoting Cal. Bus. & Prof. Code § 17204).  This because the only "lost money or property"

9  that Intel alleges are its "litigation costs" (SAC ¶ 467) from Defendants' patent suits.  The Motion

10 cited on-point law holding that the "arising from" prong is satisfied where, as here, the plaintiff

11 "would not have incurred any . . . damages" but for the "filing of the complaint."  Mot. at 40:9-12

12 (citing *Moss Bros. Toy v. Ruiz*, 27 Cal. App. 5th 424, 435 (2018)).

13      The Opposition never even addresses this point.  Intel argues that this Court has already

14 found that its claims "arise[] from Defendants' patent transfer scheme" when the Court held that

15 Intel's suit was not covered by the *Noerr-Pennington* doctrine, which is grounded on First

16 Amendment principles.  Opp. at 39:25-27.  But the question of whether Intel's suit is covered by

17 California's Anti-SLAPP statute presents a separate and distinct legal question.  Moreover, "the

18 protections afforded by the Anti-SLAPP statute are not coextensive with the categories of conduct

19 or speech protected by the First Amendment."  *Indus. Waste & Debris Box Serv., Inc. v. Murphy*,

20 4 Cal. App. 5th 1135, 1152 (2016).  Thus, "courts determining whether conduct is protected under

21 the anti-SLAPP statute look not to First Amendment law," but to the text of the statute.  *See id.*

22      While the Court need not reach this issue, the "arising from" prong is also satisfied for a

23 second and independent reason:  Intel is seeking to enjoin Defendants' protected infringement

24 suits, which amounts to a prior restraint on Defendants' protected activity.  Mot. at 40:13-18

25 (citing *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 n.4 (2002)).  According to

26 Intel, *Equilon* is distinguishable because that action for injunctive relief "<u>expressly was based on</u>"

27 the defendant's petitioning conduct.  Opp. at 40:7-10.  But in so determining, the California

28 Supreme Court pointedly noted that the plaintiff "sought injunctive relief that <u>expressly would</u>

<u>restrict</u>" the defendant's ability to pursue litigation. *Equilon*, 29 Cal. 4th at 67 n.4 (emphasis

2   added). Intel does not dispute that this is the exact relief that it is seeking here. Indeed, Intel

3   expressly admits the "relief [it] seek[s] is based on Defendants' patent aggregation <u>and assertion</u>

4   scheme." Opp. at 40:9-10 (emphasis added).

5         Finally, the second prong of the Anti-SLAPP test is satisfied because Intel's UCL claim

6   fails as a matter of law for all the reasons that its federal antitrust claims fail. Mot. at 40:20-41:7.

7   **VIII.   CONCLUSION**

8         This is Intel's third bite at the apple, but it still has not cured the multiple independent

9   deficiencies the Court already found, and in many respects Intel did not even attempt to do so.

10  Instead, Intel has recycled old allegations, argued against the Court's prior rulings (often using the

11  same case law it previously cited), and claimed this Court already ruled in its favor when that is

12  simply not true. The SAC should be dismissed with prejudice and Defendants' motion to strike

13  should be granted. *See Zucco*, 552 F.3d at 1007 (affirming dismissal of SAC with prejudice

14  because "it was clear that the plaintiffs had made their best case and had been found wanting").

15

16  Dated:  July 8, 2021                              Respectfully submitted,

17                                                          IRELL & MANELLA LLP

18

19                                                          By:*/s/ A. Matthew Ashley*
                                                            A. Matthew Ashley
20                                                          *Counsel for Defendants*
                                                            FORTRESS INVESTMENT GROUP LLC,
21                                                          FORTRESS CREDIT CO. LLC,
                                                            VLSI TECHNOLOGY LLC
22

23                                                          */s/ Christopher A. Seidl*
                                                            Christopher A. Seidl (*pro hac vice*)
24                                                          CSeidl@RobinsKaplan.com
                                                            ROBINS KAPLAN LLP
25                                                          800 LaSalle Avenue, Suite 2800
                                                            Minneapolis, MN 55402
26                                                          Telephone:  612 349 8468
                                                            Facsimile:  612 339-4181
27                                                          *Counsel for Defendants*
                                                            INVT SPE LLC
28                                                          INVENTERGY GLOBAL, INC.

*/s/ Jason D. Cassady*

Jason D. Cassady (*pro hac vice*)
jcassady@caldwellcc.com
CALDWELL CASSADY & CURRY
2121 N. Pearl Street, Suite 1200
Dallas, TX 75201
Telephone: 214 888-4841
Facsimile: 214-888-4849
*Counsel for Defendant*
IXI IP, LLC


*/s/ James J. Foster*

James J. Foster
jfoster@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
Telephone: 617 456-8022
Facsimile: 617 456-8100
*Counsel for Defendant*
UNILOC 2017 LLC


*/s/ Daniel. R. Shulman*

Daniel R. Shulman (*pro hac vice*)
dan@shulmanbuske.com
SHULMAN & BUSKE PLLC
126 North Third Street, Suite 402
Minneapolis, MN 55401
Telephone: 612 870 7410
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC


*/s/ Dean C. Eyler*

Dean C. Eyler (*pro hac vice*)
dean.eyler@lathropgpm.com
LATHROP GPM LLP
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612 632-3335
Facsimile: 612 632-4000
*Counsel for Defendants*
UNILOC LUXEMBOURG S.A.R.L.
UNILOC USA, INC

**ECF ATTESTATION**

I, Lucas S. Oxenford, am the ECF user whose ID and password are being used to file DEFENDANTS' JOINT REPLY IN SUPPORT OF JOINT MOTION TO DISMISS AND TO STRIKE INTEL'S SECOND AMENDED COMPLAINT.  I hereby attest that I received authorization to insert the signatures indicated by a conformed signature (/s/) within this e-filed document.


By: *_/s/ Lucas S. Oxenford_*