# REDACTED VERSION OF SEALED DOCUMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTEL CORPORATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SEVEN NETWORKS, LLC, <br><br> Defendant. | Case No. 19-cv-07651-EMC <br><br> **FILED UNDER SEAL** <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT MOTION TO DISMISS AND TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT** <br><br> Docket No. 244 |

The above-referenced case is an antitrust case. The current operative complaint is the second amended complaint ("SAC"). The plaintiffs named in the caption of the SAC are Intel Corporation and Apple Inc. The defendants named in the caption are:

(1) Fortress Investment Group LLC and Fortress Credit Co. LLC ("Fortress");

(2) Uniloc 2017 LLC, Uniloc USA, Inc., and Uniloc Luxembourg S.A.R.L. ("Uniloc");

(3) VLSI Technology LLC ("VLSI");

(4) INVT SPE LLC and Inventergy Global, Inc. ("INVT"); and

(5) IXI IP, LLC ("IXI").

The parameters of the SAC, however have shifted because, on June 21, 2021, Apple dismissed its claims against all of the defendants.[1] *See* Docket No. 263 (notice of voluntary dismissal). The Court asked the remaining parties to meet and confer to determine how Apple's dismissal impacted the instant case. The remaining parties agreed that, in light of Apple's

---

[1] All of the defendants, except one, were dismissed with prejudice. VLSI was dismissed without prejudice.

dismissal, "Intel currently only has claims" against Fortress and VLSI.[2] Docket No. 273 (St. at 1). Thus, at present, the Court now has an antitrust case brought by Intel only against Fortress and VLSI only.

Currently pending before the Court is (1) a joint motion to dismiss and strike the SAC and (2) INVT's supplemental brief. Having considered the parties' briefs and the oral argument of counsel, as well as the amicus briefs that were filed, the Court hereby **GRANTS** the motion to dismiss but **DENIES** the anti-SLAPP motion.

## I. IMPACT OF APPLE'S DISMISSAL

As indicated above, the Court asked the parties (other than Apple) to meet and confer to discuss how Apple's dismissal impacted the instant case. The parties agreed that, because of the dismissal, the only plaintiff remaining was Intel and that the only defendants remaining were Fortress and VLSI. The parties also agreed that, because of the dismissal, five of the nine product markets identified in the SAC were no longer at issue. *See generally* Docket No. 273 (St. at 1).

The parties, however, do have a few disputes in need of judicial resolution.

- **Product markets.** For the five product markets that are no longer at issue, Intel asks that claims based on these product markets be dismissed without prejudice; all of the defendants ask for a dismissal with prejudice. Both parties assert that their respective position is supported by the Court's prior order of January 6, 2021. *See* Docket No. 229 (Order at 15). In that order, the Court noted that, for several product markets, Plaintiffs admitted that Defendants had not yet asserted patents in those markets and further failed to explain why there was a threat that Defendants would assert such patents – and against Plaintiffs specifically. The Court thus found that Plaintiffs lacked standing to assert antitrust claims based on the product markets. The dismissal of the claims based on the product markets was *with* prejudice because Plaintiffs did not provide any indication that they were capable of curing the deficiency on standing. However, the Court's ruling did not "bar

---

[2] This is because only VLSI has sued Intel for patent infringement. .

2

Plaintiffs from initiating a new suit (including but not limited to a suit for declaratory relief) should circumstances change." Docket No. 229 (Order at 15). Consistent with the Court's January 6 order, the dismissal of the claims based on the five product markets shall be with prejudice; however, that does not bar Intel from initiating a new action should circumstances change.

- **Defendants.** Similar to above, Intel asks that the defendants who will be dismissed from the case (namely, Uniloc, INVT, and IXI) be dismissed without prejudice. Those defendants ask for a dismissal with prejudice. Consistent with the above, the Court dismisses with prejudice, but this does not bar Intel from initiating a new action should circumstances change.

## II. FACTUAL & PROCEDURAL BACKGROUND

In the SAC, Intel alleges as follows.

"PAE" stands for patent assertion entity. PAEs are companies that "aggressively pursue meritless [patent infringement] litigation." SAC ¶ 2. Over the years, "PAEs have evolved," most notably, "partnering with investment firms to fuel their litigation." SAC ¶ 6.

> Having deep-pocketed investment firms standing behind them has made PAEs only more aggressive. Indeed, to meet the expectations of their new investors for high returns, PAEs must act ever more aggressively. These new investors are content to incur loss after loss so long as they have the chance to hit a windfall reward that will justify their investment. Patent assertion thus becomes simply a numbers game disassociated from the merits of the underlying patents, with PAEs and their investors betting that serial assertions with aggressive demands will strike a jackpot eventually making up for many other losses.

SAC ¶ 7.

Fortress is an investment firm that has partnered with PAEs. *See* SAC ¶ 8. Fortress has a "web of PAEs that [it either] owns or controls." SAC ¶ 9. "Fortress has used its stable of PAEs to aggregate a massive . . . portfolio of patents." SAC ¶ 9. That portfolio includes patents that are substitutes for each other (as well as complements). SAC ¶¶ 9, 41. "When patents are aggregated as Fortress has done, the dynamics for determining whether to assert a patent change and the options available to the target of the assertion also change." SAC ¶ 40.

3

For example:

> When the patents were held by their original owners, there was competition and a prospective licensee could choose between competing options (or forgo those options and design its product in a different way), which had the effect of promoting competition and restraining royalties. But now, with the patents under the control of Fortress, the prospect of competition or redesigning products is improperly diminished or disappears. Fortress and its PAEs can thus threaten a target with the serial risk that the only or next best alternative design to an asserted patent is also subject to a patent claim by one of Fortress's PAEs.

SAC ¶ 41; *see also* SAC ¶ 12 (noting that, before aggregation, the patents were owned by sophisticated companies that were willing to assert patents and had experience with asserting patents, but the owners did not assert the patents because the patents "had insufficient expected value to make the assertions worth the costs"); SAC ¶ 44 (alleging that the aggregation of substitute patents harms "competition in the same way as any merger or combination of competitors that lessens competition").

As another example:

> Before aggregation, there would be no incentive to assert [weak] patents because there would be no expectation of a positive return from asserting a weak patent because the patent could be expected to be proven invalid, not infringed, or unenforceable in litigation, or would be easily designed around, including because there were alternatives available in the market. But, after aggregation and the elimination of competitive alternatives, assertion of weak patents as part of a wave of assertions against a target generates economic value even if many of those assertions are defeated in litigation. By increasing the volume of assertions a target faces, Fortress and its PAEs cause targets to deploy licensing and litigation resources less efficiently and thereby increase the value of litigation to Fortress and its PAEs. In particular, Fortress and its PAEs increase the likelihood that a weak patent will slip through litigation and be found infringed, valid, and enforceable when it should not be. Further, this strategy creates incentives for targets to settle with Fortress-backed PAEs for amounts that exceed the value (if any) of their patents to put an end to this risk. In this manner, Fortress's patent aggregation enables the use of weak patents to force targets to pay undeserved and inflated royalties.

SAC ¶ 42.

Intel acknowledges that "[t]here is nothing inherently illegal with owning many patents or obtaining those patents through acquisition" but maintains that there is illegality where, *e.g.*,

4

licensing is not "based on the intrinsic value of those patents." SAC ¶ 52; *see also* SAC ¶ 53 (alleging that Defendants "extort supracompetitive royalties unrelated to the value (if any) of the Fortress-controlled patents").

There are four markets at issue in this case where Defendants have aggregated patents. Those "patent markets" are as follows.

- The market for patents for preventing stalls for cache misses. *See* SAC ¶ 248.
- The market for patents for arbitrating multiple requests to access a memory bus. *See* SAC ¶ 283.
- The market for patents for third-party device authorization through limitation of information exchanged. *See* SAC ¶ 303.
- The market for patents for MOSFET channel fabrication. *See* SAC ¶ 390.

Based on, *inter alia*, the above allegations, Intel has asserted the following causes of action against Fortress and/or VLSI[3]:

(1) An agreement to restrain competition in patent licensing, in violation of § 1 of the Sherman Act (against Fortress only, not VLSI).

(2) Unlawful asset acquisitions, in violation of § 7 of the Clayton Act.

(3) Unfair competition, in violation of California Business & Professions Code § 17200.[4]

### III. DISCUSSION

A. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss

---

[3] Per the SAC, Fortress formed VLSI in 2016 and caused the transfer of patents to the company. *See* SAC ¶ 74. VLSI obtained some of its patents from a third party, NXP/Freescale, via a Patent Purchase and Cooperation Agreement. *See* SAC ¶ 76.

[4] This claim is derivative of the federal antitrust claims. *See* SAC ¶ 465 (alleging that Defendants engaged in unfair competition "by violating the Sherman and Clayton Acts").

after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

In the pending motion, Defendants make arguments that are similar to those made in their prior 12(b)(6) motions – *e.g.*, failure to allege product market, market power, and antitrust injury as well as failure to allege a § 1 claim specifically and a § 7 claim specifically.

B. <u>Product Markets</u>

In its prior order, the Court noted that,

> [a]lthough "market definition is a deeply fact-intensive inquiry, [and] courts hesitate to grant motions to dismiss for failure to plead a relevant product market," a product market must still be plausible. Here, the Court concludes that many, although not all, of the markets claimed by Plaintiffs are not plausibly stated because, facially, they are still overbroad.

Docket No. 229 (Order at 16). The markets as then pled by Plaintiffs were overbroad because they covered a general technical field rather than just a specific function within that field. *See* Docket No. 229 (Order at 17-19).

In the pending motion, Defendants assert that the four patents markets at issue, even as re-pled, are still not plausible.

For example, Defendants contend that "the new markets contain the exact same patents as

6

the markets that the Court dismissed." Mot. at 9. But the fact that the new markets contain the exact same patents as before is not, in and of itself, problematic per se. It is possible that the exact same patents do not cover a general technical field but rather a specific function within that field. As now more narrowly defined, the posited markets appear to be defined with sufficient specificity to be plausible.

The bigger problem with the new markets is that Intel claims that the markets are made up of both substitute patents *and* complementary patents. *See, e.g.*, SAC ¶ 255. But a product market is generally about substitutes, not complements. For example, the Ninth Circuit has stated that a product market "encompass[es] the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Office Soln.*, 513 F.3d 1038, 1045 (9th Cir. 2008). The court has also noted: "'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Id.*; *see also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992) (indicating that cross-elasticity of demand refers to "the extent to which consumers will change their consumption of one product in response to a price change in another"). The Areeda & Hovenkamp antitrust treatise similarly underscores that a product market is made up of substitute goods, not complements, even going so far as to say that "[g]rouping complementary goods into the same market" is "economic nonsense" and would

> undermin[e] the rationale for the policy against monopolization or collusion in the first place. One "monopolizes" a market by reducing output, and once certain output is removed from the market, the remaining output experiences increased demand and a rise in prices. Thus a monopolist might monopolize the market for gasoline by reducing output from the competitive level of, say, 1,000,000 barrels, to a monopoly level of 700,000, with the result that demand intensifies for that which remains and the market clearing price rises. No such result obtains when one aggregates complementary goods into the same market. For example, grouping gasoline and tires into a "market" suggests that an output decrease in gasoline would permit an increase in tire prices. In fact, it will do just the opposite.

2B Areeda & Hovenkamp, Antitrust Law ¶ 565a.

Admittedly, there are cases in which courts have held that commercial realities weigh in favor of putting what might appear to be different products or services into a single market. *See*

7

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285-86 (2018) (stating that "courts should 'combin[e]' different products or services into 'a single market' when 'that combination reflects commercial realities'"; thus, holding that "courts must include both sides of the platform – merchants and cardholders – when defining the credit-card market"); *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203-04 (9th Cir. 1997) (rejecting Kodak's argument that, "because no two parts are interchangeable, the relevant markets for parts consist of the market for each individual part for Kodak photocopiers and each single part for Kodak micrographics equipment"; "[c]onsideration of the 'commercial realities' in the markets for Kodak parts compels the use of an 'all parts' market theory" – "[a]s the relevant market for service 'from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines,' the relevant market for parts from the equipment owners' and service providers' perspective is composed of 'all parts' that are designed to meet Kodak photocopier and micrographics equipment specifications"). And arguably, there could be commercial realities such that complementary patents should be considered part of the same market as substitute patents – *e.g.*, where a complementary patent is essential to a combination with a subject patent to make the product and there are no substitutes for that complementary patent. But here, Intel has not shown with any specificity that commercial realities require that any of the markets at issue should be made up of both substitute patents and complementary ones identified in the SAC – this in spite of the fact that patents and their utility are publicly available information and nothing suggests Intel does not have information to make such allegations. *See also* Areeda & Hovenkamp, Antitrust Law ¶ 565a (asserting that "many 'commercial realities' describe a particular market situation, and their invocation should not become an after-the-fact rationalization for a conclusion that is *completely inconsistent with the economic rationale for defining markets*") (emphasis added). Instead, Intel has simply included certain complementary patents without any specific explanation of their essentiality or substitutability in the market.

Perhaps in the attempt to get around this problem, Intel claims that the complementary patents are "possibly substitutes." *E.g.*, SAC ¶ 255 (addressing market for patents for preventing stalls for cache misses). But that the patents are *possibly* substitute patents is not the same thing as

8

saying that the patents are *plausibly* substitutes. At the 12(b)(6) phase, possibility is not good enough; plausibility is required. In addition, Defendants are correct in arguing that *Staley v. Gilead Sciences, Inc.*, No. 19-cv-02573-EMC, 2020 U.S. Dist. LEXIS 167071 (N.D. Cal. July 29, 2020), is of no help to Intel because that case presented a different situation. In *Staley*, the plaintiffs pled *facts* demonstrating that "cART drugs sometimes may be complements for one another but other times may be substitutes. *See* FACC ¶ 402 (alleging that the HHS Guidelines have recommended regimens that include NRTIs and third agents together, as well as regimens that include third agents and no NRTIs – *i.e.*, NRTIs and third agents sometimes are complements but other times may be substitutes)." *Id.* at *28. Here, Intel has not pled any specific facts to suggest that the complementary patents could plausibly be substitutes as well. *Compare* Areeda & Hovenkamp ¶ 565b (noting that "[a] few things capable of being used in variable proportions may function as both complements and substitutes" – *e.g.*, "[w]hile aftermarket parts and the labors of a service technician are complementary goods, they may act as substitutes when the technician has a choice between using more labor or a new part").

Because the Court considers only substitute patents count for the markets, and not complementary patents (or patents that are "possibly substitutes"), Intel's claim of unlawful patent aggregation is more limited in nature that what is suggested on the face of the pleading. Quite simply, there are few patents that Defendants have allegedly aggregated.

- **Market for patents for preventing stalls for cache misses.** Intel has identified only two substitute patents: the '437 patent (held by Uniloc) and the '009 patent (held by VLSI). The five complementary patents identified by Intel – including the '331 patent and the '014 patent – are not part of the market. *See* SAC ¶ 255.

- **Market for patents for arbitrating multiple requests to access a memory bus.** Intel has identified only two substitute patents: the '687 patent (held by Uniloc) and the '983 patent (held by VLSI). The one complementary patent identified by Intel is not part of the market. *See* SAC ¶ 290.

- **Market for patents for third-party device authorization through limitation of information exchanged.** Intel has identified seven substitute patents: the '242, and

9

'620 patents (held by INVT); the '395 patent (held by Seven); the '633 patent (held by VLSI); and the '976, '907 patent, and '616 patents (held by Uniloc). The ten complementary patents identified by Intel are not part of the market. *See* SAC ¶ 320.

- **Market for patents for MOSFET channel fabrication.** Intel has identified five substitute patents: the '452, '319, '232, and '149 patents (held by Uniloc); and the '303 patent (held by VLSI). There are no complementary patents identified.

Moreover, for the first patent market (preventing stalls for cache misses), Intel has not been sued for infringement of either of the substitute patents. Although Intel has been sued for infringement of the '014 patent (No. C17-5671 BLF (N.D. Cal.)) and the '331 patent (No. C-18-0966 (D. Del.)), those patents are complementary patents only. Intel thus lacks standing to bring any antitrust claim with respect to the first market. The Court dismisses all claims against Defendants based on the first patent market.

Finally, the Court notes that, for some of the markets, Defendants have argued that the alleged patent substitutes are not, in fact, substitutes. Also, Defendants have argued that, even if there is functional substitutability, Intel must still show economic substitutability. For purposes of this order, the Court need not address these arguments but assumes in Intel's favor that Defendants have simply raised factual disputes that cannot be resolved at the 12(b)(6) phase. As discussed below, the problem for Intel is that, even with these assumptions, its antitrust claims fail.

C. <u>Market Power</u>

In its prior orders, the Court indicated that Plaintiffs' antitrust claims, as pled, turned on anticompetitive effects resulting from the alleged patent aggregation. *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (noting that, in a § 1 claim, under the rule of reason, a plaintiff "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market"); 15 U.S.C. § 18 (providing that, in a § 7 claim, "no person . . . shall acquire the whole or any part of the assets of another person . . . , where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to

10

create a monopoly"). Anticompetitive effects can be shown through either direct evidence or indirect evidence. Direct evidence of anticompetitive effects would be "'*actual* detrimental effects, such as reduced output, increased prices, or decreased quality in the relevant market.'" Docket No. 229 (Order at 5) (emphasis in original). For indirect evidence, a plaintiff would need to show the defendant's market power, plus some evidence that the defendant's conduct harms competition. *See* Docket No. 229 (Order at 20); *see also* Docket No. 229 (Order at 19) (noting that market power is simply a way to assess whether a defendant's conduct has anticompetitive effects).

The Court previously held that Plaintiffs had failed to adequately allege anticompetitive effects. It noted that, even if supracompetitive pricing by itself, would be sufficient to show anticompetitive effects (*i.e.*, without an additional showing of restricted output), "Plaintiffs [did] not plausibly show[] that Defendants extracted supracompetitive royalties as a result of their aggregation [of patents]." Docket No. 22 (Order at 24).

In the pending motion, Defendants contend that Intel has stilled failed to show supracompetitive pricing, let alone supracompetitive pricing resulting from patent aggregation. Defendants also argue that, for Intel to rely on direct evidence anticompetitive effects, it must demonstrate not only supracompetitive pricing but also restricted output. The Court agrees with Defendants that Intel has, in the SAC, failed to allege supracompetitive pricing tied to patent aggregation.

In so holding, the Court does not take issue with the general theory being put forward by Intel – *i.e.*, that aggregation of substitute patents could, in theory, harm "competition in the same way as any merger or combination of competitors that lessens competition." SAC ¶ 44. The narrative told by the operative complaint, in principle, is compelling. It is not hard to imagine that a person or entity could accrue market power by obtaining a dominant share of substitute patents and threaten a barrage approach to litigation wherein an imperfect civil justice system may yield an erroneous outcome, thus allowing legally unjustified leverage over licensees, a result which could well constitute an unreasonable restraint of trade. The Court also acknowledges that this case is still at the early stages of proceeding – 12(b)(6) – and not summary judgment. *Cf. Starr v.*

11

*Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (stating that, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)[;] [p]laintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible"). The problem for Intel is that the SAC lacks sufficient facts to demonstrate the narrative has been carried out against the company, at least at this juncture.

The Court acknowledges, as Intel argues, that the allegations in the SAC should be considered holistically. The holistic pictured painted by Intel includes the following:

- In spite of any competitive constraints (such as those identified in ¶ 49 of the prior first amended complaint), the prior owners of the patents at issue were willing to bring patent infringement suits – including against companies comparable to Intel (or Apple). However, the prior owners declined to bring infringement suits based on the patents at issue because it was not economically worthwhile (*i.e.*, comparing costs to benefits).

- When the patents at issue were transferred to the PAEs and then Fortress aggregated the patents by virtue of its control over the PAEs, the situation changed. Now the PAEs brought infringement suits based on the patents at issue. Moreover, the PAEs made astronomical demands for the alleged infringement, asking for billions in damages even though the cost of acquiring the patents paled by comparison. Even if the comparisons might not be a *precise* match (*e.g.*, Intel would compare a litigation demand made for one group of patents with the acquisition price of another group of patents, and the only overlap between the two groups would be one of the patents at issue), it can still be inferred from the large differential in price that there was significant price inflation for any given patent. And Intel *was* able to do a more specific price comparison for one patent – the '331 patent. ███████████████████████████████████████

12

1 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[5] *See* SAC ¶ 274.

If the Court credits the allegations above,[6] the allegations may tend to show that supracompetitive prices were being charged for the patents at issue. Notably, that inference requires a number of inferential leaps not free of alternative explanations; thus, even if a reasonable inference of supracompetitive pricing could be drawn, Intel's showing is not compelling. But even if Intel may be deemed to have made a sufficient showing of plausibility under Rule 12(b)(6), the critical question is whether Intel has plausibly shown that the supracompetitive prices were the *result of patent aggregation*. Here, the Court finds Intel has not made such a showing. There are several reasons.

As an example, for the '331 patent (which the Court notes is actually a complementary patent in the first market), VLSI's damages expert opined that a reasonable royalty for that patent alone would be approximately ▆▆▆▆▆▆▆; however, there is no allegation in the SAC that the expert reached that valuation *taking into account the fact that VLSI had aggregated substitutes for the '331 patent*. *See* SAC ¶ 274 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (emphasis added). The increase in value could have been based on development in technology and the market independent of any aggregation.

More generally, although it is *possible* that the supracompetitive prices for the patents were due, if only in part, to patent aggregation, Intel must show plausibility, not mere possibility under

---

[5] Intel has argued (and alleged) that it could have brought more (and better) comparisons if Defendants had agreed to let Intel use confidential information it obtained from the patent infringement lawsuits brought by the PAEs. Although the Court is not without some sympathy for Intel, it also notes that Intel could have brought antitrust counterclaims in those suits – where it could have used that confidential information without issue.

[6] The Court acknowledges Defendants' argument that the comparison involving the '331 patent is not apt because ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See* Mot. at 20-21 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

*Iqbal/Twombly*. The problem for Intel is that the holistic picture painted in the SAC weighs against this plausibility. For example, for the second market (for arbitrating multiple requests to access a memory bus), Intel has identified only two substitute patents that were aggregated: one held by Uniloc and the other held by VLSI. Given that Fortress and the *two* PAEs aggregated only *two* substitute patents, it is implausible that it was the aggregation that enabled them to charge supracompetitive prices – at least, where no other information is alleged about how many substitute patents are in the market or that these two patents are key to products in the market – *i.e.*, they constitute the "crown jewels" in the field. The Court has no idea how critical these two substitute patents are and what alternative substitutes exist. Although the third and fourth markets involve aggregation of more patents – seven and five, respectively – the aggregation is still quite limited in scope,[7] and, again, there is a complete absence of any allegations about mere essentiality and their functional and economic importance. Notably, Intel was not without ability to make those allegations. Although Intel has asserted that Defendants have obscured from the public what patents they own or have control over, Intel should still be able to explain why the patents that it knows Defendants have aggregated are, *e.g.*, the "crown jewels" of the field. In the prior order dismissing the first complaint, the Court specifically invited Intel (and Apple) to include such allegations. *See* Docket No. 229 (Order at 25) (stating that "[t]he ability to extract a supracompetitive royalty is easier to infer if Defendants held the crown jewels, but no such allegation is made in the FAC"). At the hearing on the instant motion, despite the repeated invitation of the Court to elaborate on the qualitative allegations that would support an inference of supracompetitive prices *being the result* of aggregation, Intel stated that it would stand on its current complaint. Such qualitative information, while not necessarily the *sine qua non* of market power, is material here where the showing of supracompetive pricing is itself less than compelling.

Furthermore, to the extent Intel's patent aggregation theory involves Defendants' assertion of those patents against others – *e.g.*, in serial patent infringement litigation – here, Intel's claim of

---

[7] The third market involves alleged aggregation by just four PAEs: INVT, Seven, VLSI, and Uniloc. The fourth market involves alleged aggregation by two PAEs only: Uniloc and VLSI.

14

serial litigation with respect to the markets at issue is premature:

- For the second patent market (arbitrating multiple requests to access a memory bus), Intel has been sued for infringement of the '983 patent in two cases (No. C-19-0426 (D. Del.) and No. C-19-0256 (W.D. Tex.). The two cases, however, are not true "serial" cases because VLSI dismissed the Delaware suit approximately a month after initiating it and chose to bring three suits (including No. C-19-0256) in Texas instead. Intel has not yet been sued for the other substitute patent in the market (*i.e.*, the '687 patent).
- For the third patent market (third-party device authorization through limitation of information exchanged), Intel has been sued for infringement of the '633 patent (No. C-18-0966 (D. Del.). Intel has not been sued for any of the other six substitute patents.
- For the fourth patent market (for MOSFET channel fabrication), Intel has been sued for infringement of the '303 patent (No. C-17-5671 (N.D. Cal.). Intel has not been sued for any of the other four substitute patents.

In short, Intel has not alleged sufficient facts establishing it has been subject to the unreasonable restraint of trade in the form of serial suits strategically brought to extract compensation not reflective of the merits or that it has been faced with the dilemma of being confronted with an aggregated portfolio of patents leaving it with no viable alternatives in a particular market.

Because the Court concludes that Intel has failed to allege that supracompetitive pricing was a result of the patent aggregation, Intel's antitrust claims are hereby dismissed. As Intel also made clear at the hearing that it would stand on the allegations made in the SAC, the dismissal is with prejudice. The Court need not address Defendants' remaining arguments, including but not limited to whether Intel must show restricted output in addition to supracompetitive pricing to establish direct evidence of anticompetitive effects.

D. <u>Anti-SLAPP Motion</u>

Previously, the Court declined to address arguments specific to Plaintiffs' UCL claim

15

because the claim was derivative of the federal antitrust claims. *See* Docket No. 187 (Order at 34). However, Defendants make clear in the pending motion that, if the Court rules against Intel, then it must address their anti-SLAPP motion with respect to the UCL claim because, if that motion is successful, they can be awarded their fees.

"SLAPP" stands for strategic lawsuit against public participation. California has an "anti-SLAPP" statute designed "'to allow early dismissal of meritless . . . cases aimed at chilling expression [or the right to petition] through costly, time-consuming litigation." *Verizon Del., Inc. v. Covad Comms. Co.*, 3i77 F.3d 1081, 1090 (9th Cir. 2004). The statute provides in relevant part as follows: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1).

> "The analysis of an anti-SLAPP motion proceeds in two steps." At step one, "the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." When a claim is mixed, meaning that it is based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at the first step. Only if the Court determines that relief is sought based on protected activity [**14] does it reach the second step.
>
> At step two, "the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." The Court "will review anti-SLAPP motions to strike under different standards depending on the motion's basis." "[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." . . .
>
> "[W]hen an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply." . . .
>
> If the plaintiff ultimately fails to meet its burden at the second step, the claim based on protected activity is stricken and "[a]llegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing."

*Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 810-11 (N.D. Cal. 2019).

The critical threshold issue in the instant case is whether Defendants have shown that the UCL/antitrust claim arises from protected activity (*i.e.*, the filing of patent infringement lawsuits). Defendants acknowledge that the Court previously held that Plaintiffs' lawsuit was "not covered by the *Noerr-Pennington* doctrine," Reply at 24 – *i.e.*, because the heart of the suit was about the aggregation of patents, and the patent infringement suits were, in effect, secondary. *See* Docket No. 187 (Order at 26) (stating that, under *Noerr-Pennington*, "liability cannot be predicated on petitioning activity but if a defendant engages in anticompetitive conduct which does not constitute petitioning activity, it cannot immunize itself from liability for litigation-related damages if it asserts or tries to assert its unwarranted accumulation of market power through litigation"). But Defendants argue that

> the question of whether Intel's suit is covered by California's Anti-SLAPP statute presents a separate and distinct legal question. Moreover, "the protections afforded by the Anti-SLAPP statute are not coextensive with the categories of conduct or speech protected by the First Amendment." Thus, "courts determining whether conduct is protected under the anti-SLAPP statute look not to First Amendment law," but to the text of the statute.

Reply at 24.

Defendants' argument, however, is without merit. The text of the anti-SLAPP statute is as follows: "A cause of action against a person arising from any act of that person *in furtherance of the person's right of petition or free speech* under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike . . . ." Cal. Code Civ. Proc. § 425.16(b)(1) (emphasis added). Section 425.16(e) provides:

> As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

17

*Id.* § 425.16(e).

In light of the text above, the Court's *Noerr-Pennington* analysis equally applies here. There is no basis, in this context, to apply a different interpretation of what constitutes protected activity.[8] *See Select Portfolio Servicing v. Valentino*, 875 F. Supp. 2d 975, 988 (N.D. Cal. 2012) (stating that "[t]he first part of the anti-SLAPP inquiry is substantially the same as the inquiry into whether the *Noerr-Pennington* doctrine applies"; "'[i]n the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech'"). The "true" conduct that Intel claims is anticompetitive is the aggregation of patents; that is not an act in furtherance of the right of petition or free speech, as defined in § 425.16(e). *See Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 66 (2002) (stating that "the act underlying the plaintiff's cause or the act which forms the basis for the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech") (internal quotation marks omitted).

Implicitly recognizing this problem, Defendants contend that there is an independent reason why the "'arising from' prong is . . . satisfied": "Intel is seeking to enjoin Defendants' protected infringement suits, which amounts to a prior restraint on Defendants' protected activity." Reply at 24. *See, e.g.*, *Equilon*, 29 Cal. 4th at 67 n.4 (noting that Equilon sought "injunctive relief that expressly would restrict Consumer Cause's exercise of petition rights"). But it is not clear from the SAC that Intel is seeking to enjoin any patent infringement suits per se. Certainly, the prayer for relief in the SAC does not refer to such relief. *See* SAC, Prayer ¶¶ (a), (c) (asking *in general terms* that "Defendants' unlawful conduct be declared [an antitrust] violation" and that an order be issued "directing the termination of the anticompetitive conduct and injunctive relief that restores competition to the markets at issue"). Defendants suggest that Intel must be seeking such relief because, in its opposition, it refers to "Defendants' patent aggregation *and assertion* scheme." Opp'n at 40 (emphasis added). But this mere reference to patent assertion does not clearly establish that Intel is seeking an injunction that would bar Defendants from filing patent

---

[8] Defendants do not contend that the California constitution applies a standard different from *Noerr-Pennington*.

18

infringement lawsuits.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss (with prejudice) but denies its anti-SLAPP motion to strike.

The Clerk of the Court is ordered to enter a final judgment in accordance with the above and close the file in the case.

The Clerk of the Court is also instructed to file under seal Part III of this order – at least on a temporary basis. The parties are ordered to meet and confer to determine which portions of Part III need to be filed under seal. The request to seal should be narrowly tailored and should be supported by a declaration. The sealing request shall be filed within a week of the date of this order.

This order disposes of Docket No. 244.

**IT IS SO ORDERED.**

Dated: September 28, 2021

_____
EDWARD M. CHEN
United States District Judge